**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE ZOBAY, individually, and for the estate of STEPHEN S. EVERHART, LINDSAY M. EVERHART, ABDUL GHAFFAR MUGHAL, SITORAI KHASANZOD, KHALID MUGHAL, HAMID MUGHAL, ANGELA MUGHAL, N.M., by and through her next friend Abdul Ghaffar Mughal, M.M., by and through his next friend Abdul Ghaffar Mughal, WAYNE NEWBY, THERESA HART, NATHAN NEWBY, JASON RZEPA, CASSANDRA RZEPA, C.R., by and through his next friend Cassandra Rzepa, K.R., by and through his next friend Adrian Davis, TYLER N. OGDEN, WILLIAM M. CHINN, SEAN M. NIQUETTE, LAUREN NIQUETTE, THOMAS NIQUETTE, MARY NIQUETTE, ED ELLIOTT, BRIAN C. ALLDRIDGE, JOANN ALLDRIDGE, RONALD ALLDRIDGE, DIANNA ALLDRIDGE, TODD JEFFREY ALLDRIDGE, ANDREW MAJOR, ASHLEY MAJOR, ALYSSA MAJOR, MARCUS JAMIL SULLEN, DAVID EUGENE HICKMAN, VERONICA HICKMAN, DEVON F. HICKMAN, TAMMIE FROST, individually, and for the estate of RUSSELL FROST, MADISON FROST, CRYSTAL FROST, AMANDA FROST, WAIEL EL-MAADAWY, BILQIS AIDARA ADJEI, ALEXIS GRANT, MALIK ELMAADAWY, G.E., by and through his next friend Latasha Elmaadawy, ZEINAB EL-MAADAWY, IHAB EL-MAADAWY, TAMER EL-MAADAWY, MOHAMMED EL-MAADAWY, MUSTAFA EL-MAADAWY, AMR MOHAMED, BRENDA MOHAMED, <br><br>            Plaintiffs, <br><br>      v. <br><br> MTN GROUP LIMITED, MTN IRANCELL, MTN DUBAI LIMITED, ZTE CORPORATION, ZTE (USA) INC., and ZTE (TX) INC., <br><br>            Defendants. | JURY TRIAL DEMANDED <br><br><br> Case No.: 21-cv-3503 |

**COMPLAINT FOR VIOLATION**
**OF THE ANTI-TERRORISM ACT**

Ryan R. Sparacino
 (*pro hac vice* forthcoming)
Eli J. Kay-Oliphant
 (EDNY Bar No. EK8030)
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, DC 20036
Tel: 202.629.3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

DEFENDANTS ............................................................................................................... 5

    A.    The MTN Defendants ........................................................................................ 5

    B.    The ZTE Defendants ......................................................................................... 6

JURISDICTION AND VENUE ...................................................................................... 6

FACTUAL ALLEGATIONS .......................................................................................... 7

    I.    SINCE THE ISLAMIC REVOLUTION IN 1979, THE ISLAMIC
    REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE,
    HAS FOMENTED AND SUSTAINED ANTI-AMERICAN TERRORISM ............. 7

    A.    The Islamic Revolutionary Guard Corps, including the Qods Force, has
    long supported anti-American terrorism as part of Iran's foreign policy .............. 7

    B.    The Islamic Revolutionary Guard Corps, including the Qods Force, has
    historically relied on fronts, operatives, and agents to fund, arm, and
    operationally support Iran's anti-American terrorist proxies................................ 17

    II.    DEFENDANTS TRANSACTED BUSINESS WITH FRONTS,
    OPERATIVES, AND AGENTS CONTROLLED BY THE ISLAMIC
    REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE ........... 20

    A.    An Iranian-backed Shiite terrorist alliance comprised of Hezbollah, Jaysh
    al-Mahdi, and the Islamic Revolutionary Guard Corps, including the Qods
    Force, waged a deadly terrorist campaign against Americans in Iraq ................. 21

        1.    Hezbollah ................................................................................................. 26

        2.    Jaysh al-Mahdi .......................................................................................... 30

        3.    Asaib Ahl al-Haq, a Jaysh al-Mahdi Special Group ....................................... 33

        4.    Kataib Hezbollah, a Jaysh al-Mahdi Special Group ...................................... 34

    B.    The Islamic Revolutionary Guard Corps's, including the Qods Force's,
    control of Iran's telecom, information technology, and communications
    sectors ............................................................................................................... 36

        1.    The Bonyad Mostazafan ............................................................................. 36

        2.    Iran Electronics Industries ........................................................................ 43

i

3.     MTN Irancell ................................................................. 44

4.     Telecommunications Company of Iran.......................... 45

5.     The Akbari Front Companies......................................... 47

III.    DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, PROVIDED FINANCING, WEAPONS, AND OPERATIONAL SUPPORT TO TERRORISTS ............................................ 48

A.    The Islamic Revolutionary Guard Corps, including the Qods Force, raised funds, purchased weapons, and obtained operational support through illicit corporate transactions in the telecom, communications, and IT sectors............... 48

B.    Defendants made illicit deals with fronts, operatives, and agents of the Islamic Revolutionary Guard Corps, Including the Qods Force........................... 51

IV.    DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR TRANSACTIONS WITH THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, FACILITATED TERRORIST ATTACKS ON AMERICANS IN IRAQ .................................................... 53

A.    Defendants' transactions directly funded, armed, and operationally supported terrorist attacks on Americans in Iraq .................................................... 53

B.    Defendants knew or recklessly disregarded that their transactions with Islamic Revolutionary Guard Corps, including Qods Force, fronts, operatives, and agents aided terrorism.................................................. 59

V.    EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, AND THEIR TERRORIST PROXIES HEZBOLLAH AND JAYSH AL-MAHDI ................................................ 66

A.    The MTN Defendants ............................................................. 66

1.     MTN secured its joint venture with the Islamic Revolutionary Guard Corps, including the Qods Force, in MTN Irancell through bribes and a contractual promise to aid Iran-backed terrorism ......................................... 66

2.     MTN knowingly assumed a financial and operational role in the Islamic Revolutionary Guard Corps's, including the Qods Force's, terrorist enterprise ......................................................... 81

a.    MTN assumed a financial role in the terrorist enterprise .............................. 84

        b.   MTN assumed an operational role in the terrorist enterprise ........................ 87

    3.     MTN's joint venture with the Islamic Revolutionary Guard Corps, including the Qods Force, comports with its historical business practices in international markets ................................................. 102

    4.     MTN's joint venture with the Islamic Revolutionary Guard Corps, including the Qods Force, had a substantial nexus to the United States....... 104

        a.   MTN's conduct targeted the United States................................... 105

        b.   MTN's conduct relied on American contacts ............................... 109

B.     The ZTE Defendants................................................................. 112

    1.     ZTE knowingly assumed a financial and operational role in the Islamic Revolutionary Guard Corps's, including the Qods Force's, terrorist enterprise................................................................ 112

    2.     ZTE's assistance to the Islamic Revolutionary Guard Corps, including the Qods Force, comports with its historical sales practices in international markets................................................... 119

    3.     ZTE's assistance to the Islamic Revolutionary Guard Corps, including the Qods Force, had a substantial nexus to the United States...................... 121

        a.   ZTE's conduct targeted the United States .................................... 122

        b.   ZTE's conduct relied on American contacts.................................. 126

VI.   HEZBOLLAH, JAYSH AL-MAHDI, AND THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, USED DEFENDANTS' FUNDS AND OPERATIONAL AID TO FINANCE TERRORIST OPERATIONS, BUY AND/OR BUILD ADVANCED WEAPONS SPECIALLY DESIGNED TO TARGET AMERICANS IN IRAQ, AND SUSTAIN THE JOINT CELLS USED TO COMMITT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS IN IRAQ.................................................................................. 127

A.     Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, created Jaysh al-Mahdi and Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah.................................. 129

B.     Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, provided Jaysh al-Mahdi with the weapons used to attack Americans in Iraq.................................................................. 136

C.      Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, provided Jaysh al-Mahdi with key training and logistical support to attack Americans in Iraq ................................................... 139

D.      Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, routed funds to Jaysh al-Mahdi to finance attacks against Americans in Iraq ........................................................................ 144

VII.      JOINT CELLS COMPRISED OF HEZBOLLAH, JAYSH AL-MAHDI, AND ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING QODS FORCE, KILLED AND INJURED PLAINTIFFS THROUGH TERRORIST ATTACKS FOR WHICH DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE ...................................................................................................... 145

A.      The June 23, 2011, EFP attack in Baghdad ....................................... 150

     1.      The Everhart Family and Estate ................................................. 151

     2.      The Mughal Family ................................................................... 152

B.      The July 7, 2011, EFP attack in Baghdad ......................................... 153

     1.      The Newby Family ................................................................... 154

     2.      The Rzepa Family .................................................................... 154

C.      The July 8, 2011, Rocket attack in Baghdad ..................................... 155

     1.      The Ogden Family .................................................................... 156

D.      The July 10, 2011, Rocket attack in Basra ........................................ 156

     1.      The Chinn Family ..................................................................... 157

     2.      The Niquette Family ................................................................. 157

E.      The July 15, 2011, EFP attack in Basra ........................................... 158

     1.      The Elliott Family ..................................................................... 159

F.      The October 12, 2011, Rocket attack in Basra ................................. 159

     1.      The Alldridge Family ............................................................... 160

G.      The November 2, 2011, Explosive attack in Diwaniyah .................... 161

     1.      The Sullen Family .................................................................... 161

H.      The November 14, 2011, EFP attack in Baghdad ............................. 162

      1.     The Hickman Family ................................................................... 163

I.     The January 15, 2016, Kidnapping attack in Baghdad ....................... 163

      1.     The Frost Family and Estate ........................................................ 165

      2.     The El-Maadawy Family .............................................................. 166

      3.     The Mohamed Family.................................................................. 168

CLAIMS FOR RELIEF ................................................................................. 169

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate] .......................... 169

COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate] .......................... 171

COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
§ 2333(d) [All Defendants:  Aiding-And-Abetting Liability, Attack Predicate]........................ 173

JURY DEMAND ............................................................................................ 175

PRAYER FOR RELIEF ................................................................................. 175

## INTRODUCTION

1.     This lawsuit seeks damages under the federal Anti-Terrorism Act on behalf of American service members and civilians, and their families, who were killed or wounded while serving their country in Iraq between 2011 and 2016.  Plaintiffs seek to hold MTN, a South African telecom company, and ZTE, a Chinese telecom company and technology manufacturer, accountable for their substantial assistance to terrorists in Iraq.  Plaintiffs' allegations are based on information derived from confidential witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence reporting, congressional testimony and reports, press accounts, and Plaintiffs' recollections.

2.     After the U.S.-led invasion of Iraq in 2003, an alliance of Shiite terrorists led by Hezbollah and its Iraqi proxy, Jaysh al-Mahdi, and funded and armed by the Islamic Revolutionary Guard Corps (the "IRGC"), also known as the Iranian Revolutionary Guard Corps, including its subordinate international branch the Qods Force, combined forces to pursue a shared terrorist campaign against Americans in Iraq.  To attack the citizens protected by the world's most powerful military, the terrorists formed joint cells comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force ("Joint Cells").  To further their shared goal of driving America out of Iraq, the Joint Cells attacked civilians indiscriminately; conducted kidnappings, torture, and executions; and refused to identify themselves or otherwise comply with the Geneva Conventions.

3.     While Plaintiffs, or their loved ones, worked to stabilize Iraq nearly a decade after the U.S. invasion, they were attacked by an Iran-backed, Hezbollah-led terrorist campaign that MTN's and ZTE's transactions helped finance, arm, and logistically support.  MTN and ZTE are large multinational companies that had lucrative business with Iranian entities that MTN and ZTE knew, or recklessly disregarded, served as fronts for terrorist finance and logistics, and

1

MTN and ZTE engaged in illicit, terrorism-sanctions-busting transactions with known terrorist fronts in order to boost their profits.  Those transactions aided and abetted terrorism by directly funding, arming, and logistically supporting a terrorist campaign that stretched for more than a decade, killing and injuring thousands of Americans.

4.     Both MTN and ZTE did business with Iranian companies, such as the Bonyad Mostazafan, that were notorious fronts for the IRGC, including the Qods Force.  Through that business both MTN and ZTE provided direct financial support, revenue, U.S.-origin, embargoed technology and equipment, and training and expertise—all of which the IRGC, including the Qods Force, provided to Hezbollah and Jaysh al-Mahdi terrorists operating in Iraq—and all of which was used to target to kill and injure Americans.

5.     MTN and ZTE profited by aiding Iran-backed terror.  As long-term strategic partners with one another who worked closely together in Iran, MTN and ZTE both understood their Iranian counterparties were terrorist fronts used to raise money and source weapons for terrorists, and MTN and ZTE knew or were willfully blind to the fact that their "business" with terrorist front counterparties was serving the terrorists' ends, but proceeded in any event.

6.     The IRGC, including the Qods Force, used its relationships with MTN and ZTE to optimize Iran's terrorist enterprise by bolstering the capacity of Iran's lead terrorist agent, Hezbollah.

7.     Through the IRGC's, including Qods Force's, transactions with MTN and ZTE, Hezbollah and its Iraqi terrorists were able to evade the international sanctions regime to source weapons and weapons components for terror, modernize their communications systems to better encrypt signals traffic, improve their surveillance and intelligence capabilities, and generate tens

of millions in annual revenue to fund Hezbollah-led attacks – all of which Hezbollah, and the proxies it commanded in Iraq, used to attack Americans there from 2011 through 2016.

8.     The amount of money that Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force, obtained via MTN's and ZTE's business in Iran is staggering—and the terrorists used those funds to pay for the Joint Cells' campaign by Hezbollah and its terrorist proxies in Iraq.  But this case is not just about money:  The technology that MTN and ZTE provided to the IRGC, including the Qods Force, which flowed through those groups to Hezbollah for use by the Joint Cells in Iraq, was uniquely important to the terrorists, enabling them to inflict maximum damage because, among other things, it allowed them to monitor Americans, avoid detection, clandestinely communicate, build and detonate better and more effective bombs, and develop more accurate and lethal rockets.

9.     MTN and ZTE went beyond helping to fund and arm Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force.  Defendants also provided substantial ongoing logistical and operational aid for the IRGC's, including the Qods Force's, terrorist enterprise.

10.     MTN and ZTE supported the terrorists with actual knowledge of what they were doing.  Indeed, the terrorists literally made MTN sign an agreement pledging to support their "security" needs, which all involved understood to be a euphemism for anti-American terror.

11.     This is not a case about one or two alleged rogue employees who engaged in a frolic and detour that resulted in a company's money reaching terrorists.  Here, each Defendants' executives were thoroughly implicated in the terrorist finance and logistics scheme, and actively supported doing business with the known terrorist fronts.

12.     Indeed, MTN's leadership even mocked those who raised concerns about the risks of becoming joint venture partners with two notorious Iranian terror fronts:  When queried by

3

investors about the "risk of doing business with Iran," MTN's then-CEO "laughed off" such questions, joking that "[MTN] hadn't budgeted for bomb shelters or anything like that."

13.     ZTE's executives were similarly culpable.  According to the then-Acting Assistant Attorney General, Mary B. McCord, "ZTE engaged in an elaborate scheme to acquire U.S.-origin items, send the items to Iran and mask its involvement in those exports," and the plea agreement ZTE signed "alleges that the highest levels of management within the company approved the scheme."

14.     MTN's and ZTE's transactions, and the terrorist attacks they funded, were acts of "international terrorism."  18 U.S.C. § 2333(a).  Since 1997, the United States has designated Hezbollah as a Foreign Terrorist Organization.  Since 2007, the United States has designated the Qods Force as a Specially Designated Global Terrorist.  Both designations reflect Hezbollah's and the IRGC's, including the Qods Force's, status among the world's deadliest terrorist groups.

15.     The Joint Cells' terrorist attacks against Plaintiffs were "planned," "authorized," and jointly "committed" by Hezbollah, 18 U.S.C. § 2333(d)(2), the Islamist terrorist group that serves as the lead worldwide terrorist agent for the IRGC, including the Qods Force.  Hezbollah and the IRGC, including the Qods Force, have long been fused together:  Hezbollah pledged allegiance to the IRGC, including the Qods Force, who, in turn, serve as Hezbollah's lead patron, protector, funder, and weapons supplier.  Hezbollah and the IRGC, including the Qods Force, shared money, weapons, and personnel in Iraq, Iran, and Lebanon.

16.     Plaintiffs are U.S. citizens, and their family members, who served in Iraq between 2011 and 2016 and who were killed or wounded in terrorist attacks committed by a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force.  As alleged below, Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act

("ATA").  MTN and ZTE violated the ATA, 18 U.S.C. § 2333(a), by providing material support to Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force, in violation of U.S. criminal law.  They are also secondarily liable under the ATA, 18 U.S.C. § 2333(d)(2), because they aided and abetted the campaign by Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force, to commit terrorist attacks in Iraq that were committed, planned, or authorized by Hezbollah, a designated Foreign Terrorist Organization.

17.     Each Plaintiff was killed or injured by a terrorist attack committed by terrorists who received direct funding, weapons, weapons components, communications technology, and/or operational support made possible by MTN's and ZTE's conduct.

## DEFENDANTS

### A.  The MTN Defendants

18.     Defendant MTN Group Limited ("MTN Group," together with its subsidiaries, "MTN") is a South African telecommunications company whose stock trades publicly on the Johannesburg Stock Exchange under the ticker symbol MTN:SJ.  Its principal place of business is in Roodepoort, South Africa.

19.     Defendant MTN Irancell is a joint venture between MTN Group, which has a 49% stake and is not in charge, and the Bonyad Mostazafan and Iran Electronics Industries ("IEI"), which collectively own a 51% stake and are fronts for the IRGC, including the Qods Force (sometimes abbreviated "IRGC-QF").  MTN Irancell is an Iranian company and its principal place of business is in Tehran, Iran.  MTN Irancell operates as, and MTN Irancell's employees and agents work as operatives for, a front for the IRGC, including the Qods Force.

20.     Defendant MTN (Dubai) Limited ("MTN Dubai") is a wholly owned subsidiary of MTN Group.  It is a Dubai company, and its principal place of business is in Dubai.

### B. The ZTE Defendants

21.     On information and belief, Defendant ZTE Corporation ("ZTE Corporation," together with its subsidiaries, "ZTE"), is a Chinese corporation with a principal place of business located at ZTE Plaza, Keji Road South, Hi-Tech Industrial Park, Nanshan District, Guangdong Province, People's Republic of China 518057.

22.     On information and belief, Defendant ZTE (USA), Inc. ("ZTE USA") is a New Jersey Corporation that is as wholly-owned subsidiary of ZTE, headquartered and authorized to do business at 2425 North Central Expressway, Suite 323, Richardson, Texas, 75080.

23.     On information and belief, Defendant ZTE (TX) Inc. ("ZTE TX") is a wholly-owned subsidiary of ZTE Corporation.  ZTE TX is a corporation organized and existing under the laws of the State of Texas with its principal place of business in California at 1900 McCarthy Boulevard, #420, Milpitas, California 95035.

### JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 2331.

25.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

26.     MTN's acts in the United States, including but not limited to obtaining U.S.-origin technology and equipment for export to Iran, and targeting the United States, including by entering into transactions with fronts, operatives, and agents for the IRGC, including the Qods Force, that were intent on harming United States nationals in Iraq, make appropriate this Court's jurisdiction over MTN.

27.     ZTE's acts in the United States, including but not limited to obtaining U.S.-origin technology and equipment for export to Iran, and targeting the United States, including by

entering into transactions with fronts, operatives, and agents for the IRGC, including the Qods

Force, that were intent on harming United States nationals in Iraq, make appropriate this Court's

jurisdiction over ZTE.

28.    Venue is proper in this District under 18 U.S.C. § 2334(a), because Plaintiffs

Zeinab El-Maadawy, Mustafa El-Maadawy, and Ihab El-Maadawy reside in the District.

## FACTUAL ALLEGATIONS

I.    **SINCE THE ISLAMIC REVOLUTION IN 1979, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, HAS FOMENTED AND SUSTAINED ANTI-AMERICAN TERRORISM**

A.    **The Islamic Revolutionary Guard Corps, including the Qods Force, has long supported anti-American terrorism as part of Iran's foreign policy**

29.    Iran is politically and ideologically hostile to the United States and its allies.  Iran

often acts through its lead terrorist agent, Lebanese Hezbollah (or "Hezbollah") – a designated

Foreign Terrorist Organization since 1997 – which Iran funds, arms, and logistically supports.

Through Hezbollah, Iran provides material support and resources for acts of international

terrorism targeting the United States and its overseas interests.[1]

30.    The 1979 Iranian Revolution was fueled in large part by militant anti-

Americanism.  Eliminating the United States's role in the geographic region surrounding Iran –

including through violence – was and remains a central tenet of Iranian foreign policy.[2]  Since

---

[1] Federal courts have repeatedly held that Hezbollah is an agent of the IRGC, including the Qods Force.  *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 61 (D.D.C. 2018), *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 53-55 (D.D.C. 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

[2] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*").

the Iranian Revolution, the IRGC, including the Qods Force, has engaged in and supported acts

of terrorism directed at the United States and its allies as an instrument of Iran's foreign policy.

31.     Enmity toward America is foundational for the Iranian regime in general, most of

all, Grand Ayatollah Khamenei, who is the effective leader of the IRGC, including the Qods

Force, both of which are responsible to him personally.  At a 2005 rally, Khamenei explained,

"Our people say 'Death to America,' and this is like the saying 'I seek God's refuge from the

accursed Satan,' which is recited before any chapter of the Koran, even before 'In the name of

Allah the Compassionate, the Merciful.'"   Khamenei said the routine chanting of "Death to

America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready

to attack him. . . .   The saying 'Death to America' is for this purpose."[3]

32.     As a result of the IRGC's consistent and longstanding support of anti-American

terrorism, Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to

section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the

Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control

Act (22 U.S.C. § 2780).  The United States has maintained that designation at all times since.

33.     On October 29, 1987, President Ronald Reagan issued Executive Order 12613

based upon his finding "that the Government of Iran is actively supporting terrorism as an

instrument of state policy," and also as a result of Iran's "aggressive and unlawful military action

against U.S.-flag vessels."  Exec. Order 12813, 52 Fed. Reg. 4194D (Oct. 30, 1987).

34.     In 1990, the IRGC transferred activities outside of Iran to its subordinate branch,

the Qods Force, which translates to "Jerusalem Force," in reference to the IRGC's desire to

destroy the state of Israel and take back Jerusalem.

---

[3] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

35.     On March 15, 1995, President Clinton announced that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security … of the United States. …"  Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).

36.     On August 21, 1997, President Clinton issued Executive Order 13059 to consolidate and clarify Executive Orders 12957 and 12959, and comprehensively prohibit trade intended to benefit, among other things, the IRGC, including the Qods Force.  Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997).  (That same year, the U.S. also designated Iran's lead terror agent, Hezbollah, as an FTO.)

37.     In 1998, Brigadier General Qassem Soleimani was appointed head of the Qods Force, a role in which he served continuously until his death in a U.S. airstrike in 2020.

38.     The Department of Treasury implemented regulations pursuant to these Executive Orders which, in general, broadly prohibit any economic transactions with any entities that are controlled by the Government of Iran.  31 C.F.R. § 560.304 (defining "Government of Iran"), 31 C.F.R. § 560.313 (defining "entity owned or controlled by the Government of Iran"); 31 C.F.R. § 560.314 (defining "United States person").

39.     In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[4]

40.     On October 25, 2007, the U.S. Treasury Department designated the Qods Force as a Specially Designated Global Terrorist (or "SDGT") under Executive Order 13224 ("E.O. 13224") for providing material support to terrorist groups in Iraq and other terrorist organizations, including Hezbollah; the U.S. also designated multiple Qods Force members as

---

[4] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

Specially Designated Nationals pursuant to E.O. 13224, based on their activities in Iraq,

including their support for Hezbollah.[5]

41.     Announcing the Qods Force's SDGT-related designations, the Treasury

Department stated as follows in its official press release:

> The U.S. Government is taking [] major actions today to counter Iran's …
> **support for terrorism** by exposing **Iranian … companies** and individuals that
> have been involved in these dangerous activities and by cutting them off from the
> U.S. financial system. … The Treasury Department [] designated the IRGC-Qods
> Force (IRGC-QF) under E.O. 13224 for providing material support to … terrorist
> organizations…
>
> Last week, the Treasury Department issued a warning to U.S. banks setting forth
> the risks posed by Iran…. Today's actions are consistent with this **warning, and
> provide additional information to help [] institutions protect themselves from
> deceptive [] practices by Iranian entities and individuals engaged in or
> supporting … terrorism. …** As a result of our actions today, all transactions
> involving any of the designees and any U.S. person will be prohibited … Today's
> designations also **notify the international private sector of the dangers of doing
> business with … the many IRGC-affiliated companies that pervade several
> basic Iranian industries. …**
>
> **Support for Terrorism -- Executive Order 13224 Designations**
> E.O. 13224 is an authority aimed at freezing the assets of **terrorists and their
> supporters, and at isolating them from the U.S. financial and commercial
> systems**. Designations under the E.O. prohibit all transactions between the
> designees and any U.S. person …
>
> **IRGC-Qods Force (IRGC-QF):** The Qods Force, a branch of the [IRGC],
> provides material support to the Taliban, Lebanese Hizballah, Hamas, [and]
> Palestinian Islamic Jihad …
>
> The Qods Force is the Iranian regime's primary instrument for providing lethal
> support to the Taliban. The Qods Force provides weapons and financial support to
> the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. …
> Through Qods Force material support to the Taliban, we believe Iran is seeking to
> inflict casualties on U.S. and NATO forces.
>
> The Qods Force has had a **long history of supporting Hizballah's military,
> paramilitary, and terrorist activities, providing it with guidance, funding,**

---

[5] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

*weapons, intelligence, and logistical support*. The Qods Force operates training camps for Hizballah in Lebanon[] … and has [] trained more than 3,000 Hizballah fighters at *IRGC training facilities in Iran*. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

In addition, the Qods Force provides *lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition … forces* ...[6]

42.     On May 27, 2009, the U.S. Treasury Department announced additional IRGC-related sanctions further reflecting the long-standing U.S. conclusion that the IRGC used its revenue to pay for Hezbollah's operations and training activities:

The U.S. Department of the Treasury [] designated … two Africa-based supporters of the Hizballah terrorist organization, under E.O. 13224. E.O. 13224 targets *terrorists and those providing support to terrorists or acts of terrorism* by … prohibiting U.S. persons from engaging in any transactions with them.

"We will continue to take steps to protect the financial system from the threat posed by *Hizballah and those who support it*," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. …  Iran … provide[s] significant support to Hizballah, giving money, weapons and training to the terrorist organization.  In turn, Hizballah is closely allied with and has an allegiance to [Iran].  *Iran is Hizballah's main source of weapons and uses its Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon and Iran.*  Iran provides hundreds of millions of dollars per year to Hizballah.[7]

43.     The U.S. State Department has observed that "Iran used the [Qods Force] to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East.  The Qods Force is Iran's primary mechanism for cultivating and supporting terrorists abroad."[8]  The Qods Force is the driving force behind Iran's activities in Iraq, as well as in Syria, Afghanistan, and elsewhere in the Middle East.

---

[6] *Id.* (emphases added).

[7] Press Release, U.S. Treasury Dep't, *Treasury Targets Hizballah Network in Africa* (May 27, 2009) (emphases added).

[8] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

11

44.     The IRGC, including the Qods Force, has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing.  It also regularly trains foreign terrorist proxies whose attacks promote Iran's political goals, often working side-by-side with Hezbollah.

45.     The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani, was the chief of the Qods Force for more than twenty years and oversaw the Qods Force's support for Hezbollah and its proxies to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace Soleimani.

46.     The IRGC, including the Qods Force, provide weapons, funding, and training for terrorist operations targeting American citizens, including for Hezbollah and, through Hezbollah, for Jaysh al-Mahdi.  Iran's Supreme Leader and central government are aware of and encourage those acts.  Applying pressure against the United States by funding and supplying Hezbollah and other terrorist proxies in the Middle East and Central Asia is an official component of IRGC, including Qods Force, policy.

47.     The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

48.     The Qods Force's leader until his death, Qassem Soleimani, infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani boasted: "Dear General Petraeus, You Should know that I, Qassem Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan."

Soleimani taunted General Petraeus after Iran-backed, Hezbollah-trained Jaysh al-Mahdi terrorists in Baghdad and elsewhere launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured advanced rockets and explosively formed penetrators ("EFP") built by Hezbollah with IRGC-sourced components, which caused the U.S. government to protest Iranian terrorist activity in Iraq.

49.     The IRGC, including the Qods Force, has used Hezbollah and its proxies to commit terrorist attacks.  While it is a Lebanese-based terrorist group, Hezbollah has pledged fealty to Iran's Supreme Leader.  Each year the IRGC, including the Qods Force, provides Hezbollah approximately $100 million to $200 million in funding and weapons.  As Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) explained, "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[9]

50.     The IRGC, including the Qods Force, has long provided support – routed through Hezbollah – for terrorist attacks against American military forces and contractors in Iraq.  For example, the IRGC, including the Qods Force, sponsored a substantial training, logistics, travel, and communications campaign, all of which was implemented by Hezbollah (in Lebanon, Iran, and Iraq) using IRGC, including Qods Force, resources that enabled Hezbollah to train, guide, direct, and motivate Jaysh al-Mahdi terrorists, who operated as part of the Joint Cells with Hezbollah and the IRGC, including the Qods Force, targeting American service members and civilians in Iraq in key Iraqi geographies like Baghdad and Basra.

---

[9] *Killing Americans and Their Allies*.

13

51.     Similarly, the IRGC, including the Qods Force, paid for, and sourced key components necessary for Hezbollah to build, each EFP used by the Joint Cells, all of which were constructed by Hezbollah based upon Hezbollah designs.  Hezbollah then provided such EFPs to the Joint Cells at the instruction of the IRGC, including the Qods Force, for the Joint Cells to use to attack Americans in Iraq between 2011 and 2016.

52.     The IRGC, including the Qods Force, also paid for, and helped Hezbollah build and/or deliver, advanced rockets – including upgraded 107mm variants such as the IRGC-manufactured 107mm rockets known as Improvised Rocket-Assisted Munitions ("IRAMs") – which Hezbollah then provided to the Joint Cells at the instruction of the IRGC, including the Qods Force, for the Joint Cells to use to attack Americans in Iraq between 2011 and 2016.

53.     The IRGC, including the Qods Force, intentionally used Hezbollah to lead every aspect of its terrorist campaign against Americans in Iraq, at least in part, because the IRGC, including the Qods Force, wanted "plausible deniability" of Iranian involvement based upon the Iranian propaganda that Hezbollah is and was not an Iranian agent.  To that end, when MTN and ZTE provided embargoed technology and funds, and any other materials useful for terrorist tradecraft to their IRGC, including Qods Force, counterparties, those items flowed through the IRGC, including the Qods Force, to Hezbollah, which, in turn, distributed money, arms, and technology to Hezbollah's lead Shiite terrorist proxy in Iraq, Jaysh al-Mahdi.  In this way, the IRGC, including the Qods Force, were able to maintain influence on the terror campaign in Iraq while simultaneously delegating its planning, commission, and authorization to Hezbollah.

54.     Because Hezbollah is widely understood amongst officials of the U.S. government, and those in academia, business, and the media, to be a part of the IRGC, including the Qods Force, it is not uncommon for U.S. officials to lump "Hezbollah" into discussions of

14

IRGC, including Qods Force, malign activity in Iraq.  For the avoidance of all doubt, Plaintiffs allege that all or nearly all of the support that the IRGC, including the Qods Force, provided to Jaysh al-Mahdi as described in this Complaint – including the funds, weapons, weapons components, communications technology, and computers – was routed through Hezbollah in its capacity as the IRGC's and Qods Force's lead terrorist agent worldwide and in its status as a constituent member of both organizations.  Plaintiffs expressly disclaim any allegation in this Complaint that the IRGC or Qods Force bypassed Hezbollah to directly fund, arm, or logistically support Jaysh al-Mahdi, and Plaintiffs allege that all such IRGC, including Qods Force, support of Jaysh al-Mahdi was either (a) routed through Hezbollah; or (b) provided in the context of a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force.

55.      Hezbollah's campaign of attacks via EFP, rocket, and hostage-taking inflicted nearly all the American casualties in Iraq between 2011 and 2016.

56.      On April 15, 2019, the U.S. State Department designated the IRGC, including the Qods Force, as a Foreign Terrorist Organization.[10]  Announcing the designation, President Trump explained that "the IRGC *actively participates in, finances, and promotes terrorism as a tool of statecraft*."[11]  According to the U.S. State Department's public statement explaining the designation, the IRGC, including the Qods Force, have "been directly involved in terrorist plotting; its support for terrorism is *foundational and institutional*, and it has killed U.S. citizens."[12]  Through the IRGC's, including the Qods Force's, support for terrorist organizations

---

[10] *See* 84 Fed. Reg. 15,278-01 (Apr. 15, 2019).

[11] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization (Apr. 8, 2019) (emphasis added).

[12] U.S. State Dep't, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019) (emphasis added).

throughout the region, "[t]he Iranian regime has made a clear choice not only to fund and equip, but also to fuel terrorism, violence, and unrest across the Middle East."[13]

57.     When the U.S. State Department designated the IRGC, including the Qods Force, as a Foreign Terrorist Organization, Secretary of State Michael R. Pompeo stated:

> This is the first time that the United States has designated a part of another government as an FTO. … ***[T]he Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government.*** …
>
> For 40 years, the [IRGC] has actively engaged in terrorism and created, supported, and directed other terrorist groups. The IRGC … regularly violates the laws of armed conflict; it plans, organizes, and executes terror campaigns all around the world. …
>
> The IRGC institutionalized terrorism shortly after its inception, directing horrific attacks against the Marine barracks in Beirut in 1983 and the U.S. embassy annex in 1984 alongside ***the terror group it midwifed, Lebanese Hizballah***. Its operatives have worked to destabilize the Middle East from Iraq to Lebanon to Syria and to Yemen. …
>
> The IRGC … supports: Lebanese Hizballah, Palestinian Islamic Jihad, Hamas, Kata'ib Hizballah, among others, all of which are already designated as foreign terrorist organizations. …
>
> Our designation makes clear … that [the] Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. … He ***doles out the regime's profits to terrorist groups across the region and around the world***.
>
> ***The blood of the 603 American soldiers the Iranian regime has found to have killed in Iraq is on his hands and on the hands of the IRGC more broadly***.[14]

58.     As the world's worst sponsor of terrorism, Iran is unique.  It is not a "normal" country, but a place where the IRGC, including the Qods Force, rely upon their corporate allies to directly enable violence in an open and shocking manner.  As Ambassador Mark D. Wallace,

---

[13] *Id.*

[14] Secretary of State Michael R. Pompeo, U.S. Department of State, *Remarks to the Press* (Apr. 8, 2019) (emphasis added).

the CEO of United Against Nuclear Iran ("UANI"), explained, "[i]nternational organizations must also realize that their relationship with Iran is not just … 'business as usual,' …  Put bluntly, Iran is in violation of many of its international treaty obligations, and it ***should not be treated like a member in good standing*** of international bodies."[15]

      **B.**      **The Islamic Revolutionary Guard Corps, including the Qods Force, has historically relied on fronts, operatives, and agents to fund, arm, and operationally support Iran's anti-American terrorist proxies**

59.     The IRGC, including the Qods Force, has a long and notorious history of relying on fronts, operatives, and agents to obtain funding, weapons, and operational support to benefit the IRGC's, including the Qods Force's, terrorist operations and Anti-American proxies around the world, most of all Hezbollah.

