**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE ZOBAY, et al., | |
| Plaintiffs, | |
| -v.- | Case No.: 1:21-cv-03503-CBA |
| MTN GROUP LIMITED, et al., | |
| Defendants. | |


**MEMORANDUM OF LAW IN SUPPORT OF MTN GROUP LIMITED AND
MTN (DUBAI) LIMITED'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    A.    MTN Group and MTN Dubai Are Foreign Telecommunications Companies that Operate Exclusively Outside the United States. ............. 4

    B.    MTN Group Participated in a Joint Venture to Expand Mobile Phone Service for Iranians. ........................................................................ 5

    C.    Plaintiffs or Their Family Members Were Injured in Iraq or Afghanistan by Attacks Allegedly Committed in Furtherance of a Terrorist Conspiracy. ..................................................................... 6

    D.    Plaintiffs Allege that, by Participating in Irancell and Helping to Support a Mobile Phone Network, MTN Group Conspired to Commit and Aided and Abetted Terrorist Attacks in Iraq and Afghanistan. ........................................................................................ 9

        1.    Plaintiffs' Theory Equates Investing in a Mobile Phone Company in Iran with Agreeing to Join a Global Terrorist Conspiracy. ................................................................... 9

        2.    Plaintiffs Also Allege that Unnamed "Agents" of "MTN" Sourced U.S. Equipment and Services for Irancell. ..................... 12

    E.    Plaintiffs Also Allege that the Taliban Violently Extorted MTN Afghanistan. ........................................................................... 14

LEGAL STANDARD ........................................................................................................... 15

ARGUMENT ......................................................................................................................... 16

    I.    The Court Should Dismiss the Claims Against MTN Group and MTN Dubai for Lack of Personal Jurisdiction. ........................................... 16

    A.    Plaintiffs Cannot Establish that MTN Group Had Minimum Contacts with the United States. ........................................................ 17

        1.    MTN Group Did Not Expressly Aim Its Actions at the United States. ........................................................................ 17

        2.    MTN Group Did Not Purposefully Avail Itself of the U.S. Forum. ............................................................................ 20

            a)    Plaintiffs' failure to adequately plead agency forecloses their theory of purposeful availment. .............. 20

|  |  |  | b) | Even if agency were adequately pleaded, Plaintiffs fail to allege purposeful availment of the benefits and protections of the United States. | 24 |

B. Plaintiffs' Claims Do Not Arise Out of or Relate to the Alleged U.S. Contacts. ................................................. 30

II. Plaintiffs Fail to State Any Claim for ATA Liability. ................................................. 35

    A. Plaintiffs Fail to State an ATA Conspiracy Claim (Count 2). ................. 35

        1. Plaintiffs Do Not Allege that MTN Group "Conspire[d] with the Person Who Committed" the Attacks. ........................... 37

        2. Plaintiffs Do Not Allege that MTN Group Conspired with the IRGC. ................................................. 38

        3. Plaintiffs Do Not Allege that MTN Group Entered Any Agreement with the Specific Intent of Furthering Acts of International Terrorism. ................................................. 40

    B. Plaintiffs Fail to State an ATA Aiding-and-Abetting Claim (Counts 1 and 3). ................................................. 43

        1. Plaintiffs Fail to State an Aiding-and-Abetting Claim as to the Iraq Attacks (Count 1). ................................................. 43

            a) Plaintiffs do not plead that MTN Group was generally aware that it was assuming a role in terrorist activities in Iraq. ................................................. 44

            b) The Amended Complaint does not adequately plead that MTN Group provided substantial assistance to the persons who committed the attacks that injured Plaintiffs. ................................................. 49

        2. Plaintiffs Fail to State an Aiding-and-Abetting Claim as to the Afghanistan Attacks (Count 3). ................................................. 54

            a) Plaintiffs' Afghanistan claim fails for many of the same reasons as the Iraq claim. ................................................. 55

            b) Plaintiffs' RICO-based theory also is inconsistent with the plain language of the ATA. ................................................. 56

III. All of Plaintiffs' ATA Claims Fail Because the Amended Complaint Does Not Adequately Plead that a Designated FTO Committed, Planned, or Authorized the Attacks. ................................................. 57

IV. The ATA's Act-of-War Limitation Bars Plaintiffs' ATA Claims Related to the 2011 and 2016 Iraq Attacks. ................................................. 59

V. The Court Should Dismiss All Claims Against MTN Dubai Because the Amended Complaint Does Not Allege Any Conduct by MTN Dubai. ................ 60

CONCLUSION ................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Rushaid v. Pictet & Cie*,
68 N.E.3d 1 (N.Y. 2016)...........................................................................................27

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011)........................................................................................3

*Atchley v. AstraZeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022)..................................................................30, 48, 50, 54

*Atchley v. AstraZeneca UK Ltd.*,
474 F. Supp. 3d 194 (D.D.C. 2020)..........................................................................57

*Bartlett v. Société Générale de Banque au Liban SAL*,
2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020)....................................28, 45, 48, 50

*Bernhardt v. Islamic Republic of Iran*,
2020 WL 6743066 (D.D.C. Nov. 16, 2020) ........................................38, 41, 43, 52

*Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*,
786 F.2d 1055 (11th Cir. 1986) ................................................................................29

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
137 S. Ct. 1773 (2017)........................................................................................32, 33

*C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*,
771 F.3d 59 (1st Cir. 2014)........................................................................................30

*Cabrera v. Black & Veatch Special Projects Corp.*,
2021 WL 3508091 (D.D.C. July 30, 2021) (rep. & recommendation)........19, 20, 57

*Calder v. Jones*,
465 U.S. 783 (1984)...................................................................................................17

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018)........................................................................2, 21, 23, 24

*Cmty. Fin. Grp. v. Stanbic Bank Ltd.*,
2015 WL 4164763 (S.D.N.Y. July 10, 2015) .........................................................29

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)...................................................................................................16

*Dardana Ltd. v. A.O. Yuguskneftegaz*,
317 F.3d 202 (2d Cir. 2003).....................................................................................16

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)...........................................................................15

*Disability Rights N.Y. v. New York*,
    2019 WL 2497907 (E.D.N.Y. June 14, 2019) .........................................60

*Dish Network L.L.C. v. Kaczmarek*,
    2021 WL 4483470 (E.D.N.Y. June 24, 2021) .........................................23

*EM Ltd. v. Banco Central de la República Argentina*,
    800 F.3d 78 (2d Cir. 2015)...........................................................................22

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)........................................................................ *passim*

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581 (S.D.N.Y. 2015)...........................................................42

*Freeman v. HSBC Holdings PLC*,
    2018 WL 3616845 (E.D.N.Y. July 27, 2018) ...........................................39

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) ..................................................38, 39

*Freeman v. HSBC Holdings PLC*,
    465 F. Supp. 3d 220 (E.D.N.Y 2020) ..................................................51, 54

*Fritz v. Islamic Republic of Iran*,
    320 F. Supp. 3d 48 (D.D.C. 2018)........................................................8, 58

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
    2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) .........................................20

*Gonzalez v. Google*,
    2 F.4th 871 (9th Cir. 2021) ..................................................................48, 54

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011).............................................................................16, 17

*Greene v. Long Island R.R.*,
    280 F.3d 224 (2d Cir. 2002).........................................................................22

*Griffith Labs. Inc. v. Kancor Ingredients Ltd.*,
    2017 WL 514188 (N.D. Ill. Feb. 8, 2017) .................................................33

*Grp. One Ltd. v. GTE GmbH*,
    523 F. Supp. 3d 323 (E.D.N.Y. 2021) .........................................................15

*Gucci Am., Inc. v. Weixing Li,*
    135 F. Supp. 3d 87 (S.D.N.Y. 2015)................................................................28–29

*Guo Jin v. EBI, Inc.,*
    2008 WL 896192 (E.D.N.Y. Mar. 31, 2008) ........................................................24

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ..................................................... *passim*

*Hanson v. Denckla,*
    357 U.S. 235 (1958)................................................................................25

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984)................................................................................30

*Herrera v. Navient Corp.,*
    2020 WL 3960507 (E.D.N.Y. July 13, 2020) ......................................................60

*Honickman v. BLOM Bank SAL,*
    6 F.4th 487 (2d Cir. 2021) ..................................................... *passim*

*In-Flight Devices Corp. v. Van Dusen Air, Inc.,*
    466 F.2d 220 (6th Cir. 1972) ................................................................29–30

*Kaplan v. Lebanese Can. Bank, SAL,*
    999 F.3d 842 (2d Cir. 2021)................................................................48, 49, 50

*Kavanagh v. Zwilling,*
    578 F. App'x 24 (2d Cir. 2014) ................................................................22, 27

*Kemper v. Deutsche Bank AG,*
    911 F.3d 383 (7th Cir. 2018) ..................................................... *passim*

*Krys v. Pigott,*
    749 F.3d 117 (2d Cir. 2014)................................................................15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
    2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ......................................................23

*Licci ex rel. Licci v. Lebanese Can. Bank,*
    673 F.3d 50 (2d Cir. 2012)................................................................27

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL,*
    984 N.E.2d 893 (N.Y. 2012)................................................................25

*Licci ex. rel. Licci v. Lebanese Can. Bank, SAL,*
    732 F.3d 161 (2d Cir. 2013)................................................................26, 28, 29

*Lombardi v. Paige*,
    2001 WL 303831 (S.D.N.Y. Mar. 28, 2001) ........................................................................29

*MacDermid, Inc. v. Deiter*,
    702 F.3d 725 (2d Cir. 2012)..........................................................................................15

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)..........................................................................................15

*MWH Int'l Inc. v. Inversora Murten, S.A.*,
    2015 WL 728097 ........................................................................................................23

*Nike, Inc. v. Wu*,
    349 F. Supp. 3d 346 (S.D.N.Y. 2018)............................................................................28

*O'Neill v. Asat Trust Reg., 2001*,
    714 F.3d 659 (2d Cir. 2013)..........................................................................................18

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .......................................................40, 41, 43, 45

*Ocasio v. United States*,
    578 U.S. 282 (2016).....................................................................................................38

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016).........................................................................................27

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ...............................................................23, 26

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
    369 F. Supp. 2d 353 (E.D.N.Y. 2005) ...........................................................................15

*Richardson v. N.Y.C. Bd. of Educ.*,
    711 F. App'x 11 (2d Cir. 2017) ......................................................................................3

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..................................................................................32, 35, 49, 52

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009).............................................................................22

*Rush v. Savchuk*,
    444 U.S. 320 (1980).....................................................................................................20

*Schmidt v. Martec Indus. Corp.*,
    2009 WL 2883071 (E.D.N.Y. Sept. 3, 2009) .................................................................26

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)..........................................................................44, 53, 54, 55

*SongByrd, Inc. v. Est. of Grossman*,
    206 F.3d 172 (2d Cir. 2000)..........................................................................34

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)..........................................................................34

*Star Funding, Inc. v. Vault Mins., LLC*,
    2016 WL 10952230 (S.D.N.Y. Sept. 2, 2016)..........................................................24

*Stranahan Gear Co. v. NL Indus.*,
    800 F.2d 53 (3d Cir. 1986)..........................................................................29

*Tera Grp., Inc. v. Citigroup, Inc.*,
    2018 WL 4732426 (S.D.N.Y. Sept. 28, 2018)..........................................................20

*In re Terrorist Attacks on Sept. 11, 2001*,
    538 F.3d 71 (2d Cir. 2008)...................................................................... *passim*

*Tex. Int'l Magnetics, Inc. v. Auriga-Aurex, Inc.*
    *(In re Magnetic Audiotape Antitrust Litig.)*,
    334 F.3d 204 (2d Cir. 2003)..........................................................................16

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
    779 F. App'x 66 (2d Cir. 2019) ..........................................................................18

*United Servs. Auto. Ass'n v. New Day Fin., LLC*,
    2018 WL 1899807 (W.D. Tex. Mar. 8, 2018) ..............................................32–33

*United States v. Bestfoods*,
    524 U.S. 51 (1998)..........................................................................22

*United States v. Garcia-Torres*,
    280 F.3d 1 (1st Cir. 2002)..........................................................................41

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y 2020)..........................................................25–26, 28

*Walden v. Fiore*,
    571 U.S. 277 (2014)..........................................................................16, 17, 25, 31

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)..........................................................................18, 32

*Wolet Cap. Corp. v. Walmart Inc.*,
    2021 WL 242297 (S.D.N.Y. Jan. 25, 2021) ..........................................................16

*Wolo Mfg. Corp. v. ABC Corp.*,
  349 F. Supp. 3d 176 (E.D.N.Y. 2018) .................................................................15

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)............................................................................................25

*Zurich Am. Life Ins. v. Nagel*,
  2021 WL 5225947 (S.D.N.Y. Nov. 10, 2021) .....................................................31

**Statutes**

18 U.S.C. § 1962(d) (RICO) ......................................................................................36

18 U.S.C. § 2331 ...................................................................................................56, 59

18 U.S.C. § 2333(d)(2) ....................................................................................... *passim*

18 U.S.C. § 2336(a) ..............................................................................................59, 60

31 U.S.C. § 3729(a)(1)(C) (False Claims Act) ..........................................................36

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(a)(5), 130
  Stat 852, 852 (2016)............................................................................................36

**Rules**

Fed. R. Civ. P. 4(k)(2) ...............................................................................................16

Fed. R. Civ. P. 8(a) ...................................................................................................60

Fed. R. Civ. P. 12(b)(2) .............................................................................................15

Fed. R. Civ. P. 12(b)(6) .............................................................................................15

Fed. R. Civ. P. 20(a)(2) .............................................................................................55

Fed. R. Civ. P. 21 ......................................................................................................55

**Other Authorities**

Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*,
  Am. Enter. Inst. for Pub. Pol'y Rsch. (Oct. 22, 2007),
  https://tinyurl.com/muun4m7n..................................................................... 10, 46

Amended Complaint, *Cabrera v. Black & Veatch Special Projects Corp.*,
  No. 1:19-cv-03833-EGS-ZMF (D.D.C. June 5, 2020) ...................................15, 19

Alexandra Wexler, *Telecom Giant Pushes into Dangerous Areas*,
  Wall St. J. (Aug. 10, 2019) ...................................................................................4

CommsUpdate, *MTN Extracts First Cash from Iran*
(Dec. 14, 2016), 2016 WLNR 38124973............................................................28

Complaint, *Turkcell Iletisim Hizmetleri A.S. v. MTN Grp., Ltd.*,
No. 1:12-cv-00479 (D.D.C. Mar. 28, 2012) .................................................5, 11

Cong. Rsch. Serv., *Iran's Foreign and Defense Policies*
(last updated Jan. 11, 2021), http://tiny.cc/mgbnuz.......................................7, 8

Encyc. Britannica, *Basmalah*,
https://tinyurl.com/bdessftb (last visited Apr. 25, 2022) ........................................40

Knut Royce & Kevin McCoy, *N.Y. Foundation Linked to Iran's Islamic Militants*,
Seattle Times (May 26, 1995), 1995 WLNR 1308563 ...........................................47

Knut Royce,
*No Legal Recourse in Iranian's Case / Supreme Court Won't Reopen Suit*,
Newsday (Dec. 8, 1998), 1998 WLNR 604387.................................................47

Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel,
Nov. 2010, http://tiny.cc/9dinuz .........................................................8, 58

Monika Gill, *Capitalism,*
*Communications, and the Corps: Iran's Revolutionary Guard and the*
*Communications Economy*,
Def. Strategy Commc'ns, Autumn 2020.................................................46, 52

Rowan Philip & Craig McKune, *US Trial Turns Heat on MTN*,
Mail & Guardian (Feb. 15, 2013), http://tiny.cc/9ikquz ........................................48

*Sens. Webb, Kyl: Sale of U.S. Computer Technology to Chinese Firm Poses*
*Serious Risk Chinese Firm Has History of Illegal Behavior and Ties with the*
*People's Liberation Army, Taliban and Iranian Revolutionary Guard*, States
News Service (Feb. 10, 2011).................................................................47

U.S. Dep't of Defense, *Department of Defense Law of War Manual*
§ 3.4.2 (Dec. 13, 2016), http://tiny.cc/0finuz....................................................59

U.S. Dep't of State, *Foreign Terrorist Organizations*,
http://tiny.cc/1cxquz (last visited Apr. 25, 2022) ..............................................57

U.S. Dep't of State, Press Release, *Treasury Designation of Two Iranian Entities*
*Tied to Proliferation Activities* (Dec. 17, 2008), http://tiny.cc/vdinuz ......................12

Statement of Emanuele Ottolenghi Senior Fellow,
    Found. for Defense of Democracies, Comm. on House Foreign Affairs
    Subcomm. on Middle E. and N. Afr.,
    *Iran Nuclear Deal*, Congressional Testimony via FDCH (Sept. 17, 2015),
    2015 WLNR 27612447 ................................................................................. 52

Steve Stecklow,
    *Exclusive: Iranian Cell-Phone Carrier Obtained Banned U.S. Tech*,
    Reuters (June 4, 2012), http://tiny.cc/8einuz ........................................... 13

U.S. Dep't of Treasury, Press Release,
    *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL*
    (Dec. 21, 2010), https://tinyurl.com/4nnjmbbu ................................. 12, 59

U.S. Dep't of Treasury, Press Release,
    *Treasury Designates Iranian Military Firms*
    (Sept. 17, 2008), https://tinyurl.com/yc59xjar ................................ 10, 11, 47, 51

U.S. Dep't of Treasury, Press Release,
    *Treasury Targets Vast Supreme Leader Patronage Network and Iran's
    Minister of Intelligence*
    (Nov. 18, 2020), http://tiny.cc/pdinuz .............................................. *passim*

USAID,
    *USAID Grants Will Enable More Than 100,000 Afghans to Use Mobile
    Money Services*
    (Nov. 30, 2011), https://tinyurl.com/mvrutpmy ..................................... 42

## PRELIMINARY STATEMENT

In this Anti-Terrorism Act ("ATA") action, Plaintiffs sue MTN Group and MTN Dubai, both foreign telecommunications companies, based on their indirect investment in an Iranian mobile phone company. Plaintiffs claim that when MTN Group, a South African company, acquired an indirect, minority, non-controlling stake in MTN Irancell ("Irancell"), it actually joined Iran's Islamic Revolutionary Guard Corps ("IRGC") and virtually every Shia and Sunni terrorist group in the Middle East and South Asia in a sprawling, decades-long conspiracy to drive the United States from the region. They allege that, because other indirect shareholders in Irancell had a covert affiliation with the IRGC, the company's profits indirectly furthered the IRGC's support of terrorist groups operating outside Iran. Plaintiffs thus claim that MTN Group and MTN Dubai are liable for attacks such groups committed on U.S. forces in Iraq and Afghanistan.

