1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - X
 3
    STEPHANIE ZOBAY, et al.,    :
 4                                   21-CV-3503(CBA)
            Plaintiffs,          :
 5
         -against-              :    United States Courthouse
 6                                   Brooklyn, New York
    MTN GROUP LIMITED, et al., :
 7                                   November 7, 2022
            Defendants.         :    2:00 o'clock p.m.
 8
    - - - - - - - - - - - - - - X
 9

10              TRANSCRIPT OF ORAL ARGUMENT
          BEFORE THE HONORABLE CAROL BAGLEY AMON
11              UNITED STATES DISTRICT JUDGE.

12  APPEARANCES:

13  For the Plaintiffs:        SPARACINO PLLC
                               1920 L Street, N.W., Suite 835
14                             Washington, DC 20036

15                             BY: GEOFFREY P. EATON, ESQ.

16
    For Defendant MTN:         FRESHFIELDS BRUCKHAUS
17                                DERINGER US LLP
                               601 Lexington Avenue
18                             31st Floor
                               New York, NY 10022
19
                               BY: TIMOTHY P. HARKNESS, ESQ.
20                                 DAVID MEIR ZIONTS, ESQ.

21
    For Defendant ZTE:         BLANK ROME LLP
22                             130 N 18th Street
                               One Logan Square
23                             Philadelphia, PA 19103

24                             BY:  FRANK DANTE, ESQ.
                                   SERENA S. GOPAL, ESQ.
25                                 MELISSA MURPHY, ESQ.
```

2

```
1   APPEARANCES:   (Continued)

2   For Defendant Huawei
    And Futurewei:              Jones Day
3                               555 California Street
                                San Francisco, CA 94104
4
                                BY:   JAMES E. GAUCH, ESQ.
5

6   Court Reporter:             Charleane M. Heading
                                225 Cadman Plaza East
7                               Brooklyn, New York
                                (718) 613-2643
8
    Proceedings recorded by mechanical stenography, transcript
9   produced by computer-aided transcription.

10

11                          *     *     *     *

12

13            THE CLERK:  Good afternoon, everyone.  This is on

14  for oral argument in Zobay versus MTN, 21-CV-3503.

15            Can the parties who are arguing please state their

16  appearances for the record beginning with MTN.

17            MR. HARKNESS:  Timothy P. Harkness, Freshfields

18  Bruckhaus Deringer US LLP, for MTN Group and MTN Dubai.

19            MR. ZIONTS:  David Zionts from Covington & Burling

20  for MTN Group and MTN Dubai.

21            MR. DANTE:  Frank Dante from Blank Rome on behalf of

22  ZTE (USA) and ZTE (TX).

23            MS. MURPHY:  Melissa Murphy from Blank Rome on

24  behalf of Blank Rome on behalf of ZTE (USA) and ZTE (TX).

