**Via ECF**  June 2, 2023

Honorable Carol Bagley Amon, U.S.D.J.
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:**   *Zobay v. MTN Group Ltd., et al.*, No. 1:21-cv-3503 (E.D.N.Y.) (CBA)

Dear Judge Amon:

Pursuant to this Court's order of May 22, 2023, Defendants MTN Group Limited, MTN Dubai Limited (together, "the MTN Defendants"), ZTE (USA), Inc., ZTE (TX) Inc. (together "the ZTE U.S. Defendants"), Huawei Technologies USA Inc., Huawei Device USA Inc., and Futurewei Technologies, Inc. (together the "Huawei U.S. Defendants") (collectively, the "Moving Defendants") respectfully submit this letter addressing the impact of *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023), and *Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023), on their pending motions to dismiss.[1] In the interest of efficiency, the Moving Defendants file a single letter that begins with a joint discussion of the proper legal framework for aiding-and-abetting liability after *Taamneh*. The MTN Defendants, ZTE U.S. Defendants, and Huawei U.S. Defendants then separately address *Taamneh*'s application to their individual motions.

**I.   The Post-*Taamneh* Legal Framework for Aiding-and-Abetting Liability**

On May 18, the Supreme Court issued a unanimous decision clarifying the pleading standard for aiding-and-abetting claims under the Anti-Terrorism Act ("ATA"), rejecting the Ninth Circuit's overly expansive view of what allegations sufficed to survive a motion to dismiss. The plaintiffs had accused Twitter, Facebook, and Google of providing social media services to the Islamic State of Iraq and Syria ("ISIS"), allowing that designated foreign terrorist organization to fundraise, recruit members, and distribute propaganda. The plaintiffs included the family members of a victim of a 2017 attack on the Reina nightclub in Istanbul, which was allegedly perpetrated by ISIS. The Supreme Court reversed the Ninth Circuit's judgment and affirmed the district court's dismissal of plaintiffs' aiding-and-abetting claims, making clear that district courts need to scrutinize the allegations in a complaint carefully and cannot allow conclusory allegations to suffice.

The Court confirmed that an ATA aiding-and-abetting claim could be assessed under the three-part framework of *Halberstam v. Welch*: (i) "the party whom the defendant aids must perform a wrongful act that causes an injury"; (ii) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and (iii) "the defendant must knowingly and substantially assist the principal violation." *Taamneh*, 143 S. Ct. at 1219 (internal quotation marks omitted). The first two elements were not put at issue by

---

[1] In *Gonzalez*, the Supreme Court vacated the Ninth Circuit's judgment and remanded for further consideration in light of *Taamneh*. This letter accordingly focuses on *Taamneh*.

1

the parties or addressed by the Court. Under Second Circuit precedent regarding the "general awareness" element—which thus continues to apply—the Moving Defendants have established that Plaintiffs do not adequately plead general awareness in their respective motions to dismiss. In that respect, the Court should grant the motions to dismiss for reasons that were not directly addressed by *Taamneh*.

Even when general awareness is established, a plaintiff must make a further showing of "knowing and substantial assistance." *Taamneh*, 143 S. Ct. at 1226. *Taamneh* clarifies the framework for applying that requirement to a complaint, establishing the following overarching principles:

1. "The phrase 'aids and abets' in 18 U.S.C. § 2333(d)(2), as elsewhere, refers to a *conscious, voluntary, and culpable participation* in another's wrongdoing." *Id.* at 1223 (emphasis added). The "conceptual core" of aiding-and-abetting liability is thus "that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Id.* To state a claim for aiding and abetting liability in *Taamneh*, the plaintiffs had to adequately plead that the "defendants culpably associated themselves with the Reina attack, participated in it as something that they wished to bring about, or sought by their action to make it succeed." *Id.* at 1226 (cleaned up). The Court repeatedly noted that aiding-and-abetting liability is not "boundless," but it is "cabin[ed]" to cases of "truly culpable conduct." *Id.* at 1220–21; *see also id.* at 1229 (discussing how culpability is needed so that the doctrine does not "run roughshod over the typical limits on tort liability").

*Taamneh*'s focus on culpable association with a terrorist attack reinforces important aspects of the pre-*Taamneh* precedent in this Circuit. In *Siegel v. HSBC North America Holdings Inc.*, for instance, allegations that a bank "helped [another bank] violate banking regulations despite knowing that [the other bank] supported terrorist organizations" were insufficient to support liability. 933 F.3d 217, 225–26 (2d Cir. 2019). *Taamneh* confirms why this failed to state a claim: dealing with a business partner that separately assists terrorists, even if those dealings are themselves illegal, does not reflect conscious, voluntary, and culpable participation *in the terrorist attack that injured the plaintiff*, so as to help make *that terrorist attack* succeed. Similarly, *Taamneh* elevates the importance of a consideration this Court highlighted in *Bartlett v. Société Générale de Banque Au Liban SAL*: whether a defendant deals with a partner that, even if associated with terrorism, "also performed non-terrorist activities." No. 19–cv–007, 2020 WL 7089448, at *12 (E.D.N.Y. Nov. 25, 2020). Viewing that point in light of *Taamneh*'s culpability framework, where a defendant deals with a partner that "performed non-terrorist activities" such that any assistance could "potentially have supported legitimate purposes," *id.*, the defendant is not culpably, voluntarily, and consciously participating in a terrorist attack.[2]

2. The statutory "text requires that defendants have aided and abetted the act of international terrorism that injured the plaintiffs." *Taamneh*, 143 S. Ct. at 1225. As a result, the

---

[2] In other respects, the *Bartlett* decision applied the six *Halberstam* factors in a manner consistent with circuit precedent at the time, but that has now been clarified, with greater focus on the necessary determination whether defendants' alleged support was conscious and culpable. *See infra* pp. 4, 10, 11, 18.

Ninth Circuit erred by "fram[ing] the issue of substantial assistance as turning on defendants' assistance to ISIS' activities in general" rather than the nexus between the "defendants' [acts] and the Reina attack." *Id.* at 1228-29. In other words, the Court rejected aiding-and-abetting liability based on allegations that "a defendant ha[s] given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id.* at 1224. While this requirement "does not *always* demand a strict nexus between the alleged assistance and the terrorist act," establishing liability without this strict nexus requires "pervasive, systemic, and culpable assistance to" a terrorist enterprise that verges on conspiracy such that "the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *Id.* at 1225, 1228 (emphasis added).

Thus, *Taamneh* makes clear that "the lack of any concrete nexus between defendants' [alleged assistance] and the [specific] attack" increases the plaintiff's pleading burden. *Id.* at 1228. The *Taamneh* plaintiffs' theory "would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist attack committed anywhere in the world." *Id.* To support such an "expansive" claim, the plaintiffs had the burden of "alleg[ing] that defendants so systemically and pervasively assisted ISIS that defendants could be said to aid and abet every single ISIS attack," and to do so with culpable intent. *Id.* That standard is not met where providers of "services to the public writ large" incidentally provide services to bad actors. *Id.* at 1226. Rather, as detailed by the Supreme Court, "it might be that bad actors like ISIS are able to use [communications] platforms like defendants' for illegal—and sometimes terrible—ends," but that use, without allegations of conscious, culpable knowledge, is not enough to plead an aiding-and-abetting claim under the ATA. *Id.* at 1226, 1228.

Therefore, the Court found that the allegations were "a far cry" from satisfying "pervasive, systemic, and culpable assistance," so the Ninth Circuit should have focused only on whether defendants' alleged actions constituted culpable participation in the Reina attack specifically. *Id.* at 1228. *Taamneh* thus overtakes prior suggestions that "knowing and substantial assistance to the actual injury-causing act . . . is unnecessary." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021).

