**SPARACINO**
PLLC

1920 L Street, N.W., Suite 835
Washington, D.C. 20036

June 12, 2023

**BY CM/ ECF**
The Honorable Carol Bagley Amon, U.S.D.J.
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     ***Zobay v. MTN Group Ltd.***, No. 1:21-cv-03503

Dear Judge Amon:

Pursuant to this Court's order of May 22, 2023, Plaintiffs submit this response to the Defendants' June 2, 2023, letter (ECF 122) addressing the impact of *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023), and *Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023), on the Defendants' pending motions to dismiss.[1]

*Twitter* does not compel dismissal here. To the contrary, the contrast between the "passive nonfeasance" found inadequate to support aiding and abetting liability in *Twitter* and the active malfeasance committed by the defendants here strongly supports the viability of Plaintiffs' claims.

**I.      The Post-*Twitter* Landscape for JASTA Aiding and Abetting Liability**

**A.  The *Twitter* Decision**

In *Twitter*, the Supreme Court considered two kinds of aiding and abetting claims by victims of the ISIS terrorist attacks on the Reina nightclub in Istanbul. 143 S. Ct. at 1215. The first alleged that three social media companies were liable for injuries caused by the Reina attack because they "fail[ed] to stop ISIS from using their platforms" to post recruiting and propaganda videos. *Id.* at 1227. The second alleged that Google was liable because it "reviewed and approved ISIS videos on YouTube as part of its revenue-sharing system and thereby shared advertising revenue with ISIS." *Id*. at 1230.

The Court rejected liability under both theories, but for very different reasons.  With respect to the allegations that the defendants failed to adequately prevent ISIS from using their platforms, the court observed that the allegations were based "less on affirmative conduct" than on failure to act, and that the law has "long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance." *Id*. at 1227. In the absence of affirmative misconduct, the Court explained, "a strong showing of assistance and scienter would thus be required" to support liability. *Id*. The *Twitter* plaintiffs failed to make such a showing because "the relationship between defendants and the Reina attack is highly attenuated" in that "defendants' platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis," and the plaintiffs offered no "allegations that defendants treated ISIS any differently from

---

[1] In *Google*, the Supreme Court remanded for further proceedings in light of *Twitter*. Like Defendants, Plaintiffs accordingly focus on *Twitter* here.



Judge Amon
June 12, 2023
Page 2

anyone else." *Id*. Where the defendants' relationship to the terrorists was "the same as their relationship with their billion-plus other users"—"arm's length, passive, and largely indifferent"— there was no basis for concluding that the defendants acted culpably. *Id.* Put differently, the plaintiffs' claims failed in three separate respects: they failed to allege any "nexus between th[e] assistance and the Reina attack"; failed to allege that "any defendant intend[ed] to assist ISIS"; and failed even to identify "any sort of affirmative and culpable misconduct that would aid ISIS." *Id*. at 1230. For those reasons together, the claims based on social media services fell short.

The Supreme Court employed a different analysis to allegations based on revenue sharing. It never suggested that these allegations amounted to mere "passive nonfeasance" or were not sufficiently culpable to support liability. Instead, it observed that the plaintiffs had "allege[d] nothing about the amount of money that Google supposedly shared with ISIS, the number of accounts approved for revenue sharing, or the content of the videos that were approved." *Id*. at 1230. Absent such allegations, the plaintiffs failed to plausibly allege that the assistance was "substantial": as the Court explained, if "Google only approved one ISIS-related video and shared only $50 with someone affiliated with ISIS," aiding and abetting liability would be inappropriate.[2] *Id*. The Court's logic suggests that if the number of videos approved had been large, or the revenue sharing financially significant, the allegations would have supported JASTA liability.

## B. *Twitter's* Effect on JASTA Jurisprudence

Second Circuit precedent requires this Court to take a cautious approach when evaluating the effect of *Twitter* on existing circuit precedent. "District courts in this circuit. . . must follow binding circuit precedent 'unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'" *United States v. Dupree*, 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016) (citation omitted). Indeed, the decision whether Second Circuit precedent has been overruled "should almost always be left to the Circuit," as opposed to district courts. *Id*. Accordingly, "even if a Supreme Court case is 'in tension' with Second Circuit precedent, district courts are required to follow the Circuit's precedent." *Id*. (citation omitted).

Here, the Supreme Court did not overrule the Second Circuit's precedents. On the contrary, the Court largely confirmed the JASTA framework applied by the Second Circuit in *Kaplan v.*

---

[2] Contrary to Defendants' assertion, the Supreme Court did *not* find the revenue-sharing allegation deficient "due to the absence of allegations to connect it to the terrorist attack at issue." ECF 122 at 14. Instead, the Court explained that because the plaintiffs' theory of liability required them to show that Google's assistance rendered it liable for *every* ISIS attack, a small amount of assistance was insufficient. *Twitter*, 143 S. Ct. at 1230. But the Court never suggested that such liability could never attach (when, for example, the amount was larger); nor did it foreclose liability for a "definable subset" of attacks based on smaller amounts of support with a closer nexus to the attacks. *Id*. at 1228.

**SPARACINO**
— PLLC —

Judge Amon
June 12, 2023
Page 3

*Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), and by this Court in *Bartlett v. Société Générale de Banque Au Liban SAL,* No. 19–cv–007, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020).

1. ***Twitter* confirms *Halberstam's* emphasis on liability for foreseeable results of wrongful conduct.**

The Supreme Court, like the Second Circuit, noted the statutory mandate to use the "legal framework" of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), under which (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." *Twitter*, 143 S. Ct. at 1219 (quotations omitted).

The Court clarified that *Halberstam's* "exact phrasings and formulations" are not "inflexible codes," but "should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably participate[ ] in a tortious act in such a way as to help make it succeed." *Id*. at 1225 (quotations omitted). It also confirmed that a "strict nexus between [the defendant's] assistance and the terrorist act" is not required because "people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort." *Id*. Thus, "a close nexus between the assistance and the tort," while helpful, is not necessary; "more remote support can still constitute aiding and abetting in the right case"—and what makes a case the "right" one is the foreseeability of the ultimate tort from the wrongful act the defendant aided. *Id*. That echoes the Second Circuit's explanation that "[f]oreseeability is thus central to the *Halberstam* framework, and as a result, to JASTA aiding-and-abetting liability." *Honickman*, 6 F.4th at 489; *see also Kaplan*, 999 F.3d at 860-61. Under the common-law framework that *Twitter* embraces, a defendant who knowingly engages in wrongful conduct from which a particular tort is foreseeable need not have specific intent to commit the ultimate tort to be liable for aiding and abetting it.

