# Freshfields Bruckhaus Deringer US LLP

**TIMOTHY P. HARKNESS**

601 Lexington Avenue
New York, NY 10022

Tel +1 212-230-4610
timothy.harkness@freshfields.com

<u>**VIA ECF**</u>

June 29, 2023

Honorable Carol Bagley Amon, U.S.D.J.
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    **MTN Defendants' Response to Plaintiffs' Notice of Supplemental Authority,**
       *Zobay v. MTN Group Ltd., et al.*, **No. 1:21-cv-3503 (E.D.N.Y.) (CBA)**

Dear Judge Amon,

We, along with Covington & Burling LLP, represent Defendants MTN Group Limited and MTN (Dubai) Limited (the "MTN Defendants") in this action. Plaintiffs' Notice of Supplemental Authority (ECF No. 124) argues that the recent Second Circuit decision *Spetner v. Palestine Investment Bank*, __ F. 4th __, 2023 WL 4035924 (2d Cir. June 16, 2023), weighs against dismissal. In fact, *Spetner* highlights the weaknesses of Plaintiffs' jurisdictional allegations. Unlike in *Spetner*, Plaintiffs here fail to allege how the MTN Defendants' purported U.S. contacts arise from or relate to any acts of terrorism, and in any event, the MTN Defendants are not alleged to have purposefully availed themselves of the New York financial system.

The *Spetner* plaintiffs, American victims and the relatives and estates of victims of 13 terrorist attacks in Israel between 2001 and 2003, brought Anti-Terrorism Act ("ATA") claims against Palestine Investment Bank ("PIB"), a commercial bank headquartered in the Palestinian Territories. They alleged that PIB facilitated the attacks by knowingly providing financial services to the Arab Liberation Front ("ALF") and Hamas, the terrorist organizations that allegedly perpetrated the attacks. Plaintiffs argued that PIB was subject to personal jurisdiction because it engaged in correspondent banking transactions in New York through its agent Arab Jordan Investment Bank ("AJIB"). The Second Circuit ultimately held that the plaintiffs pleaded personal jurisdiction by alleging facts showing that PIB deliberately chose to bank in the forum in order to help carry out the alleged ATA violations. That holding highlights what is missing from Plaintiffs' Complaint here.

**Relatedness.** *Spetner* confirms that Plaintiffs' claims do not arise from or relate to the MTN Defendants' alleged U.S. contacts. The touchstone of the Second Circuit's analysis was whether defendant PIB's conduct in New York was an "instrument to achieve the very wrong alleged." 2023 WL 4035924, at *8 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013)). The *Spetner* plaintiffs alleged that Saddam Hussein's regime in Iraq transferred up to $35 million to a PIB account, held by the head of ALF, as part of an incentive-payment program to reward terrorist activities. *Id.* at *1. The head of ALF withdrew these funds and sent dollar-denominated checks—primarily issued by PIB—to the families of deceased terrorists, sometimes with the word "martyr" written in the memo line. *Id.* at *2. PIB also instructed Hamas's U.S.-based fundraising arm on how to wire dollars to its account in the


Freshfields Bruckhaus Deringer US LLP

Palestinian Territories; those dollars were then used to finance Hamas's operations. *Id.* at *1–2. Because PIB "provid[ed] material support to a customer linked to Hamas" by knowingly using its agents' New York bank accounts to process payments that "b[ore] indicia of terrorism financing," the Court concluded that PIB's New York transactions were "integral to the wrongful conduct" underpinning plaintiffs' claims. *Id.* at *6, *8.

Plaintiffs' allegations here fall well short of what the *Spetner* plaintiffs pleaded. In contrast to managing an account specifically bearing terrorism financing "indicia," the smartphones, servers, and other technological equipment that the MTN Defendants allegedly procured, *see* Pls.' Letter at 2, went to a telecommunications company and served the legitimate business purpose of running a mobile phone network for a "large swath of Iranian citizens"—as Plaintiffs themselves have admitted, Arg. Tr. 34:18–24. Plaintiffs' allegations do not connect the procurement of *any* technology to *any* attack. *See* MTD 32–34. Plaintiffs likewise fail to allege how an alleged $400,000 bribe paid by MTN to secure its spot in an Iranian telecommunications joint venture (i.e., MTN Irancell), *see* Pls.' Letter at 2, was an "instrument to achieve" or otherwise connected to attacks in Iraq four and nine years later, or to attacks in Afghanistan eleven years later. *Spetner*, 2023 WL 4035924, at *8. Nor do they allege how MTN Group's alleged guarantee of a loan to a subsidiary, MTN Mauritius, relates to Irancell, much less terrorist attacks. *See* Reply 17–18. Thus, unlike in *Spetner*—where plaintiffs alleged that PIB's use of the New York banking system knowingly facilitated multimillion-dollar incentive payments specifically for terrorist attacks and related fundraising, 2023 WL 4035924, at *1–2—Plaintiffs here have not pleaded that the MTN Defendants' alleged U.S. contacts bear terrorism financing "indicia" or otherwise have "a substantial relationship" to the attacks in Afghanistan and Iraq. *Id.* at *3, 6; *see* MTD 30–35; Reply 16–18.

