## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

STEPHANIE ZOBAY, et al.,

Plaintiffs,

-v.-

Case No.: 1:21-cv-03503-CBA

MTN GROUP LIMITED, et al.,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MTN GROUP LIMITED'S MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b) AND TO STAY PROCEEDINGS

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................... 1

I.    The Court Should Certify Its Motion-to-Dismiss Ruling for Interlocutory Appeal. .......... 5

    A.    The Order Involves at Least Three Controlling Questions of Law. ...................... 5

    B.    There Is a Substantial Ground for Difference of Opinion Regarding the Three Controlling Questions of Law. ................................................... 5

        1.    Question 1: Is a purchase of goods that originated in the forum, but were not necessarily purchased from within the forum, sufficient to establish purposeful availment of the privilege of conducting business within that forum? ..................................................... 6

        2.    Question 2: Can a business relationship with an entity that has significant legitimate operations, and which the U.S. Government has declined to identify as affiliated with terrorism, establish general awareness of assuming a role in terrorism, and if so under what circumstances? ............................................................. 12

        3.    Question 3: Can participation in a commercial venture with significant legitimate activities, without intent to aid terrorism, and without dealing with the groups perpetrating attacks, establish conscious and culpable participation in numerous terrorist acts, and if so under what circumstances? ............................................. 19

    C.    An Immediate Appeal May Materially Advance Termination of the Litigation. .............................................................................. 28

    D.    This is the Type of Case the Second Circuit Has Said Warrants "Greater Appellate Oversight." ....................................................... 31

II.    The Court Should Stay all Proceedings in This Court Pending the Second Circuit's Decision. ................................................................ 34

CONCLUSION ..................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Asahi Metal Indus. Co. v. Superior Ct.*,
   480 U.S. 102 (1987) ........................................................................................................32

*AstraZeneca UK, Ltd. v. Atchley*,
   __ S. Ct. __, 2023 WL 6377773 (Oct. 2, 2023) .......................................................28

*Atchley v. AstraZeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022) ....................................................................7, 8, 14

*Balintulo v. Daimler AG*,
   727 F.3d 174 (2d Cir. 2013) .................................................................... *passim*

*Balintulo v. Ford Motor Co.*,
   796 F.3d 160 (2d Cir. 2015) ...............................................................................34

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
   321 B.R. 147 (D.N.J. 2005) ...............................................................................28

*Bartlett v. Société Générale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ......................................................14

*Batalla Vidal v. Nielsen*,
   2018 WL 10127043 (E.D.N.Y. Apr. 30, 2018) .......................................................5

*Batalla Vidal v. Nielsen*,
   2018 WL 333515 (E.D.N.Y. Jan. 8, 2018) .........................................................5, 6

*Bernhardt v. Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022) ...............................................................13, 14, 23

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ......................................................................................9, 11

*In re Chiquita Brands Int'l, Inc. v. Alien Tort Statute and S'holder Derivative Litig.*,
   2012 WL 13214854 (S.D. Fla. Mar. 27, 2012) ......................................29, 31, 32

*Chand v. MTN Irancell Telecommunications Services Co.*,
   No. 22-830 (D.D.C. filed Mar. 27, 2022) ..................................................... *passim*

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) ...............................................................................21

*Davis v. MTN Irancell Telecommunications Services Co.*,
   No. 22-829 (D.D.C. filed Mar. 27, 2022) ..................................................... *passim*

*Est. of Giron Alvarez v. Johns Hopkins Univ.*,
   2019 WL 1779339 (D. Md. Apr. 23, 2019) ....................................................................32

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) ...................................................................................................9

*Freeman* v. *HSBC Holdings PLC*,
   18-cv-07359 (E.D.N.Y. filed Dec. 26, 2018) ..............................................................31

*Hanson v. Denckla*,
   357 U.S. 235 (1958) ...................................................................................................6, 12

*Hart v. Rick's Cabaret Int'l, Inc.*,
   73 F. Supp. 3d 382 (S.D.N.Y. 2014) ..............................................................................6

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ..........................................................................................................19

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) ......................................................................................................22

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ...........................................................................................15

*Hughes v. Zarrab*,
   No. 23-cv-06481 (S.D.N.Y. filed July 26, 2023) .........................................................31

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ........................................................................................................9

*J. McIntyre Mach., Ltd. v. Nicastro*,
   564 U.S. 873 (2010) ......................................................................................................10

*Kaplan v. Lebanese Canadian Bank SAL*,
   999 F.3d 842 (2d Cir. 2021) ...........................................................................12, 14, 18

*Kemper v. Deutsche Bank*,
   911 F.3d 383 (7th Cir. 2018) ...................................................................................21, 22

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ......................................................................................................32

*Klinghoffer v. S.N.C. Achille Lauro*,
   921 F.2d 21 (2d Cir. 1990) ................................................................................5, 30, 31

*In re Lloyd's Am. Trust Fund Litig.*,
   1997 WL 458739 (S.D.N.Y. Aug. 12, 1997) ...............................................................28

*Long v. MTN Group Ltd.*,
No. 23-cv-5705 (E.D.N.Y. filed July 28, 2023) ...................................................31

*Mohammed v. Reno*,
309 F.3d 95 (2d Cir. 2002)..........................................................................34

*Neiberger v. Deutsche Bank AG*,
No. 19-cv-03005 (S.D.N.Y. filed Apr. 4, 2019) ............................................31

*O'Sullivan v. Deutsche Bank AG*,
17-cv-08709 (S.D.N.Y. filed Nov. 9, 2017) ..................................................31

*O'Sullivan v. Deutsche Bank AG*,
2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ..............................................23

*Republic of Colombia v. Diageo N. Am. Inc.*,
619 F. Supp. 2d 7 (E.D.N.Y. 2007) ..............................................1, 5, 6, 28, 34

*RJR Nabisco, Inc. v. Eur. Cmty.*,
579 U.S. 325 (2016)....................................................................................32

*Siegel v. HSBC N. Am. Holdings, Inc*,
933 F.3d 217 (2d Cir. 2019)...........................................................13, 14, 18

*Sutherland v. Ernst & Young LLP*,
856 F. Supp. 2d 638 (S.D.N.Y. 2012)............................................................36

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)............................................................................. *passim*

*Walden v. Fiore*,
47 f U.S. 277 (2014) .....................................................................6, 7, 10, 11, 12

*Weber v. United States*,
484 F.3d 154 (2d Cir. 2007)........................................................................1

*Wildman v. Deutsche Bank Aktiengesellschaft*,
2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022), *appeal docketed*, No. 23-132
(2d Cir. Jan. 30, 2023) ................................................................................23

*In re World Trade Ctr. Disaster Site Litig.*,
503 F.3d 167 (2d Cir. 2007)........................................................................34

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980)....................................................................................10

**Statutes**

28 U.S.C. § 1292(b) ............................................................................. *passim*

**Rules**

2d Cir. LR 31.2(b)..........................................................................................30

31 C.F.R. §§ 560.203–.205 (2023) ............................................................22

31 C.F.R. § 594 (2023) ..............................................................................22

**Other Authorities**

Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*,
Am. Enter. Inst. for Pub. Pol'y Rsch. (Oct. 22, 2007) ......................................13, 18

Commission Delegated Regulation (EC) No. 2018/1100, 2018 O.J. (L 199 I) 1 ........................33

Elliot Hen-Tov & Nathan Gonzalez, *The Militarization of Post-Khomeini Iran: Praetorianism 2.0*, 34 Washington Q. 45 (Winter 2011) ......................................18

U.S. Dep't of State, Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006) ..................................18

U.S. Dep't of Treasury, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007) ..............................................16

U.S. Dep't of Treasury, Press Release, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) ..............................................16

U.S. Dep't of Treasury, Press Release, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008) ..............................................17

U.S. Dep't of Treasury, Press Release, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) ..............................................15, 16, 18

U.S. Dep't of Treasury, Press Release, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) ....................13, 17

U.S. Dep't of Treasury, Press Release, *Under Secretary Sigal Mandelker Speech before the Foundation for the Defense of Democracies* (June 5, 2018)) ...............................15

U.S. Dep't of Treasury, *U.S. Department of the Treasury Under Secretary Sigal Mandelker Speech before the Securities Industry and Financial Markets Association Anti-Money Laundering & Financial Crime Conference* (Feb. 13, 2018) ..............................................15

U.N. Off. of the High Comm'r for Hum. Rts., *United States: Efforts to Use Sanctions to Expand Jurisdiction Abroad Violate Human Rights Says UN Expert* (Mar. 9, 2023) ..............................................33

## INTRODUCTION

Defendant MTN Group Limited ("MTN Group") respectfully moves for certification for interlocutory appeal because this Court's order granting in part and dismissing in part MTN Group's motion to dismiss (ECF No. 129, or the "Order") presents the kind of "knotty legal problems" that deserve "prompt resolution" that Congress enacted 28 U.S.C. § 1292(b) to address. *Weber v. United States*, 484 F.3d 154, 159 (2d Cir. 2007). The issues presented by the Court's Order are tailor-made for Section 1292(b): they involve three "controlling question[s] of law," on which there is "substantial ground for difference of opinion," and immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Because this is a "large, complex case," it is the kind of case where "certification may be more freely granted." *Republic of Colombia v. Diageo N. Am. Inc.*, 619 F. Supp. 2d 7, 9 (E.D.N.Y. 2007). And the Second Circuit has specifically noted that "greater appellate oversight" of interlocutory orders is warranted in cases raising sensitive foreign policy concerns, *Balintulo v. Daimler AG*, 727 F.3d 174, 187 (2d Cir. 2013), which this case undoubtedly does.

