**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STEPHANIE ZOBAY, et al., | |
| Plaintiffs, | |
| -v.- | Case No.: 1:21-cv-03503-CBA |
| MTN GROUP LIMITED, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MTN GROUP LIMITED
AND MTN (DUBAI) LIMITED'S MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.....................................................................................................ii

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .......................................................................................................................1

    A.    MTN Afghanistan's Mission of Providing Connectivity in the Face of Threats and Violence By the Taliban....................................................1

    B.    Iran's Relationship to Terrorism in Afghanistan ......................................4

    C.    The Two 2019 Afghanistan Attacks and Plaintiffs' Count 4....................4

LEGAL STANDARD .................................................................................................................5

ARGUMENT..............................................................................................................................5

    I.    The SAC Should be Dismissed in its Entirety as to the MTN Defendants.............5

    II.    Count 4 Fails to State a Claim That MTN Group Aided-and-Abetted the Afghanistan Attacks. ..............................................................................................6

        A.    Plaintiffs Do Not Sufficiently Plead that the Attacks were Committed, Planned, or Authorized by a Designated FTO. ......................6

        B.    Plaintiffs' Do Not Sufficiently Plead that MTN Group Aided and Abetted the Attacks. ...............................................................................7

            1.    Plaintiffs' Extortion Theory Fails. ...............................................8

                a)    Obeying the orders of terrorists under threat of violence does not constitute conscious, voluntary, and culpable participation in terrorist attacks. ..................8

                b)    Aiding-and-abetting liability independently fails because MTN Group's alleged conduct is too remote from the 2019 attacks..........................................11

            2.    Plaintiffs' Irancell Theory Fails as to the Afghanistan Attacks.......................................................................................12

                a)    MTN Group was not "generally aware" of a role in Taliban or al-Qaeda terrorism in Afghanistan. ................13

                b)    MTN Group did not "consciously and culpably" participate in the Afghanistan attacks through its Irancell investment. .........................................................15

CONCLUSION.........................................................................................................................17

i

**TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) .................................................................................7

*Ashcroft v. Iqbal,*
556 U.S. 662, 678 (2009) ......................................................................................6

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022).......................................................................... 14, 15

*Cabrera v. Black & Veatch Special Projects Corp.*,
2021 WL 3508091 (D.D.C. 2021) (report and recommnedation) .......................................6, 7

*DiFolco v. MSNBC Cable LLC*,
622 F.3d 104 (2d Cir. 2010) .................................................................................5

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)........................................................................ 10, 11

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ........................................................... 11, 14, 15, 16

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013) ............................................................................................2

*Krys v. Pigott*,
749 F.3d 117 (2d Cir. 2014) .................................................................................5

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) .................................................................................5

*Murray v. Miner*,
74 F.3d 402 (2d Cir. 1996) .................................................................................12

*Noto v. 22nd Century Grp., Inc.*,
35 F.4th 95 (2d Cir. 2022) .................................................................................5

*People v. Manfredi*,
166 A.D.2d 460 (N.Y. App. Div. 1990).................................................................9

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
369 F. Supp. 2d 353 (E.D.N.Y. 2005).................................................................5

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) .................................................................................15

*Rynasko v. N.Y. Univ.*,
   63 F.4th 186 (2d Cir. 2023) ........................................................................................2

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019) ................................................................................ 11, 13

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471, 493 (2023) ..................................................................................*passim*

*United States v. Peoni*,
   100 F.2d 401 (2d Cir. 1938) ........................................................................................9

**Statutes**

18 U.S.C. § 2333(d)(2)...............................................................................................6, 8

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................5

**Other Authorities**

Can Merey, *How the Taliban Has Turned Extortion into A Gold Mine*,
   Deutsche-Press Agentur GmbH (June 7, 2009)...........................................................2

Gretchen Peters, *Crime & Insurgency in the Tribal Areas of Afghanistan &
   Pakistan*, Combating Terrorism Center (Oct. 15, 2010) ............................................3

Jon Boone, *Taliban Target Mobile Phone Masts to Prevent Tipoffs from Afghan
   Civilians*, Guardian (Nov. 11, 2011) ..........................................................................3

Model Penal Code § 2.06 (Am. L. Inst. 2022) ..............................................................9

USAID, *Connecting to Opportunity* 5 (2013), https://tinyurl.com/3k85ecjc.................2

USAID, *USAID Grants Will Enable More Than 100,000 Afghans to Use Mobile
   Money Services*, ReliefWeb (Nov. 30, 2011), https://tinyurl.com/yb9tmbpj..........2

Wayne R. LaFave, *Substantive Criminal Law* § 13.3(e) (3d ed. 2023) ...................9, 10

World Bank Grp., *Afghanistan Country Snapshot* 53 (2015) .......................................2

Yaroslav Trofimov, *Cell Carriers Bow to Taliban Threat*,
   Wall St. J. (Mar. 24, 2010) ............................................................................... 3, 8, 10

