**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STEPHANIE ZOBAY, et al.,<br><br>               Plaintiffs,<br><br>    -v.-<br><br>MTN GROUP LIMITED, et al.,<br><br>              Defendants. | Case No.: 1:21-cv-03503-CBA |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MTN GROUP LIMITED
AND MTN (DUBAI) LIMITED'S MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT.........................................................................................................................1

    I.    Plaintiffs Fail To Save Their Extortion Theory of Aiding-and-Abetting Liability. ....................................................................................................................1

        A.    Coerced Assistance Is Not Conscious, Voluntary, and Culpable Participation. ...........................................................................................1

        B.    The Alleged Assistance Is Also Too Remote to Support Liability. ...........5

    II.    Plaintiffs Fail to Save Their Irancell Theory of Aiding-and-Abetting Liability as to Afghanistan. ................................................................................6

        A.    Plaintiffs Ignore The "Closely Intertwined" Requirement for General Awareness. ..................................................................................6

        B.    Plaintiffs Cannot Meet the *Taamneh* Standard Based on Allegations of "Indirectly Financing" the Afghanistan Attacks. ...............9

    III.    Plaintiffs Do Not Sufficiently Plead that the Attacks were Committed, Planned, or Authorized by a Designated FTO...................................................10

CONCLUSION....................................................................................................................10

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Atchley v. AstraZeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022)...................................................................................................7

*Bartlett v. Société Générale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020)........................................................................8

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
   747 F.3d 145 (2d Cir. 2014) ...................................................................................................5

*Greenblatt v. Gluck*,
   265 F. Supp. 2d 346 (S.D.N.Y. 2003) ..................................................................................10

*Honickman v. BLOM Bank SAL*
   6 F.4th 487 (2d Cir. 2021) .....................................................................................................6

*In re Chiquita Brands International, Inc.*
   284 F. Supp. 3d 1284 (S.D. Fla. 2018)..................................................................................4

*Kaplan v. Lebanese Canadian Bank*,
   SAL 999 F.3d 842 ..................................................................................................................8

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) ...................................................................................................3

*Massey v. Helman*,
   196 F.3d 727 (7th Cir. 1999) ...............................................................................................10

*Siegel v. HSBC North America Holdings, Inc.*
   933 F.3d 217 (2d Cir. 2019) ..............................................................................................5, 6

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023) ......................................................................................................*passim*

*Vance v. Terrazas*,
   444 U.S. 252 (1980) ...............................................................................................................4

## PRELIMINARY STATEMENT

The Opposition fails to cure the fundamental defects in Plaintiffs' new Count 4. Plaintiffs cannot escape the reality that they allege that MTN Afghanistan assisted the Taliban only because the Taliban extorted it through violent threats. And they cannot stretch this Court's prior ruling to mean that even allegations of *indirect* support state a claim for aiding-and-abetting liability, despite the lack of intentional aid for terrorism. Under the Supreme Court's decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), both of these defects require dismissal of Count 4.

## ARGUMENT

### I. Plaintiffs Fail To Save Their Extortion Theory of Liability.

#### A. Coerced Assistance Is Not Conscious, Voluntary, and Culpable Participation.

Plaintiffs' opposition never seriously engages with *Taamneh*'s core holding: ATA aiding-and-abetting liability requires "conscious, voluntary, and culpable participation in another's wrongdoing"—"here, an act of international terrorism." 598 U.S. at 493, 495. Nor do they explain how an extortion victim can voluntarily and culpably participate in the crimes of its extortionist. Plaintiffs instead (i) run away from some of their allegations while drawing the wrong legal conclusions from others; (ii) conflate this Court's jurisdictional ruling with the very different demands of the *Taamneh* liability standard; and (iii) confuse their pleading burden under *Taamneh* with an affirmative defense of duress.

1. Plaintiffs tacitly admit that an extortion victim does not consciously, voluntarily, and culpably participate in its extortionist's terrorist acts, arguing instead (at 7–8) that the "premise of MTN's 'extortion' argument is false." Yet while the complaint may artfully avoid the word "extortion," in substance that is exactly what it alleges.

