```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
STEPHANIE ZOBAY, et al.,

                     Plaintiffs,

     -against-

MTN GROUP LIMITED, MTN IRANCELL,               NOT FOR PUBLICATION
MTN DUBAI LIMITED, ZTE CORPORATION,            MEMORANDUM & ORDER
ZTE (USA) INC., ZTE (TX) INC., HUAWEI          21-cv-3503 (CBA) (VMS)
TECHNOLOGIES CO., LTD., HUAWEI
TECHNOLOGIES USA INC., HUAWEI
DEVICE USA INC., FUTUREWEI
TECHNOLOGIES, INC., and SKYCOM TECH
CO., LTD.,

                     Defendants.
----------------------------------------------------------x
```

**AMON, United States District Judge:**

This case arises out of the injuries or deaths of American nationals caused by terrorist attacks in Iraq and Afghanistan between 2011 and 2019 ("Attack Victims"). Plaintiffs are the Attack Victims themselves or are heirs or successors of the Attack Victims. Plaintiffs brought this action against several telecommunications companies, seeking damages pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). Plaintiffs' Amended Complaint stated three causes of action: aiding-and-abetting liability for the Iraq attacks; civil conspiracy liability; and aiding-and-abetting liability for the Afghanistan attacks premised on a RICO theory. In September 2023, I granted a subset of the captioned defendants' motions to dismiss the Amended Complaint but held that Count One—for aiding and abetting the Iraq attacks—could proceed against MTN Group Limited ("MTN Group" or "MTN").

Plaintiffs then filed their Second Amended Complaint, which adds a Count Four, alleging a new theory of liability for the Afghanistan attacks mirroring the theory alleged in Count One.

1

MTN Group now moves to dismiss Count Four of the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons set forth below, MTN Group's motion to dismiss is DENIED.[1]

## SUMMARY OF COMPLAINT

The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed true for purposes of this motion. (D.E. # 142 ("Second Amended Complaint" or "SAC").) I draw all reasonable inferences in Plaintiffs' favor. Vietnam Ass'n of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008). I presume the parties' familiarity with my September 2023 Memorandum & Order and briefly summarize only Plaintiffs' allegations most relevant to Count Four herein, which, for the purposes of this motion, seeks to hold MTN liable for aiding and abetting a suicide bombing and small-arms attack that took place in Afghanistan in 2019.

As relevant to the instant motion, the Attack Victims were injured in two terror attacks taking place in Afghanistan in 2019 ("the Afghanistan Attacks" or "the Attacks"). (SAC ¶ 1.) One Attack was jointly committed by al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba, and the other "by the Taliban and its Haqqani Network," (id. ¶¶ 1439, 1451), with support from Hezbollah, (id. ¶¶ 233-36).

Plaintiffs tie MTN to these Attacks based on dealings with the Taliban and its Haqqani Network and through the Irancell joint venture (described in detail in the September 2023 Order). According to the allegations in the Second Amended Complaint, MTN supported the Taliban in Afghanistan, despite U.S. and Afghan government opposition, by (1) issuing protection payments, which Plaintiffs allege amount to bribing the Taliban; and (2) deactivating its cell towers at the

---

[1] I agree with the parties that all counts against MTN Dubai are dismissed and Counts Two and Three are dismissed as to MTN Group based on my September 2023 Memorandum & Order ruling on Defendants' motion to dismiss the First Amended Complaint. (See ECF Docket Entry ("D.E.") # 129 ("September 2023 Order" or "Order").)