60.     On February 10, 2010, the U.S. Treasury Department announced additional IRGC front-related designations and stated that the IRGC, including the Qods Force, were using illicit commercial transactions to bolster Iran's terrorist enterprise:

> The U.S. Department of the Treasury [] took further action to implement existing U.S. sanctions against Iran's [IRGC] by designating an individual and four companies affiliated with the IRGC …  "As the ***IRGC consolidates control over broad swaths of the Iranian economy***, … ***it is hiding behind companies … to maintain vital ties to the outside world***," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey.  "Today's action … will help ***firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities***." …  The U.S. has previously acted against the IRGC and the IRGC-Qods Force for their involvement in proliferation and terrorism support activities, respectively. In joint actions on October 25, 2007, the State Department designated the IRGC, under E.O. 13382, for having engaged, or attempted to engage, in proliferation-related activities, and ***Treasury designated the IRGC--***

---

[15] Statement of the Honorable Mark D. Wallace, CEO United Against Nuclear Iran before the U.S. U.S. House of Representatives Committee on Foreign Affairs, *Iran Sanctions*, Congressional Testimony via FDCH (May 17, 2012) (emphasis added), 2012 WLNR 10405070 ("Wallace May 17, 2012 Testimony").

> *Qods Force pursuant to E.O. 13224 for providing material support to …*
> *terrorist organizations*. …[16]

61.     On August 3, 2010, the U.S. Treasury Department announced additional IRGC-

and Qods Force-related terrorist designations that bolstered the U.S. message that the "IRGC and

IRGC-QF" provided "Support for Terrorist Organizations," including Hezbollah, and relied upon

illicit commercial transactions to fund and arm the Hezbollah-led terrorist campaign against

Americans in Iraq:

> The U.S. Department of the Treasury announced [] a set of designations targeting
> the Government of Iran's support for terrorism and terrorist organizations,
> including Hizballah … Iran is the primary funder of Hizballah and has long been
> recognized as the most active state sponsor of terrorism. Today's designations
> expose Iran's use of its state apparatus – including the Islamic Revolutionary
> Guard Corps-Qods Force – and state-run social service organizations to support
> terrorism under the guise of … economic development …
>
> **IRGC and IRGC-QF Support for Terrorist Organizations:**
> The IRGC-QF is the Government of Iran's primary arm for executing its policy of
> supporting terrorist and insurgent groups. The IRGC-QF provides material,
> logistical assistance, training and financial support to militants and terrorist
> operatives throughout the Middle East and South Asia. It was designated by
> Treasury pursuant to E.O. 13224 in October 2007 for its support of terrorism.
>
> The Government of Iran also uses the Islamic Revolutionary Guard Corps (IRGC)
> and IRGC-QF to implement its foreign policy goals, including, but not limited to,
> *seemingly legitimate activities that provide* cover for intelligence operations and
> *support to terrorist and insurgent groups*. *These activities include economic*
> *investment … implemented by companies and institutions that act for or on*
> *behalf of, or are owned or controlled by the IRGC and the Iranian government*.
>
> - … In Iraq, the Government of Iran trains, equips, and funds Iraqi Shia
>   militant groups.
> - In the Levant, the IRGC-QF continues to support designated terrorist
>   groups such as Hizballah…[,] the largest recipient of Iranian financial aid,

---

[16] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10,
2010) (emphasis added).

training, and weaponry; and Iran's senior leadership has cited Hizballah as a model for other militant groups.[17]

62.     On December 21, 2010, the U.S. Treasury Department announced additional

IRGC-related designations, and stated once again that IRGC, including the Qods Force, relied

upon illicit commercial transactions, including through the Bonyads like Bonyad Mostazafan, to

facilitate Iran's terrorist enterprise:

> The U.S. Department of the Treasury announced [] a set of designations targeting the financial networks of the Islamic Revolutionary Guard Corps (IRGC) … Today's actions further expose the continued engagement of the IRGC … in illicit activities and deceptive behavior.
>
> "[T]he IRGC … [is a] major institutional participant[] in Iran's illicit conduct and in its attempts to evade sanctions.  We will therefore continue to target and expose [its] networks," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. …  The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in Iran's … support for terrorism ….  The U.S., UN, EU, Japan, South Korea and others have all targeted the IRGC for sanctions because of this illicit activity. With the IRGC's expanding influence and control over broader segments of the Iranian economy … increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct.
>
> … Iranian bonyads are opaque, quasi-official organizations controlled by key current and past government officials and clerics. Bonyads receive benefits from the Iranian government but are not required to have their budgets publicly approved. They account for a significant portion of Iran's non-petroleum economy. …  Treasury has designated 14 IRGC-affiliated individuals and entities since June 2010 for facilitating Iran's nuclear and ballistic missile program or support for terrorism.[18]

---

[17] U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010) (emphasis added).

[18] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010).

63.     On June 23, 2011, the U.S. Treasury Department announced additional IRGC-related designations that reinforced the U.S. message that illicit transactions with IRGC commercial fronts directly aided terrorism against Americans by Iranian terrorist proxies:

> ***Treasury Targets Commercial Infrastructure of IRGC, Exposes Continued IRGC Support for Terrorism***
>
> Today, the U.S. Department of the Treasury took action to designate … Iranian commercial entities … owned by [IRGC] … The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in all forms of Iran's illicit conduct, including Iran's … support for terrorism …  As Iran's isolation has increased, the IRGC has expanded its reach into critical sectors of Iran's economic infrastructure – to the detriment of the Iranian private sector – ***to generate revenue and conduct business in support of Iran's illicit activities***.  Today's actions target core commercial interests of the IRGC, while also undermining the IRGC's ability to continue using these interests to facilitate its … illicit conduct. …  The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests …, controlling billions of dollars in corporate business.  Given its increased involvement in commercial activity, imposing financial sanctions on commercial enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct.[19]

## II.     DEFENDANTS TRANSACTED BUSINESS WITH FRONTS, OPERATIVES, AND AGENTS CONTROLLED BY THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE

64.     MTN and ZTE did business with fronts, agents, and operatives for the IRGC, including the Qods Force.

65.     MTN's and ZTE's business with IRGC, including Qods Force, fronts, agents, and operatives helped the IRGC, including the Qods Force, aided Hezbollah's campaign, including the attacks by the Joint Cells from 2011 through 2016 against Americans in Iraq in order to drive the U.S. out of the country and cement Iranian influence there.  That terrorist alliance laid the groundwork for how MTN and ZTE funded, and thereby armed, terrorists for attacks that were

---

[19] U.S. Treasury Dep't, *Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities* (June 23, 2011) (emphasis added).

committed, planned, and authorized by Joint Cells comprised of Hezbollah, Jaysh al-Mahdi, and

IRGC, including Qods Force, operatives in Iraq from 2011 through 2016.

> **A.** **An Iranian-backed Shiite terrorist alliance comprised of Hezbollah, Jaysh al-Mahdi, and the Islamic Revolutionary Guard Corps, including the Qods Force, waged a deadly terrorist campaign against Americans in Iraq**

66.    On March 19, 2003, the United States invaded Iraq.  U.S. troops seized control of

Baghdad less than three weeks later, and on April 9, 2003, Saddam Hussein's government fell.

Shortly thereafter, the Coalition Provisional Authority ("CPA") began overseeing the

reconstruction of a democratic Iraqi government, ultimately transitioning to Iraqi rule.

67.    Formal armed hostilities between the United States and the Iraqi government

ended on May 1, 2003.  After that date, American troops deployed to Iraq performed a

peacekeeping and nation-building function, rather than a warfighting function.  American troops'

primary purpose was to create the political and security conditions conducive to Iraqi democracy.

The official end of major combat operations was important because it allowed civilian

reconstruction teams to enter the country.

68.    The U.S. invasion of Iraq was watched closely by Qassem Soleimani, the Qods

Force, and the Qods Force's lead terrorist agent, Hezbollah.  Even before the invasion began, as

early as September 2002, the Qods Force and Hezbollah plotted to undermine the anticipated

U.S. presence in Iraq.  For example, the leaders of Hezbollah and the Qods Force, Hassan

Nasrallah and Qassem Soleimani, regularly coordinated the Qods Force's support for the

Hezbollah-directed terrorist campaign in Iraq in which Jaysh al-Mahdi helped commit attacks.

69.    Immediately after Saddam's government fell in April 2003, Hezbollah dispatched

its chief terrorist mastermind, Imad Mugniyeh, to Iraq.  Mugniyeh's assignment was to make

contact with Muqtada al-Sadr, an influential Shiite cleric, and to work with Sadr to build a

terrorist organization modeled on Hezbollah capable of carrying out sophisticated attacks on

21

Americans in Iraq. Mugniyeh made contact with Sadr shortly thereafter and the two immediately began work on creating the terrorist organization that would become known as Jaysh al-Mahdi. An Israeli intelligence report confirmed in October 2003 that Hezbollah was already planning to "set up a resistance movement that would cause mass casualties" among American forces in Iraq.

70.     Drawing on this influence, Muqtada al-Sadr became the leader of masses of impoverished Iraqi Shi'a after Saddam's fall in April 2003. Sadr's followers took over Saddam City – the two-million-person slum in eastern Baghdad, which is the most densely populated area in Iraq – and renamed it "Sadr City" after Muqtada's father, Sadiq al-Sadr. During this time period, Sadr's public sermons in the Shiite holy city of Najaf decried the U.S. invasion of Iraq, labeled U.S. troops as an illegal occupying force, and urged Iraqis to expel Americans from the country. Sadr's rallies commonly ended with public "Death to America" chants.

71.     By the summer of 2003, Sadr had channeled his popularity into a nascent organization called the "Sadrist Trend" (members of the Sadrist Trend and related groups are known as "Sadrists"). The Sadrist Trend was modeled expressly on Hezbollah. Like Hezbollah, the Sadrist Trend had both a political wing, called the Office of Martyr Sadr, and a terrorist wing, called "Jaysh al-Mahdi" (Arabic for "the Mahdi Army") or "JAM." And, like Hezbollah, the Sadrists seized control of important neighborhoods (such as Sadr City) and used Jaysh al-Mahdi to attack U.S.-led Coalition forces.

72.     By early 2004, Sadr's growing influence, along with the escalating violence employed by his terrorist militia, threatened the U.S. strategy in Iraq. That led the CPA, on March 28, 2004, to order a 60-day closure of *al-Hawza*, the Sadrist newspaper that Sadr used to proselytize anti-American and anti-Israeli violence. Sadr reacted by intensifying his

denunciations of the U.S. government and urging his followers to "'terrorize' their enemy." According to *The Endgame: The Inside Story of the Struggle For Iraq, From George W. Bush to Barack Obama* ("*Endgame*"), Michael Gordon and General Bernard Trainor's celebrated account of the Iraq war, Sadr's Friday sermon on April 2, 2004, was a "bitter invective against the United States, denouncing the Americans and even praising the September 11 attacks."[20]

73.     From that point forward, Sadr and Jaysh al-Mahdi increased their attacks on Americans in Iraq, resulting in mass casualties among U.S. citizens (both military and civilian) working to stabilize and rebuild the country.  By late 2004, Sadr had effectively seized control of large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah, and the entire eastern half of Baghdad.  By early 2005, Sadr controlled 20 Jaysh al-Mahdi brigades – all of which were trained by Hezbollah – operating out of his command-and-control safe haven in Sadr City, from which Jaysh al-Mahdi coordinated and launched Hezbollah-supported attacks against Coalition forces throughout Iraq.

74.     In service of its terrorist agenda, and relying on Hezbollah training, weapons, and personnel, Jaysh al-Mahdi mastered several types of attacks that proved especially deadly for U.S. troops and civilians, including the attacks that killed and injured Plaintiffs.  As one commentator explained, Jaysh al-Mahdi was "[a]nalogous to the Sunni terrorist organization, al Qaeda," "committed thousands of bombings," "detonated roadside explosives," and "fired mortar shells toward the Green Zone."[21]  In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more.  The death toll inflicted by Jaysh al-Mahdi became so severe that, by July 2007, General David Petraeus

---

[20] *Endgame* at 67.

[21] Birgit Svensson, *The Mahdi Army: Turbans, Kalashnikovs and Plans to 'Slaughter'*, Deutsche Welle (June 22, 2014).

concluded that "JAM is more of a hindrance to long-term security in Iraq than is [al-Qaeda-in-Iraq]," the Sunni terrorist group that became ISIS.[22]

75.     Hezbollah's proxy in Iraq was Jaysh al-Mahdi.  The IRGC, including the Qods Force, relied upon Hezbollah and Jaysh al-Mahdi to impose maximum terrorist violence against Americans in Iraq while simultaneously maintaining "plausible deniability" by reducing the public-facing IRGC, including Qods Force, role inside Iraq.  Rather than directly engage in armed conflict with the U.S. or other Coalition Forces, the Persian IRGC, including the Qods Force, usually attempted to present an Arab face in its efforts to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence in Iraq.

76.     Hezbollah, funded and logistically supported by the IRGC, including the Qods Force, trained Jaysh al-Mahdi, at sites in Iran, Lebanon, and Iraq, to create and use sophisticated IEDs, EFPs, rockets, and other advanced weaponry.  While Jaysh al-Mahdi terrorists who had completed IRGC-funded, Hezbollah-provided training were sometimes referred to as "Jaysh al-Mahdi Special Groups" or "Special Groups," Hezbollah also provided, and the IRGC (including the Qods Force) also funded, the same Hezbollah training regime for Jaysh al-Mahdi terrorists who were not in a Special Group.

77.     Continuing the joint attack planning exemplified by Hezbollah's provision of Qods Force-funded training to Jaysh al-Mahdi terrorists operating in Iraq, the IRGC (including the Qods Force), Lebanese Hezbollah, and Jaysh al-Mahdi (including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah) formed and sustained the Joint Cells.  They operated in key regions where Hezbollah emphasized bombing and rocket attacks against

---

[22] See *Endgame* at 422.

Americans in Iraq including, but not limited to, Baghdad Province (Baghdad), Basra Province (Basra and Amarah), Diyala Province (Baqubah), and Babil Province (Hilla).

78.     The Joint Cells had significant geographic reach and were not limited to committing attacks just in their own locales.  For example, the Joint Cell operating in Babil Province (where Hilla is located) also committed attacks in nearby Qadisiyah Province (where Diwaniyah, about an hour away from Hilla via Route 8, is located), and the Joint Cell in Basra Province (where Basra and Amarah are located) committed terrorist attacks throughout southern Iraq.

79.     Each attack that injured Plaintiffs was committed by a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and IRGC, including Qods Force, operatives, and was planned and authorized by Hezbollah.

80.     The IRGC's, including the Qods Force's, support for Hezbollah and Jaysh al-Mahdi – including the Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah – ensured that the terrorist campaign had maximum effect.  Due to Hezbollah's planning, authorization, and joint commission of the attacks in this case as supported by the local muscle of Jaysh al-Mahdi, Qods Force funds benefited Hezbollah and Jaysh al-Mahdi attacks, and Qods Force support for Hezbollah supported Jaysh al-Mahdi, and vice versa.

81.     Hezbollah and the IRGC, including the Qods Force, recognized those interrelationships and so the IRGC, including the Qods Force, could comfortably ramp up the spending for Hezbollah's campaign in Iraq knowing that the professional Hezbollah terrorists would retain command-and-control of the Joint Cells in Sadr City, Basra, and elsewhere.  The IRGC, including the Qods Force, has used the same joint cell approach – combining Shiite

terrorists into a single unified command structure under Hezbollah's leadership to support wide-ranging attacks – in other conflict zones bordering Iraq, most notably Syria.

82.     Hezbollah's support of terrorists in Iraq – made possible by IRGC, including Qods Force, funds, weapons, technologies, and logistical support – likely collectively accounted for more Americans killed or injured in terrorist violence after 9/11 than any other single terrorist campaign.  As Karim Sadjadpour of the Carnegie Endowment explained in an interview, given the IRGC's, including the Qods Force's, support for anti-American terror under Soleimani,

> That's why you have … one, if not two, generations of American military forces whom if you were to ask them, who is your worst adversary in the world, the person you see as the greatest threat to the United States? Even when Osama bin Laden was living and Baghdadi [the leader of ISIS] was living, they would have still said Qassem Soleimani.[23]

83.     Plaintiffs identify below the principal terrorist groups that participated in the Joint Cells that committed, planned, and/or authorized the attacks that killed and injured them and their family members.

### 1.     Hezbollah

84.     Hezbollah, translated as "Party of God," planned and authorized the terrorist campaign against Americans in Iraq, partnering with the IRGC, including the Qods Force, and Jaysh al-Mahdi, including Jaysh al-Mahdi Special Group Asaib Ahl al-Haq and Jaysh al-Mahdi Special Group Kataib Hezbollah, to commit attacks against Americans in Iraq.

85.     On January 25, 1995, the United States designated Hezbollah as a Specially Designated Terrorist.

---

[23] Karim Sadjadpour, *quoted in* National Public Radio, *'Throughline': The Origins Of Iran's Gen. Qassem Soleimani* (Jan. 30, 2020) ("NPR, *Throughline*").

86.     On October 8, 1997, the United States designated Hezbollah as a Foreign Terrorist Organization, and it has retained that designation ever since.

87.     Richard Armitage, the Deputy Secretary of State under President George W. Bush, has described Hezbollah as "the 'A-Team of Terrorists,'"[24] and former CIA director George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable organization."[25]  Hezbollah's chief terrorist mastermind, Mugniyeh, helped Sadr found Jaysh al-Mahdi to inflict "mass casualties" on Americans in Iraq and recruited many of its first members; Hezbollah has since orchestrated Jaysh al-Mahdi's campaign of terror against Americans in Iraq.

88.     Hezbollah was and is the IRGC's, including the Qods Force's, lead terrorist proxy in Iraq and the broader Middle East, serving, in effect, as the IRGC's external terrorist operations arm in conjunction with Hezbollah's close ally and patron, the Qods Force.  As the Honorable Randolph D. Moss found, "Hezbollah envisions itself as 'the sharp end of the spear[,]' going where Iran tells it to go in defense of…. Shia [Muslims] around the world."[26]  Federal courts have repeatedly found that Hezbollah is an agent of the IRGC, including the Qods Force.[27]

89.     Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great

---

[24] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003).

[25] *Current and Future Worldwide Threats to the National Security of the United States:  Hearing Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003) (testimony of George J. Tenet).

[26] *Fritz*, 320 F. Supp. 3d at 60.

[27] *E.g.*, *id.* at 61 ("Consistent with numerous other decisions from this Court, the Court, accordingly, finds that Hezbollah is an Iranian proxy."); *see also Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, No. 16-1436, 313 F. Supp. 3d 50, 53–55, 2018 WL 2023498, at *2 (D.D.C. May 1, 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

Satan" and the "Little Satan," respectively.[28]  Hezbollah also frequently functions as a terrorist proxy for the IRGC, including the Qods Force, committing and orchestrating terrorist attacks abroad with the IRGC's, including the Qods Force's, support.  Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[29]  In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed: "Let the entire world hear me.  Our hostility to the Great Satan [America] is absolute . . . . Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[30]

90.     Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[31] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

---

[28] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[29] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[30] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

[31] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

91.     In *Fritz*, the Court found that "Hezbollah's development into an Iranian proxy in Lebanon [was] relevant" in at least "two respects":

> First, it serve[d] as an example of how Iran cultivate[d] militant organizations in other countries and employ[ed] them as surrogates—a model that Iran then applied to [Jaysh al-Mahdi].  Second, Hezbollah served as a liaison between Iran and [Jaysh al-Mahdi] and helped Iran establish a proxy relationship [with Jaysh al-Mahdi]. … Iran's relationship with Hezbollah, accordingly, is part of the story of [how Jaysh al-Mahdi] emerge[ed] as an Iranian proxy.[32]

92.     Hezbollah could not have committed, planned, and authorized each of the terrorist attacks in this case without the IRGC's, including the Qods Force's, funds and logistical support. For example, as celebrated journalist Michael R. Gordon reported in 2007:

> U.S. intelligence experts believe that Hezbollah has provided some of the logistical support and training to Shiite militias in Iraq [in EFP attacks against Americans there] but they assert that such steps would not be taken without Iran's blessing.  "All source reporting since 2004 indicates that Iran's Islamic Revolutionary Corps-Quds Force is providing professionally-built EFPs and components to Iraqi Shia militants," notes a still classified U.S. intelligence report that was prepared in 2006.  "Based on forensic analysis of materials recovered in Iraq," the report continues, "Iran is assessed as the producer of these items."[33]

93.     Iran considers Hezbollah as part of the IRGC, including the Qods Force, specifically serving as the "Hezbollah Division" of the IRGC, including the Qods Force.[34]

94.     Hezbollah operatives swear a personal oath of loyalty to Iran's Supreme Leader, Ayatollah Khamenei, and personally pledge to carry out their terrorist missions in his name.

---

[32] *Fritz*, 320 F. Supp. 3d at 60.

[33] Michael R. Gordon, *Iran Supplies Shiite Arms, U.S. Asserts Iraqi Militias Deploy Roadside Explosive*, International Herald Tribune (Feb. 12, 2007), 2007 WLNR 2751110.

[34] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, Combating Terrorism Center at West Point, CTC Sentinel, Vol. 3, No. 11 (Nov. 2010) ("Knights, *The Evolution of Iran's Special Groups in Iraq*").

## 2.    Jaysh al-Mahdi

95.    Jaysh al-Mahdi, translated as "the Mahdi Army," including the notorious Jaysh al-Mahdi "Special Group" cells Asaib Ahl al-Haq and Kataib Hezbollah, was Hezbollah's most dangerous terrorist proxy group in Iraq.  In this Complaint, Plaintiffs refer to Jaysh al-Mahdi, Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, and Jaysh al-Mahdi Special Group Kataib Hezbollah collectively as "Jaysh al-Mahdi."[35]

96.    Jaysh al-Mahdi was at all relevant times led by the notorious radical anti-American terrorist, Muqtada al-Sadr.

97.    Sadr founded Jaysh al-Mahdi in April 2003 with the assistance of Imad Mugniyeh, the chief terrorist mind of Hezbollah.  From the beginning, Jaysh al-Mahdi's publicly stated, primary goal was the expulsion of Americans from Iraq.  In July 2003, Sadr publicly announced the founding of Jaysh al-Mahdi by calling for a "general mobilization to fight" the so-called "American and British occupiers."[36]  During Sadr's Friday sermons on March 26, 2004, among other things, Sadr:

- exalted in "[t]he date of September 11th," which he explained "is the date of the collapse of the Two Towers, and therefore is a miracle from God, who never disappoints his servants but allows infidels time before striking them;"

---

[35] All references to Jaysh al-Mahdi in this Complaint are inclusive of Asaib Ahl al-Haq and Kataib Hezbollah, both of which were "Special Groups" of Jaysh al-Mahdi that were created by Hezbollah using funds, arms, and logistical support provided by the IRGC, including the Qods Force, and the Special Groups were led by senior Jaysh al-Mahdi commanders (Qais and Laith Khazali in the case of Asaib Ahl al-Haq and Abu Mahdi al-Muhandis in the case of Kataib Hezbollah), and supportive of Hezbollah's overall terrorist agenda for its terrorist proxies in Iraq. Often, the same terrorist operatives worked for multiple Jaysh al-Mahdi cells, such as a terrorist who commands a Jaysh al-Mahdi battalion, while also leading a Jaysh al-Mahdi Special Group Asaib Ahl al-Haq cell, acting under the direction of Hezbollah as supported by the IRGC, including the Qods Force.

[36] Mahan Abedin, *Dossier:  The Sadrist Movement*, Middle East Intell. Bull. (July 2003).

30

- pledged his fealty to Hezbollah, which he couched in Shi'a Islamist terms such that he was communicating to his followers that support for Hezbollah is a religious duty, stating at one point, "our victorious party, Hezbollah;" and

- called for violent resistance to, and "jihad" against, the American "occupiers" and "invaders" of Iraq, invoking multiple passages from the Koran to provide a purported religious justification for attacking Americans in Iraq.

In a later sermon delivered by an aide on August 6, 2004, Sadr amplified Hezbollah's "Great Satan" narrative in Iraq by calling America "the greatest of Satans" and proclaimed: "America is our enemy and the enemy of the people, and we will not accept its partnership."[37]

98.    Like many terrorist organizations, Jaysh al-Mahdi was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization. As Dr. David E. Johnson, a former Army Colonel who has studied Jaysh al-Mahdi's tactics, explained, "[Jaysh al-Mahdi] was mostly a franchise operation, nationally integrated in support of al-Sadr's political program, but locally owned and operated."[38] The most prominent Jaysh al-Mahdi "Special Groups" were Asaib Ahl al-Haq and Kataib Hezbollah.

99.    Despite its cellular structure, Jaysh al-Mahdi maintained a basic hierarchical command structure. As two counterterrorism scholars explained in June 2008, "although Sadr frequently gives [Jaysh al-Mahdi cells] autonomy over their local actions, he maintains the ability to control them when he chooses."[39] Formally separate Jaysh al-Mahdi cells also shared

---

[37] Abdul Hussein al-Obeidi, *Rebel Shiite Cleric Blames 'Occupier' for Church Attacks, Kidnappings in Iraq*, Assoc. Press (Aug. 6, 2004).

[38] David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*").

[39] Daveed Gartenstein-Ross & Bill Roggio, *Sadr's Special Groups*, Weekly Standard (June 9, 2008).

membership and leadership, relied on common sources of financing and institutional support from the broader Sadrist organization, and frequently operated together in coordinated attacks.[40]

100.    Jaysh al-Mahdi cells were also unified ideologically by radical Shiite ideology, devotion to Sadr, and violent opposition to American presence in Iraq.  According to an unclassified (as redacted) summary of an interview with a detained Jaysh al-Mahdi operative from 2008, the operative "look[ed] to Muqtada al-Sadr (MAS) for guidance . . . [and] ha[d] no knowledge of who would replace MAS as the leader of [Jaysh al-Mahdi] should anything happen to MAS," because "[t]here is no one who can replace MAS."[41]  A March 2008 U.S. State Department cable (as published online) similarly reported that Jaysh al-Mahdi's various elements "are different faces of the same group controlled by a single hand, who assigns each a role."[42] And a U.S. military-intelligence officer told the *Washington Post* in May 2008 that Jaysh al-Mahdi's various cells "all have direct communication with [Sadr]."[43]

101.    Jaysh al-Mahdi's cellular structure prevented Coalition forces from engaging Jaysh al-Mahdi in a conventional military manner, especially in urban settings.  For example, when Coalition forces took control of Sadr City in 2008, Jaysh al-Mahdi cells disappeared underground and hid among civilians while continuing to attack American forces.

102.    Jaysh al-Mahdi operatives acting in the Joint Cells used a variety of tactics and weaponry against Americans in Iraq, including IEDs, EFPs, rockets, mortars, complex attacks, sniper attacks, and kidnapping operations.

---

[40] *See*, *e.g.*, *2008 Battle of Sadr City* at 25-26.

[41] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 010, at 1 (Spring 2007-Early 2008).

[42] U.S. State Dep't Cable, *PM Chief Of Staff Abdallah Tells Ambassador GOI Will Continue Basra Military Operations* (Mar. 31, 2008).

[43] Amit R. Paley, *U.S. Deploys a Purpose-Driven Distinction*, Wash. Post (May 21, 2008).

103.    In 2008, Sadr rebranded Jaysh al-Mahdi as the "Promised Day Brigades," which operated as a Special Group of his own whose purpose was to carry out attacks against Americans in Iraq. The Promised Day Brigades also received funding, training, and weapons from Hezbollah, which was paid for and provided to Hezbollah by the IRGC, including the Qods Force.  The Promised Day Brigades actively targeted U.S. forces to disrupt security operations and further destabilize Iraq, and actively participated in the Joint Cells.[44]

104.    Jaysh al-Mahdi has received significant funding, training, arms, and communications technology from Hezbollah, which was made possible by Hezbollah's receipt of such money and goods from the IRGC, including the Qods Force, including the terrorist fronts that engaged in transactions with MTN and ZTE.

### 3.    Asaib Ahl al-Haq, a Jaysh al-Mahdi Special Group

105.    Jaysh al-Mahdi Special Group Asaib Ahl al-Haq (also called "Asaib Ahl al-Haq" or "AAH"), translated as "the League of the Righteous," was a Jaysh al-Mahdi Special Group supported by the IRGC, including the Qods Force, through Hezbollah, that conducted terrorist attacks against Americans.  As such, the allegations concerning Jaysh al-Mahdi apply with equal force to Jaysh al-Mahdi Special Group Asaib Ahl al-Haq.

106.    Jaysh al-Mahdi Special Group Asaib Ahl al-Haq has targeted U.S. personnel at the direction of Hezbollah, acting as their proxy in Iraq.  As a Jaysh al-Mahdi Special Group, Asaib Ahl al-Haq operatives in the Joint Cells deployed the same attack types used by Jaysh al-Mahdi, including IEDs, EFPs, rockets, and hostage-taking, attacking Americans through the Joint Cells in attacks that were planned and authorized by Hezbollah.

---

[44] Because the Promised Day Brigades name change was about branding rather than substance, Plaintiffs refer to the Promised Day Brigades as "Jaysh al-Mahdi."

107.     The 2007 arrest of Jaysh al-Mahdi Special Group operatives, and AAH leaders, Qais and Laith Khazali, alongside their handler, senior Hezbollah operative Ali Musa Daqduq, demonstrated the Joint Cells in action:  Jaysh al-Mahdi terrorists and their direct Hezbollah sponsor were detained in Iraq because they had been working together to attack Americans.

108.     On January 10, 2020, the U.S. government designated Jaysh al-Mahdi Special Group Asaib Ahl al-Haq as a Foreign Terrorist Organization.  85 Fed. Reg. 1,369, 1,369 (Jan. 10, 2020).

109.     Jaysh al-Mahdi Special Group Asaib Ahl al-Haq has received significant funding, training, arms, and communications technology from Hezbollah, which was made possible by Hezbollah's receipt of such money and goods from the IRGC, including the Qods Force, including the terrorist fronts that engaged in transactions with MTN and ZTE.

### 4.     Kataib Hezbollah, a Jaysh al-Mahdi Special Group

110.     Jaysh al-Mahdi Special Group Kataib Hezbollah (also called "Kataib Hezbollah" or "KH"), translated as "the Hezbollah Brigades," was a Jaysh al-Mahdi Special Group that was stood up by Hezbollah, with funding and arms from the IRGC, including the Qods Force, to help commit terrorist attacks against Americans in Iraq.  Jamal al-Ibrahimi, more commonly known by his *nom de guerre*, Abu Mahdi al-Muhandis ("Muhandis"), was an Iraqi Shiite who lived in Iran after he was involved in a plot bomb a U.S. embassy in the 1980s, and later led his own Jaysh al-Mahdi Special Group.

111.     Muhandis was an Iran-backed Shiite terrorist in Iraq who was an agent of multiple allied Shiite terrorist organizations.  As of 2011, when all but one of the attacks in this case occurred, Muhandis was an operative and/or agent of:  (1) Jaysh al-Mahdi, for which he led numerous Special Groups; (2) Jaysh al-Mahdi Special Group Kataib Hezbollah, which he led before and after its FTO designation in 2009; and (3) Hezbollah and the IRGC, including the

34

Qods Force, for which he was an operative.  Muhandis served all roles simultaneously, and there was no firewall between his activities relating to these terrorist groups.

112.    Supported by Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force, Muhandis established Kataib Hezbollah to be a Jaysh al-Mahdi Special Group, supported by Hezbollah training, planning, and direction, and IRGC, including Qods Force, funds and logistics (which the IRGC, including the Qods Force, provided through its network of forward deployed operatives inside Iraq) to carry out attacks against Americans in Iraq.  As such, the allegations concerning Jaysh al-Mahdi apply with equal force to Kataib Hezbollah.

113.    Jaysh al-Mahdi Special Group Kataib Hezbollah was led by Jaysh al-Mahdi commanders who received specialized training from Hezbollah cells in Iran and Lebanon and was part of Jaysh al-Mahdi in its capacity as a Jaysh al-Mahdi Special Group.  Jaysh al-Mahdi Special Group Kataib Hezbollah regularly relied upon Jaysh al-Mahdi resources and personnel to commit terrorist attacks, and often used operatives who were members of multiple terrorist groups, including Hezbollah, who were all operating in support of the Joint Cells.

114.    Jaysh al-Mahdi Special Group Kataib Hezbollah received significant funding, training, arms, and communications technology from Hezbollah, which help from Hezbollah was funded and sourced by the IRGC, including the Qods Force, including by IRGC, including Qods Force, fronts that transacted business with MTN and ZTE.

115.    On July 2, 2009, the U.S. government designated Jaysh al-Mahdi Special Group Kataib Hezbollah as a Foreign Terrorist Organization and a Specially Designated Global Terrorist, also designating Muhandis individually as an SDGT.  74 Fed. Reg. 31,788, 31,788 (July 2, 2009) (FTO designation); 74 Fed. Reg. 34,639, 34,639 (July 16, 2009) (SDGT Designations).

116.     On January 2, 2020, Muhandis was killed by a U.S. drone strike that targeted a terrorist convoy in which he was riding, along with Qassem Soleimani, outside of Baghdad International Airport.  The U.S. government conducted the drone strike because, among other reasons, Soleimani and Muhandis had worked closely with Hezbollah to orchestrate a campaign of terror against Americans in Iraq, and the terrorists were working together to plan more attacks against Americans in Iraq at the time.  Indeed, just days prior to the U.S. drone strike that killed Soleimani and Muhandis, a Joint Cell fired a rocket attack against an American target in the northern Iraqi city of Kirkuk, killing an American contractor.

**B.     The Islamic Revolutionary Guard Corps's, including the Qods Force's, control of Iran's telecom, information technology, and communications sectors**

117.     The IRGC, including the Qods Force, controlled the entire Iranian telecom sector from top to bottom.  The following Iranian fronts, operatives, and agents played especially prominent roles in ensuring that any telecom transactions in Iran benefited the IRGC's, including the Qods Force's, global terrorist agenda.

**1.     The Bonyad Mostazafan**

118.     The Bonyad Mostazafan, also known as the Bonyad Mostazafan va Janbazan, Mostazafan Foundation, and Alavi Foundation (herein, the "Bonyad Mostazafan"), was established after the Islamic Revolution to steal and manage property, including that originally belonging to religious minorities in Iran such as Baha'is and Jews, to fund the export of the Iran's Islamist Revolution around the world.

119.     The Bonyad Mostazafan was and is an IRGC, including Qods Force, front.  The Bonyad Mostazafan's purpose was and is to raise funds and obtain weapons (including weapons components) for the IRGC's, including the Qods Force's, terrorist operatives and proxies, including Hezbollah.  As a front for the IRGC, including the Qods Force, funds and weapons

(including weapons components) provided to the Bonyad Mostazafan through its commercial transactions inevitably flowed through the Bonyad Mostazafan to Hezbollah (through the IRGC, including the Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

120.    At all times, the Bonyad Mostazafan has been led by an agent or cut-out for the IRGC, including the Qods Force, and has served as a central hub of IRGC, including Qods Force, fund raising, weapons development and acquisition, computing, and communications infrastructure for Iran's terrorist enterprise, which value has flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.

121.    The Bonyad Mostazafan is currently led by IRGC Brigadier General Parviz Fattah, who is also, on information and belief, a Qods Force operative.

122.    The Bonyad Mostazafan has been widely understood in business, diplomatic, military, and media circles to be a front for Iranian terrorism through the IRGC, including the Qods Force, since the 1990s.  On May 28, 1995, the Bonyad Mostazafan's status as an Iranian terrorist front made international news when *Newsday* – which was republished around the world through various affiliate relationships – reported that the Bonyad Mostazafan served as a front for raising money and sourcing weapons for Iran's terrorist proxies, including Hezbollah:

> [I]n a four-month investigation based on dozens of interviews with law-enforcement officials and U.S. government specialists, knowledgeable Iranians who support the regime as well as dissidents, and public and private documents, *Newsday* has found that:
>
> - [The Bonyad Mostazafan] … is controlled by Iran's clerical leadership, federal officials say.
>
> - Several of [the Bonyad Mostazafan's] current and former officers and directors have been ***implicated in arms and technology shipments to Iran***, and a former president of the foundation allegedly tried to ship germ-warfare agents to Tehran, according to these officials.

- [The Bonyad Mostazafan] *served as a front* … for the placement of agents from the [IRGC, including Qods Force], dedicated zealots who … spy and *obtain military technology* from the United States and abroad.