Plaintiffs' claims suffer from two overarching and irredeemable flaws. *First*, Plaintiffs are attempting to sue *foreign* defendants in the United States over conduct that allegedly occurred *in the Middle East and South Asia*. Under settled constitutional principles, the Court lacks jurisdiction over MTN Group and MTN Dubai. *Second,* Plaintiffs' factual allegations do not support the notion that a leading telecommunications company conspired to attack Americans or knowingly assumed a role in such attacks. The Amended Complaint thus fails to state a proper ATA claim.

The Amended Complaint's threshold defect is that the Court lacks personal jurisdiction over MTN Group and MTN Dubai, neither of which has a U.S. presence or operations. Second Circuit precedent bars Plaintiffs' theory that MTN Group's indirect investment in an Iranian mobile phone company was expressly aimed at the United States. *See In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93–95 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010). And precedent likewise defeats Plaintiffs' alternative theory that "agents" of some "MTN" entity procured U.S. technology for Irancell, since they plead no facts

1

indicating that MTN Group controlled any agents who did so. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85–86 (2d Cir. 2018). Even if those agents' U.S. contacts could somehow be imputed to MTN Group, moreover, those contacts—international wire transactions that allegedly passed through New York only fortuitously, and telecommunications equipment sourced from the United States—do not demonstrate any purposeful availment, and are too far removed from the attacks in Iraq and Afghanistan to say Plaintiffs' claims arise from or relate to those contacts.

Even if this Court did have jurisdiction over MTN Group and MTN Dubai, all of Plaintiffs' claims against them would still have to be dismissed for failure to state a proper ATA claim. When Plaintiffs filed their original Complaint, they acknowledged that their "core" theory of liability is that MTN Group is responsible for acts of international terrorism because it "serv[ed] as a joint venture partner" and "form[ed]" a "telecommunications company" in Iran. Pre-Mot. Conf. Tr. 5:14–7:16. That core theory remains unchanged: Plaintiffs no longer claim that MTN Group committed acts of international terrorism, but they still allege that MTN Group, by investing in Irancell, conspired with and aided and abetted the groups who committed those acts.

Plaintiffs' remarkable conspiracy assertion fails. They have not alleged that MTN Group joined the IRGC in any global terrorist conspiracy, much less that MTN Group conspired with the specific terror groups that attacked the Plaintiffs, as any conspiracy claim under the ATA would require. Plaintiffs' aiding-and-abetting theory is equally baseless. To try to allege that MTN Group knowingly assumed a role in terrorist activities, the Amended Complaint misstates its own sources and engages in other pleading tactics that the Second Circuit has rejected, including by relying on U.S. government actions that *postdate* the relevant attacks. *See, e.g.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499–502 (2d Cir. 2021).

Plaintiffs and their families have made tremendous sacrifices on behalf of the United States and the people of Iraq and Afghanistan. MTN Group and MTN Dubai sympathize with them. But MTN Group and MTN Dubai have no connection to Plaintiffs' injuries, or to this forum. Put simply, Plaintiffs have sued the wrong defendants in the wrong court based on insufficient allegations, and the Court should dismiss all claims against MTN Group and MTN Dubai.

## BACKGROUND

The Amended Complaint spans hundreds of pages and incorporates hundreds more by reference. The background below distills the allegations against MTN Group and MTN Dubai, relying on the non-conclusory factual allegations in the Amended Complaint (which are treated as true only for purposes of this motion) and providing context from the materials Plaintiffs cite. This recitation disregards unsupported inferences, legal conclusions, and allegations contradicted by documents the Amended Complaint incorporates by reference. *See, e.g.*, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011).

To understand the lengthy Amended Complaint, two points should be highlighted:

*First,* the sources Plaintiffs incorporate often contradict the Amended Complaint's characterizations. For instance, Plaintiffs describe MTN Irancell's majority shareholders as IRGC fronts, but they cite U.S.-government sources which do not support that description. *See infra* pp. 9–12. Particularly where Plaintiffs rely upon sources that undermine or refute their claims, this Court may consider those materials in deciding Defendants' motion to dismiss.[1]

*Second*, the Amended Complaint uses the term "MTN" loosely, obfuscating who allegedly did what. Plaintiffs describe "MTN" as an amalgamation of "MTN Group . . . together with its

---

[1] *See, e.g.*, *Honickman* 6 F.4th at 501–02 (considering sources cited in complaint to evaluate whether plaintiffs stated ATA claims); *Richardson v. N.Y.C. Bd. of Educ.*, 711 F. App'x 11, 13–14 (2d Cir. 2017) (taking notice of government documents).

subsidiaries," AC ¶ 71, and Irancell, *see id.* ¶ 1078. As to Afghanistan, Plaintiffs use the term to describe "conduct that was implemented on the ground by MTN Afghanistan and approved by both MTN Group and MTN Dubai," and as to Iraq and Iran, the term refers to "conduct that was implemented on the ground by MTN Irancell and approved by both MTN Group and MTN Dubai." *Id.* ¶ 922. Plaintiffs structure their complaint this way despite acknowledging that MTN Group holds only a non-controlling stake in Irancell. *See id.* ¶ 940. It is thus necessary when reading the Amended Complaint to review critically which entity an allegation actually concerns.

**A.     MTN Group and MTN Dubai Are Foreign Telecommunications Companies that Operate Exclusively Outside the United States.**

Founded at the dawn of South African democracy in 1994, MTN Group is a South African company listed on the Johannesburg Stock Exchange. AC ¶ 71. Today, it is one of the largest companies in Africa and one of the world's leading providers of mobile telecommunications and network services, with more than 272 million subscribers. MTN Group does not operate in the United States. MTN Group instead serves a diverse range of countries in Africa and a few countries in the Middle East, including underserved populations in the developing world who have historically lacked access to reliable and affordable connectivity, and the economic, educational, and other opportunities that connectivity brings. As part of this mission, MTN Group and its affiliates have "wad[ed] into nations dealing with war, sanctions and strife," *id.* ¶ 1038, to bring connectivity where "no one else [will] go[]," Alexandra Wexler, *Telecom Giant Pushes into Dangerous Areas*, Wall St. J. (Aug. 10, 2019) (Ex. A), *cited at* AC ¶ 1038 n.490.[2]

MTN Dubai is a U.A.E. holding company (and indirect subsidiary of MTN Group), which has its principal place of business in Dubai. AC ¶ 73. Plaintiffs allege that MTN Dubai is a "shell

---

[2] The parenthetical "Ex. __" refers to exhibits to the accompanying Declaration of Scott A. Eisman.

company" with "no independent business operations from MTN Group." *Id.* ¶ 918. MTN Dubai is parent to some MTN subsidiaries operating in various countries in Africa and the Middle East, but it does not own any stake (directly or indirectly) in the Irancell joint venture. *See, e.g.*, *id.* ¶ 72. Like MTN Group, MTN Dubai has never operated in the United States. Similarly, neither MTN Group nor MTN Dubai operates in Iraq, where most of the attacks relevant to the Amended Complaint are alleged to have taken place.

### B.    MTN Group Participated in a Joint Venture to Expand Mobile Phone Service for Iranians.

In 2005, MTN International (Mauritius) Ltd.—an indirect subsidiary of MTN Group— acquired a minority equity stake in a business venture that aimed to build Iran's second-ever mobile phone network.[3] AC ¶ 959. That business venture, known as Irancell, later secured a 15-year license to operate the new network. *See id.* ¶ 997. As part of its investment, MTN Group, through MTN Mauritius, paid a €300 million license fee to regulators. *Id.* ¶¶ 945, 955, 997, 1026.

Irancell was a joint venture between Iran Electronic Development Company ("IEDC"), with a majority (51%) stake, and MTN Mauritius, with a minority (49%) stake. *Id.* ¶¶ 72, 959.[4] Plaintiffs acknowledge that, as the parent of the "junior partner," MTN Group was "not in charge"

---

[3] While Plaintiffs allege that MTN Group itself is a shareholder in the Irancell joint venture, *see* AC ¶ 72, the *Turkcell* complaint—which Plaintiffs here cite and from which they borrow their allegations concerning Irancell's formation—alleges that MTN Mauritius purchased the minority stake in Irancell. *See* Complaint ¶¶ 21–22, *Turkcell Iletisim Hizmetleri A.S. v. MTN Grp., Ltd.*, No. 1:12-cv-00479 (D.D.C. Mar. 28, 2012) (Ex. B) ("*Turkcell* Complaint"), *cited at* AC ¶ 1025; *see also* AC ¶ 959 (incorporating alleged MTN Group memorandum stating that "MTN International (Mauritius) Limited acquired a 49% equity interest in Irancell").

[4] Plaintiffs allege that Iran Electronics Industries ("IEI") and Bonyad Mostazafan were direct shareholders in Irancell, AC ¶ 72, but sources they rely upon state that IEDC was the majority owner, *see, e.g.*, U.S. Dep't of Treasury, Press Release, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) (Ex. C) ("*Treasury Targets Vast Supreme Leader Patronage Network*"), http://tiny.cc/pdinuz, *cited at* AC ¶ 786 n.367. Plaintiffs' claims would be no stronger even if these other entities were the direct shareholders.

of Irancell. *Id.* ¶¶ 72, 946. While MTN Group provided technical support to the network, *see, e.g.*, *id.* ¶¶ 1030, 1331, and had the right to sign off on business plans, budgets, accountings, and acquisitions, *see id.* ¶ 947, the Iranian shareholders held "all decision-making authority," *id.* ¶ 940.

Plaintiffs allege that MTN Group invested in this new network because Iran's telecommunications sector offered a "unique opportunity for telecommunications investors," *id.* ¶ 824 (emphasis omitted), and an "important" opportunity for "MTN's growth," *id.* ¶ 1032. According to the Amended Complaint, Iran's "telecoms sector" was "one of the most significant 'virgin' mobile opportunities in the world." *Id.* ¶ 955. The sector had "expanded rapidly" in the early 2000s, but "[w]ith a population of some [70 million people] and a mobile-phone penetration rate of below 5%," the sector "still [had] room for expansion." *Id.* ¶¶ 807, 824.

Over the years, Irancell has grown into Iran's second-largest mobile phone operator, *see id.* ¶¶ 1007, 1018, 1020, providing mobile phone services to millions of Iranian consumers, *see id.* ¶¶ 966, 970, 1089. In the medium term, however, MTN Group intends to exit Iran, as part of a broader company strategy to focus on the African market. *See id.* ¶ 1014. The Amended Complaint fails to link MTN Group's investment in a major mobile phone network to Plaintiffs' alleged injuries in militant attacks.

### C.   Plaintiffs or Their Family Members Were Injured in Iraq or Afghanistan by Attacks Allegedly Committed in Furtherance of a Terrorist Conspiracy.

The Amended Complaint alleges that Plaintiffs or their family members were injured or killed in ten attacks in Iraq (in 2011, 2016, and 2017)—where no MTN entity operates—and two attacks in Afghanistan (in 2019). AC ¶¶ 1405–1588. The attacks varied in tactics and were committed in different regions by disparate Shia and Sunni militant groups.

Plaintiffs, however, attribute their injuries to a single, sweeping "conspiracy"—described as "a NATO for Islamists"—whose object was the expulsion of Americans from the Middle East.

*Id.* ¶ 33. Plaintiffs claim that this conspiracy operated for more than two decades and involved terrorist groups spanning the Middle East and South Asia. *Id.* ¶¶ 6–11, 259–261, 264–267. According to Plaintiffs, this conspiracy was devised by the IRGC, *id.* ¶¶ 45, a military force that operates separate from and parallel to Iran's regular armed forces, Cong. Rsch. Serv., *Iran's Foreign and Defense Policies* 13 (last updated Jan. 11, 2021) (Ex. D) ("*Iran's Foreign and Defense Policies*"), http://tiny.cc/mgbnuz.

The Amended Complaint alleges that Iran acted through three groups in forming this conspiracy: the "Regular IRGC," which oversaw all of the IRGC's activities in Iran, including its "maintenance of various fronts and cover companies, charities, and foundations," AC ¶ 99; the Qods Force, the IRGC's "external security operations division," responsible for organizing and aiding Iranian-backed terrorist groups outside Iran, *id.* ¶ 98; and Lebanese Hezbollah, *id.* ¶ 96. Plaintiffs allege that the "Regular IRGC" funneled money and equipment to the Qods Force and Hezbollah, which in turn funded and equipped cells of Islamist militias, which, led or supported by Hezbollah, launched violent attacks to further the "IRGC Conspiracy." Plaintiffs often try to collapse these three entities into one, describing the Qods Force and Hezbollah as "subordinate branches" of the IRGC, *id.* ¶ 5, and repeating an unwieldy mantra for most references: "IRGC, including its Hezbollah Division and Qods Force." At the same time, the Amended Complaint insists on distinguishing between the "Real IRGC" or "Regular IRGC" and the Qods Force, *id.* ¶¶ 95, 97–99, 183, 186–87, and "disclaim[s] any allegation that IRGC operatives—other than the Qods Force or Lebanese Hezbollah—participated on the ground inside Iraq," *id.* ¶ 1406 n.600.

According to Plaintiffs, the IRGC united Shia and Sunni groups across the region in one overarching conspiracy. Plaintiffs allege, for instance, that nine of the ten attacks in Iraq were committed by "Joint Cells"—a term they coin to describe coalitions of Shia militias, including

Jaysh al-Mahdi, Asaib Ahl al-Haq ("AAH"), and Kata'ib Hezbollah ("KH"). *See id.* ¶¶ 31, 205, 285, 287. Those "Joint Cells" were allegedly led, inspired, armed, trained, and directed by the Qods Force and Hezbollah to battle U.S. and Iraqi forces. *See id.* ¶¶ 34, 69, 183, 253–289, 292–311. Plaintiffs allege that the tenth attack in Iraq was committed in 2017 by Sunni militants from Ansar al-Islam and al-Qaeda, *id.* ¶¶ 1545–1546, and that Sunni militants from al-Qaeda, the Taliban, the Haqqani Network, and Lashkar-e-Taiba committed the two Afghanistan attacks in 2019, *id.* ¶¶ 1553–1588, with indirect support from Hezbollah, *see id.* ¶¶ 266–269.

In describing this sweeping conspiracy, however, Plaintiffs also acknowledge the well-known (and often violent) sectarian differences between these groups.[5] For example, although the Amended Complaint tries to portray the Joint Cells as cohesive units led by the Qods Force and Hezbollah, Plaintiffs' sources characterize Jaysh al-Mahdi as "uncontrollable" by Iran, and AAH and other "Special Groups" as "rival[s]" to, and "independent[]" from, Jaysh al-Mahdi.[6] Similarly, Plaintiffs allege that Hezbollah "halted all cooperation" with a branch of al-Qaeda between 2013 and 2016 so that Hezbollah and al-Qaeda could "kill each other." *Id.* ¶ 267.

---

[5] According to the Congressional Research Service, "Iran opposes Sunni terrorist groups that work against Iran's core interests, such as the Islamic State." *Iran's Foreign and Defense Policies* 4. The same report explains that Iran and al-Qaeda are likewise mostly at odds, noting that "analyses have characterized the relationship between Iran and Al Qaeda as 'an on-again, off-again marriage of convenience pockmarked by bouts of bitter acrimony.'" *Id.* (citation omitted).

[6] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010, at 13 (Ex. E) ("*The Evolution of Iran's Special Groups in Iraq*"), http://tiny.cc/9dinuz, *cited at* AC ¶ 195 n.22; *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 62 (D.D.C. 2018), *cited at* AC ¶ 208.

**D.**     **Plaintiffs Allege that, by Participating in Irancell and Helping to Support a Mobile Phone Network, MTN Group Conspired to Commit and Aided and Abetted Terrorist Attacks in Iraq and Afghanistan.**

**1.**     **Plaintiffs' Theory Equates Investing in a Mobile Phone Company in Iran with Agreeing to Join a Global Terrorist Conspiracy.**

In their original complaint, Plaintiffs claimed that by investing in Irancell, MTN Group itself committed terrorist acts—a theory that Plaintiffs were adamant was warranted by the facts. Pre-Mot. Conf. Tr. 10:20–11:17. In amending their complaint, however, Plaintiffs jettisoned that direct-liability theory. They now claim only that, by investing in Irancell, MTN Group conspired with the persons who committed the attacks that injured Plaintiffs (Count 2), and aided and abetted the Joint Cell attacks in Iraq (Count 1) and two attacks in Afghanistan (Count 3).[7]

Plaintiffs' core theory, however, remains unchanged. To try to connect MTN Group's investment in an Iranian mobile phone network to attacks in Iraq and Afghanistan, Plaintiffs allege that IEDC's two shareholders—Bonyad Mostazafan and IEI—were commercial "fronts" for the Regular IRGC. *See* AC ¶ 99. Plaintiffs thus theorize that when Irancell distributed the profits it earned from Iranian mobile phone subscribers, some of that money went indirectly to the Regular IRGC. *See, e.g.*, *id.* ¶¶ 998–1000. And because the Iranian government allegedly supports terror groups abroad, Plaintiffs contend that MTN Group knowingly supported all attacks that the "Joint Cells" committed in Iraq, and that various Sunni terrorist groups committed in Afghanistan and Iraq. *See id.* ¶¶ 268–273, 1000.