25            MR. GAUCH:  James Gauch from Jones Day on behalf of
```

1  Huawei Technologies USA, Huawei Device USA and Futurewei.

2            THE COURT:  All right.

3            MR. EATON:  Geoffrey Eaton, Your Honor, from

4  Sparacino PLLC for all plaintiffs.

5            THE COURT:  All right.  Good afternoon.  Everyone

6  can be seated.

7            I'll hear first in the order that the defendants are

8  listed in the complaint so I'll hear first the motion made on

9  behalf of MTN.

10            Mr. Harkness, are you going to begin?

11            MR. HARKNESS:  Thank you, Your Honor.

12            THE COURT:  Actually, it's probably better that you

13  be seated because of the microphones here including my

14  microphone which wasn't on.  I think the microphone is at the

15  table.

16            MR. HARKNESS:  Very well, Your Honor.

17            THE COURT:  Just pull that over to you because I

18  think it's just easier to be heard.

19            MR. HARKNESS:  Absolutely.  Happy to do it this way.

20  It will take me a little getting used to.

21            We represent both MTN Group and MTN Dubai and

22  because there are no factual allegations against MTN Dubai, we

23  will focus our comments on MTN Group.  I will be handling the

24  jurisdictional parts of our motion.

25            THE COURT:  Let me just ask you to begin with,

4

1    Mr. Harkness, I see that you separated it between the

2    jurisdictional and the 12(b)(6), but aren't the arguments

3    essentially the same under both; your contention that there is

4    no personal jurisdiction is the same reason you say that there

5    is no aiding and abetting jurisdiction under concepts of

6    general awareness?

7              MR. HARKNESS:  I think, fundamentally, there is a

8    lot of overlap, Your Honor, there are, and that goes to the

9    heart of the point we've made particularly in our reply brief,

10   that when you look at the entirety of the complaint, not just

11   the words that the plaintiffs have written but everything that

12   they've attached, basically what we have is a series of

13   allegations that mean this court does not have personal

14   jurisdiction, there is no general awareness and there was no

15   conspiracy.  So all of the jurisdictional issues really get

16   resolved when you look at it that way and we would

17   respectfully submit that that's exactly what the Court should

18   do.

19             When you turn to the targeting aspect of their

20   jurisdictional argument, I think the point you just made is or

21   you suggested really becomes clear.  There, the law provides,

22   does provide the idea that one could have jurisdiction in a

23   U.S. court if there's targeting, but that's not what we have

24   here.  What we have is a South African telecommunications

25   company allegedly entering into a contract in Iran to provide

5

1    mobile phone service to Iranians in Iran.

2         We actually have -- the plaintiffs have put as

3    Exhibit A the contract that I'm talking about.  Now, they say

4    this is a contract for terrorism and we respectfully submit

5    that the actual facts they pled in their complaint and in

6    their attachments show otherwise.

7         When you look at Exhibit A, what you have here is

8    not one single reference to terrorism, not one.

9         THE COURT:  Well, there's references to "security."

10        MR. HARKNESS:  Yes, Your Honor, there are references

11   to "security," and when you read the complaint and the

12   Turkcell complaint that they refer to in their complaint and

13   we've attached as Exhibit B to the Eisman declaration, we see

14   what that word means.

15        First of all, this -- and it's paragraph 8 that you

16   cited to and that talks about security and political

17   cooperation in South Africa.  And when you read the complaint,

18   the Turkcell complaint and all the documents attached, what is

19   this talking about?  It's talking about the alleged

20   facilitation of government-to-government communications

21   between the Iranian government and the South African

22   government.

23        What are we talking about specifically?  We're

24   talking about radar installations on a coast.  We're talking

25   about helicopters.  We're not talking about terrorism.  And

6

1    that's really where the plaintiffs' complaint falls down and

2    that is the gravamen of their entire complaint.  They have

3    this front allegation.  When you look at the actual facts

4    being pled and the materials cited in our reply brief that

5    they cited themselves, what we see is their allegations are

6    either flatly contradicted by the sources they cite --

7            THE COURT:  Are you now talking about the

8    connections of the shareholders to terrorism?  Is that what

9    you're referring to?

10           MR. HARKNESS:  Yes, Your Honor, because the

11   allegation, the allegation is you've got MTN Group entering

12   into a joint venture called Irancell and Irancell is alleged

13   to have provided cell phone service to Iranians and now

14   they're alleging it's an IRGC front because it's affiliated

15   with the 51 percent shareholders.  MTN does not have a

16   controlling stake in Irancell.

17           THE COURT:  Well, I know, but if you join a group

18   that is, the shareholders are connected to terrorist

19   organizations, what difference does it make whether you have

20   the complete control or not?

21           MR. HARKNESS:  Well, that's the problem with the

22   complaint, Your Honor, is that they don't allege that these

23   institutions are actually alleged or were known to be alleged

24   to be part of a terrorist front in 2005.

25           The Bonyad Mostazafan and IEI, the two other

7

1    shareholders, are alleged to have, when you look at the

2    materials cited in the complaint, are actually alleged to have

3    all sorts of dealings, but there's nothing that we've seen in

4    the materials.  Even the Newsday articles that they cite don't

5    link either entity to the IRGC or to terrorism.

6             THE COURT:  Doesn't the Newsday article do that?

7    And I think there's another think tank publication and

8    scholarly paper.  Don't they at least link one of the entities

9    to the IRGC?

10            MR. HARKNESS:  Well, I think the Newsday articles,

11   Your Honor, are something that we would ask the Court to read

12   carefully because when you do, it's hard to see what exactly

13   the link is.  There's no doubt that it's older and there's no

14   doubt that there's some reference to Iran, but whether there's

15   a link to the IRGC is debatable and there's absolutely no

16   suggestion that the Bonyad Mostazafan is involved in terrorism

17   in that Newsday article.  And one scholarly paper with an

18   obscure reference in it is hardly evidence sufficient to show

19   general awareness or to provide this court with personal

20   jurisdiction.

21            At the end of the day, what matters are really two

22   things.  One is was there aiming, was there purposeful aiming

23   by MTN into the United States.  The answer is there are no

24   allegations that there really was.

25            When you look at the Newsday article, that's -- if

8

1    that's all they have, or even if they had that, let's just

2    suppose for the hypothetical, MTN had that -- I don't know if

3    anyone at MTN was reading Newsday in 1995.

4            THE COURT:  Well, for the purposes of the pleading,

5    they don't actually have to establish at the pleading stage

6    that the defendants knew or should have known.  They just have

7    to prove that the sources are out there.  They don't have to

8    prove at the pleading stage that the defendants read the

9    articles.

10           MR. HARKNESS:  That's correct, Your Honor, however,

11   they do have to show that when you look at Honickman and some

12   of the other cases that are talking about media reports, even

13   this court's decision in Bartlett, it's not whether or not the

14   entity read the articles.  It's, rather, the articles are

15   sufficient in scope and reach to show some general awareness,

16   that general awareness would be a plausible allegation and

17   here, we submit it's not.

18           A vague reference to the Bonyad in a Newsday article

19   is hardly the kind of thing that you cited, you yourself cited

20   in the Bartlett decision, it is more like what the court cited

21   as insufficient in Honickman.  And my point really here is

22   even if that information was known to MTN, that is not a basis

23   for inferring reasonably that there's a plausible allegation

24   of MTN targeting Americans or the United States with terrorism

25   because at the end of the day, that's what's required.  For

9

1    the targeting theory to work, you need to have something

2    that's like the Mwani case in the D.C. Circuit which is a

3    series of terrorist attacks, one of them aimed at the Kenyan

4    Embassy.

5         THE COURT:  Well, the terrorist attacks here were

6    aimed at killing American service people and the other

7    argument is having the U.S. withdraw from the Middle East.

8    That's what's alleged here.

9         MR. HARKNESS:  Well, those are --

10        THE COURT:  And those can be related to the

11   jurisdiction.

12        MR. HARKNESS:  If there were plausible factual

13   allegations that linked MTN to intending to have those kinds

14   of attacks, then I would agree with you, but that's not what

15   we have here.

16        THE COURT:  Do they have to be shown to have

17   intended those attacks to have happened or it had just been

18   reasonably foreseeable that those types of attacks occurred

19   and then had the result of --

20        MR. HARKNESS:  Well, foreseeability is not enough

21   and that's the Second Circuit's decision in In Re: Terrorist

22   Attacks.  There, even violence against the US would have been

23   a reasonably foreseeable consequence of the donations.  There,

24   you have four principals who gave money to a charity that was

25   allegedly linked to al-Qaeda and there the Court held that

10

1  even if you have violence as a foreseeable consequence, that's

2  not enough for jurisdiction.

3          Plaintiff must establish that MTN Group and MTN

4  Dubai expressly aimed tortious acts at the plaintiffs.  That's

5  what's required and that's what's missing in this complaint.

6          THE COURT:  All right.

7          MR. HARKNESS:  And just a word on Afghanistan,

8  Your Honor.  The allegations that relate to Afghanistan have

9  been considered by a District Court and a Magistrate Judge in

10 Washington, D.C., and we would respectfully submit that this

11 court should follow the same reasoning as the Cabrera court

12 did in that case.

13         THE COURT:  So the bribe, the $400,000 bribe, for

14 instance, isn't sufficient to show purposeful availment?

15         MR. HARKNESS:  No, Your Honor, it's not.  The

16 $400,000 bribe that's alleged was allegedly a U.S. dollar

17 payment.

18         THE COURT:  Well, it went through the banking system

19 here, correct?

20         MR. HARKNESS:  Here's what's interesting,

21 Your Honor.  If you look at footnote eight of their brief,

22 they actually specifically disclaim the use of correspondent

23 banking accounts.  Once you do that, Licci and its progeny

24 really don't apply.

25         The other issue with the $400,000 allegation is that

11

1   it was allegedly to a Deputy Minister of the Iranian

2   government, not the IRGC, not a front, an actual person,

3   they've given you his name, and it's allegedly two years

4   before the first attack here for the purposes of securing the

5   license to provide telecommunications services to Iranians in