3. Scienter is an important component of the "knowing and substantial assistance" requirement. The Supreme Court held that the Ninth Circuit erred by "separat[ing] the 'knowing' and 'substantial' subelements" and "then analyz[ing] the 'knowing' subelement as a carbon copy of the antecedent element of whether the defendants were 'generally aware' of their role in ISIS' overall scheme." *Taamneh*, 143 S. Ct. at 1229 (the "knowing" inquiry is "not the same general awareness that defines *Halberstam*'s second element"). This holding overtakes any suggestion that the defendant does not need "to 'know' anything more about [the terrorist's] unlawful activities than what [it] knew for the general awareness element." *Honickman*, 6 F.4th at 500. Under *Taamneh*, a plaintiff may sufficiently plead "general awareness" without sufficiently pleading the "knowing" and "substantial" subelements of her claim.

4. The Supreme Court also focused on whether "there is a direct nexus between the defendant's acts and the tort." *Taamneh*, 143 S. Ct. at 1230. "[T]he more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through *intentional aid* that substantially furthered the tort." *Id.* (emphasis added). "In other words, less substantial assistance

3

required more scienter before a court could infer conscious and culpable assistance. And, vice versa, if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." *Id.* at 1222 (citation omitted).

When there is attenuation, plaintiffs must plead facts showing at a minimum a "very good reason to think that defendants were consciously trying to help or otherwise 'participate in' the [terrorist] attack." *Taamneh*, 143 S. Ct. at 1227.

5. *Halberstam v. Welch* provides guidance on the "legal framework" for an ATA aiding-and-abetting claim, including *Halberstam*'s requirement that a "defendant must knowingly and substantially assist the principal violation," and *Halberstam*'s six factors that "help determine whether a defendant's assistance was 'substantial.'" *Taamneh*, 143 S. Ct. at 1218, 1219–1221 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477, 486 (D.C. Cir. 1983)). But the Supreme Court explained that *Halberstam*'s "elements and factors should not be taken as inflexible codes," such that the Ninth Circuit erred by "regard[ing] the factors as a sequence of disparate, unrelated considerations without a common conceptual core." *Id.* at 1225. Instead, "[t]he point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* As the Court explained, the focus of the Ninth Circuit's analysis should not have been "on the value of defendants' platforms *to ISIS*," but rather "whether defendants culpably associated themselves with ISIS' actions." *Id.*

The Court illustrated how certain *Halberstam* factors should have been assessed (though the overriding "conceptual core" is relevant to each one). For example, in applying the second factor ("the amount and kind of assistance"), the Supreme Court explained that the Ninth Circuit "erred in focusing (as it did) primarily on the value of defendants' platforms to ISIS, rather than whether defendants culpably associated themselves with ISIS' actions . . . . ISIS' ability to benefit from these platforms was merely incidental to defendants' services and general business models; it was not attributable to any culpable conduct of defendants directed toward ISIS." *Taamneh*, 143 S. Ct. at 1229. And in applying the fourth factor ("the defendants' relationship to [the terrorist]"), the Ninth Circuit erred by not giving "much greater weight to defendants' arm's-length relationship with ISIS. *Id.* In this respect, *Taamneh* confirms *Honickman*'s recognition that especially "attenuated" relationships are insufficient, *Honickman*, 6 F.4th at 501, but adds that the arms-length nature of a relationship also weighs against liability. Finally, in applying the fifth factor ("the defendants' state of mind"), the Ninth Circuit also erred by not giving greater weight to the defendants' "lack of intent to support ISIS." *Taamneh*, 143 S. Ct. at 1230.

Going forward, *Taamneh* instructs that courts must apply the *Halberstam* factors "flexibly" to determine whether there are adequate allegations that the defendant "consciously and culpably participated in a tortious act"—that is, in the terrorist attack that injured the plaintiff—"in such a way as to help make it succeed." *Id.* at 1225 (cleaned up).

II. **Under Taamneh, Plaintiffs Fail to Allege that the MTN Defendants Knowingly and Substantially Assisted Numerous Terrorist Attacks in Iraq and Afghanistan**

Plaintiffs' sweeping claim that the MTN Defendants aided and abetted numerous terrorist attacks in Iraq and Afghanistan by participating in a joint venture to run a consumer

4

telecommunications network in Iran more clearly fails to state a claim after *Taamneh*. Not even attempting to link the MTN Defendants with any particular attack, Plaintiffs attempt instead to link the MTN Defendants, through their participation in the Irancell venture, to an IRGC-led "NATO for Islamists" responsible for the acts of virtually every terrorist group (and some governments) in the Middle East. AC ¶ 33.[3] Thus, Plaintiffs claim that, based on the provision of undisputedly bona fide consumer telecommunications services in Iran, the MTN Defendants are liable for every Taliban attack in Afghanistan, every attack in Iraq by any IRGC-linked militia, any attack by Hezbollah anywhere in the world, and any attack by any other IRGC-linked terrorist group anywhere in the world. This theory is even more "expansive" than the theory of the *Taamneh* plaintiffs, which would "necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." *Taamneh*, 143 S. Ct. at 1228. To sustain such a theory after *Taamneh*, Plaintiffs must adequately plead that the MTN Defendants "culpably associated" themselves with the alleged Iraq and Afghanistan attacks, participated in these attacks "as something that [they] wished to bring about," or sought by MTN Group's investment in Irancell "to make [these attacks] succeed." *Id.* at 1226 (cleaned up). They have not. Nor have Plaintiffs come close to pleading that the MTN Defendants "so systematically and pervasively assisted" various IRGC-related militias that they can be said to have culpably participated in any terrorist attack by any IRGC-linked terrorist group anywhere in the world. *Id*. at 1228.

As in *Taamneh*, Plaintiffs' allegations about the MTN Defendants' conduct "are a far cry from the facts of *Halberstam*." *Id.* at 1220. The aider-abettor there, Linda Hamilton, assisted her live-in partner Bernard Welch's burglary enterprise in a way that "was so intentional and systematic that she assisted each and every burglary committed by Welch." *Id.* at 1224. Importantly, Hamilton associated herself with a wholly criminal enterprise: Welch "had no outside employment," but "left the house most evenings and returned with antiques, jewelry, and precious metals," after which Hamilton did the "bookkeeping" to "facilitat[e] the sale of those stolen goods." *Id.* at 1219. Here, Plaintiffs allege that the MTN Defendants associated themselves with a telecommunications joint venture, which Plaintiffs admit provided legitimate telecommunications services to a "large swath of Iranian citizens." Arg. Tr. 34:18–24. Even Irancell's other shareholders, whatever associations they may have had, undisputedly had significant commercial, charitable, and other non-terrorist activities. *See* AC ¶¶ 786 & n.367, 796 & n.371, 1327 & n.579 (incorporating sources discussing IEI and Bonyad Mostazafan's commercial and charitable activities); *see also* ECF No. 82-1, MTN Defs.' MTD 9–10. Thus, unlike Linda Hamilton's intentional and systematic assistance to an enterprise doing nothing but burglary, the MTN Defendants are alleged to have participated in a telecommunications enterprise with vast, undisputedly legitimate, commercial activities, with business partners that themselves had vast commercial activities. Plaintiffs cannot clear the high bar *Taamneh* sets for establishing that by participating in a telecommunications venture, the MTN Defendants culpably associated themselves with attacks in Iraq and Afghanistan, participated in these attacks as something they wished to bring about, or sought to make them succeed.

---

[3] The Amended Complaint names no less than fifteen groups that it alleges have links to the IRGC: (1) Hezbollah, (2) Jaysh al-Mahdi, (3) Asaib Ahl al-Haq, (4) Ka'taib Hezbollah, (5) the Qods Force, (6) al-Nusra Front, (7) Ansar al-Islam, (8) al-Qaeda, (9) ISIS, (10) the Taliban, (11) the Haqqani Network, (12) Lashkar-e-Taiba, (13) Jaysh-e-Mohammed, (14) the Syrian regime, and (15) the Houthis. *See* AC ¶¶ 1393–1588, 1602.