2. ***Twitter* clarifies that "knowing and substantial assistance" must be determined on a sliding scale of substantiality and culpability.**

The Court addressed most of its analysis to the third *Halberstam* element, which requires that the defendant "knowingly and substantially assist the principal violation."[3] It rejected the Ninth Circuit's assertion that the "knowing" aspect of "knowing and substantial assistance" tracks the "general awareness" element. Rather, "the knowledge and substantial assistance components should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Twitter*, 143 S. Ct. at 1229. That is, the "knowing" inquiry is

---

[3] The Court did not substantively address the first two *Halberstam* elements, finding both satisfied without analysis. *Twitter,* 143 S. Ct. at 1225.

SPARACINO
— PLLC —

Judge Amon
June 12, 2023
Page 4

"designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act)."[4]  *Id.*

The traditional six-factor *Halberstam* analysis for "knowing and substantial assistance" is thus not "a sequence of disparate, unrelated considerations," but should be used to "capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* To that end, the Court noted that in considering the second *Halberstam* factor (amount and kind of assistance), the Ninth Circuit "should have considered that defendants' [social media] platforms and content-sorting algorithms were generally available to the internet-using public," which indicated that "ISIS' ability to benefit from these platforms was merely incidental to defendants' services and general business models," and "not attributable to any culpable conduct of defendants directed toward ISIS." *Id.* at 1229.  Similarly, with respect to the fourth and fifth factors (the social media companies' relationship to the tortfeasor and state of mind), "the Ninth Circuit should have given much greater weight to defendants' arm's-length relationship with ISIS—which was essentially no different from their relationship with their millions or billions of other users—and their undisputed lack of intent to support ISIS." *Id.* at 1229-30.  As applied to the three social-media platforms that hosted and failed to remove ISIS content, these factors suggested that the alleged conduct was not sufficiently culpable to support liability.

With respect to the plaintiffs' allegations against Google/YouTube, however, the Court never suggested that sharing revenues with ISIS was not culpable conduct. Instead, it shifted its analysis to the other axis on the sliding scale, substantiality.  It concluded that absent allegations of the amount of the shared revenue the plaintiffs could not state a plausible claim of "substantial" assistance. *Id.* at 1230.

None of that is inconsistent with the Second Circuit's application of the *Halberstam* factors, which recognizes that they are "variables," *Kaplan*, 999 F.3d at 856, and that "the weight accorded to each is determined on a case-by-case basis," *Honickman*, 6 F.4th at 500.

---

[4] This is not, contrary to Defendants' claim, a change in existing law: as the Second Circuit recognized in *Kaplan*, *Halberstam* itself "noted that a court might well reason that culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences." *Kaplan*, 999 F.3d at 857. And although dictum in *Honickman* explained that the "knowing" prong "did not require Hamilton to 'know' anything more about Welch's unlawful activities than what she knew for the general awareness element," 6 F.4th at 500, that statement correctly identified the *minimum* level of scienter; it did not suggest that such scienter was *always* sufficient to support liability. The Supreme Court similarly recognized that defendants that provide systemic assistance to an illicit enterprise can be liable on a lesser showing of scienter. *Twitter*, 143 S. Ct. at 1225.

4



Judge Amon
June 12, 2023
Page 5

> **3.** ***Twitter* confirms that where the defendant's assistance is substantial and culpable, liability does not require a "direct nexus" between the defendant's conduct and a particular terrorist act.**

*Twitter* considered "whether the textual object of 'aids and abets'" in §2333(d) "is 'the person' or the 'act of international terrorism," but ultimately concluded that the question "makes little difference here, because aiding and abetting is inherently a rule of secondary liability for specific wrongful acts." *Id*. at 1223-24. Applying that general principle, *Twitter* held that aiding and abetting liability focuses on the relationship between the defendant's assistance and the ultimate injury-causing act—such that it is not enough merely to allege that a defendant aided "a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id*. at 1224. On the other hand, the Court rejected the argument that "a strict nexus" between the assistance and the injury-causing act is required. *Id*. at 1223, 1225. Instead, "[a]s *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort." *Id*. at 1225. And in some cases, a "secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise—as in *Halberstam* itself." *Id*. Short of that, the defendant's assistance may reasonably render it liable for "some definable subset of terrorist acts." *Id*. at 1228.

Under *Twitter*, as well as undisturbed Second Circuit precedent,[5] there is, again, a sliding scale: "[w]here there is a direct nexus between the defendant's acts and the tort, courts may more easily infer … culpable assistance." *Id*. at 1230. The "more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id*. And in other situations, involving "pervasive, systemic, and culpable assistance," "aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions of perhaps some definable subset of terrorist acts." *Id*. at 1228.

In short, *Twitter* left the existing JASTA "legal framework" intact, emphasizing that aiding and abetting liability is reserved for conduct that is "conscious and culpable." *Id*. at 1229. It also clarified that a "direct nexus" between the defendant's conduct and the terrorist attack is not required, except perhaps where the accused conduct is relatively insubstantial or non-culpable. Full-on "enterprise liability" may be appropriate where assistance is "pervasive and systemic," and in-between cases require courts to balance the strength or weakness of the nexus against the substantiality and culpability of the conduct. That is exactly what Second Circuit precedent already required.

---

[5] *Twitter*'s standard echoes the Second Circuit's formulation in *Honickman*, which focuses on foreseeability but refuses "to equate the *Halberstam* foreseeability standard with the 'fungibility' theory'" holding that the provision of fungible support to a terrorist organization is *always* enough for JASTA liability. 6 F.4th at 498.



Judge Amon
June 12, 2023
Page 6

## II.    *Twitter* Confirms That Plaintiffs Have Stated Plausible Claims Against MTN.

The Supreme Court's overriding purpose in *Twitter* was to ensure that JASTA aiding and abetting liability is reserved for defendants who act "consciously and culpably." 143 S. Ct. at 1225, 1229, 1230. The decision does not help MTN, which—accepting Plaintiffs' plausible allegations as true—assisted acts of terrorism as consciously and culpably as any defendant in JASTA history. Indeed, MTN's misconduct was so widespread, massive in scale, and blameworthy that it warrants holding the company liable for all the terrorist acts attributable to the IRGC and its proxies during the period of assistance. That said, the Court need not go so far to resolve this case: at a minimum, Plaintiffs have alleged a strong enough nexus between MTN's wrongdoing and the attacks on Plaintiffs that liability is warranted for the 12 specific attacks at issue here.