Plaintiffs cannot resist this conclusion by recasting their claims as "aris[ing] from" the MTN Defendants' acquisition (through agents) of "embargoed technology." Pls.' Letter at 3. While allegedly procuring "embargoed" goods might violate sanctions, the D.C. Circuit has explained that allegations of sanctions-evasion will not suffice absent allegations establishing "some relation between the sanctions evasion by the foreign defendants and the injuries suffered in the terrorist attack." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 866 (D.C. Cir. 2022); *see* ECF No. 98 (discussing application of *Bernhardt* to this case).

That is all the more true when the defendants deal with entities that have "legitimate operations," even if they also have links to terrorism. In *Bernhardt*, HSBC allegedly aided an Iranian state-owned bank that had been sanctioned "as a specially designated global terrorist," and a Saudi bank whose "founder was one of al-Qaeda's key financial contributors" and that "maintained accounts for al-Qaeda's charity fronts." *Bernhardt*, 47 F.4th at 863, 865. The D.C. Circuit concluded that this did "not support an inference that Bernhardt's injuries sufficiently related to HSBC's conduct because aid to Iran could just as plausibly benefit its otherwise legitimate operations rather than al-Qaeda," and because the Saudi "bank's vast and otherwise legitimate operations make it impossible to infer that HSBC's conduct was connected to al-Qaeda's attack." *Id.* at 865. Here, even if Plaintiffs adequately alleged that the MTN Defendants violated sanctions, that would not plead that procuring technology for Irancell is related to Plaintiffs' terrorism-related injuries. To the contrary, Plaintiffs allege that MTN Group helped Irancell procure U.S. technology not for any reason connected to terrorism, but because "[t]he U.S.


products had performed well in its other networks, and the company's technicians were familiar with them." AC ¶ 976.

**Purposeful Availment.** *Spetner*'s purposeful-availment analysis independently supports dismissal.

*Agency. Spetner* confirms that, for a court to exercise personal jurisdiction over a non-resident defendant based on the acts of an agent, plaintiffs must plead that the "alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." 2023 WL 4035924, at *4 (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018)). The Second Circuit determined that PIB's alleged relationship with its agent AJIB satisfied this test: The *Spetner* plaintiffs alleged facts showing that PIB had knowledge of AJIB's in-forum activities—e.g., that PIB knew from AJIB's advertisements in trade publications that AJIB could process dollar-denominated accounts only through New York. *Id.* at *4. They also alleged that PIB repeatedly accepted incoming dollar-denominated payments from AJIB, which suggested PIB's consent that "AJIB act on its behalf" in effecting transfers through AJIB's correspondent accounts in New York. *Id.* And they alleged that, because PIB did not advertise AJIB's correspondent accounts in New York, PIB's customers would have known to send funds to those accounts only if PIB had directed them to do so. *Id.* at *5.

Plaintiffs here fail to adequately plead the existence of a similar agency relationship for three independent reasons.

*First*, unlike in *Spetner*, where plaintiffs alleged that PIB was the principal and AJIB the agent, Plaintiffs here fail to identify any principal. Instead, they rely on impermissible group pleading, where they reference the catch-all "MTN" to include, at times, conduct by Irancell, *see* MTD 20–23; Reply 11–13; *see, e.g.*, AC ¶¶ 1112–1119; MTD 21 n.15, despite admitting that MTN Group does not control Irancell, AC ¶ 72. Further confusing matters, Plaintiffs sometimes allege that the agents in question were the IRGC's—not "MTN's"—"purchasing agents." AC ¶ 1114.