Indeed, this case is aptly described as a large and complex case that poses knotty legal problems and implicates foreign relations sensitivities. Plaintiffs seek to hold Africa's largest telecommunications provider liable for tragic injuries suffered in wartime Iraq. On their theory, a large consumer mobile telephone network in Iran was actually a "front" used by Iran's Islamic Revolutionary Guard Corps ("IRGC") to route equipment and money to terrorists. As a result, they say, a South African telecommunications company that held a minority stake in an Iranian telecommunications venture can be held liable for any IRGC-linked act of terrorism anywhere in the world. This litigation is literally unprecedented. Plaintiffs rely on a legal theory of Anti-Terrorism Act ("ATA") liability that has never before led to a trial. And they pair it with an equally

1

novel factual theory—unlike a number of prior ATA cases alleging that purported charities were fronts for designated foreign terrorist organizations ("FTOs") like Hamas and Hezbollah, this appears to be the first ever case to advance past a motion to dismiss based on dealing with businesses with alleged IRGC links. Plaintiffs' counsel have themselves called this Court's motion-to-dismiss ruling "a landmark in post-*Twitter* ATA litigation." *Davis v. MTN Irancell Telecommunications Services Co.*, No. 22-829 (D.D.C. filed Mar. 27, 2022) and *Chand v. MTN Irancell Telecommunications Services Co.*, No. 22-830 (D.D.C. filed Mar. 27, 2022), Pls.' Notice of Supp. Authority, ECF No. 65 at 9 ("*Davis/Chand* Supp. Authority Notice") (Ex. A).[1]

Litigating this decade- and continent-spanning case will require discovery into a transnational business transaction in 2004–2005; the relationships among a host of Iranian governmental, quasi-governmental, and corporate entities; the connections between various Middle Eastern militias and terrorist organizations; and the specific circumstances of ten different attacks across different Iraqi provinces from 2011 through 2017. This litigation will be burdensome and costly to a defendant that has no U.S. operations or any familiarity with U.S.-style discovery. It will also impose costs and burdens on third parties. Plaintiffs have telegraphed that they expect multiple U.S. Government agencies to play a significant role in how they intend to litigate what happened more than a decade ago in a complex, conflict-ridden part of the world. And given the novelty of every aspect of this case, discovery will inevitably involve nettlesome issues and disputes requiring judicial intervention, even with the parties working in good faith to advance the case.

Before these daunting challenges are confronted, expenses mount, and resources of both the Judicial and Executive branches are taxed, the Second Circuit should have an opportunity to

---

[1] The parenthetical "Ex. __" refers to exhibits to the accompanying Declaration of Scott A. Eisman.

consider the weighty questions of personal jurisdiction and ATA aiding-and-abetting liability that undergird this case. Specifically, three questions of law warrant certification.

*First*, is a foreign company's participation in the purchase of a good that "originated" from the United States—but not necessarily purchased *within* the United States—sufficient to establish purposeful availment? The D.C. District Court reached the opposite legal conclusion as this Court on that question, and whether the fact that a product was designed or manufactured in the U.S. alone is enough to support jurisdiction is a difficult question of first impression in the Second Circuit.

*Second*, does a business have general awareness of assuming a role in terrorism when it participates in a venture with significant legitimate activities, with business partners not regarded by the U.S. Government as affiliated with the IRGC or terrorism? This is also a question raising weighty legal issues that are open in the Second Circuit; as this Court recognized, Plaintiffs' theory of general awareness is weaker than what the Second Circuit has previously authorized. *See* Order at 46.

*Third*, does a business culpably participate in numerous acts of international terrorism by participating in a commercial venture without an intent to aid terrorism and without dealing with groups perpetrating attacks? This question involves addressing a number of difficult and open issues stemming from a brand-new Supreme Court decision, *see Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), a subject that has already spurred the Supreme Court to take the rare step of soliciting the views of the Solicitor General in another ATA case.

*       *       *

Each of these serious questions, and all of the circumstances of this unprecedented case, support certification under Section 1292(b), which this Court should grant. There is, however, a

3

procedural wrinkle.  As a result of a confessed "error in litigation judgment," Tr. of Conference of Oct. 31, 2023, ECF No. 140 at 7, Plaintiffs withheld a count from their complaint while the parties "spent a lot of time [and] effort" litigating the motion to dismiss, *id.* at 6, only to amend their complaint to add a new count after this Court's motion-to-dismiss ruling, *see* ECF No. 142. Plaintiffs now seek to benefit from their own mistake: they point out that reversal of this Court's decision would not "materially advance the ultimate termination of this litigation" because Plaintiffs' "new count"—that is, the one they withheld and then belatedly decided to add—"will remain unresolved and unaffected by any interlocutory appeal."  Pls.' Resp. to Pre-Mot. Letter for Cert., ECF No. 137 at 3 ("Resp. to Pre-Mot. Letter").  Plaintiffs obviously should not obtain a litigation advantage from their own mistake.  At the same time, the Second Circuit would likely favor reviewing an order addressing the whole complaint.  Under these unusual circumstances, therefore, MTN Group proposes that the Court proceed as follows:

- Allow the parties to fully brief this certification motion on the schedule this Court previously adopted;

- then hold this certification motion in abeyance pending the Court's decision on a motion to dismiss Count 4;

- concurrently, set a briefing schedule for briefing on the motion to dismiss Count 4; and

- after decision of the motion to dismiss, allow each party an opportunity to file a short supplemental brief addressing any effect the Court's decision regarding Count 4 may have on this certification motion.

I.      **The Court Should Certify Its Motion-to-Dismiss Ruling for Interlocutory Appeal.**

    A.      **The Order Involves at Least Three Controlling Questions of Law.**

"[D]istrict courts routinely certify, and the Second Circuit routinely accepts, appeals from" orders denying motions to dismiss. *Batalla Vidal v. Nielsen*, 2018 WL 10127043, at *3 (E.D.N.Y. Apr. 30, 2018). "Where . . . the grounds for dismissing pleadings can be restated as a broader legal question that is likely to be dispositive of the case at hand, certification of an interlocutory appeal may be appropriate." *Id.* That is the case here, with respect to the following three questions of law:

1.  Is a purchase of goods that originated in the forum, but were not necessarily purchased from within the forum, sufficient to establish purposeful availment of the privilege of conducting business within that forum?

2.  Can a business relationship with an entity that has significant legitimate operations, and which the U.S. Government has declined to identify as affiliated with terrorism, establish general awareness of assuming a role in terrorism, and if so under what circumstances?

3.  Can participation in a commercial venture with significant legitimate activities, without intent to aid terrorism, and without directly dealing with the groups perpetrating attacks, establish conscious and culpable participation in numerous terrorist acts, and if so under what circumstances?

These questions are "controlling." 28 U.S.C. § 1292(b). In the Second Circuit, "it is clear that a question of law is 'controlling' if reversal of the district court's order would terminate the action." *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990). If the Second Circuit were to agree with MTN Group on any one of these three questions of law, it would terminate the action (subject to the procedural wrinkle noted above resulting from Plaintiffs' belated amendment).

    B.      **There Is a Substantial Ground for Difference of Opinion Regarding the Three Controlling Questions of Law.**

"A substantial ground for difference of opinion exists when (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second

Circuit." *Batalla Vidal v. Nielsen*, 2018 WL 333515, at *2 (E.D.N.Y. Jan. 8, 2018) (quoting *Hart v. Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 393 (S.D.N.Y. 2014)). Both circumstances are present here. Indeed, this Court's lengthy opinion addressing the legal issues in this case itself confirms the difficulty of those issues. *Cf. Diageo*, 619 F. Supp. at 11 ("[I]t would be very unusual for this court to issue an Order that is 145 pages if no novel and difficult questions were presented.").

1.    **Question 1: Is a purchase of goods that originated in the forum, but were not necessarily purchased from within the forum, sufficient to establish purposeful availment of the privilege of conducting business within that forum?**

Personal jurisdiction inherently flows from contacts with the forum, which is why a defendant is subject to specific personal jurisdiction only if it has taken "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). That rule is rooted in the "traditional notions of fair play and substantial justice" that underlie due process: it ensures a defendant will be subject to jurisdiction only if its "suit-related contacts . . . create a substantial connection with the forum." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (quotation marks omitted). A controlling legal question here concerns how far purposeful availment extends. It asks whether a defendant that allegedly purchases "U.S.-origin goods" anywhere in the world, without alleged contacts with the territory of the United States (the relevant forum here), purposefully avails itself of the privilege of conducting activities in the United States.

There is substantial ground for difference of opinion on this question for two reasons. First, there is a direct conflict of authority: this Court and Judge Moss in the U.S. District Court for the District of Columbia reached opposite legal conclusions concerning jurisdictional allegations that, as Plaintiffs have acknowledged, are "essentially identical." *Davis/Chand* Supp. Authority Notice

at 1 (Ex. A) (quotation marks omitted).  Second, even putting Judge Moss's opinion to the side, this case raises a thorny legal issue that is open in the Second Circuit and on which reasonable judges could disagree: whether a defendant that obtains items that originated in the forum, but does not reach into the forum to procure those items, avails itself of the forum's benefits and protections.