**PRELIMINARY STATEMENT**

In the new claim added by their belated amendment, Plaintiffs allege that the Taliban made violent extortionate threats against MTN Group's subsidiary in Afghanistan—and that MTN Group thereby became an aider-and-abettor of the terrorist attacks committed *by its extortionist*. It is not.  MTN Group did not voluntarily, culpably participate in terrorist attacks when the Taliban allegedly extorted its local subsidiary to pay "taxes" and shut off cell towers or else face violent retribution. Nor do Plaintiffs succeed in their backup strategy of linking their Afghanistan claims to their Iraq theory of liability.  MTN Group did not voluntarily, culpably participate in the Afghanistan attacks through its participation in the Irancell venture, which Plaintiffs admit has a more "indirect" alleged relationship to the Afghanistan attacks than the Iraq attacks. SAC ¶¶ 1511, 1521. Count 4 of the Second Amended Complaint ("SAC") should be dismissed.

**BACKGROUND**

This background is based on the non-conclusory factual allegations in the SAC, treated as true only for purposes of this motion to dismiss, as well as sources incorporated in the complaint or subject to judicial notice. In light of the Court's familiarity with this case and recent decision, the MTN Defendants provide here only the background relevant to Count 4, which seeks to hold MTN Group liable for a suicide bombing and a small-arms attack in Afghanistan in 2019.

A.     **MTN Afghanistan's Mission of Providing Connectivity in the Face of Threats and Violence By the Taliban**

MTN Group and its affiliates serve a diverse range of countries, including underserved populations in the developing world who have historically lacked access to reliable and affordable connectivity, and the economic, educational, and health services opportunities that connectivity brings. That commitment is exemplified by MTN Group's acquisition of a subsidiary in Afghanistan ("MTN Afghanistan") in 2006. According to the World Bank, MTN Afghanistan's

1

operations helped "expan[d]" the "telecommunications infrastructure in a conflict-affected country, increasing the availability and affordability of communications services in Afghanistan." World Bank Grp., *Afghanistan Country Snapshot* 53 (2015) ("World Bank Snapshot") (Ex. A). In 2011, the U.S. Agency for International Development ("USAID") "partner[ed]" with MTN Afghanistan to "expand[]its mobile money services [allowing funds transfers through cell phones] into rural areas and promote teacher salary payments using mobile money." USAID, *USAID Grants Will Enable More Than 100,000 Afghans to Use Mobile Money Services*, ReliefWeb (Nov. 30, 2011), https://tinyurl.com/yb9tmbpj. The U.S. Government viewed such technology in Afghanistan as an "imperative to restoring stability, expanding the economy and forging cohesion among a society torn apart by decades of volatility." USAID, *Connecting to Opportunity* 5 (2013), https://tinyurl.com/3k85ecjc.[1]

Providing connectivity to the people of a country like Afghanistan, under conditions of civil war and violent insurgency, was not easy. "[T]he Taliban raised 'taxes' from international contractors doing business in Afghanistan," and likewise "lev[ied] similar 'taxes' on 'the big telecom companies.'" SAC ¶ 922. "Tax" was the Taliban's euphemism for extortion. *See* Can Merey, *How the Taliban Has Turned Extortion into A Gold Mine*, Deutsche-Press Agentur GmbH (June 7, 2009), *cited at* SAC ¶ 923 (Ex. B). Plaintiffs allege that "cellular-phone companies in southern Afghanistan . . . typically believed they 'had to pay the Taliban,'" for a simple reason: "[s]etting up a cell phone tower anywhere in Afghanistan requires the consent of whoever 'controls' the territory, or at least has the power to blow [it] up." SAC ¶ 924. The Taliban's basic

---

[1] The Court "may take judicial notice of documents from official government websites." *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) (quotation marks omitted); *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 545 (2013) (taking judicial notice of information on World Bank website).

demand to companies was to "pay monthly protection fees . . . or face having their transmission towers attacked." SAC ¶ 923. Beyond just infrastructure, the Taliban threatened that "people [would be] kidnapped" without regular protection payments. Gretchen Peters, *Crime & Insurgency in the Tribal Areas of Afghanistan & Pakistan* 32, Combating Terrorism Center (Oct. 15, 2010), *cited at* SAC ¶ 923 (Ex. C) ("*Crime & Insurgency*"). And it made good on such threats: cell towers became a "key battleground," and carriers faced an "onslaught" of "crippling attacks," which "bl[e]w towers completely out of the ground." Jon Boone, *Taliban Target Mobile Phone Masts to Prevent Tipoffs from Afghan Civilians*, Guardian (Nov. 11, 2011), *cited at* SAC ¶¶ 940, 946 (Ex. D) ("*Taliban Target Mobile Phone Masts*").