It is thus not MTN Group's "pious suggestion" that its subsidiary was concerned with "sav[ing] its employees' lives." Opp. 7. Plaintiffs' own sources allege that the Taliban threatened

1

cell carriers that their people would be "kidnapped" unless they made payments, Ex. C at 32; that "[w]hen carriers tried to defy" the Taliban, the Taliban "killed staff in response," Ex. E at 1; that cell carriers "made a joint decision" to comply with tower shutdown orders because "we don't like to play around when people's lives are at stake," *id*. at 2; and that Afghanistan's Minister of Communications ultimately acknowledged that "there is no other way," *id*. at 4. Plaintiffs do not dispute that their complaint incorporated these allegations by reference—they just ignore them.

Even Plaintiffs' selective presentation does not change the bottom line. On Plaintiffs' revised telling, the only reason MTN Afghanistan complied with the Taliban's orders is the economic cost of "rebuild[ing] the towers in the face of Taliban threats." Opp. 7 (quoting SAC ¶ 929). Of course, these costs are borne not just by the carriers—"[m]obile networks are a vital part of daily life" in Afghanistan, and it "stop[s] working" when the Taliban "attack[s]" masts. Jon Boone, *Telecom Chief Says Rivals Pay Taliban Protection*, Fin. Times (June 9, 2008), *cited at* SAC ¶¶ 924–926 (Ex. F). But even granting Plaintiffs' more cynical framing, they still allege that MTN Afghanistan acted "in the face of Taliban threats" to prevent property destruction by the Taliban. That is still extortion.

2. Rather than explain how being extorted can qualify as conscious, voluntary, and culpable participation in the extortionist's terrorist acts, Plaintiffs change the subject to this Court's ruling that the alleged acts were "expressly aimed" at the United States for jurisdictional purposes. Opp. 6 (citing Order at 33). But the jurisdiction and liability standards are distinct. When Plaintiffs argued that MTN Group satisfied the jurisdictional "aiming" standard, they emphasized that *the Taliban's* goal was to kill American soldiers, not whether MTN Group voluntarily and culpably participated in any attacks. ECF No. 82-25 at 22–25. This Court then found it sufficient for jurisdictional purposes that MTN Group allegedly provided "direct aid" to an entity that "was

2

known to be targeting United States forces." Order at 34. The Court expressly found "motive" and "intent" to be "distinct inquiries" from the jurisdictional question whether the alleged acts were the "unilateral activit[ies]" of third parties. *Id.* at 34–35. And the Court concluded that jurisdiction was satisfied "even considering the power differential" between MTN Afghanistan and the Taliban, and "[e]ven if" MTN Afghanistan made its "choice . . . under duress." *Id.* at 35.[1]

Under *Taamneh*, the aiding-and-abetting analysis is very different. Intent *does* matter because an aider-and-abettor must ordinarily "take some 'affirmative act' 'with the intent of facilitating the offense's commission.'" *Taamneh*, 598 U.S. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)); *see also id.* at 504 (faulting the Ninth Circuit for not giving "much greater weight to . . . [defendants'] undisputed lack of intent to support ISIS"). Power differential also matters because courts must consider the "defendants' relationship with [the terrorists]." *Id.* at 500. If it was error for the Ninth Circuit not to "give[] much greater weight to defendants' arm's-length relationship with ISIS," *id.* at 504, it would be error to ignore the Taliban's coercive power over cell carriers. And even if coercion is irrelevant to jurisdiction, voluntariness is an essential part of liability. *See id.* at 493. Beyond that, *Taamneh* focuses on the defendant's "blameworthiness" and whether it "culpably participated in the [terrorist] attack." *Id.* at 489, 497. That is a much greater hurdle than establishing "direct aid" to a group "known to be targeting United States forces." Order at 34. Circuit precedent confirms as much: "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated

---

[1] Because of the different standards, Plaintiffs are incorrect to suggest (at 7) that MTN Group improperly "seeks reconsideration of" the Court's jurisdictional decision. MTN Group does respectfully disagree with that decision, and if Count 4 is permitted to move forward, MTN Group reserves the right to supplement its motion for certification of an interlocutory appeal to include the "express aiming" question. Given Judge Faruqui's conflicting decision, this is a question on which reasonable jurists can disagree.

terrorist *organization*." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018).