2

Taliban's request, which impeded Coalition intelligence efforts. (Id. ¶¶ 920-50.) The Taliban asked MTN Group and other telecom companies to pay monthly protection fees in each province—usually in the range of $2,000 per tower, which amounted to over $100 million between 2007 and 2016—or else face attacks on its staff and network. (Id. ¶¶ 922-23.) During the relevant period, MTN Group agreed to pay these security "taxes" "[r]ather than invest in expensive security for its transmission masts," and MTN Afghanistan (with the support and approval of MTN Group) deactivated cell towers at specific times of night in response to the Taliban's demands. (Id. ¶¶ 926-44.) The Taliban wanted nighttime service in certain quadrants to shut down to impede the Coalition forces' ability to locate Taliban operatives, and the tower shutdowns in fact did so. (Id. ¶¶ 944, 948.) Additionally, and as recounted in detail in the September 2023 Order, MTN Group collaborated with known "fronts" of the Islamic Revolutionary Guard Corps ("IRGC") that Plaintiffs allege funneled money and dual-use technologies through the IRGC to the terrorist proxies that perpetrated the Afghanistan Attacks. (See id. ¶¶ 1519-20.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." A complaint will be dismissed unless the plaintiff states a claim that is "plausible on its face" by alleging sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 570 (2007)). A court must dismiss a claim if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id. at 679. Although courts will not credit "conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," id. at 678,

the court must accept as true all material factual allegations and draw all reasonable inferences in the plaintiff's favor. Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013).

## DISCUSSION

### I. Count Four: Aiding-and-Abetting Liability under JASTA (Afghanistan Attacks)

JASTA provides for secondary liability against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism." See 18 U.S.C. § 2333(d)(2); Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 854 (2016) (Amendment). To state a claim for JASTA aiding and abetting, Plaintiffs must plead three statutory elements: (1) an injury arising from an act of international terrorism; (2) that the act was committed, planned, or authorized by a designated Foreign Terrorist Organization ("FTO"); and (3) that defendants aided or abetted an act of international terrorism by knowingly providing substantial assistance. Atchley v. AstraZeneca UK Ltd., 22 F.4th 204, 216 (D.C. Cir. 2022). The framework for determining aiding-and-abetting liability under JASTA is the decision of the U.S. Court of Appeals for the D.C. Circuit in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983). See 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 2(a)(5)). As analyzed in detail in the September 2023 Order, the Supreme Court clarified the pleading standard for knowing and substantial assistance under JASTA in Twitter v. Taamneh, 598 U.S. 471 (2023). There, the Court held that "[t]he phrase 'aids and abets' in §2333(d)(2), as elsewhere, refers to a conscious, voluntary, and culpable participation in another's wrongdoing." Id. at 487, 493.

MTN argues that Plaintiffs have failed to meet the second and third elements under JASTA with respect to the Afghanistan Attacks as premised on Plaintiffs' protection payment and tower shutdown theory. (D.E. # 167-1 ("MTN Mot.") 6-12.) It argues that (1) Plaintiffs have not sufficiently pleaded that the Afghanistan Attacks were committed, planned, or authorized by a

4

designated FTO; (2) MTN's actions in Afghanistan were coerced and thus not "voluntary" within the meaning of the Supreme Court's decision in Taamneh; and (3) the two Afghanistan Attacks are too attenuated from MTN's alleged conduct because they are (i) too remote in time and (ii) Plaintiffs impermissibly blur the distinctions between MTN Group and its subsidiary, MTN Afghanistan, such that MTN Group's conduct is too distant from the Attacks. I find that Plaintiffs have plausibly alleged aiding-and-abetting liability against MTN Group on the theory that the protection payments and tower shutdowns constituted knowing and substantial assistance. I, therefore, need not reach MTN's arguments that Plaintiffs' alternative theory of liability—that MTN can be held liable based on the Irancell joint venture—is unavailing because of the arguably indirect relationship between MTN Group, Irancell, and the Taliban. (See D.E. # 168 ("Pls. Opp'n") 12-20.)

### A. The FTO Requirement

As I held in the September 2023 Order, Plaintiffs have carried their burden of alleging that the Afghanistan Attacks were "committed, planned, or authorized" by a designated FTO. See 18 U.S.C. § 2333(d)(2). In that Order, I held that "Plaintiffs' allegations give rise to the reasonable inference that Hezbollah, al-Qaeda, or the Haqqani Network were 'responsible, at minimum, for authorizing' the Attacks." (Order 39-40 (citations omitted).) I also made clear that my ruling that Plaintiffs had met the FTO requirement applied equally to the Afghanistan Attacks despite my addressing that requirement in the context of Count One of the Amended Complaint. (Id. 39 n.15.)