- [The Bonyad Mostazafan] finances [entities] in the United States that support Iran's militant version of Islam and provides safe haven for groups and individuals supporting the Islamic terrorist group[] … *Hezbollah.* …

In a classified report … the FBI asserted that [the Bonyad Mostazafan] was "entirely controlled by the government of Iran," which *used [the Bonyad Mostazafan] to set up "covert subbranches disguised* as educational centers, mosques and other centers." …  The FBI report, according to a U.S. official, claims that [the Bonyad Mostazafan] *funds "fundamentalist extremist groups"* and that Iranian students who received scholarships from [the Bonyad Mostazafan] to study in the United States *"gather[ed] intelligence"* … and *collected "technical and scientific information" for the Iranian regime*.

In 1989, Oliver Revell, then the No. 2 official at the FBI, told the Senate terrorism subcommittee that some of the "students" receiving [the Bonyad Mostazafan] grants were in fact [IRGC, including Qods Force] agents. …  Revell … said much of [the Bonyad Mostazafan]'s funds go to "a great number of mosques (in the United States) . . . where there are *organizations which directly support Hezbollah…*[,]" an Iranian-supported militant group … that has launched terrorist attacks under the tutelage of the Revolutionary Guards. …  *The [Bonyad Mostazafan] is administered by Mohsen Rafiqdoost, founder of the Revolutionary Guards*.  Rafiqdoost reports only to the Ayatollah Ali Khamenei, Iran's spiritual leader.[45]

---

[45] Knut Royce and Kevin McCoy, *Militants Build On Iranian Foundation*, Newsday, *republished by* Pittsburgh Post-Gazette (May 28, 1995), 1995 WLNR 2452536.  After the Islamic Revolution, the Ayatollah seized what had previously been the Alavi Foundation and merged it with the Bonyad Mostazafan.  Thereafter, they were one and the same and always were indistinguishable and different names for the same Iranian terrorist front.  *See*, *e.g.*, *id.* ("Vincent Cannistraro, who left the CIA in 1990 as a top official of its counterterrorism center, said in a recent interview, 'The [Bonyad Mostazafan] and the Alavi Foundation are the same, under different names.'  Other U.S. officials agreed.").

123.    In the same investigative report, *Newsday* also disclosed that "U.S. and European officials say that [the Bonyad Mostazafan] has long been a front for the procurement of military goods and prohibited technology for Iran, particularly for the Revolutionary Guards."[46]

124.    The same *Newsday* report also disclosed that "[the Bonyad Mostazafan]'s secretary until 1992, Mojtaba Hesami-Kiche, was at the same time the executive secretary of Vena Industries, a German company wholly owned by [the Bonyad Mostazafan], according to public records filed in Germany.  U.S. sources said that Vena has been active in "military procurement" for the Tehran regime."[47]

125.    Prior to publishing its international media blockbuster report on Bonyad Mostazafan, *Newsday* questioned the Bonyad Mostazafan about its connections to terrorism and allegations that it was used as a front to raise money and source weapons for Iranian terrorist proxies like Hezbollah.  The Bonyad Mostazafan replied, through counsel, that it "ha[d] no interest in responding" to such because of their "provocative tone."[48]

126.    When *Newsday* published its blockbuster investigation revealing that the Bonyad Mostazafan served as a front for providing money, weapons, and logistical support to Hezbollah, the latter was already a U.S.-government designated terrorist group, having been designated by the United States as a Specially Designated Terrorist several months prior.  As a result, from 1995 onwards, the Bonyad Mostazafan's status as a front for Iranian terrorist operations,

---

[46] Knut Royce and Kevin McCoy, *N.Y. Foundation Linked To Iran's Islamic Militants*, Newsday, *republished by* Seattle Times (May 26, 1995), 1995 WLNR 1308563 ("Royce and McCoy, *N.Y. Foundation Linked*").

[47] *Id*.

[48] *Id.*

including the IRGC's, including the Qods Force's, support for, Hezbollah was widely known in the international business community and known to Defendants.

127.    In 1998, *Newsday* again reported on the western intelligence services' consensus that the Bonyad Mostazafan was a front for funneling funds and weapons to Iranian proxies:

> [T]he quasi-official Mostazafan Foundation [] controls billions of dollars of investments in Iran and around the world. The foundation … **has been accused by western intelligence services of** espionage, **supporting terrorism** and smuggling arms. … *Newsday* disclosed in 1995 that several officers and directors … had been implicated in arms and technology shipments to Iran, that it was controlled by Iran's clerical leadership and that the **FBI believed it had served as a front for placement in the United States of Revolutionary Guards [Qods Force]**, Iranian zealots who conducted espionage and stole military technology.[49]

128.    After these two *Newsday* reports in the 1990s, the media regularly published similar reports thereafter, which routinely described the Bonyad Mostazafan as a front or funding source for Iranian-backed terrorists operating in the Middle East, including Hezbollah.

129.    On December 17, 2008, the U.S. government reinforced its messaging that the Bonyad Mostazafan was a terrorist front that served to raise money and source weapons for the IRGC, including the Qods Force.  On that date, the U.S. Departments of Justice, Treasury, and State all announced enforcement actions and sanctions against the Bonyad Mostazafan, and the U.S. Department of State's Counterterrorism Office issued a press release calling attention to U.S. sanctions against entities affiliated with Bonyad Mostazafan.

130.    The heightened U.S. crackdown on the Bonyad Mostazafan caused a new round of media coverage drawing attention to the Bonyad Mostazafan's status as a front for Iranian terror.  For example, the *Washington Post* reported that:

---

[49] Knut Royce, *No Legal Recourse In Iranian's Case / Supreme Court Won't Reopen Suit*, Newsday (Dec. 8, 1998), 1998 WLNR 604387 (emphasis added).  Since the IRGC personnel placed in the United States through the Mostazafan Foundation were operating overseas, they were Qods Force.

A Fifth Avenue building … is secretly co-owned by an Iranian bank that helped finance that country's nuclear program, the Justice Department alleged [].  Justice is seeking to seize the share of the property …, charging that 40 percent of [the building] was actually co-owned by Iran's Bank Melli …[,] [which] was previously designated by the Treasury Department as a key financier of  … the ***[IRGC] and the Quds Force, which has been linked to terrorist groups***. … "This ***scheme to use a front company … to funnel money from the United States to Iran is yet another example of Iran's duplicity***," said Stuart Levey, the Treasury Department's undersecretary for terrorism and financial intelligence.[50]

131.    The Bonyad Mostazafan's notorious reputation for directly funding Iranian terrorist proxies in the Middle East continued at all relevant times.  For example, in 2014, Jonathan Schanzer, the Vice President of Research at the Foundation for Defense of Democracies, testified that "[t]he Bonyad-e Mostazafan" was "a splinter of Iran's IRGC" and had "reportedly opened its coffers to Hamas, providing critical financial support."[51]

132.    On November 18, 2020, the U.S. Treasury Department designated the Bonyad Mostazafan, observed that it served as a "bridge to the IRGC," and announced as follows:

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) took action today against a key patronage network for the Supreme Leader of Iran, the Islamic Revolution Mostazafan Foundation (Bonyad Mostazafan, or the Foundation) …  While Bonyad Mostazafan is ***ostensibly*** a charitable organization charged …, its holdings are expropriated from the Iranian people and are used by [Ayatollah] Khamenei to …  enrich his office, reward his political allies, and persecute the regime's enemies. …  "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the ***pretense of charity***," said Secretary Steven T. Mnuchin. …

**PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**
Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer **Parviz Fattah**.  Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously . . . . served as head of the Imam Khomeini Relief Committee, whose

---

[50] Glenn Kessler, *U.S. Links Iranian Bank To Fifth Avenue Building*, Washington Post (Dec. 18, 2008) (emphases added), 2008 WLNR 28032529.

[51] Statement of Jonathan Schanzer, Vice President of Research at the Foundation for Defense of Democracies, Committee on House Foreign Affairs Subcommittee on Terrorism, Nonproliferation, and Trade. Subcommittee on the Middle East and North Africa, *Hamas and Terrorism*, Congressional Testimony via FDCH (Sept. 9, 2014), 2014 WLNR 24926764.

Lebanon branch was designated pursuant to **counterterrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah**.  Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials.  According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or deportation. . . .  The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism … authorities. …

**SANCTIONS IMPLICATIONS**
As a result of today's action, … OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.  In addition, persons that engage in certain transactions with the individuals or entities designated today may themselves be exposed to sanctions. …[52]

133.    The Bonyad Mostazafan primarily serves as a front for terror and performs little legitimate charitable work.  As the Treasury Department found when it imposed sanctions, "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has **become a secondary objective**. According to the Foundation's previous president, in past years as little as **seven percent of the Foundation's profit** has been spent on projects aimed at reducing poverty."[53]

134.    The Bonyad Mostazafan directly funds Iranian terrorist proxy military activities outside of Iran.  Fattah, who currently runs the Bonyad Mostazafan, has publicly admitted it.

135.    Fattah was separately designated for his terrorism-related connections in 2010.[54]

---

[52] U.S. Treasury Dep't, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) (emphases added).

[53] *Id*. (emphases added).

[54] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) ("Parviz Fattah, the Executive Director of Bonyad Taavon Sepah was designated today for acting on behalf of, and providing services to, Bonyad Taavon Sepah.").

136.    The Bonyad Mostazafan's participation in Irancell played a role in persuading the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[55]

## 2.    Iran Electronics Industries

137.    Iran Electronics Industries, also known as IEI, Sanaye Electronic Iran, Sasad Iran Electronics Industries, or Sherkat Sanayeh Electronics Iran ("IEI"), was and is a front for the IRGC, including the Qods Force.

138.    IEI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's, including the Qods Force's, terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by IEI through its commercial transactions inevitably flowed through IEI to Hezbollah (through the IRGC, including the Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

139.    Since the 1990s, IEI has been widely understood in business, diplomatic, military, and media circles to be a front for Iranian terrorism through the IRGC, including the Qods Force.

140.    On or about 2006, a Treasury official, Stuart Levin, told representatives of MTN's competitor, Turkcell, that IEI was "fully owned" by the IRGC, including the Qods Force.

141.    On information and belief, Undersecretary Levin communicated to MTN Group that IEI was "fully owned" by the IRGC, including the Qods Force, and that economic interactions with IEI foreseeably aided Iranian proxy terrorist attacks against Americans.

---

[55] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

142.     On September 17, 2008, the U.S. Treasury Department designated IEI and explained that it builds weapons intended for use against the U.S. military.[56]

143.     IEI's participation in Irancell played a role in persuading the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[57]

### 3.     MTN Irancell

144.     MTN Irancell is a joint venture between two IRGC, including Qods Force, fronts, the Bonyad Mostazafan and IEI, which collectively own 51% of MTN Irancell, and MTN Group Ltd., which owns 49% of MTN Irancell ("MTN Irancell").

145.     MTN Irancell was and is a front for the IRGC, including the Qods Force.

146.     MTN Irancell's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's, including the Qods Force's, terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by MTN Irancell through its commercial transactions inevitably flowed through MTN Irancell to Hezbollah (through the IRGC, including the Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

147.     The U.S. State Department purportedly referred to Irancell (as published online) as being "fully owned by the IRGC."

148.     Irancell's recognized status as being "fully owned by the IRGC" was also widely reported in the media, beginning in 2010 with the initial *WikiLeaks* reporting, and continuing thereafter.  For example, in 2012, the news commentator Greta Van Susteren noted on her

---

[56] U.S. Treasury Dep't, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008).

[57] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

widely-watched Fox News show:  "we're talking about Iran, which is trying to wipe … Israel off the map, … and **this joint venture** with [MTN Irancell], **it was not a mystery**.  In fact, the [U]ndersecretary of [the Treasury, Stuart Levin in] 2006 according to [] WikiLeaks … said that the Iran Cell was [] **fully owned by the Iranian Revolutionary Guard** [Corps]."[58]

149.    IRGC specialists agree.  For example, in 2015, Dr. Emanuele Ottolenghi, of the Foundation for Defense of Democracies, identified "telecommunications" as a "sector where the IRGC [was] bound to reap economic benefits" because "all three mobile operators in Iran" – including MTN Irancell – "are directly or indirectly partners with IRGC-affiliated companies."[59]

### 4.    Telecommunications Company of Iran

150.    The Telecommunications Company of Iran (or "TCI") was and is a front for the IRGC, including the Qods Force.

151.    TCI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of Iran's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by TCI through its commercial transactions inevitably flowed through TCI to Hezbollah (through the IRGC, including the Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

152.    TCI is known to be an IRGC, including Qods Force, front.  The *Economist*'s due diligence unit, the *Economist Intelligence Unit*, reported in 2009 that "[t]he question of possible IRGC involvement in the TCI acquisition was raised in subsequent discussion in the Iranian

---

[58] FOX: On the Record, *Interview with Byron York* (August 7, 2012), 2012 WLNR 16563491.

[59] Statement of Dr. Emanuele Ottolenghi Senior Fellow Foundation for Defense of Democracies, Committee on House Foreign Affairs Subcommittee on Middle East and North Africa, *Iran Nuclear Deal*, Congressional Testimony via FDCH (Sept. 17, 2015), 2015 WLNR 27612447 ("Dr. Ottolenghi Sept. 17, 2015 Testimony").

majlis (parliament)," where "[t]he speaker, Ali Larijani, [was] quoted by Aftab-e Yazd, an

Iranian newspaper, as saying that the IRGC was a direct party to the deal."[60]  The same report

also noted the  "[b]lurred distinctions" between the IRGC and Iranian telecom companies:

> [In 2006,] the Supreme Leader, Ayatollah Ali Khamenei, lent his personal support
> to the proposed asset sales. As with many other privatisation programmes in
> authoritarian states, there are strong grounds to suspect that elite groups are
> manipulating the process to advance their own interests unfairly. It is clear that
> over the past few years much political and economic power has flowed towards
> the IRGC. … The telecoms sector in Iran has expanded rapidly over the past five
> years, in particular in the mobile segment, which recorded a compound annual
> growth rate of 65% between 2003 and 2008. There is still room for expansion of
> mobile telephony as the penetration rate is only about 70%, and broadband
> services are notably underdeveloped. ***This makes telecoms one of the most
> attractive targets for investment in Iran***. At the same time, telecoms is a critical
> sector for the security forces, as the Islamic Republic faces unprecedented
> domestic opposition along with growing external threats. ***If the IRGC is indeed
> behind the TCI deal, it would make sense from both the commercial and the
> security perspective.***[61]

153.    IRGC specialists concur.  For example, when Dr. Ottolenghi identified

"telecommunications" as "[a]nother sector where the IRGC [was] bound to reap economic

benefits," Ottolenghi also noted that "[t]he IRGC control[led] Iran's largest telecom company,

the Telecommunication Company of Iran or TCI," which the "[t]he Guards bought … in

September 2009 in a controversial bid that at the last minute disqualified the only non-IRGC

offer."[62]  As Dr. Ottolenghi further explained:

> TCI's main shareholder is now Toseye Etemad Mobin (50%), a company
> ***controlled by the IRGC*** jointly with the supreme leader's financial network,
> through two companies - the Tadbir Group-owned Gostaresh Electronic Mobin
> and Shahriar Mahestan Company.  TCI has a monopoly over Iran's landlines, and
> thus controls much of the country's Internet traffic.  As *Al-Monitor* reported in

---

[60] Economist Intelligence Unit, *Iran Telecoms: Dial I for IRGC?*, Telecoms and Technology
Forecast (October 12, 2009), 2009 WLNR 20135393.

[61] *Id.*

[62] Dr. Ottolenghi Sept. 17, 2015 Testimony.

August 2013, *all three mobile operators in Iran are directly or indirectly partners with IRGC-affiliated companies*.[63]

### 5.      The Akbari Front Companies

154.    Mahmood Akbari, also known as John Wasserman (herein, "Akbari"), was an Iranian resident who purchased dual-use commercial grade computers, related equipment and services from illegal sources in the United States to benefit the IRGC, including the Qods Force. On information and belief, Akbari was an IRGC operative who was used by the Qods Force to serve as a cut-out to help source dual-use technology from America for use by the Joint Cells to attack Americans in Iraq, doing so upon the instruction of one or more Defendants.

155.    Patco Group Ltd. ("Patco") was a company in the U.A.E. operated by Akbari for the purpose of receiving commercial grade computers and related equipment from illegal sources in the United States to benefit the IRGC, including the Qods Force.

156.    Managed Systems and Services (FZC) ("MSAS") was a company in the U.A.E. operated by Akbari and used as a front company and consignee for computer parts to make it appear that the computer parts were being sent to the U.A.E. when in fact they were being diverted to Iran.

157.    TGO General Trading LLC, also known as Three Green Orbit (herein, "TGO"), was a company in the U.A.E. operated by Akbari and used as a front company to make it appear that payments were being made from the U.A.E., rather than from Iran.

158.    On information and belief, Patco, MSAS, and TGO (collectively, "Akbari Entities") were fronts for the IRGC, including the Qods Force, that served as cut-outs in order to help the IRGC, including the Qods Force, source sensitive dual-use technology from America for

---

[63] *Id.*

the benefit of Iran's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by the Akbari Entities through their commercial transactions inevitably flowed through Akbari Entities to Hezbollah (through the IRGC, including the Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

III.  **DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, PROVIDED FINANCING, WEAPONS, AND OPERATIONAL SUPPORT TO TERRORISTS**

A.  **The Islamic Revolutionary Guard Corps, including the Qods Force, raised funds, purchased weapons, and obtained operational support through illicit corporate transactions in the telecom, communications, and IT sectors**

159.  As western sanctions clamped down on Iranian terror fronts, the IRGC, including the Qods Force, responded by expanding its efforts to obtain funds, purchase weapons and source operational support through illicit corporate transactions in the U.S., U.A.E., and Iran.

160.  In so doing, the IRGC, including the Qods Force, relied on transactions with multinational corporations, like MTN and ZTE, who operated in key sectors for the dual-use technologies that were essential to the IRGC's, including the Qods Force's, bombmaking, rocket, intelligence gathering, and communications enterprises – everything a terrorist group needs to coordinate attacks against Americans in the Middle East.

161.  Sadegh Zibakalam, a professor of political science at the University of Tehran, explained to the BBC in 2012 that "[d]uring the past decade Iran has come up with various ways of getting around international sanctions."[64]  Per the BBC, Professor Zibakalam "said Iranian companies had been able to source many American … goods through international markets,

---

[64] BBC News, *Iran Mobile Operator Irancell 'Secures US Technology'* (June 6, 2012).

especially companies based in Dubai … He added that international companies have been eager to assist Iran with equipment it needs."[65]

162.    It is widely understood that illicit transactions that route money or technology to the IRGC inevitably result in the Qods Force receiving money or technology that it can use in its terrorist enterprise, and vice versa.

163.    Scholars who have studied the IRGC, including the Qods Force, concur that both benefit from illicit transactions and that the purported distinction between them is largely immaterial when it comes to Iran's terrorist enterprise and support for terrorist proxies.  For example, a British researcher Ben Smith, who studied the IRGC, including the Qods Force, for the House of Commons, identified telecoms as a key area that financially benefits all:

> [T]he Revolutionary Guards, have large and expanding business interests … The Iranian economy is "marked by a bloated, inefficient state sector".  That has allowed the president to appoint allies and old colleagues from the Revolutionary Guard into key positions in the public sector, and to award government contracts to companies owned or controlled by Guard members, many of which are involved in dual use technology with both civilian and military utility, including telecommunications … The al-Quds force is thought to be no less involved in the business world than the rest of the Revolutionary Guard, and analysts suspect that these growing business interests provide clandestine sources of funding to be channelled to overseas groups and individuals, hidden from [] scrutiny …[66]

164.    Prominent media reports also support this conclusion.  According to a 2007 report in the *New York Times*, "[s]ome specialists even question whether the Quds Force exists as a formal unit clearly delineated from the rest of the Revolutionary Guard."[67]  As one such Iran

---

[65] *Id*.

[66] Ben Smith (International Affairs and Defence Section of the UK House of Commons Library), *The Quds Force of the Iranian Revolutionary, Guard -- Standard Note: SN/IA/4494*, UK House of Commons Library Standard Note (Oct. 30, 2007).

[67] Scott Shane, *Iranian Force, Focus of U.S., Still a Mystery*, N.Y. Times (Feb. 17, 2007).

specialist, Vali R. Nasr of the Naval Postgraduate School explained to the *Times*, "[i]t could be that anyone with an intelligence role in the Revolutionary Guard is just called Quds."[68]

165.    Moreover, any lines between the IRGC and the Qods Force blur when it comes to Iran's support for Islamist terrorists outside of Iran.  As the same *New York Times* report noted in 2007, "[w]hether properly identified as part of the Quds Force or not, members of the Revolutionary Guard mobilized intelligence and paramilitary agents in Lebanon in the 1980s, where they trained the Shiite militia Hezbollah; in Afghanistan, during the anti-Soviet jihad in the 1980s and episodically since then; in the former Yugoslavia, supporting the Bosnian Muslims against Serbian forces; and in other trouble spots."[69]

166.    Like its subordinate branch the Qods Force, the IRGC also directly funds key Iranian terrorist proxies.  For example, the IRGC uses a portion of its revenue to fund Hezbollah. As the Defense Intelligence Agency ("DIA") concluded with "high confidence" in 2010, "Iran has methodically cultivated a network of sponsored terrorist surrogates capable of conducting effective, plausibly deniable attacks against … the United States," and the DIA "judge[d]" that "Tehran provide[d] support to terrorist and militant groups to support Iran's strategic interests in each situation."[70]  DIA concluded: "[e]lements of Iran's Islamic Revolutionary Guard Corps []have provided direct support to terrorist groups, assisting in the planning of terrorist acts or enhancing terrorist group capabilities."[71]

167.    As the Foundation for Defense of Democracies similarly concluded, given the tight nexus between IRGC commercial activity and violence by Iranian proxies, any transaction

---

[68] *Id*.

[69] *Id*.

[70] Defense Intelligence Agency, *Unclassified Report on Military Power of Iran* (Apr. 2010).

[71] *Id*.

with IRGC fronts benefits Iran's terrorist enterprise – even when it does not result in the IRGC or Qods Force directly obtaining any embargoed arms or technology:

> IRGC front companies … have stakes in telecommunications ….   of which Iran is the largest manufacturer in the Middle East. … Many IRGC projects are military in nature, and the group *diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends*. … Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities … Yet *even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities.* In June 2006, [the head of an IRGC-owned company] confirmed in an interview with a local daily that the *organization's funds finance various national defense projects, including arming and training Hezbollah*.[72]

**B.     Defendants made illicit deals with fronts, operatives, and agents of the Islamic Revolutionary Guard Corps, Including the Qods Force**

168.    Beginning in 2005, after the Iran had intensified its support of the insurgency in Iraq, MTN and ZTE made illicit deals with IRGC, including Qods Force, fronts, operatives, and agents in the telecom, communications, and computer sectors.  Those deals directly benefited MTN and ZTE.

169.    MTN's and ZTE's transactions provided financial, logistical, and operational support to the IRGC, including the Qods Force, and their terrorist proxies Hezbollah and Jaysh al-Mahdi.  Defendants' corrupt deals with the IRGC, including the Qods Force, fell into three broad categories:  (1) weapons procurement through sham deals; (2) financing through illicit transactions; and (3) operational support obtained through the legitimacy of the companies helping the IRGC, including the Qods Force.

---

[72] Mark Dubowitz and Emanuele Ottolenghi (Foundation for Defense of Democracies), *The Dangers Of Doing Business With Iran's Revolutionary Guards*, Forbes (June 15, 2010) (emphasis added).

170.     Under official IRGC, including Qods Force policy, the IRGC, including the Qods Force, follows a mafia-style financial approach under which all IRGC, including Qods Force, fronts, operatives, and agents share a percentage of all income they realize with the IRGC, including the Qods Force, like how a mafia lieutenant kicks up a portion of his earnings to the mob boss.  For example, in 2003, the IRGC issued a directive decreeing those profits realized by IRGC fronts, operatives, and agents must be shared with the broader organization.

171.     The IRGC, including the Qods Force, was able to leverage Defendants' insatiable appetite for Iran's telecom market, which was widely understood to represent a unique opportunity.  As the *Economist* explained in 2004, "[w]ith a population of some [70 million people] and a mobile-phone penetration rate of below 5%, ***Iran offers a unique opportunity for telecommunications investors***. … However, the wrangles with … Turkcell illustrate the difficulties in assessing the political risk associated with trying to enter the Iranian market."[73]

172.     Although Defendants' illicit transactions with, and resulting cash flow to, fronts, operatives, and agents for the IRGC, including the Qods Force, provided especially valuable assistance for the Joint Cells' terrorist attacks, the causal nexus was not limited to Iran sanctions violations.  Whether or not MTN and ZTE technically violated Iranian sanctions (although they did), their transactions with a counterparty that was openly controlled by terrorists – and which openly diverted the fruits of the transactions to terrorist ends – supplied the IRGC, including the Qods Force, Hezbollah, and Jaysh al-Mahdi, with funds, weapons, weapons components, computers, communications gear, enterprise data management solutions, and essential logistical support that their Joint Cells relied upon to commit terrorist attacks against Americans in Iraq.

---

[73] Economist Intelligence Unit, *Iran: Putting Up The Shutters*, Business Middle East (Sept. 1, 2004) (emphasis added), 2004 WLNR 10893473.

IV. **DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR TRANSACTIONS WITH THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, FACILITATED TERRORIST ATTACKS ON AMERICANS IN IRAQ**

A. **Defendants' transactions directly funded, armed, and operationally supported terrorist attacks on Americans in Iraq**

173.　MTN, from at least 2005 through the present, and ZTE, from at least 2008 through at least 2016, knowingly structured their transactions to facilitate the IRGC's, including the Qods Force's, fundraising, weapons procurement, and operational support from their IRGC-controlled, including Qods Force-controlled, counterparties – which the IRGC, including the Qods Force, used to support Hezbollah and the Joint Cells' terrorist attacks against Americans in Iraq.  Senior Iranian entity officials involved in the Defendants' transactions were avowed, well-known fronts, operatives, and agents for the IRGC, including the Qods Force.

174.　Defendants knew or recklessly disregarded that their corrupt transactions overseen by a counterparty that the IRGC, including the Qods Force, had totally commandeered, delivered resources directly to the IRGC, including the Qods Force, which they provided to Hezbollah in the form of funds, weapons, logistical support, and other aid to jointly commit terrorist attacks against Americans in Iraq terrorist through their Joint Cells.

175.　The IRGC's, including the Qods Force's, control over the Iranian telecom, communications, and computer sector was so complete that, by 2004, there was no longer any meaningful distinction between any of the large Iranian telecom, communications, or computer companies and the IRGC, including the Qods Force.  Because the IRGC, including the Qods Force, had effectively captured the Iranian telecom, communications, and computer sectors, and was using such control to fund and arm Hezbollah as Hezbollah led the Joint Cell attacks against Americans in Iraq, transactions with Iranian telecom, communications, and information technology companies directly benefited the Hezbollah campaign targeting Americans in Iraq.

53

176.     Defendants' transactions with their IRGC-controlled, including Qods Force-controlled, Iranian counterparties supplied Hezbollah, and through Hezbollah, Jaysh al-Mahdi, with resources critical to the Joint Cells' terrorist operations.  The IRGC's, including the Qods Force's, control over these critical Iranian economic sectors – and the enormous cash flow that came with it, both from normal revenue as well as corrupt payments from foreign companies – was a key source of the IRGC's, including the Qods Force's, power.

177.     Indeed, the telecom, communications, and information technology sectors were (and remain) controlled by the IRGC, including the Qods Force, precisely because such control allows the IRGC, including the Qods Force, to make groups like Hezbollah more effective at attacking the enemies of Iran, both foreign and domestic, through the substantial funding for the IRGC, including the Qods Force, which flows through to Hezbollah in its capacity as a constituent member of the IRGC, including the Qods Force.  The IRGC's, including the Qods Force's, complete conversion of the telecom, communications, and computer sectors of the Iranian economy as direct tools of terrorism further strengthened the potency of Defendants' illicit transactions as a means of financing, arming, and operationally supporting attacks.

178.     Defendants provided fungible funds to the IRGC, including the Qods Force, that inevitably flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi for attacks against Americans in Iraq.  As Ambassador Mark D. Wallace explained in 2012, "[a]bsent *economic support from international businesses*, the Iranian regime would *not have the financial wherewithal to … support terrorism*."[74]

---

[74] Wallace May 17, 2012 Testimony (emphasis added).

179.    Writing in the *Eurasia Review*, a foreign affairs analyst specializing in Iran

explained the tight nexus between economic transactions with the Bonyad Mostazafan and

Hezbollah-led terrorist attacks against Americans in Iraq and elsewhere:

> The question is, where does the revenue go? … Since US sanctions caused a sharp decline in Iran's official revenues, the regime is facing financial difficulties and cannot fund its proxies to meddle in the region or as the mullahs' call it "expand its strategic scope". ***Iran cannot fund its proxies including Hezbollah, and its multitude of militia forces in Iraq*** and Yemen, or its Afghan Fatemiyoun Division and Pakistani Zainebiyoun militias in Syria using its official annual budget. ***The millions of dollars used to fund these group must be provided from other financial sources***. …[B]onyads such as Bonyad-e-Mostazafan, are among the organizations that have ***directly assisted the Quds Force in this regard***. Iranian opposition sources have previously stated that the Quds Force receives ***most of its funds*** from [Bonyads]. … The US's decision to sanction [Bonyads] will definitely be welcomed by Iranians who are tired of having their ***stolen wealth used for terrorism***.[75]

180.    Juan C. Zarate, former Deputy National Security Advisor for Combatting

Terrorism from 2005 through 2009, previously testified about the key role played by IRGC,

including Qods Force, front companies in funding and arming anti-American terrorist attacks

committed by Iranian terrorist proxy groups:

> We have limited tools to address … terrorism … And the use of financial power and the power to exclude from the global system is one of our principal if not most effective tools….. . .  [W]e have to have a comprehensive strategy with the use of all tools of national power. No doubt. But the reality is at the end of the day, these tools are the ones that prove to be most effective. … So we are going to have to, ***if we are honest about what's happening in the international financial commercial order, we are going to have to crack down on Qods Force front companies*** … That's the nature of the Iranian economy in the way that they do business, and the way they have reached precisely what we have cut off that hardened them so much.[76]

---

[75] Cyrus Yaqubi, *Recently Sanctioned Iran Foundation Is Regime's Slush Fund For Terrorism*, Eurasia Review (Jan. 24, 2021) (emphasis added). While Mr. Yaqubi primarily focused on a separate bonyad, his claims apply equally to Bonyad Mostazafan.  *See id.* ("[B]onyads such as Bonyad-e-Mostazafan, … have directly assisted the Quds Force in this regard.").

[76] Testimony of Juan Zarate, *Sen. Bob Corker Holds a Hearing on Sanctions and the Joint Comprehensive Plan of Action*, SEC Wire (July 31, 2015) (emphasis added).

181.   On April 23, 2012, the Treasury Department announced new sanctions against Iran that recognized that the IRGC's, including the Qods Force's, control of the telecommunications sector was inextricably linked with violence, and stated, in part, as follows:

The Order targets …information and communications technology that facilitates computer or network disruption, monitoring or tracking that could assist in or enable human rights abuses by or on behalf of the … Government of Iran. Pursuant to this order sanctions were imposed on … Iran's Islamic Revolutionary Guard Corps (IRGC) … The IRGC's Guard Cyber Defense Command (GCDC) includes a special department called the Center for Inspecting Organized Crimes (CIOC). … The IRGC's CIOC has openly admitted that it would forcefully suppress anyone seeking to carry out "cultural operations" against the Islamic Republic via the Internet … Individuals arrested by the IRGC have been subjected to severe mental and physical abuse …."[77]

182.   The nexus between Defendants' illicit transactions in the Iranian telecom sector and terrorist violence by Iranian proxies was especially tight.  As Ali Alfoneh, of the American Enterprise Institute, explained, the IRGC, including the Qods Force, pushed their way into the telecom sector mafia-style, and relied upon the funds and technology they acquired through their telecom front companies to fund IRGC, including Qods Force, operations:

**Telecommunications**
The *IRGC has also muscled its way into the Iranian telecommunications sector*. In February 2002, Turkish cell phone company Turkcell … won a bid to inaugurate a second mobile phone network for Iran … *The Iranian government welcomed Turkcell.  That is, Turkcell was welcome until the IRGC complained.* Turkcell would have been in direct competition with IRGC communications technology and electronics firms.  The Council of Guardians–an executive body close to the IRGC and the supreme leader–protested that Iranians would have only 30 percent ownership of the new company.  Even after the National Bank of Iran bought out foreign investors to achieve a 51 percent Iranian stake, *the IRGC was not satisfied*.  The IRGC-operated [IEI] and the [Bonyad Mostazafan]–an independent financial body *traditionally run by a retired IRGC commander and used by the state as a proxy to fund off-the-books IRGC operations*–erected a cascade of legal and practical obstacles leading [] Turkish investors to retreat from the Iranian market.

---

[77] U.S. Treasury Dep't, *Fact Sheet: New Executive Order Targeting Human Rights Abuses Via Information Technology* (Apr. 23, 2012).

The IRGC rooted its rhetoric on Turkcell on national security. … **the IRGC expects to maintain its dominant position not only on the battlefield, but in civilian sectors as well.** … Because some of the Iranian economy's most advanced technological undertakings occur under the aegis of the IRGC and within the framework of the Iranian arms industry, the IRGC can monopolize the transfer and adaptation of high technology to civilian applications … The homepage[] of [IEI] … display[s] many consumer goods produced by the arms industry for sale in the Iranian market. The list includes personal computers, scanners, telephone sets and intercoms, mobile phones, and telephone sim cards. These **purchases support … IRGC operations** ….[78]

183.     As national security analysts Elliot Hen-Tov and Nathan Gonzalez wrote in the *Washington Quarterly* in 2011, the IRGC, including the Qods Force, "'cashed in' since 2005."[79] Describing the "dramatic increase" in the IRGC's, including the Qods Force's, "economic importance" since 2005, they explained that:

> [T]he Guards [i.e., the IRGC, including the Qods Force] controlled less than five percent of GDP shortly after the end of the Iran-Iraq War in 1989.  Now, they directly or indirectly oversee … about 35 percent and growing. … Prior to 2005, the Guards … occasionally **used raw power to reverse high-profile tenders in their favor**.  One of the **most notable examples** is when it nullified Turkcell's winning bid to operate a second mobile-phone network as part of a consortium [in favor of Defendant MTN]. Upon **pressure by the Guards** and their patrons, the Majles was **forced to change the terms of the deal and revoke Turkcell's majority share in the consortium**. After Turkcell's departure, an Iranian-led consortium **under the ownership of a Guards' subsidiary** [i.e., Defendant MTN Irancell] received the license for the network.[80]

184.     Defendants also helped the IRGC, including the Qods Force, arm their terrorist proxies Hezbollah and Jaysh al-Mahdi by providing embargoed dual-use technology from the United States.  Defendants' contribution to the terrorist enterprise was essential, as the embargoed American technology that Defendants provided to the IRGC, including the Qods

---

[78] Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, American Enterprise Institute,  (Oct. 22, 2007) (emphasis added).

[79] Elliot Hen-Tov and Nathan Gonzalez, *The Militarization of Post-Khomeini Iran: Praetorianism 2.0*, The Washington Quarterly (Winter 2011).

[80] *Id*. (emphasis added).