The materials Plaintiffs incorporate present a different narrative. According to a U.S. government report, Bonyad Mostazafan is a state-directed charitable and commercial enterprise

---

[7] While the conspiracy claim (Count 2) encompasses all twelve attacks in the Amended Complaint, the aiding-and-abetting claims cover only the two Afghanistan attacks (Count 3) and nine of the ten Iraq attacks (Count 1). Plaintiffs limit the Iraq aiding-and-abetting-claim to the nine "joint cell" attacks that occurred in Iraq in 2011 and 2016. *See id.* ¶¶ 1590–1599. As a result, that claim does not encompass the 2017 Iraq attack allegedly committed by Ansar al-Islam. *See id.* ¶¶ 1545–1546.

with a "multi-billion dollar economic empire" of "energy, mining, logistics, information technology, and financial services" firms that is "owned or controlled by" the Office of the Supreme Leader of Iran. *Treasury Targets Vast Supreme Leader Patronage Network*. Similarly, the U.S. government views IEI as an electronics manufacturer that is "owned or controlled" by Iran's Ministry of Defense for Armed Forces Logistics ("MODAFL"), not the IRGC. U.S. Dep't of Treasury, Press Release, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008) (Ex. F) ("*Treasury Designates Iranian Military Firms*"), https://tinyurl.com/yc59xjar, *cited at* AC ¶ 796 n.371. Other sources in the Amended Complaint note that IEI sold "many consumer goods," including "personal computers, scanners, telephone sets and intercoms, [and] mobile phones."[8]

Plaintiffs nonetheless claim that IEI and Bonyad Mostazafan's indirect investment in Irancell was part of an effort by the Regular IRGC to use "companies and institutions" that Iran's government owned or controlled to invest in "broad swaths of the Iranian economy." AC ¶¶ 252–256. And they contend, without supporting factual allegations, that when MTN Group signed a letter agreement with Irancell's Iranian shareholders in 2005 outlining the terms of its investment, MTN Group was actually agreeing (on behalf of itself and every one of its affiliates) to join the "IRGC Conspiracy." *Id.* ¶ 111.

The 2005 Letter Agreement on which Plaintiffs rely makes no mention of the IRGC or terrorism and addresses only business terms. *See id.* Ex. A. Plaintiffs seize on a single reference to "security" in the document, *id.* ¶ 1091, which called on "MTN" to "cooperat[e]" with the "Iranian shareholders" on "defensive, security and political" issues "*in South Africa*," *id.* Ex. A (emphasis added). Despite the Agreement's plain language, Plaintiffs hypothesize that it reflected an intent

---

[8] Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, Am. Enter. Inst. for Pub. Pol'y Rsch. (Oct. 22, 2007) (Ex. G), https://tinyurl.com/muun4m7n, *cited at* AC ¶ 1327 & n.579.

to join a sprawling conspiracy to empower virtually every terrorist group *in the Middle East and South Asia. See id.* ¶¶ 879–886. But Plaintiffs' allegations about this clause incorporate the *Turkcell* Complaint, *see supra* note 3, which says nothing about aiding IRGC terrorism. Instead, the *Turkcell* Complaint at most alleges that MTN Group committed to "use[] its high-level political influence within the South African government" to offer Iran "support for . . . the procurement of high-tech defense equipment." *Turkcell* Complaint ¶ 4. The Amended Complaint itself claims, albeit in sparser terms, that the focus of the "security" clause was the South African government.[9]

Plaintiffs' portrayal of the Irancell stakeholders as "fronts" of the IRGC reflects a broad pattern of twisting the sources cited in the Amended Complaint. For example:

- **IEI Not Designated for Ties to the IRGC or Terrorism.** Plaintiffs assert that IEI was an IRGC front, AC ¶ 791, that was "fully owned by the IRGC," *id.* ¶ 797, and whose "express purpose" was to support the IRGC's terrorist activities, *id.* ¶ 792. The 2008 U.S. government designation that Plaintiffs cite in support of these allegations, however, says only that IEI was "owned or controlled by Iran's MODAFL," and supported "Iran's nuclear and ballistic missile programs."[10] The designation does not mention any link between IEI and the IRGC or terrorism, even while it described *other* Iranian military firms as supplying the IRGC.

- **Bonyad Mostazafan Not Designated for Ties to the IRGC or Terrorism.** Plaintiffs assert that Bonyad Mostazafan was "widely understood . . . to be a front for Iranian terrorism through the IRGC," *id.* ¶ 776, citing a 2020 U.S. government designation in support of this statement, *id.* ¶ 786 n.367 (citing *Treasury Targets Vast Supreme Leader Patronage*

---

[9] *Compare* AC ¶ 1028 ("MTN's executives '[t]ogether [] promised [the Iranian agents] that South Africa would deliver "heaven, earth, and the fish," meaning whatever military equipment [Iran] desired.'" (alterations in original)) *with Turkcell* Complaint ¶ 93 (MTN Executives and South African defense officials "met with members from the Iranian Ministry of Defense," and "promised the [Iranian] Minister of Defense that South Africa would deliver 'heaven, earth, and the fish,' meaning whatever military equipment he desired."). Plaintiffs likewise distort an internal memorandum as stating that "MTN would need to serve as a weapons supplier for its Iranian counterparties if it wanted to win and maintain its position in the joint venture." AC ¶ 966. What the memorandum actually said is that in 2007, MTN Group faced "serious blowback" *from Iran* because "it is highly unlikely that *the Government of South Africa* will be prepared to sign any defence agreements or deliver defence materials to Iran." *Id.* The memorandum thus suggests that Iran permitted MTN Group to invest in Irancell in the hope that the South African government— not MTN Group—would provide defense support to Iran.

[10] *Treasury Designates Iranian Military Firms*.

11

*Network*). But that document highlights that Bonyad Mostazafan was never a designated entity during the period relevant to the Amended Complaint. *Id.* When the U.S. government did designate Bonyad Mostazafan, it was for ties to the "Supreme Leader of Iran"[11]—not because of the IRGC or any ties to terrorism.

- **Bonyad Mostazafan Not Subject of U.S. Enforcement Action.** Plaintiffs assert that, in 2008—three years after MTN Mauritius's investment in Irancell—the U.S. government "announced enforcement actions and sanctions against the Bonyad Mostazafan," and that this announcement "reinforced [the government's] messaging that the Bonyad Mostazafan was a terrorist front that served to raise money for the IRGC, including the Qods Force." AC ¶ 783. According to the U.S. Government, however, these were enforcement actions against other companies, not Bonyad Mostazafan, for ties to weapons proliferation, not terrorism. U.S. Dep't of State, Press Release, *Treasury Designation of Two Iranian Entities Tied to Proliferation Activities* (Dec. 17, 2008) (Ex. H), http://tiny.cc/vdinuz; AC ¶ 783 (indirectly referencing press release). The announcement merely mentioned Bonyad Mostazafan as a "non-profit Iranian charitable organization" that "co-own[ed] a property" with a sanctioned entity. *Id.*

- **Designation of an Unrelated Bonyad.** Plaintiffs contend that a 2010 designation put MTN Group on notice that the IRGC "relied upon illicit commercial transactions, including through Bonyads like Bonyad Mostazafan, to facilitate Iran's terrorist enterprise." AC ¶ 255. That designation never mentioned Bonyad Mostazafan. U.S. Dep't of Treasury, Press Release, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) (Ex. I) ("*Treasury Designates Iranian Entities Tied to the IRGC*"), https://tinyurl.com/4nnjmbbu, *cited at* AC ¶ 255 n.48.[12]

In sum, despite the Amended Complaint's repeated misstatements of its own sources, the sources themselves reveal that the United States never designated or sanctioned Irancell, and never designated or sanctioned IEI or Bonyad Mostazafan for alleged ties to the IRGC or terrorism.

### 2.   Plaintiffs Also Allege that Unnamed "Agents" of "MTN" Sourced U.S. Equipment and Services for Irancell.

In addition to alleging that the IRGC benefited indirectly from revenue Irancell generated from its mobile phone subscribers, Plaintiffs allege that "agents" of "MTN" helped Irancell source

---

[11] *Treasury Targets Vast Supreme Leader Patronage Network.*

[12] Iranian bonyads are "quasi-official organizations controlled by . . . current and past government officials and clerics," which "receive benefits from the Iranian government but are not required to have their budgets publicly approved." *Treasury Designates Iranian Entities Tied to the IRGC.* In 2010, "[t]hey account[ed] for a significant portion of Iran's non-petroleum economy." *Id.*

"dual-use" U.S. telecommunications equipment and technology services for Irancell. AC ¶ 1112. Plaintiffs contend that this procurement also contributed to the IRGC Conspiracy, and supports personal jurisdiction in the United States over MTN Group and MTN Dubai.

**Alleged Agents.** According to the Amended Complaint, "MTN" relied upon "U.S. agents" to source embargoed goods from the United States, *id.* ¶¶ 1112 1114–1115, 1118, and "MTN and/or MTN's agents" obtained "technology support services" for Irancell through "U.S. agents," *id.* ¶ 1119; *see also id.* ¶ 1092. The Amended Complaint does not name these alleged "agents" or make factual allegations as to how MTN Group controlled them.

In another section, Plaintiffs allege that an "MTN" affiliate may have retained a company called "Exit40" to "help source" U.S. goods. *Id.* ¶ 861. But Plaintiffs make no factual allegations showing that MTN Group controlled either Exit40 or any other "agent," purchased any U.S. technology itself, or directed that any equipment be sourced specifically from the United States.

**Goods and Services.** The "technology and equipment" that these "agents" allegedly obtained comprised items that any telecommunications company would need, such as "computer equipment," *id.* ¶ 1008; "routers and numerous switches . . . to route communications traffic," Steve Stecklow, *Exclusive: Iranian Cell-Phone Carrier Obtained Banned U.S. Tech*, Reuters (June 4, 2012) (Ex. J), http://tiny.cc/8einuz, *cited at* AC ¶ 1007 & n.469; and "smart phones," AC ¶ 1011. Plaintiffs also allege that the agents procured "encryption technologies," *id.* ¶ 1010, and help "servic[ing] MTN Irancell's enterprise-level computers and associated networks," *id.* ¶ 1117.

The Amended Complaint does not allege that MTN Group provided any telecommunications equipment to the IRGC, the Qods Force, Hezbollah, or any Shia or Sunni militia group. Instead, Plaintiffs try to connect the technology that "MTN" allegedly procured for Irancell to the attacks in Iraq and Afghanistan, by asserting that when MTN Group helped improve

13

Irancell's network, the IRGC's own "cellular-phone capabilities" benefited. *Id.* ¶¶ 1005, 1331. In particular, the Amended Complaint alleges that the IRGC used encryption technology of the sort that Irancell sourced to communicate with Hezbollah, though not in connection with any attack at issue. *See id.* ¶¶ 60, 1010, 1332. The Amended Complaint also alleges that, of the "American smart phones" that "MTN" supplied to Irancell, the IRGC gave hundreds to Hezbollah. *See id.* ¶ 1011.

***Banking.*** Plaintiffs also allege that, to pay for this technology, "MTN and/or MTN's agents routed millions of dollars" to other "agents" in wires that passed "through the New York banking system," *id.* ¶ 1115. The Amended Complaint alleges that "purchasing agents working for the IRGC" and "acting at the direction of MTN Group and its IRGC . . . ally" wired "more than $5,000,000 . . . to associates in the U.S. who purchased embargoed technology." *Id.* ¶ 1114.

Plaintiffs also allege that MTN Group made use of the U.S. financial system in other contexts. For example, the Amended Complaint alleges that in 2007, MTN Group facilitated the Irancell deal by paying a $400,000 "bribe" to the Iranian Deputy Foreign Minister. *Id.* ¶¶ 1026, 1105. Although the alleged payment was wired outside the United States, Plaintiffs allege that, because the Iranian official requested U.S. dollars, "the wire instruction" must have at some point "caused a bank in the United States to send" money to his account in the U.A.E. *Id.* ¶ 995.

### E.   Plaintiffs Also Allege that the Taliban Violently Extorted MTN Afghanistan.

In addition to the attacks in Iraq, the Amended Complaint now encompasses two attacks in Afghanistan in 2019 that it claims injured some Plaintiffs. While Plaintiffs allege that the IRGC indirectly aided those attacks, *see, e.g.*, AC ¶ 1629, they also import allegations about Afghanistan from a different lawsuit against MTN Group and MTN Dubai, *Cabrera v. Black & Veatch Special Projects Corp.*, No. 1:19-cv-03833 (D.D.C.). Borrowing from the *Cabrera* complaint, Plaintiffs allege that the Taliban violently forced MTN Afghanistan (which is not a defendant here) to shut down its cell towers in Afghanistan, and pay so-called taxes, AC ¶¶ 1040–1068, 1629, or else face

14

Taliban attacks on its staff and network, *see* Amended Complaint ¶¶ 294–295, 311, 318, *Cabrera*, No. 1:19-cv-03833 (D.D.C. June 5, 2020) (Ex. K) ("*Cabrera* Complaint").

## LEGAL STANDARD

When a defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (citation omitted). At this stage of the litigation, Plaintiffs must "make a *prima facie* showing that the court possesses jurisdiction over [each] defendant." *Grp. One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 331 (E.D.N.Y. 2021) (citation omitted). To do that, they must plausibly plead "facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *Id.* at 332 (citation omitted). MTN Group and MTN Dubai move to dismiss for lack of jurisdiction based on the pleadings, so the Court reviews their Rule 12(b)(2) motion under the same standard applicable to a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *See id.*

When deciding a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "In reviewing the sufficiency of a complaint, [the court] accept[s] only its factual allegations, and the reasonable inferences that can be drawn therefrom, as true." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014). The court need not "draw unreasonable inferences in plaintiffs' favor," *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 369 F. Supp. 2d 353, 359 (E.D.N.Y. 2005), or accept any "legal conclusions couched as factual allegations," *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (citation omitted), "conclusory statements" devoid of further factual support, *Wolo Mfg. Corp. v. ABC Corp.*, 349 F. Supp. 3d 176, 200 (E.D.N.Y. 2018) (citation omitted), or allegations that are contradicted by documents on which the complaint relies,

*Wolet Cap. Corp. v. Walmart Inc.*, 2021 WL 242297, at *11–12 (S.D.N.Y. Jan. 25, 2021).

## ARGUMENT

**I.    The Court Should Dismiss the Claims Against MTN Group and MTN Dubai for Lack of Personal Jurisdiction.**

The Amended Complaint fails to establish personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), the sole basis for jurisdiction that it invokes over MTN Group or MTN Dubai. Rule 4(k)(2) acts as a federal long-arm statute, *Tex. Int'l Magnetics, Inc. v. Auriga-Aurex, Inc. (In re Magnetic Audiotape Antitrust Litig.)*, 334 F.3d 204, 207 (2d Cir. 2003), and requires that "exercising jurisdiction [be] consistent with the United States Constitution and laws," Fed. R. Civ. P. 4(k)(2)(B). To be consistent with the Constitution, the exercise of jurisdiction must "comport[] with the limits imposed by federal due process," *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citation omitted), given the defendant's contacts with the United States as a whole, *see Dardana Ltd. v. A.O. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003). To satisfy due process, Plaintiffs must establish either general or specific jurisdiction over each defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Neither MTN Group nor MTN Dubai is subject to general jurisdiction: each is incorporated and has its principal place of business outside the United States, AC ¶¶ 71, 73, and neither operates—much less is "at home"—here. *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014).

All that remains, then, is specific jurisdiction, which Plaintiffs again fail to sufficiently plead. Specific jurisdiction "focuses on 'the relationship among the defendant, the forum, and the litigation,'" *Walden*, 571 U.S. at 284 (citation omitted), and is "confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction,'" *Goodyear*, 564 U.S. at 919 (citation omitted). To demonstrate specific jurisdiction, a plaintiff must plead (1) that the defendant has "minimum contacts" with the forum, (2) that those contacts are suit-

16

related (meaning plaintiff's claims arise from or relate to those contacts), and (3) that the exercise of jurisdiction would "not offend traditional notions of fair play and substantial justice." *Id.* at 923–24 (citation omitted). Even as alleged, Plaintiffs' claims do not arise out of or relate to any "minimum contacts" that either MTN Group or MTN Dubai purposefully created with the United States.[13]

### A. Plaintiffs Cannot Establish that MTN Group Had Minimum Contacts with the United States.

MTN Group's alleged suit-related conduct occurred entirely abroad. Plaintiffs identify two theories for why MTN Group can nonetheless be sued in the United States—direct targeting and purposeful availment—but neither succeeds in establishing specific jurisdiction.

### 1. MTN Group Did Not Expressly Aim Its Actions at the United States.

Plaintiffs assert that MTN Group "expressly aimed" or "directed" its conduct at the United States by supporting terrorist attacks against U.S. nationals in Iraq and Afghanistan. AC ¶¶ 1082–1091. While jurisdiction can in limited circumstances be based on an intentional tort "expressly aimed" at the forum, *see Calder v. Jones*, 465 U.S. 783, 789–90 (1984), the Supreme Court clarified in *Walden* that the defendant's actions must be expressly aimed at the forum *itself*, not just at a forum resident. 571 U.S. at 285. The Amended Complaint comes nowhere close to pleading that MTN Group's own alleged actions were expressly aimed at the United States.