6   Iran.

7          So there's no related link between that $400,000

8   payment and any single attack here, any of the attacks or all

9   of them.  So, no, it's not purposeful availment.  I think when

10  you look at Schwab and some of the other cases, the other

11  purposeful availment allegations that they have particularly

12  with regard to agency, alleged agents fall away.  We don't

13  have direction or control.  All we have is a series of on

14  information and belief allegations related to this Exit40 that

15  purportedly is either owned by Hezbollah or is controlled,

16  depending on which part of it you believe, or controlled by a

17  supplier to Irancell.  It's not terribly clear.

18         What is clear is that all they're alleging is that

19  somebody has created an agency relationship with a purported

20  agent, we're not exactly sure, who came to the United States

21  to do something, we're not exactly sure what.  And that's not

22  enough to plead agency jurisdiction.

23         THE COURT:  Do you dispute that they have shown at

24  least links between the IRGC and Hezbollah and the terrorist

25  proxy groups?  You're not disputing that they've made that

12

1  link, are you?

2          MR. HARKNESS:  I think they've alleged that,

3  Your Honor, and what they haven't alleged is any tie between

4  MTN Group and a so-called IRGC front and absolutely no

5  connection between anything MTN's done and terrorism and,

6  fundamentally, that's what's required.

7          THE COURT:  Well, is it that they didn't know they

8  were fronts or are you saying they're not fronts?

9          MR. HARKNESS:  Well, Your Honor, we have -- this is

10  a 12(b)(2) and 12(b)(6) motion.

11          THE COURT:  Right.

12          MR. HARKNESS:  We've been disputing the fundamental

13  allegations in this case for ten years.  Turkcell filed its

14  claim over ten years ago.  So we're assuming as true the facts

15  in this complaint for the purposes of this motion, as we must,

16  but we're doing so in looking at the materials they themselves

17  have appended to the complaint.  When we do that, the actual

18  facts alleged, not the conclusions but the actual facts, don't

19  support the inferences they would have this court draw.

20          THE COURT:  The inferences that the shareholders are

21  associated with terrorist groups?

22          MR. HARKNESS:  That's right, Your Honor.  When you

23  look at the materials that they cited in their complaint, you

24  don't have -- IRGC wasn't made an FTO until, I believe, 2019.

25          I mean, the kinds of pieces of evidence that you

13

1    cited in <u>Bartlett</u> don't exist here, and not that we're making

2    an evidentiary showing or that they're making an evidentiary

3    showing.  The question really is looking at all of the

4    allegations before you, including the materials that they

5    themselves have put before you as the allegations in their

6    complaint, they don't add up to the kind of showing that

7    there's a, that these are fronts at all.

8            THE COURT:  All right.  Does your co-counsel have

9    anything to add or have all the arguments just been made by

10   Mr. Harkness?

11           MR. ZIONTS:  Your Honor, I won't duplicate what

12   Mr. Harkness said and I agree that, fundamentally, these

13   arguments start at the same place.  I do think, you know, once

14   you start with that premise, there is a sort of doctrinal

15   overlay that you get into with the Second Circuit cases, in

16   <u>Honickman</u> and <u>Kaplan</u>, and I'll just make a couple of points

17   about general awareness and then a point about substantial

18   assistance which I don't think has been covered by the

19   discussion to this point.

20           First, you know, we've heard about this question of

21   whether they've alleged that these entities were known IRGC

22   fronts.  We don't think that's alleged but <u>Honickman</u> and

23   <u>Kaplan</u> are quite clear that you need more than that.

24           IRGC, plaintiffs themselves allege, their sources

25   allege that the IRGC was deeply intertwined throughout the

14

1    Iranian economy, it is doing a lot of things in Iran.  So the

2    question is can you tie these shareholders specifically to the

3    violent terrorist activities.

4              So, for example, when you have this IEI -- excuse

5    me -- American Enterprise Institute's scholarly publication,

6    you know, buried within it, there's reference to a Guards

7    subsidiary.  You know, I don't think that's enough to even

8    conclude that the general public would have awareness that

9    this has a relationship with the IRGC.  You need a lot more

10   than that.  You need a relationship with the IRGC's violent

11   terrorist activities which I don't think you have.

12             Then just a last point on that.  The other thing

13   that Honickman refers to is this contrast between -- in that

14   case, there were, quote, "limited public sources" as opposed

15   to the detailed numerous sources that sufficed in Kaplan.

16             So what we absolutely don't have here are U.S.

17   Government designations putting anyone on notice that these

18   are entities that are intertwined with violent terrorist

19   activities.  Now, I'm not saying it has to be a government

20   designation, but here you actually have the U.S. Government

21   saying these entities are actually affiliated with other parts

22   of the Iranian government, not with the IRGC.

23             So when you don't have that --

24             THE COURT:  Where are you getting that from, that

25   they're actually associated with other legitimate parts of the

1   government?

2          MR. ZIONTS:  Your Honor, the 2008 designation of

3   IEI, this is Exhibit F to the motion to dismiss, designates

4   the IEI because it is owned by the Ministry of Defense.  No

5   reference to the IRGC.  Exhibit C to the motion is the 2020

6   designation of Bonyad Mostazafan because it's controlled by

7   the Supreme Leader's office.  There's no reference to it being

8   controlled by the IRGC.

9          I think it's important to remember that this is a

10  time when the U.S. Government, the Treasury Department and the

11  State Department are really actively monitoring and seized of

12  the situation of Iran and the IRGC.

13         At paragraph 253 of the complaint, plaintiffs cited

14  a February 2010 Treasury announcement where they do designate

15  a different entity.  No allegation to this one, the Khatam

16  Al-Anbiya, no allegation that that is related to Irancell.

17  There, that is what shows you what it looks like when the U.S.

18  Government is saying, you know, this is tied to the IRGC.

19  It's actually quite notable when you read Treasury's

20  announcement:  "Today's action exposing Khatam al-Anbiya's

21  subsidiaries will help firms worldwide avoid business that

22  ultimately benefits the IRGC and its dangerous activities."

23         So I think the obvious corollary to that is that

24  Bonyad Mostazafan and IEI were not exposed in that way and

25  firms worldwide were not informed that dealing with them meant

1  benefiting the IRGC.

2         Your Honor, unless you have further questions about

3  general awareness, if I can make a quick point about the

4  substantial assistance?

5         THE COURT:  Okay.  Sure.

6         MR. ZIONTS:  All I would say is we've talked about

7  in the briefing the Halberstam factors, but really there's a

8  cross-cutting issue there which is that the assistance -- even

9  if you did assume that there were ties, alleged ties here, the

10  assistance allegedly flowed through several layers and at each

11  step, it flowed through entities with significant

12  non-terrorist activities.

13         So even if you accept that there was a linkage

14  between the shareholders with the IRGC, I don't think anyone's

15  disputing based on the allegations that, one, Irancell had

16  plentiful non-terrorist activities.  It was running a popular

17  mobile phone network.  Bonyad Mostazafan and IEI, again, even

18  if there was some link there, what is clearly pled in the

19  complaint is that Bonyad Mostazafan has a vast economic

20  empire, equal to more than 1 percent of the Iranian GDP.  IEI,

21  according to plaintiffs and their sources, produces consumer

22  products such as computers and phones.  And then one layer

23  down, the IRGC is not, according to the plaintiffs' complaint,

24  only in the business of terrorism.  It's deeply intertwined

25  throughout the Iranian economy.

1          So Your Honor made this point in <u>Bartlett</u>.  There

2     you have before you essentially a funnel for Hezbollah.  So

3     you had a designated SDGT that existed to get money for

4     Hezbollah's violent terrorist activities and, as the Court

5     noted, that's important to this question of substantial

6     assistance, whether the, quote, "assistance" is actually

7     getting to the terrorists and supporting terrorist attacks.

8          Here, you have a breakdown at every step of the way,

9     several steps.  You know, you have dealings with an entity

10    that has significant non-terrorist activities.

11         THE COURT:  All right.  Anything further?

12         MR. ZIONTS:  No, Your Honor.  Unless you have

13    questions about conspiracy, I'm happy to respond.

14         THE COURT:  No, I don't have any questions about

15    conspiracy.  Thank you.

16         Mr. Dante?

17         MR. DANTE:  Good afternoon, Your Honor.

18         On behalf of ZTE (USA) and ZTE (TX), those are two

19    American telecommunications companies that had no operations

20    in Afghanistan, no business dealings in Afghanistan, Iran or

21    anywhere in the Middle East.  They're primarily lumped

22    together with the parent company ZTE Corporation with

23    conclusory allegations that plaintiffs allege that they were

24    somehow involved or must have been involved in

25    ZTE Corporation's sanctions evading conduct.

18

1          There are no plausible allegations linking ZTE (USA)

2    and ZTE (TX) to that sanctions evading conduct.  In fact, the

3    document --

4          THE COURT:  What about the allegation that the

5    former general counsel of ZTE (USA) alleged that ZTE Corp.

6    asked for assistance in the sanction evasion scheme?

7          MR. DANTE:  Your Honor, if you read that allegation,

8    the former general counsel was asked for assistance and, and

9    refused to assist or cooperate and, in fact, blew the whistle

10   on ZTE Corp.  That shows that ZTE (USA) and ZTE (TX) were not

11   involved in any sanctions evading conduct.

12         That was fully investigated by the United States

13   Government, by the DOJ, by the U.S. Attorney.  There was a

14   grand jury investigation.  There was an indictment.  There was

15   a guilty plea.  The only entity that was ever indicted was

16   ZTE Corporation.  Even though ZTE (USA) was investigated, it

17   was never indicted, it never pled guilty and it was also not

18   implicated in any wrongdoing in the factual resume that went

19   along with that indictment.  It was not implicated in any of

20   the wrongdoing in the OFAC settlement agreement which they

21   heavily relied on.

22         You can parse through all of those documents which

23   are now a matter of public record and are attached to our

24   motion to dismiss and nowhere in those agreements is ZTE (USA)

25   or ZTE (TX) implicated in any way in any of the wrongdoing in

1   connection with the sanctions violation.

2            That is the sole basis that plaintiffs really use to

3   try to lump together ZTE (USA) and ZTE (TX) to ZTE

4   Corporation.  So we would submit that those are merely

5   conclusory allegations that are not supported with specific