5

***Culpable Scienter***. *Taamneh* establishes that Plaintiffs had to plead that the MTN Defendants provided *culpable, knowing* assistance *to the attack* – beyond the general awareness separately required under *Halberstam*. *See supra* p. 3. Here, Plaintiffs cannot sustain their theory that the MTN Defendants dealt with known "IRGC fronts" based on a 1980s *Newsday* article and references in two think-tank and scholarly publications—particularly when official U.S. Government sanctions determinations do *not* link Irancell's shareholders to the IRGC. *See* MTN Defs.' MTD 45–49; ECF No. 82-26, MTN Defs.' MTD Reply 4–5. But even if this were enough for general awareness, it cannot establish the knowledge required by *Taamneh*. Establishing *culpable, knowing* assistance requires more: Plaintiffs would have to plausibly allege that the MTN Defendants knowingly participated in terrorist acts to "make [them] succeed." 143 S. Ct. at 1223; *accord Siegel*, 933 F.3d at 224; *see supra* p. 2. Plaintiffs fail to do so here.

- At most, Plaintiffs allege that some terrorist groups have used cell phones to commit attacks, *see, e.g.*, AC ¶¶ 836–837; that the IRGC was involved with the Iranian telecommunications sector, *see, e.g.*, *id.* ¶¶ 896–897; and that Bonyad Mostazafan was a front for procuring military goods and technology, *id.* ¶¶ 776–779. But those allegations do not connect the dots between MTN Group's alleged provision of cellular technology to Irancell and the requisite mental state: "consciously and culpably 'participat[ing]' in a wrongful act so as to help 'make it succeed.'" *Taamneh*, 143 S. Ct. at 1223 (citation omitted).

- Even if Plaintiffs could adequately allege awareness that Bonyad Mostazafan and IEI were linked to the IRGC, that does not equate to knowledge about playing a role in terrorist attacks. The very source Plaintiffs cite to establish their theory of general awareness is not about terrorism, but is entitled: "How Intertwined Are the Revolutionary Guards in Iran's Economy?" ECF No. 82-9, Eisman MTN Defs.' MTD Decl. Ex. G (Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, Am. Enter. Inst. for Pub. Pol'y Rsch. (Oct. 22, 2007), *cited at* AC ¶ 1327 & n.579); *see also* MTN Defs.' MTD 10; MTN Defs.' MTD Reply 4. Entering a business venture with a partner that is at most linked to an organization that is intertwined with an entire country's economy does not establish culpable knowledge of participating in a terrorist attack to help make it succeed.

- Plaintiffs also fail to plausibly allege that the MTN Defendants satisfy *Taamneh*'s culpable-knowledge requirement by invoking the use of the term "security" in the 2005 Letter Agreement. *See* AC ¶¶ 877–887; Arg. Tr. 30:14–18. The Letter Agreement requires cooperation "in South Africa," and the Amended Complaint itself alleges what this security cooperation references: an alleged promise "that South Africa would deliver . . . whatever military equipment [Iran] desired." AC ¶¶ 915, 1028; *see* MTN Defs.' MTD 10–11; MTN Defs.' MTD Reply 5–7. These allegations cannot support any inference that the MTN Defendants culpably knew that they were participating in *terrorist* acts in Iraq and Afghanistan.

Any inference of knowledge is especially untenable since MTN Group undisputedly operated a real telecommunications service in Iran. As *Taamneh* explained, "internet or cell service providers [do not] incur culpability merely for providing their services to the public writ large."

6

143 S. Ct. at 1226; *see also supra* p. 3. Yet that is undisputedly what MTN Group did. As Plaintiffs conceded at oral argument, Irancell is a company that provides communications services to a "large swath of Iranian citizens." Arg. Tr. 34:18–24. Irancell's other indirect shareholders—IEI and Bonyad Mostazafan—likewise have substantial non-terrorist operations: IEI is an electronics manufacturer, while Bonyad Mostazafan is a state-directed charitable and commercial enterprise. *See* MTN Defs.' MTD 9–10.

Yet even if knowledge could be alleged, *Taamneh* requires plausible allegations of *intentional* aid to sustain Plaintiffs' theory. The alleged "nexus" between the MTN Defendants' acts and terrorist attacks in Iraq and Afghanistan is at best "attenuated," *Taamneh*, 143 S. Ct. at 1230: MTN Group invested in Irancell and provided it telecommunications equipment; Irancell did run a network but also allegedly had shareholders who, alongside their significant commercial activities, had IRGC ties; the IRGC itself had expansive commercial activities, but siphoned off some of the proceeds and equipment from Irancell to benefit a sweeping "NATO for Islamists" terrorist enterprise; this enterprise generally assisted a host of IRGC-linked terrorist militias across the Middle East and South Asia; and some of these IRGC-linked groups committed attacks in Iraq and Afghanistan, *see* MTN Defs.' MTD 50, 53. Where the alleged nexus is this attenuated, "courts should demand that plaintiffs show culpable participation through *intentional aid* that substantially furthered the tort." *Taamneh*, 143 S. Ct. at 1230 (emphasis added). No allegation plausibly supports an inference that a South African telecommunications company, by investing in an Iranian company that in fact provided telecommunications services, *intentionally* aided terrorist attacks in Iraq and Afghanistan.

Plaintiffs' allegations about the MTN Defendants' Afghanistan-based conduct also fail to plead culpable scienter under *Taamneh*. Those allegations claim that MTN Afghanistan employees "pa[id] monthly protection fees" to the Taliban, AC ¶ 1041 (internal quotation marks omitted), and deactivated transmission masts at night, *e.g.*, *id.* ¶ 1055. But MTN Afghanistan did not allegedly undertake these acts to help "make [a terrorist act] succeed." *Taamneh*, 143 S. Ct. at 1223 (internal quotation marks omitted). Quite the opposite, MTN Afghanistan allegedly paid the Taliban and deactivated transmission masts to "avoid the destruction of [MTN Afghanistan's] transmission masts," which the Taliban threatened to do if MTN Afghanistan did not comply with its demands. AC ¶ 1044 (internal quotation marks omitted). Put simply, Plaintiffs' allegation that the Taliban *violently extorted* MTN Afghanistan undermine any claim of "conscious, *voluntary*, and culpable participation" in the Taliban's terrorist acts. *Taamneh*, 143 S. Ct. at 1223 (emphasis added).

***Pervasive and Systemic Assistance***. Plaintiffs do not even try to allege that the MTN Defendants aided and abetted any of the specific "act[s] of international terrorism that injured the plaintiffs." *Id.* at 1225; *see supra* p. 2. Indeed, they premise their substantial assistance argument on an allegation that American technology "flow[ed]" from Irancell to "the IRGC's (including its Hezbollah Division's and Qods Force's) terrorist *enterprise*." ECF No. 82-25, Opp. to MTN Defs.' MTD 47 (quoting AC ¶ 823; emphasis added). This is exactly the sort of claim of "substantial assistance to a transcendent 'enterprise'" that *Taamneh* held is insufficient. 143 S. Ct. at 1224. Plaintiffs' only way to plead aiding-and-abetting liability, then, is to allege that the MTN Defendants "so systemically and pervasively" provided culpable assistance to terrorist groups that the MTN Defendants could be said to "aid and abet every single . . . attack" perpetrated by any IRGC-linked terrorist group anywhere in the world. *Id.* at 1228.