### A.  Plaintiffs Allege "Conscious and Culpable" Assistance.

As Plaintiffs explained in their opposition to MTN's motion to dismiss, Plaintiffs allege that MTN knew it was entering a joint venture with Iranian terrorist fronts—the kind of "near-common enterprise" with the IRGC that the Supreme Court suggested would support "broad liability." *Twitter*, 143 S. Ct. at 1228. It knew the profits from that joint venture would flow through to the terrorists; knew it was violating U.S. law to provide those fronts with embargoed dual-use telecommunications equipment in violation of anti-terrorism sanctions; and knew it was illegally paying millions of dollars and providing operational assistance to terrorists in Afghanistan. ECF 86 at 1-2, 11-12, 18, 44-56. Its behavior was both conscious (because it acted knowingly) and culpable (both because it knew it was violating American law and knew that it was was dealing with violent terrorists). If a social media "platform consciously and selectively cho[osing] to promote content provided by a particular group perhaps … culpably assisted the terrorist group," then consciously and selectively choosing to provide hundreds of millions of dollars and dual-use equipment to that terrorist group certainly does, too. *Id.* at 1228.

MTN strains to avoid that conclusion by misreading *Twitter* to require that Plaintiffs "plausibly allege that the MTN Defendants knowingly participated *in terrorist acts* to 'make [them] succeed.'" ECF 122 at 6 (quotation omitted). Not so. *Twitter* is clear that Plaintiffs need only plausibly allege that MTN knowingly participated in illegal or tortious acts from which terrorist acts were "a foreseeable risk." *Twitter*, 143 S. Ct. at 1225 (citing *Halberstam*). Put another way, consciously and culpably providing substantial assistance to a wrongful act from which acts of terrorism are foreseeable is a form of "participation" in those acts. *See id.* at 1226 ("The key question, therefore, is whether defendants gave such knowing and substantial assistance to ISIS *that* they culpably participated in the Reina attack.") (emphasis added). Otherwise, the Supreme Court's examples of potentially liable conduct would make no sense: a defendant who selectively promotes terrorist internet content, provides terrorists with "routine services … in an unusual way," or sells terrorists "dangerous wares" is not "participating in terrorist acts" in the narrow sense, *id.* at 1228; he is engaging in wrongful conduct from which terrorist acts are foreseeable. And terrorist acts are undoubtedly a foreseeable risk of massively funding and equipping known

**SPARACINO**
— PLLC —

Judge Amon
June 12, 2023
Page 7

terrorist fronts—particularly where, as here, Iranian regulations have required since 2003 that profits from IRGC-controlled enterprises be funneled back to the IRGC to support its terrorist operations. ¶839.[6]

Even if *Twitter* required Plaintiffs to allege that MTN "participated in terrorist acts," Plaintiffs have done so: Plaintiffs allege that MTN shut down specific Afghanistan cellular towers at the terrorists' request, and that "MTN's tower shutdowns substantially contributed to the Taliban's ability to commit the attacks that killed and injured Plaintiffs," because "[t]he Taliban targeted its shutdown orders at key districts and provinces with tactical importance for ongoing Taliban operations." ¶1066. MTN thus actively participated in the terrorists' tactical operations— and for no better reason than that doing so was cheaper than hiring expensive legitimate security. *E.g.*, ¶1044. MTN, unlike some competitors, could not resist the cost savings that cooperating provided, even though it placed the company in direct defiance of U.S. and Afghan policy. *E.g.*, ¶¶1044, 1049.

The rest of MTN's arguments about culpability merely repeat the failed arguments it raised before *Twitter* was decided, and warrant little additional attention here. MTN continues to insist that the IRGC—a full-blown FTO since 2019, and comprising two sub-entities that have been FTOs for decades—is just an innocent "organization … intertwined with [Iran's] economy."  ECF 122 at 6. MTN cherry-picks a handful of media sources identifying its Iranian counterparties as IRGC-controlled and claims they are insufficient to demonstrate "knowing" assistance to the IRGC, *id.*, but grapples neither with the most damning aspects of those sources nor with the full spectrum of sources Plaintiffs have identified.[7] It reiterates its anodyne interpretation of its secret "security" cooperation agreement with its IRGC-front counterparties but does not explain why its

---

[6]  One scholar explained in 2007 that the directive instructed IRGC units to "act as contractors in development schemes and projects," from which any surplus profits were to be earmarked "to purchase and upgrade equipment for the Revolutionary Guard and fund its other activities." Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, American Enterprise Institute (Oct. 22, 2007), https://tinyurl.com/2p8ejded (cited at ¶1327) (citing Iranian government's "Logistics Implementation Directive," June 11, 2003, as quoted in Islamic Republic of Iran, *Official Gazette,* June 28, 2003).

[7]  Those sources include syndicated *Newsday* articles in 1995 and 1998, a 2007 American Enterprise Institute article, a 2006 State Department cable released in 2010, a 2007 House of Commons report, a 2010 article in Forbes, a 2011 statement by a bipartisan group of U.S. Senators and Representatives, a 2011 article in the Washington Quarterly, 2012 public statements from United Against Nuclear Iran, Turkcell's 2012 complaint against MTN, a 2013 report in South Africa's *Mail & Guardian*, and 2014 and 2015 Congressional testimony by the Foundation for the Defense of Democracies. *See* ¶¶711, 776-78, 781, 785, 790, 794-95, 802-03, 819, 906, 1019, 1021, 1024-27, 1111, 1327-28*s.* The substance of those sources is described in ECF 86 at 1, 3-4, 6, 46-47 and the transcript of the November 7, 2022, hearing at 36-39.