*Second*, unlike in *Spetner*, where the agent is indisputably AJIB, *see* 2023 WL 4035924, at *7, Plaintiffs here have not plausibly alleged the identity of the agents who were directed by some principal to act in the United States. Plaintiffs allege that Exit40 was an agent, but virtually all of Plaintiffs' allegations with respect to Exit40 are on information and belief without meeting the requirements of proper information-and-belief pleading. *See* MTD 23–24; Reply 12. In any event, there is no allegation that MTN Group—or even Irancell—retained Exit40. *See* Reply 12 (discussing AC ¶¶ 856–857, 860–864). The Amended Complaint also undermines Plaintiffs' assertion that Mohammad Hajian was MTN Group's agent. *See* Pls.' Letter at 2. According to the Amended Complaint, Hajian sold goods "intended to facilitate a joint venture between a South African cellphone company and a non-governmental Iranian entity related to the provision of civilian cellular telephone service within Iran," AC ¶ 1108—i.e., Irancell, a company (as noted above) MTN Group did not control, *id.* ¶ 72. In other words, the most Plaintiffs allege is that Hajian was *Irancell's* agent, not MTN Group's. *See* Reply 13 n.10.

*Third*, Plaintiffs allege no facts supporting an agency relationship between MTN Group and any purported agent with U.S. contacts. While the *Spetner* plaintiffs "averred facts" and attached to their amended complaint copies of PIB-issued checks sent from ALF to families of

terrorists and receipt vouchers, 2023 WL 4035924, at *6, Plaintiffs here offer only conclusory assertions that "purchasing agents working for the IRGC" "act[ed] at the direction of MTN Group and its IRGC . . . ally," AC ¶ 1114—a naked legal conclusion devoid of factual allegations that cannot demonstrate control. *See Dish Network L.L.C. v. Kaczmarek*, 2021 WL 4483470, at *5 (E.D.N.Y. June 24, 2021) (citation omitted), *adopted in relevant part*, 2021 WL 4485870 (E.D.N.Y. Sept. 30, 2021). Plaintiffs likewise fail to "aver[] facts" showing that MTN Group directed or controlled Exit40. *Spetner*, 2023 WL 4035924, at *6; *see* MTD 23–24, 26–27; Reply 12–14.

        *U.S. Financial System. Spetner* recognizes that jurisdiction requires "a choice by the defendant bank to avail itself of the benefits of the New York financial system." 2023 WL 4035924, at *6. Thus, "[s]imply transacting in U.S. dollars" is not enough to make a defendant amenable to suit in New York. *Id.* The Second Circuit held that PIB purposefully availed itself of the U.S. banking system based on allegations showing that PIB "exercised control [over AJIB] by utilizing AJIB's correspondent bank accounts in New York." *Id.* at *5.

        Plaintiffs here fail to allege that the MTN Defendants made a similar choice. Plaintiffs concede that "the[ir] complaint nowhere mentions 'correspondent accounts.'" Opp. 27 n.8. And Plaintiffs fail to allege that the MTN Defendants otherwise chose to avail themselves of the New York financial system. *Spetner* thus forecloses Plaintiffs' argument that they can "support an inference that Defendants utilized the U.S. financial system" merely by "alleg[ing] [U.S.] dollar payments." Opp. 28; *see Spetner*, 2023 WL 4035924, at *6. Plaintiffs also fail to put forth allegations shedding light on how MTN Group could have directed (or even had a say in) foreign wires sent through New York by purchasing agents working for the *IRGC*, not MTN Group. *See* MTD 26–27; Reply 13–14. Putting aside these inadequately pleaded wire allegations, all that Plaintiffs allege is a single transfer of $400,000 that MTN Group allegedly "caused the issuance of" to secure Irancell's license. AC ¶ 1105; *see* Opp. 26, 28. A one-off transaction totaling $400,000, merely passing through New York as a waystation between foreign banks, is not large enough, in frequency or volume, to be considered purposeful availment. *See* MTD 28–29; Reply 14–15. This is especially true when viewed against the *Spetner* plaintiffs' allegations that PIB, through its agent AJIB, repeatedly accepted incoming dollar-denominated payments that may have totaled up to $35 million. *See* 2023 WL 4035924, at *1. Whereas PIB—itself a bank—sought "indirect access" to New York's financial system by knowingly using AJIB's New York correspondent accounts, *id.*, the most that Plaintiffs here allege is that the MTN Defendants incidentally engaged in dollar-denominated transactions and procured U.S. goods in order to operate their telecommunications company. Yet as *Spetner* made clear, a person can procure U.S. dollars without transacting through the United States, through "alternative channels." *Id.* at *5 & n.28. The same is true for "U.S.-origin goods." *See* MTD 29–30. Indeed, even if the goods at issue allegedly *originated* in the United States, Plaintiffs allege that Irancell procured them "through a network of Chinese, Middle Eastern and Iranian firms." AC ¶ 1008 (citation omitted).

# Freshfields Bruckhaus Deringer US LLP

Respectfully,

/s/ Timothy P. Harkness
Timothy P. Harkness

CC:  Counsel of Record (via ECF)