### a)    Conflicting Authority

Judge Moss has already ruled on this precise question and reached the opposite conclusion from this Court.  In the *Chand* and *Davis* cases —which involve the "same factual allegations" as this case, *Davis/Chand* Supp. Authority Notice at 1 (Ex. A) (quotation marks omitted)—Judge Moss held that allegations that MTN Group helped Irancell acquire "U.S.-origin embargoed technology and equipment, and training and expertise," *Davis* Compl. ¶ 47, did not adequately plead purposeful availment.  *Davis/Chand* Tr. of Conference of July 28, 2023, Ruling on the Record at 54–56 ("*Davis/Chand* Ruling") (Ex. B).  Judge Moss explained that this legal conclusion was compelled by *Walden*, *id.* at 55, which held that "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliations with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State," 571 U.S. at 286 (quotation marks omitted).  Thus, if alleging "a contact with a person who resides in the forum is insufficient" to plead purposeful availment, it must be insufficient to allege that the defendant "acquire[d] a good that was manufactured at some unknown place and acquired in some unknown place," even if "the good is associated with a company that is based in the [forum]." *Davis/Chand* Ruling at 55 (Ex. B).

That ruling contrasts with what this Court held in concluding that Plaintiffs adequately alleged MTN Group's purposeful availment.  As characterized by this Court, Plaintiffs' purposeful-availment theory was that MTN Group "sourc[ed] embargoed U.S. goods for Irancell." Order at 26.  The Court started its purposeful-availment analysis by noting that "[c]ourts have

found personal jurisdiction to be properly conferred where foreign defendants source goods from the forum." *Id.* (citing *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 233 (D.C. Cir. 2022)). Yet the Court did not rely on any factual allegations that MTN Group, whether directly or through agents, purchased goods from within the United States—and Judge Moss, reviewing a materially identical complaint, found no non-conclusory allegations supporting such a proposition. *See Davis/Chand* Ruling at 52–53, 54 (Ex. B). In contrast to *Atchley*, which focused on allegations that the foreign defendants "reached into the United States to source goods," 22 F.4th at 233, this Court based its purposeful-availment holding on the allegation that MTN helped procure "U.S.-origin" goods. *Davis/Chand* Ruling at 53 (Ex. B) (emphasis added). Thus, this Court pointed to allegations that MTN Group helped procure "American tech equipment," Order at 27 (quoting AC ¶ 977, ECF No. 52),[2] including "U.S. components," *id.* (quoting AC ¶ 982), that were "[]designed, protected, manufactured, and/or assembled" in the United States, *id.* (quoting AC ¶ 711). This Court, in other words, held that Plaintiffs pleaded purposeful availment by alleging that MTN Group helped procure "U.S.-origin items," *id.*, or "embargoed U.S. technologies," *id.* at 29, without necessarily reaching into the United States to do so. And Plaintiffs' own allegations indicate that MTN Group may well have obtained these items *without* reaching into the United States—"through a network of Chinese, Middle Eastern and Iranian firms." AC ¶ 1008 (quotation marks omitted). The same allegation featured in Judge Moss's conclusion that the *Chand* and *Davis* plaintiffs failed to plead purposeful availment, since it "suggest[s] that the units may not have been acquired in the United States." *Davis/Chand* Ruling at 56 (Ex. B).

---

[2] "AC" refers to Plaintiffs' First Amended Complaint, ECF No. 52, as distinguished from the Second Amended Complaint that Plaintiffs filed on November 13, 2023, ECF No. 142.

In short, this Court and the D.C. District Court took conflicting approaches to the same legal question. The *Chand* and *Davis* court considered it necessary to purposeful availment that the defendant reach into the forum to purchase equipment. This Court, in contrast, considered it sufficient that the defendant allegedly assisted in the procurement of equipment that was designed, manufactured, or assembled in the forum, whether or not the defendant reached into the forum to purchase it. This direct conflict establishes that there is a substantial ground for difference of opinion on a controlling question of law on the purposeful availment standard.

b)    *Difficult Questions of First Impression*

Conflicting authority aside, the question here is particularly difficult and of first impression in the Second Circuit. Whether a company that sources forum-origin goods from anywhere in the world is subject to jurisdiction in the forum raises novel and unsettled issues about the limits of purposeful availment. Purposeful availment centers on a tradeoff: "When (but only when) a company exercises the privilege of conducting activities within a state—thus enjoying the benefits and protections of its laws—the State may hold the company to account for related misconduct." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (cleaned up). Put another way, "where individuals purposefully derive benefit from their [in-forum] activities," they "may well . . . hav[e] to account" in the forum "for consequences that proximately arise from such activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985) (citation and quotation marks omitted). Thus, a defendant that contracts to buy a widget from the forum "'enjoys the benefits and protections of [the forum's] laws'—the enforcement of contracts, the defense of property, the resulting formation of effective markets." *Ford*, 141 S. Ct. at 1029–30 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)); *see Burger King*, 471 U.S. at 482 (defendant "'purposefully availed himself of the benefits and protections of Florida's laws' by entering into contracts expressly providing that those laws would govern franchise disputes"). The same would

not be true of a defendant who contracts to buy an American-designed widget from a non-U.S. distributor in, say, China—a transaction that does not come with the protection of U.S. laws, wherever the widget was originally designed or assembled.

In fact, even selling a product into a forum, through a distributor, and thereby incidentally receiving the benefit of that forum's markets, is not enough for jurisdiction.  *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2010) (plurality op.); *id.* at 887 (Breyer, J., concurring in the judgment).  Because "a defendant's amenability to suit" does not "'travel[] with the chattel,'" merely placing a product into the stream of commerce does not allow the defendant to be sued wherever the product ends up.  *McIntyre*, 564 U.S. at 891 (Breyer, J., concurring in the judgment) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296 (1980)). A defendant must instead "manifest an intention to submit to the power of a sovereign" before the sovereign can hale it into its courts.  *McIntyre*, 564 U.S. at 882 (plurality op.).  If jurisdiction does not "travel with the chattel" that a defendant sells while foreseeing it will go to the United States, then jurisdiction should also not travel with the chattel that a defendant buys *outside* the United States.

Here, Plaintiffs do not allege that MTN Group conducted any activities "within" the United States.  Nor do they allege that MTN Group directly obtained the benefits and protection of U.S. law, such as U.S.-governed contracts governing their alleged purchases of U.S.-origin items. Instead, Plaintiffs' theory is that MTN Group bought items that were originally made or designed in the United States.  That theory hinges on contacts with *goods* that originated in the forum, rather than with the forum itself.  It is thus in tension with the requirement that the defendant's contacts be with the forum, not with someone (or something) that happens to "originate[]" there.  *Walden*, 571 U.S. at 291 (quotation marks omitted).  It is also in tension with the jurisdictional rule that the "relationship among the defendant, the forum, and the litigation"—the "focus[]" of the

jurisdictional inquiry—"must arise out of contacts that the defendant *[it]self* creates with the forum." *Id.* at 284 (quotation marks omitted). Indeed, under Plaintiffs' theory, the only people or entities that enjoyed U.S. benefits and protections of the forum were those who "designed, protected, manufactured, and/or assembled" the U.S.-origin items. Order at 27 (quoting AC ¶ 711). A theory that holds that these benefits and protections travel with the item, such that any downstream purchaser anywhere in the world inherits the jurisdictional contacts of the manufacturers and designers, would "impermissibly allow[]" the contacts of someone other than the defendant "to drive the jurisdictional analysis." *Walden*, 571 U.S. at 289.

Plaintiffs' own allegations underscore this point. Their allegations, as this Court summarized them, are that MTN Group sought out "U.S.-origin items" because (1) MTN Group was "familiar[] with them," and (2) "they were requested by [MTN Group's] business partners, the Iranian shareholders." Order at 27 (citing AC ¶¶ 976, 935, 976, 1006, 1615). The first reason suggests only that MTN Group formed an intentional contact with a *product*—not with territory or the legal protections that come with doing business in that territory. And regardless, it rests on the notion that MTN Group wanted U.S. components because "the company's technicians" happened to be "familiar with them." AC ¶ 976 (quotation marks omitted). That is the sort of "random, fortuitous, or attenuated" contact that is insufficient for personal jurisdiction. *Burger King*, 471 U.S. at 475 (quotation marks omitted). As for the second reason, Plaintiffs allege that MTN Group's business partners desired U.S.-origin items "because [such items] have been the gold standard from 9/11 through today." Order at 27 (quoting AC ¶ 711); *see* AC ¶ 976 ("U.S. products had performed well in [MTN Group's] other networks" (quotation marks and emphasis omitted)); *id.* ¶ 761 (describing "American technologies" as "state-of-the-art"). But that alleged motivation for desiring certain products also does not establish that MTN Group "formed a contact

with the forum." *Walden*, 571 U.S. at 290.  Besides, even if allegations that U.S.-origin items were "the gold standard" suggest that *the manufacturers or designers*—as opposed to MTN Group— enjoyed the benefits and protections of U.S. laws, merely alleging that a "third party" would be subject to jurisdiction in the forum "'cannot satisfy the requirement'" to show that the defendant has purposefully availed itself of the forum.  *Id.* at 291 (quoting *Hanson*, 357 U.S. at 253).