The SAC alleges that MTN Afghanistan made these extorted payments "from 2007 through 2016." SAC ¶ 936. The SAC further alleges that MTN Afghanistan was not alone, quoting the owner of another company as saying, "You have to do it. Everybody does." SAC ¶ 923; *see also* SAC ¶ 929 (alleging "common practice among Afghan telecommunications firms").

Plaintiffs also claim that "[i]n or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night." SAC ¶ 937. Plaintiffs allege that "the Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts," so it threatened to "target the costly cell towers with explosives" if providers did not switch them off on demand. SAC ¶¶ 937, 947. According to reporting cited in the SAC, "[w]hen carriers tried to defy the edict," the Taliban "killed staff in response" and destroyed "some 40 base towers—costing as much as $400,000 each." Yaroslav Trofimov, *Cell Carriers Bow to Taliban Threat*, Wall St. J. (Mar. 24, 2010), *cited at* SAC ¶¶ 922, 927, 938, 944, 946 (Ex. E) ("*Cell Carriers Bow To Taliban Threat*"). According to Plaintiffs' source, in the wake of this destruction "the [Afghan] government no longer insist[ed] that the networks operate at night

3

in insurgent-dominated regions." *Id.* It quoted Afghanistan's Communications Minister in 2010: "We understand that in some areas, unfortunately, there is no other way," and "[w]e don't have security to protect the towers." *Id.* The same report states that with "people's lives . . . at stake," "all of Afghanistan's national cellphone carriers . . . made a joint decision to shut down their networks at night in areas where the insurgents [were] active." *Id.* As with their alleged response to the Taliban's other threats, the companies' alleged aim was to "reduce the risk" that the Taliban would "target the costly cell towers with explosives." SAC ¶¶ 940, 947. Plaintiffs base their tower shut-down allegations on press reports concentrated between 2008 and 2011, *see* SAC ¶¶ 920–936; they do not allege whether, or for how long, the supposed shutdowns continued after that period.

> **B.      Iran's Relationship to Terrorism in Afghanistan**

With respect to the Iraq claims this Court has already addressed, Plaintiffs attempt to portray a tight relationship between Iran's Islamic Revolutionary Guard Corps ("IRGC"), Hezbollah, and "Shiite Terrorist Proxies" operating in Iraq. In fact, they assert that Hezbollah was "part of the IRGC." SAC ¶¶ 169, 176–177, 1515. Though Plaintiffs also attempt to link Iran to terrorist groups operating in Afghanistan, these allegations are of a different nature. Neither al-Qaeda nor the Taliban is alleged to be "part of the IRGC." Instead, the IRGC allegedly provided "material support" to the Taliban, such as providing shipments of "small arms." SAC ¶¶ 394, 423, 428. Plaintiffs do even less to connect the IRGC with al-Qaeda, alleging instead that al-Qaeda reached a deal with a different Iranian government agency allowing it free passage through its territory in return for al-Qaeda not attacking Iran. SAC ¶¶ 439, 530, 541, 548, 554, 563, 567.

> **C.      The Two 2019 Afghanistan Attacks and Plaintiffs' Count 4**

Count 4 is based on two Afghanistan attacks in 2019. The first, in January, was a suicide bombing allegedly "jointly committed" by "al-Qaida, the Haqqani Network, and Lashkar-e-

Taiba." SAC ¶¶ 1438–1439. The second, in July, was "an insider attack involving small arms fire" allegedly conducted by the "Taliban and its Haqqani Network," and "on information and belief" planned by an individual "al-Qaeda/Taliban polyterrorist." SAC ¶¶ 1450–1452. Beyond these conclusory assertions, the SAC pleads no specific facts about these attacks or what role these various groups may have played in them.

## LEGAL STANDARD

On a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). The court "accept[s] only [the complaint's] factual allegations, and the reasonable inferences that can be drawn therefrom, as true," *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014), and need not "draw unreasonable inferences in plaintiffs' favor," *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 369 F. Supp. 2d 353, 359 (E.D.N.Y. 2005), or accept "legal conclusions couched as factual allegations," *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (citation omitted), or "conclusory allegations" devoid of further factual support, *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 102 (2d Cir. 2022) (citation omitted).

## ARGUMENT

I.      **The SAC Should be Dismissed in its Entirety as to the MTN Defendants.**

All counts of the SAC should be dismissed as to MTN Dubai, and Counts 2 and 3 should be dismissed as to MTN Group, based on this Court's ruling on the motion to dismiss the FAC. ECF No. 129 ("Order").[2] The SAC should also be dismissed in its entirety as to MTN Group. MTN Group expressly incorporates and preserves all arguments made in its motion to dismiss the

---

[2] The reasoning behind this Court's dismissal of all counts in the FAC as to MTN Dubai applies equally to the new Count 4.

FAC, including its objection to personal jurisdiction. *See* ECF No. 82. In the interest of efficiency, however, MTN Group focuses this brief on the reasons why, consistent with the Court's prior ruling, Plaintiffs' Count 4 should be dismissed.