3. Plaintiffs likewise miss the point in arguing (at 8) that duress is an affirmative defense. MTN Group is not raising a duress defense but pointing out that Plaintiffs have not adequately pleaded their affirmative case. Plaintiffs oddly contend (at 8) that voluntariness should be "presumed" based on a decision upholding Congress's authority to *enact* such a presumption, *see Vance v. Terrazas*, 444 U.S. 252, 267–70 (1980). Congress enacted no such presumption in the ATA, but rather imposed an aiding-and-abetting framework that requires "conscious, *voluntary*, and culpable participation in [the principal's] wrongdoing." *Taamneh*, 598 U.S. at 493 (emphasis added). And Plaintiffs cannot clear that voluntariness bar by alleging that MTN Afghanistan acted "in the face of Taliban threats." Opp. 7. Nor can Plaintiffs explain why it is "irrelevant" that extortion victims are not criminally liable as accomplices based on "coerced conduct." Opp. 8 n.4. That is precisely the type of criminal-law analogy *Taamneh* drew. *See* 598 U.S. at 490, 492. The authorities we cited (and Plaintiffs summarily brush aside) put this point not in terms of duress, but in terms of the limits of accomplice liability. Mot. 9. And whatever Plaintiffs say about "commercial interests," Opp. 7, it is undeniable that the complaint's allegations—the Taliban threatened to destroy cell towers if carriers refused to comply—plead coercion.

Even if acting under coercion could somehow be deemed voluntary, Plaintiffs never try to explain how MTN Group could be a *culpable participant* in the Taliban's *terrorist acts*. On the facts as Plaintiffs allege them, MTN Afghanistan was not "a willing partner in [the Taliban's] criminal activities." *Taamneh*, 598 U.S. at 485 (citation omitted). Plaintiffs have not identified a single precedent, under the ATA or otherwise, for treating an extortion victim as the aider-and-abettor of its extortionist's acts. This case should not be the first.[2]

---

[2] *In re Chiquita Brands International, Inc.* merely concluded that a defendant's "know[ledge]"

**B.  The Alleged Assistance Is Also Too Remote to Support Liability.**

Plaintiffs also fail to close the glaring temporal gap between MTN Afghanistan's alleged acts and the attacks, or the attenuation gap between MTN *Group* and the attacks.

Plaintiffs cannot escape their allegation of MTN Afghanistan's total alleged assistance based on "payments from 2007 through 2016." SAC ¶ 936; *see also* SAC ¶ 929 (relying on "evidence from 2008-2012"). If Plaintiffs had a good-faith basis to allege payments beyond 2016, they surely would have made such an allegation. This very specific alleged period is not overridden by vague references to payments "every year," Opp. 9 (quoting SAC ¶ 1521), or a hedge that payments were made "*at least . . .* through 2016," *id.* (quoting SAC ¶ 930). *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014) ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint." (citations omitted)). Likewise, given that Plaintiffs draw their specific allegations of tower shutdowns from reports more than a decade old, *see* SAC ¶¶ 937–938, 941, 947, a vague allegation that "MTN's policy has remained consistent," Opp. 10 (quoting SAC ¶ 938), does not support a plausible inference that tower shutdowns continued into 2019.