MTN nonetheless asks that I "revisit this one issue" and hold that Plaintiffs have not pleaded that the Afghanistan Attacks were committed, planned, or authorized by a designated FTO. (D.E. # 169 ("MTN Reply") n.5.) Without deciding whether MTN's request is, in fact, procedurally proper, I decline to disturb my previous holding. As in the last round of briefing,

MTN argues that Plaintiffs' "joint cell" allegations, this time concerning the Kabul Attack Network, allegedly comprised of "operatives from al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba" (SAC ¶¶ 1438-39; see also id. ¶¶ 380-82), are insufficient. (MTN Mot. 6.) But as I noted in the September 2023 Order, I can credit allegations like those Plaintiffs have mounted here. See Freeman v. HSBC Holdings PLC, 413 F. Supp. 3d 67, 96-97 (E.D.N.Y. 2019), aff'd on other grounds, 57 F.4th 66 (2d Cir. 2023) ("[T]aken as a whole, [the allegations] describe Hezbollah as deeply involved in supporting and coordinating an extensive campaign of terrorist activity against American citizens in Iraq."); see also King v. Habib Bank Ltd., No. 20-cv-4322 (LGS), 2022 WL 4537849, at *6 (S.D.N.Y. Sept. 28, 2022) ("[I]t is well known that terrorist organizations . . . often operate by proxy.") (quoting Atchley, 22 F.4th at 216-17).)

Additionally, I credit at the pleading stage Plaintiffs' allegations that the Haqqani Network operates as the "most radical part of the Taliban," that the organizations share leadership, that the Haqqani Network "oversee[s] the Taliban's terrorist attacks," and that "[t]he Taliban has rejected claims that the Haqqani Network is separate from the Taliban." (SAC ¶¶ 362, 371-72); see also Cabrera v. Islamic Republic of Iran, No. 18-CV-2065 (JDB), 2022 WL 2817730, at *8 (D.D.C. July 19, 2022) (on default judgment, crediting evidence that "the Taliban specifically disclaimed the view that the two groups are distinct"). My ruling that Plaintiffs had met the FTO requirement with respect to the Afghanistan Attacks will, therefore, stand.

### B. Knowing and Substantial Assistance

MTN next claims that Plaintiffs fail to properly allege knowing and substantial assistance under the Supreme Court's decision in Twitter v. Taamneh. First, MTN argues that MTN Group's actions were not "voluntary" within the meaning of that decision. (MTN Mot. 8-10.) Next, MTN argues that MTN Group's actions are too attenuated from the Afghanistan Attacks because (i) it

was MTN Afghanistan that is alleged to have interfaced directly with the Taliban and (ii) the allegations are too remote in time from the 2019 Attacks.² (Id. 11-12.) I address each of these arguments in turn.

**1. Voluntariness**

MTN argues that it was a victim of an extortion campaign committed by the Taliban and that it would be absurd to hold the company liable as an aider and abettor for acquiescing to the Taliban's demands for protection payments and systematic cell tower shutdowns. (Id. 8.) Plaintiffs respond that MTN's self-serving version of events should not be credited at the pleading stage and that instead, the company acted in its own commercial interests in "ma[king] a choice to enter a bilateral bargain for economic advantage." (Pls. Opp'n 7.) Both because I am obligated to draw all reasonable inferences in Plaintiffs' favor at this stage and because the dispute between the parties presents precisely the type of factual question inappropriate for resolution on a motion to dismiss, I find MTN's argument unavailing.³