Force, fronts directly improved the efficacy of the Hezbollah-designed and built bombs that the

Joint Cells used to attack Americans in Iraq between 2011 and 2016.  As the RAND Corporation

has explained: "[s]everal *network technologies, most notably cell phones … and other*

*communication devices*, have *enabled terrorists to improve their use of [IEDs]*.  There have

been *well-publicized cases of terrorist use of cellular phones in operations*."[81]

185.    The technology Defendants provided also helped the IRGC, including the Qods

Force, logistically support the Joint Cells operating in Iraq.  In their 2007 study, RAND

explained that telecom, communications and information technologies are vital for transnational

terrorist organizations to plan, communicate, and execute attacks:

> *Increasingly, as more functionality is integrated into personal electronic devices, clusters of technologies are likely to play an increasingly important role in enabling terrorist operations.* Although these devices are referred to individually as smart phones, digital cameras, personal digital music devices, personal memory devices (e.g., jump drives), GPS devices, and digital video recorders, they increasingly embody *clusters of technological capabilities that can be useful to terrorists*. The development trajectory of cell phones in particular may enable terrorists to have a single electronic device that can provide *integrated, redundant mechanisms for signaling operations or detonating explosive devices*. … As communication technologies become increasingly able to use available wireless communication modes, it may become *more difficult to interrupt the triggering of IEDs*. Early generations of terrorist detonation devices could frequently be jammed because they could only receive transmitted signals on a limited number of frequencies.  In the future, a single … smart phone will likely be able to receive information using [an array of signals]. The diversity of signals could make jamming devices based on these technologies difficult.[82]

186.    As a result of the foregoing, each time Defendants publicly touted how it had

helped improve the technical capabilities of the phones and other network devices supplied to

MTN Irancell or TCI, MTN and ZTE were also admitting that they were bolstering the

---

[81] Bruce W. Don, David R. Frelinger, Scott Gerwehr, Eric Landree, Brian A. Jackson, *Network Technologies for Networked Terrorists: Assessing the Value of Information and Communication Technologies to Modern Terrorist Organizations* 38-39 (RAND Corp. 2007) (emphasis added).

[82] *Id.* at 39-40 (emphasis added).

communications networks, technologies, and operative phones relied upon by the IRGC, including the Qods Force, to sponsor Hezbollah's terrorist attacks against Americans in Iraq.

187.    The technology Defendants provided also helped the IRGC, including the Qods Force, communicate with Hezbollah and Jaysh al-Mahdi (through Hezbollah) in Iraq by sourcing embargoed dual-use technology from the United States.  Indeed, the IRGC's, including the Qods Force's, desire to ensure that it could securely communicate with Hezbollah and Jaysh al-Mahdi in Iraq was what motivated it to instruct MTN and ZTE to obtain the embargoed U.S. technology in the first instance.  And for good reason:  for a terrorist alliance seeking to evade the surveillance of the world's greatest military so that it could plan its attacks unmolested, sensitive communications technology from the United States offered an almost impossible-to-overstate communications advantage to the terrorists by arming them with state-of-the-art communications and encryption technology.  As the RAND Corporation explained:

> For security forces monitoring terrorist communication, such mode nimbleness can **increase the challenges of successfully using terrorist communication traffic**. … **Terrorist access to easy-to-use devices with multiple modes of communication present challenges for security forces** attempting to intercept or track communications … Such communication networks can bypass security forces' centralized monitoring at switches or through the intermediate organization that manages the network infrastructure, **and thereby provide fairly secure communication** …[83]

### B.    Defendants knew or recklessly disregarded that their transactions with Islamic Revolutionary Guard Corps, including Qods Force, fronts, operatives, and agents aided terrorism

188.    Defendants knew or recklessly disregarded that their transactions with fronts, operatives, and agents for the IRGC, including the Qods Force, financed, armed, and operationally supported Iranian proxy terrorist attacks against Americans in Iraq.

---

[83] *Id*. at 35-36 (emphasis added).

189.    By early 2005, it was widely understood in diplomatic, business, and military circles that the IRGC, including the Qods Force, had seized control of Iran's telecom, communications, and information technology sectors.  Before they transacted with IRGC, including Qods Force, fronts, operatives, and agents, Defendants were aware that IRGC, including the Qods Force, had seized control of these sectors.

190.    Defendants were aware of IRGC's, including Qods Force's, capture of Iran's telecom, communications, and information technology companies in part through their local agents and affiliates, whom Defendants relied upon to keep abreast of Iranian market conditions; these agents (who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the IRGC, including the Qods Force, controlled Iran's telecom, communications, and information technology sectors and used that control to raise money, obtain weapons, and source operational support for terrorism.  As a general matter, those agents spoke fluent Farsi, had relationships with people throughout Iranian government and industry, and were well-informed about Iranian politics and economics.  They could not have remained ignorant of the common understanding that the Iranian telecom, communications, and information technology sectors were controlled by the IRGC, including the Qods Force.

191.    Defendants knew, or recklessly disregarded, that the IRGC, including the Qods Force, routinely used commercial transactions to raise money and acquire key weapons and weapons components in support of the IRGC's, including the Qods Force's, lead terrorist agent, Hezbollah, as well as Hezbollah's Iraqi proxy, Jaysh al-Mahdi.  As a regional studies professor

explained, "Dubai … maintains crucial avenues for the IRGC … to generate money" and serves as "the gate to the world for" Iranian terrorist front company efforts.[84]

192.    Defendants knew, or recklessly disregarded, that as American sanctions seeking to choke off IRGC, including Qods Force, access to the global financial system escalated, the IRGC, including the Qods Force, responded by using IRGC, including Qods Force, front companies and agents in the United Arab Emirates, Iraq, and elsewhere to raise money through criminal enterprise, facilitate terrorist finance through the banking system, and maintain the steady supply of key telecom, communications, and information technologies necessary to continue to prosecute a terrorist campaign against Americans in Iraq and elsewhere.  Per *Reuters*, the IRGC, including the Qods Force, has:

> long proved successful in defending [its] economic interests, including in recent years when the sanctions … effectively exclude[ed] Iran from the global financial and trading system.  "Even under very difficult economic circumstances, the funds for the IRGC's activities, whether domestic or overseas, remained intact," said a former official close to the [Iranian] government…  As the U.S. and EU sanctions on Iran's oil and finance sectors in 2012 started to bite, the [IRGC] responded by setting up complex operations involving the likes of Dubai …. "***The IRGC started to buy hundreds of … companies around the [U.A.E.] to use as front companies,***" said a trader involved in … the oil industry. ***"These companies partnered with some foreign companies to bypass sanctions.  Most of the time cash was delivered to a foreign account in a neighbouring country***."[85]

193.    At all relevant times, Defendants understood that the U.S. government believed that IRGC, including Qods Force, activities in the U.A.E. supported anti-American terrorism in Iraq and Afghanistan.  For example, in 2008, President George W. Bush gave a widely-reported speech to U.A.E. government and business leaders in which he called Iran "the world's leading

---

[84] TRT World (Turkey), *Amid Soleimani Crisis, Iran Threatens to Level Dubai and Israel. But Why?* (Jan. 8, 2020), 2020 WLNR 663153.

[85] Parisa Hafezi, *RPT-INSIGHT-Iran's Elite Guards to Gain Regional, Economic Power in Post-Sanctions Era*, Reuters News (Jan. 20, 2016) (emphasis added).

sponsor of terrorism" and stressed that illicit transactions in the U.A.E. were important to the IRGC's, including the Qods Force's, ability to provide "support for Islamist groups and militants in Afghanistan, Iraq, Lebanon and the Palestinian territories."[86]  Press reports concerning President Bush's speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the administration want[ed] to restrict."[87]

194.    From 2005 through 2016, accounts from prominent Western media sources also reported on the direct link between the Iranian telecom, communications, and information technology sectors and the IRGC, including the Qods Force.

195.    On information and belief, Defendants were aware of these reports documenting the link between their Iran-related counterparties and the IRGC, including the Qods Force.  Each Defendant generally maintained a corporate security group responsible for supervising their global supply chains, doing counterparty diligence, and preventing the theft or diversion of the devices or services they sold, including in the Middle East.  As part of such efforts, Defendants' standard practice would have been to conduct basic open-source research on the Iranian telecom market and the mechanics of making telecom deals in Iran – even a modicum of which would have uncovered the reports discussing the Iranian front entities' terrorist ties set forth above.[88]

---

[86] APS Diplomat Redrawing the Islamic Map, *Bush Says Iran Poses Threat To Global Security* (Jan. 14, 2008), 2008 WLNR 25283869.

[87] *Id*.

[88] This allegation applies to all Defendants except MTN Irancell.  Plaintiffs allege that MTN Irancell relied upon the IRGC, including the Qods Force, to conduct diligence on the counterparties with whom MTN Irancell conducted business, and that the IRGC, including Qods Force, fronts, operatives, and agents that owned and managed MTN Irancell would not have approved any significant investment or hire by MTN Irancell if the IRGC, including the Qods Force, believed that such proposed deal did not benefit the "security" agenda of the IRGC, including the Qods Force.

196.    After 2005, Defendants could not have conducted credible due diligence that would have "cleared" their transactions with their counterparties controlled by the IRGC, including the Qods Force.  Defendants also knew or recklessly disregarded the IRGC's, including the Qods Force's, control of their business partners based upon the statements set forth in prominent due diligence materials concerning Iran.

197.    MTN's collusion against Turkcell with the conservatives who controlled the IRGC, including the Qods Force, fronts responsible for the Irancell contract itself became a notable "red flag" about the highly risky Iranian business environment that Defendants knew of, and ignored.  For example, as the *Economist*'s flagship due diligence report, the *Economist Intelligence Unit*, explained in June 2005:

> There is considerable doubt that [] Turkish investment projects … will proceed after facing opposition from the new conservative-dominated [Iranian parliament, the] Majlis. The Majlis in late 2004 passed a law giving it a veto over foreign investment and in early 2005 ruled that Turkcell … should reduce its stake in [] Irancell … to 49% from 70% [and] … that a majority of Iranian shareholders would have to support any management decisions and that security issues be referred to the intelligence ministry and the Supreme National Security Council. … The Majlis's opposition to the projects … is sure to cause nervousness among foreign investors who will see it as calling into question the value of contracts in the Islamic Republic and as a sign of arbitrariness in governance.[89]

198.    After MTN had finished off Turkcell and secured the Irancell license from the IRGC, including Qods Force, fronts who controlled Irancell, the *Economist* updated its standard diligence briefing concerning Iran to warn potential investors, including Defendants, against the "High Risk" of doing business with Iranian entities:

> ***Foreign investors are deterred by the nationalist stance of the Majlis towards foreign investment (High Risk)***.  The Majlis in late 2004 passed a law giving it a veto over foreign investment which it has used to ... severely tighten up on the terms of a project by Turkcell … ***The conditions imposed on Turkcell have seen***

---

[89] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (June 29, 2005), 2005 WLNR 26571496.

*its bid superseded by a South African company, MTN.* The episodes caused nervousness among foreign investors who fear that they called into question the value of contracts in [Iran] and indicated arbitrariness in government decision-making. President Mahmoud Ahmadinejad's presidency (until at least 2009, when fresh elections will take place) will *continue to heighten such concerns*. …[90]

199.    Public statements made by prominent Members of Congress also alerted Defendants to the IRGC's, including the Qods Force's, control of the Iranian telecom sector.  For example, on February 10, 2011, a bipartisan group of United States Senators and Representatives confirmed the widespread understanding that the IRGC's (and by extension, the Qods Force's) control of the "Iran telecom sector, of which the Iranian Revolutionary Guard Corps owns a significant stake."[91]  These Members' letter received widespread coverage in the global media.

200.    Pressure campaigns, also known as "private sanctions," by public interest groups also warned Defendants about the IRGC's, including the Qods Force's, control of the Iran telecom sector.  For example, from 2011 through the present, the non-partisan group UANI[92] has pressured technology and telecom companies to cut ties with IRGC, including Qods Force, fronts

---

[90] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (Nov. 9, 2006) (emphasis added), 2006 WLNR 26677912.

[91] Letter from U.S. Senators Jim Webb, Jon Kyl, and Richard Burr, and U.S. Representatives Ileana Ros Lehtinen and Sue Myrick, *Sens. Webb, Kyl: Sale of U.S. Computer Technology to Chinese Firm Poses Serious Risk Chinese Firm Has History of Illegal Behavior and Ties with the People's Liberation Army, Taliban and Iranian Revolutionary Guard*, States News Service (Feb. 10, 2011).

[92] UANI is a non-partisan group that focuses on protecting American national security from the threat posed by Iran.  In 2012, UANI and its Advisory Board included an array of former national security officials from the U.S. U.K., Germany, Israel, and others, including "Graham Allison, Les Gelb and Fouad Ajami, and former government officials including former CIA Director Jim Woolsey, former Homeland Security Advisor Fran Townsend, former Mossad Chief Meir Dagan, former head of the German Intelligence Service Dr. August Hanning, and former head of the United Kingdom`s MI6 Sir Richard Dearlove among many others."  Wallace May 17, 2012 Testimony.

in order to pressure the Iranian regime to cease its support for anti-American terror and other malign activities in the Middle East.  As Ambassador Mark D. Wallace explained in 2012:

> [I]n 2011 UANI launched its "Tech and Telecom Campaign" to ***publicly highlight the role of telecommunications companies in Iran and about how their technology was being misused by Iranian government security forces*** … In so doing, companies were ***directly facilitating the ability of the Iranian regime to wage a campaign of terror*** … In response to UANI's campaign, companies like Nokia Siemens Networks and Ericsson agreed to not take on any new business in Iran. … In today's integrated business and financial worlds, companies cannot exist in a national vacuum.  Any corporation that seeks access to American capital [] is subject to American law, public pressure and American public opinion.[93]

201.    Defendants also knew that most of their multinational peers had already chosen to exit ventures in which they participated alongside Iranian entities that could potentially be fronts for the IRGC, including the Qods Force.  By 2012, the roster of companies that announced an intention to depart Iran included such prominent multinationals as Huawei, Siemens, Ingersoll Rand, Hitachi, ABB, Porsche, Caterpillar, Komatsu, Bobcat, and others.  Regardless of whether Defendants' multinational peers, in fact, exited these Iranian relationships, their public announcement of their intention to do so further alerted Defendants to the extreme risk posed by their continued economic relationships with their Iranian counterparties.

---

[93] Wallace May 17, 2012 Testimony (emphasis added).

V. **EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, AND THEIR TERRORIST PROXIES HEZBOLLAH AND JAYSH AL-MAHDI**

   A. **The MTN Defendants**

      1. **MTN secured its joint venture with the Islamic Revolutionary Guard Corps, including the Qods Force, in MTN Irancell through bribes and a contractual promise to aid Iran-backed terrorism**

202.    MTN secured its joint venture with the IRGC, including the Qods Force—i.e., MTN Irancell—through MTN's direct contractual promise to the IRGC, including the Qods Force, to aid the IRGC's, including the Qods Force's, terrorist enterprise and MTN's corrupt payments to one or more IRGC, including Qods Force, agents.

203.    In 2004, Iran had awarded a cellular-phone license to MTN's competitor, Turkcell.  But MTN then engaged in a corrupt scheme to take the license away from Turkcell and enter the Iranian market itself.  MTN's efforts were successful and led it to acquire a 49% stake in Irancell – a joint venture with an Iranian government-controlled consortium.  MTN internally called its corrupt scheme to enter the Iranian market "Project Snooker."[94]

204.    MTN threw itself into Project Snooker with abandon, and dedicated senior MTN Group executives to the mission, including, but not limited to, its President and CEO, Commercial Director, and regional head responsible for the Middle East.

205.    On November 16, 2004, MTN's Commercial Director, Irene Charnley, documented MTN's aggressive support for the terrorist agenda of the IRGC, including the Qods Force.  In a fax to Iranians, Ms. Charnley provided MTN's help for Iranian efforts to violate

---

[94] *See* Memorandum from Phuthuma Nhleko to Sifiso Dabengwa *et al.*, *Overview & Way Forward – Project Snooker* (Sept. 21, 2005) ("*Project Snooker Mem.*").

terror-related sanctions against the IRGC, including the Qods Force, by sourcing "major components" for American-made "Bell" and "Sikorsky" helicopters that were intended, in part, for "military use" by the IRGC, including the Qods Force.

206.    Project Snooker required close cooperation between MTN and the Iranian government.  On July 5, 2005, MTN sent a letter from its CEO to two Iranian terrorists, one of whom was the former Chief of Staff of the IRGC, who led the Bonyad Mostazafan and the IEI, which were the two terrorist fronts with whom MTN was attempting to join in the Irancell joint venture (the "July 5, 2005, Letter").  In the July 5, 2005, Letter, MTN Group wrote to its prospective IRGC, including Qods Force, joint venture partner:

> We appreciated the very hospitable manner that you received the MTN Group executive team. During the course of my visit it became clear to me that your organisations play a very important role in the economy of the Islamic Republic of Iran. I was also convinced that your organizations together with MTN could create a partnership that would be ***mutually beneficial*** in ***meeting all our objectives*** in the telecommunications sector in Iran.
>
> I would be honoured if you could find the time to pay a visit to the MTN Group Head Office in … South Africa … [in] July 2005. … [D]uring your visit, … [t]he two key discussion points are:
>
> 1.  The nature and extent of ***financial assistance that the MTN Group could provide to the Iranian partners*** in the Second Mobile licence in Iran.
>
> 2.  The nature and extent of the co-operation between your esteemed organizations and the MTN Group in current and future telecommunications projects in Iran.  [Emphases added.]

207.    The negotiations were successful.  On September 18, 2005, MTN Group signed a Letter Agreement with the IRGC, including Qods Force, fronts with whom MTN had been negotiating, which gave MTN the right to participate in the MTN Irancell joint venture as a junior partner with a 49% stake, leaving 51% collectively – and all decision-making authority – to MTN's two partners whom MTN knew were IRGC, including Qods Force, fronts (hereinafter,

the "Letter Agreement" or "Agreement").  MTN's Letter Agreement with the IRGC, including

the Qods Force, is attached hereto as Exhibit A.

208.    On information and belief, the Letter Agreement was drafted by the IRGC,

including the Qods Force, and constitutes the IRGC's, including the Qods Force's, "template"

for the terms under which Iranian terrorist fronts in industries essential to the terrorist enterprise

are permitted to enter business arrangements with foreign companies, such as MTN and ZTE.

The Letter Agreement is replete with indicia that it was drafted by the IRGC, including the Qods

Force, rather than a sophisticated multinational corporation like Defendants.  Such indicia

include, but are not limited to:  (1) the reference to God at the start of the Agreement; (2) the

inclusion of the Islamic calendar date (27/06/1384) in the Agreement; (3) the generic reference to

"Iranian shareholders," rather than any specific reference to any specific Iranian entity; and (4)

the inclusion of a blank space for the handwritten insertion of certain terms.  Here is how the

Agreement begins:

> *In the Name of God*
>
> **Letter Agreement**
>
> On September 18, 2005 (27/06/1384)  this letter agreement is concluded between local shareholders of Irancell Consortium and MTN, regarding the manner and conditions of transfer of 49% of Irancell Consortium shares to MTN. Parties herein agreed as follows:

209.    The Letter Agreement pledged broad cooperation between MTN Group and its

IRGC, including Qods Force, partners in furtherance of Iran's terrorist agenda.  Section 8

obligated MTN Group to assure that, with respect to its new "Iranian shareholder[]" partners,

"[t]he cooperation between MTN and Iranian shareholders should be in the line of defensive,

security and political cooperation." Notably, Section 8 expressly contemplated that MTN would work with new IRGC partners outside of Iran: "MTN shall fully support cooperation regarding the aforementioned issues in South Africa."

210. Thus, MTN officers, employees, and agents directly partnered with Qods Force operatives because when MTN "fully" cooperated on "security" matters with IRGC operatives and agents outside of Iran as it contractually promised to do, MTN was directly aiding Qods Force terrorists because IRGC personnel acting outside of Iran are Qods Force.

211. The Letter Agreement's deliberate ambiguity through its repeated generalized references to "Iranian shareholders," rather than the Iranian entities with which MTN Group was reportedly partnering, was itself an indication of, and evidence that, the Iranian shareholders in MTN Irancell were fronts, operatives, and agents for the IRGC, including the Qods Force. Indeed, the execution of the Agreement was deliberately designed to obscure each signatory:



212. The Letter Agreement did not merely obligate MTN Group to help the IRGC, including the Qods Force, source weapons in furtherance of the IRGC's, including the Qods Force's, "security" agenda. It also obligated MTN to both pay its new IRGC front partners as well as serve as, in effect, their financial manager:

- Section 2 required that MTN Group "agreed to put in trust twenty-one (21) percent of Irancell Consortium before Bank Melli as trustee." Bank Melli is another IRGC, including Qods Force, front and has been sanctioned by the U.S. government.

- Section 3 required that MTN pay the IRGC, including the Qods Force, hundreds of millions of dollars in up-front license fees as a condition for becoming the new junior

partner in the Irancell joint venture, and that "MTN and Bank Melli shall be responsible for arranging project financing."

- Section 7 set forth an additional catch-all provision designed to route additional money from MTN Group to the IRGC, including the Qods Force, and provided that: "[t]he costs and expenses incurred by Iranian shareholders" – i.e., Irancell's two  IRGC, including Qods Force, fronts – "if any, due to transfer of Irancell's share to MTN shall be compensated by MTN."  On information and belief, MTN routed millions of additional dollars to the IRGC, including the Qods Force, under Section 7.

213.    Although MTN was the IRGC's, including Qods Force's, junior partner in the MTN Irancell joint venture, the Letter Agreement nonetheless empowered MTN with the legal authorities it needed to effectively shut down the IRGC's, including the Qods Force's, ability to weaponize MTN Irancell as an instrument of terror.  Most directly, MTN could simply immediately and unconditionally announce its plans to rapidly exit the joint venture.

214.    MTN is also responsible for MTN Irancell's conduct because MTN had (and continues to have) a veto power over most of the major decisions at MTN Irancell similar to the veto possessed by its joint venture partners, the terrorist fronts Bonyad Mostazafan and IEI.  For example, Section 5.1 of the Agreement provides that:

The resolutions on the below mentioned issues require the affirmative votes of MTN:

- Annual business plans and budgets of [MTN Irancell], including, but not limited to, medium and long term financing;

- Major acquisitions, partnerships, formation of joint ventures or consortiums;

- Discontinuation of business activities;

- Entering into any agreement with persons, individuals or entities that are directly or indirectly related to Non-Iranian or Iranian Shareholders;

- Charging the assets of the Company in any manner which could have significant impact on the Company's ability to use or benefit from its assets in its ordinary course of business;

- Profit appropriates and dividend policy; and

70

- Approval of annual accounts.

215.   The Letter Agreement confirmed that MTN promised to provide other "off-the-books" value to the "Iranian shareholders" with whom MTN had partnered in MTN Irancell, which was itself another obvious reference to MTN's support for the IRGC's, including the Qods Force's, terrorist enterprise.  Section 9 provides that "for this agreement to be effective, it is necessary that the above-mentioned documents and related agreements be signed by MTN as well as to pay license fee and equity as provided in item 3 above [i.e., Section 3 of the Agreement] within 20 days from the signature of Addendum No. 1 to [sic] license agreement, simultaneously, the parties try to finalize the other relevant operational agreements."[95]

216.   MTN Group and its "Iranian shareholder[]" joint venture partners went to great lengths to keep the Letter Agreement a secret.  The Letter Agreement was a "close hold" document at MTN Group and was only known to a select group of senior MTN Group executives because MTN understood that it memorialized an obviously illegal scheme between MTN Group and two fronts for the IRGC, including the Qods Force.  MTN Group also conspicuously failed to obtain any sign-off from any of MTN's elite, white-shoe global law firms, none of which would have approved the Letter Agreement.

217.   MTN Group's executives quickly got to work after MTN Group executed the Letter Agreement on September 18, 2005.  Three days later, MTN's President and CEO, Mr. Nhleko, circulated a memorandum, which was from himself, to five senior MTN executives (the "September 18, 2005, Memo").  Captioned "**STRICTLY CONFIDENTIAL**" and headed with

---

[95] In the Letter Agreement, the number "1" in this sentence is handwritten into what was obviously a placeholder.

the subject "**OVERVIEW AND WAY FORWARD – PROJECT SNOOKER**," the September

18, 2005, Memo provided, in part, as follows:

1. **OPPORTUNITY**
   Project Snooker still presents *one of the most significant "virgin" mobile opportunities in the world*. … [N]otwithstanding the significant challenges that lie ahead, [MTN] must continue to pursue this opportunity vigorously.

2. **CURRENT STATUS**
   *The signing of the various agreements this week [under duress]* was to "book our place at the foot of the mountain – we still need to scale it to get to the peak." It was a choice between inheriting an advanced arrangement [Turkcell revenue share and various negotiated agreements] or taking the chance that the window of opportunity may close on us whilst we try to reconstruct the deal and arrangements from scratch. We chose the former.

3. **RISK AND REWARD**
   *Snooker is "no normal country".* The Ministry of Defense, Government controlled banks and companies, together with Government *essentially control all the commercial activity in the country. Consequently, a conventional mindset, orthodox financial and operational approach to this project is unlikely* to provide us with an outcome that I would feel comfortable to recommend to the board on an investment of over €400 million [license fee and working capital] into Snooker. It is therefore imperative to *think laterally on how we can secure the investment* … in a manner that allows us to penetrate the market achieving an acceptable IRR [i.e., "internal rate of return," a measure of investment profitability]. …

4. **TIMING**
   The expectation is that the license fee should be paid within weeks and the operation launched commercially within a six month period. … The implied time scale can only be achieved through a well though out and coordinated project management structure up …

5. **PROJECT MANAGEMENT**
   *Given the size of the market*, limited time to launch and all that has to be reviewed and completed before the MTN Group board ratifies the revised business plan, *a special project structure must be put in place*. …

   5.1.2 **Finance Structure, project funding and ancillary loan agreements**
   The Group CFO should take responsibility for this area, primarily in the following categories:
   - Flow of license fee and working capital

- Appropriate security arrangements for funding of local partners together with the loan agreements
- Arranging the project finance …

6. **PROJECT STEERING COMMITTEE** [sic]
   I will chair a project steering committee that will have the responsibility of meeting regularly to oversee both Phase I and Phase II until the project is passed onto the MD / COO.  The Steering Committee shall comprise of:
   CEO
   COO
   CFO
   CTO
   Commercial Director
   Group Executive HR …

8. **CONCLUSION**
   ***This is one of the most significant opportunities the Group will undertake*** and will require teamwork to achieve these objectives.  [Emphases added; formatting adjusted.]

218.    After MTN's executive team successfully executed Project Snooker, the conservative-dominated, Qods Force-applauding Iranian parliament determined that MTN's operation of Irancell would improve Iran's "security."

219.    Project Snooker was successful not only because MTN pledged strategic cooperation with the Iranian government, but also because MTN made corrupt payments to government officials, at least one of which it structured as a sham consultancy payment.  On December 11, 2006, MTN Group's CEO instructed MTN Group's CFO to "finalise all agreements with the consultants" who had "assisted the Company" in obtaining the Iran deal.  The first agreement called for MTN Group to make a $400,000 payment for the benefit of an Iranian government operative.  The payment was effectuated through an MTN Group subsidiary, MTN International (Mauritius) Limited, and sent to a consulting firm owned by the Iranian operative's associate.  On April 4, 2007, MTN wired the $400,000 to the putative "consultant."  MTN has never proffered a legitimate explanation for that payment.

220.     MTN's second corrupt payment was to South Africa's ambassador to Iran. MTN's Iran Director has admitted to paying the Ambassador $200,000 in cash out of his own funds, which he tied to cooperation in helping MTN secure its equity interest in Irancell.

221.     MTN Group's senior executives knew of, and approved, MTN Group's bribes to the IRGC, including Qods Force, agents who helped MTN secure the Irancell joint venture.  For example, on December 11, 2006, MTN's President and CEO, Mr. Nhleko, wrote a memorandum to MTN Group's commercial director, in which Mr. Nhleko authorized MTN's bribes (the "December 11, 2006 Memo").  The December 11, 2006 Memo provided, in full, as follows:



# MEMORANDUM

| | | |
|---|---|---|
| TO | : | IRENE CHARNLEY |
| DATE | : | 11 DECEMBER 2006 |
| FROM | : | PHUTHUMA NHLEKO |
| **SUBJECT** | : | **CONSULTANCY AGREEMENTS** |

Dear Irene

With reference to the process in terms of which MTN International (Mauritius) Limited acquired a 49% equity interest in Irancell, you are authorized to finalise all agreements with the consultants that assisted the Company during the run up to and actual negotiating period, and to effect the necessary payments.

Kind regards

**PHUTHUMA F. NHLEKO
GROUP PRESIDENT & CEO**

222.    The phrase "necessary payments" in the December 11, 2006 Memo was a direct admission that the consultancy payments were bribes.  Indeed "necessary payments" has long been understood to refer to bribery.

223.     A host of other highly confidential internal MTN Group documents, leaked by a whistleblower, also confirm that MTN Group's executives directed MTN's financial, technological and operational support for MTN Irancell and the IRGC, including Qods Force, fronts that controlled Irancell.  For example, a March 25, 2007 memorandum from MTN's regional manager responsible for Iran, Chris Kilowan, and MTN's CEO, Mr. Nhleko extensively documents MTN Group's illicit activities (the "March 25, 2007 Memo").

224.     The March 25, 2007 Memo was intended to remain highly confidential, as reflected by what is set forth at the top of it:



| **MTN GROUP LIMITED** | |
|---|---|
| **MEMORANDUM – HIGHLY CONFIDENTIAL** | |
| **To:** | Phuthuma Nhleko |
| **From:** | Chris Kilowan |
| **Date:** | 25 March 2007 |
| **Re:** | Ambassador Briefing: Larijani, Mottaki and MTN |

225.     In the March 25, 2007 Memo, MTN's regional director responsible for Iran confirmed to MTN's President and CEO that "it was the [President of South Africa's] view that the matter of MTN has nothing to do with the Government of South Africa as it is a private business in which the Government of South Africa plays no role."

226.     In the March 25, 2007 Memo, MTN's regional director responsible for Iran confirmed to MTN's President and CEO that he had met with "Mr. Motakki" on behalf of the "Minister of Foreign Affairs."  On information and belief, "Mr. Motakki" was an IRGC,

including Qods Force, cut-out who was either relaying a message from the IRGC or acting as an IRGC operative himself.  In the Memo, MTN's regional director for Iran told its CEO that Mr. Motakki "re-iterated [the IRGC's, including the Qods Force's] understanding that MTN was allowed to replace Turkcell in exchange for defence co-operation," and that "the office of the Supreme Leader" had personally intervened based upon the conclusion by the IRGC, including the Qods Force, "that there are significant defence benefits in it for [the IRGC, including the Qods Force] were MTN to be allowed into the process.  On that basis [the IRGC, including the Qods Force] withdrew their objections [to a foreign company playing a role in the Iranian telecom sector] and allowed the process to proceed in MTN's favour."

227.    In the March 25, 2007 Memo, MTN's regional director responsible for Iran confirmed to MTN's President and CEO that MTN had only become a candidate for the Irancell joint venture after it had promised to pledge to aggressively support the "security" needs of the IRGC, including Qods Force, fronts that controlled the Bonyad Mostazafan and IEI.  He noted, as a "brief recap of history," that "MTN only seriously got back into the [bidding] process" after its Iranian counterparties perceived that MTN would affirmatively aid their "security" needs.

228.    In the March 25, 2007 Memo (emphases added), MTN's regional director for Iran underscored to MTN's President and CEO that MTN would need to serve as a weapons supplier for its Iranian counterparties if it wanted to win, and keep, its position in the joint venture:

> It would seem clear that the issue of ***defence co-operation*** has become a pressing matter with the government of Iran.
>
> If regard is had to the latest UNSC [i.e., U.N. Security Council] Resolution there is a clear move towards dealing with Iran's conventional weapons capability.  … Russia has traditionally played the ***role of key weapons supplier*** to Iran.  Given recent developments …, [Russia] is actively looking at more secured suppliers of defence materials. … Because the entire political situation has now deteriorated significantly it is highly unlikely that the Government of South Africa will be prepared to sign any defence agreements or deliver defence materials to Iran.

Given the ***clear linkage that the Government of Iran has drawn between the defence assistance and allowing MTN into the country the likelihood that there will be serious blowback for MTN is increasing***.

Because there has been a recognition of the ***non-business imperatives that drove MTN's entry into Iran***, the Distant Thunder … projects have been developed to deepen MTN's position, as opposed to and distinct from Irancell, inside Iran so that MTN would be able to rely on broad popular support for its continued presence.  More recently a more mid to long range strategy has been proposed to ensure that MTN puts in place an exit strategy that would ensure that it not be caught in a situation where it loses its entire investment in the country. …

I am preparing a document that spell out the range of actions that can be taken against MTN and will submit that to you as soon as it is complete. In summarized form it can be said that there is every possibility that MTN could be effectively isolated from Irancell with very little negative effect on Irancell.

While 1 million subscribers will act as a defensive buffer for Irancell, it does not provide the same protection for MTN. This is because these subscribers are reflected locally as Irancell subscribers and not MTN. ***All the innovations are not sold as MTN innovations but as Irancell's***. …

To give MTN a realistic chance to navigate through what is potentially going to be a difficult few months (if not years until the end of the current presidency in 2009), I make the following recommendations:

1. Implementation of Project Distant Thunder at the earliest opportunity. We could pre-empt some of the activity that is almost certain to be started in the public sphere against MTN. … (Dimension 1)

2. Approval of the creation of the committee to pursue mid to long term strategies for MTN's investment in Iran. (Dimension 2)

3. Finalisation of the diplomatic support initiative. The ***first consultant is still waiting for the transfer of the agreed amount. This is causing considerable anxiety in his mind and going forward we are going to need his support.*** We still have not given the second consultant any indication whether we are seriously considering his request. He too is developing some anxiety and I have to field almost daily questions on it. (Dimension 3)

229.    A November 10, 2007 memorandum from MTN's regional manager responsible

for Iran, Chris Kilowan, and MTN's then-CEO, Mr. Nhleko further documented MTN Group's

open support for the illicit activities conducted by the fronts operating on behalf of the IRGC,

including the Qods Force, with whom MTN had partnered in Irancell, including MTN partners whom MTN nicknamed "Short John" and "Long John" (the "November 10, 2007 Memo").  On information and belief, the Iranian operative whom MTN derisively nicknamed "Short John" was an agent for the IRGC, including the Qods Forces.

230.    The November 10, 2007 Memo was labeled "**STRICTLY CONFIDENTIAL**" in bright red bolded all-caps font and was titled "**SUBJECT: OUTSTANDING ISSUES**" in bolded all-caps black font.  In it, MTN's executive for Iran communicated to MTN's CEO that:

> Pursuant to [our] last communication … I set out below the issues that I believe are still outstanding [] and will have an impact … on MTN's investment. …

> ### 2.  FINALISATION OF CONTRACT WITH SHORT JOHN

> Subsequent to our last discussion on this matter [in early 2007] I did not do anything about the agreement, preferring to wait until December [2007] to do an agreement … I can certainly state that [Short John] has ***come to the party on every occasion that I called upon him***.  The fact that the ***quid pro quo that has threatened at one stage to be the primary stick with which we could be hit has now largely disappeared*** because of his efforts.

> The initial concessions on promised support for the revenue share issue was ***because of his direct involvement*** … With me out of the picture he will probably be the only friendly source of information and interaction for MTN on this side.  I would recommend that ***MTN finalise arrangements with him and offer fair compensation commensurate with the huge role he has played right from the outset***.

> ### 3.  RENEWED APPROACH BY LONG JOHN

> I have communicated this to you a few weeks ago and recently forwarded an SMS from him.  The background to this new approach is centered in planned developments within the area that he is currently working.  Whatever his motivations, it is not something that should be ignored.  While he has very little power to do anything positive, ***he can be a destructive force*** or simply an unnecessary distraction. …

> ### 6.  PERSISTENT NEGATIVE VIEWS ABOUT SOME MTN EXPATS

> I beg your forgiveness if I sound like a record with a stuck needle but I … alert[] you to a serious risk to MTN's investment. … In [Mr. Mokhber's] view

> MTN made a mistake and inflicted a huge insult on Iran by placing [a woman] here [as Chief Operating Officer of MTN Irancell]. …

(Bolded all-caps emphases in original; bolded italicized emphases added.)

231.    In June 2018, South Africa's anti-corruption police – called the "Hawks" – raided the offices of MTN and its outside counsel as part of an investigation into Irancell-connected bribery.  Roughly eight months later, the Hawks also arrested the former Ambassador whom MTN had bribed.  On information and belief, that investigation remains ongoing.