Second Circuit precedent forecloses Plaintiffs' "targeting" theory of jurisdiction. In *In re Terrorist Attacks*, victims of the September 11 attacks sued four Saudi princes, alleging that "the Princes supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance" attacks on Americans. 538 F.3d at 94. Rejecting that theory,

---

[13] The discussion that follows focuses on the allegations against MTN Group because the Amended Complaint makes no factual allegations at all against MTN Dubai. *See infra* § V.

the Second Circuit held that "[e]ven if the four princes were reckless in monitoring how their donations were spent, or could and did foresee that the recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction." *Id.* at 94–95. Such contacts with the United States, the court held, were "far too attenuated" to meet the plaintiffs' burden of pleading "'intentional . . . actions expressly aimed'" at the United States. *Id.* at 95. The Second Circuit more recently reiterated that "providing indirect funding to an organization that was openly hostile to the United States" is not "the type of intentional conduct" that "constitute[s] purposeful direction of activities at the forum." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) (citing *Terrorist Attacks*, 538 F.3d at 95–96). This conclusion holds true, the court noted, even if the funders "could and did foresee" that the recipients would use the funds "to finance the September 11 attacks." *Id.*[14]

The Amended Complaint's attempt to connect MTN Group's investment in Irancell to attacks on Americans is likewise "far too attenuated" to establish that MTN Group engaged in "intentional actions expressly aimed at" the United States. Plaintiffs allege that MTN Group joined a joint venture with IEDC, whose shareholders, IEI and Bonyad Mostazafan, were supposedly "fronts" for the Regular IRGC, and that the Regular IRGC in turn supported militia attacks in Iraq and Afghanistan through the Qods Force and Hezbollah. AC ¶ 5. That theory fails on its own terms

---

[14] After *Terrorist Attacks*, the Second Circuit held that a targeting theory *might* be viable against officials of charitable organizations who "*directly* provided financial and other resources to al Qaeda knowing that al Qaeda was engaged in a global campaign of terror directed at the United States." *O'Neill v. Asat Trust Reg., 2001*, 714 F.3d 659, 678 (2d Cir. 2013); *see also Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 68–69 (2d Cir. 2019) ("The inclusion of allegations related to Al Rajhi Bank's specific intent to further terrorism in the United States . . . distinguishes the present case from those in which we have not granted personal jurisdiction."). Even in these cases, allegations of direct support to al-Qaeda or a specific intent to further terrorism only sufficed to gain access to jurisdictional discovery. More importantly, these cases confirm that allegations of *indirect* funding of terrorists, based on a foreseeability theory, fail to plead a basis for personal jurisdiction or even jurisdictional discovery.

18

because the Amended Complaint fails to support Plaintiffs' conclusory assertion that IEI and Bonyad Mostazafan were known IRGC fronts. *See supra* pp. 9–12; *infra* pp. 45–48. That defect aside, the most Plaintiffs have tried to allege is that MTN Group knew that its business partners had ties to the Regular IRGC, and that it was foreseeable that some of the revenue Irancell generated from Iranian subscribers might further the Qods Force's support for Shia and Sunni militias in Iraq and, still more remotely, for Sunni militias in Afghanistan. This roundabout theory is even weaker than the claims of indirectly and foreseeably funding al-Qaeda and the September 11 attacks that the Second Circuit previously rejected as a basis for personal jurisdiction.

The Amended Complaint also fails in its effort to shoehorn in allegations from another case that concern the alleged acts of non-party MTN Afghanistan. In their letter to the Court, Plaintiffs claimed that MTN Group "expressly aimed" its acts at the United States when it allegedly "directly facilitated, and caused to be paid," funds "to the Haqqani Network," Pls.' Letter 3, ECF No. 59 (citing AC ¶¶ 855–864), and "direct[ly] coordinat[ed] with the Haqqani Network on the tower shutdowns that aided their attacks," *id.* (citing AC ¶¶ 1055–68). Yet the magistrate judge in *Cabrera v. Black & Veatch Special Projects Corp.*—the case from which Plaintiffs here borrow their allegations about MTN Afghanistan—rejected an identical targeting theory. 2021 WL 3508091, at *12 (D.D.C. July 30, 2021) (rep. & recommendation). As the magistrate judge explained, the most that was alleged was that the Taliban extorted MTN Afghanistan into making protection payments and shutting down cellular towers, and that harm to Americans was a foreseeable result. *See id.*; *compare* AC ¶ 1038–1068, 1082 *with Cabrera* Complaint ¶¶ 291–321, 334–336. As discussed above, however, "[f]oreseeability alone is not enough to confer jurisdiction" under a targeting theory. *Cabrera*, 2021 WL 3508091, at *12 (citing *Terrorist Attacks*, 538 F.3d at 93). The magistrate judge in *Cabrera* thus concluded that MTN Afghanistan's

19

alleged acts "at the Taliban's behest" were "'far too attenuated'" from attacks on Americans "'to establish personal jurisdiction in American courts.'" *Id.* (quoting *Terrorist* Attacks, 538 F.3d at 95). This Court should reach the same conclusion.

### 2.      MTN Group Did Not Purposefully Avail Itself of the U.S. Forum.

Plaintiffs fare no better on their backup theory that MTN Group, which does no business in the United States, purposefully availed itself of the benefits of doing business here. This alternative theory fails for two reasons: it relies mainly on flawed jurisdiction-by-agency allegations, and those allegations in any event do not adequately plead purposeful availment.

### a)      Plaintiffs' failure to adequately plead agency forecloses their theory of purposeful availment.

Nowhere does the Amended Complaint allege that MTN Group itself purchased U.S. equipment for Irancell's benefit. Instead, Plaintiffs allege only that "MTN" or its "agents" did so. But this theory has two fundamental defects: Plaintiffs employ impermissible group pleading and fail to allege an agency relationship between MTN Group and any particular "agent" that had these supposed U.S. contacts. These flaws defeat Plaintiffs' central purposeful-availment theory.

**1.** To begin with, Plaintiffs do not identify the principal on whose behalf the agents were allegedly acting. "For purposes of alleging that there is personal jurisdiction over each [f]oreign [d]efendant, plaintiffs may not refer to affiliated defendants by a conclusory collective name unless plaintiffs adequately allege that the conduct of one affiliate is attributable to another." *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *6 n.3 (S.D.N.Y. Aug. 18, 2017) (personal jurisdiction lacking because plaintiffs did not "specify which of the three Barclay defendants" were involved in the alleged acts); *accord Tera Grp., Inc. v. Citigroup, Inc.*, 2018 WL 4732426, at *2 (S.D.N.Y. Sept. 28, 2018) (citing *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

Here, Plaintiffs rely on impermissible group pleading. Aside from one conclusory

20

allegation that "MTN Group and its IRGC[] ally" directed certain IRGC agents, AC ¶ 1114, Plaintiffs' agency allegations use the catch-all "MTN," *id.* ¶¶ 1112–1113, 1115–1119—a term that Plaintiffs say includes various entities whose "conduct that was implemented on the ground by MTN Irancell."[15] *Id.* ¶ 922. Plaintiffs try to impute such conduct to MTN Group by alleging that it "approved" Irancell's actions. *Id.* But Plaintiffs acknowledge that MTN Group did not control Irancell beyond limited veto rights, which are inapplicable here. *See id.* ¶¶ 72, 940, 947. By failing to distinguish between separate corporate entities, Plaintiffs obscure whether the principal on whose behalf these unnamed "agents" allegedly sourced U.S. goods was really MTN Group or Irancell. Plaintiffs thus leave the Court unable to determine whether MTN Group—or another entity—was the one that allegedly directed any given "agent." Without that allegation, Plaintiffs' agency theory cannot succeed. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85–86 (2d Cir. 2018).

Similarly, Plaintiffs' allegations that some "MTN" affiliate may have retained "Exit40" to "help source" U.S. goods, AC ¶ 861—recycled nearly verbatim from allegations that ZTE and Huawei retained the same company, *id.* ¶¶ 868, 874—not only fail to identify the principal on whose behalf Exit40 was allegedly acting, but also suggest that the principal might not even be an MTN affiliate. Indeed, Plaintiffs speculate that Exit40 "serve[d] as MTN Group's, MTN Dubai's, MTN's Irancell's *and/or* [Telecommunications of Iran ('TCI')]'s agent or cut-out," and was retained by any one of "MTN Group, MTN Dubai, or MTN Mauritius." *Id.* ¶ 862 (emphasis

---

[15] As one illustration, the Amended Complaint alleges that "MTN Irancell relied upon one or more U.S. persons to service MTN Irancell's enterprise-level computers and associated networks," AC ¶ 1117, but then goes on to allege that "MTN, or agents acting at MTN's direction, sourced embargoed technology" and that "MTN and/or MTN's agents routed" payments "to its U.S. agents in order to pay for the technology support it illegally obtained for the IRGC," *id.* ¶¶ 1117, 1119. At least here, Plaintiffs appear to be using "MTN" to refer to only Irancell, not MTN Group.

21

added). They then allege that "MTN Group personnel, MTN Dubai, or an MTN subsidiary, affiliate, agents, cut-out, or business partner" paid "Exit40 in order to cause Exit40 to procure the embargoed American technologies." *Id*. ¶ 863. By conflating MTN Group, legally separate affiliates, and unrelated companies, Plaintiffs fail to make even a minimal allegation of a principal-agent relationship between MTN Group and Exit40.

Nor can Plaintiffs excuse their group pleading by claiming, again in conclusory fashion, that MTN Group "disregarded the corporate form." *Id*. ¶ 926. Given the "general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries" or affiliates, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted), courts will not collapse separate corporate entities unless a plaintiff pleads *facts* showing that the defendant "abused the corporate form" to work a "fraud[]" or "injustice[]," *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 95–96 (2d Cir. 2015). Plaintiffs come nowhere close to pleading such facts. Instead, they give three examples of MTN Group officers or directors directing acts of subsidiaries.[16] Those examples are not enough. As the Second Circuit has recognized, even a "parent's 100% ownership of [a] subsidiary and active participation in or control of the subsidiary's board of directors" is not enough to pierce the corporate veil. *Greene v. Long Island R.R.*, 280 F.3d 224, 234 (2d Cir. 2002). Because "[a] parent corporation does not lose the benefits of limited liability by taking an active interest in the affairs of its subsidiary,"

---

[16] Plaintiffs' fourth example—that MTN Group signed its letter agreement to invest in Irancell "on behalf of every 'MTN' entity," ¶ 926—is neither stated in that agreement nor inferable from its text, *see* AC Ex. A. The Court should ignore Plaintiffs' "legal conclusion[] masquerading as fact." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 394 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010). Equally conclusory is Plaintiffs' assertion that "MTN Dubai was an MTN Group subsidiary and shell company created for financial and tax purposes." AC ¶ 918. The Court need not accept that bare conclusion. *See Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).

Plaintiffs' allegations that MTN Group stayed involved in its subsidiaries' businesses do not carry the "heavy burden" of pleading that the Court should disregard the corporate form. *MWH Int'l Inc. v. Inversora Murten, S.A.*, 2015 WL 728097, at *13 (citation omitted).

**2.** Group pleading aside, the Amended Complaint offers no non-conclusory allegations supporting agency. To plead jurisdiction on an agency theory, Plaintiffs must allege facts showing that the purported agent acted "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab*, 883 F.3d at 85 (citation omitted) (applying standard from New York long-arm statute to due-process analysis). "[S]parse allegations of agency, however, are too conclusory to make a prima facie showing of personal jurisdiction." *Id.* at 86. Yet all that Plaintiffs offer are sparse allegations that a defendant "directed" its alleged agents' actions, which are too "bare" to "impute[]" the agent's actions to the defendant. *Id.* at 86.[17] Plaintiffs allege, for instance, that "purchasing agents working for the IRGC" "act[ed] at the direction of MTN Group and its IRGC[] ally," AC ¶ 1114—a naked legal conclusion devoid of factual allegations that cannot demonstrate the "critical" "element of control," *Dish Network L.L.C. v. Kaczmarek*, 2021 WL 4483470, at *5 (E.D.N.Y. June 24, 2021) (citation omitted), *adopted in relevant part*, 2021 WL 4485870 (E.D.N.Y. Sept. 30, 2021).

Plaintiffs likewise fail to plead facts showing that MTN Group directed or controlled Exit40. At best, the Amended Complaint alleges, solely on "information and belief," that (1) MTN Group "caused the retention of Exit40" so that Exit40 would serve as an "agent or cut-out" for

---

[17] *Accord Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *40 (E.D.N.Y. Jan. 4, 2011) ("Conclusory restatements of the elements of agency will not suffice . . . ."), *adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *10 (S.D.N.Y. Mar. 25, 2019) ("[L]egal conclusions that defendants 'knew of,' 'directed,' and/or 'benefited' from their subsidiaries or affiliates' transactions . . . are insufficient to establish personal jurisdiction over defendants.").

MTN Group, MTN Dubai, MTN Irancell and/or TCI; and (2) MTN Group "caused" "MTN Group personnel, MTN Dubai, or an MTN subsidiary, affiliate, agents, cut-out, or business partner" to make payments "in order to cause Exit40" to procure embargoed technology. AC ¶¶ 862–863. Those "conclusory allegations" are "insufficient to establish that the court has personal jurisdiction," including because they are "stated only upon information and belief." *Guo Jin v. EBI*, *Inc.*, 2008 WL 896192, at \*2 (E.D.N.Y. Mar. 31, 2008) (citation omitted); *see also Star Funding, Inc. v. Vault Mins., LLC*, 2016 WL 10952230, at \*4 (S.D.N.Y. Sept. 2, 2016) (holding that "claims made solely on information and belief" were insufficient to sustain personal jurisdiction based on an agent's actions). Indeed, Plaintiffs' "bare" allegations that MTN Group "caused" Exit40's actions "shed[] no light on the relationship" between MTN Group and Exit40, much less that it meets elements of a principal-agent relationship. *Charles Schwab*, 883 F.3d at 86.

Finally, in the few instances where the Amended Complaint does attempt to "shed light on" "MTN's" purported agency relationships, it alleges that "MTN's agents" did not actually operate in the United States, and that "MTN" instead obtained equipment through "Chinese, Middle Eastern and Iranian firms" and individuals, AC ¶ 1008, including Mahmood Akbari (an Iranian resident), *see id.* ¶ 1117, and three U.A.E. entities he operated, *see id.* ¶¶ 1117, 809–13. Far from showing that "MTN" controlled the alleged "agents" with U.S. contacts, these allegations suggest that several layers of interactions separated "MTN" from the United States. Plaintiffs thus fail to create, even through their speculative allegations, a clear relationship of control necessary to justify "imput[ing]" the alleged U.S. "contacts" of "agents" of an unspecified "MTN" entity to MTN Group. *Charles Schwab*, 883 F.3d at 86.

> **b)      Even if agency were adequately pleaded, Plaintiffs fail to allege purposeful availment of the benefits and protections of the United States.**

In addition to failing to plead agency, the Amended Complaint still fails to plead that MTN

Group purposefully availed itself of the United States. A defendant purposefully avails itself of a forum's benefits only when it seeks out a forum so that it can do business or conduct some other activity there. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The basic premise of purposeful availment is that a party should not be held to answer in a forum unless that party can "reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), because it purposefully "*reach[ed] out* beyond [its own] [jurisdiction] and into another," *Walden*, 571 U.S. at 285 (emphasis added) (citation omitted). Plaintiffs' two purposeful-availment theories—that MTN Group made use of the U.S. banking system and that it reached into the United States to procure goods and technology—fail to meet this standard.

**Banking.** Plaintiffs' banking allegations do not plead a substantial U.S. nexus. The Amended Complaint fails to show that, by allegedly making or directing payments that allegedly touched the New York banking system, MTN Group purposefully availed itself of the U.S. forum.

Where courts have found personal jurisdiction based on a defendant's use of U.S. wires to effect transfers, the defendants have been foreign banks that used *their own* correspondent bank accounts to carry out a "course of dealing" in which the stability of the U.S. financial system was an important component.[18] *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 984 N.E.2d 893, 900 (N.Y. 2012), *applying answers to certified questions*, 732 F.3d 161 (2d Cir. 2013). *Licci* and similar cases have established that, if the defendant has made "repeated use of such an account, purposeful availment may be inferred from the sheer volume," or from other factors suggesting that the use of U.S.-based bank accounts was deliberate. *Vasquez v. Hong Kong & Shanghai*

---

[18] "A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds." *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 246 n.2 (S.D.N.Y 2020) (cleaned up). "These accounts help to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed to the United States." *Id.* (cleaned up).

*Banking Corp.*, 477 F. Supp. 3d 241, 257–58 (S.D.N.Y 2020). Courts apply this standard to gauge whether the defendant specifically sought out a feature of the forum, such as "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci*, 732 F.3d at 168 (citation omitted). In *Licci*, for instance, the foreign bank's use of its own New York correspondent bank account to provide millions of dollars to a charity that allegedly served as the financial arm of Hezbollah indicated that the bank's use of the account was no coincidence but rather was what "enabled" the bank "to retain [the organization] as a customer." *Id.* at 171.

Here, the Amended Complaint fails to specify whether MTN Group even knew, much less intended, that any of the transferred funds would touch New York. Plaintiffs recite in conclusory fashion the standard set out in *Licci*, claiming without elaboration that MTN Group "benefited from the New York financial system, and New York laws," and "knew that the New York financial system imparted extra value to every transaction." AC ¶ 1102. But that "[c]onclusory restatement[] of the elements" of purposeful availment through use of the wires "will not suffice." *Precision Assocs.*, 2011 WL 7053807, at *40. Plaintiffs must instead plead "supporting facts" to buttress their "conclusory statements." *Schmidt v. Martec Indus. Corp.*, 2009 WL 2883071, at *3 (E.D.N.Y. Sept. 3, 2009). They have not done so. In short, any routing of foreign transfers through New York was "fortuitous," *Licci*, 732 F.3d at 171, so the Amended Complaint's transfer allegations fail to show the kind of "deliberate" use of wires that might justify a finding of purposeful availment.