6   facts and are actually contradicted by the documents that

7   plaintiffs rely on.

8            THE COURT:  Okay.  Thank you.

9            Counsel for Huawei?

10           MR. GAUCH:  Yes, Your Honor.

11           THE COURT:  Have I pronounced that correctly?

12           MR. GAUCH:  Yes, "Huawei."

13           So, Your Honor, if I can make two brief points.

14  There's certainly a lot of overlapping arguments and I don't

15  want to belabor either of these.

16           First, as you're no doubt aware, we represent the

17  Huawei defendants:  Futurewei, Huawei Technologies USA called

18  "Huawei USA" in the complaint, and Huawei Device USA which we

19  refer to as "Device."  All three of those entities are in the

20  United States.  Device and Huawei USA were focused on the U.S.

21  market on sales of infrastructure equipment and handsets

22  within the U.S.  They were not manufacturing for export.

23  Futurewei operates in Silicon Valley.  It's a tech research

24  center.

25           None of them are alleged to have any activities in

20

1  Iran, in Afghanistan, in Iraq.  We've raised that in our

2  motion.  The plaintiffs do not dispute that.  They are -- they

3  have absolutely no connection to the Middle East, let alone

4  the terrorism that the plaintiffs are basing a claim on here.

5          Second, if I can just make one brief point on the

6  merits on the general awareness standard.  You've already

7  heard from counsel for the other parties about the need to

8  show general awareness which, as Honickman has now clearly

9  stated, comes in two parts.

10          The first part is to demonstrate a connection which

11  you have already discussed with counsel between the, between

12  the defendants' customers and the terrorist groups in

13  question, but the second part, I think, is critically

14  important in this case which is to demonstrate an awareness

15  that the customers in this case, the three Iranian

16  telecommunications companies, were so closely intertwined with

17  the company's violent terrorist activities, that one can

18  reasonably infer that they're aware of their general role in

19  which the attacks were foreseeable.

20          You don't get to foreseeability under the Honickman

21  test unless you can show a close intertwining of the customers

22  with terrorist activities and there's absolutely nothing in

23  the complaints that show that any of these Iranian

24  telecommunications companies, Irancell, MCI or TCI, were

25  involved in terrorist activities.

1          The plaintiffs in their October 13th letter to the

2     Court asked the Court to draw comparisons to three cases:

3     <u>Atchley</u>, <u>Bartlett</u> and <u>Kaplan</u>.  In all three of those cases,

4     the facts were dramatically different.

5          In <u>Atchley</u>, the Ministry of Health was overrun by

6     terrorists.  The court found that it was obvious to anyone who

7     was there -- and the defendants were there entering into

8     contracts with the Ministry of Health -- it was obvious they

9     were controlled by terrorists and the Ministry of Health was

10    using ambulances to ferry terrorists around Baghdad.  They

11    were using hospitals as bases of terrorist operations.  They

12    were completely engaged in the terrorist enterprise.

13         In <u>Kaplan</u>, the defendant bank actually, when it

14    received reports of one of its customers being tied in with

15    terror, they disputed that, they dismissed it as Israeli

16    propaganda and they doubled down on the relationship.

17         As Your Honor knows, in <u>Bartlett</u>, there were, the

18    charities at issue there that were the bank's customers were

19    fully immersed in terrorism to the point where the donation

20    forms that were attached to the complaint in that case

21    actually allowed donors to choose whether they wanted to pay

22    for rockets or fund fighters.

23         All three of those cases had dramatically different

24    connections between the customers at issue and here.

25         Here, although the plaintiffs argue that they

1  haven't pled that the Iranian telecommunications companies had

2  legitimate functions, they have, in fact, pled that Irancell

3  and MCI are the two largest mobile providers in Iran, that TCI

4  has a monopoly on land lines within the country and is

5  obviously providing telecommunications services to the entire

6  country.  Those are legitimate, much like ARB in <u>Siegel</u>.

7          THE COURT:  But there's also allegations that the

8  money that these companies raised was funneled towards the

9  terrorist organizations as well as the equipment they

10 procured.

11         MR. GAUCH:  Well, they certainly argued -- that's

12 the thrust of their argument, is that because the money

13 that -- because these telecommunications companies might have

14 been, some money might have been flowing to terrorist

15 organizations, that that's enough, but that's not enough under

16 the Second Circuit's cases.

17         THE COURT:  Well, do they say might have been or do

18 they allege that it was?

19         MR. GAUCH:  No.  They allege that hundreds of

20 millions of dollars flowed from these telecommunications

21 companies to the IRGC and then somehow flowed to various

22 terrorist organizations, but that is no different than in

23 cases that the Second Circuit has dealt with where they, where

24 they've said that they know full well that the money, that

25 some of the money -- the conclusory allegation is that some of

1  the money might have been flowing to terrorists, but you need

2  much more than that, than the fact that --

3       THE COURT:  Well, what do they need?  Facts to

4  support -- are you saying that there needs to be some factual

5  support for the statement that the money was going to the

6  terrorist organizations?  What's missing?

7       They allege that millions of dollars from these

8  companies or these entities went to fund terrorist attacks,

9  terrorist organizations.

10       MR. GAUCH:  Yes.  They make a conclusory allegation

11  that millions of dollars were flowing from these organizations

12  to terrorists.  They have nothing underneath that, nothing to

13  support the inference that the money was actually flowing.

14       They don't have to show, as Honickman said, they

15  don't have to show the actual receipt by terrorists of the

16  funds but they have to show facts, they have to have factual

17  allegations that permit a reasonable inference that the

18  defendant recognized that money was flowing.  That's in

19  Honickman.

20       They haven't done that here.  They haven't provided

21  this court with allegations from which the Court can infer

22  that the defendants knew that when they were dealing with

23  these legitimate Iranian telecommunications entities, that

24  some of the money would be flowing to terrorism.

25       THE COURT:  Are you saying though -- I mean, I think

24

1  they're two different things.  One thing is the knowledge of

2  the defendants that this money was flowing, but I understood

3  you to be disputing that it was, they were only conclusory

4  allegations that the money was, in fact, flowing.

5       Are you disputing that the allegations are -- are

6  you saying that the allegations are insufficient to show that

7  money actually did flow to the terrorists or is your argument

8  that the allegations are insufficient to show your clients

9  knew this was happening?

10       MR. GAUCH:  So I'm saying that the money, the

11  allegations that the money was flowing to terrorists are

12  conclusory.  They don't show how.  They don't show why.  They

13  don't connect any of the dots.  They don't provide detail that

14  plaintiffs in earlier cases have, to show the flow.

15       The point I was trying to emphasize was within the

16  context of the general awareness factor.  What they have to

17  show is a connection between these entities and terrorist

18  organizations such that the Court can determine that they were

19  generally aware that they were assuming a role in terrorist

20  activities, not simply that they were working with legitimate

21  enterprises in the course of which some money might have

22  flowed to terrorism.

23       Look at Rothstein.  That was a case where the money

24  was going directly to the government of Iran.  The Second

25  Circuit said, yes, the fact that it was going to the

25

1    government of Iran makes it possible that some of the money

2    was flowing to terrorists, I think the court said more likely

3    that it was going to terrorism, but that wasn't enough because

4    the government of Iran also has many legitimate functions.

5            The courts have consistently made a distinction

6    between customers that are fully dedicated to terrorism, as

7    the charities in Bartlett, the charities in Kaplan, as

8    contrasted to customers who have legitimate activities like

9    the government of Iran in Rothstein, like ARB in Siegel.

10   That's an important line because you're trying to figure out

11   what the defendant knew about its work with that entity.

12           You simply can't draw an inference from working with

13   an Iranian telecommunications company that you are, that you

14   knew you were taking on a role in a terrorist enterprise when

15   the plaintiffs haven't alleged that those Iranian

16   telecommunications companies were engaged in any way in the

17   terrorist enterprise in dramatic contrast actually to Kaplan

18   and Bartlett.

19           THE COURT:  Thank you.

20           Mr. Eaton?

21           MR. EATON:  Thank you, Your Honor.  Is this working?

22           THE COURT:  Is the little green light on?

23           MR. EATON:  It is.

24           Your Honor, that's a lot.  Because most of that was

25   about merits, let me start there and I will work back to

1    personal jurisdiction and I want to start, Your Honor, with

2    this question of the IRGC.

3              Your Honor, the IRGC is a terrorist organization.

4    It was founded as such.  It operates as such.  Everything that

5    it does is done in the service of what we have alleged is its

6    constitutional duty to attack and kill Americans.

7              It is -- when it was finally designated an FTO in

8    2019, the U.S. Government said the IRGC's commitment to

9    terrorism is "foundational and institutional," and it noted

10   that the IRGC began killing American citizens in 1983 and has

11   killed more American citizens than any terrorist group on

12   earth save al-Qaeda.

13             It is true that the IRGC is engaged in the

14   commercial marketplace in various places and we've alleged

15   extensively one of the reasons that they did that.  It got

16   engaged in the telecommunications market specifically because

17   it was losing the fighting in Iraq.

18             They were at a severe technological disadvantage

19   relative to the United States and coalition militaries.  They

20   needed to access U.S. telecom equipment to allow themselves to

21   compete with the Americans.  So they got into that business

22   precisely so that they could partner with foreign companies

23   who had access to American goods that the Iranians did not

24   have access to.  That is the genesis of this case, Your Honor.

25   That's how the IRGC became connected with these defendants.

1          So I think it doesn't much matter, Your Honor, that

2    the -- in fact, I think it doesn't matter at all that the IRGC

3    sometimes does things other than kill people.  What matters is

4    that it is, in its essence, a terrorist organization and the

5    legitimate things, the purportedly legitimate things it does,

6    they're really just commercial things.  I don't want to