7

At most, Plaintiffs allege that (a) the IRGC indirectly benefitted from revenue that Irancell generated from its mobile phone subscribers as well as from illicit transactions between Irancell and the MTN Defendants, *see, e.g.,* AC ¶¶ 935, 1310, 1321, 1342–1343; (b) unidentified "agents" of the MTN Defendants helped Irancell source dual-use U.S. telecommunications equipment and technology services, which were used to run the Irancell network but also improved the IRGC's cellular-phone capabilities, which in turn enabled communication with Hezbollah and in turn facilitated its ability to carry out attacks, *id*. ¶¶ 60, 1005, 1010, 1113, 1332, 1350, 1361–1362, 1555; and (c) terrorist groups used the equipment that eventually flowed through to them to broadcast their recruiting propaganda throughout the Middle East, *id*. ¶¶ 1370–1374; *see also id*. ¶ 935. But the alleged activities—the procurement and provision of telecommunications services—reflect the activities of a telecommunications company. Indeed, allegations that terrorists could use customary communications technology needed to operate an ordinary commercial mobile network purportedly provided by the MTN Defendants to advance a broader terrorism enterprise is precisely the type of allegation that is "a far cry from the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." *Taamneh*, 143 S. Ct. at 1228.[4]

Nor does the Amended Complaint contain any allegations that the MTN Defendants offered their "routine services . . . in an unusual way or provide[d] such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terrorist attack." *Id*. (citing *Direct Sales Co. v. United States*, 319 U.S. 703, 707, 711–12, 714–15 (1943)). The MTN Defendants are nothing like the morphine distributor in *Direct Sales*. The distributor there was held liable for conspiring to illegally distribute narcotics based on its mailing to a small-town doctor of morphine in amounts far exceeding what an average doctor would prescribe in a year. *Direct* Sales, 319 U.S. at 706–07, 711–12, 714–15.[5] The MTN Defendants, by contrast, are

---

[4] That this technology allegedly included "encryption" technology, *see* AC ¶ 1332 (citing Ex. A, Bruce W. Don et al., RAND, *Network Technologies for Networked Terrorists* (2007), available to download at https://www.rand.org/pubs/technical_reports/TR454.html), is of no moment, because Plaintiffs' own sources confirm that such "dual-use technology," *id*.—technology that can be put to both commercial and non-commercial ends—is ubiquitous in everyday mobile communications. Plaintiffs' cited source confirms that, as early as 2007, "[t]errorists' use of encrypted communication [was] expected to become a fact of life" as "advances in cell phone computational capabilities will lead to easy-to-use encryption and decryption being used for all cell phone calls." Don et al, *supra*, at 33. Thus, as Plaintiffs themselves acknowledge, their allegation is simply that terrorists gained "encryption" technology because MTN Group "helped improve the technical capabilities of the phones and other network devices supplied to MTN Irancell," AC ¶ 1331—not because of any culpable and conscious effort to make acts of international terrorism succeed.

[5] That the defendant in *Direct Sales* was liable as a co-conspirator underscores *Taamneh*'s point that a pervasive-and-systemic theory of aiding-and-abetting liability "begins to blur with conspiracy liability." 143 S. Ct. at 1225. In conspiracy cases, the law imposes liability based "on a more attenuated relation with the principal violation because the defendant and the principal wrongdoer had agreed to a wrongful enterprise." *Id*. at 1221 n.9 (internal quotation marks omitted). Here, however, Plaintiffs fail to allege any such wrongful agreement. *See* MTN Defs.' MTD 38–

not alleged to have provided anything beyond telecommunications equipment and services that were indisputably necessary to run a consumer cell phone network. *See also supra* p. 5 (contrasting allegations against the MTN Defendants with the facts of *Halberstam*). In fact, Plaintiffs' own sources incorporated in their Amended Complaint acknowledge that the MTN Defendants allegedly procured "U.S. products" because they "performed well in [MTN Group's] other networks, and the company's technicians were familiar with them." ECF No. 82-35, Eisman MTN Defs.' Reply Decl. Ex. DD (Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters, Aug. 30, 2012, *cited at* AC ¶ 976 & n.454); *see also* MTN Defs.' MTD Reply 7, 12. Even assuming as true that this procurement evaded sanctions, the alleged purpose of the procurement was to help run a mobile-phone network. That is a world away from taking acts "consciously trying to help or otherwise participate in" international terrorism. *Taamneh*, 143 S. Ct. at 1227 (internal quotation marks omitted). Only the latter gives rise to ATA aiding-and-abetting liability.

For similar reasons, Plaintiffs also fail to plead that the MTN Defendants' actions in Afghanistan pervasively and systemically helped the Taliban such that they could be liable for any Taliban-linked attack. Far from playing a "systemic" "role in an illicit enterprise," *id.* at 1225, MTN Afghanistan, by Plaintiffs' own admission, paid the Taliban and deactivated transmission masts because the Taliban had "the power to blow . . . up" MTN Afghanistan's operations, AC ¶ 1042 (cleaned up)—not because MTN Afghanistan sought to join any sort of terrorist enterprise.

***Substantial Assistance***. Finally, when *Halberstam*'s substantial assistance factors are applied flexibly as *Taamneh* requires, the Amended Complaint fails to plausibly allege "participation in" the Iraq and Afghanistan attacks that is "both significant and culpable enough to justify attributing" those attacks to the MTN Defendants. 143 S. Ct. at 1225, 1229. Earlier briefing established that a factor-by-factor application of *Halberstam* strongly favored the MTN Defendants: helping run a consumer telecommunications network and providing U.S.-origin equipment for the specific reason that it is useful to running such a network does not constitute "culpable association" with terrorist attacks, and taking acts in Afghanistan to protect employees and a telecommunications network from the alleged wrongdoers themselves likewise does not constitute "culpable association"; the MTN Defendants were undisputedly not present at any terrorist attacks; and the MTN Defendants were motivated by commercial interests (and in the case of Afghanistan, the interests of protecting employees' lives). *See* MTN Defs.' MTD 50–56; MTN Defs.' MTD Reply 26–28. *Taamneh*'s application of specific factors further bolsters the reasons for dismissal: the MTN Defendants are alleged to have provided assistance relevant to running a telecommunications network, not "culpable conduct . . . directed toward" the terrorists who carried out the attacks in Iraq and Afghanistan; the MTN Defendants had no relationship with those terrorists, and even with respect to Irancell's shareholders had only an "arm's-length relationship"; and the MTN Defendants indisputably lacked an "intent to support" the terrorists in Iraq and Afghanistan. *Taamneh*, 143 S. Ct. at 1229–30.

---

43; MTN Defs.' MTD Reply 21–22. Having failed to allege that the MTN Defendants joined an "IRGC Conspiracy," Plaintiffs unsurprisingly fail to plead that the MTN Defendants provided pervasive and systemic assistance to an IRGC terrorist enterprise.

More fundamentally, *Taamneh* explains that the purpose of the *Halberstam* factors is to "help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* at 1229. Here, Plaintiffs have not alleged that the MTN Defendants "culpably associated themselves with [the terrorists'] actions" or that the MTN Defendants' assistance to the perpetrators of attacks in Iraq and Afghanistan was anything beyond "incidental." *Id.* Put simply, the largest telecommunications provider in Africa did not, by investing in a network in Iran that Plaintiffs concede had legitimate operations, engage in "conscious, voluntary, and culpable participation" in a series of terrorist attacks across the Middle East and South Asia. *Id.* at 1223. The aiding-and-abetting claims against the MTN Defendants therefore cannot withstand a motion to dismiss.