**SPARACINO**
— PLLC —

Judge Amon
June 12, 2023
Page 8

self-serving account should be credited over Plaintiffs' allegations. It again insists that the existence of "legitimate" commercial operations at MTN Irancell provides a kind of get-out-of-jail-free card for the joint venture's assistance to terrorists, but points to nothing in *Twitter* to support that sweeping claim, which would immunize from liability a substantial portion of the IRGC's fundraising. *E.g.*, ECF 86 at 7.[8] As Plaintiffs have explained, the question is not whether MTN Irancell engaged in "legitimate" commercial activities, but whether MTN knew that by funding and illegally supplying a known IRGC front, it was engaged in unlawful conduct from which IRGC-led terrorist attacks were foreseeable.  Plaintiffs have plausibly alleged exactly that. *Twitter's* requirement of "conscious culpability" requires nothing more.[9] And even if it did, Plaintiffs have alleged the "more": that MTN knew it was supporting the IRGC's "security" agenda and thus actually knew that it was assisting terrorist attacks on Americans. *E.g.*, ECF 86 at 1, 10-11, 18, 36, 51-52.

Nor is it any answer for MTN to argue that its assistance was not "intentional," and so cannot support liability for conduct with an "attenuated" nexus to the terrorist attacks on Plaintiffs. ECF 122 at 7. As a threshold matter, the "nexus" between MTN's assistance and the attacks is not "attenuated" at all. The "attenuated" nexus in *Twitter* was essentially no nexus: the plaintiffs failed to allege links between the defendants and ISIS different than the defendants' relationships with "hundreds of millions (or billions)" of other users or to allege *any link at all* "connecting the Reina attack with ISIS' use of [the defendants'] platforms."143 S. Ct. at 1227. Here, by contrast, Plaintiffs allege that MTN deliberately entered into a special "security" agreement and joint venture with known terrorist fronts (including working directly with Qods Force operatives), and knew that the IRGC used such fronts to fund the terrorist groups who attacked Plaintiffs. ECF 86 at 52; *see* ¶¶ 5, 27, 119-121, 823, 827, 831-33, 943, 967-68). As this Court explained in *Bartlett*, "to aid such front groups is to aid" the terrorists. 2020 WL 7089448, at n.7. A "nexus" only one step removed from terrorist groups is not "attenuated" in any meaningful sense.

---

[8] *See also, e.g.*, ¶¶253-54 (citing 2010 U.S. Treasury releases stating that the IRGC was "hiding behind companies" and engaging in "seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups"); ¶256 (citing 2011 Treasury release explaining that the IRGC had "expanded its reach into critical sectors of Iran's economic infrastructure … to generate revenue and conduct business in support of Iran's illicit activities"); ¶258 (citing U.S. officials stating that the IRGC "has moved increasingly into commercial operations"); ¶895 (citing U.S. treasury official warning that Iran "uses shell and front companies" to procure cash for the IRGC's Qods Force).

[9] The Supreme Court's statement in *Twitter* that "internet or cell service providers [do not] incur culpability merely for providing their services to the public writ large" is irrelevant here. 143 S. Ct. at 1226. Plaintiffs do not allege that MTN is liable for providing cellular service to the public, but for using that service as a vehicle for knowingly and illegally equipping and funding IRGC fronts.

**SPARACINO**
— PLLC —

Judge Amon
June 12, 2023
Page 9

The nexus between MTN's conduct and terrorist attacks in Afghanistan is even less "attenuated." MTN paid huge sums of money directly to the Taliban and the Haqqani Network for "protection" of its facilities, and cooperated with the terrorists' requests to shut down cellular towers to foil counterterrorism efforts. Directly funding terrorists and assisting their operations in Afghanistan is as strong a nexus to those terrorists' attacks in Afghanistan as a company could achieve without committing violence itself. MTN does not dispute this, pivoting instead to its claim that its assistance was not "voluntary," and therefore not culpable. ECF 122 at 7. But Plaintiffs allege that MTN's assistance *was* voluntary, because the company chose to pay off the terrorists "[r]ather than invest in expensive security." ¶¶1044, 1049. Some of its competitors chose not to pay the terrorists, *id*., indicating that MTN could have made a different choice, too. To the extent MTN wishes to argue duress, no such defense is available here—and even if it were, duress is an affirmative defense that MTN would be required to both plead and prove at trial. It is not a basis for dismissal, particularly because any duress argument would contradict Plaintiffs' allegations that MTN made a voluntary choice to help the terrorists in defiance of both U.S. and Afghan policy. *E.g.*, ¶1049.

Because the nexus between MTN's conduct and the terrorist attacks is not "attenuated" under *Twitter*, Plaintiffs are not required to allege that MTN's assistance was "intentional." In any event, they have done so by alleging that MTN knowingly went into business with terrorists, promised to assist them with "security" matters, poured hundreds of millions of dollars into the terrorist joint venture knowing it would go to the IRGC, and violated U.S. law to provide the terrorists with embargoed technology. MTN was thus engaged in intentionally wrongful conduct from which terrorist attacks were foreseeable. That is all *Twitter* requires. 143 S. Ct. at 1225 ("As *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were "a foreseeable risk" of the intended tort."). In any event, "a person who acts (or omits to act) intends a result of his act (or omission) … when he knows that the result is practically certain to follow from his conduct, whatever his desire may be as to that result." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978) (quotation omitted). Acts of terrorism in Iraq and Afghanistan were "practically certain to follow" from MTN's massive and deliberate assistance to known IRGC fronts, and no more is necessary to infer intent.

**B. Plaintiffs Allege That MTN Substantially Assisted (At Least) The 12 Attacks At Issue Here.**

As explained above, *Twitter* confirms that Plaintiffs need not allege a "direct nexus" between MTN's conduct and a particular terrorist attack. Instead, the required nexus is determined on a sliding scale with the culpability and significance of the conduct: "[t]he "more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." 143 S. Ct. at 1230. Where a defendant provides "pervasive, systemic, and culpable assistance to a series of terrorist activities," it may be held liable for "each terrorist act" committed by the group assisted. *Id*. at 1228.