At a minimum, reasonable judges could disagree about whether a defendant that undertakes no in-forum activities, and thus enjoys none of the benefits and protections of acting within the forum, creates a contact with the forum by purchasing items that happened to be designed or manufactured there.  The Second Circuit has not endorsed such a conception of purposeful availment, and whether it should do so is at least a difficult question.  The Court should therefore certify it.

2.    **Question 2: Can a business relationship with an entity that has significant legitimate operations, and which the U.S. Government has declined to identify as affiliated with terrorism, establish general awareness of assuming a role in terrorism, and if so under what circumstances?**

This Court's ruling on the scope of aiding-and-abetting liability under the ATA also raises questions warranting certification.  Under the second element of the *Halberstam* framework for such liability, a defendant cannot be liable unless it is "generally aware that through its" alleged conduct, it "was playing a role in [the terrorist perpetrator's] terrorist activities."  *Kaplan v. Lebanese Canadian Bank SAL*, 999 F.3d 842, 865 (2d Cir. 2021).  As this Court recognized, the present case is not squarely controlled by Second Circuit precedent.  *See* Order at 46 ("Although these sources are not as robust as the detailed, numerous sources in *Kaplan II*, they are stronger than the sources found insufficient in *Honickman*.").  Two facets of this case make the legal question of general awareness particularly novel and difficult: (i) the asserted basis for liability is MTN Group's participation in a business venture with significant legitimate activities, and (ii) the

U.S. Government has specifically determined that the IRGC "hides" its affiliations, has expressly used sanctions designations to "expose" IRGC-affiliated entities to avoid, and has never identified MTN Group's alleged business partners as such entities. No court of appeals has found general awareness in such circumstances, and whether to do so for the first time here is a difficult question.

### a)   *Significant Legitimate Activities*

"It is undisputed that Irancell has significant legitimate operations; the company grew into Iran's second-largest mobile phone operator, and provides mobile phone services to millions of Iranian consumers." Order at 51–52 (citations omitted). Likewise, Irancell's indirect shareholder Bonyad Mostazafan operates a "multi-billion dollar economic empire" of "energy, mining, logistics, information technology, and financial services" firms, U.S. Dep't of Treasury, Press Release, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) ("Treasury Targets Supreme Leader") (Ex. C to ECF No. 82-1), and its other shareholder, IEI, sold "many consumer goods," including "personal computers, scanners, telephone sets and intercoms, [and] mobile phones." Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, Am. Enter. Inst. For Pub. Pol'y Rsch. (Oct. 22, 2007) (Ex. G to ECF No. 82-1).

The non-terrorist activities of a defendant's business partner are relevant to general awareness under Second and D.C. Circuit precedent. In *Siegel v. HSBC N. Am. Holdings, Inc.*, the Second Circuit affirmed dismissal for lack of general awareness where the defendant's business partner engaged in "vast" activities not "linked to terrorists." 933 F.3d 217, 224 (2d Cir. 2019). It was not sufficient that "various public reports" suggested that this party "ha[d] links to [al-Qaeda] and other terrorist organizations." *Id.* at 224, n.6. The D.C. Circuit has likewise recognized that when a defendant's customer has "extensive legitimate operations," the defendant will have "little reason to suspect that it [is] assuming a role in [an FTO's] terrorist activities." *Bernhardt v.*

13

*Islamic Republic of Iran*, 47 F.4th 856, 869 (D.C. Cir. 2022) (quoting *Siegel*, 933 F.3d at 224).

That rationale compelled the D.C. Circuit to affirm dismissal on general-awareness grounds in

*Bernhardt* even though one of the defendant's partners had been listed "as a specially designated

global terrorist" by the U.S. Government, and another was designated "for providing banking

services to a terrorist-affiliated group of Iran's military" (i.e., the IRGC). *Id.* at 863, 868–69.

We recognize that this Court considered *Bernhardt* distinguishable and concluded that

"*some*" legitimate activities do not defeat general awareness. Order at 36 (emphasis added). But

no court of appeals has ever found the general-awareness requirement satisfied when a defendant

engages with an entity with *significant* legitimate activities. *Cf. Kaplan*, 999 F.3d at 862 (no

discussion of legitimate activities; defendant's customers "were in fact integral parts of Hizbollah,"

and "Hizbollah repeatedly publicized those relationships on Hizbollah websites and in news

media"); *Atchley*, 22 F.4th at 228 (defendant's business partner allegedly so "thoroughly

dominated by Jaysh al-Mahdi" that it "functioned more as a terrorist apparatus than a health

organization" (quotation marks omitted)); *cf. also Bartlett v. Société Générale de Banque Au Liban

SAL*, 2020 WL 7089448, at *12 (E.D.N.Y. Nov. 25, 2020) (defendant's customers "allegedly have

no legitimate activities"). It is at least a novel and difficult legal question whether participating in

a commercial venture with "significant" legitimate activities, in partnership with entities

themselves having vast non-terrorist commercial activities, can support general awareness of

assuming a role in terrorism.

### b)    *U.S. Government Messaging*

The legal question of general awareness is made even more difficult by the U.S.

Government's public messages. The Second Circuit has held that the mere *absence* of a terrorism

designation does not preclude general awareness. *Kaplan*, 999 F.3d at 865. But the Second Circuit

has also held that general awareness is undermined when the U.S. Government has described

certain organizations as supporting terrorism under "cover," "which the Treasury Department unveiled only after developing 'credible evidence' in an investigation." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502 (2d Cir. 2021). When "organizations . . . maintain[] a 'cover' in public," it "undermines the plausibility" of a claim that a defendant would have "understood [its] true nature and activities." *Id.*

This case raises an even more complex version of the same legal problem. Plaintiffs' theory of general awareness is based on alleged connections to the IRGC, a part of the Iranian government that "consolidate[d] control over broad swaths of the Iranian economy," with a "growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and oil industries, controlling billions of dollars of business." U.S. Dep't of Treasury, Press Release, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) ("Treasury Targets IRGC") (Ex. C). As the U.S. Under Secretary of Treasury later explained, "[t]here is no transparency to speak of in Iran," and "[t]he IRGC . . . makes up a significant and *often covert* part of the Iranian economy." U.S. Dep't of Treasury, *U.S. Department of the Treasury Under Secretary Sigal Mandelker Speech before the Securities Industry and Financial Markets Association Anti-Money Laundering & Financial Crime Conference* (Feb. 13, 2018) ("Under Secretary Speech I") (Ex. D) (emphasis added). Indeed, when Iran "use[s] deceptive tactics including front and shell companies," its "objective is to ensure that no legitimate company or government knows that they are being used to achieve Iran's illicit aims." U.S. Dep't of Treasury, Press Release, *Under Secretary Sigal Mandelker Speech before the Foundation for the Defense of Democracies* (June 5, 2018) ("Under Secretary Speech II") (Ex. E).

Thus, in the U.S. Government's view, the IRGC was "*hiding* behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world." Treasury Targets IRGC (Ex. C) (emphasis added). When the U.S. Government uncovers which companies the IRGC is "hiding" behind, it designates those specific entities. In 2007, for example, Treasury "*expos[ed]*" various companies "that have been involved in [Iran's] dangerous activities." U.S. Dep't of Treasury, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007) (Ex. F) (emphasis added). Treasury stated that its designations "*notify* the international private sector of the dangers of doing business with . . . the many IRGC-affiliated companies that pervade several basic Iranian industries." *Id.* (emphasis added). Critically, Treasury said this in the context of *specifically identifying nine companies* as "IRGC-affiliated entities." *Id.* In 2010, Treasury further "expos[ed]" subsidiaries of one of those named IRGC-affiliated entities (Khatam al-Anbiya) in order to "help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities." Treasury Targets IRGC (Ex. C). Later that year, the U.S. Government designated an Iranian charitable *bonyad*—Bonyad Taavon Sepah, but *not* Bonyad Mostazafan—"for providing services to the IRGC." U.S. Dep't of Treasury, Press Release, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) (Ex. I to ECF No. 82-1).

Throughout the relevant period, then, "[t]he IRGC" was "a primary focus of U.S. and international sanctions against Iran," with continued efforts by the U.S. Government to "expose" its "deceptive behavior." *Id.*; *see also id.* (noting designation of "14 IRGC-affiliated individuals and entities" in a six-month span); Under Secretary Speech I ("Over the last year, we have designated 97 targets in the Middle East, Asia, and Europe in connection with the Islamic Revolutionary Guard Corps (IRGC) and Iran's support for terrorism.") (Ex. D). Yet the U.S.