**II.      Count 4 Fails to State a Claim That MTN Group Aided-and-Abetted the Afghanistan Attacks.**

  **A. Plaintiffs Do Not Sufficiently Plead that the Attacks were Committed, Planned, or Authorized by a Designated FTO.**

The Second Amended Complaint fails to sufficiently allege that a designated FTO "committed, planned, or authorized" the two Afghanistan attacks. 18 U.S.C. § 2333(d)(2). Aiding-and-abetting liability is therefore unavailable for these attacks.[3]

Plaintiffs allege *nothing* about the January 2019 suicide bombing other than that the bomber was "deployed by a Joint Cell of the Kabul Attack Network comprised of operatives from al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba." SAC ¶ 1438. That is exactly the type of "naked assertion[] devoid of further factual enhancement" that *Ashcroft v. Iqbal* precludes. 556 U.S. 662, 678 (2009). As another court has recognized, "conclusory allegations that the Taliban and al-Qaeda executed an attack as a 'joint cell' will not suffice." *Cabrera v. Black & Veatch Special Projects Corp.*, 2021 WL 3508091, at *26 (D.D.C. 2021) (report & recommendation). There is nothing beyond that here. There is no factual enhancement supporting an inference that Al-Qaeda or Haqqani were "responsible . . . for authorizing" the attacks. Order at 39–40. And there is no factual enhancement about Al-Qaeda or Haqqani "train[ing]" the unidentified suicide

---

[3] We acknowledge that this Court's prior ruling addressed the FTO requirement as to the Iraq and Afghanistan attacks together. Order at 39–40. The Court held that the attacks met this requirement based on "allegations that an FTO trained the militias, controlled and directed those militias, planned the Attacks, and 'designed and emplaced the weapons used in the Attacks.'" *Id*. at 40. MTN Group respectfully asks the Court to reconsider its conclusion with respect to the two specific Afghanistan attacks, because the types of allegations the Court considered sufficient are not present with respect to those attacks, as explained below.

bomber, "controll[ing] and direct[ing]" whoever the bomber was affiliated with, or "design[ing] and emplac[ing] the weapons" the bomber used. Order at 40. A bare assertion that three different FTOs "jointly committed" the attack, SAC ¶ 1439, fails to adequately plead the FTO requirement.

The SAC is just as cursory with respect to the July 2019 attack: "the Taliban, including its Haqqani Network, committed an insider attack involving small arms fire against U.S. Army personnel." SAC ¶ 1450. Plaintiffs' pleading trick of collapsing Haqqani and the Taliban into one "cannot be" accepted, "as one is an FTO and the other is not." *Cabrera*, 2021 WL 3508019, at *26. "Plaintiffs cannot skirt the FTO requirement by collapsing separate entities into one amorphous conglomerate, particularly not when the United States has differentiated the entities through terrorist designations." *Id.* To do so would nullify Congress's decision to include an FTO requirement and the State Department's decision of who to designate—and not designate—as an FTO.

Nor can Plaintiffs satisfy the requirement by alleging "[o]n information and belief" that an individual "al-Qaeda/Taliban polyterrorist" planned the July attack. SAC ¶ 1452. Consistent with this Court's prior opinion (Order at 31), this is not a proper "information and belief" allegation: it is neither uniquely within the defendant's knowledge nor a fact that can plausibly be inferred from other alleged facts. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

### B.   Plaintiffs' Do Not Sufficiently Plead that MTN Group Aided and Abetted the Attacks.

Beyond the threshold unavailability of aiding-and-abetting liability, Plaintiffs fail to plead that MTN Group is liable. They present two theories according to which MTN Group purportedly aided and abetted the two attacks. First, they allege that MTN Group aided and abetted the attacks because its Afghanistan subsidiary complied with the Taliban's violent demands. Second, they allege that MTN Group aided and abetted those attacks by participating in the Irancell

7

telecommunications venture. Neither theory states a valid claim.

### 1.   Plaintiffs' Extortion Theory Fails.

The SAC fails in its effort to hold MTN Group responsible for participating in attacks in Afghanistan based on allegations that the Taliban extorted MTN Afghanistan. The Supreme Court's core holding in *Twitter, Inc. v. Taamneh* is that "the phrase 'aids and abets' in § 2333(d)(2) . . . refers to a conscious, voluntary, and culpable participation in another's wrongdoing." 598 U.S. 471, 493 (2023). But Plaintiffs allege that MTN Afghanistan did not agree to pay the Taliban and shut down its towers voluntarily, but rather did so *under threat of physical violence*. Beyond that fundamental problem, the two 2019 attacks are remote in time from the alleged conduct, and also remote from MTN Group—which is not even alleged to have been the entity dealing with the Taliban. These are further, independent reasons MTN Group cannot be said to have consciously, voluntarily, and culpably participated in the 2019 attacks.