The Second Circuit's decision in *Siegel v. HSBC North America Holdings, Inc.*, defeats Plaintiffs' suggestion (at 10–11) that the quantity of support cures any temporal gap. The *Siegel* plaintiffs alleged that HSBC "provided hundreds of millions of dollars" of support. 933 F.3d 217, 225 (2d Cir. 2019). And while Plaintiffs (at 11 n.6) may point to other factors at play in *Siegel*, the point remains that the cessation of the relevant acts "ten months preceding" the attacks made it

---

"that its support would be used to prepare for or carry out a terror-related crime" is sufficient to satisfy 18 U.S.C. § 2339A's mens rea requirement, for which coercion is irrelevant. 284 F. Supp. 3d 1284, 1320 (S.D. Fla. 2018). The court was not considering the standard of "conscious, voluntary, and culpable participation" that the Supreme Court had yet to articulate.

"implausible under the circumstances that HSBC had knowingly assumed a role in the [a]ttacks." 933 F.3d at 224. It is equally implausible that MTN Afghanistan's alleged compliance with the Taliban's extortionate demands constituted culpable participation in attacks years later.

Plaintiffs also fail to engage with the implications under *Taamneh* of the "distance" between MTN Group and the attacks. 598 U.S. at 500. Whatever MTN Group allegedly "authorized and approved," Opp. 11, acts of corporate authorization have a more attenuated nexus to the attacks than engaging with the Taliban, which only MTN Afghanistan is alleged to have done, *see* SAC ¶¶ 928–929. And "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Taamneh*, 598 U.S. at 506. Plaintiffs do not try to make that showing as to MTN Group.

## II.      Plaintiffs Fail to Save Their Irancell Theory of Liability as to Afghanistan.

### A.  Plaintiffs Ignore The "Closely Intertwined" Requirement for General Awareness.

The Opposition ignores the Second Circuit's general-awareness standard. In *Honickman v. BLOM Bank SAL*, plaintiffs alleged that by dealing with "Three Customers," the defendant was generally aware of assuming a role in Hamas terrorism. To connect those dots, the Second Circuit demanded awareness that "the Three Customers were closely intertwined with Hamas's violent terrorist activities." 6 F.4th 487, 499 (2d Cir. 2021) (cleaned up). Here, Plaintiffs have added a layer, saying MTN Group invested in Irancell, which was purportedly an IRGC "front," which in turn was connected to terrorists. This Court accepted as sufficient Plaintiffs' allegations that Irancell was intertwined with the IRGC, and that the IRGC was intertwined with Hezbollah and affiliated Shia proxies in Iraq. But it has not considered whether MTN Group was allegedly aware that the IRGC was closely intertwined with the Taliban. The complaint makes no such allegation.

All Plaintiffs can point to (at 16) is publicly available information, including sanctions designations, "describing the IRGC's assistance to the Taliban and other Afghan militants."

6

Another of Plaintiffs' key sources qualifies the point, saying that "Iran continues to provide *measured* support to Taliban insurgents," while maintaining "close and constructive relations with the same Afghan central government that is battling Taliban forces." Alireza Nader & Joya Laha, RAND Corp*., Iran's Balancing Act in Afghanistan*, at ix (2011), *cited at* SAC ¶¶ 314, 388 (Ex. G) (emphasis added). MTN Group is not "bur[ying]" the Qods Force sanctions designation or other public reports. Opp. 15. MTN Group simply asks the Court to read those sources in light of the applicable legal framework: whether the IRGC and Taliban were "closely intertwined." Public reporting that the IRGC provided some "assistance" or "measured support" to the Taliban does not show that they were *so closely intertwined* that supporting one equates to assuming a role in the other's acts.[3]

As for al-Qaeda, Plaintiffs focus on an allegation that the Qods Force offered "shelter[]" to "dozens" of al-Qaeda terrorists, Opp. 17 (quoting SAC ¶ 569), then look beyond the complaint to suggest "relations" between al-Qaeda operatives and IRGC leaders, *id.* Again, this is not the same as alleging that the two groups are "closely intertwined."