First, I find that Plaintiffs have at least plausibly alleged that MTN acted voluntarily within the meaning of JASTA. As Plaintiffs tell it, "[r]ather than invest in expensive security for its transmission masts, MTN purchased cheaper 'security' by buying it from the Taliban." (SAC ¶ 926.) MTN's decision was, according to Plaintiffs, the result of cold, commercial calculus: "MTN sources told the [Afghanistan Threat Finance Cell ("ATFC")] that it was cheaper to pay the Taliban than it would have been to rebuild the towers in the face of Taliban threats." (Id. ¶ 929.) As a result of MTN's cooperation with the Taliban—which Plaintiffs allege was more substantial

---

² MTN does not challenge Plaintiffs' allegations that the Attack Victims suffered injury from acts of international terrorism, or whether Plaintiffs have met the general awareness requirement with respect to their tower shutdown and protection payment theory.

³ I note that I agree with MTN that my ruling on personal jurisdiction does not control the outcome on whether Plaintiffs have sufficiently alleged knowing and substantial assistance, although I ultimately reach Plaintiffs' desired result. (MTN Reply 2-3.)

7

than that of its competitors—MTN's towers were attacked less frequently than other operators in the area. (Id. ¶¶ 933-34.) Plaintiffs allege that MTN similarly engaged in systematic cell tower shutdowns with its commercial interests in mind: "[t]he ATFC observed that the security threat MTN faced was not primarily to its employees; it was to equipment that MTN did not want to spend the money to protect or rebuild." (Id. ¶ 941.) This conduct is at least plausibly voluntary and, in the same vein, plausibly culpable under Taamneh. As Plaintiffs note, MTN will be free to present its contrary version of events—that MTN was extorted and forced to comply with the Taliban lest it risk its employees' lives and that the Afghan government acknowledged that telecoms companies like MTN had no choice but to engage in this course of behavior (see MTN Reply 1-2)—as this litigation progresses.

MTN is, of course, correct that the Supreme Court in Taamneh articulated that "[t]he phrase 'aids and abets' in § 2333(d)(2), as elsewhere, refers to a conscious, voluntary, and culpable participation in another's wrongdoing." 598 U.S. at 493. The Court's decision in that case, however, did not turn on the voluntariness of the defendants' alleged conduct. Nor did its articulation of what JASTA demands of plaintiffs disturb the well-settled principle that voluntariness is ordinarily a fact-bound question. As MTN points out, the Court in Taamneh analogized to criminal law principles in articulating the bounds of aiding-and-abetting liability under JASTA. Extending that logic, I decline to wade into the fact-intensive question of whether MTN acted voluntarily in making the protection payments and shutting down its cell towers at the Taliban's direction at this early stage in the litigation. Cf. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) ("[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). Indeed, considering whether the extent of the risk MTN faced even as

8

Plaintiffs articulate it—commercial obstacles resulting from the need to rebuild towers and resulting mobile network interruptions—constitutes sufficient coercion as to make MTN's conduct involuntary within the meaning of JASTA as interpreted by the Taamneh Court is a quintessentially fact-bound question of degree. I need not "ignore the Taliban's coercive power over cell carriers" (MTN Reply 3), which is indisputably relevant to the ultimate question of liability under JASTA, to postpone that inquiry beyond the motion-to-dismiss stage. Unlike in Taamneh, there is a live—indeed, potentially dispositive—factual dispute about the nature and contours of the relationship between the terrorist actors and the moving defendant here. (Id. (citing Taamneh, 598 U.S. at 504).)

### 2. Attenuation

MTN makes two arguments sounding in attenuation: first, that MTN Group should not be held liable for the protection payments or tower shutdowns because it is MTN Afghanistan that is alleged to have operationalized these policies on the ground; and second, that Plaintiffs' allegations predate the 2019 Afghanistan Attacks, such that MTN's conduct cannot be said to have contributed to the Attack Victims' injuries. (MTN Mot. 11-12.) Just as with the question of whether MTN's conduct was voluntary within the meaning of JASTA as interpreted by the Court in Taamneh, each of these arguments is unavailing at the pleading stage.