232.    One reason MTN chose to become the IRGC's, including the Qods Force's, joint venture partner was the potential for enormous profits.  As the *Financial Times* reported at the time in 2013, "[a]s the international community was weighing whether to impose yet more sanctions on Iran over its nuclear programme, [MTN President and CEO] Phuthuma Nhleko was making other plans. Instead of seeing a country with mounting political problems, Mr Nhleko saw a nation with relatively few mobile phone users. Iran, he reckoned, could quickly add 2.5m-3m new customers for MTN Group, the mobile phone company he was running in 2006."[96]

233.    After MTN secured its joint venture with two fronts for the IRGC, including the Qods Force, MTN's President and CEO, Phuthuma Nhleko, "laughed off questions about the political risk of doing business with Iran."[97]  As he chuckled in a discussion with investors after closing the deal with the Iranians, "[MTN] hadn't budgeted for bomb shelters or anything like that."[98]  MTN's CEO's choice to literally "laugh off" questions about the obviously dire risks associated with MTN's new joint venture in Iran typifies MTN's deliberate choice to align itself

---

[96] Lina Saigol and Andrew England, *Telecoms: Dealings in the Danger Zone; MTN of South Africa's Ventures in Iran and Syria Have Dented Its Reputation and Rattled Shareholders*, Financial Times (July 2, 2013) ("Saigol and England, *Telecoms: Dealings in the Danger Zone*").

[97] *Id*.

[98] *Id*.

with anti-American terrorists as the cost of doing business as the IRGC's, including the Qods

Force's, junior partner in the MTN Irancell joint venture.

234.    MTN continued to pursue Project Snooker even after the U.S. Undersecretary of

the Treasury told Turkish officials that Irancell was "fully owned" by the IRGC, including the

Qods Force.  Undersecretary Levey did so as part of a campaign in which he alerted every major

western business and financial partner of the IRGC, including the Qods Force, about the inherent

terrorism risks attendant to any transactions with fronts for the IRGC, including the Qods Force.

On information and belief, Undersecretary Levey told MTN Group that Irancell was "fully

owned" by the IRGC, including the Qods Force, and, by extension, that when Irancell operated

outside of Iran, it was Qods Force operatives who were in charge.

235.    MTN's bribes and alliance with the IRGC, including the Qods Force, "is a saga

that illustrates the extraordinary risks MTN has taken to profit from doing business with pariah

states."[99]

> **2.    MTN knowingly assumed a financial and operational role in the Islamic Revolutionary Guard Corps's, including the Qods Force's, terrorist enterprise**

236.    For more than fifteen years, MTN has served as a reliable joint venture partner for

the IRGC, including the Qods Force.

237.    From the course of negotiations with its IRGC, including Qods Force,

counterparts in 2004 and 2005, MTN knew at all times that it was acting to benefit the IRGC's,

including the Qods Force's terrorist agenda.  MTN contractually agreed to benefit the "security"

needs of its "Iranian shareholders" (a direct reference to the two fronts for the IRGC, including

the Qods Force, with whom MTN agreed to serve as the junior partner in their shared joint

---

[99] *Id.*

venture).  MTN's agreement with the IRGC, including the Qods Force, is attached hereto as Exhibit A.

238.    According to the broad consensus of Iran experts, regional scholars, businesspeople, and former government personnel from the U.S. and allied nations, Iranian government references to "security"-related policies are widely-understood as a euphemism for the IRGC's, Qods Force's and Hezbollah's foreign terror operations against regime enemies, most of all Americans, outside of Iran, such as the Joint Cell's bombing campaign against Americans in Iraq.  A broad range of sources, including statements from governments and the media, alerted MTN and ZTE to this consensus.

239.    MTN knew, or recklessly disregarded, that its pledge to aid the IRGC's, including the Qods Force's, "security"-related efforts committed MTN to actively participating in the IRGC's, including the Qods Force's, terrorist enterprise against Americans outside of Iran, including in Iraq.

240.    MTN remained committed to its IRGC, including Qods Force, allies even after withering U.S. pressure.  For example, in or around 2010 or 2011, MTN representatives met with senior executive officials from the U.S. government.  During these meetings, MTN representatives falsely assured the U.S. government that they were not helping the IRGC, including the Qods Force, or supplying them with any embargoed U.S. technology in violation of U.S. sanctions against Iran that are intended to deprive Iran the IRGC, including the Qods Force, of the money and technology useful to the Joint Cells' shared terrorist enterprise.  MTN provided the U.S. such false assurances even after "MTN ha[d] carried out orders from the regime to shut off text messaging and Skype during times of political protest, and reportedly ha[d] a floor in its Tehran headquarters controlled by Iranian security officials."

241.     As the IRGC, including the Qods Force, joint venture partner, responsible for sourcing the most important technological items for modern terrorism – the communications, computing, and encryption technologies that were vital to attacking Americans – MTN assumed a key financial and operational role in the IRGC's, including the Qods Force's, terrorist enterprise, including their technological support of Hezbollah.

242.     Under the structure of the MTN Irancell joint venture, the two fronts for the IRGC, including the Qods Force, that exercised 51% control of MTN Irancell – the Bonyad Mostazafan and IEI – had the mandate to promote the IRGC's, including the Qods Force's, "security" agenda, including the obligation to block any significant MTN Irancell-related transaction or commercial relationship unless it improved the IRGC's, including the Qods Force's, terroristic capabilities.  Given the IRGC's, including the Qods Force's, view that MTN Irancell was essential to IRGC, including Qods Force, "security" operations, the terrorist fronts that controlled MTN Irancell (Bonyad Mostazafan and IEI) would not have approved any material MTN Irancell transaction unless they determined that, on balance, the particular transaction improved the IRGC's, including the Qods Force's, ability to execute terror operations as the central element of the IRGC's "security" agenda.  As a result, one may infer that every significant commercial transaction and business relationship that MTN Irancell entered into was: (1) vetted by the IRGC, including the Qods Force; and (2) determined by the IRGC, including the Qods Force, to advance the IRGC's, including the Qods Force's, "security"-related capabilities, which was a specific Iranian euphemism for external terror operations.

243.     MTN was the lead target of a major public pressure campaign demanding that MTN exit its joint venture with the IRGC, including the Qods Force.  For example, on March 7, 2012,  UANI "renewed its call on investors, affiliated institutions and potential customers to

cease all business with South African telecommunications firm MTN in response to MTN Group President and CEO Sifiso Dabengwa's callous remarks and irresponsible posture on MTN's partnership with sanctioned Iranian entities that are linked to the Islamic Revolutionary Guards Corps (IRGC)."[100]  MTN chose to stay in their alliance with the IRGC, including the Qods Force, in the face of such pressure and even after nearly every other multinational had exited such ventures.

244.    From 2005 through the present, MTN's joint venture with MTN Irancell, and MTN's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI, and the Akbari Fronts, each provided tens of millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force, which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

### a.    MTN assumed a financial role in the terrorist enterprise

245.    MTN assumed a financial role in the terrorist enterprise by, among other things, bribing its IRGC, including Qods Force, joint venture partners to win the Irancell license in the first instance, paying large license fees, and generating revenue for MTN Irancell throughout the operation of the joint venture.

246.    **MTN's Bribes to Terrorist Fronts.**  On information and belief, the recipient of MTN's $400,000 wire was acting as a front, operative, or agent for the IRGC, including the Qods Force.  On information and belief, the recipient of MTN's $400,000 wire was a cut-out for MTN to route value to "Iranian shareholders," who were the IRGC, including the Qods Force.

---

[100] United Against Nuclear Iran ("UANI"), *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012); *see* Business Wire, *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012) (broad international publication of this UANI press release).

The IRGC, including the Qods Force, ensures that all economic value is shared amongst constituent parts of the organization, and would not have permitted such value transfer here relating to a contract decision-making process the IRGC, including the Qods Force, controlled without obtaining their share of the payment under the IRGC's mafia-like revenue sharing practices.

247.    MTN knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire was acting as a cut-out to allow money to flow through for the benefit of the IRGC, including the Qods Force, which had proved vital to MTN's successful campaign to steal Turkcell's license.

248.    MTN also knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire instructed MTN to wire the money, in U.S. Dollars, to a bank account in the U.A.E., and therefore that the recipient of MTN's $400,000 wire was specifically acting as a pass-through for the benefit of the Qods Force because MTN's $400,000 wire instruction, on information and belief, caused a bank in the United States to send $400,000 to a bank account controlled by a cut-out for the IRGC, including the Qods Force, acting in Dubai, which was the Qods Force's most notorious financial and logistical hub in the Middle East outside of Iran.

249.    On information and belief, MTN regularly makes similar sham "consulting" payments like one that MTN used to attempt to justify MTN's $400,000 wire, and such payments benefitted fronts, operatives, or agents for the IRGC, including the Qods Force, in their MTN Irancell-related terrorist fundraising efforts from 2005 through today.

250.    **MTN's License Fee Payments to Terrorist Fronts.**  After it corruptly secured the 15-year Irancell license, MTN Group Ltd. paid the IRGC, including the Qods Force, through the Bonyad Mostazafan and IEI, an approximately $300 million license fee when it secured its 49% status as the junior partner in the MTN Irancell joint venture.  This money benefited the

IRGC's, including the Qods Force's, terrorist enterprise, and the Qods Force received a substantial amount per standard IRGC, including Qods Force, practice.

251.   **MTN's Funding of Terrorist Fronts through MTN Irancell Cash Flow.**  MTN reaped enormous profits from its involvement in MTN Irancell, and sourcing of copious amounts of dual-use technology to benefit MTN Irancell and the IRGC, including the Qods Force. Indeed, by 2013, "MTN has faced a huge headache in seeking to get dividends out of Iran because stringent sanctions prevent[ed] banks from moving cash easily in and out of the country. MTN … *was virtually printing money in Iran*, where it has a 46% share of the market."[101]

252.   Under MTN's joint venture with its two IRGC, including Qods Force, front partners in MTN Irancell, for every dollar (or Iranian Rial) that MTN generated for the joint venture, MTN's terrorist partners received 51 cents to invest in their terrorist enterprise.  Thus, every dollar in profit for MTN Irancell inevitably helped fund Hezbollah's coordination of a nationwide insurgency against Americans in Iraq, the IRGC's, including the Qods Force's, industrial-scale production of EFP components, advanced rockets, and other high-tech weapons for use by Shiite terrorists against Americans in Iraq, and the aggressive forward deployment of IRGC, including Qods Force, operatives throughout Iraq to partner with Hezbollah and Jaysh al-Mahdi to maximize the effectiveness of the Joint Cells maintained by the groups in Sadr City, Basra, and elsewhere.

253.   Through its participation in MTN Irancell, MTN caused the IRGC, including the Qods Force, to realize tens of millions of dollars per year in income that the IRGC, including the Qods Force, used to fund terrorist operations against Americans in Iraq including, among other

---

[101] Business Day Live, *Iran Deals Forced MTN Boss to Quit* (July 28, 2013) (emphasis added).

things, by funding Hezbollah and Jaysh al-Mahdi, including Jaysh al-Mahdi Special Groups

Asaib Ahl al-Haq and Kataib Hezbollah.

> **b.      MTN assumed an operational role in the terrorist enterprise**

254.    As the IRGC's, including the Qods Force's, and Qods Force's chief outside

telecommunications partner, MTN helped the IRGC, including the Qods Force, grow their

cellular-phone capabilities, evade American sanctions, and acquire embargoed U.S.-made

communications technology.

255.    From 2005 through the present, MTN has illegally sourced embargoed dual-use

U.S. technology at the request of the IRGC, including the Qods Force, in coordination with

MTN's Qods Force handlers in the U.A.E., where MTN and the IRGC, including the Qods

Force, coordinate their technical collaboration.  Plaintiffs' belief is based upon, among other

things, information and inferences based upon statements made by one or more witnesses,

MTN's own internal documents, financial records, and investigations by major global media

outlets.

256.    For example, on June 4, 2012, *Reuters* reported on MTN leading efforts to

illegally acquire hundreds of dual-use, military-grade embargoed communications, telecom, and

computer technologies for the IRGC, including the Qods Force:

> A fast-growing Iranian mobile-phone network managed to ***obtain sophisticated U.S. computer equipment despite sanctions that prohibit sales of American technology to Iran***, interviews and documents show.  MTN Irancell, a joint venture between MTN Group Ltd of South Africa and an Iranian government-controlled consortium, sourced equipment from Sun Microsystems Inc, Hewlett Packard Co and Cisco Systems Inc, the documents and interviews show. MTN owns 49% of the joint venture but provided the initial funding. …
>
> Chris Kilowan, who was MTN's top executive in Iran from 2004 to 2007, said in an interview … [that] ***MTN's parent company, MTN Group, was directly involved in procuring U.S. parts for MTN Irancell***, which launched in 2006 and is now Iran's second-largest mobile-phone operator.  ***"All the procedures and processes around procurement were established by MTN,"*** he said. He said the

company *agreed to allow its Iranian partners and MTN Irancell* to set up a local Iranian company with the *"basic" purpose of evading sanctions on Iran.* …

Reuters provided MTN with the names of four current MTN Group executives believed to have knowledge of the procurement of U.S. parts by MTN Irancell. MTN declined to make any of them available for interviews. …

Kilowan's claims regarding how MTN Irancell obtained U.S. parts for its network … were supported in documents and numerous interviews conducted by Reuters. For example, Reuters reviewed an 89-page MTN Irancell document from 2008 that shows the telecom carrier was specifically interested in acquiring embargoed products. … In a section on managing product-support agreements for third-party equipment, *the MTN Irancell document states, "This should include embargo items."* The document also includes *lists of network equipment, including Cisco routers, Sun servers and products from HP*. …[102]

257.    *Reuters* "documented … how Iranian telecoms - including the MTN joint venture – [] managed to obtain embargoed U.S. computer equipment through a network of Chinese, Middle Eastern and Iranian firms."[103]  As *Reuters* put it, "[t]he Turkcell-MTN case offers further evidence that there are always companies willing to do business with a country even when it becomes an international pariah."[104]

258.    MTN's technical assistance to the IRGC, including the Qods Force, had a devastating impact on the U.S. government's ability to protect Americans in Iraq from Shiite terrorist attacks.  By helping to revolutionize the IRGC's, including the Qods Force's, communications abilities, MTN helped the IRGC, including the Qods Force, better conceal their communications with their Hezbollah and, through Hezbollah, Jaysh al-Mahdi, proxies inside Iraq to make it nearly impossible for American counter-terror forces in Iraq to monitor the Joint

---

[102] Steve Stecklow, *Exclusive:  Iranian Cell-Phone Carrier Obtained Banned U.S. Tech*, Reuters (June 4, 2012) (emphasis added; formatting adjusted).

[103] Steve Stecklow and David Dolan, *Special Report: How An African Telecom Allegedly Bribed Its Way Into Iran*, Reuters (June 15, 2012).

[104] *Id*.

Cells attacking Americans in Iraq.  By making it easier for Hezbollah and Jaysh al-Mahdi to securely communicate with one another, MTN made it easier for the Joint Cells to attack Americans – and they did.  MTN accomplished this "communications concealment" assistance to the IRGC, including the Qods Force, which flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi, in at least three ways.

259.     *First*, MTN acquired advanced American-made encryption technologies for the IRGC, including the Qods Force, their agent, Hezbollah, and Jaysh al-Mahdi.  The terrorists used the MTN-acquired, U.S.-manufactured and embargoed technologies to encrypt their communications.

260.     *Second*, MTN sourced hundreds of advanced American smart phones each year that were intended to be used, and were in fact used, by the IRGC, including the Qods Force for terrorism.  On information and belief, the American smart phones sourced by MTN for the IRGC, including the Qods Force, were used to increase the effectiveness of Hezbollah-designed, IRGC-funded (including and Qods Force-funded) IEDs and EFPs in Iraq by making it easier for terrorists to detonate them and harder for American counter-IED technologies to prevent their detonation by "jamming" them.

261.     *Third*, MTN lied to the U.S. government about its ongoing cooperation with and work on behalf of the IRGC, including the Qods Force.  This furthered the Joint Cells' terrorist campaign by preventing the U.S. government from knowing and understanding what technology the terrorists had, and when.

262.     Even as of the date of this Complaint, MTN continues to dissemble about its relationship with the IRGC, including the Qods Force.  Even after the United States designated the IRGC as a Foreign Terrorist Organization on April 19, 2019, MTN stubbornly refused to

acknowledge any need to change its business practices in Iran for more than a year, instead rolling out a host of new offerings designed to *increase revenue* flowing to MTN Irancell and, by extension, the two newly-designated-FTO-fronts that controlled MTN Irancell.

263.    Finally, on August 6, 2020 – *475 days after the IRGC's FTO designation* – MTN announced that it was exiting the Middle East.  Even then, however, MTN refused to condemn the IRGC, including the Qods Force, refused to promise a rapid withdrawal from its terrorist joint venture, MTN Irancell, and merely offered a blithe promise that MTN would eventually exit MTN Irancell in four or five years (i.e., sometime in 2024 or 2025).

264.    On information and belief, MTN declined to immediately exit its joint venture with two FTO fronts after the IRGC's FTO designation because MTN determined that MTN would lose, at least, hundreds of millions of dollars if MTN rapidly withdrew from its MTN Irancell joint venture with the Bonyad Mostazafan and IEI.

265.    As alleged, MTN knew, or recklessly disregarded, that it was dealing with Qods Force fronts, but given the IRGC's designation as an FTO in 2019, MTN's ongoing relationship with two widely recognized IRGC fronts proves MTN deliberately chose to join the IRGC's, including the Qods Force's, terrorist enterprise against America, which MTN self-evidently views as an acceptable cost of doing business.

266.    MTN's ongoing refusal in 2021 to immediately and unconditionally (as in weeks, not months or years) exit its joint venture with fronts for the IRGC, including the Qods Force, even after the IRGC had been designated as an FTO in 2019, and nearly every other multinational corporation had withdrawn from such joint ventures with Iranian fronts nearly a decade earlier, further confirms that MTN meant to support Iran-backed terror all along.  The following history of the UANI's public pressure campaign demonstrates this.

267.    On January 25, 2012, Ambassador Wallace, the president of UANI, wrote to

Sifizo Debengwa, MTN Group's then-President and CEO:

> [UANI] is writing to express its concern about the ongoing business of [MTN] in Iran. Recently, UANI launched its "Tech and Telecom Campaign" to highlight the Iranian regime's misuse of technology … In response …, a number of corporations, including Huawei and Nokia Siemens Networks ("NSN"), have curbed their business activities in Iran. We now ask MTN to do the same.
>
> The reasons for this call by UANI are manifold. … Iran [] remains the ***world's leading state sponsor of terrorism and has sponsored notorious terrorist groups like … Hezbollah…. Iran's … terrorist activities should be reason enough for a corporation to pull out of Iran***….
>
> MTN is a 49% shareholder of MTN Irancell, the second largest mobile phone network operator in Iran. The majority 51% is in turn owned by the Iranian regime, which has exploited the network and telecommunication technology of MTN Irancell …
>
> In addition, in 2009 MTN Irancell bought a mobile-positioning center from Ericsson.  Iranian security forces have reportedly utilized such mobile positioning centers to pinpoint the location of mobile telecommunications users. (Bloomberg, "Iranian Police Seizing Dissidents Get Aid of Western Companies," 10/30/2011) More recently, MTN Irancell reportedly purchased a system from Creativity Software that enables Iranian security forces to monitor the location of cellular phone users. The system also stores data and can generate reports about a person's movements. (Bloomberg, "Iranian Police Seizing Dissidents Get Aid of Western Companies," 10/30/2011) As co-owner of MTN Irancell, MTN certainly had knowledge of such purchases and by collaborating directly with the Iranian regime, MTN is complicit in facilitating the abuses that occurred … as a result.
>
> In short, it appears that MTN is taking advantage of the fact that responsible corporations are leaving Iran, and eagerly filling the void. MTN must end its irresponsible business practices in Iran and, in particular, its direct collaboration with the Iranian regime. …  [Emphasis added.]

268.    On February 29, 2012, Ambassador Wallace followed up on his January 2012

letter to MTN Group's President and CEO:

> [MTN] fails to respond to evidence of Iran's routine use of telecommunications equipment to illegally track, monitor, and in some cases arrest, detain, and torture Iranian citizens opposed to the current extremist regime.  More specifically, [MTN] also fails to refute the fact that the Iranian regime, the majority 51% holder of Irancell and partner of MTN, "has exploited the network and

91

communications of peaceful dissidents in Iran."  Finally, [MTN] fails to respond to UANI's inquiries regarding multiple reports of collaboration by MTN Irancell and the Iranian regime … MTN is a 49% shareholder of MTN Irancell, and the majority 51% is in turn owned by the Iranian regime.  ***This means that MTN's "partner" in MTN Irancell is the Iranian regime***. …

In addition, given MTN's relationship with the regime, MTN's assertion that it is a "liberating force," "enriching the lives" of Iranians is completely untenable. MTN cannot reasonably assert that the substantial profits it earns from its growing role in the Iranian telecommunications market are merely a byproduct of a larger altruistic goal to empower the citizens of Iran and the developing world….

Recent reports in the news media regarding MTN's Iran business further belie MTN's assertion that its business in Iran is altruistic or ethical in nature.  For example . . . .  ***MTN Irancell's other Iranian partial owner is the Mostazafan Foundation of Islamic Revolution, a "Bonyad" organization directly supervised by Iran's Supreme Leader.  Both IEI and Mostazafan are closely linked to the regime's radical [IRGC].*** … [Emphases added.]

269.    MTN's President and CEO responded to UANI in an on on-the-record interview with the *Wall Street Journal*, during which MTN's CEO stated: "What the [Iranian] government decides to do with that equipment ***is not in our hands***. We cannot say who they listen to and when."[105]  In the same 2012 article regarding that interview, the *Journal* reported that:

MTN Group Ltd. will leave Iran ***only if*** South Africa applies sanctions on the country, Chief Executive Sifiso Dabengwa said Wednesday.  The South African telecom company is facing international pressure to pull out or scale down operations in Iran … "We are guided by South African government policies internationally," Mr. Dabengwa said, noting that the country hasn't imposed sanctions on Iran.  MTN has a 49% stake in Iran's second-largest mobile-phone operator and derives 21% of its subscriber base from Iran, according to recent figures from MTN. …[106]

270.    On March 7, 2012, Ambassador Wallace, the president of UANI, publicly responded:

The facts are clear: MTN is partners with sanctioned Iranian entities with direct links to the IRGC.  …If MTN does not respect its own stated corporate values, it

---

[105] Devon Maylie, *South African Wireless Firm MTN To Remain In Iran*, Wall St. J. (Mar. 8, 2012) (emphasis added).

[106] *Id*. (emphasis added).

should … respect the will of the international community, which is working to isolate the Iranian regime in response to its … ***support of global terrorism*** … Investors and affiliated institutions should immediately divest themselves from MTN until MTN ceases its complicity with the Iranian regime.[107]

271.    On March 12, 2012, MTN Group issued a press release that stated, in part: "On human rights, the [MTN] group takes direction from and adheres to the policies of both the South African government and the United Nations. South Africa has human rights enshrined as fundamental principles within its Constitution."  MTN then shamefully invoked South Africa's history of apartheid to suggest that it was a responsible corporate citizen, stating: "Given South Africa's own recent history and our struggle against apartheid, the centrality of civil rights is at the core of our culture as a company and as individuals."  MTN further defiantly – and absurdly – claimed that there was no "evidence that the Iranian government has used the data [MTN] collected [and shared with the IRGC via Irancell] to identify and locate citizens or dissidents."

272.    After issuing its press release, MTN subsequently scrubbed any presence of it from MTN's websites.  On information and belief, MTN did so because it knew that its statement was a damaging admission that MTN believed that although it was violating U.S. law, it could not be held accountable under U.S. law regardless of what it did with Iranian terrorist fronts like the IRGC, including the Qods Force.

273.    On March 14, 2012, Ambassador Wallace, the president of UANI, replied to MTN's March 12, 2012, press release, in part by stating:

If MTN was serious about respecting human rights, it would withdraw from Iran … Respecting human rights would also mean not trying to whitewash what MTN is really doing in Iran. MTN is not a liberating force for the Iranian people, as it claims. On the contrary, MTN is partnered with sanctioned Iranian entities with

---

[107] UANI, *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012) (emphasis added); *see* Business Wire, *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012) (broad international publication of this UANI press release).

direct links to the IRGC, and has provided the regime with location data on Iranian citizens … MTN must end its irresponsible business in Iran, and stop contributing to the regime's continual human rights violations.[108]

274.    On March 28, 2012, Turkcell filed suit against MTN Group in United States District Court for the District of Columbia.  *See* Complaint [Dkt. 1], *Turkcell İletişim Hizmetleri A.Ş. and East Asian Consortium B.V v. MTN Group, Ltd. and MTN International (Mauritius) Ltd.*, No. 1:12-cv-00479-RBW, (D.D.C. Compl. Filed Mar. 28, 2012) ("*Turkcell v. MTN*").[109]  In its complaint (at 1), Turkcell alleged that MTN "violat[ed] … the law of nations through bribery of sitting Iranian … officials and trading influence to steal the first private Iranian Global System for Mobile Communications ("GSM") license (the "License") from Turkcell," which included MTN's "promis[e] [to] Iran [MTN would source] defense equipment otherwise prohibited by national and international laws" and MTN's "outright bribery of high-level government officials in both Iran and South Africa," which "acts … deliberately resulted in Turkcell losing its rightfully-won valuable telecommunications opportunity and in MTN's taking over the License."

275.    In its complaint (at ¶ 9), Turkcell alleged that, "[b]etween the end of 2004 and receiving the License in November 2005, MTN through 'Project Snooker' made at least five illegal bribes and trades in influence to government officials with the intention and belief that the bribes would cause the Iranian government to grant the License to MTN rather than Turkcell."

- Paragraph 9(B) – labeled "Illicit Arms for the GSM License" – alleged that "MTN struck a deal to deliver 'The Fish' the Iranian Ministry of Defense in August 2004.  'The Fish' was a code name for a combination of military cooperation and big ticket defense equipment, including … frequency hopping encrypted military radios, sniper rifles, … radar technology, … and other defense

---

[108] UANI, *UANI Responds to MTN's Claims that it Adheres to UN Human Rights Policies* (Mar. 14, 2012); *see* Business Wire, *UANI Responds to MTN's Claims that it Adheres to UN Human Rights Policies* (Mar. 14, 2012) (broad international publication of this UANI press release).

[109] Turkcell subsequently voluntarily dismissed the case to pursue the matter in South Africa. *See* Notice of Voluntary Dismissal (Dkt. 47) and Minute Order (Dkt. 48) in *Turkcell v. MTN*, No. 1:12-cv-00479-RBW (D.D.C. May 1, 2013).

articles—particular items including U.S. systems or components.  This equipment was unavailable to Iran through legitimate means because of U.S. and international restrictions at the time.  MTN officials … promise[d] delivery of the elicit [i.e., illicit] arms and technology in exchange for the License.”

- Paragraph 9(C) – labeled "Bribe of Iranian Deputy Foreign Minister" – alleged that "MTN promised in May 2005, and later paid through a sham consultancy, the Iranian Deputy Foreign Minister, Javid Ghorbanoghli, $400,000 in U.S. dollars for his efforts to politically undermine and destroy Turkcell's position as the license-holder and to deliver the License to MTN."

- Paragraph 9(D) – labeled "Bribe of South African Ambassador to Iran" – alleged that, "[i]n June 2005, MTN promised, and later paid, the South African Ambassador to Iran, Yusuf Saloojee, the equivalent of U.S. $200,000 to help MTN deliver on the nuclear vote and the weapons trafficking and to support MTN within the Iranian government.  Ambassador Saloojee was integral to MTN's ultimate success in securing the License."

- Paragraph 9(E) – labeled "Bribes of Iranian Defense Organizations" – alleged that, "MTN promised the Iranian Ministry of Defense through its state-owned defense company Sairan (also known as Iran Electronics Industries or 'IEI') and the 'Bonyad' (one of the five Iranian quasi-independent 'Charitable Foundations,' an organization integral to the Iranian defense establishment), that MTN would pay all of Sairan [i.e., the IEI's] and the Bonyad's 51% share of the €300 million license fee, plus its entire capitalization cost and a share transfer tax, in exchange for their assistance within the Ministry of Defense and with the Supreme Leader.  MTN later paid these amounts.  These promises and payments, made through sham loans MTN knew at the time would not be repaid, were essential to MTN's takeover of Turkcell's License."

276.   Turkcell's complaint against MTN also specifically alleged that MTN had

engaged with an IRGC-controlled company.  For example, Turkcell alleged that to

establish[] itself within Iran[,] … [MTN] reached out to … Mr. Mohammed Mokhber, the Deputy President of a major "charitable foundation" controlled by the Supreme Leader of Iran, known as the Bonyad Mostazafan ("the Bonyad"), which is … **controlled by the Iran Revolutionary Guard Corps**, the Iranian military complex formed by Iran's Supreme Leader Ayatollah Ali Khamenei, which is believed to control approximately one third of the Iranian economy. … The Bonyad **reports directly to the Supreme Leader** and MTN was confident that its relationship with Mr. Mokhber and the Bonyad he controlled provided direct access to the Supreme Leader.  **The Bonyad is well known for engaging in "Iran's shadow foreign policy."**

*Id.* ¶ 65 (emphasis added; citations omitted).[110]

277.   Turkcell's complaint against MTN alleged that MTN's senior executives, including its CEO, met with Iranian agents in South Africa (whom, Turkcell alleged, MTN invited to South Africa on a "trip" that "MTN funded"), during which time MTN's executives "[t]ogether [] promised [the Iranian agents] that South Africa would deliver 'heaven, earth, and the fish,' meaning whatever military equipment [Iran] desired." *Id.* ¶ 93.  Turkcell continued: "The entire trip was organized and coordinated by MTN so that they could corruptly induce the Iranian government to eliminate Turkcell … and replace it as the owner of the GSM opportunity." *Id.*

278.   On April 5, 2012, the *Mail & Guardian Centre* for Investigative Journalism in South Africa published a detailed expose on MTN's partnership with Iranian terrorists, titled "Iran 'Puts the Screws' on MTN," which reported that MTN "fac[ed] a storm over claims that it helped the Iranian government in 2009 and 2010," and reported that:

> Sources close to MTN's Iranian business have [] described ***an Orwellian environment in the company's Tehran headquarters***, where it allegedly ***gave military intelligence officials "open" access*** … [S]ources claimed:
>
> • Because MTN Irancell and its data centre were part-owned by the Iranian military, subscriber data was shared "on a collegial basis" with the intelligence sector;

---

[110] Similarly, Turkcell also alleged (at ¶ 86), that "[t]hroughout 2004 and 2005, MTN regularly met with … the Bonyad [Mostazafan] and Sairan [i.e., IEI]," during which time MTN's "goal was to entice those entities to support MTN and abandon Turkcell, on the promise that MTN had more to offer than Turkcell." *Turkcell v. MTN* Complaint at ¶ 86.  Turkcell continued: "The Bonyad and [IEI] responded exactly as MTN planned:  They not only used political leverage to increase delay and shift Turkcell's regulatory requirements, but also they directly began disengaging from their relationship with Turkcell.  After mid-2005, the Bonyad and [IEI]'s involvement with Turkcell was merely a charade along the path to forming its venture with MTN."  *Id.* ¶ 86.

- A shadowy *"second floor" in MTN's building was populated by military intelligence officials*, the volunteer militia known as the Basij ("morality police") and clerics;

- During the 2009 and 2010 Green movement protests, men from the second floor, accompanied by Irancell chief executive Alireza Dezfouli, allegedly approached data warehouse staff regularly to demand detailed records for individuals;

- In one case, they demanded the number of a known Green Party activist, who could not be reached after his information had been given to military intelligence; and

- Third parties listened in to staff calls over Irancell SIMs and would intervene and demand that the staff speak in English and not in other South African languages. …

[Turkcell's lawsuit] accuses MTN of bribing South African and Iranian officials, facilitating weapon trade agreements between the two countries and influencing South African foreign policy … in a bid to stop Turkcell from being awarded a second cellular network licence in Iran. … MTN is a 49% shareholder in Iran-cell. Fifty-one percent is held by an Iranian state-linked consortium, which is dominated by a subsidiary owned by the defence ministry known as Sairan, or Iran Electronics Industries. Sairan is subject to US and European Union sanctions that target proliferators of "weapons of mass destruction". It also holds a share in consortium Arya Hamrah, which owns and runs MTN Irancell's data centre that houses the company's servers and hardware. …

**Military intelligence**
The sources familiar with MTN's Iranian operations said that, because of these ownership structures, Irancell readily gave information about subscribers to intelligence officials. … One of the sources said: *"MTN's data centre in Iran is effectively run by the military and military intelligence. None of the intelligence organisations needs to go through normal procedures to access subscriber data and track individuals."*

Describing the climate at MTN's headquarters, a senior official said it was *dominated by the presence of Iran's military intelligence officials and the "morality police"*.

"There was a tea lady who just stood at the printer all day. Her job was to watch us." The woman, understood to be a member of the "morality police", would scold female staff whose clothing was considered too revealing and signalled her displeasure over "inappropriate" behaviour.

97

> Communicating by email, the source said: "The people on the second floor are from military intelligence and the Basij and some clerics. They oversee the intelligence and moral activities of the employees of Irancell. All emails, telephone conversations and SMSes of employees are monitored on an ongoing basis. This is then exposed to MTN against the threat that they will kick out MTN when they need concessions from it."

> The staffer described how men from the second floor would accompany Dezfouli to collect data on individuals and political dissidents: "On several occasions someone from the second floor and [Dezfouli] would come to the managed services group and say 'give us all the details for this number', and they would have to."  The staffer said subscription and location data and call and SMS histories were handed over. …[111]

On information and belief, the *Mail & Guardian*'s investigative report accurately described operations at MTN Irancell.

279.    Shortly before the *Mail & Guardian*'s investigative piece was published, MTN issued a written statement to the *Mail & Guardian* from MTN Human Resources Head Paul Norman that was replete with falsehoods designed to conceal MTN's ongoing joint venture with the IRGC, including the Qods Force, including MTN's awareness that such a business partnership could conceivably result in violence.  In that statement, MTN's head of HR stated:

> MTN's role in Iran is mostly as a technical partner. It is a non-controlling shareholder. Fewer than 30 MTN expats (not all South African) are employed in Irancell, out of around 2000. … MTN works hard, with international legal advisors, to ensure that it is sanctions compliant. … Civic and human rights are vital to the company … We expect all our business partners to abide by our code of ethics.  Mobile telecoms has been a force for political and economic liberation … But we accept the ethical complexities around telecoms in this new environment, and the potential for their manipulation for unethical means.[112]

280.    MTN remained defiant even though nearly every other major multinational corporation exited their own joint ventures with fronts for the IRGC, including the Qods Force,

---

[111] Craig McKune and Sharda Naidoo, *Iran 'Puts the Screws' on MTN*, Mail & Guardian (Apr. 5, 2012) (emphases added).

[112] *Id.*

after the Bush and Obama administration ramped up sanctions enforcement in the 2000s. As Ambassador Wallace explained in May 2012,

> despite the action of other responsible telecommunication companies, South African telecom company MTN continues to openly partner with sanctioned Iran entities affiliated with the brutal Iranian regime. ***Companies like MTN deserve the condemnation of the American public and concerned citizens worldwide as well as the attention of this Congress, which should investigate MTN`s collaboration with the Iranian regime***. Nevertheless, UANI will continue to educate citizens and apply pressure against recalcitrant companies that pursue short-term profits at the expense of global security.[113]

281.    Even after a decade of Iran-backed terrorism against the United Sates, MTN's President and CEO told interviewers in 2013 that the company had no regrets about doing business with the Iranian and Syrian regimes that sponsored anti-American terror. As the *Financial Times* reported at the time, "[y]et [MTN's CEO] Mr Dabengwa says MTN has few regrets about entering Iran or Syria and includes them among countries that will be important to MTN's growth. 'The starting point for entering frontier markets is the business case. ***The other risks, we can manage***,' he says."[114] This view reflected MTN's corporate DNA that emphasizes taking risks that the rest of the industry thinks are too great: "Venturing into areas where others might fear to tread is a characteristic that has been at the heart of MTN's rapid expansion since it was established in 1994, the year South Africa held its first democratic election."[115]

282.    As the *Financial Times* reported in 2013, even the prospect of "deadly conflict" did "little to diminish MTN's appetite for risk."[116] Indeed, MTN's CEO admitted, in effect, that MTN believed that American lives in Iraq and Afghanistan did not count in MTN's calculations.