*First*, nothing in the Amended Complaint comes close to demonstrating that MTN Group controlled "purchasing agents *working for the IRGC*," who allegedly "wired more than $5,000,000" to associates in the United States to procure technology. AC ¶ 1114. Plaintiffs assert that MTN Group "direct[ed]" those agents, *id.*, but shed no light on how MTN Group could have

26

controlled someone else's agents. At most, Plaintiffs' allegation of direction is a "conclusion[]
unsupported by the facts alleged," which the Court should ignore, *Kavanagh*, 578 F. App'x at 24.

Even if these agents' contacts could somehow be imputed to MTN Group, the Amended
Complaint would still fail to allege that MTN Group owned, or had any say in the use of, the
accounts in "the New York banking system." AC ¶ 1115. At its core, the Amended Complaint
alleges only that foreign wires between foreign parties might have involved some bank's
correspondent accounts in New York. *See id.* ¶¶ 995, 1104, 1118–1119. But this sort of
"adventitious" touchpoint with New York's banking system cannot constitute purposeful
availment. *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56,
66 (S.D.N.Y. 2016); *see Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 8–9 (N.Y. 2016) (in-forum
"banking by happenstance" not enough for jurisdiction under New York's long-arm statute).[19]

*Second*, Plaintiffs surmise that MTN Group used the U.S. banking system in other contexts,
but their factual allegations do not support that supposition. For instance, Plaintiffs claim that MTN
Afghanistan's alleged protection payments to the Taliban were U.S.-dollar denominated. Pls.'
Letter 3. But the Amended Complaint never alleges that fact; it only approximates what the
payments would allegedly have *totaled* in dollars, *see* AC ¶ 1054. The Amended Complaint
likewise alleges only that MTN Group guaranteed a "Citibank" loan that was "*worth* $1 billion,"
AC ¶ 1097 (emphasis added), but it does not allege that the loan was denominated or drawn down
in U.S. dollars, or even issued by a Citibank branch in the United States.[20] The same problem

---

[19] "[T]he jurisdictional analysis under the New York long-arm statute" often "closely resemble[s]
the analysis under the Due Process Clause of the Fourteenth Amendment." *Licci ex rel. Licci v.
Lebanese Can. Bank*, 673 F.3d 50, 61 n.11 (2d Cir. 2012).

[20] This allegation is particularly weak, given that MTN Group was merely the guarantor for an
affiliate's loan—not the borrower. The allegation accordingly fails to show that MTN Group,
rather than the affiliate that procured the loan, availed itself of the U.S. forum.

plagues the allegation that MTN Group "reached into the United States" to "repatriat[e]" funds from Iran to South Africa through "European Banks." *Id.* ¶¶ 1099–1100. This contention rests on reporting that quotes only the *value* of the funds in U.S. dollars, nowhere suggesting that the transfers were denominated in U.S. dollars or touched the United States. CommsUpdate, *MTN Extracts First Cash from Iran*, (Dec. 14, 2016) (Ex. L), 2016 WLNR 38124973, *cited at* AC ¶ 1099 n.535. Indeed, Plaintiffs allege that MTN Group relied on "banking relationships with U.S. financial institutions *and/or financial institutions with U.S. subsidiaries or offices* . . . to facilitate the repatriation of funds." AC ¶ 1101 (emphasis added). Plaintiffs thus concede that the repatriation might have occurred through European banks.

*Third*, setting aside these two categories of inadequately pleaded wire allegations, all that Plaintiffs ultimately allege is a single transfer of $400,000, which MTN Group allegedly paid to secure its investment in the Irancell joint venture. AC ¶¶ 1026, 1103. That transfer is not of a high enough volume or frequency to support purposeful availment, even under the standard courts apply to a foreign bank's use of *its own* New York correspondent bank account. *See Vasquez*, 477 F. Supp. 3d at 257 (holding that three wire transfers were insufficient to support an inference of purposeful availment). By contrast, courts have concluded that "wire transfers . . . that numbered in the dozens and totaled several million dollars" were "deliberate and recurring activity" constituting purposeful availment. *Licci*, 732 F.3d at 171; *accord Bartlett v. Société Générale de Banque au Liban SAL*, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (Amon, J.) (transactions "number[ing] in the dozens and total[ing] millions of dollars" were sufficient for personal jurisdiction).[21] The alleged routing of a single transaction through a New York

---

[21] *See also Nike, Inc. v. Wu*, 349 F. Supp. 3d 346, 356 (S.D.N.Y. 2018) (transfers made through correspondent accounts "on hundreds of occasions to the tune of millions of dollars" were sufficient for personal jurisdiction); *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 94–96

correspondent bank account much more closely resembles a "random, isolated, or fortuitous" forum contact, which does not support jurisdiction. *Licci*, 732 F.3d at 171 (citation omitted); *see Cmty. Fin. Grp. v. Stanbic Bank Ltd.*, 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015) (a single wire transfer of $350,000 in fraudulent funds through the defendant bank's correspondent account, where not initiated by the bank, was insufficient to support personal jurisdiction).

*U.S. Equipment.* Plaintiffs' second theory of purposeful availment—that "MTN" obtained embargoed U.S. goods and technology for the IRGC—likewise fails.

The Amended Complaint does not demonstrate that MTN Group "actively participate[d]" in transactions in the forum, as required to plead purposeful availment. *E.g.*, *Lombardi v. Paige*, 2001 WL 303831, at *4 (S.D.N.Y. Mar. 28, 2001) (citation omitted). As noted above, this purported basis for jurisdiction is an inadequately pleaded agency theory and should be disregarded. In any event, MTN Group's role in the alleged procurement of U.S. goods and technology—to the extent it can be discerned from the opaque chain of random events alleged, *see e.g.*, AC ¶ 1114; *supra* pp. 23–24—is akin to a passive participant who merely places orders according to the sellers' terms. *See Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1058, 1062 n.5 (11th Cir. 1986) (the defendant was a "passive purchaser" of goods in the forum, and even visiting the forum to return noncompliant goods did not constitute purposeful availment); *Stranahan Gear Co. v. NL Indus.*, 800 F.2d 53, 59 (3d Cir. 1986) (two visits to forum "fail[ed] to establish vigorous negotiating or dictating of contract terms and departure from the passive buyer role required to make this court's exercise of jurisdiction fair and reasonable" (citation omitted)); *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 233

---

(S.D.N.Y. 2015) ("nearly a dozen" transfers through a correspondent account, in conjunction with establishment of New York office and marketing, were sufficient to support personal jurisdiction).

(6th Cir. 1972) ("The buyer . . . is frequently a relatively passive party, simply placing an order, accepting the seller's price and terms as stated in his product advertising and agreeing only to pay a sum upon receipt of the goods or services.").

MTN Group's role stands in contrast to a defendant who actively seeks a forum's benefits. For instance, courts have held that a defendant that "actively negotiat[es] [a] contract" with a forum resident through "interactive communications . . . for an extended period of time" subjects itself to personal jurisdiction there, *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 68 (1st Cir. 2014); *see Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 233 (D.C. Cir. 2022) (finding purposeful availment where foreign defendants "reached into the [forum] to contract with . . . affiliated" in-forum manufacturers and then "[c]ontinuously over a period of years" maintained a "collaborative relationship" with those manufacturers to sell their goods abroad).

Here, by contrast, the Amended Complaint nowhere alleges that MTN Group engaged in negotiations in the United States, communicated with anyone located in the United States, or was party to any agreements with U.S. counterparties. Rather, it alleges that the IRGC's "purchasing agents" worked with their "associates in the U.S.," who were the ones that "purchased embargoed technology." AC ¶ 1114. Although Plaintiffs make a conclusory assertion that these transactions took place "at the direction of MTN Group," *id.*, the Amended Complaint acknowledges that MTN Group was "not in control" of Irancell, *id.* ¶ 72, let alone in control of agents of the IRGC.

## B.     Plaintiffs' Claims Do Not Arise Out of or Relate to the Alleged U.S. Contacts.

Plaintiffs' jurisdictional allegations independently fail because their ATA claims do not "arise out of or relate to" MTN Group's supposed U.S. contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). That requirement asks whether the defendant's forum contacts caused, or otherwise have a "strong 'relationship'" with, the plaintiff's claims. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (citation omitted);

30

*see Walden*, 571 U.S. at 283–84 (requiring that defendant's "suit-related conduct" create a "substantial connection" with the forum). Because that strong relationship is "the 'essential foundation' of specific jurisdiction," *Ford*, 141 S. Ct. at 1028 (citation omitted), jurisdiction is lacking when a defendant's contacts are "too remotely 'related to'" a plaintiff's claims, *Zurich Am. Life Ins. v. Nagel*, 2021 WL 5225947, at *7 (S.D.N.Y. Nov. 10, 2021).

As an initial matter, Plaintiffs do not even try to allege that their claim based on alleged payments to the Taliban and tower deactivations, *see infra* § II.B.2, arises from or relates to any purposeful availment of the United States. Plaintiffs never link their allegations about loans whose amounts were publicly reported in U.S. dollars—which cannot plead purposeful availment in any case, *supra* pp. 27–28—to allegedly illicit payments. Nor do Plaintiffs claim that the tower deactivations had anything to do with any supposed U.S. contact; they merely contend that abiding by the Taliban's violent demands foreseeably harmed Americans, which is not enough to support Plaintiffs' targeting theory of jurisdiction, *supra* pp. 19–20.

Plaintiffs' claim of jurisdiction as to their Irancell-based theories of liability, which is premised on the Amended Complaint's allegations that MTN Group paid a "bribe" and helped Irancell procure U.S. equipment, is no more successful. Plaintiffs' claims do not arise from or relate to these alleged actions.

***Alleged $400,000 bribe.*** The alleged bribe has nothing to do with Plaintiffs' claims. Plaintiffs allege that MTN Group paid "a consulting firm owned by" an "associate" of Iran's "Deputy Foreign Minister" to secure its spot in Irancell. AC ¶¶ 957, 1026. While the Amended Complaint labels this in conclusory terms a "bribe[] to the IRGC, including Qods Force, agents" through an IRGC "cutout," *id.* ¶¶ 959, 1105, it alleges no facts that connect the consulting firm to the IRGC or explain why the Deputy Foreign Minister was an IRGC "cutout." And they make no

31

effort to connect either one to the groups that allegedly harmed Plaintiffs. Nor does the Amended Complaint attempt to show how a $400,000 alleged bribe to a Deputy Foreign Minister in 2007 could have any relationship to attacks in Iraq four and nine years later, or to attacks in Afghanistan eleven years later—particularly considering the vast resources at the disposal of Iran and the IRGC. *See Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (noting Iran's "billions of dollars in reserve"); AC ¶ 253 (describing the IRGC's "control over broad swaths of the Iranian economy"). Thus, even if the "bribe" passed through accounts in New York and that could constitute purposeful availment, *but see supra* p. 27, it would not create "a substantial connection" between the United States and "the terror attacks in [Iraq and Afghanistan]." *Waldman*, 835 F.3d at 341.

**U.S. Equipment.** The alleged procurement of "smartphones, servers, network computing systems," and "associated technical support services," AC ¶ 829, is similarly unmoored from Plaintiffs' ATA claims. While the Amended Complaint observes that these technologies improved Irancell's network and thereby improved the IRGC's own "cellular-phone capabilities," *id.* ¶¶ 1005, 1331; *supra* pp. 13–14, it never connects that improvement to any attack. And because Plaintiffs fail to allege that any attack involved the encryption technology "MTN" allegedly also sourced,[22] any alleged role MTN Group played in procuring that technology is not suit-related. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (rejecting "spurious" approach that allowed specific jurisdiction based on "forum contacts that are unrelated to [plaintiffs'] claims"); *United Servs. Auto. Ass'n v. New Day Fin., LLC*, 2018 WL 1899807, at *5 (W.D. Tex. Mar. 8, 2018) (court lacked specific jurisdiction over defendant providing certain products in forum where claims based on "completely unrelated" products), *adopted*, 2018 WL

---

[22] *See* AC ¶¶ 1405–1406, 1427–1428, 1445–1446, 1452–1453, 1467–1468, 1476–1477, 1491–1492, 1499–1500, 1510–1514, 1553–1554, 1556–1557, 1568–1569.

1905113 (W.D. Tex. Mar. 27, 2018); *Griffith Labs. Inc. v. Kancor Ingredients Ltd.*, 2017 WL 514188, at *3–4 (N.D. Ill. Feb. 8, 2017) (sales of one product in forum insufficient to establish specific jurisdiction over defendant for claims arising out of different product).[23]

Nor are the allegations that MTN Group supplied smartphones to Irancell suit-related. The "technology and equipment" MTN Group allegedly procured for Irancell comprised items common to all telecommunications companies, such as "smartphones, servers, network computing systems," and "associated technical support services." AC ¶ 829; *supra* pp. 13–14. Thus, although Plaintiffs attempt to connect smartphones to terrorist attacks, the Amended Complaint's factual allegations support the obvious and benign conclusion that any alleged supply of smartphones to Irancell related to running a mobile phone network in Iran.

At most, these technology allegations amount to a claim that procuring U.S.-origin goods was a distant cause of Plaintiffs' injuries. Plaintiffs nowhere allege that any server, router, or other network computing system went any further than Irancell. Plaintiffs thus allege only that this technology helped Irancell's network run more effectively, *see* AC ¶¶ 1005, 1331; *supra* pp. 13–14, at most indirectly benefitting the IRGC. But alleging that any action that helps Irancell relates to terrorist acts by entities all over the Middle East is far too boundless a theory to comport with due process. *See Ford*, 141 S. Ct. at 1026 (personal-jurisdiction requirement that defendant's contacts must be suit-related "incorporates real limits, as it must to adequately protect defendants foreign to a forum"). And the allegation that the shareholders in Irancell's majority partner might have obtained cell phones from Irancell "for the benefit of the IRGC[]," *e.g.*, AC ¶ 1118, provides

---

[23] Plaintiffs' allegations that MTN Group issued American depository receipts, AC ¶ 85, had a "relationship with the Bank of New York," *id.* ¶ 1097, and guaranteed a loan by MTN Mauritius, *id.*, are also irrelevant to jurisdiction, because they have no conceivable connection to Plaintiffs' injuries. *See Bristol-Myers*, 137 S. Ct. at 1781.

a similarly thin connection to the attacks given that one of those shareholders, IEI, was itself a cell phone manufacturer, *see supra* p. 10. Those misappropriated cell phones would still then have to pass from IEI and Bonyad Mostazafan to the IRGC, to the Qods Force, then to Hezbollah, and eventually to the Joint Cells before any alleged involvement in the relevant attacks.

Any "connection" between MTN Group and Plaintiffs' alleged harm would thus be far "too tenuous" for specific jurisdiction—even if Plaintiffs had established that MTN Group's acts could "be viewed as a 'but for' cause" of their injuries. *SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 181 (2d Cir. 2000); *see SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018) ("limited" or "tenuous" contacts do not give rise to jurisdiction, even if a but-for cause of plaintiff's claims).

* * *

As the Supreme Court recently observed, the personal jurisdiction requirement that the defendant's contacts must be suit-related conduct "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford*, 141 S. Ct. at 1026. Plaintiffs' theory, however, would expand jurisdiction without limit. Plaintiffs contend that the IRGC "control[led] broad swaths of the Iranian economy," AC ¶ 253, and that "every dollar in profit" that allegedly indirectly benefitted the IRGC "inevitably helped" its global terrorist conspiracy. *Id.* ¶ 999. If personal jurisdiction were to exist over MTN Group and MTN Dubai merely on that basis, then it would seemingly exist over any other foreign company that does any business in Iran. Any such company could be randomly chosen and sued in the United States for any alleged attack that the IRGC supports around the world, so long as Plaintiffs can claim that some wire transfer associated with that business at some point touched a U.S. bank account, or some unidentified phantom "agent" sourced products from the United States. That theory is inconsistent with the Second Circuit's recognition, in the ATA context, that the Iranian government has "legitimate agencies, operations,

34

and programs to fund," and that not all funds sent to Iran are meant help finance terrorism. *Rothstein*, 708 F.3d at 97. It is also inconsistent with the "real limits" that due process places on the exercise of personal jurisdiction over foreign defendants. *Ford*, 141 S. Ct. at 1026.

## II.     Plaintiffs Fail to State Any Claim for ATA Liability.

Plaintiffs' failure to plead personal jurisdiction over MTN Group or MTN Dubai requires their claims to be dismissed at the threshold. But Plaintiffs also fail to state any ATA claim. The fundamental flaw is that making a minority investment in a mobile phone company in Iran does not constitute conspiring to commit acts of international terrorism, or aiding and abetting such acts.

### A.     Plaintiffs Fail to State an ATA Conspiracy Claim (Count 2).

In their original complaint, Plaintiffs claimed that MTN Group directly committed acts of international terrorism when it invested in Irancell. Plaintiffs now abandon that claim in favor of a new, but no less remarkable, theory: that in making that investment, MTN Group agreed on behalf of its entire corporate family to join a sprawling, decades-long terrorism conspiracy that included virtually every terrorist group in the Middle East and South Asia. AC ¶¶ 5–12, 49.