7    conflate commercial and legitimate.  Right?

8          This is an organization which by directive of the

9    Iranian government, profits that are sourced from

10   IRGC-controlled companies have to be routed out to the IRGC's

11   broader operations -- I think that's in paragraph 954 of our

12   complaint -- which means every dollar that TCI and Irancell

13   earns, that profit flows through to other parts of the IRGC.

14   It would be wildly implausible to suggest that none of that

15   money goes toward the IRGC's primary directive for its

16   existence which is to kill American citizens.

17         I should also note, Your Honor, that two of the

18   three constituent parts of IRGC were already designated, one

19   as an FTO and one as SDGT in 2007, four years before the first

20   attack at issue here.

21         THE COURT:  Which entities are those that you're

22   referring to?

23         MR. EATON:  Hezbollah is an FTO since 1997.

24   Qods Force is a SDGT since 2007.

25         THE COURT:  You're saying those are parts of IRGC?

28

1          MR. EATON:  They are definitely parts of IRGC,

2     Your Honor.  I don't think that there's any dispute that

3     Qods Force, it is part of the external security apparatus of

4     the IRGC.  It shares the same name.  Hezbollah is a Lebanese

5     outreach of the IRGC founded by the IRGC, trained by the IRGC,

6     supplied by the IRGC to the tune of several hundred million

7     dollars every year.

8               They argue, I guess, that they're not, but that's

9     what we've alleged, Your Honor, and we will put witnesses on

10    who will say that Hezbollah is a constituent part of the IRGC.

11         THE COURT:  I don't think that's the principal

12    argument.  I think the principal argument that defendants are

13    making is the inadequacy of the complaint in establishing that

14    the Irancell and its stockholders or shareholders were, in

15    fact, part of the IRGC or that that was something that they

16    should have known or understood.

17         MR. EATON:  Sure, Your Honor.  So let's talk about

18    general awareness a little bit.  I think the general awareness

19    case actually differs a little bit by defendant.  I think MTN

20    is a very different case than the other two.  Most of the

21    briefing did focus on sort of publication based awareness.

22         THE COURT:  Right.

23         MR. EATON:  But for our friends at MTN, the general

24    awareness for them, the indicia, the circumstances of their

25    engagement with the Iranian shareholders are themselves

1   sufficient to put them on notice that, I think, as <u>Halberstam</u>

2   said, something untoward was afoot and that it had access to

3   terrorism.

4            For example, Your Honor, we cite an MTN executive

5   who said that the MTN knew at the time it got into business

6   with the Iranian shareholders that they were, quote, "violent

7   killers."

8            THE COURT:  Where is that allegation?

9            MR. EATON:  That's at 954 according to my notes.  I

10  said 954.  I think the one I said earlier, Your Honor, the

11  directive requiring the flowthrough to the IRGC's broader

12  operations is actually at 839.  So I apologize.

13           THE COURT:  Well, there's so many paragraphs here.

14           MR. EATON:  I understand, Your Honor, having spent

15  the last month grappling with them.  It presents some

16  difficulties but this is a very complicated case and as you'll

17  have seen, Your Honor, the defendants have challenged every

18  possible aspect of it.

19           THE COURT:  Which, of course --

20           MR. EATON:  So it's incumbent upon us to be detailed

21  and I apologize for the length.

22           So, to return, you know, there's the security

23  agreement.  Now, we should talk about this because this is an

24  extraordinary document, this 2005, two page, two and a half

25  page document, where the president of MTN Group signed an

1    agreement with Iranian shareholders who were represented, who

2    were Bonyad and IEI we now know -- and I'll talk in a second

3    about those organizations and their connections to

4    terrorism -- agreeing to provide security and defensive

5    cooperation.  That's a very strange thing for --

6              THE COURT:  They say that that related specifically

7    to the South African company providing some material or

8    equipment.

9              MR. EATON:  Well, I don't think that helps them at

10   all, Your Honor.  For one thing, the agreement doesn't say

11   that anywhere so this is the pleading stage.  If we're

12   interpreting an agreement, we are entitled to favorable

13   inferences.

14             We've made an extensive case about what this

15   agreement means.  Something like 25 paragraphs of the

16   complaint are dedicated to the proposition that "security" has

17   a specific meaning in this circumstance, it refers to

18   terrorism, and the defendant should have known that.

19             The bit about South Africa, regardless of what it

20   means -- so the first point is this doesn't say anything about

21   government to government, nothing.  It doesn't say terrorism.

22   It also doesn't say we're just doing the bidding of the

23   South African government here.  To the extent that's

24   ambiguous, we get the inference.

25             Second, Your Honor, even if it were true that MTN

1  were playing sort of an intermediary role helping the IRGC

2  source stuff from the South African government, they still

3  would be liable, right?  It's not -- because they meet the

4  other elements of the test.  I don't think it matters at all

5  where they ultimately get the weapons from if MTN is

6  facilitating the deal.

7          THE COURT:  But that's not what you allege in your

8  complaint.

9          MR. EATON:  I'm sorry.  Could you repeat --

10         THE COURT:  But that isn't what you allege.

11         MR. EATON:  I'm sorry.  What specifically isn't?

12         THE COURT:  That there is arms dealing between them.

13         MR. EATON:  No, that's their -- they came up with

14  that.  And, you know, there's this, there's stuff that we cite

15  in the complaint that relates to, you know, when they talk

16  about the defense cooperation part of this which is one of the

17  other things that MTN promised.

18         The other thing to know about this agreement is that

19  after -- well, first, we've alleged that it was signed in

20  Tehran by the president of MTN Group, as an enterprise, with

21  an IRGC general.  We have a basis for that.  We allege it on

22  information and belief.

23         THE COURT:  What's your basis for that?

24         MR. EATON:  Our basis for it is a former MTN

25  executive who turned whistleblower in 2008, 7.

32

1          THE COURT:  Is that alleged in your complaint?

2          MR. EATON:  I'm sorry?

3          THE COURT:  Is it alleged in your complaint who it

4    was who said this?

5          MR. EATON:  No.  We just said, we just stated that

6    it was an allegation made on information and belief.

7          So even if you take that away, Your Honor, the

8    substance of the contract that they signed, who they signed it

9    with and the fact that once he signed it, the president of MTN

10   took it, stuck it in a safe, told nobody about it except a

11   handful of hand-picked people at MTN and left it there and

12   never told anybody until the whistleblower, who happened to be

13   one of those people, leaked it to the world, a very brave

14   thing for him to have done.  That is suspicious behavior,

15   Your Honor.  That suggests complicity on something that is

16   untoward.

17         So now let's go back to -- so I think, Your Honor,

18   that based on all the facts, MTN was eminently aware that it

19   was getting into nefarious business in this context.  And,

20   remember, they're dealing here with Iranians who purport to

21   represent a charitable organization and an electronics company

22   who are asking them to make these commitments to security, to

23   defense.  They're offering to provide helicopter parts.

24   They're talking about -- they admit in their internal

25   documents they got into this agreement in the first place only

1    because they agreed to cooperate on these matters.

2         So there's all sorts of indicia here that they knew

3    that they were up to something bad and that they were up to it

4    with people who are probably terrorists.  Right?  I mean, the

5    solution set of people who are Iranian who purport to be

6    working for a charity and were asking for cooperation on

7    helicopter parts and, you know, security and defense

8    cooperation, that's a solution set of one.  That's the

9    Revolutionary Guard.  There's nobody else.

10        THE COURT:  So are you saying that any company that

11   engages with Iran would fit that scenario?

12        MR. EATON:  No, not at all, not at all, and that's

13   an important point to make.

14        Our allegations here are very specific that the

15   connections here are not to Iran.  They are to the IRGC.  The

16   relationship of IRGC to the Iranian government is somewhat

17   complicated, Your Honor, but I don't think it matters because

18   what the IRGC is is not, in its operations and in sort of its

19   essence, is not a government agency.  It's a terrorist group.

20   This is not a bank.  It's not Berkshire-Hathaway.  It's a

21   terrorist group, that's what it does, and everybody knew that

22   since the mid 1980s.

23        THE COURT:  How do you distinguish your allegations

24   from those in the recent D.C. Court of Appeals case of

25   Bernhardt?

34

1          MR. EATON:  So Bernhardt, Your Honor, is very

2     different.  There's sort of two lines of cases in this kind of

3     still maturing field.  One are sort of the Bernhardt-Siegel

4     kind of line of cases where you have an intermediary between

5     the defendants and the terrorists who is basically a

6     legitimate enterprise like, I think, if you take Al Rajhi.

7          If you take Bernhardt on its face, or Siegel also

8     involved Al Rajhi Bank, and the argument there is that the Al

9     Rajhi Bank has been around since 1957.  It's a huge Middle

10    Eastern financial institution.  It's based in Saudi Arabia.

11    It's not alleged to be controlled by terrorists.  It's not

12    alleged to be a front for terrorists.  It's just a bank and

13    it's a bank that has connections with terrorists in a variety

14    of contexts.  Right?  In that circumstance, courts have often

15    said that's not enough because you haven't alleged that it's

16    sufficiently closely intertwined with the terrorists,

17    terrorist business.

18          THE COURT:  But Irancell is a company that's

19    providing communication services to Iranian citizens.

20          MR. EATON:  It is.

21          THE COURT:  A large swath of Iranian citizens.

22          MR. EATON:  We don't dispute that.

23          THE COURT:  They're a legitimate company to that

24    extent.

25          MR. EATON:  There's two things to be aware about

35

1    that.

2          Again, as I said before, any profit generated by

3    that enterprise ultimately goes to the IRGC.  That's Iranian

4    law as we've alleged it and happens to be true.  And,

5    secondly, the existence of legitimate operations doesn't

6    impede any aiding and abetting allegation where the

7    intermediary is alleged to be a front in that circumstance.

8    And I think that's Bartlett, that's Atchley, that's Kaplan.

9    All of those are front cases and this is a front case.

10          I think in the circumstances --

11          THE COURT:  What is the front, Irancell?

12          MR. EATON:  Irancell is a front, yes, because it is