### III. Plaintiffs Fail to Sufficiently Allege that ZTE USA and ZTE TX Provided Knowing, Culpable and Substantial Assistance to the Acts of International Terrorism that Injured the Plaintiffs, as Required Under *Taamneh*

After *Taamneh*, the deficiencies in Plaintiffs' aiding and abetting claims alleged against ZTE USA and ZTE TX are even clearer. The *Taamneh* Court's ruling favors dismissal of ZTE USA and ZTE TX for at least five reasons:[6]

**First**, the Court clarified that the "knowing" part of the "knowing and substantial assistance" element of JASTA aiding and abetting requires more than mere general awareness; it requires conscious and culpable intent to make the terrorist attacks succeed. *Taamneh*, 143 S. Ct. at 1223, 1226. Plaintiffs have not asserted any plausible allegations that ZTE USA and ZTE TX— two American companies—had any intention to make terrorist attacks against U.S. citizens succeed. **Second**, the Court found that a defendant's provision of a widely used technology platform alone is insufficient to establish the culpable conduct required by JASTA. *Id.* at 1226. Plaintiffs' allegations regarding the ZTE U.S. Defendants' alleged provision of telecommunications capabilities is similarly inadequate. **Third**, the Court held that a JASTA claim requires sufficient allegations that a defendant aided another in the commission of the specific acts of international terrorism that injured the Plaintiffs—it is not enough to allege substantial assistance to a terrorist enterprise, as Plaintiffs do here. *Id.* at 1224. **Fourth**, the *Taamneh* Court held that an attenuated relationship between the defendant and the acts of international terrorism is fatal to an aiding and abetting claim, absent systemic and pervasive assistance. *Id.* at 1227, 1230. Here, Plaintiffs attempt to connect ZTE USA and ZTE TX to the acts of international terrorism only through a long chain of intermediaries and otherwise fail to allege any non-conclusory allegations of systemic and pervasive assistance by ZTE USA and ZTE TX. **Fifth**, the Court clarified that *Halberstam*'s six-factor test should not be applied rigidly, and a flexible application here weighs in favor of dismissal.

---

[6] These reasons for dismissal also apply to ZTE USA and ZTE TX's pending Motion to Dismiss in related case *Lau, et al., v. ZTE Corporation, et al.*, Case No. 1:22-cv-01855-CBA-SJB. To the extent the Court would like a separate letter addressing the impact of *Taamneh* to the *Lau* case, however, ZTE USA and ZTE TX would be happy to submit a letter to the Court.

The *Taamneh* decision also supports dismissal of Plaintiffs' conspiracy claim, in that the Court noted that the pleading burden for conspiracy liability is higher than aiding and abetting because it requires that the defendant entered into an agreement "with the primary wrongdoer." *Id.* at 1221. Here, Plaintiffs merely allege (insufficiently) that ZTE USA and ZTE TX entered into an agreement with ZTE Corp.—not any of the terrorist actors.

***Lack of Conscious Intent to Make the Terrorist Attacks Succeed***: Plaintiffs fail to sufficiently allege that ZTE USA and ZTE TX consciously and culpably participated in an act of international terrorism so as to help "make it succeed," as *Taamneh* requires. *Id.* at 1223. The *Taamneh* Court held that the "knowing" prong of the "knowing and substantial assistance" element of JASTA aiding and abetting is not merely a "carbon copy" of the general awareness element. *Id.* at 1229. Rather, the "knowing" prong requires conscious and culpable participation in an act of international terrorism. *Id*. at 1223–24. The requisite scienter must be so strong that "the key question, therefore, is whether defendants gave such knowing and substantial assistance to [the terrorist group] that they culpably participated in the [terrorist] attack." *Id.* at 1226. Plaintiffs plead no specific conduct by ZTE USA and ZTE TX to infer an intent to make the terrorist attacks in Iraq and Afghanistan succeed. Instead, Plaintiffs allege only that ZTE USA and ZTE TX's intent was to assist ZTE Corp. in evading trade sanctions to provide a telecommunications platform in Iran. Without more, Plaintiffs fall far short of adequately alleging an intent to make the terrorist attacks that injured the Plaintiffs succeed.

***Lack of Culpable Conduct***: In *Taamneh*, the Court held that the defendants' mere provision of social media platforms was not itself culpable conduct sufficient to suggest that defendants intended to associate themselves with the Reina attack. *Id.* at 1226 ("To be sure, it might be that bad actors like ISIS are able to use platforms like defendants' for illegal—and sometimes terrible—ends. But the same could be said of cell phones, email, or the internet generally."). Similarly here, Plaintiffs argue that ZTE USA and ZTE TX intended to help ZTE Corp. "modernize telecommunications technology" by providing telecommunications equipment to Iran's largest telecommunications company for use by millions of citizens across Iran. *See* AC, ¶ 1135. According to Plaintiffs, this, in turn, provided terrorists with enhanced modes of communication, such as location tracking. But even if ZTE USA and ZTE TX's alleged assistance to ZTE Corp. in providing telecommunications technology to Iran's largest telecommunications carrier ultimately made it easier for terrorists to conduct their illegal activities, that alone is not sufficient to support liability. *Taamneh*, 143 S. Ct. at 1226 ("Nor do we think that such providers would normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones—even if the provider's conference-call or video-call features made the sale easier.").

***Failure to Allege Assistance of Another in the Commission of the Act of International Terrorism***: Like Plaintiffs here, the *Taamneh* plaintiffs argued that JASTA only requires a defendant to aid and abet the terrorist actor generally. *Id.* at 1223. The Supreme Court rejected this view, stating that "the focus must remain on the tort itself"—on the act, not simply the "person." *Id.* at 1223–24; *see also id*. at 1225 ("[B]ecause [plaintiffs] are trying to hold defendants liable for the Reina attack, plaintiffs must plausibly allege that defendants aided and abetted ISIS in carrying out *that attack*." (emphasis added)). While aiding and abetting does not require the defendant to know "all the particulars of the primary actor's plan," it does require that the defendant aid and abet another in the commission of the specific act of international terrorism. *Id.* at 1224. Because

11

aid to the specific terrorist attack is crucial, the Court held that it is therefore "not enough" to allege a defendant's "substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id.*

Here, Plaintiffs only allege that ZTE USA and ZTE TX provided substantial assistance to *ZTE Corp.*—not that either entity provided substantial assistance to the acts of international terrorism or aided and abetted the terrorist actors. On this basis alone, Plaintiffs' theory of liability against ZTE USA and ZTE TX fails under *Taamneh*. But even if the U.S. entities were considered alongside ZTE Corp., at most Plaintiffs allege that ZTE Corp. aided and abetted a terrorist enterprise generally—a theory the Court rejected. *See id.* 1224 ("Enterprises' or 'conspiracies' alone are…not tortious" for purposes of JASTA).[7] Plaintiffs' entire theory against the ZTE U.S. Defendants rests on "ZTE's" alleged aid to a "terrorist campaign" or enterprise. Indeed, the phrase "campaign" appears 305 times in the 488-page Amended Complaint. The allegation that ZTE USA and ZTE TX's conduct resulted in substantial assistance to a broader enterprise or "campaign" is at the core of Plaintiffs' claims. *See, e.g.*, AC, ¶ 1596 (alleging that ZTE USA and ZTE TX coordinated with "ZTE" to aid and abet the attacks by modernizing Iranian telecommunications, providing U.S.-origin technology and generating revenue, which were used "***in furtherance of Hezbollah's terrorist enterprise***" (emphasis added)); *see also* AC, ¶¶ 3, 37, 48, 61, 62, 69, 1629. Thus, because *Taamneh* requires substantial assistance to another *in the commission of the act of terrorism*—not substantial assistance to ZTE Corp. or some broader campaign—Plaintiffs' aiding and abetting claims against ZTE USA and ZTE TX fail.