9

Plaintiffs have sufficiently alleged "pervasive, systemic, and culpable assistance" to state an aiding and abetting claim against MTN for every IRGC-led attack during the period of assistance. As alleged, MTN's assistance was (and remains) *pervasive*: it began in 2005 and continues to this day; includes multiple modalities of assistance, including money, embargoed equipment, and "technical, logistical and operational support," ¶827; and involved conduct around the world, including (at least) Iran, South Africa, Dubai, and the United States. It was also *systemic*: it involved (and involves) MTN's management at the highest levels and multiple different divisions and subsidiaries operating under the MTN umbrella; this is not a case of a rogue employee or a one-off transaction by a single entity. And the assistance was so massive—the financial assistance alone amounts to billions of dollars, ¶47—that it could fund *thousands* of terrorist attacks, which are typically cheap.[10] And MTN's conduct was *culpable*: as we have explained at length, MTN deliberately assisted violent terrorists, knowingly violated U.S. law to do so, and continues to provide that assistance more than a decade after being publicly called out for aiding the IRGC (*e.g.*, ¶989). The conduct alleged here is vastly more blameworthy and extensive than any of the "enterprise liability" scenarios contemplated in *Twitter*, which include "consciously and selectively cho[osing] to promote [internet] content provided by a particular terrorist group," 143 S. Ct. at 1228, and providing "bookkeeping work" for a burglary enterprise, *id*. at 1219, 1225 (citing *Halberstam*).

MTN has no real answer to any of this, except to recharacterize its misconduct as "the procurement and provision of telecommunications services," which are normal "activities of a telecommunications company." ECF 122 at 8; *see also id.* at 9 (claiming that the purpose of MTN's illegal procurement of U.S. technology "was to help run a mobile phone network"). But that is— again—not what Plaintiffs allege. Plaintiffs allege that the IRGC set up the Irancell joint venture in the first place to obtain access to dual-use American telecommunications technologies for use in its terrorist operations, ¶¶758-62; that MTN joined the venture knowing it was in business with the IRGC and promising to assist it with matters ("security," "defense," military helicopters) that are decidedly *not* normal activities of a telecommunications company, ¶¶938, 942-43; that MTN "represented the Iranian Shareholders as their purchasing agent, and coordinated efforts to obtain vital U.S. technology that aided bomb and rocket construction and terrorist surveillance, as requested by IRGC-QF and Lebanese Hezbollah," ¶935; that MTN intentionally broke American anti-terrorism laws to provide the IRGC with that technology, ¶¶977-78; that an entire floor of MTN's Teheran headquarters was staffed with military intelligence and paramilitary personnel, ¶1029; that the IRGC used MTN's cellular network to "track and target" American soldiers near the Iranian border with Iraq, ¶1140; that MTN "prepared detailed studies at the request of IRGC-QF [Qods Force] that were designed to improve Iranian weapons capabilities," ¶935; and that MTN knew and

---

[10] For example, a typical roadside bomb attack that could kill or maim a dozen or more American soldiers typically cost between $4,000 and $13,000. ¶362. According to the 9/11 Commission, the deadliest terrorist attack in history—which involved 19 hijackers, support personnel in multiple countries, and flight training—cost "somewhere in the range of $400,000–500,000." *See* https://9-11commission.gov/staff_statements/911_TerrFin_Ch1.pdf, at 3.

**SPARACINO**
— PLLC —

Judge Amon
June 12, 2023
Page 11

intended that a significant portion of Irancell's annual profits would flow through its IRGC front counterparties to the IRGC, which would use it to fund terrorist operations. *E.g.*, ¶¶121, 798-800, 945.

These allegations present precisely the kind of "pervasive, systemic, and culpable" conduct that warrants liability for all the IRGC's attacks. MTN knowingly entered into a joint venture that constituted a "near-common enterprise" with the IRGC via its front companies. *Twitter*, 143 S. Ct. at 1228. Its willful campaign to illegally provide the IRGC with embargoed U.S. products and its manipulation of its Afghanistan network to assist terrorist operations are both examples of providing "routine services" (product acquisition and cellular network operation) "in an unusual way" that suggests culpability. *Id*. The massive flow of funding provided by MTN—approximately $500 million every year, ¶47, or enough to finance the IRGC's funding for Hezbollah for as many as five years, ¶182—is the kind of systemic "aid that would assist each of [the IRGC's] terrorist acts." *Twitter*, 143 S. Ct. at 1228. To the extent MTN can straight-facedly muster an innocent explanation for all this conduct, it must offer that explanation to the jury; it is not basis for dismissal. When Plaintiffs' allegations are honestly considered, they support the conclusion that MTN's aid to the IRGC was so "pervasive, systemic, and culpable" that it warrants liability for all the IRGC's attacks.

But the Court need not conclude that MTN is liable for "all the torts of the [IRGC] enterprise" to reject dismissal here. *Id*. at 1230. *Twitter* provides for a middle ground between "passive nonfeasance" that warrants liability only if there is a direct nexus with the attacks and "systemic and pervasive" assistance that warrants liability for all attacks regardless of nexus. On *Twitter's* sliding scale, a defendant's assistance to a terrorist group may be sufficiently significant and culpable to warrant liability for a "definable subset" of that group's attacks as to which the defendant's conduct has a less than "direct," but more than "attenuated," nexus. *Id*. at 1228. Plaintiffs' allegations here easily meet that bar. Plaintiffs were injured in 12 attacks—10 in Iraq committed by joint cells including members of Hezbollah, Jaysh al-Mahdi, and Qods Force (¶¶1393-1552), and two in Afghanistan committed by joint cells including members of al-Qaeda, the Haqqani Network, and the Taliban (¶¶1553-88). Plaintiffs have alleged how profits generated by MTN Irancell were legally required to be passed through to the IRGC, which funneled them to Qods Force and Hezbollah for use by those organizations and their proxies, including Jaysh al-Mahdi in Iraq. *E.g.*, ¶¶839, 360-63. Jaysh al-Mahdi received IRGC funding in amounts up to $3 million a month—enough to fund the 10 Iraq attacks a hundred times over. ¶361.More specifically, Plaintiffs allege that all electronically formed penetrators ("EFPs") used by Jaysh al-Mahdi in Iraq—implicated in four of the 10 Iraq attacks—were supplied by Hezbollah using IRGC-supplied components, ¶¶181, 184, 209, 354; that Jaysh al-Mahdi's rockets—implicated in three of the attacks—were manufactured and provided by the IRGC, ¶¶181, 185, 356; and that Jaysh al-Mahdi's kidnapping tactics—used in one attack—were developed with Hezbollah training, ¶357-59.