16

Government never designated Irancell, Bonyad Mostazafan, or IEI for connections to either the IRGC or terrorism. *See* Order at 46–47. The U.S. Government never designated Irancell for anything; designated Bonyad Mostazafan only in 2020 (after the last relevant attack) and only for being controlled by the Supreme Leader (not the IRGC); and designated IEI under a non-proliferation sanctions program (not counter-terrorism sanctions) for its affiliation with the Iranian defense ministry (not the IRGC). *See* Treasury Targets Supreme Leader (Ex. C to ECF No. 82-1); U.S. Dep't of Treasury, Press Release, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008) (Ex. F to ECF No. 82-1).[3]

MTN Group agrees with this Court that *Kaplan* "rejected the argument that general awareness can be gained no other way" than through U.S. Government designations. Order at 47. But it is equally true, under *Honickman*, that the U.S. Government's messaging can *undermine* general awareness. General awareness, in other words, is not merely the counting of indicia, but the legal weighing of the public record as a whole. Critically, the situation here is not government silence, but repeated government recognition that the IRGC "hides" its affiliations; repeated government designations of various different entities for the express purpose of exposing IRGC affiliates so that the international private sector can avoid them; and affirmative government decisions *not* to designate Irancell or its Iranian shareholders as IRGC affiliates. It is at minimum a difficult legal question whether a defendant can be said to have general awareness of assuming a role in terrorism when it engaged in a commercial venture with undisputedly significant

---

[3] This Court recognized that IEI's designation concerned the Ministry of Defense and Armed Forces Logistics (MODAFL), rather than the IRGC or terrorism, but found relevant its "military" ties. Order at 47. Reasonable judges could disagree about whether a designation for ties to Iran's regular military, rather than ties to the IRGC or terrorism for which Treasury makes distinct designations, supports general awareness of assuming a role in acts of international terrorism.

legitimate activities, with partners the U.S. Government has considered and declined to determine were IRGC affiliates involved in terrorism.

Of course, that question might be less difficult if the IRGC had publicly broadcast that Irancell, Bonyad Mostazafan, or IEI was an "integral part[]" of its organization, together with public reports that those entities specifically supplied "funds for Hizballah-affiliated suicide bombers." *Compare Kaplan,* 999 F.3d at 850–51 (quotation marks omitted). But instead, the IRGC "hid[es]" its affiliations, Treasury Targets IRGC (Ex. C), precisely so that "legitimate compan[ies]" are not aware they are "being used to achieve Iran's illicit aims," Under Secretary Speech II (Ex. E). Consequently, unlike the "robust" public sources in *Kaplan*, Order at 46, Plaintiffs have had to rely on passing mentions of purported IRGC affiliation in two academic articles by doctoral students, *see* Elliot Hen-Tov & Nathan Gonzalez, *The Militarization of Post-Khomeini Iran: Praetorianism 2.0*, 34 Washington Q. 45 (Winter 2011) (Ex. Y to ECF No. 82-26), *cited at* AC ¶ 1328 & n.580; Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, Am. Enter. Inst. for Pub. Pol'y Rsch. (Oct. 22, 2007) (Ex. G to ECF No. 82-1), *cited at* AC ¶ 1328 & n.579, and a purported internal government cable leaked by hackers, U.S. Dep't of State, Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006), *cited at* AC ¶ 790 & n.370—none of which even specifies an alleged connection between the relevant entities and terrorism. A reasonable conclusion to draw from this public record is that Irancell, Bonyad Mostazafan, and IEI were at most "believed by some to have links" to the IRGC (which itself was not a designated terrorist organization at the relevant time). *Siegel*, 933 F.3d at 224.[4]

---

[4] The IRGC's non-designation at the relevant time adds to the difficulty of the novel legal questions raised here. When the State Department designates FTOs, it is notifying the world "that the specified organizations 'are so tainted by their criminal conduct that any contribution to such an

No court of appeals has found general awareness in such circumstances—indeed, this appears to be the first ATA case to survive a motion to dismiss based on dealings with alleged "IRGC fronts."  This case thus at least raises serious questions under the Second Circuit's decisions in *Siegel* and *Honickman* and the D.C. Circuit's decision in *Bernhardt*.  As a difficult question of first impression, it amply satisfies the requirement of a substantial ground for difference of opinion.

3.    **Question 3: Can participation in a commercial venture with significant legitimate activities, without intent to aid terrorism, and without dealing with the groups perpetrating attacks, establish conscious and culpable participation in numerous terrorist acts, and if so under what circumstances?**

In addition to satisfying the general-awareness requirement, a plaintiff must adequately plead that the defendant "aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong—here, an act of international terrorism." *Taamneh,* 598 U.S. at 495.  The Supreme Court recently instructed that the "conceptual core" of aiding-and-abetting liability under the ATA is "that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'"  *Id.* at 493.  The proper interpretation and application of this landmark ruling raises difficult questions of first impression.  Further, even pre-*Taamneh*, a number of courts rejected ATA liability based on reasoning that is in tension with aspects of this Court's ruling.  For all of these reasons, there is substantial ground for difference of opinion on the question of knowing and substantial assistance.

a)    *Is Intent Required, and If So, When?*

*Taamneh* raises difficult questions about the availability of aiding-and-abetting liability without intent to support terrorism.  Throughout its opinion, the Supreme Court underscored the

---

organization facilitates that conduct.'"  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010). As harmful as the IRGC's activities are, it also has involvement in "broad swaths of the Iranian economy," Treasury Targets IRGC (Ex. C), and at the relevant time, the U.S. Government had declined to send the message that any assistance to the IRGC necessarily facilitated terrorism.

importance of intent.  It borrowed the criminal law principle that "the defendant has to take some 'affirmative act' '*with the intent of facilitating* the offense's commission.'"  598 U.S. at 490 (emphasis added).   Applying this principle to the ATA, the Court highlighted the lack of allegations that the defendants "participate[d] in [the Reina attack] as something that [they] *wishe[d]* to bring about," or *sought* "by [their] action to make it succeed."  *Id.* at 498 (emphasis added) (quotation marks omitted).  The Supreme Court faulted the Ninth Circuit for not giving "much greater weight" to the defendants' "undisputed lack of intent to support ISIS."  *Id.* at 504. While "plaintiffs might be able to establish liability with a lesser showing of scienter" if the defendant's aid is "more direct, active, and substantial," "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through *intentional* aid that substantially furthered the tort."  *Id.* at 502, 506 (emphasis added); *see also id.* at 500 ("[B]ecause of the distance between defendants' acts (or failures to act) and the Reina attack, plaintiffs would need some other very good reason to think that defendants were consciously *trying* to help or otherwise 'participate in' the Reina attack."  (emphasis added)).

This Court correctly concluded that Plaintiffs' "allegations do not plausibly support that Defendants shared in [the IRGC's] goal," or "raise an inference of a common scheme to commit an act of international terrorism."  Order at 74.  The Court held that aiding-and-abetting liability is nonetheless available because MTN Group's alleged actions qualify as "direct and extraordinary" assistance.  *Id.* at 59.

As an initial matter, the Supreme Court was careful to say that direct and extraordinary assistance "might" lessen the required scienter—whether it *does* lessen that requirement is itself an open legal question.  598 U.S. at 491–92.  But even then, *Taamneh* raises the question of what it means for there to be a "direct nexus between the defendant's acts and the tort," versus an

"attenuated" one. *Id.* at 506. This Court found directness, and that "[a]ny suggestion of an attenuated chain . . . collapses," because "MTN allegedly invested in a venture with two shareholder entities with significant connections to the IRGC and provided embargoed U.S. goods important to the IRGC's aims to the venture to help make it succeed." Order at 60.[5] In reaching this legal conclusion about what "directness" means, the Court still recognized a number of steps between MTN Group's acts and the terrorist attacks: "the IRGC uses commercial entities it controls, like Irancell, as fronts to funnel money, dual-use goods, and technical aid to entities like the Qods Force and FTOs like Hezbollah," which in turn "allegedly funds, trains, and equips terrorist proxies in Iraq," which in turn carry out attacks. Order at 60; *see also, e.g.*, AC ¶ 319 (alleging that "the IRGC," acting "[t]hrough" Hezbollah, "provided material support" to the perpetrators of the attacks).

Other courts have reached the legal conclusion that such a chain cannot establish a *direct* nexus between a defendant's acts and terrorist attacks. In *Kemper v. Deutsche Bank*, for instance, the Seventh Circuit rejected directness because "all of the following actors"—many of the same alleged actors as in this case—"had to commit an independent criminal act before the offending [explosive device] was set in Basra: the Iraqi militias, Hezbollah, the Guard, the Iranian financial and shipping institutions, and most importantly, the Islamic Republic itself." 911 F.3d 383, 393 (7th Cir. 2018);[6] *see also Crosby v. Twitter, Inc.*, 921 F.3d 617, 624–25 (6th Cir. 2019) (finding

---

[5] MTN Group respectfully notes that under *Taamneh*, assistance to help make a "venture" succeed is different from assistance to help make an *attack* succeed. *See Taamneh*, 598 U.S. at 503 (Ninth Circuit erred in "fram[ing] the issue of substantial assistance as turning on defendants' assistance to ISIS' activities in general"); *id.* at 495 ("[I]t is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it.").

[6] *Kemper* reached this conclusion in the context of proximate causation for a direct-liability claim, which raised the question of whether there were alleged "facts *directly* connecting Deutsche Bank's business dealings, as shady as those dealings might have been, to Iranian terrorist acts."

no direct nexus between defendant's legal provision of online platforms and user's terrorist attack "especially" where "independent criminal acts . . . are involved").  Likewise here, accepting this Court's reading of the complaint and assuming as true that MTN Group entered a commercial venture with parties having "significant connections to the IRGC," Order at 60, those business partners, the IRGC, Hezbollah, and the Iraqi militias all had to commit independent criminal acts before MTN Group's alleged assistance could lead to battlefield injuries in Iraq.  Given how other courts have regarded questions of directness and attenuation under the ATA, is at least a difficult legal question whether such a chain can constitute a "direct" nexus, sufficient to allow aiding-and-abetting liability without any intent to help make terrorist attacks succeed.