> **a)**      **Obeying the orders of terrorists under threat of violence does not constitute conscious, voluntary, and culpable participation in terrorist attacks.**

The SAC makes clear that any alleged support that MTN Afghanistan provided to the Taliban was not voluntary, much less culpable. If MTN Afghanistan did not pay the extortive protection fees or shut down its towers, the SAC alleges, it would "face having [its] transmission towers attacked," leading to "the destruction of [its] transmission masts." SAC ¶¶ 923, 926. And "[w]hen carriers tried to defy the edict in the past, insurgents destroyed cellphone towers and killed staff in response." Ex. E. Anyone who defied the Taliban's efforts to "extract money" faced a barrage of attacks. SAC ¶¶ 932–34; *see also supra* at 3–4.

Such allegations cannot sustain an aiding-and-abetting claim under *Taamneh*. The Court repeatedly emphasized the importance of the voluntariness of a defendant's conduct in participating in the terrorist act. And when discussing the common-law foundations of aiding-and-

abetting liability, *Taamneh* pointed to the Second Circuit's decision in *United States v. Peoni*, in which Judge Learned Hand explained that to "abet" "carr[ies] an implication of purposive attitude towards [the act]." 100 F.2d 401, 402 (2d Cir. 1938); *see Taamneh*, 598 U.S. at 488, 491 & n.10 (relying on *Peoni*'s formulation).

*Taamneh*'s reliance on criminal law forms of accomplice liability, *see* 598 U.S. at 488, is also instructive here. Longstanding criminal law principles recognize that a person or entity is not ordinarily liable *as an accomplice* when coerced by the criminal acts of another. A leading criminal law treatise provides several examples to illustrate this limitation: "[t]he businessman who yields to the extortion of a racketeer, the parent who pays ransom to the kidnapper, may be unwise or even may be thought immoral; to view them as involved in the commission of the crime confounds the policy embodied in the prohibition." Wayne R. LaFave, *Substantive Criminal Law* § 13.3(e) (3d ed. 2023) (citation omitted); *accord People v. Manfredi*, 166 A.D.2d 460, 462 (N.Y. App. Div. 1990) ("A person who pays a coerced bribe is not guilty of criminal conduct and cannot be an accomplice of the bribe receiver."). And the Model Penal Code notes that accomplice liability applies only when one acts "with the purpose of promoting or facilitating the commission of the offense," and that the "victim" of an offense, like extortion, is excluded from accomplice liability. Model Penal Code § 2.06 (Am. L. Inst. 2022).

These principles apply with equal force to the requirement of "conscious, voluntary, and culpable participation" in a terrorist act. Like "the businessman who yields to the extortion of a racketeer," MTN Afghanistan is alleged to have faced credible threats of extreme violence if it did not comply with the Taliban's demands. Indeed, the alleged extortion payments and tower shutdowns are quintessential examples of compelled support and defeat any inference that MTN Group *voluntarily* participated in terrorist acts. To the contrary, the SAC and its cited sources

9

portray MTN Afghanistan as only engaging in the alleged activity with a proverbial—and literal—gun to the head of its personnel. In light of these allegations, MTN Group cannot remotely be described as "a willing partner in [the Taliban's] criminal activities." *Taamneh*, 598 U.S. at 485 (quoting *Halberstam v. Welch*, 705 F.2d 472, 474 (D.C. Cir. 1983)).

Plaintiffs cannot avoid this intuitive conclusion by alleging that MTN Afghanistan provided "more" assistance "than its competitors," SAC ¶ 932, or was less willing to explore relocating its towers to U.S. army bases, SAC ¶ 949. Whatever Plaintiffs may speculate about matters of degree, Plaintiffs allege (directly in their complaint and through their sources) that "[e]verybody" made the payments, SAC ¶ 923; *see also* SAC ¶¶ 926, 932–934, 940, that the decision to comply with the shutdown orders was made "joint[ly]" by all carriers, and that by at least 2010, the sovereign government of Afghanistan concluded that "unfortunately, there is no other way," Ex. E. More fundamentally, the aiding-and-abetting question is not whether, in retrospect, MTN Afghanistan made the best possible decisions when faced with the terrible choice the Taliban presented. Put differently, the question is not whether MTN Afghanistan's alleged decision under fire was "unwise or even may be thought immoral." LaFave, *supra*, § 13.3(e). The question is whether there was "conscious, voluntary, and culpable participation" in terrorist acts. *Taamneh*, 598 U.S. at 493. One can agree or disagree with every cell carrier in Afghanistan (and Afghanistan's Communications Minister) about whether there were viable alternatives that would not have resulted in death and destruction. But one cannot reasonably deem an alleged extortion victim as engaged in the sort of "truly culpable conduct" that makes one an aider-and-abettor in the terrorist acts of its extortionist. *Id.* at 489.