Despite spending pages on the proposition that the IRGC provided some "assistance" to the Taliban and al-Qaeda, Plaintiffs make no effort to show that this is enough for general awareness under the "closely intertwined" standard. They certainly point to no case finding as much. *Cf. Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 221 (D.C. Cir. 2022) ("defendants were [allegedly] aware of reports extensively documenting both Jaysh al-Mahdi's domination of the

---

[3] MTN Group agrees that sanctions designations are important to the general awareness analysis. It is also important to read them accurately. And it is simply false that the U.S. Government made an "express statement that the IRGC's Qods Force was the primary supplier of 'lethal support' to the Taliban." Opp. 15–16. What the U.S. Government said was that the Qods Force was "the *Iranian regime's* primary instrument" for supporting the Taliban. SAC ¶ 188 (emphasis added; quoting Treasury fact sheet on the Qods Force designation). That overall Iranian support, though, was allegedly "measured." Ex. G at ix. Plaintiffs make no allegation, and cite nothing, suggesting that either the IRGC or Iran was the Taliban's primary supplier.

Ministry and its mission to engage in terrorist acts"); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (defendant allegedly aware that its customers were "integral constituent parts of Hizbollah"); *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *9, *11 (E.D.N.Y. Nov. 25, 2020) (most defendants' customers designated as "Hezbollah affiliates"; another did business with a prominent family known to be "synonymous with Hezbollah").

Public reporting that the IRGC assisted the Taliban and al-Qaeda is quite different from what Plaintiffs allege the IRGC-Hezbollah relationship to be. According to the complaint, Hezbollah was the "the IRGC's external terrorist operations arm." SAC ¶ 181. For all but one of the Iraq attacks, Plaintiffs allege that Hezbollah and the Qods Force worked together *as participants*. SAC ¶ 1275. That is why, as Plaintiffs emphasize, this Court described the Iraq attacks as "IRGC-led terrorist attack[s]." Opp. 12 (quoting Order at 61). That description does not apply to the Afghanistan attacks, which were allegedly planned, committed, and authorized by some combination of Sirajuddin Haqqani, the Taliban, the Haqqani Network, and al-Qaeda—not the IRGC, the Qods Force, or Hezbollah. Opp. 4–6.[4]

It would be a significant extension of this Court's already broad ruling to now say that if the IRGC gives material support to any terrorist group, every act by that group becomes an "IRGC-led terrorist attack," and general awareness extends accordingly. Such an extension would read the "closely intertwined" requirement out of the Second Circuit's case law.

---

[4] This Court should reject Plaintiffs' request (at 13) to hold that it already decided that they adequately pleaded general awareness for the final Iraq attack committed by Sunni groups. Instead, because Plaintiffs themselves "reference[d] only the Joint Cells"—not any Sunni group—in their IRGC-based aiding-and-abetting claim Order at 40–41 n.16, we did not address general awareness as to those groups. And although the Court generously read Count One to cover the additional Iraq attack—which, as Plaintiffs alleged, was not a Joint Cell attack—our reasonable understanding of the complaint meant that the parties never briefed the question of general awareness of assuming a role in Sunni attacks. By urging the Court to treat this question as already decided, Plaintiffs seek an unfair advantage from their own sloppy pleading.

8

**B. Plaintiffs Cannot Meet the *Taamneh* Standard Based on Allegations of "Indirectly Financing" the Afghanistan Attacks.**

Plaintiffs do not deny that their theory is that MTN Group "*indirectly* financed the Taliban's terrorist attacks." SAC ¶ 1511 (emphasis added). Nor do they respond to the importance of indirectness under *Taamneh*. As the Supreme Court summed up *Taamneh*'s framework: "When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance. But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." 598 U.S. at 506. Finally, Plaintiffs do not dispute that this Court found no "intentional aid" to terrorism. Mot. 16. Putting these points together, the straightforward conclusion is that Plaintiffs have not stated a claim that MTN Group culpably participated in the Afghanistan attacks by "indirectly" financing the Taliban and al-Qaeda.