First, Plaintiffs have not attempted to collapse MTN Afghanistan and MTN Group into a single corporate entity. Instead, Plaintiffs have specifically alleged that MTN Afghanistan acted only with the express authorization of its parent, MTN Group and, in so doing, have differentiated between both entities' conduct. MTN argues that Plaintiffs have tried to "blur[] distinct corporate entities into a generic 'MTN,'" and that their allegations amount to nothing more than conclusory assertions that MTN Group approved of MTN Afghanistan's conduct. (Id. 12.) This is not a

compelling argument. MTN cites my September 2023 Order to argue that Plaintiffs have presented nothing more than a "list of conclusory allegations of intra-corporate affiliations" (id. (citing Order 29)), but here, Plaintiffs have alleged specific facts alleging MTN Group's role in the protection payments and tower shutdowns. According to the Second Amended Complaint, "[t]he senior MTN Afghanistan security official who oversaw many of MTN Afghanistan's protection payments to the Taliban reported directly to the head of MTN Group's head of business risk management"; "MTN Group compensated MTN Afghanistan's security team with cash bonuses reflecting its success at resolving 'security issues' involving the Taliban"; and MTN Afghanistan's security department was staffed in part with a "South African security component from MTN Group." (SAC ¶¶ 928, 935.) Even if MTN Afghanistan officials were ultimately responsible for the "direct discussions . . . [with] Taliban commanders," that does not render it implausible that MTN Group participated in the conduct alleged to an extent that would justify holding that indisputably separate corporate entity liable. Plaintiffs, therefore, have provided differentiated allegations about the roles that MTN Group and MTN Afghanistan played in this conduct that amount to more than conclusory allegations of a corporate parent exercising control over its subsidiary.

MTN's argument that MTN Group cannot be liable under Taamneh for authorizing and approving MTN Afghanistan's actions also fails. (MTN Mot. 12.) Taamneh does not stand for the proposition that a corporate parent cannot be held liable for actions directly undertaken by a subsidiary—only that a defendant's actions with respect to the terrorist act must be sufficiently culpable to justify aiding-and-abetting liability. 598 U.S. at 504. MTN Afghanistan acting as the alleged mediating entity between MTN Group and the Taliban does not as a matter of law justify insulating MTN Group from any potential liability at the pleading stage.

10

Next, drawing inferences in Plaintiffs' favor, I find that the time-bound nature of certain of their allegations does not so undermine Plaintiffs' theory of liability as to require dismissal. MTN argues that the SAC's allegations about extortion payments range from 2007 to 2016 and that the tower-shutdown theory is based on news sources from 2008 to 2011. (MTN Mot. 3, 11.) These specific allegations, then, predate the 2019 Afghanistan Attacks by 12 years at most and at least three years. MTN cites to the Second Circuit's decision in Siegel v. HSBC North America Holdings, Inc. to argue that such a temporal disconnect between a defendant's alleged conduct and the relevant terrorist attacks renders the notion that a defendant supported the attacks "impossible." (Id. 11 (citing Siegel v. HSBC N. Am. Holdings, Inc., 933 F.3d 217, 224 (2d Cir. 2019).) But as Plaintiffs point out, this case is inapposite. (Pls. Opp'n 11 n.6.) As alleged in the complaint in Siegel, the defendant severed ties with Saudi Arabia's largest bank ten months before the attacks at issue due to "terrorist financing concerns." 933 F.3d at 221 (citing Siegel complaint). Analyzing the general awareness requirement, the Second Circuit in Siegel held that it was "implausible under the circumstances" that the defendant had knowingly assumed a role in the attacks because the defendant ceased providing services to the bank due to its concerns about where the funds would flow. Id. at 224. Plaintiffs here, by contrast, have not alleged on the face of their complaint that MTN Group stopped providing financial and operational assistance to the Taliban because of concerns about the Taliban's involvement in terrorist activities. Plaintiffs allege that MTN "knew that its money was going to Taliban and Haqqani network terrorists and intended that result." (Pls. Opp'n 11 n.6.) Indeed, MTN does not mount an argument that Plaintiffs have not met the general awareness requirement with respect to their protection payment and tower shutdown theory of liability. The Siegel court's observations about the cessation of a business relationship due to

11

concerns about terrorist financing less than a year before the attacks at issue in that case does not control the result here.