---

[113] Wallace May 17, 2012 Testimony (emphasis added).

[114] Saigol and England, *Telecoms: Dealings in the Danger Zone*.

[115] *Id*.

[116] *Id*.

Specifically, commenting on how MTN operates in conflict zones, MTN's President and CEO stated: "I would say, is our presence there enhancing anybody's position in this conflict? That, for me, would be the test. If you could turn around and say our presence there is enhancing the government's position or it's enhancing the other side's position, then I guess it's an issue. Walking out today is not an option."[117]

283.    On or about November 2012, the Treasury Department announced additional sanctions targeting the IRGC's, including the Qods Force's, use of the telecommunications industry to help inflict violence upon innocent civilians.  As was reported in real time by the South African media, MTN understood that these new Treasury sanctions punished MTN's counterparty for its support of terrorism.  For example, according to the South African financial publication Fin24, these "[s]anctions announced … by the US treasury against Iranian individuals and companies have led to panic at mobile operator MTN," because MTN "believed" that the Treasury announcement "target[ed] 17 individuals believed to be related to human rights abuses by the Iranian government, as well as to supporting terrorism and the Islamic Revolutionary Guard."[118] As Fin24 reported at the time, "the mobile operator [was] concerned sanctions will cause a hardening of attitudes in the US against the company," which was problematic for it as "MTN [was] being sued in the US for allegedly bribing Iranian officials to obtain an operating licence, while it [was] negotiating with the US treasury to allow the operator to expatriate its cash profits from Iran before the Iranian rial completely bottom[ed] out."[119]

---

[117] *Id*.

[118] Fin24, *Panic at MTN Over US Treasury Sanctions* (Nov. 11, 2012).

[119] *Id*.

284.    Incredibly, even after MTN understood the Treasury Department to be sanctioning its business partners in Iran for sponsoring terror, MTN sources still complained to the media about the audacity of the United States expecting MTN to follow U.S. law.  As one anonymous "MTN source[]" complained to Fin24 that "[t]his is a [South African] company that *should not be subjected to US foreign policy decisions*."[120]

285.    By the end of 2012, MTN was nearly alone (joined by ZTE, among others) as one of the few large multinational corporations that remained willing to work – openly or surreptitiously – as an IRGC, including Qods Force, joint venture partner.  As Nathan Carleton, communications director for UANI, summed it up at the time "MTN stands out as one of the single most irresponsible businesses in the world and should be ashamed of the depths it has gone to in pursuit of profit."[121]

286.    MTN is virtually alone in the corporate world as a multinational corporation that rarely explicitly and unambiguously condemns terrorist violence against Americans, for the obvious reason that openly condemning anti-American terror would anger MTN's joint venture partners in Iran.  Instead of expressing any sympathy for Americans killed and maimed in Iraq and Afghanistan – which, on information and belief, MTN never publicly did prior to being sued by victims of Taliban terrorism in 2019 – MTN instead showered its business partner, Ayatollah Khamenei, with adulation.  For example, MTN Irancell was the lead sponsor of an Ayatollah-backed contest, which MTN Irancell as offering a chance "to visit the Supreme Leader of the Islamic Revolution Ayatollah Seyyed Ali Khamenei during [the competitors'] stay in Tehran."[122]

---

[120] *Id*. (emphasis added).

[121] *Id*.

[122] Tehran Times, *Reciters From 75 Countries to Participate in Tehran Quran Competition* (May 14, 2015), 2015 WLNR 14128237.

3. **MTN's joint venture with the Islamic Revolutionary Guard Corps, including the Qods Force, comports with its historical business practices in international markets**

287.　MTN's conduct above reflected a willingness to support America's enemies as a way to increase profits in Iran.

288.　**MTN Aided Terrorists in Afghanistan.**　While MTN Group was devising a plan to maximize its profits from its IRGC, including Qods Force, joint venture partner, the same MTN Group management team was working to obtain business in Afghanistan.　In 2006, MTN entered the Afghan market, and quickly established itself as the leading telecommunications company there through its embrace of its joint venture partner's ally, the Taliban, which at all relevant times was a Specially Designated Global Terrorist.

289.　Since entering the Afghan telecom market in 2006, MTN has grown to a dominant position by paying off the terrorists.　On information and belief, MTN made "protection payments" to the Taliban (including the Haqqani Network) of approximately $2,000 per month per cell tower, and at that rate MTN has paid the Taliban (including the Haqqani Network) more than $100 million in protection money since it entered Afghanistan.　MTN has therefore provided millions in payoffs each year to anti-American terrorists in Afghanistan.

290.　As it did in Iraq, MTN also provided direct operational support to anti-American terrorists targeting Americans in Afghanistan.　MTN did so by covertly working with the Taliban to coordinate the shutdown of cell phone towers in a manner that was timed to benefit Taliban offensive operations against Coalition forces.

291.　**MTN Aided the IRGC's Terroristic Violence Against Iranian Pro-Democracy Demonstrators.**　MTN enabled the terroristic violence deployed by IRGC agents against peaceful pro-democracy and human rights protestors in Iran during the 2009 uprising popularly known as the "Green Revolution."

292.     As the *L.A. Times* explained at the time, while Iran "brac[ed] for further confrontations between security forces and supporters of Mousavi …[,] [o]ne of the country's main cellphone operators, Irancell, co-owned by South Africa's MTN, warned customers [] that it would be suffering unspecified 'technical' problems over the next three days, which coincide[d] with the anticipated unrest."[123]  MTN was lying to its customers and the world – there were no "technical" problems but, rather, simply the IRGC's desire to shut down any avenue for mass democratic mobilization against it – which MTN happily obliged.

293.     MTN went beyond merely lying to its customers when it shut down its network at the request of the IRGC.  MTN actively aided the IRGC by helping it develop sophisticated tools for monitoring, eavesdropping, and surveilling targets.  MTN's technical services for the IRGC did not merely benefit its domestic regime suppression; the exact same functions also benefit foreign intelligence gathering, surveillance, and communications – critical competencies relevant to the success of a terrorist attack against Americans in Iraq.

294.     **MTN Aided Terrorists in Nigeria.**  MTN also aided violent actors in Nigeria. On or about October 26, 2015, the Nigerian Communication Commission fined MTN Group $5.2 billion for failing to meet a deadline to disconnect 5.1 million unregistered subscribers in Nigeria.  Nigeria imposed the deadline on all cellular operators in the country due to evidence that unregistered phones were facilitating the activities of criminal gangs and terrorists, including Boko Haram.  The requirements that MTN violated, the *Wall Street Journal* reported, were

---

[123] Borzou Daragahi, *Iran Court Warns Against Criticizing Proceedings*, L.A. Times (Aug. 3, 2009), 2009 WLNR 14945080.

"meant to combat terrorism."[124]  MTN eventually negotiated the criminal fine down to $1.67 billion and agreed to pay it in seven installments.

### 4. MTN's joint venture with the Islamic Revolutionary Guard Corps, including the Qods Force, had a substantial nexus to the United States

295.    MTN's joint venture with the IRGC, including the Qods Force, and its related assistance for Hezbollah and Jaysh al-Mahdi, relied on significant contacts with the United States.  MTN Group was a key player in orchestrating both those U.S. contacts and MTN's material support to the IRGC, including the Qods Force, Hezbollah, and Jaysh al-Mahdi.  At a high level,

296.    MTN employs a top-down management structure in which MTN Group centralizes operational control over the functions performed by its various subsidiaries.  During the relevant timeframe, MTN Group divided responsibility for its subsidiaries into six business groups; MTN Irancell (and Afghanistan) fell under the purview of the Middle East and North Africa ("MENA") group.  The MENA group's functional units resided in Dubai and reported directly to senior management in South Africa.

297.    MTN Group made the decision to enter a joint venture with the IRGC, including the Qods Force, in 2004, when it began plotting "Project Snooker" to eject Turkcell from the existing deal.  As part of "Project Snooker" – negotiated and executed by MTN Group's senior management – MTN ejected Turkcell from Irancell.  MTN Group later rebranded Irancell as MTN Irancell.

298.    Because MTN's business model depends on unstable countries, including Iran, one of MTN Group's core management responsibilities is to manage operational and political

---

[124] Alexandra Wexler, *Nigeria Reduces MTN Group Fine By $1.8 Billion*, Wall St. J. (Dec. 3, 2015).

risk in the countries MTN enters.  Assessments of those risks occur both before the decision to

enter a market – here, as MTN entered Afghanistan in the mid-2000s – and on an ongoing basis.

In mitigating those risks – which here included designing a strategy for coordinating MTN's

operational support for the IRGC, including the Qods Force, in Dubai and Iran – MTN Group

implemented a number of measures, including the "appointment of a Group crisis manager"; the

implementation of "physical and staff security measures"; and "[c]ontinual monitoring of the

political environment in operating countries."[125]  MTN Group, not its operating subsidiaries,

decided to do business with the IRGC, and Qods Force, fronts, and developed MTN's strategy

related thereto.

299.    Those policies required MTN Group's close supervision of MTN's payments to

Qods Force fronts, operatives, and agents, and MTN Irancell's joint venture with the IRGC.  As

explained above, MTN Group made the decision – and instructed its subsidiary – to enter into a

joint venture with the IRGC, including the Qods Force.  MTN Group also approved its

subsidiary's practice of providing payments and operational support to the IRGC, including the

Qods Force, including sourcing hundreds of sensitive dual-use items for IRGC, including Qods

Force fronts, operatives, and agents inside and outside Iran in Dubai to benefit the Iranian

IRGC's, including Qods Force's, terrorist enterprise.  Those decisions had a substantial

connection to the United States for the reasons explained below.

### a.    MTN's conduct targeted the United States

300.    MTN's provision of material support to the IRGC (including the Qods Force),

Hezbollah, and Jaysh al-Mahdi, was expressly aimed at the United States.  At all relevant times,

MTN knew that the IRGC (including the Qods Force), Hezbollah, and Jaysh al-Mahdi were

---

[125] *Id.*

targeting the United States.  The Joint Cells operated by the IRGC (including the Qods Force), Hezbollah, and Jaysh al-Mahdi did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, these Joint Cells directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that they could inflict pain in the United States and influence U.S. policy.  As the Treasury Department stated when it announced the Qods Force's designation as a Specially Designated Global Terrorist in 2007, "the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition … forces…."[126]  And the IRGC's (including the Qods Force's), Hezbollah's, and Jaysh al-Mahdi's ultimate, shared, publicly stated goal was to effect a withdrawal of American forces from Iraq.  Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

301.    MTN's decision to reach into the United States to obtain embargoed dual-use technology to aid the IRGC's, including the Qods Force's, terrorist enterprise was also expressly aimed at the United States.  MTN knew, based on conversations with IRGC, including Qods Force, agents that the IRGC, including the Qods Force, viewed MTN's assistance to the IRGC, including the Qods Force, as vital to Iran's ability to protect the "security" of its Islamist revolution, *i.e.*, external terror operations aimed to spread the revolution and counteract the Great Satan (the United States).  MTN knew that the IRGC's, including the Qods Force's understanding of what was needed to protect Iranian "security" inherently involved terrorist violence against Americans as part of Iran's effort to export its Islamist revolution and drive the United States out of the Middle East.

---

[126] U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

302.   MTN also knew, based on conversations with U.S. officials, that it was assuming an active role in an IRGC, including Qods Force, plot to develop cash flow and to source vital dual-use components for the IRGC, including Qods Force, Hezbollah, and Jaysh al-Mahdi. MTN further knew of the critical importance that communications and computing technology plays for terrorists.

303.   When MTN sourced embargoed technology that the United States had publicly declared could benefit IRGC, including Qods Force, efforts to kill others, it intentionally helped arm terrorists it knew were targeting the United States.  Indeed, the IRGC's, including the Qods Force's, direct statement in their contract with MTN obligated MTN to help the IRGC, including the Qods Force, protect Iran's "security."  MTN at all times knew or recklessly disregarded that "security" was a euphemism for IRGC, including Qods Force, terrorist operations outside of the territorial borders of Iran.  When MTN obtained the technology requested by its partners in the IRGC, including the Qods Force, MTN targeted the United States by helping the terrorists improve their bombs, rockets, communications, and intelligence gathering.

304.   Although MTN's primary motivation for assisting the IRGC, including the Qods Force, was financial, it also intended to harm Americans in Iraq.  One reason MTN cooperated with the IRGC, including the Qods Force, was to align itself with their effort to drive Americans out of the country.  MTN had two distinct but related reasons for desiring that outcome.

305.   *First*, MTN intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the Ayatollah and the IRGC, including the Qods Force.  The Ayatollah and the IRGC, including the Qods Force, were explicit – both in public, and in conversations with MTN – that it wanted MTN's financial and technical help in fighting against U.S. forces in particular.  Thus, for MTN to achieve its business objectives vis-à-

vis its joint venture partners the Ayatollah and the IRGC, including the Qods Force, MTN needed to disassociate itself from the United States and prove that it could deliver value to the Shiite terrorist campaign against U.S. forces in Iraq.

306.     *Second*, MTN Group's support for attacks against U.S. citizens by the Joint Cells advanced the foreign-policy interests of MTN Group's most important business partner, the Bonyad Mostazafan and Iran Electronics Industries, which MTN at all times knew to be IRGC, including Qods Force, fronts.

307.     MTN Group depends on its partnership with the Ayatollah and the IRGC, including the Qods Force.  As of 2012, Iran was MTN's fastest growing market and its third largest source of revenue overall.  Today, Iran is MTN's second-biggest market by subscribers. MTN Group's financial incentive to satiate the Ayatollah and its IRGC, including Qods Force, partners has led it to take a number of illegal steps to assist the Iranian regime.  Three South African investigative journalists summarized these acts in an informative headline, "MTN [is] in bed with Iran's military."[127]

308.     MTN Group cooperates with the Ayatollah,  and the IRGC, and including the Qods Force, despite knowing that the Ayatollah,  and the IRGC, and including the Qods Force, are, collectively, the world's worst sponsor of anti-American terrorism.

309.     MTN Group's agreement to aid the IRGC, including the Qods Force, served the IRGC's, including the Qods Force's, agenda of inflicting pain on U.S. forces.  It also fulfilled MTN Group's contractual obligation to engage in "defensive, security and political cooperation" with its IRGC, including Qods Force, partner.[128]  Such cooperation offered MTN Group added

---

[127] Craig McKune et. al, *MTN In Bed With Iran's Military*, Mail & Guardian (Feb. 10, 2012).

[128] MTN-Irancell Consortium Letter Agreement § 8 (Sept. 18, 2005), attached as Exhibit A.

motivation for becoming joint venture partners with the IRGC, including the Qods Force. MTN's support for the IRGC, including the Qods Force, did not merely grow its profits by allowing it to obtain the Irancell business in the first instance; it also benefited MTN's business by inflicting harm on an enemy (the United States) of MTN's most lucrative business partner (the IRGC, including the Qods Force, fronts that controlled MTN Irancell) in order for MTN to curry Iranian favor to gain market share for a potentially uniquely lucrative telecom and communications market (Iran).

### b.    MTN's conduct relied on American contacts

310.    MTN Group also connected MTN's support of the IRGC, including the Qods Force, Hezbollah, and Jaysh al-Mahdi, to the United States by obtaining technology and vital operational support in reliance on U.S. contacts.  MTN Group supplied technology and operational support for the MTN Irancell through various U.S. agents.  In doing so, MTN Group tied MTN's unlawful conduct to the United States in three ways.

311.    **First, MTN facilitated U.S. dollar bribes to IRGC, including Qods Force, operatives.**  MTN's U.S. contacts were essential to the initial bribe that allowed MTN to obtain business in Iran in the first instance and MTN's subsequent ability thereafter to assist the IRGC, including the Qods Force's, terrorist enterprise.

312.    MTN relied upon bank accounts in New York to complete the $400,000 wire that MTN sent to a recipient in 2007 who acted on behalf of the IRGC, including the Qods Force. That payment depended upon MTN's use of bank accounts in New York, which cleared the dollar transaction.

313.    MTN's $400,000 wire to the cutout for the IRGC, including the Qods Force, also aided the IRGC's, including the Qods Force's, efforts to covertly obtain U.S. Dollars – the vital common currency of terrorist finance – to fund Joint Cell attacks against Americans in Iraq.

314.     **Second, MTN obtained U.S. technology for the benefit of the IRGC, including the Qods Force.**  MTN's U.S. contacts were essential to the technological assistance it provided to the IRGC, including the Qods Force, and Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.  At all relevant times, MTN relied upon U.S. agents to illegally source dual-use technology from the United States that benefited the Joint Cells' terrorist enterprise.

315.     As a condition of its contract with the IRGC, including the Qods Force, MTN promised to obtain embargoed U.S. technology to benefit the IRGC's, including the Qods Force's, terrorist enterprise.

316.     Between 2009 and 2012, one or more purchasing agents working for the IRGC, including the Qods Force, in the U.A.E. and elsewhere, spending money provided by MTN Group, and acting at the direction of MTN Group and its IRGC, including Qods Force, ally, collectively wired more than $5,000,000 into the United States to associates in the U.S. who purchased embargoed technology for the IRGC's, including the Qods Force's benefit, which was then shipped from the U.S. to the U.A.E., where the IRGC, including the Qods Force, assumed possession of the technology for use in its terrorist enterprise.

317.     On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents to pay for the embargoed dual-use U.S. technology it illegally obtained for the IRGC, including the Qods Force, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally obtain embargoed dual-use U.S. technology for the benefit of the Qods Force's terrorist enterprise.

318.     **Third, MTN obtained essential U.S. services that aided the IRGC's, including the Qods Force's, terrorist capabilities.**  MTN's U.S. contacts were also key to its

ability to obtain technical support from U.S. persons operating inside America, without which the IRGC, including the Qods Force, could not have derived the terrorist benefits they did from MTN Irancell including the cash flow, network reliability, and enterprise computing benefits.

319.    Between 2009 and 2012, and on information and belief ever since the mid-2000s, MTN Irancell relied upon one or more U.S. persons to service MTN Irancell's enterprise-level computers and associated networks, relying on one or more U.S. persons to maintain MTN Irancell's network remotely from the United States and, on at least one occasion, having such U.S. person travel to meet with MTN's IRGC, including Qods Force, allies in the U.A.E. to provide training to the Qods Force.  MTN, or agents acting at MTN's direction, sourced embargoed technology for the IRGC's, including the Qods Force's, benefits from, among others, Akbari, Patco, MSAS, and TGO.

320.    MTN routed millions of dollars each year to its U.S. agents, and sourced the sensitive dual-use U.S. technology, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to provide services, or obtain sensitive dual-use U.S. technology, for the benefit of the IRGC's, including the Qods Force's, terrorist enterprise.

321.    On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents in order to pay for the technology support services it illegally obtained for the IRGC, including the Qods Force, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally provide technological support to maintain MTN Irancell for the benefit of the IRGC's, including the Qods Force's, terrorist enterprise.

B.     **The ZTE Defendants**

1.     **ZTE knowingly assumed a financial and operational role in the Islamic Revolutionary Guard Corps's, including the Qods Force's, terrorist enterprise**

322.    ZTE bid on and secured contracts worth hundreds of millions of dollars to install cellular and landline network infrastructure in Iran.  ZTE knew or should have known that its counterparties were IRGC, including Qods Force, fronts, operatives, or agents.  ZTE thereafter developed an elaborate system to fulfill those contracts using US-origin items, including dual-use goods controlled by the U.S. government due to their terrorism applications.

323.    Before 2011, ZTE sourced U.S. technology for the IRGC, including the Qods Force.  A Department of Justice Press Release dated March 7, 2017 (the "March 2017 Press Release"), announced ZTE's guilty plea and agreement to pay the U.S. government $892,360,065, and stated that ZTE violated U.S. sanctions by sending U.S.-origin items to Iran. As detailed in the March 2017 Press Release, ZTE repeatedly violated export controls and illegally shipped U.S. technology to Iran.

324.    ZTE's scheme with the IRGC, including the Qods Force, for ZTE to obtain U.S.-origin goods and to evade export controls to get telecommunications technology into the hands of the IRGC, including the Qods Force, lasted from as early as 2010 and as late as 2016.

325.    The cell phone technology and equipment ZTE sourced from inside the United States was subject to the embargo imposed and enforced by the United States Government.  ZTE thus violated export controls designed to keep sensitive American technology out of the hands of IRGC, including the Qods Force.

326.    Through this scheme, between January 2010 and January 2016, ZTE exported over 20 million U.S.-origin items to the IRGC, including the Qods Force, with a value of approximately $32,000,000, without obtaining proper export licenses.

327.     To evade the U.S. embargo, ZTE devised a scheme whereby an "isolation company" would be the vehicle used to hide ZTE's shipment of prohibited U.S. technology to the IRGC (including the Qods Force).

328.     In early 2011, when ZTE determined that the use of its original "isolation company" was insufficient to hide ZTE's connection to the illegal export of U.S.-origin goods to the IRGC, including the Qods Force, ZTE re-evaluated its strategy.  In September 2011, four senior ZTE managers signed an Executive Memo which proposed that ZTE identify and establish new "isolation companies" that would be responsible for supplying U.S. component parts necessary for projects in embargoed countries.

329.     After an international publication in March 2012 publicly revealed ZTE's sale of prohibited equipment to Iran, ZTE temporarily stopped sending U.S. equipment to the IRGC, including the Qods Force.

330.     But in July 2014, ZTE began shipping U.S.-origin equipment to the IRGC, including the Qods Force, once again without the necessary licenses.  Thus, properly understood, ZTE's temporary pause was not the rumblings of a corporate conscience causing it to separate from terrorists but, rather, an effort to pause their support while they assessed whether they could get away with it.  Once ZTE believed it could, on or about 2014, they resumed their support for the IRGC, including the Qods Force.

331.     ZTE made these additional shipments by using a new "isolation company."  In the new version of the scheme, ZTE purchased and manufactured all relevant equipment – both U.S.-origin and ZTE-manufactured – and prepared them for pick-up at its warehouse by the new isolation company. The new isolation company then shipped all items to the Iranian customers.

332.    In a March 7, 2017, Settlement Agreement ZTE entered into with OFAC, ZTE

admitted, in relevant part:

    a.  From on or about January 2010 to on or about March 2016, ZTE engaged in a pattern or practice whereby ZTE sought to evade and circumvent the United States Iran Transactions and Sanctions Regulations ("ITSR") and willfully violated U.S. economic sanctions regulations.

    b.  From on or about January 2010 to on or about March 2016, ZTE exported, sold, or supplied United States goods to Iran or the Government of Iran with knowledge that the goods were intended specifically for Iran or the Government of Iran and thereby evaded or avoided, attempted and/or conspired to violate, and/or caused violations of the prohibitions set forth in the ITSR.

    c.  ZTE engaged in at least 251 such transactions, and the total value of U.S.-origin goods in the 251 transactions constituting the apparent violations was $39,622,972.

    d.  From approximately as early as November 2010 to approximately March 2016, ZTE's senior leadership had been developing, and in fact did develop and adopt in whole or in part, a company-wide scheme to evade U.S. economic sanctions and export control laws.

    e.  ZTE's actions were developed and approved by the highest levels of its management, and entailed the use of third-party companies to both conceal and facilitate its business with Iran.

    f.  ZTE was "specifically aware of and considered the legal risks and consequences of violating U.S. economic sanctions and export control laws," and was "specifically aware" of the potential consequences "if the U.S. government learned of [ZTE]'s unauthorized reexportation of U.S.-origin goods to sanctioned countries, including Iran."

    g.  Despite recognizing that "violations of U.S. law would be 'inevitable' if ZTE exported and/or reexported U.S.-origin goods to Iran," ZTE reexported and supplied a substantial volume of U.S.-origin goods to Iran from at least January 2010 to approximately March 2016 and "pursued and developed an evasive practice of 'risk avoidance' by utilizing isolation companies and other concealment activities" to do so.

    h.  ZTE's contracts with Iranian companies from 2010 and 2012 required ZTE to export and/or reexport goods, services, and technology to Iran with the purpose of enhancing Iran's telecommunications infrastructure, which in turn required  supplying and/or attempting to supply Iran with U.S.-origin goods subject to the U.S. Department of Commerce's Commerce Control List for

anti-terrorism, national security, regional stability, and encryption item purposes and enhancing the law enforcement surveillance capabilities and features of Iran's telecommunications facilities and infrastructure.

i.  ZTE temporarily ceased performance of one of its contracts with an Iranian company [TCI], when Reuters reported in March 2012 that ZTE was circumventing U.S. sanctions law to provide U.S.-origin goods to TCI, but resumed its unlawful activity thereafter and "ZTE would not ultimately cease its unlawful activity or cooperate with the U.S. government until on or about March 2016."

j.  ZTE informed the U.S. government agencies and the public in 2012 that it was winding down its reexports of U.S.-origin goods to Iran. However, approximately one year later in November 2013, ZTE resumed its unlawful business activities with Iran without updating or informing the U.S. government agencies of this change until on or about April 6, 2016.

k.  In connection with the decision to resume its Iran-related business in approximately November 2013, ZTE's highest-level leadership instituted directives authorizing various divisions of the company to surreptitiously resume business with Iran, including by using a new third-party isolation company to conceal the resumption of prohibited activities from U.S. government investigators, the media, and others outside of ZTE.

333.  ZTE modernized telecommunications technology used by Iranian entities that were controlled by IRGC, including Qods Force, fronts, thereby pumping additional revenue into the coffers of the IRGC, including Qods Force, and, thereby, Hezbollah and Jaysh al-Mahdi.

334.  ZTE provided substantial banned technology to Iranian companies that were controlled by the IRGC, including the Qods Force and, thereby, ZTE's illegally sourced technology ordinarily flowed through to Hezbollah.  That banned technology was crucial to actually perpetrate terrorism.  By way of example, terrorists were able to use cell phones and other telecommunication technology and software to perpetrate attacks on Americans.

335.  ZTE also assisted the terrorist enterprise by serving as a long-term strategic partner for MTN Irancell, which was as front for the IRGC, including the Qods Force.

336.  ZTE's technical aid to the IRGC, including the Qods Force, was devastating to America's ability to protect Americans overseas from attacks committed by Iranian terrorist

proxies like Hezbollah because, as a result of ZTE's actions, "[t]he IRGC will also now be in a position to benefit from sensitive monitoring technology it can put to its advantage to enhance its surveillance abilities," which the IRGC, including the Qods Force, acquired after "ZTE Corporation sold TCI a powerful surveillance system capable of monitoring landline, mobile and internet communications."[129]

337.     For a terrorist group intent on targeting Americans traveling in tightly secured convoys or on heavily fortified bases, aid that bolstered the terrorists' ability to conduct successful surveillance was vitally important to their ability to execute successful attacks, like the ones that killed and injured Plaintiffs and their loved ones.

338.     The ample evidence of ZTE's own consciousness of guilt supports the inference that ZTE knew it was benefiting the IRGC's, and the Qods Force's, terrorist enterprise.

339.     In 2017, the United States Commerce Department disclosed two internal ZTE documents it had discovered during its investigation.  The first, from 2011 and signed by several senior ZTE executives, detailed how the company had ongoing projects in Iran.  The second document laid out in a complex flow chart a method for circumventing United States export controls.

340.     According to the then-Acting Assistant Attorney General, Mary B. McCord, "ZTE engaged in an elaborate scheme to acquire U.S.-origin items, send the items to Iran and mask its involvement in those exports," and the plea agreement ZTE signed "alleges that the highest levels of management within the company approved the scheme."

341.     In 2012, after ZTE's original contract with TCI, which allowed the IRGC, including the Qods Force, to build a country-wide surveillance system capable of monitoring

---

[129] Dr. Ottolenghi Sept. 17, 2015 Testimony.

landline, mobile, and internet communications, was widely reported, ZTE claimed it would stop its business with Iran. In or around March 2012, ZTE spokesman David Shu said in a telephone interview "[w]e are going to curtail our business in Iran." Although that was a lie, because ZTE thereafter doubled-down on its business relationships with IRGC, including Qods Force, fronts, it was also an admission that such business was fraught with risk that it would support and contribute to terrorism.

342. Ashley Kyle Yablon, ZTE's Texas-based general counsel, gave the FBI an affidavit in May 2012 in which he alleged ZTE had plotted to cover up the Iran sales. Yablon has indicated that in the course of the U.S. investigation into ZTE's transfer of U.S.-origin technology to Iran, ZTE internally discussed destroying evidence. After the Yablon affidavit became public in July 2012, ZTE placed Yablon on administrative leave.

343. ZTE has destroyed evidence of its business with fronts for the IRGC, including the Qods Force.

344. There has been public reporting related to ZTE's internal documentation of its strategies for how to get around export controls so it can do business with state sponsors of terrorism. Those strategies included using a codeword for Iran in internal documents.

345. Throughout the scheme, ZTE attempted to conceal its export of U.S.-sourced technology to Iran by, among other things, requiring its employees to sign non-disclosure agreements, lying to its own lawyers regarding its exports, lying to a forensic expert hired to conduct an internal investigation, and adopting a policy and hiring thirteen (13) employees to alter, delete, and hide data relevant to the export sales.

346. ZTE admitted that it assembled and authorized a team of IT employees to engage in a project to alter, process, sanitize, and/or remove references to Iran in ZTE's internal

databases regarding its business with Iran. The IT team coordinated with various relevant divisions throughout the company, including the sales, procurement, and finance divisions, to locate and remove any references to business with Iran. The employees executing this IT project were instructed to, and did in fact, delete their emails related to the project.

347.    ZTE's acts related to its export of U.S. embargoed technology to Iran, and its attempts to hide and obscure the same, were labelled by the United States Government as a "cover-up."

348.    In relation to ZTE's acts to export U.S. embargoed technology to Iran, and its attempts to hide and obscure the same, the U.S. Government charged ZTE with making materially false, fictitious, and fraudulent statements and representations to the United States Federal Bureau of Investigation.

349.    In 2017, ZTE chairman and chief executive acknowledged guilt for its acts to evade the embargo and provide banned technology and goods to Iran, saying "ZTE acknowledges the mistakes it made, takes responsibility for them and remains committed to positive change in the company."

350.    ZTE knew that it was breaking U.S. law when it exported sensitive telecommunications technology to the IRGC, including the Qods Force, and knew or recklessly disregarded that the entities with which it was transacting business (and indeed who were receiving that technology) were fronts for IRGC, including Qods Force, terrorists who were actively attempting to kill Americans in Iraq as part of Joint Cells, and benefitted thereby.

351.    From 2008 through at least 2016, ZTE's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI, and/or the Akbari Fronts, provided millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC, including

the Qods Force, which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

>**2.**    **ZTE's assistance to the Islamic Revolutionary Guard Corps, including the Qods Force, comports with its historical sales practices in international markets**

352.    Like MTN, ZTE's conduct reflected a willingness to support America's enemies, and engage in illicit financial transactions, as a way to increase profits in Iran.  The same calculation pervaded ZTE's other conduct throughout the world.  ZTE's other conduct further demonstrates its pattern and practice of entering transactions with violent actors to increase MTN revenue.

353.    **ZTE Aided North Korean Sanctions Busting.**  Like Iran, North Korea is a designated state sponsor of terrorism with a long history of attacking and murdering Americans overseas.  ZTE's illicit transactions concerning North Korea, therefore, further inform ZTE's deliberate support for terror.

354.    As part of its guilty plea, "ZTE … pleaded guilty … to violating U.S. sanctions against Iran and North Korea."[130]  Like with Iran, when it helped North Korea source embargoed goods, ZTE knew or recklessly disregarded that it was engaging in illicit transactions with North Korean counterparties in violation of U.S. and international sanctions that were designed to choke off North Korea's support for terrorism.  Moreover, even after ZTE got caught helping North Korea evade U.S. sanctions (and pledged to be truthful with the U.S. government), ZTE lied and made additional false statements to American authorities.[131]

---

[130] Gretchen Morgenson and Tom Winter, *The U.S. Is Now investigating Chinese Telecom Giant ZTE For Alleged Bribery*, NBC News (Mar. 13, 2020) ("Morgenson and Winter, *U.S. Is Now Investigating*").

[131] As *NBC News* noted, "[i]n the deal with the U.S. government [in 2017], ZTE also agreed to a denial of export privileges that could be activated for seven years if the company committed

355.    Indeed, ZTE continuously pursued its strategy to bust terrorism-related sanctions for profit continuously since 9/11.  For example, less than two weeks after that attack, commentators were already marveling over the audacity of ZTE's efforts to curry favor with the Taliban, even though they were understood to have sheltered bin Laden and contributed to the attack as a result.  As one wrote at the time:

> China … has been playing its own complex "Great Game," through the Taliban in Afghanistan … [China] has not hesitated to link itself with revolutionary movements …  The Chinese attitude towards radical "Islamism" is two-faced. Beijing is happy to train and send armed insurgents – separatist terrorists -- to … sow mischief wherever it can against Western interests. But it is also worried, sometimes to the point of paranoia, about the security threat to its own Uighur territory. …  From the Beijing point of view, co-operation with the Taliban kills two birds with one stone. On the one hand, China has been **helping to nurture a very painful thorn in the West's backside**; on the other, it is buying off Taliban encouragement for Uighur separatists. …. [L]ast year, [the] Chinese telecommunications firm[], … ZTE, began work laying secure land-based phone lines between and within Kabul and Kandahar, and they may well be directly involved in providing communications services to the terrorist "underground" (literally, for it works from caves) in the Kandahar region. … China trie[d] to help the Afghan terrorist regime in its struggle against the West …[132]

356.    As legal commentator Stewart Baker noted at the time in 2012, when discussing ZTE's corporate criminal culture, that "[a] kind of perfect storm has struck ZTE, … [a] storm largely of ZTE's own making."[133]  He explained:

> **ZTE … ha[s] been the subject[] of great national security concern for years**. … Now, though, the mess is everywhere, and the House intelligence investigation will surely be heavily influenced by the new evidence that ZTE at least is quite

additional violations. In mid-April 2018, the Commerce Department activated the denial of privileges after determining that ZTE had made false statements to the government about actions it had taken to punish employees involved in the Iran and North Korea activities. While ZTE said it had reprimanded the employees, the government later found that the company had rewarded them with bonuses. Activating the denial meant that ZTE could not buy semiconductors required for its products."  *Id.*

[132] David Warren, *How China Advances Its Imperial Ambitions By Backing The Taliban*, Ottawa Citizen (Canada), (Sept. 22, 2001), 2001 WLNR 6660411.

[133] Stewart Baker, *And You Think You're Having A Bad Day?*, The Volokh Conspiracy (July 13, 2012) (emphasis added), 2012 WLNR 14621514.

capable of ***carrying out sophisticated telecommunications surveillance, of violating US law, and perhaps even lying about it later***. Which, come to think of it, is pretty much what US intelligence agencies have been saying all along.[134]

357.   **ZTE Paid Bribes to Win Business.**   On information and belief, ZTE has engaged in serial bribery around the world to win business.   As *NBC News* first reported on March 13, 2020, "ZTE … is the subject of a new and separate bribery investigation by the Justice Department, according to two people briefed on the matter.   The new investigation … centers on possible bribes ZTE paid to foreign officials to gain advantages in its worldwide operations."[135]

358.   ZTE is not a "normal" multinational corporation but rather, a notoriously dirty company that seeks to advance the agenda of the Chinese Communist Party and is willing to engage in corrupt deals that most other corporations shun.   For example, as NBC News reported that, "Norway's giant government pension fund banned ZTE from its investment universe" in 2016 "based on 'the risk of severe corruption,' according to a report by the Norges Bank Council on Ethics."[136]   As *NBC News* noted, "***[o]nly three other companies*** are barred by the Norwegians for 'gross corruption' alongside ZTE."[137]

### 3.   ZTE's assistance to the Islamic Revolutionary Guard Corps, including the Qods Force, had a substantial nexus to the United States

359.   ZTE's assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force, relied on significant contacts with the United States.   As it has admitted, ZTE orchestrated both those U.S. contacts and ZTE's violation of U.S. law.   Like MTN, ZTE employs a top-down

---

[134] *Id*.