It is hard to overstate the scope of the conspiracy the Amended Complaint alleges MTN Group joined. Plaintiffs contend that from 2001 "until the end of the war in Afghanistan," "[t]he IRGC led a conspiracy" in which a "a litany of allied Shiite and Sunni terrorist groups" across the Middle East and South Asia came together in a "transnational alliance with all the same functionalities as NATO to successfully prosecute a global terror campaign against Americans." *Id.* ¶¶ 6–11, 259–261, 264–267, 1616–1617. Plaintiffs allege that when MTN Group, ZTE, and Huawei each invested in, or did business with, Iranian telecommunications companies, they were actually agreeing to "further[] the IRGC Conspiracy's ultimate objective" of expelling Americans from the region. *Id.* ¶ 11. The Amended Complaint even asserts, without explanation or supporting allegations, that these companies also conspired with "one another" for this purpose. *Id.* ¶ 1602.

Plaintiffs' new theory of liability ignores statutory limits, contravening both the ATA's text and purpose, as well as bedrock conspiracy law principles. Conspiracy liability under the ATA is limited to a defendant "who conspires with the person who committed such an act of international terrorism" (i.e., "an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization"). 18 U.S.C. § 2333(d)(2). Thus, while it might be enough under other statutes to allege that a defendant conspired to violate the statute,[24] under the ATA the defendant must conspire with the specific person who committed the act of international terrorism that injured the plaintiff. In addition, a plaintiff asserting a conspiracy claim under the ATA must establish that the defendant entered "an agreement" "to participate in an unlawful act." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(a)(5), 130 Stat 852, 852 (2016) (stating that *Halberstam* sets forth the "proper legal framework" for ATA secondary-liability claims); *see also Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) (conspirators "must 'reach an agreement with the *specific intent* that' the conspiratorial goal be completed" (citation omitted)). Here, however, Plaintiffs fail to allege that MTN Group conspired with the persons who committed the acts of international terrorism that injured Plaintiffs, and they do not come close to alleging that MTN Group entered any agreement with the specific intent of using terrorist violence to expel the United States from the Middle East and South Asia.[25]

---

[24] *See, e.g.*, 18 U.S.C. § 1962(d) (RICO) ("It shall be unlawful for any person to conspire to violate any of the provisions of . . . of this section."); 31 U.S.C. § 3729(a)(1)(C) (False Claims Act) ("[A]ny person who . . . conspires to commit a violation of [various subsections] . . .").

[25] All of Plaintiffs' ATA claims fail for the additional reason that the Amended Complaint fails to allege that each act of international terrorism at issue was "committed, planned, or authorized" by a designated FTO. *See* 18 U.S.C. § 2333(d)(2); *infra* § III.

1.    **Plaintiffs Do Not Allege that MTN Group "Conspire[d] with the Person Who Committed" the Attacks.**

No ATA conspiracy claim is viable without allegations that the defendant "conspire[d] with the person who committed" the act of international terrorism that injured the plaintiff. 18 U.S.C. § 2333(d)(2). Plaintiffs allege that the attacks in Iraq were "jointly committed by Hezbollah, Jaysh al-Mahdi, and the Qods Force," AC ¶ 1620, or in one instance by al-Qaeda and Ansar al-Islam, *id.* ¶¶ 1545–1546. In Afghanistan, one attack was allegedly "jointly committed by al-Qaeda," "the Haqqani Network," and "Lashkar-e-Taiba," and the other "by the Taliban and its Haqqani Network." *Id.* ¶¶ 1557, 1569. Yet Plaintiffs do *not* allege that MTN Group reached any agreement—much less agreed to join a terrorism conspiracy—with Hezbollah, Jaysh al-Mahdi, the Qods Force, Ansar al-Islam, al-Qaeda, the Taliban, the Haqqani Network, or Lashkar-e-Taiba. At most, Plaintiffs strain—unsuccessfully, *see supra* pp. 9–12—to plead a conspiracy by alleging that MTN Group agreed to invest and supply Irancell, whose other indirect shareholders allegedly had ties to the IRGC. *See, e.g.*, AC ¶¶ 301, 306, 311 (alleging not that the IRGC transacted with MTN Group, but that IRGC "fronts . . . engaged in transactions with MTN").

Even if Plaintiffs had alleged some agreement between MTN Group and the IRGC, that would not be sufficient. The paragraphs alleging which persons "committed" the acts of terrorism conspicuously omit the IRGC. *See id.* ¶¶ 1546, 1557, 1569, 1620. While Plaintiffs allege that "the Qods Force" jointly committed the Joint Cell attacks in Iraq, and at times call the Qods Force a "branch[]" of the IRGC, *e.g.*, *id.* ¶ 5, the Amended Complaint repeatedly distinguishes the Qods Force from the "Real" or "Regular" IRGC, *e.g.*, *id.* ¶¶ 95–99, 213, 911, 913, 1623. Indeed, Plaintiffs go so far as to "expressly disclaim any allegation that IRGC operatives—other than the Qods Force or Lebanese Hezbollah—participated on the ground inside Iraq." *Id.* ¶ 1406 n.600.

Thus, there is a threshold disconnect between the persons who allegedly committed the

acts of international terrorism that injured Plaintiffs, and the persons with whom MTN Group allegedly conspired. For that reason alone, Count 2 fails to state a claim that MTN Group "conspire[d] with the person who committed [the] act of international terrorism." 18 U.S.C. § 2333(d)(2); *see also, e.g.*, *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *7–8 (D.D.C. Nov. 16, 2020) (plaintiffs "fail[ed] to plead a JASTA conspiracy claim" because they alleged only that defendants provided illegal services to Iranian banks, not that they "conspired with al-Qaeda or Balawi—'the person[s] who committed [the] act of international terrorism'" (citation omitted)).

### 2.    Plaintiffs Do Not Allege that MTN Group Conspired with the IRGC.

Even if Plaintiffs could overcome their own disclaimer that "the IRGC" and "the Qods Force" are different, and one could read the Amended Complaint to allege that the IRGC "committed" some attacks, Plaintiffs still fail to allege that MTN Group conspired with the IRGC.

"The crux of any conspiracy is an agreement between the co-conspirators." *Kemper*, 911 F.3d at 395 (citing *Ocasio v. United States*, 578 U.S. 282, 287–88 (2016)). Yet the only agreement involving MTN Group that the Amended Complaint alleges is with IEDC, the majority partner in Irancell, and its two Iranian shareholders, Bonyad Mostazafan and IEI. *See supra* pp. 10–11. Although the Amended Complaint attempts to tie *these* entities to the IRGC, that is insufficient as a matter of law to plead that MTN Group conspired with the IRGC under the ATA.

Another court in this District reached the same conclusion in a case alleging a similarly "wide-ranging conspiracy." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 73 (E.D.N.Y. 2019) (*Freeman II*), *appeal pending*, No. 19-3970 (2d Cir.). There, the plaintiffs alleged that western financial institutions engaged in sanctions-evading transactions with various Iranian entities. *Id.* at 73–74, 94. Those entities included the National Iranian Oil Company, alleged to be an "agent of the IRGC"; the Islamic Republic of Iran Shipping Lines, alleged to have "a long

38

history of facilitating arms shipments on behalf of the IRGC"; and Mahan Air, alleged to have "facilitated the covert transport of IRGC-QF officers into and out of Iraq." *Freeman v. HSBC Holdings PLC*, 2018 WL 3616845, at *4–5 (E.D.N.Y. July 27, 2018), *report and recommendation rejected*, *Freeman II*, 413 F. Supp. 3d 67; *see also Freeman II*, 413 F. Supp. 3d at 73–74 & n.5, 94. In spite of these deep connections (and even an alleged agency relationship) between the Iranian entities and the IRGC, the plaintiffs' conspiracy claim under § 2333(d)(2) failed because "there is not a single allegation . . . that any of the Defendants *directly* conspired with Hezbollah or the IRGC." *Freeman II*, 413 F. Supp. 3d at 98. Here too, even if Plaintiffs claim that MTN Group "engaged in transactions" with "fronts" tied to the IRGC, AC ¶¶ 301, 306, there is not a single allegation that it directly conspired with the IRGC.

The Amended Complaint's attempt to plead that MTN Group nonetheless conspired with the IRGC is based on a blatant mischaracterization of a 2005 Letter Agreement, which is plainly not a contract with the IRGC but a shareholder agreement between "MTN" and the "local shareholders of Irancell." *Id.* Ex. A at 1. As one would expect in a commercial joint venture agreement, the Letter Agreement specifies how the parties will divide equity and fund licensing fees, and notes which commercial activities will require "MTN's" approval as the minority investor. *Id.* at 1–3.

Ignoring all that, the Amended Complaint relies on supposed "indicia" that the Letter Agreement was actually "drafted by the IRGC," *id.* ¶ 941, and asks this Court to draw patently unreasonable inferences on that basis. The first two "indicia" are the "reference to God at the start of the Agreement" and "the inclusion of the Islamic calendar date." *Id.* It is unreasonable—and offensive—to imply that terrorists were involved in a commercial contract in an Islamic country

because the contract refers to God and the Islamic calendar.[26] Plaintiffs further find it suspicious that the Agreement refers to "Iranian shareholders" without naming them, *id.*, but the Amended Complaint alleges who those shareholders were and that they were enterprises with significant legitimate operations, *see supra* pp. 9–10. Plaintiffs also emphasize a "blank space" which could have been used to add "handwritten . . . terms," AC ¶ 941, but do not allege that there were such terms, or provide any reason to infer that a blank space is nefarious, *see id.*

In short, Plaintiffs' inference that the MTN Defendants reached an agreement with the IRGC is based on a contract they cannot reasonably connect to the IRGC. For this reason as well, the Amended Complaint does not plead that the MTN Defendants "conspired with" the IRGC.

### 3. Plaintiffs Do Not Allege that MTN Group Entered Any Agreement with the Specific Intent of Furthering Acts of International Terrorism.

Even if the IRGC committed the acts of international terrorism, and even if an agreement with IEDC to form a telecommunications joint venture could somehow be construed as an agreement with the IRGC, the Amended Complaint does not plead that MTN Group agreed with the IRGC *to engage in terrorist acts*. This is a further, independent reason the conspiracy claim must be dismissed, because to be held liable under the ATA "on the basis of a conspiracy, a defendant must have conspired *to commit an act of international terrorism*." *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, *9 (S.D.N.Y. Mar. 28, 2019) (emphasis added).

This requirement follows from basic conspiracy principles, according to which a conspirator "must 'reach an agreement with the *specific intent* that' the conspiratorial goal be completed." *Kemper*, 911 F.3d at 395 (citation omitted). In *Kemper*, the Seventh Circuit observed

---

[26] The reference to God, called the "*basmalah*," is customary in Muslim-majority countries and "introduces all formal documents and transactions." Encyc. Britannica, *Basmalah* (Ex. M), https://tinyurl.com/bdessftb (last visited Apr. 25, 2022).

that, by helping Iranian state banks evade U.S. sanctions, "Deutsche Bank may have engaged in business dealings that incidentally assisted a separate terrorism-related conspiracy involving Iran." *Id.* But that did "not suggest that Deutsche Bank ever agreed to join that conspiracy," because "[a] person who is indifferent to the goals of an ongoing conspiracy does not become a party to this conspiracy merely because that person knows that his or her actions might somehow be furthering that conspiracy." *Id.*; *see also O'Sullivan*, 2019 WL 1409446, at *9 (allegations that defendant engaged in unlawful transactions with state-owned companies with ties to the IRGC failed to plead that the defendants "shared a common purpose or plan with FTOs like Hezbollah" that "committed the attacks" in Iraq); *Bernhardt*, 2020 WL 6743066, at *7–8 (alleging that defendants "illegally provid[ed] financial services" to Iranian banks "[a]t most" alleges that they "joined a conspiracy to evade U.S. sanctions," not that they "shared the common goal of committing an act of international terrorism," "even assuming that [defendants] knew that the United States imposed sanctions against Iran and [an Iranian bank] because of their connections to terrorism").

According to the Amended Complaint, "[t]he Object of the IRGC Conspiracy" was "expelling the United States from the Middle East, including Iraq and Afghanistan." AC ¶ 94. Yet no facts alleged in the Amended Complaint plausibly suggest that MTN Group intended the "conspiratorial goal" of expelling the United States from the Middle East. *Kemper*, 911 F.3d at 395. For starters, MTN Group could not have joined an "IRGC Conspiracy" without knowing that it was dealing with the IRGC. *See United States v. Garcia-Torres*, 280 F.3d 1, 4 (1st Cir. 2002) ("No one can join a conspiracy without knowledge of its existence."). Whether or not Bonyad Mostazafan and IEI were IRGC fronts, nothing in the Amended Complaint supports the notion that MTN Group *knew* these indirect shareholders in Irancell were IRGC fronts. *Infra* § II.B.1.a.

More generally, it is implausible for the Amended Complaint to make the conclusory

41

assertion that Africa's largest telecommunications company "hoped for the IRGC" to drive the United States out of Iraq and Afghanistan. AC ¶ 1607. To the contrary, the Amended Complaint alleges that MTN Group invested in Irancell not because of sinister geopolitical motives, but because of "the potential for enormous profits" from serving millions of Iranian consumers. AC ¶ 970; *see also id.* ¶ 824 (MTN Group had an "appetite for Iran's telecom market" because it "was widely understood to represent a unique opportunity . . . for telecommunications investors" (emphasis omitted)).[27]

Lacking any factual support for the shocking assertion that MTN Group "intended to harm Americans in Iraq," *id.* ¶ 1086, Plaintiffs rely heavily on a single reference to "security" in the 2005 Letter Agreement. *See id.* ¶ 1091. As explained above, the purpose of this clause was for MTN Group to encourage the South African government to sell military equipment to the Iranian Defense Ministry. That is not a "direct contractual promise" by MTN Group to "aid the IRGC and Qods Force['s] terrorist enterprise." *Id.* ¶ 931.

The Amended Complaint also cannot credibly imply that MTN Group intended to promote terrorist acts from allegations that "MTN" or its "agents" helped Irancell procure "embargoed technology and equipment." *Id.* ¶ 57; *see id.* ¶¶ 829, 1007. Even if Plaintiffs had plausibly alleged that MTN Group conspired with someone to "evade American sanctions," *id.* ¶¶ 1005; *but see supra* § I.A.2.a, alleging "a conspiracy to avoid sanctions" does not establish that a defendant

---

[27] Beyond the Amended Complaint's lack of support for its provocative assertion, the Court can take judicial notice of the fact that the U.S. Agency for International Development ("USAID") "partner[ed]" with MTN Afghanistan to "expand[] its mobile money services" for the Afghan people. USAID, *USAID Grants Will Enable More Than 100,000 Afghans to Use Mobile Money Services* (Nov. 30, 2011) (Ex. N), https://tinyurl.com/mvrutpmy; *see, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015) ("The Court may take judicial notice of the press releases of government agencies." (citation omitted)). It is implausible that an MTN affiliate would partner with a U.S. agency in Afghanistan if it were attempting to drive the United States away from the region—or that the U.S. government would partner with a company with such an anti-American agenda.

shared "any of Iran's terrorism-related goals" or "conspir[ed] . . . to provide material support for terrorism." *Kemper*, 911 F.3d at 389; *see also O'Sullivan*, 2019 WL 1409446, at *9 (dismissing conspiracy claim because allegations that bank provided sanctions-evading services to Iranian entities did not allow court to infer that it conspired with an FTO or "shared [its] common goal of committing an act of international terrorism"); *Bernhardt*, 2020 WL 6743066, at *7–8 (similar).

Plaintiffs thus fail to allege any facts that would support a plausible inference that MTN Group entered into "an agreement" with the IRGC "with the *specific intent*" of supporting violent attacks to expel U.S. forces from the Middle East and South Asia. *Kemper*, 911 F.3d at 395.

*    *    *

Merely alleging that "MTN" invested in and supplied equipment to an Iranian mobile phone company, whose indirect shareholders allegedly had ties to the IRGC, does not establish that any MTN company joined any "IRGC Conspiracy." Count 2 should be dismissed.

## B.    Plaintiffs Fail to State an ATA Aiding-and-Abetting Claim (Counts 1 and 3).

Plaintiffs also fail to state a claim that MTN Group aided and abetted acts of international terrorism in Iraq or Afghanistan. They have not alleged facts showing that MTN Group knew that it was playing a role in terrorist activity, or that it "knowingly provide[d] substantial assistance" to acts of international terrorism. 18 U.S.C. § 2333(d)(2). And Plaintiffs cannot claim that MTN Group aided and abetted every attack in the armed conflict in Afghanistan by characterizing an alleged multi-year RICO enterprise as an "*act* of international terrorism." *Id.* (emphasis added).

### 1.    Plaintiffs Fail to State an Aiding-and-Abetting Claim as to the Iraq Attacks (Count 1).

In Count 1, Plaintiffs allege that MTN Group and MTN Dubai aided and abetted acts of international terrorism—i.e., attacks on U.S. forces—in Iraq in 2011 and 2016. AC ¶¶ 1589–1600. Plaintiffs attribute these attacks to "joint cells" composed of fighters from Hezbollah, the Qods

43

Force, and "Jaysh al-Mahdi," *id.* ¶ 1591, the latter of which Plaintiffs use as an umbrella to refer to three Iraqi militias, "Jaysh al-Mahdi," "Asaib Ahl al-Haq," and Kata'ib Hezbollah," *id.* ¶ 292.[28]

When Congress added secondary liability to the ATA in 2016, it strictly limited aiding-and-abetting claims. By invoking the "legal framework" in *Halberstam*, Congress ensured that, at a minimum, an ATA plaintiff proceeding on an aiding and abetting theory would have to establish (1) that they were injured by a principal's "wrongful act," (2) that the defendant "knowingly and substantially assist[ed] the principal violation," and (3) that the defendant was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] assistance" to the principal's violation. *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019) (quoting *Halberstam*, 705 F.2d at 477). Congress further cabined aiding-and-abetting lability under the ATA to defendants who "knowingly provid[e] substantial assistance" to "the person who committed" an "act of international terrorism" that was "committed, planned, or authorized" by an organization that the United States had previously designated as an FTO. 18 U.S.C. § 2333(d)(2).