13    controlled by other IRGC fronts.  I still haven't gotten to my

14    point about allegations about those two fronts but there's an

15    important point, Your Honor.

16          I think the distinguishing line in the cases in this

17    field is who's the intermediary.  How plausible is it that if

18    I give that intermediary some money, it's foreseeable that it

19    will flow through to terrorists, right?  If it's Citibank,

20    probably not very high.  If it's someone who's owned by

21    Hezbollah or owned by the IRGC or owned by Hamas, then chances

22    are pretty high.  It's foreseeable that if you give money and

23    you know it's going to go to IRGC, it's going to be used for

24    terrorist purposes because that's why the IRGC exists.

25          So if I may, Your Honor, let me turn to general

36

1   awareness.  There's quite a long list of stuff that we've

2   cited with respect to Irancell and with, and with TCI.

3          Again, as to MTN, Your Honor, I think you don't even

4   need the publications.  I think the circumstances of their

5   involvement are sufficient to put them on notice, but let's

6   talk about the publications because this is kind of where the

7   briefing went.

8          The 1995 Newsday article which I invite you to read

9   and draw your own conclusions but I'll quote some relevant

10  parts for you.  That article directly implicates Bonyad

11  Mostazafan in "arms and technology shipments to Iran,"

12  described it as, quote, "a front" for the "placement of agents

13  from the Revolutionary Guard who are dedicated zealots who spy

14  and obtain military technology in the U.S."  It provides safe

15  haven, I'm quoting again, "for groups and individuals

16  supporting the Islamic terrorist group Hezbollah."  It cites

17  an FBI report finding that Bonyad Mostazafan funds

18  fundamentalist extremist groups and said that U.S. and

19  European officials say that Bonyad has long been a front for

20  the procurement of military goods and for other technology for

21  Iran and particularly for the Revolutionary Guards.

22         I think Your Honor should read it and draw your own

23  conclusions but I don't see how they get around that other

24  than maybe arguing that it's too old so let's move on to some

25  newer things.

1          And just to respond to a point you made, Your Honor,

2    you are absolutely correct.  They don't have -- we don't have

3    to allege that they actually read any of this stuff.  That's

4    not the point at this stage of the game.

5          Just for completion, for completeness, that Newsday

6    article was widely syndicated in the English language media.

7    I mean the ones that we used were syndicated to a major

8    Seattle paper and a major Pittsburgh paper.  Millions of

9    people read that article just for the record.

10          Newsday had another article in 1998 stating that

11    Mostazafan Foundation controls billions of dollars in

12    investments and has been accused by Western intelligence

13    services of espionage and supporting terrorism.

14          The 2007 AEI article that Your Honor referenced says

15    the IRGC has muscled its way into the Iranian

16    telecommunications center.  It identifies IEI as IRGC operated

17    and describes Bonyad as an independent financial body

18    traditionally run by a retired IRGC commander used by the

19    state as a proxy to fund off-the-books IRGC operations.

20          Now, we have a House of Commons report from 2007

21    which describes companies being Guard members owing and

22    controlling telecommunications firms.

23          We have the 2010 Forbes article which refers to IRGC

24    front companies that have taken stakes in the

25    telecommunications industry and the whole point of the

1    article, Your Honor, is to warn that "any company that does

2    business with these entities risk becoming an unwitting

3    accomplice to the IRGC's nefarious activities."

4         Then we have the 2010 Wikileaks release of a 2006

5    State Department cable that quotes Under Secretary of State

6    for Terrorism Stuart Levey as stating to Turkcell that

7    Irancell is fully owned by the IRGC.  That's at paragraph 790.

8         We have a 2011 statement by a bipartisan group of

9    U.S. Senators warning of doing business with the Iran telecom

10   sector in which the Iranian Revolutionary Guard Corps owns a

11   significant stake.  That's paragraph 906.

12        We have a 2011 Washington Quarterly article saying

13   that the IRGC forced Turkcell out of the proposed cellular

14   licensing agreement and gave it, instead, to an Iranian-led

15   consortium under the ownership of the Guards' subsidiary.

16        All of those sources, Your Honor, predate every

17   attack in this case.  We also have a lot -- and this actually

18   didn't come out in the briefing at all.  There's quite a few

19   that have come after that.  And, remember, four of the twelve

20   attacks in this case occurred after -- occurred between 2016

21   and 2019.  So we have a bunch between 2011 and 2016.

22        There was a whole public sort of shaming campaign

23   that started in 2012 from an organization called United

24   Against a Nuclear Iran that expressly alleged MTN's partners

25   in Irancell were closely linked to the IRGC and that the

1    company was complicit in Iranian human rights abuses.

2            The Turkcell complaint we've already talked about.

3    It expressly alleges that Bonyad Mostazafan is controlled by

4    the IRGC.  We have 2013 and '12 reports in the South African

5    press in the Mail & Guardian stating that MTN's partners in

6    Irancell were "understood to be controlled by Iranian

7    Revolutionary Guard."  Paragraph 1111.

8            We have 2014 Congressional testimony of the

9    Foundation for the Defense of Democracy stating that the

10   Bonyad was "a splinter of Iran's IRGC."  Paragraph 785.  Then

11   we have 2015 Congressional testimony by the same organization

12   identifying telecommunications as a sector where the IRGC was

13   found to reap substantial benefits because "all three mobile

14   operators in Iran," which would include MTN, Irancell and TCI

15   and the other TCI subsidiaries, "are directly or indirectly

16   partners with IRGC-affiliated companies."

17           Your Honor, that is an avalanche of public

18   information associating these entities.  And that's just

19   Irancell, by the way.  We have separate ones for TCI which I'm

20   happy to talk about which I'll summarize as follows.

21           In 2009, when the Irancell -- excuse me -- when the

22   IRGC purchased a majority stake in TCI, news organizations

23   around the world reported that for exactly what it was which

24   was an IRGC direct investment in TCI.  Both Newsday and -- not

25   Newsday.  The New York Times and the Guardian, I think, I'll

1    have to check, ran articles that literally were titled "IRGC

2    buys 51 percent stake in TCI."

3            There's a lot of that.  I don't know what else to

4    say about it, Your Honor.

5            THE COURT:  That relates to which defendant?

6            MR. EATON:  So TCI, Your Honor, is Huawei and ZTE

7    only.

8            THE COURT:  All right.  So do you want to direct

9    your comments to the substantiality of your complaint against

10   ZTE and Huawei or was that just what you were doing?

11           MR. EATON:  Well, so Huawei had significant business

12   with both of those entities, Your Honor.

13           THE COURT:  With both of whom?

14           MR. EATON:  Sorry.  With Irancell and with TCI.

15           THE COURT:  The U.S. entities are the ones that are

16   in your complaint.

17           MR. EATON:  Oh, yes, of course.  Understood.

18           THE COURT:  What about the U.S. entities?

19           MR. EATON:  So, yes, let's talk about the U.S.

20   entities, Your Honor.

21           So with ZTE, as Your Honor knows, the parent

22   company, the Chinese parent company pled guilty to essentially

23   the conduct that underlies our clients' claims, right, evading

24   U.S. sanctions to provide embargoed goods to Iran in violation

25   of anti-terrorism sanctions.

1          There's a guilty plea on that.  It doesn't directly

2     say anything about the subs, but the settlement agreement that

3     they entered into with the United States government, the OFAC

4     supplemental agreement, says specifically that the settlement

5     is done on behalf of ZTE Corp. and all of its subsidiaries and

6     its affiliates and at the end of that document, Your Honor,

7     the president of ZTE Corp., the Chinese entity, signs as the

8     authorized representative of the "respondents."  The

9     respondents are defined in the agreement to mean MTN Corp. --

10    excuse me -- ZTE Corp. and all of its subsidiaries.

11          THE COURT:  But why does that broad reference -- it

12    doesn't have any allegations that the subsidiaries were

13    involved in anything.  I mean the outline of the agreement

14    doesn't mention that they did anything.

15          MR. EATON:  Well --

16          THE COURT:  So why does the fact that an agreement

17    is signed on behalf of everyone really mean that much?

18          MR. EATON:  Well, Your Honor, that's the defendants'

19    point of view.  Our point of view is the agreement on its face

20    attributes all the conduct that's admitted to by all of those

21    entities.

22          THE COURT:  How does it do that?

23          MR. EATON:  It says, Your Honor, it defines the term

24    "respondent" to be ZTE and all of its subsidiaries and

25    affiliates, and then all the admissions that are made within

1  it are on behalf of respondent, all of them.

2          THE COURT:  Do any of those admissions that are in

3  it refer specifically to the U.S. entities?

4          MR. EATON:  Not with respect to sanctions evasion,

5  no.  There's other aspects of that settlement that implicate

6  them and I'll talk about those.

7          THE COURT:  Well, that's the technology part,

8  correct?

9          MR. EATON:  The technology part, meaning?

10          THE COURT:  I mean the sale of the technology, or

11  not?

12          MR. EATON:  Right.  Right.

13          THE COURT:  Maybe I'm confusing it.

14          MR. EATON:  So I think, you know, just to sort of

15  close the loop, Your Honor, I think at the pleading stage,

16  we're entitled to take on its face what that agreement says.

17  If they want to argue about who it binds and who it doesn't

18  bind, that's something they can do later, but I will move on

19  from that, Your Honor, and talk about the other bases for the

20  ZTE entities' involvement in that campaign.

21          Your Honor, as Your Honor brought up, the reason

22  that ZTE's involvement in the Iranian scheme came to light at

23  all was because of a whistleblower from ZTE (USA), the general

24  counsel of ZTE (USA), in fact, who was asked by ZTE Corp. to

25  design a sanctions evasion scheme for the enterprise to use.

43

1          Now, the defendants say, well, he said no and he

2    turned whistleblower so that was probably the end of it, but

3    we know that it wasn't because what happened after that is

4    that Mr. Yablon got fired or put on administrative leave in, I

5    think, 2012 or 2013.  ZTE then said, well, we're getting out

6    of Iran.  They got out for a year, formed a new subsidiary

7    that hadn't been investigated by the FBI, ZTE (TX), and

8    resumed surreptitiously their conduct in 2014.

9          So I think it's reasonable to infer from -- I don't

10   think it's reasonable at this stage of the litigation to infer

11   that because the attorney Yablon turned whistleblower, that