***Attenuated Relationship between ZTE USA & ZTE TX and the Terrorist Attacks***: The *Taamneh* Court placed critical importance on the "highly attenuated relationship" between the defendants and the Reina attack, absent some other good reason to infer conscious help with or participation in that attack. *Taamneh*, 143 S. Ct. at 1227; *see also id.* at 1229 ("The focus thus must remain on the Reina attack; plaintiffs' failure to allege any definable nexus between the defendants' assistance and that attack therefore—at minimum—drastically increases their burden to show that defendants somehow consciously and culpably assisted the attack."). Here, ZTE USA and ZTE TX's alleged assistance to ZTE Corp. is highly attenuated from the ultimate acts of international terrorism in Iraq and Afghanistan that injured the Plaintiffs. Indeed, the alleged connection involves a long chain of intermediaries and intervening actors that breaks any plausible chain of causation. *See* ECF 83-1, ZTE U.S. Defs.' MTD, at 32–33.

Importantly, the *Taamneh* Court held that establishing JASTA liability *without* a strict nexus between the defendant's aid and the specific act of terrorism increases the burden on plaintiffs to sufficiently allege that defendants "so systemically and pervasively assisted" the terrorist perpetrator such that "defendants could be said to aid and abet every single ISIS attack." *Taamneh*, 143 S. Ct. at 1228. Here, Plaintiffs fail to plausibly allege what role ZTE USA or ZTE TX played even in assisting ZTE Corp., let alone the role the U.S. entities played in assisting each and every attack arising from Plaintiffs' so-called worldwide terrorist campaign. *See, e.g.*, ZTE U.S. Defs.' MTD at 14–16.

---

[7] For the same reasons, Plaintiffs' aiding and abetting claim based on a RICO predicate fails because Plaintiffs merely allege assistance to a general conspiracy, not assistance to the acts of international terrorism that injured the Plaintiffs.

***Halberstam's six factors weigh in favor of dismissal:*** The *Taamneh* Court clarified that *Halberstam's* six-factor test is not to be taken as an "inflexible code[]" but rather should be analyzed flexibly to see whether a plaintiff's allegations "capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Taamneh*, 143 S. Ct. at 1229. Importantly, the focus of the Ninth Circuit's analysis should not have been "on the value of defendants' platforms *to ISIS*," but rather "whether defendants culpably associated themselves with ISIS' actions." *Id.* (emphasis in original). As the ZTE U.S. Defendants set forth in their Motion to Dismiss, each of the six *Halberstam* factors strongly favor dismissal. That conclusion is only strengthened by *Taamneh*. For example, in applying the second factor ("the amount and kind of assistance"), the Supreme Court explained that ISIS' ability to benefit from the defendants' platforms "was merely incidental to defendants' services and general business models; it was not attributable to any culpable conduct of defendants directed toward ISIS." *Id.* The same is true here. Plaintiffs plead only that terrorists incidentally benefitted from ZTE Corp.'s assistance in "modernizing" Iran's telecommunications infrastructure. They do not plead that any ZTE entity's conduct was "directed toward" the terrorists who injured the Plaintiffs. And in applying the fourth factor ("the defendants' relationship to [the terrorist]"), the Ninth Circuit erred by not giving "much greater weight to defendants' arm's-length relationship with ISIS." *Id.* Here, there is far greater attenuation than an arm's length relationship to the terrorist actors—indeed, the only relationship ZTE USA and ZTE TX are alleged to have had was with ZTE Corp. Finally, in applying the fifth factor ("the defendants' state of mind"), the Ninth Circuit also erred by not giving greater weight to the defendants' "lack of intent to support ISIS." *Id.* at 1230. Here, no such intent was plausibly pled or can be reasonably inferred on the part of ZTE USA and ZTE TX. Neither defendant "consciously and culpably participated in a tortious act"—that is, in the terrorist attack that injured the plaintiff— "in such a way as to help make it succeed." *Id.* at 1225 (cleaned up).

***Conspiracy***: In drawing a contrast between aiding and abetting and conspiracy liability, the *Taamneh* Court observed that conspiracy liability has a "significant limiting principle" in that it requires defendant's "agreement with the primary wrongdoer to commit wrongful acts[.]" *Id.* at 1221 (citing *Nye & Nissen v. United States*, 336 U.S. 613, 620 (1949)). This reaffirmance of a long-established, common-law principle makes clear that Plaintiffs do not sufficiently allege a JASTA conspiracy claim because they do not allege a conspiracy agreement between ZTE USA and ZTE TX and the primary wrongdoers, *i.e.*—terrorist actors.

      For all of the foregoing reasons, in addition to those set forth in the ZTE U.S. Defendants' Motion to Dismiss, all of Plaintiffs' claims should be dismissed as to ZTE USA and ZTE TX.

**IV.**    **<u>Taamneh Confirms Plaintiffs' Failure to Allege that the Huawei U.S. Defendants Knowingly and Substantially Assisted Terrorist Attacks in Iraq and Afghanistan</u>**

      As discussed above, the Supreme Court's decision in *Taamneh* made several points abundantly clear, all of which reinforce the arguments of Huawei Technologies USA Inc., Huawei Device USA Inc., and Futurewei Technologies, Inc. (collectively, the "Huawei U.S. Defendants") in their motions to dismiss. <u>First</u>, in upholding the district court's decision granting defendants' motion to dismiss, the Supreme Court reaffirmed that district courts are to engage in a rigorous

review of plaintiffs' allegations. They are not to ignore gaps in plaintiffs' claims and leave it to discovery for plaintiffs to fill in the voids. Second, the Supreme Court emphasized the important role the *knowledge* requirement plays in the "knowing and substantial assistance" element. Plaintiffs must plead more than general awareness—rather they must plead sufficient facts to show defendant's "conscious and culpable conduct" as to the terrorist attacks in question. *Taamneh*, 143 S. Ct. at 1229. Third, the Court explicitly held that the degree of attenuation between the defendants' alleged assistance and the relevant terrorist attacks is critical to assessing whether plaintiffs have stated a valid aiding and abetting claim. In sum, while our papers already showed Plaintiffs fail to state a claim for aiding and abetting against the Huawei U.S. Defendants, Plaintiffs' failures become even more pronounced in light of *Taamneh*.[8]

***First, plaintiffs must allege specific, non-conclusory facts to support aiding-and-abetting claims.*** In unanimously upholding the district court's dismissal of aiding and abetting claims at the pleading stage, the Supreme Court made clear that plaintiffs' allegations must be closely scrutinized. Although the *Taamneh* Court dispensed with an express discussion of well established pleading standards, it embraced the district court's careful application of *Iqbal* and *Twombly* to the plaintiffs' ATA claims. *See Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 909 (N.D. Cal. 2018) (citing *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)). Indeed, on the key point for the Supreme Court that the plaintiffs had alleged no connection between ISIS's use of social media and the attack at issue, *see Taamneh*, at 143 S. Ct. at 1227, the district court, expressly relying on *Iqbal* and *Twombly*, had rejected the plaintiffs' reliance on their conclusory allegation that the ISIS attacker "was radicalized by ISIS's use of social media." *See Taamneh*, 343 F. Supp. 3d at 913 (internal quotations omitted); *see also id.* at 919 (describing allegation as inadequate because it was "entirely conclusory in nature"). The Supreme Court disregarded that allegation without comment, and thus took the same view of the allegation as the district court. Moreover, one aspect of the Ninth Circuit's analysis that the *Taamneh* Court accepted was its conclusion that plaintiffs "failed to state a claim for aiding-and-abetting liability" as to Google's revenue-sharing system due to the absence of allegations to connect it to the terrorist attack at issue: "The complaint here alleges nothing about the amount of money that Google supposedly shared with ISIS, the number of accounts approved for revenue sharing, or the content of the videos that were approved." 143 S. Ct. at 1230. Critically, the Supreme Court did not view these holes as a reason for discovery—instead, they were reasons for dismissal.