11

**SPARACINO**
_____ PLLC

Judge Amon
June 12, 2023
Page 12

In Afghanistan, Plaintiffs allege that IRGC funds and equipment were routed to Hezbollah and Qods Force (via the latter's Fourth Corps) for provision to both the Taliban (including its Haqqani Network), ¶¶365-67, 443-82, and al-Qaeda, ¶¶500-10; and that Qods Force and Hezbollah operators trained their Taliban, Haqqani Network, and al-Qaeda proxies in terrorist methods, ¶¶365-66, 454-55, 489-90, 501-10, including the IED tactics implicated in one of the two Afghanistan attacks, ¶¶487-88. In addition, Plaintiffs allege that MTN paid millions in protection money directly to the Taliban and the Haqqani Network, ¶¶1040-54, and cooperated in tower shutdowns that were intended to, and did, impair the U.S. military's counterterrorism operations and thus facilitate attacks on American troops, ¶¶1055-68

In short, Plaintiffs allege that MTN's joint venture with Irancell poured financial and operational resources into its IRGC-front counterparties, which were required by law to funnel profits into IRGC operations, and that the IRGC in turn made, paid for, or supplied the specific weapons and training used to murder and maim the Plaintiffs. Plaintiffs have thus alleged a highly specific nexus between MTN's assistance and the attacks on Plaintiffs in both Iraq and Afghanistan—a nexus more than sufficient to warrant aiding and abetting liability for those attacks in light of MTN's highly culpable behavior and the massive quantity of the assistance.

### III.   _Twitter_ Confirms That Plaintiffs Have Stated A Plausible Aiding And Abetting Claim Against The ZTE U.S. Defendants.

The ZTE U.S. Defendants persist in a funhouse-mirror view of Plaintiffs' allegations in which, for example, willfully violating anti-terrorism sanctions to supply known terrorist fronts with encryption and surveillance equipment is recharacterized as innocently "providing telecommunications technology to Iran's largest telecommunications carrier." ECF 122 at 11. When Plaintiffs' allegations are fairly considered, they establish that the defendants' assistance to the IRGC was conscious, culpable, and so systemic and pervasive as to state a claim for all IRGC-led attacks—or, at minimum, at least the 12 attacks at issue here.

#### A.  Plaintiffs Allege "Conscious and Culpable" Assistance.

Like MTN, the ZTE U.S. Defendants rely heavily on misreading _Twitter_ to require "conscious and culpable participation in an act of international terrorism." ECF 122 at 11. As explained above (_supra_ at 3, 6-7), ZTE is wrong: _Twitter_ requires only conscious and culpable participation in wrongful activity from which acts of international terrorism are "a foreseeable risk." 143 S. Ct. at 1225 (citing _Halberstam_). The tort that defendants must consciously help "make succeed" is the underlying wrongful activity, not the act of terrorism that foreseeably results.

Here, Plaintiffs allege that the ZTE U.S. Defendants participated in a "company-wide scheme" to evade U.S. anti-terrorism sanctions and provide U.S. technologies with military applications to TCI, a known IRGC front company. ECF 87 at 12-13, 19-21, 36-38. That conduct was "conscious": the evasion of sanctions was intentional, and ZTE Corp. expressly sought ZTE

12

**SPARACINO**
PLLC

Judge Amon
June 12, 2023
Page 13

USA's assistance with the scheme. ¶1146.  It was also "culpable": TCI was a known IRGC front, and circumventing anti-terrorism sanctions to benefit a known terrorist front is an inherently culpable activity.

ZTE's arguments to the contrary do nothing to undermine Plaintiffs' claims. Its attempt (at 11) to seek shelter in *Twitter's* observation that cellular "providers would [not] normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones," 143 S. Ct. at 1226, is ill-conceived: Plaintiffs do not allege that the ZTE U.S. Defendants aided and abetted terrorist attacks by providing Iranian citizens with generally available cellular service that incidentally benefitted terrorists, but by deliberately providing illegal dual-use technologies to a particular cellular company owned and controlled by terrorists.  Plaintiffs do not allege "passive nonfeasance" by a hypothetical cellular carrier, but active malfeasance by a company intentionally violating the law to benefit a particular terrorist group.

### B.  Plaintiffs Allege That The ZTE U.S. Defendants Substantially Assisted (At Least) The 12 Attacks At Issue Here.

Like MTN, the ZTE U.S. Defendants argue that Plaintiffs fail to allege substantial assistance to the acts of terrorism that injured Plaintiffs, because the nexus between the defendants' conduct and the acts of terrorism is too "attenuated" to support liability in (what the defendants allege is) the absence of allegations of "pervasive, systemic, and culpable" assistance that would warrant "enterprise" liability. ECF 122 at 12. Like MTN, the ZTE U.S. Defendants are wrong.

First, ZTE's claim (at 12) that the nexus between its conduct and Plaintiffs' injuries is too "attenuated" to support liability fails for the same reasons that MTN's similar argument fails: compared to the nonexistent nexus found inadequate in *Twitter*, the nexus here is not attenuated at all. Plaintiffs allege that the ZTE U.S. Defendants acquired embargoed dual-use technologies in the United States and shipped them to TCI, which passed them through to Hezbollah, which used the embargoed cell phones and other telecommunications technologies "to perpetrate attacks on Americans." ¶1136. Those technologies included "a powerful surveillance system capable of monitoring landline, mobile and internet communications," an encrypted fiber-optics network that Hezbollah regarded as its "most valuable weapons system," and components for the "ZXMT monitoring system," which allowed the IRGC to "track and target" U.S. forces operating near Iran's borders. ¶¶1138-40. In short, Plaintiffs allege that the ZTE U.S. Defendants provided technology to an IRGC front that IRGC component Hezbollah—which was involved in all the Iraq attacks at issue—weaponized against Americans in Iraq and passed to al-Qaeda and the Taliban, who committed the attacks in Afghanistan.

Second, the ZTE U.S. Defendants' assistance to the IRGC was sufficiently "pervasive, systemic, and culpable" to support liability for all IRGC-led attacks. ZTE illegally supplied multiple IRGC-front entities with millions of U.S.-origin items worth at least $32 million, ¶1128, which Plaintiffs have plausibly alleged were sourced by the ZTE U.S. Defendants, *e.g.,* ¶1134.