### b)    *What is Sufficient to Establish "Culpable Participation"?*

The Supreme Court held that the "key question" in the case before it was whether "defendants gave such knowing and substantial assistance to ISIS that they culpably participated in the Reina attack." *Taamneh*, 598 U.S. at 497.  In this case, this Court found that MTN Group's alleged conduct was "certainly a 'culpable' course of action" because it allegedly violated sanctions laws in connection with procuring U.S.-origin technology, and because funds from "commercial ventures like Irancell" ultimately "flowed to terrorist groups."  Order at 58.[7]

---

*Kemper*, 911 F.3d at 394; *see also Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged").  In light of *Taamneh*'s conclusion that directness is also relevant to the aiding-and-abetting analysis, ATA decisions regarding directness and attenuation for proximate causation purposes are relevant.

[7] The Court characterized the procurement of embargoed technology as "br[eaking] United States anti-terrorism laws."  Order at 58.  MTN Group respectfully notes that Plaintiffs have identified no anti-terrorism sanctions that were violated by the alleged procurement activities.  The United States maintains a broad embargo on Iran, which generally covers non-U.S. nationals providing U.S.-origin technology to anyone in Iran.  *See Iranian Transactions and Sanctions Regulations*, 31 C.F.R. §§ 560.203–.205 (2023); *see also Kemper*, 911 F.3d at 394 ("Even if Deutsche Bank had facilitated Iran's purchase of a crate of oranges, that deal could violate U.S. sanctions.").  Beyond this broad embargo, the United States maintains more targeted sanctions programs for dealing with

A reasonable judge could read *Taamneh* as requiring more than such allegations to establish culpable participation. *Taamneh* indicates that the critical question is not culpability in an abstract sense, but whether the "defendant[] *culpably 'associate[d itself] with' the [terrorist] attack*." *Taamneh*, 598 U.S. at 498 (emphasis added). This conclusion is bolstered by the fact that even before *Taamneh*, courts dismissed aiding-and-abetting claims where the defendant allegedly "violated laws that were designed principally to prevent terrorist activity"—which is certainly culpable in the abstract. *Wildman v. Deutsche Bank Aktiengesellschaft*, 2022 WL 17993076, at *7 (E.D.N.Y. Dec. 29, 2022), *appeal docketed*, No. 23-132 (2d Cir. Jan. 30, 2023); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) ("allegations regarding the purpose of U.S. sanctions are, on their own, insufficient to allege plausibly that Defendants were 'generally aware' that they had taken a 'role' in the attacks that killed or injured Plaintiffs"); *Bernhardt*, 47 F.4th at 862 (dismissing aiding-and-abetting claims where the defendant admitted to sanctions violations involving Iran and that its actions had "undermined U.S. national security, foreign policy, and other objectives of U.S. sanctions programs").

A related question is the relevance of foreseeability to the culpable participation analysis. As this Court correctly recognized, MTN Group is not alleged to have provided funds or technology directly to terrorist militias in Iraq. There is no question that Irancell had "significant legitimate activities," Order at 51, and that the equipment MTN Group allegedly helped procure— e.g., "enterprise level servers" and "computer networking technologies," *id.* at 27—have legitimate uses in running a telecommunications network. Operating a network for millions of consumers

---

entities affiliated with terrorism. *See* Global Terrorism Sanctions Regulations, 31 C.F.R. § 594 (2023). Irancell has never been designated for any reason; Bonyad Mostazafan was designated for affiliation with the Supreme Leader and only after the relevant attacks; and IEI's 2008 designation was not under an anti-terrorism sanctions program.

"is not culpable," even if independent "bad actors" might divert some equipment or profits for "terrible [] ends." *Taamneh*, 598 U.S. at 499. This Court nonetheless found culpable participation on the basis that "[i]t was *foreseeable* . . . that goods and funds would flow to proxy groups and that acts of terror would result." Order at 59.

Reasonable judges could disagree on whether this is the proper role for foreseeability under *Taamneh*. The Supreme Court discussed "foreseeability" not in defining what culpable participation means, but to explain when aiding and abetting one tort might lead to liability for another foreseeable tort (noting that liability for foreseeable risks "begins to blur with conspiracy liability"). 598 U.S. at 496. *Taamneh* can at least reasonably be read as holding that a defendant first needs to have culpably participated *in terrorism*; then, liability can potentially be extended to one or many specific terrorist attacks based on foreseeability. That would explain why the Court still asked whether the defendants "culpably participated *in the Reina attack*"—not whether they engaged in conduct that might have been illegal for other reasons from which terrorist attacks might be foreseeable. *Id.* at 497 (emphasis added); *see also id.* ("the text requires that defendants have aided and abetted the act of international terrorism that injured the plaintiffs"); *id.* at 505 (the "fundamental question" is "[d]id defendants consciously, voluntarily, and culpably participate in or support *the relevant* wrongdoing" (emphasis added)); *id.* at 506 ("The point of aiding and abetting is to impose liability on those who consciously and culpably participated *in the tort at issue*." (emphasis added)). This reading of *Taamneh* is bolstered by the Supreme Court's admonition that the scienter required for "knowing and substantial assistance" is "not the same general awareness that defines *Halberstam*'s second element." *Id.* at 504. To the extent that foreseeability is significant to general awareness, *see* Order at 52, the culpable-participation standard cannot also be satisfied by the foreseeability that assistance will flow to terrorists, or else

two separate parts of the aiding-and-abetting analysis would collapse in a manner the Supreme Court rejected.

Further, *Taamneh* referred to "aiding and abetting a foreseeable terror attack" as a consequence of providing services "in an unusual way . . . *to a terrorist group*," such that "the defendants would arguably have offered aid that is more *direct*, active, and substantial."  598 U.S. at 502 (emphasis added).  When a defendant transacts directly with the perpetrator of the terrorist attack, and does so "in an unusual way" or by selling particularly "dangerous wares," *id.* at 502, it may be reasonable to conclude that the defendant is culpably participating in terrorism, and is thus liable for any foreseeable attack by the terrorist it is directly aiding.  But it is a different and difficult question whether culpable participation can be established *without* direct dealings with the terrorist perpetrator, but instead because it is "foreseeable . . . that goods and funds would flow" from one's commercial partner to the perpetrator.  Order at 59.

Finally, this Court's focus on the distinction between "passive nonfeasance" and "affirmative misconduct" raises additional difficult questions about the legal standards for culpable participation.  This Court indicated that since "affirmative misconduct" is "the traditional predicate for liability in tort," Plaintiffs did not need to make the same "strong showing of assistance and scienter" as was required in *Taamneh*.  Order at 59.  Another reasonable interpretation of *Taamneh* is that a defendant's passivity is one reason, but not the only reason, why a strong showing of assistance and scienter could be required.  In *Taamneh*, the Court held that the plaintiffs failed to allege culpable participation "*in part*"—i.e., not only—because they failed to allege affirmative conduct.  598 U.S. at 498.  The Supreme Court elsewhere indicated that this was one consideration among others.  For example, it rejected liability "[g]iven . . . the lack of any defendant intending to assist ISIS, *and* the lack of any sort of affirmative and culpable misconduct that would aid ISIS."

25

*Id.* at 505; *see also id.* at 490 ("the defendant has to take some 'affirmative act' '*with* the intent of facilitating the offense's commission.'" (emphasis added)). A reasonable judge could conclude that allegations of affirmative conduct, but *without* the intent of facilitating a terrorist act, and *without* dealing directly with the perpetrator of the terrorist act, is not enough to establish culpable participation in a terrorist act as something the defendant wishes to bring about.

        c)        ***What Is Necessary to Establish Expansive Liability for Numerous Terrorist Acts?***

This case also raises difficult questions about the legal standard when the plaintiff's theory of liability is "expansive" and "would necessarily hold defendants liable as having aided and abetted each and every" attack by a particular group "committed anywhere in the world," or a large "subset" of such attacks. *Taamneh*, 598 U.S. at 501–02. This Court held that MTN Group could be liable for "each and every IRGC-led terrorist attack," or at a minimum for a range of attacks throughout Iraq, because it "is alleged to have known that a significant portion of Irancell's annual profits would flow to the IRGC and ultimately be used to fund terrorist operations." Order at 61.[8]

---

[8] Plaintiffs suggest that the question of liability for "every attack" is not presented because the Court found in the alternative a sufficient nexus to a "definable subset" of terrorist acts. Resp. to Pre-Mot. Letter at 2. To begin, the Supreme Court's reference to a "definable subset" came within its discussion of claims with an "expansive scope" that require a stronger showing of culpable participation. U.S. 598 at 502. In other words, a claim that a defendant is liable for every attack *or* a large but definable subset of attacks is the type of expansive claim requiring particularly "direct, active, and substantial" assistance." *Id.* In any event, the Court's "subset" discussion would still "necessarily hold [MTN Group] liable" for a huge number of attacks. In finding a sufficient nexus, the Court noted that "the dual-use technologies MTN procured were of particular importance *to terrorist activities*" generally—suggesting that any terrorist attack by any IRGC-linked group anywhere in the world would fall within the definable subset of attacks. Order at 60–61 (emphasis added). An illustration of that conclusion is the 2016 Baghdad kidnapping attack, for which the complaint includes no allegations about weapons, capabilities, or other specifics; the nexus is simply that the kidnappers were an alleged "Hezbollah proxy." AC ¶ 1512. The Court also did not go attack-by-attack identifying specific commonalities, further confirming that the "definable subset" the Court identified remains a broad one, and requires a correspondingly strong showing to support liability.