**b)      Aiding-and-abetting liability independently fails because MTN Group's alleged conduct is too remote from the 2019 attacks.**

Beyond the coerced nature of the alleged support, MTN Group's alleged conduct is too remote from the 2019 attacks to plausibly infer that it culpably participated in them.

*First*, there is too large a temporal disconnect. Consistent with *Taamneh*'s overall framework of culpable participation in the act in question, the first *Halberstam* factor "assesses whether the alleged aid 'would be important to the nature of the injury causing act.'" Order at 62 (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021)). A temporal mismatch between the alleged aid and the ultimate attack undermines any claim that the aid was important to the attack. *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (explaining that, "crucially," defendants did not provide banking services to terrorist affiliate within ten months of attacks, making defendant's role in attack "implausible"); *see also Taamneh*, 598 U.S. at 500 (finding defendants' support and terrorist attack were "highly attenuated").

The SAC alleges that MTN Afghanistan made extortion payments from 2010 to 2016, without any allegations of payments after 2016. SAC ¶¶ 930, 936. As for the tower shutdowns, Plaintiffs' allegations are all based on news sources describing the situation in 2008–2011, and lack any allegation that these shutdowns continued for nearly a decade until 2019. *See* SAC ¶¶ 937–950. From these allegations, it is impossible to infer that MTN Afghanistan's actions played any role at all, much less a substantial and important one, in attacks that happened in 2019.

*Second*, the SAC alleges that payments were made and towers were shut down by *MTN Afghanistan*, which is not a defendant here. *See, e.g.*, SAC ¶¶ 928–929. To hold *MTN Group* liable as an aider-and-abettor, Plaintiffs need to establish that *MTN Group* culpably participated in the 2019 Afghanistan attacks. Instead, the SAC alleges that the extortion payments were arranged between MTN Afghanistan and Taliban commanders. SAC ¶ 928. The added "distance" between

11

MTN Group and the attacks further undermines any inference that MTN Group culpably participated in those attacks. *Taamneh*, 598 U.S. at 500.

Plaintiffs cannot avoid this problem by blurring distinct corporate entities into a generic "MTN," *see, e.g.*, SAC ¶¶ 920–934, 936–942, which they unilaterally define to mean "conduct that was implemented on the ground by MTN Afghanistan and approved by MTN Group and MTN Dubai," SAC ¶ 805. The black-letter rule remains that "[t]he law allows a corporation to organize so as to isolate liabilities among separate entities." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996). And as this Court explained, "a list of conclusory allegations of intra-corporate affiliations is insufficient to show the requisite control by a principal over its subsidiary." Order at 29 (citation omitted).

Nor can Plaintiffs establish liability for MTN Group based on allegations that it "oversaw" and was "aware of" MTN Afghanistan's activities and "authorized" or "approved" of them. SAC ¶ 795, 800, 943. Under *Taamneh*, the question is whether the *defendant's own conduct* amounts to "participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to" the defendant. 598 U.S. at 504. MTN Group is not alleged to have planted a bomb, but it is also not even alleged to have paid the Taliban anything. The allegation is simply that a subsidiary faced a challenging situation, and MTN Group oversaw and approved of how the subsidiary handled it. Even if that could suffice to establish liability by the corporate parent in other contexts, it cannot do so under *Taamneh*, which emphasizes the defendant's own culpability for *participating in* the ultimate terrorist act through the provision of "direct, active, and substantial" assistance. *See id.* at 502–04.

### 2.   Plaintiffs' Irancell Theory Fails as to the Afghanistan Attacks.

Unable to state a claim on their main Afghanistan theory, Plaintiffs also fail in their effort to lump the Afghanistan attacks together with the Iraq attacks. That theory, as applied to

Afghanistan, is that MTN Group's partners in Irancell were allegedly "IRGC fronts," and because the IRGC supported the Taliban, MTN Group "indirectly" funded the Taliban. SAC ¶¶ 1511, 1521. We recognize that this Court has concluded that the complaint adequately pleads that the Irancell allegations support aiding-and-abetting liability for attacks committed by IRGC "proxies" in Iraq. Order at 62. But Plaintiffs' allegations trying to connect Irancell and the IRGC to *Afghanistan* are different and weaker. They fail to plead that MTN Group was "generally aware" it was "itself assuming a role in the terrorist activities" in Afghanistan by the Taliban and al-Qaeda. *Siegel*, 933 F.3d at 224. Plaintiffs also fail to plead that MTN Group "consciously and culpably participated" in the Afghanistan attacks, *Taamneh*, 598 U.S. at 506, because Plaintiffs concede that any connection between MTN Group and the attacks was "indirect," and they do not make the strong showing of scienter and assistance required for such attenuated allegations.