Instead of addressing any of this, Plaintiffs try to refashion this Court's ruling. But the Court did not use "direct and extraordinary" as just a "phrase," and directness was not one of several alternative culpability grounds. Opp. 20. It was the conclusion: "*Therefore*, I am satisfied, *given the 'direct and extraordinary' assistance* that Plaintiffs describe, that MTN's alleged role was sufficiently conscious and culpable to satisfy *Taamneh*." Order at 59 (emphasis added).

Strikingly, Plaintiffs' response has nothing to do with their Afghanistan allegations at all. Instead, they recharacterize the *Iraq* allegations, saying that "the Court clearly did not find that MTN aided the Iraq attacks 'directly' in the sense that it passed money and equipment directly to the terrorists who committed the attacks." Opp. 20. That concession does not do much for the Afghanistan claims, though it does support MTN Group's arguments for certification of the prior ruling. *See* ECF 152-1 at 20–22. In any event, while Plaintiffs now wish to describe the directness of their Iraq and Afghanistan allegations as "functionally identical," Opp. 20, their complaint tells

9

a different story: that MTN Group "indirectly financed" the Afghanistan attacks, but not the Iraq attacks, SAC ¶¶ 1511, 1521. Under *Taamneh*, that is not a viable aiding-and-abetting theory.

**III.    Plaintiffs Do Not Sufficiently Plead that the Attacks were Committed, Planned, or Authorized by a Designated FTO.**

Finally, Count 4 independently fails because it fails to meet the FTO requirement. To support their allegations that the "Kabul Attack Network included 'operatives from al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba,'" Plaintiffs point to other conclusory assertions (SAC ¶¶ 380-83) that repeat the alleged composition of the group and fail to factually enhance its connection to the January 2019 attack. As to the July 2019 attack, Plaintiffs continue to insist (at 5) that the Taliban and Haqqani Network are one and the same, but do not explain how that can be accepted without improperly second-guessing the Executive Branch determination to treat them as distinct. As for planning and authorization, while Plaintiffs (at 5–6) point to general allegations about Sirajuddin Haqqani's "coordinating" between al-Qaeda and the Haqqani Network, they do not explain how this supports an information-and-belief inference that he planned or authorized this specific attack.[5]

**CONCLUSION**

The Court should dismiss the claims against Defendants MTN Group and MTN Dubai.

---

[5] Plaintiffs erroneously assert (at 3) that MTN Group cannot make these arguments without moving for reconsideration. But any such motion would have been "moot," because Plaintiffs "already filed a new complaint." *Greenblatt v. Gluck*, 265 F. Supp. 2d 346, 351 (S.D.N.Y. 2003). A "new complaint wipes away prior pleadings . . . [and] . . . opens the door" for "new" arguments. *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999). In the interest of efficiency, MTN Group has not re-briefed every argument from its prior motion, though it has incorporated all arguments for preservation. But the parties did not extensively brief application of the FTO requirement to the Afghanistan claims—unsurprisingly, since the prior complaint's RICO-based Afghanistan theory was so farfetched. MTN Group respectfully suggests that the Court revisit this one issue, and there is no procedural obstacle to such a request.

Dated: January 4, 2024

Respectfully submitted,

s/ *David M. Zionts*[*]

David M. Zionts (admitted *pro hac vice*)
Covington & Burling LLP
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Telephone: (202) 662-5987
Facsimile: (202) 778-5987
dzionts@cov.com

Benjamin S. Haley (admitted *pro hac vice*)
Covington & Burling (Pty) Ltd.
Rosebank Link
173 Oxford Road, 7th Floor
Johannesburg 2196, South Africa
Telephone: +27 (11) 944-6914
Facsimile: (202) 778-5194
bhaley@cov.com

Micaela R.H. McMurrough
Covington & Burling LLP
The N.Y. Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1131
mmcmurrough@cov.com

s/ *Timothy P. Harkness*

Timothy P. Harkness
Kimberly H. Zelnick
Scott A. Eisman
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
kimberly.zelnick@freshfields.com
scott.eisman@freshfields.com

*Counsel for Defendants MTN Group Limited and MTN (Dubai) Limited*

---

[*] Signed with permission.

11