Moreover, I decline to read the existence of certain more particularized allegations included in the Second Amended Complaint as foreclosing the plausible allegation that MTN's conduct continued through the time of the Afghanistan Attacks. MTN argues in reply that Plaintiffs' specific allegations that predate the Attacks are "not overridden by vague references to payments 'every year'" and that "a vague allegation that MTN's [tower shutdown] policy has remained consistent' . . . does not support a plausible inference that tower shutdowns continued into 2019." (MTN Reply 5.) However, this is not an instance wherein these general allegations are "contradicted by more specific allegations in the Complaint," (id. (citing DPWN Holdings (USA), Inc. v. United Air Lines, Inc., 747 F.3d 145, 151-52 (2d Cir. 2014)); rather, the factual support that Plaintiffs have been able to gather at this early stage skews earlier than 2019, and Plaintiffs assert that MTN's conduct continued through the relevant time period. Indeed, Plaintiffs argue that it is reasonable to infer that the protection payments have continued because the Taliban still holds power in Afghanistan and that MTN's tower-shutdown policy has remained consistent. (Pls. Opp'n 9-10.) I accept these plausible allegations as true for the purposes of MTN's motion; as with its other arguments, MTN, of course, can reassert any arguments about attenuation at a later stage in this litigation.[4]

Finally, I note that the six substantiality factors from Halberstam also weigh against dismissal of Plaintiffs' aiding-and-abetting claim with respect to MTN. As described in the September 2023 Order, the Taamneh Court clarified that the six factors are meant to "capture the

---

[4] Because I find Plaintiffs have plausibly alleged liability under JASTA premised on their protection payment and tower shutdown theory, I need not reach MTN's arguments about the relationship between the Irancell venture and the Afghanistan Attacks.

essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." 598 U.S. at 504. In brief, Plaintiffs allege that the tower shutdowns and protection payments were "important to the nature of the injury-causing act," Honickman v. BLOM Bank SAL, 6 F.4th 487, 500 (2d Cir. 2021), in that the shutdowns impeded Coalition efforts and the payments were substantial. (See Pls. Opp'n 9-10.) For similar reasons, the factor considering the "amount [and kind] of assistance given [to] the wrongdoer," Halberstam, 705 F.2d at 484, also mediates against dismissal at this stage. As to the factors assessing MTN's relationship to the terrorist actors and MTN's state of mind, I note that, as in the September 2023 Order, Plaintiffs have alleged more than an arms-length business relationship here. (Order 65.) Moreover, as noted above, MTN is free to mount arguments regarding alleged extortion and its implications for MTN's intentions in making the protection payments and initiating the tower shutdowns at a later stage in this litigation. I have addressed the issue of the duration of MTN's assistance in discussing MTN's arguments about temporal attenuation. In short, focusing on the essence of aiding-and-abetting liability, the Halberstam factors do not favor dismissal at this stage.

## CONCLUSION

For the foregoing reasons, MTN Group's motion to dismiss Count Four of the Second Amended Complaint is DENIED.[5]

SO ORDERED.

Dated: September 16, 2024
Brooklyn, New York

Carol Bagley Amon
United States District Judge

---

[5] I note that in MTN's Notice of Supplemental Authority submitted on July 1, 2024 and providing me with the Supreme Court's grant of certiorari, vacatur, and remand of the D.C. Circuit's decision in Atchley (D.E. # 176), the MTN Defendants assert that "the vacatur of Atchley and the United States' brief may also bear on the MTN Defendants' pending motion to dismiss the Second Amended Complaint." MTN's arguments in its letter to the Court, however, relate primarily to the issue of certifying an interlocutory appeal and, as Plaintiffs point out in their response (D.E. # 177), I am relying on Taamneh in rendering this decision, as I did in the September 2023 Order.

14