[135] Gretchen Morgenson and Tom Winter, *The U.S. Is Now investigating Chinese Telecom Giant ZTE For Alleged Bribery*, NBC News (Mar. 13, 2020) ("Morgenson and Winter, U.S. Is Now Investigating").

[136] *Id*.

[137] *Id*.

management structure in which ZTE centralizes operational control over the functions performed by its various subsidiaries.

360.     ZTE's decision to assist the IRGC, including the Qods Force, and by extension their proxies, had a substantial nexus to the United States for the reasons explained below.

### a.     ZTE's conduct targeted the United States

361.     ZTE's provision of material support to the IRGC (including the Qods Force), Hezbollah, and Jaysh al-Mahdi, was expressly aimed at the United States.  At all relevant times, ZTE knew that the IRGC (including the Qods Force), Hezbollah, and Jaysh al-Mahdi were targeting the United States.  The IRGC (including the Qods Force), Hezbollah, and Jaysh al-Mahdi did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, the Joint Cells directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that they could inflict pain in the United States and influence U.S. policy.  As the Treasury Department stated when it announced the Qods Force's designation as a Specially Designated Global Terrorist in 2007, "the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition … forces…."[138]  And the IRGC's (including the Qods Force's), Hezbollah's, and Jaysh al-Mahdi's ultimate, shared, publicly stated goal was to effect a withdrawal of American forces from Iraq and the broader Middle East.  Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

362.     ZTE's decision to reach into the United States to obtain embargoed dual-use technology to aid the IRGC's, including the Qods Force's, terrorist enterprise was also expressly

---

[138] U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

aimed at the United States. Like MTN, ZTE knew, based on conversations with IRGC, including Qods Force, agents, that the IRGC, including the Qods Force, viewed ZTE's assistance as vital to Iranian national security, which ZTE understood to inherently involve the promotion of terrorist violence against Americans around the world as part of the IRGC's (including the Qods Force's) effort to export its Islamist revolution and drive the U.S. out of Iraq.

363.    On information and belief, like MTN, ZTE also knew, based on conversations with U.S. officials, that it was assuming an active role in an IRGC, including the Qods Force, plot to develop cash flow and source vital dual-use components for the IRGC, including the Qods Force, Hezbollah, and Jaysh al-Mahdi. ZTE further knew of the critical importance that communications and computing technology plays for terrorists.

364.    When ZTE sourced embargoed technology that the United States had publicly declared could benefit IRGC, including Qods Force, efforts to kill others, it intentionally helped arm terrorists it knew were targeting the United States. On information and belief, the IRGC, including the Qods Force, made ZTE agree to a similar contractual pledge as the one in which MTN agreed to aid Iran's "defensive, security, and political" interests outside of Iran. On information and belief, ZTE at all times knew or recklessly disregarded that "security" was a euphemism for IRGC, including Qods Force, terrorist operations outside of the territorial borders of Iran. When ZTE obtained the technology requested by its IRGC, including Qods Force, partners, ZTE targeted the United States by helping the terrorists improve their bombs, rockets, communications, and intelligence gathering.

365.    Although ZTE's primary motivation for assisting the IRGC, including the Qods Force, was financial, it also intended to harm Americans in Iraq. One reason ZTE cooperated

with the IRGC, including the Qods Force, was to align itself with their effort to drive Americans out of Iraq.

366. Like MTN, ZTE intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the IRGC, including the Qods Force, who were explicit, that they expected their partners to provide significant help in fighting against U.S. forces in particular. Thus, for ZTE to achieve its business objectives vis-à-vis the IRGC, including the Qods Force, fronts who controlled TCI and MTN Irancell – both of which ZTE serviced – ZTE needed to disassociate itself from the United States and prove that it could deliver value to the Shiite terrorist campaign against U.S. forces in Iraq.

367. On information and belief, like MTN, ZTE's agreement to aid the IRGC, including the Qods Force, also fulfilled an obligation by ZTE, like MTN, to engage in "defensive, security and political cooperation" with its IRGC, including Qods Force and Qods Force, counterparties.[139] Such cooperation offered ZTE added motivation for ZTE's illicit transactions with the IRGC, including Qods Force, counterparties. ZTE's support for the IRGC, including the Qods Force, did not merely grow ZTE's profits by allowing it to obtain lucrative business from MTN Irancell and TCI in the first instance; it also benefited ZTE's business by inflicting harm on an enemy (the United States) of one of ZTE's most important business partners (the IRGC, including the Qods Force) in order for ZTE to curry Iranian favor to gain market share for a potentially uniquely lucrative telecom and communications market (Iran).

368. Plaintiffs' allegations also comport with the widespread view of relevant U.S. government officials from the executive and legislative branches. For starters, ZTE was forced to plead guilty and the largest criminal fine, to that date, in a United States sanctions case.

---

[139] Exhibit A, MTN-Irancell Consortium Letter Agreement § 8.

369.     Moreover, a group of 33 Senators expressed concern about ZTE, and on May 15, 2018, they sent a letter to President Trump indicating they viewed ZTE as a security threat.  In relevant part the Democratic Senators (a) noted that ZTE violated US sanctions law and repeatedly lied about steps it would take to remedy the problems; (b) argued that America's national security must not be used as a bargaining chip in trade negotiations; (c) labeled ZTE as a "bad actor"; and (d) argued that loosening restrictions on ZTE could "risk American national security".

370.     Concerns about ZTE's hostility to American national security are bipartisan.  For example, Senator Marco Rubio has warned against allowing ZTE "to operate in U.S. without tighter restrictions," given national security and espionage concerns, and Senator Mark Warner has publicly reported to label ZTE as a "national security threat."

371.     Moreover, a multi-year bipartisan investigation by the House Select Committee on Intelligence concluded in October 2012 that ZTE "cannot be trusted to be free of foreign state influence and thus pose[s] a security threat to the United States and to our systems."

372.     Further, the FCC recently designated ZTE as a "national security threat," and stated that "ZTE's violation of U.S. trade agreements and export laws, coupled with its obstruction of the Department of Justice's investigation, indicate a clear disregard for U.S. law and national security."  Indeed, the FCC noted that ZTE has broken laws that pertain to U.S. national security, and ZTE has "shown a willingness to obstruct the investigations into such national security threats."  The FCC stated concern regarding "ZTE's knowing violations of U.S. national security laws and its proven lack of cooperation in dealing with U.S. criminal investigators."

373.    OFAC, as well as the other U.S. government agencies, opened an investigation of ZTE in March 2012. As agreed by ZTE in its Settlement Agreement with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), at or around that time, "an undisclosed person in ZTE's legal department in Shenzhen called at least one ZTE employee present within the United States to instruct him to leave the country. These instructions were provided on the same day or shortly after search warrants were executed upon ZTE's facilities located in the United States."

374.    As part of ZTE's attempt to "cover up" its acts to provide U.S.-origin technology to TCI, ZTE retaliated in the United States against the whistleblower in the United States who reported the scheme.

### b.    ZTE's conduct relied on American contacts

375.    ZTE reached into the United States to acquire U.S.-sourced embargoed technology that it then provided to Telecommunication Company of Iran and Aryacell.

376.    TCI is predominantly state-controlled. Indeed, TCI is owned by the Iranian government and a private consortium with reported ties to IRGC, including the Qods Force.

377.    Aryacell is part of the consortium that, along with the IRGC, including the Qods Force, controls TCI.

378.    ZTE reached into the United States to support the IRGC, including the Qods Force, and by implication, Hezbollah and Jaysh al-Mahdi, when it obtained technology and vital operational support from the U.S. ZTE supplied technology and operational support for TCI and MTN Irancell through various U.S. agents. In doing so, ZTE tied its unlawful conduct to the United States by obtaining irreplaceable, best-in-class, and embargoed U.S.-supplied dual-use technology to aid the IRGC's, including the Qods Force's, terrorist enterprise. This U.S. contact

was closely related to ZTE's support for the IRGC, including the Qods Force, Hezbollah, and Jaysh al-Mahdi.

379.   ZTE relied on U.S.-made materials as components for its smartphones, cell phone systems, and computer networking gear.  U.S.-origin goods were technically essential to ZTE's IRGC-related, including Qods Force-related, projects and/or end-users as there were no suitable foreign-made substitutes for many of them.

380.   The embargoed United States technology included but was not limited to servers, switches, routers, and component parts of cellular network infrastructure.

381.   The United States Commerce Department has said that ZTE sold prohibited American electronics to Iran to help Iran build its telecom networks.

382.   Just about every product that ZTE makes has some American components or software in it, such as microchips, modems, and Google's Android operating system.

383.   Public reports indicate ZTE helped funnel software and hardware from U.S. firms including Oracle, Microsoft, and Cisco Systems to the government of Iran in 2010 for use building what was described as a massive, nationwide surveillance system.

384.   Simply put, ZTE could not do the business it did with IRGC, including the Qods Force, and thereby cause the transfer of key technology to Hezbollah and Jaysh al-Mahdi, without reaching into the United States to obtain that technology.

## VI.   HEZBOLLAH, JAYSH AL-MAHDI, AND THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, USED DEFENDANTS' FUNDS AND OPERATIONAL AID TO FINANCE TERRORIST OPERATIONS, BUY AND/OR BUILD ADVANCED WEAPONS SPECIALLY DESIGNED TO TARGET AMERICANS IN IRAQ, AND SUSTAIN THE JOINT CELLS USED TO COMMITT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS IN IRAQ

385.   Hezbollah, funded and supported by the IRGC, including the Qods Force, used Defendants' resources to carry out the Joint Cells' terrorist attacks against Americans in Iraq.  As

127

a scholar writing in the journal published by the Combating Terrorism Center at West Point summarized in 2010, "it is clear that Iran has a proven ability to commission violence inside Iraq" because "Iraqi government Harmony records collated by the Combating Terrorism Center at West Point illustrate [that] Iran has been in the business of sponsoring Iraqi paramilitary proxies for 30 years, practically the government's entire existence."[140]

386.    When U.S. forces arrived in Iraq, Iran's nationwide terror campaign against Americans there was assigned to the Qods Force under the command of Soleimani, who answered directly to Ayatollah Khamenei.  Soleimani caused the IRGC, including the Qods Force, to partner with Hezbollah in Iraq so that Hezbollah would serve as the bridge between the IRGC, including the Qods Force, and Jaysh al-Mahdi.

387.    According to the U.S. State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the [IRGC], is the regime's primary mechanism for cultivating and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[141]

388.    The First Corps of the Qods Force, one of its four regional commands, executes Iran's terrorist agenda in Iraq.  During the relevant timeframe, the Qods Force did so largely by providing Hezbollah the funding, weapons, and logistical support it needed to facilitate the attacks by the Joint Cells.  The First Corps' al-Ramazan Headquarters is based across several sites in Iran's largest city (and capital), Tehran, a short trip from the Iraqi border with Iraq.

---

[140] Knights, *The Evolution of Iran's Special Groups in Iraq*.

[141] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

389. Raids conducted in Iraq by the elite U.S. Joint Special Operations Command ("JSOC") also proved that the IRGC, including the Qods Force, directly deployed their own terrorists inside Iraq to augment the Hezbollah-led Joint Cells attack Americans there. For example, in a late 2006 JSOC raid in central Iraq, U.S. forces detained Mohsen Chizari, the Qods Force's head of Operations and Training, as well as the Qods Force's station chiefs for Baghdad and Dubai. In another raid in northern Iraq, U.S. forces captured five Qods Force terrorists.

A. **Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, created Jaysh al-Mahdi and Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah**

390. Through Iran's long-standing proxy Hezbollah, the IRGC, including the Qods Force, provided material support to the Joint Cells attacking Americans in Iraq.

391. Iran's – and therefore Hezbollah's – objective always was to kill Americans in order to drive the U.S. out of Iraq.

392. The IRGC, including the Qods Force, provided material support to its longstanding lead terrorist agent and proxy, Hezbollah, to facilitate Hezbollah-led attacks against Americans in Iraq, and Hezbollah's commission, planning, and/or authorization of attacks carried out by the Joint Cells between 2011 and 2016.

393. Hezbollah's role regarding Jaysh al-Mahdi and the attacks by the Joint Cells in Iraq was similar to its role in other terror campaigns it sponsored: Hezbollah recruited, trained, armed, and directed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf. Hezbollah Secretary-General Hassan Nasrallah was deeply involved in this campaign, reportedly spending "several hours daily dealing with 'the situation in Iraq.'"[142]

---

[142] Hamza Hendawi & Qassim Abdul-Zahra, *Shiite Sources: Hezbollah Helping Iraqi Militia*, NBC News (July 1, 2008).

394.    Federal judges have recognized the key role that the IRGC, including the Qods Force, played in ensuring that Hezbollah had the funds, arms, and logistical aid it needed to manage the Joint Cells' attack campaign against Americans in Iraq.  For example, in *Fritz*, the Honorable Randolph D. Moss found that "Iranian support—in the form of funding, weapons, and training—was critical to the success of the Special Groups, which otherwise 'would [have been] unable to conduct their terrorist attacks in Iraq.'"[143]

395.    Hezbollah at all times acted at the instruction of the IRGC, including the Qods Force, and to benefit Iran's terrorist enterprise targeting Americans in Iraq, by helping establish Jaysh al-Mahdi, including the Jaysh al-Mahdi Special Groups, and later supporting the Jaysh al-Mahdi terrorist campaign against Americans in Iraq.[144]

396.    In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Muqtada al-Sadr found Jaysh al-Mahdi.  Hezbollah's goal, according to an October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict "mass casualties" on Americans.  A U.S. Special Operations task force report quoted by the *U.S. News & World Report* in 2004 explained that "the Lebanese Hizballah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S."[145]  As one embedded war correspondent put it, Jaysh al-Mahdi was created to be "the Iraqi branch of Hezbollah."[146]

---

[143] *Fritz*, 320 F. Supp. 3d at 62.

[144] The Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah were both the fruits of Iran's and Hezbollah's strategy of standing up and supporting Jaysh al-Mahdi in Iraq. For that reason, all of allegations concerning Jaysh al-Mahdi also apply to Asaib Ahl al-Haq and Kataib Hezbollah.

[145] *Id.*

[146] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J. (Aug. 14, 2007).

397.    Sadr was a natural fit to lead Hezbollah's campaign of terror in Iraq.  In addition to being the descendant of two revered Shi'a martyrs (Sadiq al-Sadr and Baqir al-Sadr) and sharing Hezbollah's affinity for violence, Sadr himself had a close relationship with Hezbollah and Iran.  Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-Sadr's uncle, Baqir al-Sadr.  Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor in Lebanon.  A 2004 U.S. military-intelligence report concluded that Sadr had a direct relationship with Hassan Nasrallah, the head of Hezbollah, and that a top adviser to Nasrallah had personally delivered funds to Sadr in Najaf.  Sadr himself visited Tehran and Beirut on numerous occasions.  And, in 2016, Nasrallah personally brokered talks between Sadr and the Iraqi government.

398.    Immediately after Jaysh al-Mahdi's founding in April 2003, Mugniyeh began to recruit and train soldiers for Jaysh al-Mahdi.  Mugniyeh soon recruited 300 terrorists for Jaysh al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for training in the use of assault rifles, booby traps, and kidnapping.  These 300 fighters were some of Jaysh al-Mahdi's first members.  That same month, according to the *Asia Times*, Hezbollah "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[] up [its] organizational and military apparatuses in Iraq."[147]  By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train Jaysh al-Mahdi terrorists.  At the same time, these Hezbollah operatives were acquiring rocket-propelled grenades, antitank missiles, and other weapons for Jaysh al-Mahdi.

399.    Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years.  By January 2004, nearly 800 Hezbollah agents had

---

[147] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006).

been sent to Iraq, where they were deployed to direct Jaysh al-Mahdi's terrorist campaign from key Jaysh al-Mahdi strongholds in Iraq, including, but not limited to, Sadr City, Najaf, Safwan, and Basra. Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005. An October 2006 U.S. intelligence summary (as published online) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after travelling to Iraq on tourist visas.[148] Mugniyeh continued to personally supervise Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other Hezbollah operatives. At the time Mugniyeh was killed in 2008, the U.S. government continued to view him as an ongoing threat to Americans in Iraq.

400. In addition to its terrorist mastermind Imad Mugniyeh, Hezbollah deployed a litany of its senior terrorist planners to direct Jaysh al-Mahdi's campaign of terror against Americans in Iraq, including, but not limited to, the following Hezbollah terrorists:

- **Ali Mussa Daqduq (Senior Hezbollah Field Commander).** Hezbollah directed its senior field commander, Ali Mussa Daqduq, to work with the Qods Force to instruct Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations.

- **Muhammad Kawtharani (Nasrallah's Personal Liaison to Sadr).** Hezbollah also deployed a senior cleric, Muhammad Kawtharani, to serve as a liaison to Jaysh al-Mahdi. In 2013, the U.S. Treasury Department identified Kawtharani as a member of "Hizballah's leadership" who "act[ed] for, or on behalf of Hizballah," and was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's Iraq activities."[149] Kawtharani, as personal adviser to Nasrallah, was directly involved in coordinating attacks against Americans in Baghdad.

- **Yusuf Hashem (Iraq Operations – Country-wide).** Hezbollah also tasked another senior Hezbollah terrorist commander, Yusuf Hashem, to coordinate Hezbollah's Jaysh al-Mahdi operations in Iraq.

---

[148] U.S. Dep't of Defense, *US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala* (Oct. 10, 2006).

[149] U.S. Dep't of Treasury, *Treasury Sanctions Hizballah Leadership* (Aug. 22, 2013).

- **Ali Falih Hadi (Iraq Operations – Basra and Amarah).**  According to a Coalition threat report (as published online), Ali Falih Hadi was a member of Hezbollah who was based in Amarah in Basra Province and was "responsible for supplying" weapons to members of a joint Jaysh al-Mahdi/Hezbollah cell operating in Basra.

- **Hezbollah Bombmakers.**  On information and belief, Hezbollah deployed one or more experienced bombmakers into Iraq to provide in-country direction to Jaysh al-Mahdi terrorists relating to the design, manufacture, storage, and maintenance of EFPs and IEDs for use against Americans in Iraq.

401.    At Hezbollah's direction, Jaysh al-Mahdi escalated its attacks on Americans in Iraq beginning in the winter of 2005.  This escalation was the result of Hezbollah's own "strategic decision" to ratchet up pressure on the United States by boosting Hezbollah's "support [for] Sadr" and fostering "managed instability" in Iraq.[150]  According to the *New York Times*, a senior American intelligence official assessed that, as part of this "strategic decision" to escalate the terrorist campaign against Americans in Iraq, Iran served as "a link to Lebanese Hezbollah" and "helped facilitate Hezbollah training inside of Iraq, but more importantly Jaish al-Mahdi members going to Lebanon" for training.[151]

402.    Jaysh al-Mahdi and Sadr publicly embraced their links to Hezbollah.  During his Friday sermons on March 26, 2004 – in which he praised the attacks of September 11th and called for violence against Americans in Iraq – Sadr swore fealty to Hezbollah in Shi'a Islamist terms, pledging support to "our victorious party, Hezbollah."  Weeks later, in a sermon in April 2004, Sadr declared that he was Hezbollah's "striking arm in Iraq," proclaiming:  "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[152]  In an August 2007 interview, Sadr again reportedly acknowledged that

---

[150] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006).

[151] *Id.*

[152] The Buffalo News, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas* (Apr. 2, 2004).

Jaysh al-Mahdi "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[153]  Another Jaysh al-Mahdi member told an interviewer that "[w]e learned [from Hezbollah] how to take advantage of an armored vehicle's weakness" – referring to the use of EFPs – "and how to wait and kill the soldiers who try to escape."[154]

403.    In the years after 2003, Jaysh al-Mahdi fighters regularly participated in anti-American marches in which they marched under Hezbollah flags and banners.  Tens of thousands of members of Jaysh al-Mahdi publicly swore fealty to Hezbollah in various marches in Sadr City in 2006 alone, including on July 21, 2006, and August 4, 2006.

404.    On August 4, 2006, more than 10,000 members of Jaysh al-Mahdi attended a joint Jaysh al-Mahdi/Hezbollah march in Sadr City, which further demonstrated Hezbollah's control over Jaysh al-Mahdi operations.  As recounted in a field report in *Al Jazeera*, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah."[155]  The crowd of Jaysh al-Mahdi fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."[156]  The close, symbiotic connection between Jaysh al-Mahdi and Hezbollah was summed up by Jaysh al-Mahdi members' repeated declaration at the rally:  "we are Hezbollah."

405.    In 2009, the U.S. Treasury Department formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi Special Groups commander

---

[153] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent (Aug. 20, 2007).

[154] *Id.*

[155] Al-Jazeera, *Iraq's Shia March for Hezbollah* (Aug. 4, 2006).

[156] *Id*.

Abu Mahdi al-Muhandis as a Specially Designated Global Terrorist.  The press release noted that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces."[157]  According to the press release, these Jaysh al-Mahdi cells "received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.[158]

406.    The U.S. Treasury Department again recognized the links between Hezbollah and Jaysh al-Mahdi in 2012, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[159]  According to Treasury's findings, in 2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq.  In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups."[160]  As of 2006, that unit was working with the Iranian Qods Force "to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops."[161]

407.    The IRGC, including the Qods Force, used Hezbollah to provide material support to Asaib Ahl al-Haq, which was one of the most dangerous of Jaysh al-Mahdi's so-called "Special Groups."  As such, AAH was a terrorist proxy of Iran's lead terrorist agent, Hezbollah.  Given Asaib Ahl al-Haq's status as a Jaysh al-Mahdi Special Group, the IRGC, including the

---

[157] U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009).

[158] *Id*.

[159] U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012).

[160] *Id*.

[161] *Id.*

Qods Force, through its agent, Hezbollah, caused the provision of the same types of support to Asaib Ahl al-Haq as Hezbollah provided to Jaysh al-Mahdi and Kataib Hezbollah.

408.    Federal courts have previously concluded that the IRGC, including the Qods Force, provided material support to Jaysh al-Mahdi Special Group Asaib Ahl al-Haq through Hezbollah that proximately caused terrorist attacks against Americans in Iraq.  For example, in *Fritz*, the Honorable Randolph D. Moss ruled that, "Based on the testimony of these witnesses, and almost one hundred trial exhibits, the Court finds as follows: … Iran provided AAH with significant support—in the form of training, supplies, intelligence, and funding—as part of its larger strategy to destabilize Iraq and drive the United States from the Middle East using Iraqi Shia militias as proxies. … and] AAH could not have committed any of these acts without Iran's support."[162]  Indeed, Judge Moss found that "Iran played a central role in Qais Khazali's ascent and AAH's formation."[163]

409.    The IRGC, including the Qods Force, also used Hezbollah to provide material support to Jaysh al-Mahdi Special Group Kataib Hezbollah.  As such Kataib Hezbollah was Hezbollah's terrorist proxy in Iraq.

**B.      Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, provided Jaysh al-Mahdi with the weapons used to attack Americans in Iraq**

410.    The IRGC, including the Qods Force, relied upon Hezbollah to provide Jaysh al-Mahdi the weapons it used to attack Americans in Iraq, including, but not limited to, IEDs EFPs, advanced rockets (including IRAMs), and rocket-propelled grenades, and explosives, which

---

[162] *Fritz*, 320 F. Supp. 3d at 58.

[163] *Id.* at 62.

were uniquely suited for terrorist attacks on U.S. peacekeeping and allied forces and civilian convoys in Iraq.

411. As Judge Moss found in *Fritz*, the "[t]he Special Groups were … armed[] and directed by Iran's Q[u]ds Force, with help from Lebanese Hezbollah" and "[t]he U.S. Department of Defense estimated that, in addition to training, the Quds Force supplied the Special Groups with arms and funding valued at between $750,000 and $3 million a month." [164]

412. The IRGC, including the Qods Force, through their lead terrorist agent, Hezbollah, provided the Joint Cells with weapons to use against Americans in Iraq.

413. Hezbollah supplied many of the weapons that Jaysh al-Mahdi used to commit acts of terror against Americans in Iraq – though Jaysh al-Mahdi still required money and resources to acquire those weapons and transport them to the appropriate cells in Iraq. A Jaysh al-Mahdi commander told journalists in June 2007 that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran." [165]

414. Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks. The *Long War Journal* reported in June 2007 that rockets that Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006." [166] Later that year, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq. Hezbollah's involvement in these smuggling operations accorded with its longstanding role as Iran's weapons smuggler

---

[164] *Fritz*, 320 F. Supp. 3d at 63.

[165] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007).

[166] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

(including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

415.    Hezbollah also used funds provided by the IRGC, including the Qods Force, to purchase weapons for Jaysh al-Mahdi outright.  For example, according to a U.S. military-intelligence document, "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."

416.    Weapons supplied to Jaysh al-Mahdi by Hezbollah include the same types of weapons on which Hezbollah trained Jaysh al-Mahdi:  small arms, IEDs, EFPs, rockets, mortars, and RPGs.  These weapons were first smuggled into the Jaysh al-Mahdi command-and-control safe haven of Sadr City and then distributed to Jaysh al-Mahdi cells in outlying provinces.  For attacks carried out with those weapons, Hezbollah not only trained Jaysh al-Mahdi how to use them; it supplied the weapons themselves.

417.    These trends accelerated "[a]fter Lebanese Hizb Allah's successful 'summer war' against Israel in July 2006," when Hezbollah and the IRGC, including the Qods Force, "sought to replicate this victory in Iraq, opening the floodgates to provide advanced [EFP] munitions and other weapons to" Jaysh al-Mahdi terrorists in Iraq.[167]  As one analyst explained in 2010:

> Iran's support to Special Groups appears to be largely focused on anti-U.S. resistance operations … The most visible symbol of Iran's support is the 20-30 rocket attacks launched against U.S. bases each month in Iraq, almost all of which involve entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence specialists. The IRGC has been supporting such attacks since the early 1980s … Iran [] smuggle[d] large numbers of 107mm Hesab and 122mm Grad rockets into Iraq, as well as some larger 240mm Fajr rockets.[168]

---

[167] Knights, *The Evolution of Iran's Special Groups in Iraq*.

[168] *Id*.

138

418.     U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Iraq, many of which bore markings of Iranian origin, and all of which, on information and belief, were smuggled into Iraq by Hezbollah.  Coalition forces regularly recovered weapons caches from Iranian proxies that were replete with newly manufactured weapons often stamped "Made in Iran."  Examples include a massive seizure of a Joint Cell terrorist weapons cache near Basra in 2010, which seized "76 rockets, 15 tons of TNT and significant amounts of bomb-making materiel," and "41 magnets for making under-vehicle IEDs and silenced weapons."[169]  Indeed, "[t]he Iranian government does not appear to be unduly concerned about plausible deniability, deploying new Iranian-produced 'signature' weapons across Iraq. The U.S. government has released many photographic slideshows of newly-produced weapons systems in Iraq that are known to be manufactured by Iran."[170]

### C.     Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, provided Jaysh al-Mahdi with key training and logistical support to attack Americans in Iraq

419.     The IRGC's, including the Qods Force's, funding for Hezbollah and support for the Hezbollah-led training and logistical effort relating to Jaysh al-Mahdi had cross-cutting effects.  As the State Department explained in 2009, "[t]he Qods Force, in concert with Lebanese Hizballah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry."[171]

---

[169] *Id.*

[170] *Id.*

[171] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

420.     Hezbollah trained Jaysh al-Mahdi, including its Special Groups Asaib Ahl al-Haq and Kataib Hezbollah, in the use of weapons and tactics that were specifically designed to target Americans in Iraq.

421.     Jaysh al-Mahdi successfully used Hezbollah training to perpetrate terrorist attacks against Americans in Iraq.

422.     This training began at Jaysh al-Mahdi's inception in April 2003, when Imad Mugniyeh recruited and trained some of Jaysh al-Mahdi's first 300 fighters in Lebanon.  It continued through at least 2008, when Hezbollah held training camps for Jaysh al-Mahdi fighters in Iran (in conjunction with Iran's Qods Force), Lebanon, and Iraq.  According to a captured Jaysh al-Mahdi operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence report, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[172]

423.     From 2003 through the present, Jaysh al-Mahdi recruits have travelled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes.  Because of the logistical challenges associated with bringing Jaysh al-Mahdi militants into Iran and Lebanon, Hezbollah occasionally trained members of Jaysh al-Mahdi to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Jaysh al-Mahdi members in Iraq.[173]  U.S. officials have referred to this

---

[172] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008).

[173] Michael R. Gordon, *Hezbollah Trains Iraqis in Iran, Officials Say*, N.Y. Times (May 5, 2008).

practice as "training the trainer."[174]  Hezbollah also trained members of Jaysh al-Mahdi inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

424.    Hezbollah's training was rigorous.  According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[175]  Trainees were awakened at 5:30 a.m. every day to pray and exercise.  Classes started at 8:00 a.m. and continued until dusk.  Each class lasted roughly 50 minutes, with 10-minute breaks in between classes.  Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations.  The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the *New York Times* in November 2006.[176]  The topics covered in these training programs included the following:

425.    **EFPs.**  In 2004, Hezbollah "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before" – the EFP.[177]  Hezbollah trained members of Jaysh al-Mahdi in the deployment of EFPs, which were expressly designed to penetrate the American armor. Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon.  Indeed, at that point, Hezbollah was the world's foremost expert on EFPs.  Hezbollah also imparted to Jaysh al-Mahdi the complex expertise required to manufacture and use EFPs, and drawing on its experience in Lebanon,

---

[174] *Id.*

[175] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008).

[176] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006).

[177] Michael Ware, *Inside Iran's Secret War for Iraq*, Time (Aug. 22, 2005).

Hezbollah instructed Jaysh al-Mahdi to use EFPs against American soldiers.  The *New York Times* reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[178]  On information and belief, the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October 2008, was built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi with funding provided by the IRGC, including the Qods Force.  As a declassified British intelligence report concluded, EFPs used in Iraq were "exclusively associated with Hizballah."[179]

426.    Hezbollah planned the Joint Cells' EFP attacks (as with the other attacks outlined in this Complaint) in Iraq through the extensive training and coordination set forth above. Hezbollah's planning of the Joint Cells' EFP attacks against Americans included:  (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi and the Joint Cells were permitted to launch EFP attacks; (2) instructing Jaysh al-Mahdi and the Joint Cells to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance to Jaysh al-Mahdi and the Joint Cells with respect to EFP design schematics and concepts; (4) helping manufacture EFPs for use against Americans in Iraq; (5) training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and instructional videos concerning EFPs; and (8) forward deploying senior

---

[178] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013).

[179] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans with Jaysh al-Mahdi and the other members of the Joint Cells.

427.   **Rockets.**  Hezbollah trained members of Jaysh al-Mahdi in the use of rocket launchers and anti-aircraft missiles.  In particular, Hezbollah directed Jaysh al-Mahdi members to launch indirect-fire rocket attacks on the Green Zone from Sadr City, and it instructed them on how to do so.  Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City.  During these attacks in 2008, Jaysh al-Mahdi rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's instruction.  By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel.  Indeed, the *Long War Journal* reported that the rockets Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[180]

428.   **Kidnappings**.  Hezbollah is well-known for its kidnapping operations.  In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers.  Hezbollah also trained Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[181]  Jaysh al-Mahdi put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where Jaysh al-Mahdi terrorists kidnapped four U.S. soldiers and killed another.  And a 2011 letter from five U.S. Senators documented that

---

[180] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

[181] *Id*.

Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Jaysh al-Mahdi on "how to conduct intelligence and kidnapping operations."

429.    As Judge Moss found in *Fritz*, Iran's training, through Hezbollah, "played a significant role in the success of AAH and other Special Groups. Without that Iranian-backed training, the Special Groups would have been 'nowhere' near as effective as they were."[182]

430.    The extent of Hezbollah's involvement in Jaysh al-Mahdi's attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out abductions of Americans.  Hezbollah's instruction as reflected in this "planning guide" enabled Jaysh al-Mahdi to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

D.    **Acting through Hezbollah, the Islamic Revolutionary Guard Corps, including the Qods Force, routed funds to Jaysh al-Mahdi to finance attacks against Americans in Iraq**

431.    Acting through Hezbollah, the IRGC, including the Qods Force, also provided substantial financial support to Jaysh al-Mahdi, including its Special Groups Asaib Ahl al-Haq and Kataib Hezbollah.

432.    Acting through Hezbollah, the IRGC, including the Qods Force, regularly provided large cash payments to Jaysh al-Mahdi, channeled via Hezbollah, in the latter's role as the connector between Jaysh al-Mahdi and the IRGC, including the Qods Force.  Jaysh al-Mahdi Special Groups were supported by the Qods Force, through Hezbollah, with arms and funding

---

[182] *Fritz*, 320 F. Supp. 3d at 64.

valued at between $750,000 and $3 million a month.[183]  "In the words of Dr. Levitt, although far

less than the funding Iran provided to Hezbollah, the funds provided to AAH were devoted 'to

carry[ing] out operations,' and 'three-quarter[s] of a million dollars to $3,000,000 a month ... can

buy a lot of damage.'" [184]

433.    Acting through Hezbollah, the IRGC, including the Qods Force, also paid the

Joint Cells to kill U.S. forces.  As one scholar examining Iranian support for Hezbollah and

Jaysh al-Mahdi found in 2010, "[m]oney continues to be provided in significant volumes,

allowing cells to be paid between $4,000 and $13,000 per rocket or roadside bomb attack,

depending on the circumstances."[185]

434.    Acting through Hezbollah, the IRGC, including the Qods Force, also provided

funding to individual Jaysh al-Mahdi commanders, including for Asaib Ahl al-Haq and Kataib

Hezbollah.  For example, through Hezbollah, the IRGC, including the Qods Force, paid millions

each to Muqtada al-Sadr, Qais and Laith Khazali, and Abu Mahdi al-Muhandis.

## VII.    JOINT CELLS COMPRISED OF HEZBOLLAH, JAYSH AL-MAHDI, AND ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING QODS FORCE, KILLED AND INJURED PLAINTIFFS THROUGH TERRORIST ATTACKS FOR WHICH DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE

435.    Plaintiffs are members of the American civilians, servicemembers, and

contractors serving in Iraq, and their family members, who were killed or injured in terrorist

attacks committed by Hezbollah (a designated FTO at the time), Jaysh al-Mahdi (including Jaysh

al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah, the latter of which was a

---

[183] *Id*. at 63.

[184] *Id*.

[185] Knights, *The Evolution of Iran's Special Groups in Iraq*.

designated FTO at the time), and the IRGC (including the Qods Force), all of which acted together in Joint Cells.

436.    Hezbollah has a history of significantly escalating the violence during its ongoing terroristic campaigns to drive its own (and that of the IRGC's, including the Qods Force's) terroristic Anti-American and Anti-Israeli messaging in the Middle East.  For example, in 2006, during its terrorist attacks against Israel, Hezbollah executed a coordinated rocket offensive that Hezbollah (and the IRGC, including the Qods Force) touted to show that Hezbollah (including its Iranian paymasters) could militarily challenge the Great Satan (the United States) and the Little Satan (Israel), both of whom the terrorists claimed to be worthy of attacking.

437.    Following this practice, Hezbollah escalated its ongoing terrorist campaign in Iraq to achieve a messaging strategy on behalf of Hezbollah and its Iranian patrons the IRGC, including the Qods Force.  Hezbollah's decision in 2005 to aggressively expand the EFP and rocket campaigns throughout Iraq, as well as Hezbollah's repeated tactic of to targeting the Green Zone in Baghdad, such as in 2008, are two examples of Hezbollah following this longstanding Hezbollah strategy in Iraq.