Here, Plaintiffs fail to allege facts necessary to plausibly plead the general awareness or substantial assistance requirements specific to an ATA aiding-and-abetting claim.

> **a)**     **Plaintiffs do not plead that MTN Group was generally aware that it was assuming a role in terrorist activities in Iraq.**

A complaint cannot state an ATA aiding-and-abetting claim unless it can "plausibly allege that the defendant was 'aware that, by assisting the principal, it [was] itself assuming a role in terrorist activities.'" *Siegel*, 933 F.3d at 224 (citation omitted). When a plaintiff alleges that a

---

[28] Because Plaintiffs limit Count 1 to the attacks committed by these "joint cells" in Iraq, *see* AC ¶¶ 1590–1599, this claim does not encompass the 2017 Iraq attack committed by Ansar al-Islam, *see id.* ¶¶ 1545–1546, or the two Afghanistan attacks, *see id.* ¶¶ 1556–1557, 1568–1569.

defendant had the requisite general awareness because of its dealings with third parties—not with terrorists themselves—those third parties must be "so closely intertwined with [the terrorists'] violent terrorist activities" that the defendant would have been aware "that it was playing a role in unlawful activities from which attacks were foreseeable." *Honickman*, 6 F.4th at 499 (citation omitted). Here, there is no allegation that MTN Group dealt with the Joint Cells, the Qods Force, or the IRGC. It was allegedly an indirect joint venture partner with Bonyad Mostazafan and IEI. Thus, to state a claim, Plaintiffs would need to allege a factual basis for inferring that MTN Group knew that these entities were closely intertwined with the Joint Cells' terrorist activities. The complaint fails to do so for three core reasons recognized by the Second Circuit: (1) it relies on sources published *after* the relevant attacks, (2) it relies on sources which do not put anyone on notice that Bonyad Mostazafan or IEI was involved in terrorist activities, and (3) it alleges that these relationships were concealed, undermining any possible inference of public awareness.

*First*, when general awareness is based on public knowledge, it must be "public knowledge during the relevant period." *Id.* at 502. Thus, aiding-and-abetting claims are not viable when "the public sources cited in the complaint do not plausibly support an inference that [defendants] had the requisite general awareness *at the time*." *Id.* at 501–02 (emphasis added). Courts thus "discount[]" even terrorism designations if "there was a temporal disconnect between the attacks and designations." *Bartlett*, 2020 WL 7089448, at *9; *see also O'Sullivan*, 2019 WL 1409446, at *9 ("[T]he complaint alleges that certain Iranian entities were only designated . . . years after Defendants transacted business with them, further undermining any inference that Defendants had reason to know about these entities' connections with FTOs.").

The Amended Complaint lacks the required temporal connection. It relies on Bonyad Mostazafan's designation for ties to the Office of the Supreme Leader in 2020—four years *after*

45

the last relevant attack in 2016. *See* AC ¶ 786 & n.367. Plaintiffs highlight that this designation refers to a former IRGC officer's becoming president of Bonyad Mostazafan in July 2019, but that too comes three years too late to have any relevance. *See id.* ¶ 786. Similarly, the Amended Complaint repeatedly cites a journal article published in 2020 for the proposition that IRGC control of Iran's telecommunications sector was widely understood, Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Def. Strategy Commc'ns, Autumn 2020, at 97 (Ex. O), *cited at* AC ¶¶ 164, 165, 236–39, but that is again irrelevant under *Honickman*.

*Second*, though Plaintiffs repeat the conclusory label IRGC "front," *see* AC ¶¶ 72, 773, 791, their sources do not suggest any reason MTN Group would have known that other shareholders in Irancell were "closely intertwined" with the IRGC, much less with its terrorist activities. *Honickman*, 6 F.4th at 499. Rather, according to Plaintiffs' own sources (including U.S. government publications), Bonyad Mostazafan and IEI had significant economic, non-terroristic operations: Bonyad Mostazafan controlled a "multi-billion dollar economic empire" of "energy, mining, logistics, information technology, and financial services" firms,[29] and IEI sold "many consumer goods."[30] *See supra* pp. 9–12. Bonyad Mostazafan's 2020 designation was, as noted above, for ties to the Supreme Leader, not for affiliation with the IRGC or terrorism. As for IEI, though Plaintiffs call it a "front," AC ¶ 791, that was "fully owned by the IRGC," *id.* ¶ 797, and whose "express purpose" was to support the IRGC's terrorist activities, *id.* ¶ 792, the U.S. government designated it because it was "owned or controlled by Iran's" defense ministry (not the

---

[29] *Treasury Targets Vast Supreme Leader Patronage Network.*

[30] Alfoneh, *supra.*

IRGC), and it was allegedly involved in proliferation activities (not terrorism).[31] All but admitting that U.S. designations defeat their theory, Plaintiffs rely on "additional IRGC-related designations," *id.* ¶¶ 253–256—*none* of which mention Bonyad Mostazafan or IEI as commercial fronts for the IRGC's terrorist activities. Designations indicating that *other* Iranian entities supported terrorist activities only confirm that MTN Group could not have been aware that *IEI and Bonyad Mostazafan*, *not so designated*, were closely intertwined with terrorist activities.

Apart from government designations that undermine their claim, Plaintiffs cite a grab-bag of sources that do nothing to establish knowledge that MTN Group's joint venture partners were closely intertwined with terrorism. Plaintiffs point to a letter from Members of Congress that supposedly supports an inference of IRGC control of telecommunications, but that letter concerned the sale of a U.S. cloud-computing company to Huawei because of its ties to the Chinese Government—never mentioning Irancell, IEI, or Bonyad Mostazafan.[32] Equally unavailing is "blockbuster" reporting from 1995 published in local U.S. newspapers, *id.* ¶¶ 776–779, which alleged that Bonyad Mostazafan had been "a front for the procurement of military goods and prohibited technology for Iran," and to "place[] in the United States" "zealots who conducted espionage and stole military technology"—not for terrorist activity.[33] And Plaintiffs describe an advocacy organization's "public pressure campaign" calling on MTN Group to cease its business with Irancell, *id.* ¶¶ 1017–24, but that campaign urged MTN Group to terminate its investment

---

[31] *Treasury Designates Iranian Military Firms*.

[32] Letter from U.S. Senator Jim Webb, et al., *Sens. Webb, Kyl: Sale of U.S. Computer Technology to Chinese Firm Poses Serious Risk Chinese Firm Has History of Illegal Behavior and Ties with the People's Liberation Army, Taliban and Iranian Revolutionary Guard*, States News Service (Feb. 10, 2011) (Ex. P), *cited at* AC ¶ 906 & n.441.

[33] Knut Royce & Kevin McCoy, *N.Y. Foundation Linked to Iran's Islamic Militants*, Seattle Times (May 26, 1995) (Ex. Q), 1995 WLNR 1308563, *cited at* AC ¶ 777 & n.361; Knut Royce, *No Legal Recourse in Iranian's Case / Supreme Court Won't Reopen Suit*, Newsday (Dec. 8, 1998) (Ex. R), 1998 WLNR 604387, *cited at* AC ¶ 781 & n.364.

because of "evidence of Iran's routine use of telecommunications equipment to illegally track, monitor, and in some cases arrest, detain, and torture Iranian citizens." *Id.* ¶ 1019. Whatever the merit of that criticism, it drew no connection between Irancell and terrorist attacks in Iraq.[34]

These "limited public sources," *Honickman*, 6 F.4th at 502, are nothing like the "extensive media coverage," *Gonzalez v. Google*, 2 F.4th 871, 908 (9th Cir. 2021), or "detailed, numerous sources," *Honickman*, 6 F.4th at 502, that supported general awareness in other cases. *See Kaplan v. Lebanese Can. Bank, SAL*, 999 F.3d 842, 862 (2d Cir. 2021) (complaint pleaded that bank knew its customers were "integral parts of Hizbollah" because "Hizbollah repeatedly publicized those relationships on Hizbollah websites and in news media that included Hizbollah's own radio and television stations"); *Atchley*, 22 F.4th at 221 (plaintiffs' agents allegedly "finalize[d] deals" in a government ministry where "armed terrorist fighters openly circulated," and contemporaneous press reports "extensively document[ed]" terrorists' "domination of the Ministry"); *Bartlett*, 2020 WL 7089448 at *10 (media reports merely "bolster[ed] the inference—already made plausible by the timely [Specially Designated Global Terrorist] designations—that Defendants knew their customers were using Defendants' financial services to weaponize their terrorist attacks").

*Third*, the Second Circuit recently held that a complaint's allegations that an organization "maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that [Defendant] understood these organizations' true nature and activities from the public record at the time." *Honickman*, 6 F.4th at 502. Plaintiffs here have likewise undermined the plausibility of their

---

[34] Similarly, Plaintiffs rely on a 2013 story describing the conviction of an individual who procured embargoed technologies on behalf of Irancell, which refers only to the possibility of the technology being used to "spy on [Iranian] citizens," not to assist terrorism. Rowan Philip & Craig McKune, *US Trial Turns Heat on MTN*, Mail & Guardian (Feb. 15, 2013) (Ex. S), http://tiny.cc/9ikquz, *cited at* AC ¶ 1107 & n.537. Besides mischaracterizing their own sources, plaintiffs offer only conclusory assertions about Bonyad Mostazafan and IEI. *See, e.g.*, AC ¶¶ 782, 788, 793.

theory, alleging "cover" and "concealment" as "axiomatic . . . ingredient[s] to any long-term terrorist finance and logistics strategy that depends upon commercial transactions," AC ¶¶ 218–219, and as "the two most important principles in [the IRGC's] terrorist tradecraft," *id.* ¶ 222.

In sum, as in *Honickman*, "the public sources cited in the complaint do not plausibly support an inference that [MTN Group] had the requisite general awareness at the time that it provided" the resources and services in question to Irancell. 6 F.4th at 501. The aiding-and-abetting claims must therefore be dismissed.

### b) The Amended Complaint does not adequately plead that MTN Group provided substantial assistance to the persons who committed the attacks that injured Plaintiffs.

Congress further limited aiding-and-abetting liability under the ATA to cases where the defendant knowingly provided "substantial assistance" to the "person who committed [the] act of international terrorism" that injured the plaintiff. 18 U.S.C. § 2333(d)(2). That assistance can be provided indirectly, *see Kaplan*, 999 F.3d at 866, but it still must ultimately be provided to the person who committed the attack—in the context of Count 1, the Joint Cells in Iraq.

Yet the Amended Complaint fails to allege that MTN Group provided *any* assistance to the Joint Cells. Instead, MTN Group entered into a joint venture with IEDC, which is itself a joint venture between IEI, a state-owned company controlled by Iran's defense ministry, and Bonyad Mostazafan, controlled directly or indirectly by the Office of the Supreme Leader. *Supra* pp. 9–10. But alleging that MTN Group invested in a phone network alongside companies that allegedly had ties to the Iranian government is not enough to establish that MTN assisted any terrorist act in Iraq. *Cf. Rothstein*, 708 F.3d at 97 ("[t]he fact that the [financial] transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism," but ATA plaintiffs need more to adequately allege defendant's connection to terrorist attacks).

Setting aside the Amended Complaint's failure to plead *any* assistance—indirect or

otherwise—to the "person who committed" the attacks in Iraq, any assistance that MTN Group allegedly provided could not have been "substantial" under Second Circuit precedent. The Second Circuit considers six factors to determine whether an alleged aider-and-abettor provided "substantial assistance" to the principal: (1) the nature of the act encouraged; (2) the amount and kind of the defendant's assistance; (3) the defendant's absence or presence at the time of the tort; (4) the defendant's relationship to the principal; (5) the defendant's state of mind; and (6) the duration of the assistance. *Honickman*, 6 F.4th at 500 (citing *Halberstam*, 705 F.2d at 484–85).

The first factor—the nature of the act assisted—weighs against substantial assistance. Plaintiffs' only non-conclusory allegations are of direct financial or in-kind assistance to the Iranian state-owned or affiliated entities that partnered in Irancell. The Amended Complaint alleges that some of the revenue earned from sales of mobile phone services to Iranian subscribers accrued to Iranian state-controlled entities that, in turn, allegedly provided support to the IRGC, which then shared money and resources with the Qods Force, Hezbollah, and other Joint Cell members. These allegations differ considerably from those in cases where defendants allegedly provided support directly to the terrorists that attacked plaintiffs, *see, e.g.*, *Atchley*, 22 F.4th at 221 (describing defendants' alleged bribe payments to ministry "dominat[ed]" by Jaysh al-Mahdi), or to third parties that were "openly, publicly, and repeatedly acknowledged" as "integral parts" of the FTO that attacked plaintiffs, *Kaplan*, 999 F.3d at 850. Plaintiffs concede that Irancell "performed non-terrorist activities, meaning" that the "assistance" MTN Group allegedly provided Irancell "would potentially have supported legitimate purposes." *Bartlett*, 2020 WL 7089448, at *12. Thus, the allegation that MTN Group assisted Irancell's attempt to earn revenue running a commercial telecommunications network, and the procurement of goods and services for it, does not suggest MTN Group provided substantial assistance through Irancell to the Joint Cells.

50

Moreover, even if MTN Group allegedly procured U.S.-origin equipment for Irancell, *see, e.g.*, AC ¶ 57; *but see supra* pp. 20–23, that would not demonstrate substantial assistance to *terrorist acts*. As the Second Circuit explained in *Honickman*, "the principal violation"—the Joint Cell attacks that injured Plaintiffs—"must be foreseeable from the illegal activity that the defendant assisted." 6 F.4th at 499. Plaintiffs cannot credibly argue that the explosively formed penetrator ("EFP"), rocket, or kidnapping attacks that injured Plaintiffs were foreseeable from MTN Group's helping a phone company procure "network equipment, including Cisco routers [and] Sun servers," AC ¶ 1007, cellphones, *id.* ¶ 1011, and assistance "servic[ing] [its] enterprise-level computers and associated networks," *id.* ¶ 1117. *See, e.g.*, *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 234 (E.D.N.Y 2020) (*Freeman III*) (enabling "illegal Iranian transactions" to obtain equipment for "MODAFL sub-agencies" "fall[s] far short of establishing that Defendants 'knowingly and substantially assist[ed]' . . . the alleged acts of terrorism" (second alteration in original) (citation omitted)). At most, the "nature of the act" MTN Group allegedly assisted was evading trade embargoes, not the attacks that injured Plaintiffs.[35]

The second factor—amount and kind of assistance—also does not support Plaintiffs' claim. The Amended Complaint asserts that MTN Group "brib[ed] its IRGC . . . joint venture partners to win the Irancell license" by "paying large license fees" to Iranian regulators, "generat[ed] revenue for MTN Irancell throughout the operation of the joint venture," and provided "millions of dollars" worth of "U.S. technology" and services to the IRGC. *See, e.g.*, AC ¶¶ 991, 1117–18. But it does not make any sense to suggest that Iran needed assistance from a South African company to funnel money from Iranian cell phone subscribers to the IRGC, particularly if, according to Plaintiffs'

---

[35] *Treasury Targets Vast Supreme Leader Patronage Network; Treasury Designates Iranian Military Firms*.

own sources, the IRGC "overtly purchased a majority stake in TCI's monopoly over Iranian telecommunications" for $5 billion in 2009.[36] And Plaintiffs hardly establish that MTN Group provided substantial financial resources to the IRGC. Instead, they describe an alleged $400,000 bribe to Iran's Deputy Foreign Minister and a €300 million payment to Iranian *regulators*.[37] Though Plaintiffs contend that the IRGC allegedly drew millions of dollars in shared revenue from Irancell, that revenue came not from MTN Group, but from mobile phone subscribers and the Iranian shareholders in Irancell. *See Bernhardt*, 2020 WL 6743066, at *6 (second factor weighed against substantial assistance finding because allegations that defendant helped "Iranian Banks circumvent U.S. sanctions" did not show that defendant "had any involvement in transactions that the Banks performed" for al-Qaeda's "direct[] benefit[]" or that it "knew or intended that [al-Qaeda] would receive [such] funds"). And that amount paled in comparison to the IRGC's vast economic holdings, including $17 billion worth of shares in Iranian companies,[38] and Iran's "billions of U.S. dollars in its reserves," *Rothstein*, 708 F.3d at 93.

Nor do Plaintiffs plausibly plead that the equipment and services MTN Group allegedly helped Irancell acquire for its network were an "essential part" of the EFP and rocket attacks and kidnapping operations that the Joint Cells conducted in Iraq. *Halberstam*, 705 F.2d at 488. Plaintiffs assert that MTN Group helped Irancell acquire "smartphones, servers, network

---

[36] Gill, *supra*, at 106.

[37] Plaintiffs assert in conclusory terms that the recipient of the $400,000 bribe was a "front, operative, or agent" of the IRGC. *See* AC ¶ 993 ("On information and belief, the recipient of MTN's $400,000 wire acted as a front, operative, or agent for the IRGC"). But the Amended Complaint makes clear that MTN Group allegedly bribed Iran's Deputy Foreign Minister, not an IRGC cutout. *Id.* ¶ 1026 ("'MTN promised in May 2005, and later paid through a sham consultancy, the Iranian Deputy Foreign Minister, Javid Ghorbangholi, $400,000'").

[38] Statement of Emanuele Ottolenghi Senior Fellow, Found. for Defense of Democracies, Comm. on House Foreign Affairs Subcomm. on Middle E. and N. Afr., *Iran Nuclear Deal*, Congressional Testimony via FDCH (Sept. 17, 2015), 2015 WLNR 27612447 (Ex. T), *cited at* AC ¶ 803 & n.374.

computing systems," and "associated technical support services," that helped "sustain the terrorist campaigns in Iraq." AC ¶ 829. But they do not connect this network equipment to the Joint Cell attacks; instead, they claim generically that the equipment helped aid a "Revolution in Terrorist Affairs" by improving the IRGC's communications capabilities. *Id.* ¶ 750.