12   the conduct stopped or didn't involve the U.S. entities.  We

13   know that it didn't stop, and it would be a little strange if,

14   in fact --

15          THE COURT:  It didn't stop but what proof is there

16   that it started?

17          MR. EATON:  Well, Your Honor --

18          THE COURT:  You said it didn't stop but what

19   allegations do you have that they were involved before?

20          You say this new corporation came over and started

21   doing things, but why does that mean that the New York entity

22   did anything wrong beforehand?

23          MR. EATON:  Well, you'll recall, Your Honor, from

24   the allegations about the whistleblower, the whistleblower

25   instructed his employees at ZTE (USA) to preserve evidence

44

1   relating to the Iranian scheme which suggested that ZTE Corp.,

2   that he thought that ZTE Corp. was going to tell him to

3   destroy it, and if ZTE (USA) had that information, it's a

4   plausible inference that they were involved in the scheme

5   because why else would they have it.  It doesn't make a lot of

6   sense that they would have information about the ZTE Corp.

7   scheme in Iran that was happening completely overseas with no

8   involvement by the ZTE U.S. subsidiaries.

9        I mean, in fact, when you take a step back, and

10  we're not relying on this in and of itself but I think it's

11  relevant context, this whole case is about schemes to source

12  U.S. goods from the U.S. and export them to Iran illegally.

13  It would be surprising if the U.S. subsidiaries of these

14  companies were not involved in that operation.

15       THE COURT:  But in that plea, it was actually

16  ZTE Corp. that was alleged to be the source of the materials,

17  not ZTE (USA).  I mean there was someone that they say they

18  got the material from and it was an entirely different entity.

19       MR. EATON:  No, that's true, Your Honor, the plea

20  itself doesn't directly implicate the U.S. subsidiaries.

21       THE COURT:  Then what else do you have?  I thought

22  you were relying principally on the plea.  What else do you

23  have?

24       MR. EATON:  I just told you, Your Honor, what our

25  basis is.  It's largely the allegations from the ZTE

45

1   whistleblower, allegations that ZTE --

2        THE COURT:  Does the ZTE whistleblower say that my

3   company that I was working with was involved in this and we

4   were transferring these goods?  Does the whistleblower say

5   that?

6        MR. EATON:  I don't know exactly the -- I have not

7   seen that document personally, Your Honor, but, again, we're

8   entitled to plausible inferences at this point.

9        It seems like a plausible inference to me that

10  ZTE Corp. wouldn't have come to ZTE (USA) and asked it to

11  design a sanctions evasion scheme that ZTE (USA) had no part

12  in.  I think that's enough to at least get us to ask the

13  question.  That's all we're talking about here, Your Honor, is

14  the opportunity to ask these questions of these entities that

15  have been publicly implicated in this kind of conduct.

16       THE COURT:  Okay.

17       MR. EATON:  On Huawei, Your Honor, Huawei is sort of

18  parallel but a little bit different in that they are under

19  indictment in this District for conduct that is not directly

20  related to sanctions evasion, but the indictment makes it

21  quite clear instead, it states as fact that Huawei Co.'s

22  operations in Iran were illegal and violated U.S. sanctions.

23       Now, that's Huawei Co., but what we know is that

24  from that same indictment, that two of the three Huawei

25  subsidiaries who are here engaged in a coverup of that

46

1    conduct.  They destroyed documents.  They moved witnesses.

2    They told lies to U.S. officials.  They told lies to

3    international banks and, actually, U.S. banks.

4              I don't think you can cover up a scheme unless you

5    know about the scheme and are involved in it, Your Honor.

6    That doesn't even make any sense.  I think --

7              THE COURT:  What is their involvement according to

8    your complaint?  What is it that they did?

9              MR. EATON:  At an absolute minimum, Your Honor, the

10   act of concealment itself is, in fact, sufficient to state the

11   aiding and abetting claim because it allows the scheme to go

12   on longer than it otherwise would.  We cite some cases in our

13   brief that support that including Gonzalez which cites

14   Halberstam.  I don't think that's a particularly difficult

15   proposition to support.

16             That is the -- I mean, so backing up a little bit,

17   we do know from both public sources and from the indictment,

18   that Huawei Co. does an enormous amount of business in Iran

19   with the two entities that we've alleged are fronts for the

20   IRGC.  The involvement of the subs is primarily based on the

21   obstruction of justice charge filed against one of them and

22   the allegations or statements in the indictment about the

23   other that connected to the scheme to conceal.

24             THE COURT:  What does the indictment say about the

25   U.S. entities?

1          MR. EATON:  It says, Your Honor, so, one, ZTE --

2     sorry, Huawei Device USA is charged with obstruction of

3     justice specifically for destroying documents and concealing

4     evidence that relates specifically to the Iran scheme.  That's

5     what it says.  And it says that it destroyed those documents

6     and obstructed justice to avoid prosecution for that scheme.

7          I don't see how it could be true that they could

8     have been prosecuted for it had they not destroyed those

9     documents if they weren't involved in it.

10          THE COURT:  What scheme are you referring to?

11          MR. EATON:  The scheme to illegally --

12          THE COURT:  Evade sanctions?

13          MR. EATON:  The scheme to violate U.S. sanctions to

14     send goods to Iran.

15          And the other, and Futurewei, Your Honor, is said to

16     have made material misrepresentations to the U.S. Government

17     and to U.S. banks, again, about the overall scheme to export

18     things to Iran.  Again, you can't lie about it if you don't

19     know about it.

20          THE COURT:  But how do you connect the, even the

21     evasion scheme sending things to Iran to, ultimately, what you

22     contend happened here which is your clients being killed by

23     the terrorist activity?

24          MR. EATON:  So ultimately, Your Honor, from the

25     IRGC's point of view, the whole purpose of having these

48

1  relationships with Western or non-Western in this case

2  telecommunications companies was to acquire this kind of

3  technology.  Right?  And, particularly, with Irancell but also

4  TCI, the hundreds of millions of dollars flowing through these

5  Iranian entities because of this business funded the IRGC

6  because the IRGC owned those businesses and the companies were

7  required by law to pass their profits through to the IRGC.

8            THE COURT:  So let's just assume that there's an

9  Iranian company that sells cars.  So if you invest or send

10  cars to that particular company, and because the Iranian

11  government takes money from those companies and then you say

12  that this money is ultimately funneled to terrorist groups,

13  does that mean that the car company here in the United States

14  is guilty?

15            MR. EATON:  No, Your Honor.

16            THE COURT:  Or is part of this?

17            MR. EATON:  For one thing because the Iranian

18  government is not the same thing as the IRGC.  The Iranian

19  government --

20            THE COURT:  But it's the Iranian government that

21  you -- I'm sorry.  Which is it that requires money from all of

22  these individual private companies?

23            MR. EATON:  So, Your Honor, I believe it's described

24  in the complaint as an IRGC directive.

25            THE COURT:  So you mean the IRGC has such control

49

1    over every private company in Iran --

2           MR. EATON:  No, no, over the ones it owns, that's

3    right.  839 is an IRGC directive demanding companies --

4           THE COURT:  To the company that it owns, only to the

5    company that it owns.

6           MR. EATON:  Yes, only to the company it owns, that's

7    who it applies to.

8           THE COURT:  So if, in my example, the automobile

9    company in Iran was owned by the IRGC, then the company here

10   in the United States shipping them cars would be liable?

11          MR. EATON:  Not necessarily.  It depends.  Right?

12   You have to put it through the Halberstam analysis and you

13   have to say, all right, what's the level of awareness, what's

14   the level of assistance, does it actually meet the general

15   awareness and substantial factors, substantial assistance

16   factors.  It might or it might not.  That's highly fact

17   specific.

18          THE COURT:  Okay.  Anything further?

19          MR. EATON:  Your Honor, I think I haven't talked yet

20   about personal jurisdiction over MTN.  Would you like me to

21   address that?

22          THE COURT:  I don't know how it really differs from

23   the general awareness test that you've described but you can

24   if you see fit.

25          MR. EATON:  I'll be brief, Your Honor.

50

1          THE COURT:  If there's something you think that's

2     different, let me know.

3          MR. EATON:  Well, I don't think -- I think they

4     overlap a lot as my colleagues across the way said.

5          I do think it's -- what I would encourage Your Honor

6     to think about in this minimum -- this is a minimum contacts

7     analysis, is the totality of the circumstances analysis, and

8     the ultimate point is to ask did the conduct that the

9     defendant engaged in put it sort of reasonably on notice that

10    it might be haled into court for this conduct.  And there's

11    two sorts of answers to that.  Here, there's two different

12    triable routes to get there.

13         One is they said they didn't direct their conduct at

14    the United States but they clearly did.  We have internal MTN

15    documents stating that they were intentionally violating U.S.

16    sanctions for the purpose of acquiring U.S. goods and they

17    knew it was against U.S. law.  That is directing your conduct

18    at the United States certainly as much as, you know, writing

19    an article in Florida about someone in California.

20         Second, the conduct, let's say -- because the scheme

21    was U.S. centric, right?  That's the whole point of this

22    scheme, is to get U.S. goods.  Because the scheme is U.S.

23    centric, the contacts that they have that we've used for

24    purposeful availment purposes aren't random or fortuitous

25    because they are in service of a program that is entirely

1    based entirely in the U.S.  Right?

2         So most of these cases where you're talking about

3    getting jurisdiction over conduct that occurred entirely

4    abroad but maybe it touched banks in New York, you know, for a

5    couple of transactions so we're going to try to grab

6    jurisdiction on that basis, that's not what we're talking

7    about here.  Here, we're talking about an almost two-decade

8    long effort on MTN's part to exploit the market in the

9    United States against American law.

10        So I think you have to look at all of their

11   activities through that lens that this is a U.S. directed

12   activity.  This is not random or fortuitous.

13        THE COURT:  Does that argument depend on their

14   connection with a company you've identified as Exit40?

15        MR. EATON:  That is one piece of it, Your Honor, for

16   sure.  So Exit40 is, there have been publications that have

17   stated that MTN was involved in Exit40 and Exit40 was part of