Plaintiffs' complaint here exhibits the same flaws. Plaintiffs' extensive and improper reliance on group pleading and conclusory allegations (*see* ECF No. 102-1, Huawei U.S. Defs' MTD at 15-22), as well as express hopes for discovery to fill the gaps (*see, e.g.*, AC ¶¶ 876; *see also id.* ¶¶ 20, 109, 864, 870), cannot satisfy the pleading standard *Taamneh* applied. *See, e.g.*, ECF No. 103, Huawei U.S. Defs' Reply at 8–11 (detailing Plaintiffs' failure to allege any specific facts regarding "how or what assistance the Huawei U.S. Defendants supposedly provided to the

---

[8] Plaintiffs have likewise failed to state a conspiracy claim against the Huawei U.S. Defendants, but because the *Taamneh* decision only addresses aiding and abetting, this letter addresses only plaintiffs' aiding-and-abetting claim. Similarly, that this letter refers to some, but not all, of the Huawei U.S. Defendants' arguments for dismissal, does not constitute a disclaimer or waiver of those omitted arguments.

14

terrorists who caused their injuries"); Huawei U.S. Defs' MTD at 14 (discussing how the amended complaint "is devoid of *any* specific factual allegations . . . that could support a plausible inference that [the Huawei U.S. Defendants] provided . . . substantial and knowing assistance").

***Second, the Court's attention must be focused on whether the defendants provided conscious and culpable support to the terrorist attacks in question.*** Stepping back from *Halberstam's* well worn six-factor analysis, the *Taamneh* Court focused on core principles:

> [B]oth JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably "participate[d]" in a wrongful act so as to help "make it succeed." *Nye & Nissen*, 336 U.S., at 619. . . .
>
> * * *
>
> [I]t is not enough, as plaintiffs contend, that a defendant have given substantial assistance to a transcendent "enterprise" separate from and floating above all the actionable wrongs that constitute it. Rather, a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong—here, an act of international terrorism.

143 S. Ct. at 1223-24. For the reasons fully addressed in the Huawei U.S. Defendants' prior briefing and argument, Plaintiffs have utterly failed to allege that Huawei "consciously and culpably" participated in an "act of international terrorism" to help "make it succeed." *Id.* at 1223.

Plaintiffs plead no specific connection between Huawei's conduct and any of the individual attacks that injured them. Instead, Plaintiffs devote hundreds of pages in their complaint to describing a sweeping terrorist enterprise involving dozens of terrorist organizations throughout the Middle East and Asia, as well as the Iranian government, its military arm the IRGC, and numerous companies with which it is affiliated. That disparate alleged network is precisely the type that the Supreme Court disapprovingly described: a "transcendent enterprise . . . floating above" widespread terrorist activity in the Middle East. Plaintiffs pled no facts supporting the inference that the Huawei U.S. Defendants associated with, or knew the fruits of their alleged conduct were going to, the IRGC, Hezbollah, or any other terrorist group responsible for the attacks, let alone that the Huawei U.S. Defendants intended to aid such attacks. Huawei U.S. Defs' Reply at 14–18. Rather, Plaintiffs accuse the Huawei U.S. Defendants of providing telecommunications equipment and services, through various intermediaries, to three Iranian telecommunications operators that undeniably perform significant legitimate economic activities. Huawei U.S. Defs' MTD at 23–24; Huawei U.S. Defs' Reply at 4-5. Or, as Plaintiffs themselves characterize it, Huawei played a role in "'moderniz[ing] the telecommunications technology' in Iran." Huawei U.S. Defs' MTD at 24 (quoting AC ¶¶ 1264, 1597). These allegations align closely with those the Supreme Court found far from adequate in *Taamneh*.

In *Taamneh*, as here, the plaintiffs never alleged a connection between the defendants' servicers and the attack in question. None of those allegations suggest that defendants culpably "associate[d themselves] with" the Reina attack, "participate[d] in it as something that [they] wishe[d] to bring about," or sought "by [their] action to make it succeed." 143 S. Ct. at 1226

15

(quoting *Nye & Nissen*, 336 U.S., at 619). Instead, the plaintiffs attempted to rest liability on the defendants' provision of services on an "arm's length" basis to the public at large. And the Court emphasized that allegations that bad actors might have used those platforms for ill purposes did not render Twitter liable. Although the Huawei U.S. Defendants are several steps further removed—in that they themselves did not provide the telecommunications services Plaintiffs claim might have been used in the attacks here, the same reasoning applies with equal force here:

> The mere creation of those platforms, however, is not culpable. To be sure, it might be that bad actors like ISIS are able to use platforms like defendants' for illegal—and sometimes terrible—ends. But the same could be said of cell phones, email, or the internet generally. Yet, we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large.
>
> * * *
>
> The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts. And that is particularly true because a contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them. That conclusion would run roughshod over the typical limits on tort liability and take aiding and abetting far beyond its essential culpability moorings.

*Id.* at 1226, 1228-29. Absent allegations that would support a claim that the Huawei U.S. Defendants supported the objectives of the terrorists who harmed Plaintiffs, their claims under JASTA cannot succeed.[9]

**Third, attenuation matters.** Faced with the fact that the Huawei U.S. Defendants' alleged provision of telecommunications technology and infrastructure to the Iranian telecommunications companies is many steps removed from any terrorist organization or acts in Iraq or Afghanistan, Plaintiffs argued that the Huawei U.S. Defendants' "attempt (MTD 26-27) to transform 'relation to the principal' into an inquiry about 'attenuation' is [] misplaced." ECF No. 105, Opp. to Huawei U.S. Defs' MTD at 32. Attenuation, which they acknowledged the Second Circuit had discussed in *Honickman*, has nothing to do with substantial assistance, they argued. The Supreme Court disagreed.

---

[9] The Supreme Court's decision further illustrates why Plaintiffs' theory that providing substantial assistance to a party that has to then remit some money to a terrorist-affiliated group that might itself remit some money to the terrorists who committed the attack cannot support an aiding-and-abetting claim. Such a theory—without additional facts showing scienter and a nexus between the assistance and the specific terrorist attacks at issue (or "pervasive, systemic, and culpable" support for the FTO, *see infra* page 18)—falls far short of what *Taamneh* requires. And here, Plaintiffs do not plead nearly enough facts to support this theory.

The Court expressed grave concern about stretching aiding and abetting liability "too far," such that "ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." 143 S. Ct. at 1221. To avoid that, "the more attenuated the nexus" "between the defendant's acts and the tort," "the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* at 1230. On the facts before it, the Supreme Court observed:

> the relationship between defendants and the Reina attack is highly attenuated. As noted above, defendants' platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis. Yet, there are no allegations that defendants treated ISIS any differently from anyone else. Rather, defendants' relationship with ISIS and its supporters appears to have been the same as their relationship with their billion-plus other users: arm's length, passive, and largely indifferent.

*Id.* at 1227. So too, here. The Huawei U.S. Defendants are alleged to have engaged in arm's length transactions to supply telecommunications equipment and technology to the largest mobile telephone operators in Iran. There is no allegation that they gave special treatment to, or even interacted with, any terrorist organization in the course of doing so. Even Plaintiffs allege that they did so for "greed" or "profit," not to somehow promote the aims of terrorist groups that might use the telecommunications networks. *See* Huawei U.S. Defs' MTD at 27–28 (discussing how Plaintiffs allege that profits—and not support for terrorists—was the Huawei U.S. Defendants' motivation).