13

**SPARACINO**
PLLC

Judge Amon
June 12, 2023
Page 14

The surveillance, encryption, and telecommunications advantages this aid provided to the IRGC allowed it to "close the communications gap with" the U.S. military and "and enhance the lethality of its global terrorist campaign against America." ¶750. The ZTE U.S. Defendants also helped conceal the sanctions-evasion scheme by lying to the U.S. government and the public about its continuing role in the scheme, thereby allowing the assistance to keep flowing for years after it would otherwise have been stopped. ¶¶1123(e)-(g), 1146-52. This is the kind of systemic aid that effectively assisted all the IRGC's attacks on Americans, and it was unquestionably culpable: like MTN, the ZTE U.S. Defendants knew they were acting illegally and knew their Iranian counterparties were terrorist fronts, and covering up those facts was an inherently culpable act.

Even if those allegations were not enough to support enterprise liability, they are more than sufficient to support liability for the 12 attacks at issue here, where a real nexus (even if not a "direct" one) connects the defendants' conduct to the attacks and the ZTE U.S. Defendants behaved culpably (knowing they were violating anti-terrorism sanctions to benefit a terrorist front) and provided large amounts of assistance (at least 20 million separate U.S.-origin items subject to the embargo, worth tens of millions of dollars, ¶1128). *See Twitter,* 143 S. Ct. at 1230 (the "more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort").

The ZTE U.S. Defendants also argue that the traditional six-factor *Halberstam* analysis, as applied by *Twitter*, supports dismissal here. It did not support dismissal before *Twitter*, and it does not support dismissal now. As to the "nature of assistance" factor, contrary to ZTE's assertion, Plaintiffs do not "plead only that terrorists incidentally benefitted from ZTE Corp.'s assistance in 'modernizing' Iran's telecommunications infrastructure." ECF 122 at 13. Rather, Plaintiffs allege that the terrorists specifically benefited from the ZTE U.S. Defendants' (and ZTE Corp.'s) deliberate effort to supply the IRGC with embargoed dual-use technology. The relationship between the *Twitter* defendants and ISIS was not just "arm's length," but also "passive," "indifferent," and identical to their relationship with "billions" of other customers—none of which is true here. *Twitter,* 143 S. Ct. at 1227. And with respect to the 'state of mind' factor, unlike the *Twitter* plaintiffs, Plaintiffs here *have* pled that the ZTE Defendants intended to support the terrorists, because doing so "served the hostile national security objectives of the Chinese Communist Party." ¶¶56, 893.

**IV.    *Twitter* Confirms That Plaintiffs Have Stated A Plausible Aiding And Abetting Claim Against The Huawei U.S. Defendants.**

The Huawei U.S. Defendants devote much of their briefing to re-hashing arguments from their motion to dismiss that have little to do with the *Twitter* decision. *See* ECF 122 at 14-15. *Twitter* says nothing at all about "group pleading," purportedly conclusory allegations, or the pleading standards established by *Iqbal* and *Twombly*—neither of which *Twitter* even cites—and thus offers no support for the defendants' arguments on those issues. As for the Huawei U.S.

14

SPARACINO
——— PLLC ———

Judge Amon
June 12, 2023
Page 15

Defendants' arguments that do relate to *Twitter*, they fail for many of the same reasons that their codefendants' arguments fail.

### A.  Plaintiffs Allege "Conscious and Culpable" Assistance.

Like their co-defendants, the Huawei U.S. Defendants insist that *Twitter* requires allegations that "Huawei 'consciously and culpably' participated in an 'act of international terrorism' to help 'make it succeed,'" and argue that Plaintiffs have not alleged culpable participation in any specific "act of terrorism." ECF 122 at 15. As Plaintiffs have explained, *Twitter* requires only "conscious and culpable" participation in wrongful activity from which acts of terrorism were foreseeable. *Supra* at 3, 6-7, 12. Here, Plaintiffs allege that the Huawei U.S. Defendants, like their ZTE counterparts, participated in a broad scheme to illegally evade U.S. anti-terrorism sanctions and provide U.S. technologies with military applications to known IRGC front companies. ECF 105 at 1, 3-4, 10-12, 14-15, 18-21, 23-42. Plaintiffs also allege that the Huawei U.S. Defendants actively concealed their own and their parent company's illegal assistance to Irancell and TCI by lying to U.S. officials, destroying documents, and moving witnesses offshore to obstruct the grand jury investigation would provide an independent basis for liability—conduct for which two of the three Huawei U.S. Defendants are under indictment in this District. ¶¶3, 20-21. That conduct allowed the equipping and funding of the IRGC to continue for years after it would otherwise have been revealed and stopped by U.S. authorities.

The Huawei U.S. Defendants' conduct was conscious: they could only have taken affirmative steps to conceal the scheme if they knew about it.  And it was culpable: helping known terrorist fronts avoid anti-terrorism controls on dual-use equipment and deceiving U.S. government officials about that conduct are both highly blameworthy activities. Terrorist attacks by the terrorist group receiving the assistance were a foreseeable result.

Huawei's arguments to the contrary are variations on those addressed and rebutted already. The suggestion that the defendants are alleged merely to have "played a role in modernizing the telecommunications technology in Iran" (ECF 122 at 15) seizes on a single sentence in the complaint to the exclusion of Plaintiffs' substantive allegations, and ignores not only the wholesale and willful illegality of the defendants' sanctions-evasion scheme but also that the scheme was specifically intended to aid the IRGC in its efforts to drive U.S. forces out of the Middle East and enhance China's power there. *E.g.*, ¶¶56, 893. Remarkably, the Huawei U.S. Defendants do not even acknowledge Plaintiffs' aiding and abetting claims based on concealment of the sanctions-evasion scheme, which Plaintiffs heavily briefed in their opposition to the Huawei motion to dismiss, *see* ECF 105 at 1, 3-4, 11-12, 15, 20-21, 24, 27, 31, 40—presumably because they are aware that such conduct is necessarily both conscious and culpable.[11]

---

[11] The Huawei U.S. Defendants' failure to address the concealment-based claims is consistent with their reply brief in support of their motion to dismiss, which confines them to a single conclusory footnote. ECF 103 at 9-10 n. 9.

15







Judge Amon
June 12, 2023
Page 16

Similarly, the Huawei U.S. Defendants (like their ZTE codefendants) seek to draw parallels with *Twitter's* observation that "internet or cell service providers [do not] incur culpability merely for providing their services to the public writ large." ECF 122 at 15 (citing *Twitter*, 143 S. Ct. at 1226). As was true with ZTE, the analogy is false: Plaintiffs' claims are not based on the provision of cellular service to the Iranian public, but on the Huawei U.S. Defendants' deliberate decision to illegally provide known terrorist fronts with dual-use equipment subject to anti-terrorism export controls. Plaintiffs' allegations against the Huawei U.S. Defendants do not resemble the allegations of "passive nonfeasance" by social media companies acting entirely as "bystanders" providing globally available services in *Twitter*. 143 S. Ct. at 1227.