Reasonable judges could interpret *Taamneh* to reach a different conclusion on what type of allegations could sustain such a broad theory.  In light of *Taamneh*'s heavy focus on intent, *see supra* Pt. I.B.3.a, it is a difficult question whether such expansive liability could be based solely on what the defendant "is alleged to have *known*," as opposed to intended.  Order at 61 (emphasis added).  Further, *Taamneh*'s example of aid "to a known terrorist group," which might support making the defendant broadly liable "for all of the group's actions or perhaps some definable subset," emphasized "direct[ness]."  598 U.S. at 502.  Even if the multistep chain Plaintiffs allege could support liability for a single, closely connected terrorist attack without intent, there are serious questions whether allegations that assistance would foreseeably "flow" to one entity (the IRGC) and then "ultimately" be used by another (terrorist perpetrators) can sustain expansive liability for every IRGC-linked terrorist act across the globe.

The difficulty of these questions is deepened by the Supreme Court's indication that when a defendant is held liable for "aiding and abetting every wrongful act committed by [an] enterprise," it "begins to blur with conspiracy liability."  *Id.* at 496.  *Taamneh* can be read to indicate that the defendant must "form[] a near-common enterprise" akin to a conspiracy before such expansive aiding-and-abetting liability is permissible.  *Id.* at 502.  Here, however, the Court rejected Plaintiffs' conspiracy claim, correctly concluding that the complaint did not establish that MTN Group joined a common enterprise with the IRGC or its terrorist affiliates.  Order at 73.  While the Court held that MTN Group could be held liable for every IRGC-linked act of terrorism based on "pervasive, conscious, and culpable assistance" *without* being part of any "agreement to carry out a common scheme," Order at 74 n.22, other reasonable judges could conclude that where a defendant is not liable as a conspirator, it cannot be liable on a theory that "blur[s] with conspiracy liability."  598 U.S. at 496.

\*    \*    \*

MTN Group appreciates that *Taamneh* is a recent decision, that this Court was among the first to consider and apply it, and that there may be multiple reasonable interpretations of the Supreme Court's newly announced standards. In such circumstances, courts can find a substantial ground for difference of opinion "principally[] *because* precedent bearing on the matter is relatively thin." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 157 (D.N.J. 2005) (emphasis added). The issues raised above show that the legal questions left open by *Taamneh* are difficult and would benefit from the Second Circuit's resolution. Indeed, since this Court issued its order, the Supreme Court took the relatively rare step of calling for the views of the Solicitor General in *Atchley*, *see AstraZeneca UK, Ltd. v. Atchley*, __ S. Ct. __, 2023 WL 6377773 (Mem) (Oct. 2, 2023)—a case cited throughout this Court's order, which is about affirmative conduct rather than passive nonfeasance, and where there is no plausible claim of intent to help make terrorist attacks succeed. The difficult questions raised by *Taamneh* warrant guidance from the Second Circuit.

### C.    An Immediate Appeal May Materially Advance Termination of the Litigation.

The last criterion under Section 1292(b) is also met. An immediate appeal could materially advance termination of the litigation because, if the Second Circuit agrees with MTN Group's views on the proper standards for personal jurisdiction or ATA aiding-and-abetting liability, Plaintiffs' claims will be dismissed, and the case will be over.

Given the complexity of the present case, this factor strongly supports an interlocutory appeal. *See Diageo*, 619 F. Supp. at 9 ("certification may be more freely granted" in "large, complex cases" (quoting *In re Lloyd's Am. Trust Fund Litig.*, 1997 WL 458739, at \*4 (S.D.N.Y. Aug. 12, 1997))). The staggering length of Plaintiffs' complaint is testament to this complexity.

So is the timeframe, with key allegations against MTN Group going back nearly twenty years. The subject matter is even more daunting: U.S. courts have little experience parsing the precise relationships among Iranian commercial and government entities, attribution of attacks on a chaotic foreign battlefield, and how, if at all, servers and software played some role. Plaintiffs' counsel hinted at some of this complexity in a filing in a related case, in which they provided a "non-exclusive list of witnesses that Plaintiffs may call at trial" here. *Davis/Chand*, Pls.' Opp. to Transfer Case, ECF No. 25 at 21 ("*Davis/Chand*, Opp. to Transfer") (Ex. G). The list has 28 entries (without even naming any of the Plaintiffs themselves), including seven expert witnesses and representatives of eight U.S. government agencies and two international organizations. *Id.* at 21–23. Indeed, Plaintiffs forecast that "a significant portion of Plaintiffs' evidence will be presented through representatives of federal agencies." *Id.* at 24. In addition to raising a number of practical questions, this plan highlights the extent to which litigating this case threatens to burden scarce U.S. government resources.

Reversal on appeal would end this litigation and avoid all of these costs and burdens. That is reason enough to conclude that an immediate appeal may materially advance the termination of this litigation. *See In re Chiquita Brands Int'l, Inc. v. Alien Tort Statute and S'holder Derivative Litig.*, 2012 WL 13214854, at *2 (S.D. Fla. Mar. 27, 2012). But even if the Second Circuit affirmed, its decision would likely aid in the efficient further conduct of this litigation. By shedding light on open legal questions regarding purposeful availment, general awareness, and culpable participation, the Second Circuit's guidance would ensure that further proceedings in this case are efficiently geared toward the correct legal standards. Further, the Second Circuit might isolate which specific allegations in Plaintiffs' voluminous complaint are critical to stating a claim, enabling the parties to focus their attention on the right places, and potentially teeing up discrete

29

factual issues that could lead to early disposition without necessitating full-blown discovery into every aspect of this sprawling case.

Against the undeniable benefits of immediate appeal in this unusual case, Plaintiffs raise the cost of delay in the event of affirmance, stressing the "difficulties presented by the long time between the events and discovery." Resp. to Pre-Mot. Letter at 3. That question is more relevant to the question of a stay pending appeal, which is separate from whether to certify the order for appeal in the first place. *See infra* Pt. II. In any event, MTN Group would be prepared to join Plaintiffs in asking the Second Circuit to place this case on its expedited calendar, *see* 2d Cir. LR 31.2(b), minimizing the time an appeal would take. More fundamentally, Plaintiffs cannot reasonably complain of delay under the circumstances here. Plaintiffs elected not to file this action until 2021—nearly a *decade* after most of the attacks at issue, and five years after Congress enacted JASTA. A number of the individual Plaintiffs in this case even filed a different ATA case in 2017, accusing a number of pharmaceutical companies of aiding and abetting the same attacks, *compare, e.g.,* AC ¶¶ 1409–1415 *with* Second AC ¶¶ 1735–1741, *Atchley*, No. 17-cv-02136 (D.D.C. Jan. 21, 2020),—and then still waited four more years to sue MTN Group. Even since eventually filing this case, Plaintiffs have added to the delay through their two amendments, one of them quite belated. Plaintiffs may have been free to take their time, but they cannot turn around and complain of "the long time between the events and discovery." Resp. to Pre-Mot. Letter at 3. Considered against Plaintiffs' own delays, any incremental delay from an appeal will be relatively inconsequential, and is far outweighed by the efficiency gains of an early appeal in this large and complex case.

Finally, while interlocutory appeal is warranted based on the four corners of this case, an interlocutory appeal will also generate useful precedent for other pending suits, a factor courts can

consider in deciding whether to certify. *See Klinghoffer*, 921 F.2d at 24. ATA aiding-and-abetting claims are currently proliferating in this circuit, and guidance from the Second Circuit on how to operationalize the Supreme Court's recent *Taamneh* decision would benefit all of them. *See, e.g.*, *Hughes v. Zarrab*, No. 23-cv-06481 (S.D.N.Y. filed July 26, 2023); *Neiberger v. Deutsche Bank AG*, No. 19-cv-03005 (S.D.N.Y. filed Apr. 4, 2019); *Freeman* v. *HSBC Holdings PLC*, 18-cv-07359 (E.D.N.Y. filed Dec. 26, 2018); *O'Sullivan v. Deutsche Bank AG*, 17-cv-08709 (S.D.N.Y. filed Nov. 9, 2017). One such case is *Long v. MTN Group Ltd.*, No. 23-cv-5705 (E.D.N.Y. filed July 28, 2023), presenting a very similar theory but now suggesting that the same alleged conduct also creates liability for a kidnapping in Syria. *Long* Compl. ¶¶ 1278–1283. Another recent lawsuit by the same counsel against a Turkish bank is based on a seemingly similar theory: aiding-and-abetting liability premised on business relationships with Iranian entities alleged to be "IRGC fronts." *Hughes* Compl. ¶ 124. If the legal basis for these various cases has merit, it would be beneficial for the Second Circuit to say so soon and provide guidance on how they should be litigated. If they do not, it would be beneficial for the Second Circuit to have an opportunity to say that as well, potentially resolving a number of cases and avoiding additional waves of lengthy but unmeritorious ATA complaints.