**a)**      **MTN Group was not "generally aware" of a role in Taliban or al-Qaeda terrorism in Afghanistan.**

Plaintiffs fail to allege facts sufficient to support a plausible inference that MTN Group could foresee that it was playing a role in terrorist attacks *in Afghanistan* by virtue of its investment in Irancell. *See* Order at 52 (concluding that "the touchstone of general awareness . . . is foreseeability"). When this Court found general awareness established as to the Iraq attacks, it proceeded in two steps. First, it concluded that Plaintiffs pled sufficient public sources providing notice that Irancell's shareholders were linked to the IRGC. Order at 53. Second, to connect the dots from the IRGC to the attacks themselves, the Court concluded that MTN Group allegedly had notice of a close relationship between the IRGC and Hezbollah. *See id.* at 48, 52 (relying on allegations of "publicly available information concerning the IRGC, its Qods Force, and Hezbollah"). While MTN Group respectfully maintains its position that Plaintiffs have not adequately alleged general awareness of dealing with "IRGC fronts" who were "closely

13

intertwined" with terrorism, *Honickman*, 6 F.4th at 499, such allegations are still only the first step in the analysis. As to Afghanistan, Plaintiffs cannot satisfy the second step by adequately pleading that the IRGC was "so closely intertwined" with *the Taliban and al-Qaeda* that MTN Group was "generally aware . . . that it was playing a role" in *Taliban and al-Qaeda* terrorism. *Id.*; *see also Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 868 (D.C. Cir. 2022) ("[Plaintiffs'] allegations connect the intermediary [Iranian] banks to terrorism generally but fail to support an inference that HSBC had general awareness it was playing a role in *al-Qaeda's* terrorist acts.").

Plaintiffs admit that the IRGC's alleged relationship with what they call "Sunni Terrorist Proxies"—including the Taliban and al-Qaeda—is weaker the alleged relationship between Hezbollah and Shiite groups in Iraq. For example, Plaintiffs admit that the IRGC "did *not* have a decades long-alliance" with either the Taliban or al-Qaeda and was not "sectarian allies" with either group. SAC ¶ 234. Plaintiffs focus most of the SAC on describing al-Qaeda's leading role and control over an intricate global "Syndicate" that was ideologically "fused" with the Taliban—*not* the IRGC. *E.g.*, SAC ¶ 323. These allegations and the public record on which Plaintiffs rely do not satisfy this Court's approach to demonstrating general awareness, especially when compared with Plaintiffs' characterization of the IRGC's links with Hezbollah, which this Court found to be supported by "[d]ecades of media coverage." Order at 48.

To the contrary, the public record on which Plaintiffs rely describes "Tehran's" ties with the Taliban as "inconsistent with their historic enmity" and "not ideologically based." SAC ¶¶ 396, 398. In contrast to Plaintiffs' reliance on the public record in the Iraq attacks to support an inference that IRGC's and Hezbollah's links were widely known, here, Plaintiffs rely on public reports—each more than a decade prior to the attacks—alleging only that the IRGC provided limited small-arms and other munitions to the Taliban. SAC ¶ 394. Plaintiffs' other public sources largely focus

14

not on the IRGC at all, but on *Iran*'s involvement in Afghanistan (e.g., "*Iran* is maybe getting more involved in an unhealthy way in Afghanistan" and "*Iran* was 'covertly' supporting the Taliban"). SAC ¶¶ 392, 396. Neither is a sufficient basis to plead that MTN Group "had general awareness it was playing a role in [*the Taliban's*] terrorist acts." *Bernhardt*, 47 F.4th at 868.

Plaintiffs' allegations are weaker still as to al-Qaeda. Plaintiffs fail to sufficiently allege *any* relationship between the IRGC and al-Qaeda; they allege only that *Iran* provided al-Qaeda officials with safe haven in exchange for a "secret agreement" that the group not attack Iran. SAC ¶¶ 439, 523–525. Allegations of dealings with "Iran" are insufficient. *See Bernhardt*, 47 F.4th at 868 (holding that "Iran's support for terrorism is not enough to demonstrate HSBC's general awareness that its transactions with Iranian banks would support al-Qaeda's terrorist acts without some 'additional allegations' more closely connecting these intermediary banks to the 'terrorist act or organization'"); *cf. Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (rejecting claims of providing support to Iran as capable of supporting proximate causation under the ATA, even though Iran is a state-sponsor of terrorism). Moreover, the SAC identifies Iran's Ministry of Intelligence and Security—*not the IRGC*—as involved in this alleged arrangement with al-Qaeda. SAC ¶ 525. Allegations that Iran generally, or non-IRGC parts of the Iranian government specifically, had ties to al-Qaeda does not support a plausible inference that the IRGC and al-Qaeda were "so closely intertwined" that MTN Group's business dealings with Irancell's shareholders reflected general awareness of assuming a role in al-Qaeda terrorism in Afghanistan. *Honickman*, 6 F.4th at 499.

### b) MTN Group did not "consciously and culpably" participate in the Afghanistan attacks through its Irancell investment.

Plaintiffs independently fail to meet their burden of pleading knowing and substantial assistance under *Taamneh*: that MTN Group "culpably participated in the [Afghanistan attacks]."