438.    On or about the spring of 2011, Hezbollah returned to its playbook and intensified Hezbollah's existing terrorist campaign targeting Americans in Iraq.  Hezbollah did so because it sought to drive a wave of anti-American violence until the then-contemplated full withdrawal of U.S. forces from Iraq, which was scheduled to take place at the end of 2011.  Hezbollah sought to promote violence against Americans in order to intimidate the U.S. and Iraq during this critical period for both governments.  Hezbollah also sought to bolster its claims of victory over America in Iraq, and specifically, Hezbollah's claims that U.S. forces withdrew from Iraq because of Hezbollah's leadership of the jihadist alliance of Hezbollah, Jaysh al-Mahdi and the

IRGC, including the Qods Force.  Hezbollah sought to leverage its perceived "victory" over America in Iraq to show its strength and superiority to the jihadist world, including but not limited to, Hezbollah's Iranian patrons, the IRGC, including the Qods Force, and other terrorists whom Hezbollah hoped to rally to Hezbollah's terrorist campaign.

439.    In 2011, Hezbollah, acting through the Joint Cells, promoted a new wave of terrorist attacks against Americans in Iraq.  To do so, Hezbollah, as part of the Joint Cells, relied upon two signature Hezbollah weapons: (1) EFPs, which were a weapon that was exclusively associated with Hezbollah and was the terrorists' most effective roadside bomb in Iraq; and (2) advanced rockets, which had been converted into so-called IRAMs or "lob bombs."

440.    Hezbollah provided each bomb, EFP, and rocket (including IRAM) that the Joint Cells used to commit each attack that injured each Plaintiff.  Hezbollah also coordinated every aspect of the terrorist campaign that injured each Plaintiff.  In both respects, Hezbollah continued the same strategy and practice it had pursued in Iraq since 2003.

441.    In its escalation of attacks in 2011, Hezbollah, acting through the Joint Cells, targeted Americans in key Iraqi geographies that had the greatest terroristic impact for Hezbollah's jihadist messaging purposes, including, but not limited to, Baghdad, Basra, and Diwaniyah. Acting through the Joint Cells, Hezbollah targeted Americans in Baghdad, Basra, and Diwaniyah because the terrorists' Joint Cells had successfully carried out attacks against Americans there as part of Hezbollah's campaign since Hezbollah first helped create Jaysh al-Mahdi in 2003 and ever since.

442.    The IRGC, including the Qods Force, provided key aid to the intensified terrorist campaign through the Joint Cells in Iraq in 2011.  The IRGC, including the Qods Force, specifically provided Hezbollah money, logistical support, telecommunications technology, and

the advanced weapons or weapons components, which Hezbollah supplied to the Joint Cells to aid the terrorists' ability to execute the attacks that injured Plaintiffs.

443.   Each Plaintiff who suffered injury because of an attack that took place in 2011 was injured because of Hezbollah's above-described strategic decision to further escalate Hezbollah's anti-American terror campaign in 2011 in order to intimidate the U.S. and Iraqi governments.

444.   In late 2015, Hezbollah decided, once again, to return to its playbook of escalated attacks and intimidation in Iraq, which was designed to intimidate Americans and Iraqis during a critical period for both governments in Iraq.  Hezbollah pursued this surge in its own terrorist campaign in Iraq through at least the spring of 2016.

445.   Each Plaintiff who suffered injury because of an attack that took place in 2016 was injured because of Hezbollah's above-described strategic decision to further escalate Hezbollah's anti-American terror campaign in 2016 in order to intimidate the U.S. and Iraqi governments.

446.   The financial and technological support that MTN and ZTE provided to their IRGC-controlled, including Qods Force-controlled, counterparties flowed through to the Joint Cells that committed each attack that injured each Plaintiff through some channels that were "official" and some that were "off-the books."

447.   With respect to the former, MTN's and ZTE's "official" transactions with their IRGC, including Qods Force, front counterparties – which, though open, were still illegal – flowed through the IRGC, including the Qods Force, into Hezbollah's terrorist budget in order to fund the Joint Cells that committed each attack that injured each Plaintiff.  The millions in value that MTN and ZTE each showered upon the IRGC, including the Qods Force, each year – for

MTN, from 2005 until the present; for ZTE, from at least 2008 through at least 2016 – through their official transactions flowed through Hezbollah to the terrorist(s) that committed each attack against each Plaintiff.

448.    MTN's and ZTE's covert "off-the-books" assistance to the terrorists was no less important.  The IRGC, including the Qods Force, has provided tens of millions of dollars "off-the-books" to Hezbollah since Hezbollah's inception.  MTN's and ZTE's "off-the-books" financial-, technology-, and services-related transactions with their IRGC, including Qods Force, front counterparties also flowed through the IRGC, including the Qods Force, into Hezbollah's terrorist budget in order to fund the Joint Cells that committed each attack that injured each Plaintiff.  MTN's and ZTE's illicit transactions with the Bonyad Mostazafan, IEI, MTN Irancell, TCI, and/or the Akbari Fronts provided millions in illicit "off-the-books" income, often in U.S. Dollars, to the IRGC, including the Qods Force, each year, which the IRGC, including the Qods Force, then provided to Hezbollah so that the Joint Cells could commit each attack that injured each Plaintiff, which they did.

449.    MTN and ZTE also aided the Joint Cell terrorist(s) who committed each attack by transacting with notorious terrorist front counterparties, including, but not limited to, the Bonyad Mostazafan, IEI, MTN Irancell, TCI, and/or the Akbari Fronts, which had a widespread and specific reputation for raising money, providing logistical support, and obtaining weapons for terrorists, including Hezbollah, to use to attack Americans.  MTN's and ZTE's financial support and provision of embargoed American technologies and services for such IRGC-controlled, including the Qods Force-controlled, counterparties flowed through Hezbollah to the terrorist(s) that committed each attack that injured each Plaintiff.

450.    MTN's and ZTE's conduct had an especially tight nexus with the Joint Cells'
ability to execute signature Hezbollah attacks involving the use of EFPs, advanced rockets, and
hostage-taking.  Each EFP and advanced rocket that the Joint Cells used to attack and injure each
Plaintiff contained, reflected, was reverse engineered from, and/or was otherwise technologically
aided by, the IRGC's, including the Qods Force's, use of embargoed American technology that
MTN and ZTE obtained for Hezbollah and the Joint Cells through MTN's and ZTE's
transactions with fronts, operatives, and agents for the IRGC, including the Qods Force, and in
the case of MTN, MTN Group Limited's joint venture with the IRGC, including the Qods Force,
through MTN Irancell.  The embargoed American technology that MTN and ZTE covertly
supplied to the IRGC, including the Qods Force, substantially improved the efficacy and lethality
of each EFP and adv rocket used to attack and injure each Plaintiff.

451.    MTN and ZTE also supported the terrorist campaign through their financial
support of fronts acting for the IRGC, including the Qods Force, which funded the Joint Cell
attacks.  The IRGC, including the Qods Force, manufactured and/or sourced key components for
Hezbollah's EFP attacks, including, but not limited to, the military- and factory-grade copper
discs and embargoed technologies, which Hezbollah used and were vital to Hezbollah's ability to
build the advanced Hezbollah-designed EFPs that the Joint Cells used to commit each EFP attack
that injured each Plaintiff.

### A.    The June 23, 2011, EFP attack in Baghdad

452.    On June 23, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-
Mahdi, and the IRGC (including the Qods Force) attacked a three-vehicle American civilian
convoy that was traveling in civilian traffic with an EFP in the Karadah District on the road
between the University of Baghdad and the Green Zone in Baghdad, Iraq ("The June 23, 2011,
EFP Attack").  The convoy was attacked while traveling to the U.S. Embassy after two of its

passengers, Dr. Stephen S. Everhart and Abdul Ghaffar Mughal, had conducted a seminar designed to elevate an Iraqi business school to international standards and to advise the academic leadership on obtaining accreditation for its business school.

453.    The June 23, 2011, EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell, comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.  The Joint Cell that committed the June 23, 2011, EFP Attack was led by forward-deployed Hezbollah.

454.    The June 23, 2011, EFP Attack, and Dr. Everhart's murder, would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, Dr. Everhart and Mr. Mughal were civilians not taking part in hostilities, and the terrorist(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.    The Everhart Family and Estate

455.    Dr. Stephen S. Everhart served on the faculty of The American University in Cairo, including as the Associate Dean of the School of Business.

456.    On June 23, 2011, Dr. Stephen S. Everhart was injured in the June 23, 2011, EFP Attack in Baghdad Province, Iraq.  Dr. Everhart died on June 23, 2011, as a result of injuries sustained during the June 23, 2011, EFP Attack.  He was 53 years old.

457.    Dr. Stephen S. Everhart was a national of the United States at the time of the attack and his death.

458.    Plaintiff Dr. Stephanie Zobay is the widow of Dr. Stephen S. Everhart.  She brings claims in both her personal capacity and her representative capacity on behalf of Dr. Everhart's estate.  She is a national of the United States.

459.    Plaintiff Lindsay M. Everhart is the daughter of Dr. Stephen S. Everhart.  She is a national of the United States.

460.    As a result of the June 23, 2011, EFP Attack, and Dr. Everhart's death, Dr. Zobay has experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Everhart's society, companionship, and counsel.

461.    Dr. Everhart's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force.

### 2.      The Mughal Family

462.    Plaintiff Dr. Abdul Ghaffar Mughal served in Iraq as a civilian contractor with the Iraq Financial Development Project of USAID and had travelled, along with Dr. Stephen S. Everhart, to Baghdad University to advise its academic leadership.

463.    On June 23, 2011, Dr. Abdul Ghaffar Mughal was injured in the June 23, 2011, EFP Attack.  The attack severely wounded Dr. Mughal, who suffered from, among other injuries, a broken hand, partial loss of hearing, a variety of shrapnel injuries, and post-traumatic stress disorder.

464.    Dr. Abdul Ghaffar Mughal was a passenger alongside Dr. Stephen S. Everhart in the same vehicle when the Joint Cell terrorists exploded their EFP.  Along with his own injuries, Dr. Mughal witnessed Dr. Everhart's death.  As a result of the June 23, 2011, EFP Attack and his injuries, Dr. Mughal has experienced severe physical and emotional pain and suffering.

465.    Dr. Abdul Ghaffar Mughal was a national of the United States at the time of the attack, and remains one to this day.

466.    Plaintiff Sitorai Khasanzod is the wife of Dr. Abdul Ghaffar Mughal.  She is a national of the United States.

467.   Plaintiff Khalid Mughal is the son of Dr. Abdul Ghaffar Mughal.  He is a national of the United States.

468.   Plaintiff Hamid Mughal is the son of Dr. Abdul Ghaffar Mughal.  He is a national of the United States.

469.   Plaintiff Angela Mughal is the daughter of Dr. Abdul Ghaffar Mughal.  She is a national of the United States.

470.   Plaintiff N.M., by and through his next friend Dr. Abdul Ghaffar Mughal, is the minor daughter of Abdul Ghaffar Mughal.  She is a national of the United States.

471.   Plaintiff M.M., by and through his next friend Dr. Abdul Ghaffar Mughal, is the minor son of Abdul Ghaffar Mughal.  He is a national of the United States.

472.   As a result of the June 23, 2011, EFP Attack and Dr. Abdul Ghaffar Mughal's injuries, each member of the Mughal family has experienced severe mental anguish, emotional pain and suffering.

**B.     The July 7, 2011, EFP attack in Baghdad**

473.   On July 7, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force) attacked an American military convoy that was traveling near the Victory Base Complex in the Mansour District of Baghdad, Iraq, with an EFP (the "July 7, 2011, EFP Attack").

474.   The July 7, 2011, EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.

475.   The July 7, 2011, EFP Attack would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.    The Newby Family

476.    Specialist Nicholas W. Newby served in Iraq in the Idaho National Guard as part of the 145th Brigade Support Battalion, 116th Cavalry Heavy Brigade Combat Team, Idaho National Guard.

477.    On July 7, 2011, SPC Newby was injured in the July 7, 2011, EFP Attack in Baghdad Province, Iraq.  SPC Newby died on July 7, 2011, as a result of injuries sustained during the July 7, 2011, EFP Attack.

478.    SPC Newby was a national of the United States at the time of the attack and his death.

479.    Plaintiff Wayne Newby is the father of SPC Newby.  He is a national of the United States.

480.    Plaintiff Theresa Hart is the mother of SPC Newby.  She is a national of the United States.

481.    Plaintiff Nathan Newby is the brother of SPC Newby.  He is a national of the United States.

482.    As a result of the July 7, 2011, EFP Attack, and SPC Newby's death, each member of the Newby family has experienced severe mental anguish, emotional pain and suffering.

### 2.    The Rzepa Family

483.    Plaintiff Staff Sergeant Jason Rzepa served in Iraq in the U.S. Army as part of the 145th Brigade Support Battalion, 116th Cavalry Heavy Brigade Combat Team, Idaho National Guard.

484.     On July 7, 2011, SSG Rzepa was injured in the July 7, 2011, EFP Attack in Baghdad Province, Iraq.  SSG Rzepa lost both his legs below the knees.  As a result of the July 7, 2011, EFP Attack, SSG Rzepa has experienced extreme physical and emotional pain and suffering.

485.     SSG Rzepa was a national of the United States at the time of the attack, and remains one to this day.

486.     Plaintiff Cassandra Rzepa is the former spouse of SSG Rzepa.  She is a national of the United States.

487.     Plaintiff C.R., by and through his next friend Cassandra Rzepa, is the minor son of SSG Rzepa and Cassandra Rzepa.  He is a national of the United States.

488.     Plaintiff K.R., by and through his next friend Adrian Davis, is the minor son of SSG Rzepa.  He is a national of the United States.

489.     As a result of the July 7, 2011, EFP Attack, and SSG Rzepa's injuries, each member of the Rzepa Family has experienced extreme emotional pain and suffering.

**C.     The July 8, 2011, Rocket attack in Baghdad**

490.     On July 8, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force) attacked Camp Victory, which housed American servicemembers in Baghdad, conducted an indirect fire attack against Americans with advanced rockets, including IRAMs (the "July 8, 2011, Rocket Attack").

491.     The July 8, 2011, Rocket Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.

155

492.     The July 8, 2011, Rocket Attack would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.     The Ogden Family

493.     Plaintiff Technical Sergeant Tyler N. Ogden served in the U.S. Air Force in Iraq as part of the 477th Air Expeditionary Group.

494.     On July 8, 2011, TSgt Ogden was injured during the July 8, 2011, Rocket Attack in Baghdad Province, Iraq.  The July 8, 2011, Rocket Attack resulted in severe injuries to TSgt Ogden requiring extensive treatment, including shrapnel wounds to his right leg, knee, and ankle, muscle damage, hearing loss, and PTSD.  Due to his injuries, he received an 80% disability rating from the VA.

495.     As a result of the July 8, 2011, Rocket Attack and his injuries, TSgt Ogden has experienced severe physical and emotional pain and suffering.

496.     TSgt Ogden was a national of the United States at the time of the attack, and remains one to this day.

### D.     The July 10, 2011, Rocket attack in Basra

497.     On July 10, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force) attacked Forward Operating Base ("FOB") Gary Owen, which housed American servicemembers in Amarah in Basra Province in Southern Iraq, with advanced rockets, including IRAMs (the "July 10, 2011, Rocket Attack").

498.     The July 10, 2011, Rocket Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting

together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.

499. The July 10, 2011, Rocket Attack would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who fired the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1. The Chinn Family

500. Plaintiff Staff Sergeant William M. Chinn served in the U.S. Army in Iraq as part of the 3rd Battalion, 8th Cavalry Regiment, 3rd Brigade Combat Team, 1st Cavalry Division.

501. On July 10, 2011, SSG Chinn was injured during the July 10, 2011, Rocket Attack in Basra Province, Iraq. The July 10, 2011, Rocket Attack resulted in severe injuries to SSG Chinn requiring extensive treatment. Due to his injuries, SSG Chinn received a 100% disability rating from the VA.

502. As a result of the July 10, 2011, Rocket Attack and his injuries, SSG Chinn has experienced severe physical and emotional pain and suffering.

503. SSG Chinn was a national of the United States at the time of the attack, and remains one to this day.

### 2. The Niquette Family

504. Plaintiff First Lieutenant Sean M. Niquette served in the U.S. Army in Iraq as part of the 3rd Battalion, 8th Cavalry Regiment, 3rd Brigade Combat Team, 1st Cavalry Division.

505. On July 10, 2011, 1LT Niquette was injured during the July 10, 2011, Rocket Attack in Basra Province, Iraq. The July 10, 2011, Rocket Attack resulted in severe injuries to 1LT Niquette requiring extensive treatment. Due to his injuries, 1LT Niquette received an 80% disability rating from the VA.

506.     As a result of the July 10, 2011, Rocket Attack and his injuries, 1LT Niquette has experienced severe physical and emotional pain and suffering.

507.     1LT Niquette was a national of the United States at the time of the attack, and remains one to this day.

508.     Plaintiff Lauren Niquette is the wife of 1LT Niquette.  She is a national of the United States.

509.     Plaintiff Thomas Niquette is the father of 1LT Niquette.  He is a national of the United States.

510.     Plaintiff Mary Niquette is the mother of 1LT Niquette.  She is a national of the United States.

511.     As a result of the July 10, 2011, Rocket Attack and 1LT Niquette's injuries, each member of the Niquette family has experienced severe mental anguish, emotional pain and suffering.

### E.     The July 15, 2011, EFP attack in Basra

512.     On July 15, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force) attacked an American military convoy that was traveling in Basra, Iraq, with an EFP (the "July 15, 2011, EFP Attack").

513.     The July 15, 2011, EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.

514.     The July 15, 2011, EFP Attack would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1. The Elliott Family

515. Specialist Daniel L. Elliott served in Iraq as part of the 290th Military Police Brigade, 200th Military Police Command, U.S. Army Reserve.

516. On July 15, 2011, SPC Elliott was injured in the July 15, 2011, EFP Attack in Basra Province, Iraq. SPC Elliott died on July 15, 2011, as a result of injuries sustained during the July 15, 2011, EFP Attack.

517. SPC Elliott was a national of the United States at the time of the attack and his death.

518. Plaintiff Ed Elliott is the father of SPC Elliott. He is a national of the United States.

519. As a result of the July 15, 2011, EFP Attack, and SPC Elliott's death, each member of the Elliott family has experienced severe mental anguish, emotional pain and suffering.

### F. The October 12, 2011, Rocket attack in Basra

520. On October 12, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force) attacked FOB Gary Owen in Amarah in Basra Province in Southern Iraq, with advanced rockets, including IRAMs (the "October 12, 2011, Rocket Attack").

521. The October 12, 2011, Rocket Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.

159

522. The October 12, 2011, Rocket Attack would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who fired the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1. The Alldridge Family

523. Plaintiff Private First Class Brian C. Alldridge served in the U.S. Army in Iraq as part of the 8th Cavalry Regiment.

524. On October 12, 2011, PFC Alldridge was injured during the October 12, 2011, Rocket Attack in Basra Province, Iraq. The October 12, 2011, Rocket Attack resulted in severe injuries to PFC Alldridge requiring extensive treatment. Due to his injuries, PFC Alldridge received a 100% disability rating from the VA.

525. As a result of the October 12, 2011, Rocket Attack and his injuries, PFC Alldridge has experienced severe physical and emotional pain and suffering.

526. PFC Alldridge was a national of the United States at the time of the attack, and remains one to this day.

527. Plaintiff Joann Alldridge is the wife of PFC Alldridge. She is a national of the United States.

528. Plaintiff Ronald Alldridge is the father of PFC Alldridge. He is a national of the United States.

529. Plaintiff Dianna Alldridge is the mother of PFC Alldridge. She is a national of the United States.

530. Plaintiff Todd Jeffrey Alldridge is the brother of PFC Alldridge. He is a national of the United States.

531. Plaintiff Andrew Major is the stepson of PFC Alldridge. He is a national of the United States.

532.    Plaintiff Ashley Major is the stepdaughter of PFC Alldridge.  She is a national of the United States.

533.    Plaintiff Alyssa Major is the stepdaughter of PFC Alldridge.  She is a national of the United States.

534.    As a result of the October 12, 2011, Rocket Attack and PFC Alldridge's injuries, each member of the Alldridge family has experienced severe mental anguish, emotional pain and suffering.

### G.    The November 2, 2011, Explosive attack in Diwaniyah

535.    On November 2, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force) attacked American servicemembers as they were traveling in Diwaniyah in Qadisiyah Province in Southern Iraq, with an Iranian manufactured anti-tank hand grenade (the "November 2, 2011, Explosive Attack").

536.    The November 2, 2011, Explosive Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.

537.    The November 2, 2011, Explosive Attack would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who detonated the explosives neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.    The Sullen Family

538.    Plaintiff Private First Class Marcus Jamil Sullen served in the U.S. Army in Iraq as part of Bravo Company, 64th Brigade Support Battalion.

539.    On November 2, 2011, PFC Sullen was injured during the November 2, 2011, Explosive Attack in Qadisiyah Province, Iraq.  The November 2, 2011, Explosive Attack resulted in severe injuries requiring extensive treatment. Due to his injuries, PFC Sullen received a 80% disability rating from the VA.

540.    As a result of the November 2, 2011, Explosive Attack and his injuries, PFC Sullen has experienced severe physical and emotional pain and suffering.

541.    PFC Sullen was a national of the United States at the time of the attack, and remains one to this day.

542.    As a result of the November 2, 2011, Explosive Attack and PFC Sullen's injuries, each member of the Sullen family has experienced severe mental anguish, emotional pain and suffering.

**H.    The November 14, 2011, EFP attack in Baghdad**

543.    On November 14, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force) attacked an American military convoy that was traveling in Baghdad, Iraq, with an EFP (the "November 14, 2011, EFP Attack").

544.    The November 14, 2011, EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), with a Jaysh al-Mahdi terrorist serving as the triggerman.

545.    The November 14, 2011, EFP Attack would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.   The Hickman Family

546.   Specialist David Emanuel Hickman served in Iraq as part of B Company, 2nd Battalion, 325th Airborne Infantry Regiment, 2nd Brigade Combat Team, 82nd Airborne Division.

547.   On November 14, 2011, SPC Hickman was injured in the November 14, 2011, EFP Attack in Baghdad Province, Iraq.  SPC Hickman died on November 14, 2011, as a result of injuries sustained during the November 14, 2011, EFP Attack.

548.   SPC Hickman was a national of the United States at the time of the attack and his death.

549.   Plaintiff David Eugene Hickman is the father of SPC Hickman.  He is a national of the United States.

550.   Plaintiff Veronica Hickman is the mother of SPC Hickman.  She is a national of the United States.

551.   Plaintiff Devon F. Hickman is the brother of SPC Hickman.  He is a national of the United States.

552.   As a result of the November 14, 2011, EFP Attack, and SPC Hickman's death, each member of the Hickman family has experienced severe mental anguish, emotional pain and suffering.

### I.   The January 15, 2016, Kidnapping attack in Baghdad

553.   On January 15, 2016, a team of Jaysh al-Mahdi terrorists, acting as part of a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC (including the Qods Force), kidnapped Plaintiff Russell Frost, Plaintiff Waiel El-Maadawy, and Plaintiff Amr

Mohamed as they were attending a business meeting in Baghdad (the "January 15, 2016, Kidnapping Attack").[186]

554.     The terrorists targeted Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed in the January 15, 2016, Kidnapping Attack because Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed were American contractors working in Iraq on a contract for Blue Light LLC, which had been hired as a subcontractor by General Dynamics Information Technology, Inc. to perform work on a U.S. government subcontract relating to the training of Iraqi special forces.

555.     The January 15, 2016, Kidnapping Attack was the first successful Hezbollah proxy kidnapping operation in Iraq since 2011.  After kidnapping them, the terrorists held Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed hostage for thirty-one days, during which they beat, tortured, and humiliated their American hostages, singling out Mr. El-Maadawy and Mr. Mohamed for special abuse because the terrorists believed that Mr. El-Maadawy and Mr. Mohamed, who are Arab American veterans, had betrayed Muslims by helping America in Iraq.

556.     On February 16, 2016, after thirty-one days in captivity, the terrorists released Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed.

557.     The January 15, 2016, Kidnapping Attack, and subsequent hostage taking and torture of Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed, was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the IRGC (including the Qods Force) acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC

---

[186] By 2016, Jaysh al-Mahdi had undergone several additional branding changes and the terror organization referred to itself as "Saraya al-Salam" at the time of the attack.  Regardless of whether it called itself Jaysh al-Mahdi or Saraya al-Salam, the terrorist organization served as a proxy for Hezbollah in Iraq and was at all times led by notorious Shiite terrorist Muqtada al-Sadr.

(including the Qods Force), with Hezbollah planning the kidnapping and Jaysh al-Mahdi serving as the kidnappers.

558.    The January 15, 2016, Kidnapping Attack, and subsequent hostage taking and torture of Russell Frost, Waiel El-Maadawy, and Amr Mohamed, would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who kidnapped them did not identify themselves as enemy combatants.

### 1.    The Frost Family and Estate

559.    On January 15, 2016, and thereafter, Russell Frost was injured during the January 15, 2016, Kidnapping Attack in Baghdad Province, Iraq.  As a result of the January 15, 2016, Kidnapping Attack and his injuries, Mr. Frost experienced severe physical and emotional pain and suffering before ultimately dying.

560.    The January 15, 2016, Kidnapping Attack resulted in severe injuries that ultimately were the proximate cause of Russell Frost's death less than two years later:  after his hostage ordeal, Mr. Frost would only live for another 685 days, each one as agonizing as the last.

561.    Russell Frost died on November 30, 2017, as a result of injuries sustained during the January 15, 2016, Kidnapping Attack.

562.    Until his death, Russell Frost suffered from nerve damage to both feet, pain in his back, shoulder and elbow, Tarsal Tunnel Syndrome in both ankles, kidney damage due to dehydration, hearing loss, a chronic cough and breathing problems, vision loss, and permanent scarring on his face and wrists.  Mr. Frost also suffered from Post-Traumatic Stress Disorder, anxiety, anger, insomnia, and a general lack of energy and loss of stamina.  These conditions contributed to, and were a proximate cause of, his untimely death.

563.    Russell Frost was a national of the United States at the time of the January 15, 2016, Kidnapping Attack, and remained one until his death.

564.     Plaintiff Tammie Frost is the widow of Russell Frost.  She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Frost's estate.  She is a national of the United States.

565.     Plaintiff Madison Frost is the daughter of Russell Frost and Tammie Frost.  She is a national of the United States.

566.     Plaintiff Crystal Frost is the daughter of Russell Frost and Tammie Frost.  She is a national of the United States.

567.     Plaintiff Amanda Frost is the adopted daughter of Russell Frost, and the natural born daughter of Tammie Frost.  She is a national of the United States.

568.     As a result of the January 15, 2016, Kidnapping Attack and Mr. Frost's injuries, each member of the Frost family has experienced severe mental anguish, emotional pain and suffering.

569.     Russell Frost's estate is entitled to recover economic and non-economic damages from Defendants, due to his death being proximately caused by his kidnapping and being held hostage by Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force.

### 2.     The El-Maadawy Family

570.     On January 15, 2016, and thereafter, Plaintiff Waiel El-Maadawy was injured during the January 15, 2016, Kidnapping Attack in Baghdad Province, Iraq.

571.     The January 15, 2016, Kidnapping Attack severely injured Mr. El-Maadawy.  He suffers from constant and ongoing pain in his lower back, wrists, elbows, knees, ankles, and shoulders.  Mr. El-Maadawy also experiences intermittent numbness in his extremities and has permanent scarring on his ankles and nose as a result of the restrains placed on him during his captivity.  He also suffers from Post-Traumatic Stress Disorder, frequent nightmares, and difficulty sleeping.

572.    Plaintiff Waiel El-Maadawy was a national of the United States at the time of the attack, and remains one to this day.

573.    Plaintiff BilQis Aidara Adjei is the wife of Waiel El-Maadawy.  She was engaged to be married and living with Mr. El-Maadawy at the time of the hostage taking.  She is a national of the United States.

574.    Plaintiff Alexis Grant is the stepdaughter of Waiel El-Maadawy.  She is a national of the United States.

575.    Plaintiff Malik Elmaadawy is the son of Waiel El-Maadawy.  He is a national of the United States.

576.    Plaintiff G.E., by and through his next friend Latasha Elmaadawy, is the minor son of Waiel.  He is a national of the United States.

577.    Plaintiff Zeinab El-Maadawy is the mother of Waiel El-Maadawy.  She is a national of the United States and resides in the Eastern District of New York.

578.    Plaintiff Ihab El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States and resides in the Eastern District of New York.

579.    Plaintiff Tamer El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States.

580.    Plaintiff Mohammed El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States.

581.    Plaintiff Mustafa El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States and resides in the Eastern District of New York.

582.     As a result of the January 15, 2016, Kidnapping Attack and Waiel El-Maadawy's injuries, each member of the El-Maadawy family has experienced severe mental anguish, emotional pain and suffering.

### 3.     The Mohamed Family

583.     On January 15, 2016, and thereafter, Plaintiff Amr Mohamed was injured during the January 15, 2016, Kidnapping Attack in Baghdad Province, Iraq.

584.     The January 15, 2016, Kidnapping Attack severely injured Amr Mohamed.  Mr. Mohamed suffers from severe nerve damage that requires surgical repair in his ankles and wrists. The permanency of those injuries remains unknown at this time and will remain that way until the surgeries are performed.  He continues to experience significant pain in his back, neck, and head as a result of how he was treated.  Mr. Mohamed also suffered from Post-Traumatic Stress Disorder.  This mental condition is severe enough that at one point while Mr. Mohamed was hospitalized in February 2017 when he awoke to the sound of gunfire, fully believing that he was in the midst of a warzone and fearing for his life.  He then blacked out, and the next thing he remembers is waking up in a local jail.  Mr. Mohamed does not remember any of the events that occurred after he blacked out, but, despite a long history of public service and law-abiding behavior, he was accused of allegedly assaulting a hospital security guard.

585.     Plaintiff Amr Mohamed was a national of the United States at the time of the attack, and remains one to this day.

586.     Plaintiff Brenda Mohamed was the wife of Amr Mohamed at the time of the January 15, 2016, Kidnapping Attack.  She is a national of the United States.

587.     As a result of the January 15, 2016, Kidnapping Attack and Amr Mohamed's injuries, each member of the Mohamed family has experienced severe mental anguish, emotional pain and suffering.

## CLAIMS FOR RELIEF

**COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate]**

588.    Plaintiffs incorporate their factual allegations above.

589.    Defendants provided material support to the IRGC, including the Qods Force,[187] in violation of 18 U.S.C. § 2339A.  They did so by reaching into the United States to illegally obtain for the IRGC's, including the Qods Force's, benefit, dual-use technology that greatly aided Iran's terrorist enterprise, and by entering into business transactions and/or making payments directly to the IRGC, including the Qods Force, which provided substantial funds for the benefit of the IRGC's, including the Qods Force's, terrorist proxies like Hezbollah.

590.    Defendants' sourcing of American technology for the IRGC's, including the Qods Force's, benefit provided a service; assistance derived from scientific, technical, or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the sourcing requests), which likewise qualified as material support. MTN's cash-flow generation for the IRGC, including the Qods Force, through MTN Irancell also took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).  ZTE's cash-flow generation for the IRGC, including the Qods Force, via modernizing the IRGC-controlled cellular and landline communications networks likewise took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).

---

[187] All references to the "IRGC" in Counts One through Three below are inclusive of the Qods Force, unless otherwise specified.  *See supra* Part I(A) (explaining that the Qods Force is part of the IRGC).

591.    Defendants knew or recklessly disregarded that their material support would be used by the IRGC, Qods Force, Hezbollah, and Jaysh al-Mahdi in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from FTOs.  Those acts by the IRGC, Qods Force, Hezbollah, and Jaysh al-Mahdi, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  Defendants also disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

592.    Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).[188] Defendants' support for the IRGC, Qods Force, Hezbollah, and Jaysh al-Mahdi appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Iraq, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Iraq, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of

---

[188] *See, e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010) (violation of material-support statutes, even without any "subjective intent" to further terrorist objectives, meets statutory definition of "international terrorism" based on such support's "objective 'external appearance'"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003) (similar).

the U.S., Iraq, and other Coalition governments by mass destruction, assassination, and kidnapping.

593.    Defendants' provision of material support to the IRGC, Qods Force, Hezbollah, and Jaysh al-Mahdi occurred primarily outside the territorial jurisdiction of the United States.

594.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

595.    As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate]**

596.    Plaintiffs incorporate their factual allegations above.

597.    Defendants, by making payments to the IRGC, including the Qods Force, that financed the IRGC's, including the Qods Force's, terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A).  Defendants knew or recklessly disregarded that the IRGC, including the Qods Force, would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

598.    Defendants, by making payments to the IRGC, including the Qods Force, that financed the IRGC's, including the Qods Force's, terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B).  Defendants knew or recklessly disregarded that the IRGC, including the Qods Force, would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the IRGC's, including the Qods Force's, purpose was to intimidate the U.S. and Iraqi populations and to compel the U.S. and Iraqi governments to effect a withdrawal of U.S. forces from Iraq.

599.    Defendants' provision of funds to the IRGC, including the Qods Force, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' support for the IRGC, including the Qods Force, appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Iraq, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Iraqi, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, and other Coalition governments by mass destruction, assassination, and kidnapping.

600.    Defendants' provision of funds to the IRGC, including the Qods Force, occurred primarily outside the territorial jurisdiction of the United States.

601.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

602.     As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants:  Aiding-And-Abetting Liability, Attack Predicate]

603.     Plaintiffs incorporate their factual allegations above.

604.     The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by joint cells comprised of Hezbollah, a designated FTO at the time, Jaysh al-Mahdi, and the IRGC, including the Qods Force.

605.     The terrorist attacks committed by joint cells comprised of Hezbollah, a designated FTO at the time, Jaysh al-Mahdi, and the Qods Force, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States.  In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

606.     The terrorist attacks committed by the joint cell comprised of Hezbollah, a designated FTO at the time, Jaysh al-Mahdi, and the Qods Force appear to have been intended (a) to intimidate or coerce the civilian populations of Iraq, the United States, and other Coalition

nations, (b) to influence the policy of the U.S., Iraqi, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, and other Coalition governments by mass destruction, assassination, and kidnapping.

607.   The terrorist attacks jointly committed by Hezbollah, Jaysh al-Mahdi, and the Qods Force occurred primarily outside the territorial jurisdiction of the United States.

608.   Defendants aided and abetted and knowingly provided substantial assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force – and aided and abetted and knowingly provided substantial assistance to the Joint Cell attacks on Plaintiffs – by providing technical support to the IRGC, including the Qods Force, that aided those attacks.

609.   MTN also aided and abetted and knowingly provided substantial assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force – and aided and abetted and knowingly provided substantial assistance to the Joint Cell attacks on Plaintiffs – by serving as the joint venture partner of the IRGC, including the Qods Force, and generating millions in annual cash flow for the IRGC, including the Qods Force, to use in furtherance of Hezbollah's terrorist enterprise against Americans in Iraq.

610.   ZTE also aided and abetted and knowingly provided substantial assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force – and aided and abetted and knowingly provided substantial assistance to the joint cell attacks on Plaintiffs – by contracting with TCI to modernize the IRGC-controlled Iranian cellular and landline communications systems, and thereby generating substantial revenue for the IRGC, including the Qods Force, to use in furtherance of Hezbollah's terrorist enterprise against Americans in Iraq.

611.    The attacks that killed or injured Plaintiffs and their family members were all jointly committed, as well as planned and authorized, by Hezbollah, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1997.

612.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks jointly committed by Hezbollah, Jaysh al-Mahdi, and the IRGC, including the Qods Force.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

613.    As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

614.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

615.    Plaintiffs request that the Court:

(a)    Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)    Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)    Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d)    Award Plaintiffs prejudgment interest; and

(e)    Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  June 22, 2021

Respectfully submitted,

*/s/ Eli J. Kay-Oliphant*

Ryan R. Sparacino
 (*pro hac vice* forthcoming)
Eli J. Kay-Oliphant
 (EDNY Bar No. EK8030)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*