The third and fourth factors similarly weigh against a finding of substantial assistance. The Amended Complaint does not (and could not) allege that MTN Group was present at any attack in Iraq, and Plaintiffs do not allege that MTN Group had any "relationship to the principal" that committed the attacks (i.e., the Joint Cells). Indeed, any connection between MTN Group and the Joint Cells was "several steps removed." *Honickman*, 6 F.4th at 501. According to the Amended Complaint, at most MTN Group had "commercial relationship[s]" with Iranian entities that Plaintiffs assert were "linked to various terrorist organizations including" the IRGC, which, through the Qods Force, allegedly joined with several terrorist entities to conduct the attacks "that caused [P]laintiffs' injuries." *Id.* (citing *Siegel*, 933 F.3d at 220–21). Though the ATA does not require a "direct relationship between the defendant and the FTO" that committed, planned, or authorized the attack at issue, the defendant's relationship with the terrorists "should not be so attenuated as in *Siegel*," *id*, where plaintiffs alleged the defendant bank had a relationship with another bank that "was believed by some" to have ties to terrorists. *Siegel*, 933 F.3d at 224. As in *Siegel*, Plaintiffs do "not advance any non-conclusory allegation that [the Joint Cells] received any" resources from MTN Group through its joint venture investment in Irancell, "or that [MTN Group] knew or intended that [the Joint Cells] would receive" such resources. *Id.* at 225.

Nor does the fifth factor—the state of mind plausibly alleged in the Amended Complaint—support finding substantial assistance. Unlike in *Halberstam*, where the defendant "desire[d] to make the [criminal] venture succeed," 705 F.2d at 488, Plaintiffs repeatedly allege that MTN

Group's involvement in Irancell was motivated by commercial interests. AC ¶ 936 (MTN Group motivated by desire to "take the [cellular-phone] license away from Turkcell and enter the Iranian [telecommunications] market itself"); *id.* ¶ 970 (citing "potential for enormous profits" as a reason MTN Group entered into Irancell joint venture); *see also Atchley*, 22 F.4th at 223 (state of mind factor "more powerfully supports aiding-and-abetting liability of defendants who share the same goal as the principal or specifically intend the principal's tort"); *Gonzalez*, 2 F.4th at 906 (fifth factor weighed against substantial assistance because defendant was not "one in spirit" with terrorists (quoting *Halberstam*, 705 F.2d at 484)); *Freeman III*, 465 F. Supp. 3d at 234.

Finally, the sixth factor—the duration of defendant's assistance—cuts against finding substantial assistance. The "length of time an alleged aider-abettor has been involved with a tortfeasor" may "afford evidence of the defendant's state of mind." *Atchley*, 22 F.4th at 224 (citation omitted). But Plaintiffs' non-conclusory allegations make clear that Irancell had non-terroristic commercial operations that MTN Group aided. *E.g.*, AC ¶ 1018 ("MTN Irancell [is] the second largest mobile phone network operator in Iran"). Plaintiffs' failure to assert non-conclusory allegations that "most, or even many," of MTN Group's services to Irancell "assisted terrorism" weakens their claim that MTN Group's nearly 16-year investment in Irancell substantially assisted the IRGC's terrorist activities in Iraq and Afghanistan. *Siegel*, 933 F.3d at 225.

## 2.  Plaintiffs Fail to State an Aiding-and-Abetting Claim as to the Afghanistan Attacks (Count 3).

Plaintiffs separately seek to hold MTN Group liable on an aiding-and-abetting theory for injuries arising from two 2019 attacks in Afghanistan. *See* AC ¶¶ 1556–1557, 1568–1569, 1622–1631. Besides involving Afghanistan, Count 3 differs in another respect from Plaintiffs' other aiding-and-abetting claim: rather than alleging that MTN Group aided and abetted specific attacks, as they did in Count 1, Plaintiffs here claim that MTN Group aided and abetted an "IRGC-Taliban-

al-Qaeda Campaign," i.e., a multiyear criminal enterprise that violated the federal racketeering statute (RICO), of which Plaintiffs allege the attacks were a part. *Id.* ¶¶ 1624–1626. This unusual claim is not supported by Plaintiffs' allegations and cannot be squared with the text of the ATA.

### a) Plaintiffs' Afghanistan claim fails for many of the same reasons as the Iraq claim.

Plaintiffs advance two theories for how MTN Group aided and abetted the "IRGC-Taliban-al-Qaeda Campaign" that forms the basis of their RICO allegations in Count 3.

*First*, Plaintiffs contend that MTN Group's minority investment in Irancell provided the IRGC with money and communications equipment that it used to support the Afghan insurgency. AC ¶ 1629. This theory fails for the same reasons that Count 1 fails. *See supra* § II.B.1.

*Second*, borrowing their counsel's theory in *Cabrera*, Plaintiffs allege that MTN Group aided and abetted the Taliban's attacks in Afghanistan because, when the Taliban violently threatened MTN Afghanistan's personnel and operations, MTN Group agreed MTN Afghanistan could make protection payments to the Taliban and shut down its cell towers when the Taliban demanded it. But Plaintiffs' theory about Afghanistan is no more viable here than in *Cabrera*. This Court, like the D.C. district court, lacks jurisdiction over MTN Group and MTN Dubai with respect to the Afghanistan claim. *Supra* pp. 19–20. And Plaintiffs cannot state an ATA claim based on the *Cabrera* allegations. MTN Group did not knowingly "assum[e] a role in terrorist activities" when it was violently extorted by the Taliban. *Siegel*, 933 F.3d at 224. Nor did it knowingly provide substantial assistance to any Taliban or al-Qaeda attack. Plaintiffs cannot allege that MTN Group was present at any attack (third factor) or had a special relationship with the Taliban or al-Qaeda that would have given MTN Group influence over their conduct (fourth factor). *Halberstam*, 705 F.2d at 484. Indeed, the Amended Complaint makes clear that the Taliban violently extorted MTN Afghanistan. *E.g.*, AC ¶ 1041 ("[T]he Taliban asked MTN to 'pay monthly protection fees

in each province, or face having their transmission towers attacked.'" (citations omitted)). And Plaintiffs cannot claim that MTN Group was "one in spirit" with the Taliban fighters extorting it (fifth factor), *Halberstam*, 705 F.2d at 484, when they concede that MTN Group's aim was to protect its people and operations, not to target U.S. forces. *E.g.*, AC ¶ 1041 ("MTN made payments to local commanders in exchange for protection."); *id.* ¶ 1044 ("[O]ther phone companies," including MTN Afghanistan, "[were] bowing to . . . Taliban demands to pay protection money to avoid the destruction of their transmission masts." (citation omitted)).

### b) Plaintiffs' RICO-based theory also is inconsistent with the plain language of the ATA.

Plaintiffs' Afghanistan claim also fails because it is based on a fundamentally flawed (and convoluted) legal theory. To state any aiding-and-abetting claim under the ATA, a plaintiff must allege that he was injured by an "*act* of international terrorism." 18 U.S.C. § 2333(d)(2) (emphasis added). And the ATA defines act of "international terrorism" as an act that is violent or dangerous to human life and would violate U.S. criminal law if committed within the jurisdiction of the United States. *Id.* § 2331(1). Count 1 is a typical (though unavailing) aiding-and-abetting claim, in which Plaintiffs allege that the "act[s] of international terrorism," i.e., the predicate violent crimes, that injured them were the attacks themselves. *See* AC ¶¶ 1598–1599. In Count 3, by contrast, the Afghanistan Plaintiffs contend that the "act of international terrorism" that caused their injuries was not the 2019 attacks, but a pattern of racketeering that comprised numerous crimes over many years, which Plaintiffs lump together under the label "IRGC-Taliban-al-Qaeda Campaign" and claim violated RICO. *See id.* ¶¶ 1622–1631.

Plaintiffs use this gambit to try to bypass the ATA's FTO requirement, since the Taliban is not an FTO. Unable to allege that al-Qaeda—which is an FTO—"committed, planned, or authorized" both attacks, 18 U.S.C. § 2333(d)(2), Plaintiffs allege that al-Qaeda "planned" or

"authorized" a multiyear enterprise, of which the two attacks at issue were a part. AC ¶ 1630.

This attempted workaround fails, because a multi-year RICO "campaign"—involving countless crimes committed at different times, in different provinces, by different actors—does not constitute a singular "act" of international terrorism. *See Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 212 (D.D.C. 2020), *rev'd on other grounds*, 22 F.4th 204; *Cabrera*, 2021 WL 3508091, at *26. It would be unnatural to read the language in § 2333(d)(2) to mean that the "act" that caused each Afghanistan Plaintiff's injury was not the attack in which they were injured, but a collection of hundreds of attacks and crimes spanning several years and provinces. *See* AC ¶ 1624 (describing the "IRGC-Taliban-al-Qaeda Campaign" as "a campaign to expel Americans from Afghanistan through crime and anti-American violence" which ran "[f]rom at least 2007 through 2016"). The Afghanistan Plaintiffs' RICO-based claim thus fails for the additional reason that they fail to plead that they were injured by an "act of international terrorism."

### III. All of Plaintiffs' ATA Claims Fail Because the Amended Complaint Does Not Adequately Plead that a Designated FTO Committed, Planned, or Authorized the Attacks.

The Amended Complaint also fails to meet another prerequisite for pleading any secondary liability claim under the ATA: a defendant cannot be held liable for aiding and abetting, or conspiring with, the person who committed an act of international terrorism unless that act was "committed, planned, or authorized" by a designated FTO. 18 U.S.C. § 2333(d)(2).

Starting with Iraq, Jaysh al-Mahdi—which the Amended Complaint portrays as a key participant in the Iraq attacks—is not an FTO, and the United States did not designate other alleged participants, such as AAH or the IRGC, until after the attacks.[39] So to skirt the FTO requirement

---

[39] U.S. Dep't of State, *Foreign Terrorist Organizations* (Ex. U), http://tiny.cc/1cxquz (last visited Apr. 25, 2022) (listing designation dates for all FTOs).

with respect to the Iraq attacks, Plaintiffs again resort to pleading artifice. The Amended Complaint conflates FTOs and non-FTOs under the single label "Joint Cells," alleging that Jaysh al-Mahdi (not an FTO), AAH (FTO since 2020), Kataib Hezbollah (FTO since 2009), Hezbollah (FTO since 1997), and the Qods Force (FTO since 2019) jointly conducted each attack in Iraq in 2011 and 2016, and that each attack was "planned and authorized by Hezbollah." AC ¶ 287.

But the sources upon which Plaintiffs rely, including decisions from federal courts, undermine that gambit. Rather than describing these militias as joining in cohesive "Joint Cells," they portray them as "rival[s]" that "functioned independently from" each other. *Fritz*, 320 F. Supp. 3d at 62. And while Plaintiffs assert that Hezbollah controlled these Joint Cells, their sources say that Hezbollah created some of the militias (like AAH) because others (like Jaysh-al-Mahdi) were "uncontrollable."[40] *See supra* p. 8. These contradictions, and Plaintiffs' attempt to flout the U.S. government's decision to designate only some of these groups as FTOs, undercut the attempt to plead that the "Joint Cell" attacks were committed, planned, or authorized by a designated FTO.

Plaintiffs' Afghanistan claims face much the same problem: the Taliban is not an FTO. So Plaintiffs resort to more artifice, conflating FTOs and non-FTOs under the label of a "terrorist alliance, known as the 'Syndicate,'" AC ¶ 1553, alleging that a "network" of operatives from the Taliban (not an FTO), the Haqqani Network (FTO since 2012), Lashkar-e-Taiba (FTO since 2001), and al-Qaeda (FTO since 1999) committed the January 14, 2019 suicide bomb attack in Kabul, *id.* ¶¶ 435–442, 1556–1557, and that the Taliban "*and its Haqqani Network*" conducted the July 29, 2019 attack, *id.* ¶ 1569 (emphasis added). But once again, Plaintiffs' attempts to label the Taliban, Haqqani Network, and al-Qaeda as "inseparable," *id.* ¶ 374, and the Haqqani Network as "part of the Taliban," *id*. ¶ 422, would contradict the U.S. Government's considered designation decisions.

---

[40] Michael Knights, *The Evolution of Iran's Special Groups in Iran*, CTC Sentinel (Nov. 2010) (Ex. E), http://tiny.cc/9dinuz (last visited Apr. 25, 2022), *cited at* AC ¶ 195 n.22.

**IV.    The ATA's Act-of-War Limitation Bars Plaintiffs' ATA Claims Related to the 2011 and 2016 Iraq Attacks.**

To close some of the distance between MTN Group's minority stake in an Iranian phone network and attacks in Iraq, Plaintiffs strain to collapse the IRGC into the Joint Cells, alleging that the 2011 and 2016 attacks in Iraq were committed jointly by operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force. *See, e.g.*, AC ¶¶ 1393–1404, 1406 n.600. In trying to shorten that gap, though, Plaintiffs created a problem: because Plaintiffs allege the Qods Force participated in these attacks, *see supra* p. 8, the ATA's act-of-war limitation bars any claim arising from these attacks.

The ATA provides that "[n]o action shall be maintained . . . for injury or loss by reason of an act of war," 18 U.S.C. §§ 2331(4), and defines "act of war" to mean "any act occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin," *id.* § 2336(a).

By alleging that the Qods Force participated in each Joint Cell attack, Plaintiffs plead that their injuries occurred "in the course of . . . armed conflict . . . between two or more nations." *Id.* § 2331(4). An "armed conflict" between nations is "any situation in which there is hostile action between the armed forces of two [states], regardless of the duration, intensity or scope of the fighting." U.S. Dep't of Defense, *Department of Defense Law of War Manual* § 3.4.2, at 82 (Dec. 13, 2016) (Ex. V), http://tiny.cc/0finuz. The Qods Force is a military special operations force that operates in parallel to Iran's regular armed forces. *See, e.g.*, *Treasury Designates Iranian Entities Tied to the IRGC* (describing the "IRGC" as the "military vanguard of Iran," "composed of five branches," including the "Qods Force special operations"); *supra* p. 7. And according to the Amended Complaint, Qods Force operatives took part in the Joint Cells and helped commit the 2011 and 2016 attacks against "American military forces and contractors" in Iraq, AC ¶¶ 183, to further Iran's "objective . . . to kill Americans in order to drive the U.S. out of Iraq," *id.* ¶ 320.

Thus, the Plaintiffs who were injured by the 2011 and 2016 attacks claim that they were injured in the course of attacks committed by the armed forces of one nation (Iran) against the armed forces of another (the United States). Under Plaintiffs' own theory, the ATA thus bars them from "maintain[ing]" this action with respect to the 2011 and 2016 Iraq attacks. 18 U.S.C. § 2336(a).

**V.      The Court Should Dismiss All Claims Against MTN Dubai Because the Amended Complaint Does Not Allege Any Conduct by MTN Dubai.**

"Federal Rule of Civil Procedure 8(a) requires that a complaint naming multiple defendants provide a factual basis to distinguish each defendant's conduct." *Herrera v. Navient Corp.*, 2020 WL 3960507, at *2 (E.D.N.Y. July 13, 2020). Though Plaintiffs amended their complaint to refer to "MTN Group and MTN Dubai" jointly, *see, e.g.*, AC ¶ 859, they also allege that MTN Dubai was merely "a shell company created for financial and tax purposes" with "no independent business operations," *id.* ¶ 918. By Plaintiffs' own allegations, then, none of the alleged conduct at issue was actually carried out by MTN Dubai. Because Plaintiffs do not allege any "particular actions" by MTN Dubai that could give rise to liability under the ATA, Plaintiffs fail to state any claim against MTN Dubai. *See Disability Rights N.Y. v. New York*, 2019 WL 2497907, at *23–24 (E.D.N.Y. June 14, 2019) (dismissing claims against two defendants because complaint did not "allege any particular actions" they took that gave rise to claims).

The Court should therefore dismiss all counts against MTN Dubai. In any event, even if Plaintiffs' allegations against MTN Group could be imputed to MTN Dubai, the reasons why Plaintiffs' ATA claims fail as to MTN Group also apply to MTN Dubai.

**CONCLUSION**

For the reasons stated above, the Court should dismiss the claims against Defendants MTN Group and MTN Dubai.

Dated: April 25, 2022                                    Respectfully submitted,


s/ *David M. Zionts*                                    s/ *Timothy P. Harkness*
David M. Zionts[*]                                      Timothy P. Harkness
Jordan Moran                                            Kimberly H. Zelnick
Michael Goudey[*]                                       Scott A. Eisman
Alexandra Widas[**]                                     Freshfields Bruckhaus Deringer US LLP
Covington & Burling LLP                                 601 Lexington Avenue, 31st Floor
One CityCenter                                          New York, New York 10022
850 Tenth Street N.W.                                   Telephone: (212) 277-4000
Washington, DC 20001                                    timothy.harkness@freshfields.com
Telephone: (202) 662-5987                               kimberly.zelnick@freshfields.com
Facsimile: (202) 778-5987                               scott.eisman@freshfields.com
dzionts@cov.com
jmoran@cov.com
mgoudey@cov.com
awidas@cov.com

Benjamin S. Haley[*]
Covington & Burling (Pty) Ltd.
Rosebank Link
173 Oxford Road, 7th Floor
Johannesburg 2196, South Africa
Telephone: +27 (11) 944-6914
bhaley@cov.com

                                                        *Counsel for Defendants MTN Group
                                                        Limited and MTN (Dubai) Limited*

---

[*] Admitted pro hac vice.

[**] Pro hac vice application forthcoming.