18   its procurement scheme in the United States.  We've alleged

19   that Exit40 has an office in Florida and that it was involved

20   in obtaining U.S. goods.

21        The way, Your Honor, we've alleged that MTN

22   performed its part of this scheme was essentially they would

23   get a list from Irancell of different U.S. technologies that

24   they wanted to acquire.  The whole scheme was illegal so they

25   couldn't do it themselves.  They had to find third parties to

52

do it.  So they would send third parties to the United States

to acquire specific --

        THE COURT:  What third parties?

        MR. EATON:  Well, Exit40 we've alleged is one.  I'll

be fair, Your Honor, we have not been able to identify most of

them because it's criminal behavior, it's secret.

        Exit40 had an office in Florida and was known to be

engaged in this kind of conduct and because we think, because

we've alleged that they were going out to get specified goods,

right?  They weren't just being offered -- it wasn't just like

a market transaction.  This was you go to the United States

and get this particular thing, get this encryption system, get

this super computer, whatever it happens to be.  If they're

acting in that capacity, then MTN is serving as a principal or

primary participant in Exit40's behavior and that's enough to

establish agency jurisdiction over them.

        There's also the case of Mr. Hajian, I think it's

pronounced, an Iranian-American citizen who was prosecuted in

Florida for selling $14 million worth of super computers to

Iran.  His defense was that he didn't sell them to the Iranian

government.  He sold them to a South African cell phone

company in Iran.  That would be MTN.  I think based on the way

that we have alleged the scheme worked, it's plausible to

infer that he was acting on MTN's behalf in those

circumstances, Your Honor.  In addition to which fact, of

1  course, we have the $400,000 bribe that came through the

2  system.

3          Another piece that I think is worth mentioning is

4  there was a year's long effort on MTN's part to repatriate

5  profits out of Irancell which they couldn't do because of U.S.

6  sanctions and we've alleged that they negotiated or at least

7  spoke, discussed with U.S. financial institutions ways to do

8  that.

9          We know from MTN's own statements that in 2012, MTN

10  negotiated with the U.S. Treasury Department for that purpose.

11  They ultimately were able to repatriate about a billion U.S.

12  dollars out of Irancell resulting, in part, from those

13  efforts, Your Honor, and those contacts, I think,

14  independently suggest that they were purposely availing

15  themselves, purposely availing themselves of the U.S.

16  financial system.

17          THE COURT:  But it has to be -- you also have to

18  show relatedness.  How do you show relatedness?

19          MR. EATON:  We do, Your Honor.  In that case,

20  Your Honor, because these are the profits coming out of the

21  very venture that we allege is the instrument of their

22  wrongdoing, then I think it's related.  Right?  Because if you

23  pull $1 billion out of that and you use it to pay the

24  shareholders, that's going to go back to the IRGC ultimately.

25  So it's an indirect way of funneling money back to the IRGC.

54

1    I think that's more than sufficient to establish an

2    affiliation between the contacts and the claims.

3            Your Honor, just one word about MTN Dubai.  I know

4    I've gone on a long time.

5            THE COURT:  You have no allegations against them.

6            MR. EATON:  So let me tell you the ones that we

7    point to, Your Honor, and I'll leave it at that.

8            Dubai, Your Honor, so we have two that are specific.

9            First, we allege that MTN Dubai coordinated to

10   "manage the procurement scheme for MTN Group."  That's in

11   paragraph 975.  If you take that as true, then MTN Dubai was,

12   in fact, operating this entire program from Dubai or at least

13   assisting in its operation.  We've also alleged that it was

14   responsible for MTN's Afghanistan operations which connects it

15   to Afghanistan.  That's in paragraph 918.

16           I think that's enough, Your Honor, to raise a

17   reasonable inference that MTN Dubai was functionally integral

18   to MTN Group's conduct.

19           There's also the matter, Your Honor, that we've

20   alleged that MTN Dubai is a shell company with no existence

21   independent of MTN Group which would make it MTN's alter ego

22   which would allow us to use MTN Group's contacts to get

23   jurisdiction for MTN Dubai.

24           THE COURT:  Is it enough just to say that they were

25   a shell company?  Would you need to show more than that?

55

1          MR. EATON:  We say its personnel are all MTN Group

2   personnel, we say it has no existence independent and we say

3   in a different section of the complaint that MTN routinely

4   disregarded the corporate form and had an unusual amount of

5   control over its subsidiaries.  I think if you take all that

6   together, Your Honor, that should be enough.

7          THE COURT:  Okay.  Thank you.

8          MR. EATON:  Thank you.

9          THE COURT:  Just let me ask MTN just briefly if

10  there's any one point that Counsel made that you feel

11  compelled to address.

12         MR. HARKNESS:  Yes, Your Honor, we have -- a lot of

13  this is covered in our papers but I would direct you to two

14  quick points.

15         First, Walden and the cases citing Walden, I think,

16  show one of the key differences between general awareness and

17  the jurisdictional analysis we've been talking about and there

18  needs to be this express aiming into the jurisdiction which,

19  as we've explained earlier today and in our papers, is

20  missing.

21         Then if we could just have discussion about the word

22  "security" and the allegations of the complaint.  I'm not

23  going to rehash anything I've said before.

24         I would point the Court to two specific paragraphs,

25  first, to 964 of the complaint which purports to quote from a

1   March 25, 2007 memo.  Now, we have the memo because it's been

2   part of the public record for a decade.  The Court has it

3   because it was attached to the Turkcell complaint filed in

4   2012.  I would just invite the Court to contrast the way it's

5   been quoted in 964 with the actual text which the Court has.

6           At the end of the day, I think that "security"

7   related allegations that relate to Mr. Kilowan and his

8   allegations that we saw in the Turkcell complaint can be

9   summarized at 1028.  1028 really describes what, the

10  allegations that are fundamental to this entire Iranian part

11  of the plaintiffs' complaint and all of this comes from the

12  Turkcell complaint from ten years ago which, ultimately,

13  several months after it was filed, was withdrawn, and 1028

14  describes a commercial dispute.

15          This is not about terrorism.  This is the -- the

16  fundamental allegation is that Turkcell was going to get this

17  license to provide cell phone service to Iranians in Iran and

18  that MTN usurped their position, they have alleged, and used

19  the bribe that we've talked about which is described in 1026

20  and then this promise to provide, facilitate, delivering

21  heaven, earth and the fish is what the allegation is.  And

22  when you read their complaint and the Turkcell complaint, what

23  is that?  That's facilitating the conversation between the

24  Iranian government and the South African government.  For the

25  purposes of terrorism?  No, for the purposes of getting the

1   GSM license in Iran and, fundamentally, that's what this is

2   about.

3          The jurisdictional question at least aims at whether

4   or not there was conduct by MTN to try to engage in conduct

5   that was ultimately tortious that would hale it into a U.S.

6   court.  And here, we just don't see that when you look at the

7   actual facts before you in this complaint and its attachments.

8          THE COURT:  All right.  Thank you.

9          Anything from ZTE?

10         MR. DANTE:  Your Honor, just two quick points with

11  regard to the comments made by Counsel.

12         The first point is I think Counsel referred to

13  ZTE (TX) as being born into a system in 2013 and that they're

14  entitled to an inference that ZTE (TX) somehow started or was

15  involved in the sanction evading scheme.

16         The one thing I want to draw the Court's attention

17  to is Exhibit A which is the factual resume, specifically,

18  paragraphs 57 to 60 where it details the thorough

19  investigation that the FBI of the United States Government did

20  from 2012 until 2016 culminating in the guilty plea that was

21  entered into in 2017 that covers the year 2013.

22         There were numerous subpoenas that were issued to

23  ZTE (TX).  There was a seizure of documents and electronic

24  information of the company.  The government fully investigated

25  this and the factual proffer fully refutes their allegation

58

1    that ZTE (USA) or ZTE (TX) was somehow involved in the

2    sanction evading conduct.

3            Then the second point is, Your Honor, even to the

4    extent that the Court can plausibly agree with their complaint

5    about ZTE (USA) and ZTE (TX), which we believe it cannot, they

6    still have the problem that if they're, if ZTE (USA) and ZTE

7    (TX) are implicated in this, they're alleged to have done

8    business with TCI, TCI is a public company and was during the

9    relevant time period the largest provider of

10   telecommunications systems in Iran.  It is essentially the

11   Bell telephone company of Iran.  It has many legitimate

12   purposes.  It provides most of the land lines, if not all the

13   land lines in the country of Iran, internet service and things

14   of that nature.  This is not a front company.  It cannot be

15   plausibly alleged to be a front company for the IRGC.

16           THE COURT:  Okay.  Huawei?

17           MR. GAUCH:  Your Honor, if I can just briefly

18   address comments with regard to the indictment against Huawei.

19           Counsel for plaintiffs made a number of accusations

20   against two of the three U.S. subsidiaries.  The indictment is

21   a public record.  I commend it to the Court's attention.  We

22   make reference to it in our brief.  Even though the plaintiff

23   has only pled contents based on information and belief, a

24   number of what he said were inaccurate.  I commend that to the

25   Court's attention.

59

1          I do want to underscore though that when it comes to

2    the scheme in the indictment and the export violations, what

3    Huawei's, what the subsidiary's parent company was accused of

4    exporting were U.S. dollars in the form of dollar-based,

5    dollar-denominated financial transactions and the services of

6    one employee of whom the indictment doesn't say to Iran.

7    There's actually nothing in the indictment concerning the

8    export of any U.S. technology to Iran.

9          In their opposition brief, the plaintiffs describe

10   that proceeding as a U.S. Government terrorism investigation.

11   There is nothing in the indictment about terrorism.  Nothing

12   at all.  No charges.  No references.  The IRGC is never

13   mentioned.  None of this is mentioned.  The plaintiffs tried

14   to blur the lines and make everything part of the same scheme

15   but that indictment really has nothing to do with what we're

16   dealing with today.

17          THE COURT:  Okay.  Thank you, gentlemen and ladies

18   sitting at counsel table.  I will reserve decision.

19          Thank you.

20          (Matter concluded.)

21

22

23

24

25