The Supreme Court noted that the defendants' "relationship with the Reina attack is even further removed, given the lack of allegations connecting the Reina attack with ISIS' use of these platforms." 143 S. Ct. at 1227. Again, the same is true here. Plaintiffs' several hundred page complaint makes no effort to connect the use of any Huawei equipment or technology, much less any provided by the Huawei U.S. Defendants, to any terrorist attack. The closest they come is the vacuous allegation that terrorists use cellphones. *See* AC ¶ 1265 ("By way of example, terrorists were able to use cell phones and other telecommunication technology and software to perpetrate attacks on Americans."). Such conclusory allegations should be rejected for the same reason as those in *Taamneh* alleging a conclusory connection between social media and the attack there: they are plainly inadequate to support aiding and abetting claims. In fact, here "[t]he chain between the Huawei U.S. Defendants and the terrorists has far more links, and far less alleged factual support, than the ATA precedents on which Plaintiffs rely." Huawei U.S. Defs' MTD at 4; *see also* Huawei U.S. Defs' Reply at 4–5 (detailing distance between Huawei U.S. Defendants' alleged conduct and the terrorist groups who carried out the attacks).

Plaintiffs also wrongly "frame[] the issue of substantial assistance as turning on defendants' assistance to [the FTOs'] activities in general" as opposed to the nexus between the "defendants' [acts] and the [terrorist] attack[s]." 143 S. Ct. at 1229. And, in the course of doing so, they (like the Ninth Circuit) rely heavily on the supposed value of the telecommunications equipment to terrorists and give little to no attention to the absence of facts to show that the Huawei U.S. Defendants engaged in "conscious, voluntary, and culpable participation" in any act of terrorism that injured Plaintiffs. *Id.* at 1223. As noted above, the Supreme Court explained:

17

> The Ninth Circuit thus erred in focusing (as it did) primarily on the value of defendants' platforms *to ISIS*, rather than whether defendants culpably associated themselves with ISIS' actions. . . . ISIS' ability to benefit from these platforms was merely incidental to defendants' services and general business models; it was not attributable to any culpable conduct of defendants directed toward ISIS. . . . [T]he Ninth Circuit should have given much greater weight to defendants' arm's-length relationship with ISIS—which was essentially no different from their relationship with their millions or billions of other users—and their undisputed lack of intent to support ISIS.

*Id.* at 1229-30.

The same problem infuses Plaintiffs' argument here. The amended complaint devotes numerous paragraphs to the Huawei U.S. Defendants' supposed (indirect) commercial connections to the Iranian telecommunications companies, but it alleges no specifics connecting it in any way to any terrorist attack. *See, e.g.*, Huawei U.S. Defs' MTD at 21 ("Plaintiffs do not bother to allege, however, how any terrorist organization is purported to have used any of this allegedly stolen IP or other technology."). They certainly do not allege any kind of nexus between the "aid" defendants provided and the attacks in this case—which is fatal to their claims.

Nor can Plaintiffs' case be saved by a heightened showing that their allegations establish a "type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." *Taamneh*, 143 S. Ct. at 1228. Plaintiffs fall far short of that standard here for the same reasons the Supreme Court found plaintiffs' allegations "a far cry" from satisfying that standard in Twitter:  both sets of plaintiffs failed to allege "defendants intentionally associated themselves with [the terrorist groups'] operations or affirmatively gave aid that would assist each of [the terrorist groups'] terrorist acts." *Id.; see also* Huawei U.S. Defs' Reply at 14-18 (detailing lack of allegations that Huawei U.S. Defendants associated with, were "one in spirit with," or knew the telecommunications equipment they allegedly provided went to, any entity responsible for the attacks, much less that the Huawei U.S. Defendants intended to aid such attacks.); *see id.* at 8-13 (detailing Plaintiffs' failure to allege any "assistance at all on the part of the Huawei U.S. Defendants"); *see also* Huawei U.S. Defs' MTD at 21-26 ("Plaintiffs do not bother to allege, however, how any terrorist organization is purported to have used any of this allegedly stolen IP or other technology…[and] Plaintiffs have not pled with any specificity what technology—let alone the quantity—any of the Huawei U.S. Defendants provided or how the technology flowed from any of those entities to Hezbollah or any other terrorist group.").

While the Supreme Court has discounted the value of rigid application of the six *Halberstam* factors as a framework for analysis, the principles of "conscious, voluntary, and culpable participation" that it draws from *Halberstam* dovetail with the Huawei U.S. Defendants' arguments under that framework. Plaintiffs pointed to no allegations, under those factors or otherwise, that support the necessary nexus to the terrorist attacks in question or the necessary culpable association with the terrorist actors. For all these reasons, *Taamneh* confirms that the Huawei U.S. Defendants' motion to dismiss should be granted.

18

Dated: June 2, 2023                               Respectfully submitted,

| | |
|---|---|
| **COVINGTON & BURLING LLP** | **FRESHFIELDS BRUCKHAUS DERINGER LLP** |
| s/ *David M. Zionts* <br> David M. Zionts (admitted *PHV*) <br> Covington & Burling LLP <br> One CityCenter <br> 850 Tenth Street N.W. <br> Washington, DC 20001 <br> Telephone: (202) 662-5987 <br> Facsimile: (202) 778-5987 <br> dzionts@cov.com <br><br> Benjamin S. Haley (admitted *PHV*) <br> Covington & Burling (Pty) Ltd. <br> Rosebank Link <br> 173 Oxford Road, 7th Floor <br> Johannesburg 2196, South Africa <br> Telephone: +27 (11) 944-6914 <br> bhaley@cov.com <br><br> *Counsel for Defendants MTN Group Limited and MTN (Dubai) Limited* | s/ *Timothy P. Harkness\** <br> Timothy P. Harkness <br> Kimberly H. Zelnick <br> Scott A. Eisman <br> Freshfields Bruckhaus Deringer US LLP <br> 601 Lexington Avenue, 31st Floor <br> New York, New York 10022 <br> Telephone: (212) 277-4000 <br> timothy.harkness@freshfields.com <br> kimberly.zelnick@freshfields.com <br> scott.eisman@freshfields.com |
| **BLANK ROME LLP** | |
| s/ *Frank A. Dante\** <br> Frank A. Dante (admitted *PHV*) <br> Melissa F. Murphy (admitted *PHV*) <br> Serena S. Gopal (admitted *PHV*) <br> One Logan Square <br> Philadelphia, Pennsylvania 19103 <br> (215) 569-5645 <br> frank.dante@blankrome.com <br> melissa.murphy@blankrome.com <br> serena.gopal@blankrome.com <br><br> *Attorneys for ZTE (USA), Inc. and ZTE (TX), Inc.* | Mike Margolis (admitted *PHV*) <br> 2029 Century Park East, 6th Floor <br> Los Angeles, CA 90067 <br> (424) 239-3839 <br> mike.margolis@blankrome.com <br><br> Martin S. Krezalek <br> 1271 Avenue of the Americas <br> New York, NY 10020 <br> (212) 885-5130 <br> martin.krezalek@blankrome.com |

**JONES DAY**

s/ *Stephen J. Brogan*\*
Stephen J. Brogan (*pro hac vice*)
sjbrogan@jonesday.com
James E. Gauch (*pro hac vice*)
jegauch@jonesday.com
Steven T. Cottreau, No. 830194
scottreau@jonesday.com
Gabrielle E. Pritsker, No. 5432208
gpritsker@jonesday.com
51 Louisiana Avenue, N.W.
Washington, DC 20001.2113
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700

Fahad A. Habib (*pro hac vice*)
fahabib@jonesday.com
Emily Goldberg Knox (*pro hac vice*)
egoldbergknox@jonesday.com
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700

*Attorneys for Defendants*
HUAWEI TECHNOLOGIES USA INC.,
HUAWEI DEVICE USA INC. and
FUTUREWEI TECHNOLOGIES, INC

\*E-signed with permission.

CC: Counsel of Record (via ECF)