**B. Plaintiffs Allege That The Huawei U.S. Defendants Substantially Assisted (At Least) The 12 Attacks At Issue Here.**

Like their codefendants, the Huawei U.S. Defendants argue that Plaintiffs have not alleged specific assistance to individual attacks, and that the relationship between the defendants' misconduct and to those attacks is too attenuated to support liability and that Plaintiffs have not pled sufficiently "pervasive, systemic, and culpable" conduct to warrant enterprise-level liability. ECF 122 at 16-18.

Again, the defendants' claims of attenuation are exaggerated. Plaintiffs allege that the Huawei U.S. Defendants helped source embargoed U.S. technology and supply it to multiple IRGC fronts, from which it was passed to operational terrorist cells who either sold it to obtain operational funds or weaponized it against American forces in Iraq and Afghanistan—including, for example, by using Huawei-supplied cell phones "for secure communications and as sophisticated IED triggers." ECF 105 at 2 (citing ¶¶40-44, 48, 1219, 1238-39, 1316). Nearly half the attacks at issue involved IEDs (either traditional explosive IEDs or EFPs, which are "a type of IED" (¶386)), and secure communications benefitted terrorist operations in all theaters (*e.g.,* ¶750). There is thus a far stronger nexus between the defendants' conduct here and the attacks on Plaintiffs than was true in *Twitter*, where (as noted) the plaintiffs failed to allege any meaningful nexus between the defendants' failure to remove ISIS recruiting videos and a particular ISIS attack. *See supra* at 8-9, 13.

The Huawei U.S. Defendants' arguments to the contrary fail for the same reasons their codefendants' arguments fail. Their analogy to the "arm's length" relationship in *Twitter* ignores the profoundly non-analogous aspects of that relationship, which was not only "arm's length" but "passive," "indifferent," and indistinguishable from the social media companies' relationship with billions of other customers. *Twitter*, 143 S. Ct. at 1227. The Huawei U.S. Defendants' relationship with its IRGC front counterparties was "arm's length," but otherwise did not resemble the passive and remote relationship in *Twitter*. Similarly, the defendants are simply wrong to claim that "[t]here is no allegation that they gave special treatment to … any terrorist organization," ECF 122 at 17, unless they regard deliberately violating anti-terrorism sanctions for IRGC fronts to be

16

**SPARACINO**
— PLLC

Judge Amon
June 12, 2023
Page 17

business in the ordinary course.  And their assertion that "Plaintiffs allege that [defendants helped their Iranian counterparties obtain embargoed U.S. technology] … for 'greed' or 'profit,' not to somehow promote the aims of terrorist groups" is flatly contradicted by the complaint, which alleges that the defendants were motivated by both "greed" and "profit" *and* by the desire to advance the political goals of the Chinese Communist Party. ECF 105 at 34 (citing ¶¶56, 893, 1608).

As Plaintiffs explain in connection with both MTN and the ZTE Defendants, the nexus they have alleged between the Huawei U.S. Defendants' assistance and the attacks on Plaintiffs, although not "direct," is far stronger than the minimal nexus at issue in *Twitter*, and in light of the extreme culpability of the defendants' conduct and substantial amount of the assistance is sufficient to support aiding and abetting liability for the 10 Iraq and two Afghanistan attacks alleged here. *See supra* at 11-12, 13-14. In addition, Plaintiffs' allegations of aiding and abetting based on obstruction of the U.S. investigation, which operated to conceal the Huawei U.S. Defendants' misconduct and thus has essentially the same nexus to the attacks as the misconduct itself.

**V.    *Twitter* Supports Plaintiffs' Conspiracy Claims.**

*Twitter* did not squarely address JASTA conspiracy, but in contrasting aiding and abetting liability with conspiracy liability it emphasized the breadth of conspiracy liability in ways that support Plaintiffs' conspiracy claims. In describing the broadest version of aiding and abetting liability—that in which "a secondary defendant's role in an illicit enterprise" is "so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise"— the Supreme Court pointed out that such enterprise-level aiding and abetting liability "begins to blur with conspiracy liability, which typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy." 143 S. Ct. at 1225. The primary limiting principle on the breadth of conspiracy is the "requisite agreement that justifies such extensive" liability. Conspiracy law imposes liability based on "a more attenuated relation[ship]," because "the defendant and the principal wrongdoer had agreed to a wrongful enterprise." *Id.* at 1221 n.9.

Here, as explained above, the relationship between the defendants' assistance and the attacks on Plaintiffs is not "attenuated." But if it were, conspiracy liability would be appropriate for all the attacks at issue, because the defendants and the terrorists had the "requisite agreement" necessary to support it. As Plaintiffs explain in their opposition to MTN's motion to dismiss, MTN's 2005 Letter Agreement with the "Iranian Shareholders" is an express agreement with IRGC fronts to support the IRGC's anti-American terrorism.  ECF 86 at 43. And even if the 2005 Letter Agreement did not exist, Plaintiffs allege the kind of carefully coordinated wrongdoing by all three defendant groups and IRGC fronts from which one can plausibly infer an agreement to engage in activities—*e.g.*, evading anti-terrorism sanctions to benefit known IRGC fronts—in furtherance of the IRGC-led conspiracy to drive the U.S. out of the Middle East. *See* ECF 86 at 40-45; ECF 87 at 27; ECF 105 at 45-50. Under *Twitter*, participation in such an agreement would

17

**SPARACINO**
PLLC

Judge Amon
June 12, 2023
Page 18

render the defendants liable "for all reasonably foreseeable acts taken to further the conspiracy," including all the attacks alleged by Plaintiffs.  143 S. Ct. at 1225.

\*     \*     \*

For the reasons given here and in Plaintiffs' opposition briefs, defendants' motions to dismiss should be denied.

Respectfully submitted,

*/s/ Geoffrey P. Eaton*

Geoffrey P. Eaton
Ryan R. Sparacino
Eli J. Kay-Oliphant
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
geoff.eaton@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*