**D.    This is the Type of Case the Second Circuit Has Said Warrants "Greater Appellate Oversight."**

The case for certification is particularly strong in light of this case's subject matter. In the similar context of the Alien Tort Statute ("ATS"), the Second Circuit has "urge[d] greater appellate oversight" of interlocutory orders than in an ordinary case. *Balintulo v. Daimler AG*, 727 F.3d

174, 187 (2d Cir. 2013);[9] *see also In re Chiquita Brands*, 2012 WL 13214854, at \*2 (certifying interlocutory appeal in ATS case because "[t]his case . . . is far from ordinary," noting that it seeks to address "killings and acts of torture that occurred on foreign soil," and that "[t]he cost of discovery associated with investigating these claims will be nothing less than extraordinary"); *Est. of Giron Alvarez v. Johns Hopkins Univ.*, 2019 WL 1779339, at \*2 (D. Md. Apr. 23, 2019) (certifying ATS case for interlocutory appeal where it "will likely require testimony by foreign witnesses and multiple expert witnesses"). One reason for this heightened need for "appellate oversight" is a lawsuit's "risks of adverse foreign policy consequences," "obliging courts to be 'particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs.'" *Balintulo*, 727 F.3d at 187. Though the ATA and ATS raise different legal issues, they both implicate a fundamental concern: "each of the decisions involved in defining a cause of action based on 'conduct within the territory of another sovereign' 'carries with it significant foreign policy implications.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 347 (2016) (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013)) (cleaned up).

This case plainly concerns the scope of a cause of action for conduct within the territory of another sovereign (in fact, several foreign sovereigns). The questions raised in this motion also present more specific foreign relations implications. With respect to personal jurisdiction, the Supreme Court has admonished courts to "consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction," and that "'[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 115 (1987) (emphasis

---

[9] The Second Circuit said this in the context of expressing greater opening to mandamus review. The same point applies with at least as much force to the less extraordinary route of certification under § 1292(b).

omitted).  Subjecting a South African company with no U.S. operations to the jurisdiction of a U.S. court, based on allegations that it assisted in the procurement of goods that were simply *made* in the United States, is an extension of extraterritorial jurisdiction that risks international friction.

With respect to general awareness, the Court's decision suggests that a foreign company should refrain from entering into a foreign transaction based on opinions expressed by a few individuals, in apparent disagreement with U.S. Government sanctions designations.  Even U.S. sanctions decisions have caused international controversy and concern over extraterritorial assertions of jurisdiction by the United States.  *See, e.g.*, Commission Delegated Regulation (EC) No. 2018/1100, 2018 O.J. (L 199 I) 1 (Ex. H) (prohibiting compliance by EU persons with certain U.S. sanctions on Cuba and Iran to "protect[] against the effects of extra-territorial application" of other countries' laws); U.N. Off. of the High Comm'r for Hum. Rts., *United States: Efforts to Use Sanctions to Expand Jurisdiction Abroad Violate Human Rights Says UN Expert* (Mar. 9, 2023) (Ex. I).  But those are at least decisions made by the Executive Branch, which is responsible for foreign relations and can weigh the costs and benefits of such actions.  It is quite another thing for private litigation to be used as a tool for regulating foreign companies' foreign transactions.  If a doctoral student asserts in a *Washington Quarterly* article that an Iranian entity is owned by the IRGC, but the U.S. Government determines that the IRGC "hides" its affiliations and has declined to label the same entity as an IRGC affiliate, *see supra* Pt. I.B.2.b., allowing liability on that basis at least raises questions of "impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."  *Balintulo*, 727 F.3d at 187.

And with respect to knowing and substantial assistance, the Court's decision requires one of South Africa's leading companies, founded at the dawn of multiracial democracy in that country, to defend itself in a foreign forum against charges of *culpably participating in*

*international terrorist attacks*.  That in itself is a striking, and potentially stigmatizing, label to place on a foreign company known for bringing connectivity to underserved parts of the world.  Moreover, it is relevant to the foreign relations implications of this case that the Second Circuit has denied South African apartheid victims a forum for redress in U.S. courts against U.S. companies allegedly complicit in their injuries, including because an aiding-and-abetting claim did not adequately plead a "purpose" of supporting apartheid.  *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 170 (2d Cir. 2015).  This case could well cause international friction by being perceived internationally as presenting a double-standard: U.S. nationals can sue a South African company over foreign transactions on a wide conception of aiding-and-abetting liability, but the same type of aiding-and-abetting liability is unavailable to South Africans suing a U.S. company.

Even without these considerations, the Section 1292(b) standard is amply satisfied.  But they supply added reason for "greater appellate oversight," *Balintulo*, 727 F.3d at 187–88, and why "certification may be more freely granted in so-called 'big' cases" like this one, *Diageo*, 619 F. Supp. at 9.

## II.    The Court Should Stay all Proceedings in This Court Pending the Second Circuit's Decision.

In addition to certifying the Order for immediate appeal, the Court should stay proceedings pending the Second Circuit's disposition of MTN Group's petition for permission to appeal and, if the petition is granted, of the appeal itself.  Four factors inform the decision to stay a case pending an appeal: (i) the possibility of success on the merits, the necessary level of which varies based on the other factors; (ii) irreparable harm to the applicant absent a stay; (iii) whether the stay will substantially injure the other parties to the proceeding; and (iv) the public interest.  *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007); *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002).  These factors counsel in favor of a stay pending appeal here.

*First*, while MTN Group recognizes the Court has decided the questions at issue against it, the considerations discussed above indicate that it at least has a significant chance of success on the merits.  The questions in this case involve conflicts of authority and difficult questions of first impression in the Second Circuit, with at least substantial support for MTN Group's position in decisions of the Supreme Court (*Taamneh*), the Second Circuit (*Siegel* and *Honickman*), and another District (*Davis/Chand*).  *See supra* Pt. I.B.1–3.

*Second*, MTN Group faces irreparable harm absent a stay.  If MTN Group (and Judge Moss) prove to be right about the legal standard for purposeful availment, MTN Group will face significant burdens despite not being properly subject to the jurisdiction of U.S. courts.  Those burdens include the immediate cost of burdensome, multi-continent, decade-spanning discovery relating to liability for ten different attacks across various Iraqi provinces by Plaintiffs who may ultimately prove to have no viable claims.  As illustrated above, the discovery burdens in this case are likely to be unusually onerous.  This would be true of any defendant facing such litigation, but it is especially true of a South African company with no U.S. operations and, consequently, no experience participating in U.S.-style discovery.

*Third*, Plaintiffs do not face substantial injury.  They decided to file this case 16 years after the allegedly key business transaction, nearly a decade after most of the attacks, and five years after Congress enacted JASTA.  Then they decided to amend their complaint twice, compounding the delay.  That is the reason this case will require litigating events long in the past, and the modest additional time awaiting the results of a potentially dispositive appeal will not meaningfully change the calculus.  *See supra* Pt. I.C.

*Fourth*, the public interest favors efficiently allocating judicial resources by awaiting further proceedings until the Second Circuit has resolved the central legal questions in this case.

"[C]onsiderations of judicial economy counsel, as a general matter, against investment of court resources in proceedings that may prove to have been unnecessary." *Sutherland v. Ernst & Young LLP*, 856 F. Supp. 2d 638, 644 (S.D.N.Y. 2012). And here, Plaintiffs wish to tax not just Judicial Branch but also Executive Branch resources, promising to put on "a significant portion" of their case "through representatives of federal agencies." *Davis/Chand*, Opp. to Transfer at 24 (Ex. G). The public interest favors not placing that burden on multiple federal agencies (among others) until the Second Circuit can decide whether that is truly needed.

## CONCLUSION

For the foregoing reasons, the Court should certify for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) its order of September 28, 2023 denying in part Defendant MTN Group Limited's motion to dismiss. In light of Plaintiffs' belated addition of a new count to the complaint after the Court's motion-to-dismiss ruling, the Court should further hold the present motion in abeyance and return to it after disposition of MTN Group's forthcoming motion to dismiss the new count. Finally, the Court should further stay proceedings pending the Second Circuit's resolution of a petition for permission to appeal and, if granted, the subsequent appeal.

Dated: November 14, 2023

Respectfully submitted,

**COVINGTON & BURLING LLP**

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

s/ *David M. Zionts*
David M. Zionts (admitted *pro hac vice*)
Covington & Burling LLP
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Telephone: (202) 662-5987
Facsimile: (202) 778-5987
dzionts@cov.com

s/ *Timothy P. Harkness**
Timothy P. Harkness
Kimberly H. Zelnick
Scott A. Eisman
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
kimberly.zelnick@freshfields.com
scott.eisman@freshfields.com

Benjamin S. Haley (admitted *pro hac vice*)
Covington & Burling (Pty) Ltd.
Rosebank Link
173 Oxford Road, 7th Floor
Johannesburg 2196, South Africa
Telephone: +27 (11) 944-6914
Facsimile: (202) 778-5194
bhaley@cov.com

Micaela R.H. McMurrough
Covington & Burling LLP
The N.Y. Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1131
mmcmurrough@cov.com

*Counsel for Defendant MTN Group Limited*

---
* Signed with permission.