15

598 U.S. at 506. With respect to the Iraq attacks, this Court concluded that MTN Group's "alleged role was sufficiently conscious and culpable" because MTN Group allegedly provided "'direct and extraordinary' assistance" to those attacks. Order at 59. While MTN Group again respectfully disagrees that the allegations establish "direct and extraordinary assistance" to the perpetrators of the Iraq attacks, there is no question of "direct and extraordinary assistance" to the Taliban and al-Qaeda. By Plaintiffs' own admission, their Afghanistan theory is the opposite of "direct": it is that that MTN Group "provide[d] resources to the IRGC that *indirectly* financed the Taliban's terrorist attacks." SAC ¶¶ 1511, 1521 (emphasis added). Plaintiffs do not allege that the IRGC participated in the specific attacks at issue, relying instead on conclusory and indirect allegations that "Hezbollah and the Qods Force supported" the Afghan groups through "their global network of cells." SAC ¶¶ 234–235.

This difference in the Afghanistan allegations matters under *Taamneh*. As the Supreme Court held, when the alleged nexus between defendant and attack is as "attenuated" as Plaintiffs admit here, their burden is to plead "culpable participation through *intentional* aid that *substantially* furthered the tort." 598 U.S. at 506. Plaintiffs cannot meet that burden.

*First*, this Court has already held that Plaintiffs do not adequately allege that MTN Group intended to support terrorism. Order at 74. That alone defeats the possibility of culpable participation in attacks as attenuated from the alleged conduct as the Afghanistan attacks are.

*Second*, in contrast to what the Court concluded with respect to the Iraq-related allegations, Plaintiffs plead no facts supporting a plausible inference that providing cellphones or other telecommunications technology was "substantial" assistance that would be "important to the nature of the injury-causing act," *Honickman*, 6 F.4th at 500—here a suicide bombing and a small-arms attack by an Afghan army "insider" in 2019, *supra* at 4–5.

*Third*, Plaintiffs' allegations and incorporated sources do not support a plausible inference that the IRGC provided the same level of tactical or operational assistance to the Afghan militant groups as this Court concluded was alleged with respect to the "Shiite Terrorist Proxies" in Iraq. As to Iraq, for example, Plaintiffs allege that "the IRGC 'midwifed' Hezbollah," SAC ¶ 230, going so far as to claim that Hezbollah is "part of the IRGC," SAC ¶¶ 169, 176–177, 1515. But as to Afghanistan, Plaintiffs make no claim that the Taliban and al-Qaeda were birthed by the IRGC or are part of the IRGC. They instead rely on sources that discuss some IRGC assistance to the Taliban—in the form of small arms and other munitions—over a decade before the attacks. *Supra* at 4. They otherwise allege that *Iran*, and not the IRGC, allowed al-Qaeda leaders safe haven inside the country in exchange for a "secret agreement" that al-Qaeda would not attack Iran. Where Plaintiffs further elaborate on this agreement between the Iranian government and al-Qaeda, they allege that a non-IRGC ministry was involved.

None of these allegations pleads facts sufficient to support a plausible inference that MTN Group, via its Irancell investment, provided such substantial and intentional support to the Taliban and Al-Qaeda that it consciously and culpably participated in two 2019 attacks in Afghanistan.

### CONCLUSION

For the reasons stated above, the Court should dismiss the claims against Defendants MTN Group and MTN Dubai.

17

Dated: December 4, 2023                                   Respectfully submitted,


s/ *David M. Zionts**                                    s/ *Timothy P. Harkness*
_____                                  _____

David M. Zionts (admitted *pro hac vice*)                Timothy P. Harkness
Covington & Burling LLP                                   Kimberly H. Zelnick
One CityCenter                                            Scott A. Eisman
850 Tenth Street N.W.                                     Freshfields Bruckhaus Deringer US LLP
Washington, DC 20001                                      601 Lexington Avenue, 31st Floor
Telephone: (202) 662-5987                                 New York, New York 10022
Facsimile: (202) 778-5987                                 Telephone: (212) 277-4000
dzionts@cov.com                                           Facsimile: (212) 277-4001
                                                          timothy.harkness@freshfields.com
                                                          kimberly.zelnick@freshfields.com
Benjamin S. Haley (admitted *pro hac vice*)               scott.eisman@freshfields.com
Covington & Burling (Pty) Ltd.
Rosebank Link
173 Oxford Road, 7th Floor
Johannesburg 2196, South Africa
Telephone: +27 (11) 944-6914
Facsimile: (202) 778-5194
bhaley@cov.com


Micaela R.H. McMurrough
Covington & Burling LLP
The N.Y. Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1131
mmcmurrough@cov.com


                                                          *Counsel for Defendants MTN Group Limited and*
                                                          *MTN (Dubai) Limited*


_____

* Signed with permission.

18