IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ X
STEPHANIE ZOBAY, et al.,                               :
                                                       :      CASE NO. 1:21-cv-3503-CBA-VMS
                  Plaintiffs,                           :
                                                       :
            vs.                                         :
                                                       :
MTN GROUP LIMITED, et al.,                             :
                                                       :
                  Defendants.                           :
                                                       :
------------------------------------------------------ X
------------------------------------------------------ X
DAVID LAU, et al.,                                     :
                                                       :      CASE NO. 1:22-cv-1855-CBA-VMS
                  Plaintiffs,                           :
                                                       :
            vs.                                         :
                                                       :
ZTE CORPORATION, et al.,                               :
                                                       :
                  Defendants.                           :
                                                       :
------------------------------------------------------ X
------------------------------------------------------ X
SHEILA LONG, et al.,                                   :
                                                       :      CASE NO. 1:23-cv-5705-CBA-VMS
                  Plaintiffs,                           :
                                                       :
            vs.                                         :
                                                       :
MTN GROUP LIMITED, et al.,                             :
                                                       :
                  Defendants.                           :
                                                       :
------------------------------------------------------ X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ZTE CORPORATION'S MOTION TO DISMISS THE OPERATIVE COMPLAINTS

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND ......................................................................................................2

    A.    ZTE Corporation ............................................................................................ 4

    B.    ZTEC's Transactions in Iran ........................................................................ 4

    C.    TCI and Its Ownership .................................................................................. 5

    D.    Iran, including the IRGC, and the Telecommunications Industry ......................... 7

    E.    "ZTE's" Transactions in Afghanistan ......................................................... 9

    F.    Plaintiffs' Claims & Theories of Liability ................................................... 9

        1.    The *Zobay* Action ........................................................................... 9

        2.    The *Lau* Action ..............................................................................10

        3.    The *Long* Action ............................................................................11

        4.    Plaintiffs' Theories of Aiding-and-Abetting Liability ..............................11

    G.    Alternative Service on ZTEC ...................................................................... 12

LEGAL STANDARD ................................................................................................................12

    A.    Standard of Review Under Rule 12(b)(5) for Lack of Proper Service of Process ....................................................................................................... 12

    B.    Standard of Review Under Rule 12(b)(2) for Lack of Personal Jurisdiction ....... 12

    C.    Standard of Review under Rule 12(b)(6) for Failure to State a Claim ................. 13

ARGUMENT .............................................................................................................................14

I.    This Court Lacks Personal Jurisdiction over ZTEC ........................................................14

    A.    Plaintiffs Have Not Demonstrated that Personal Jurisdiction Is Authorized by New York's Long-Arm Statute ........................................................................ 16

    B.    Personal Jurisdiction over ZTEC Does Not Satisfy Fourteenth Amendment Due Process Requirements .......................................................................... 18

    C.    Plaintiffs Cannot Rely on Rule 4(k)(1)(C) or Rule 4(k)(2) as a Basis for Jurisdiction .............................................................................................. 20

D.    Even if a Nationwide Contacts Test Could Be Invoked, Personal Jurisdiction over ZTEC Does Not Satisfy Fifth Amendment Due Process Requirements ............................................................... 22

II.   Pursuant to Rule 12(b)(6), the Operative Complaints Should Be Dismissed Because They Fail to State a JASTA Aiding-and-Abetting Claim Against ZTEC ..........25

A.    Plaintiffs' Allegations Against ZTEC Are Improperly Group Pled, Alleged Upon Information and Belief, and Lack a Sufficient Factual Basis .................... 25

B.    Plaintiffs Do Not Plausibly Allege That ZTEC Was "Generally Aware" That It Was Assuming a Role in Terrorist Activities ........................................... 29

1.    Plaintiffs Fail to Plausibly Allege that TCI Had a Known Connection to Terrorism or Was Publicly Deemed a Terrorist Front ...........................................................................................30

2.    Plaintiffs Fail to Allege that TCI Was "So Intertwined" with Any Terrorist Group's Violent Activities ...........................................34

3.    Plaintiffs Cannot Satisfy General Awareness by Alleging Sanctions-Evading Conduct with Iran ......................................35

C.    Plaintiffs Do Not Plausibly Allege that ZTEC Provided Knowing Substantial Assistance to the Terrorist Attacks that Injured Plaintiffs ................ 36

1.    Plaintiffs Fail to Adequately Plead that ZTEC Consciously and Culpably Participated in Terrorist Attacks ................................37

2.    Plaintiffs Fail to Plead a Sufficient Nexus Between ZTEC's Assistance to TCI and the Terrorist Attacks in Iraq, Afghanistan and Syria ....................................................................40

3.    Application of the Halberstam Factors Also Support Dismissal ..............42

D.    Plaintiffs Fail to Plead that Each Attack Was "Committed, Planned, or Authorized" by a Designated FTO ........................................................ 47

E.    The Operative Complaints Should Be Dismissed Because Plaintiffs' Claims Are Barred by the Act of War Defense .................................................... 49

F.    Individual Plaintiffs Fail to State a Claim Under the ATA ................................. 50

CONCLUSION ................................................................................................51

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akins v. Islamic Republic of Iran*,
 332 F. Supp. 3d 1 (D.D.C. 2018) ............................................................................7

*Allah v. City of New York*,
 No. 15-CV-6852 (CBA), 2019 WL 6875410 (E.D.N.Y. Dec. 17, 2019) ...............13

*Arista Recs., LLC v. Doe 3*,
 604 F.3d 110 (2d Cir. 2010).................................................................................26

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)...............................................................................................13

*Atuahene v. City of Hartford*,
 10 F. App'x 33 (2d Cir. 2001) ...............................................................................25

*Averbach v. Cairo Amman Bank*,
 No. 1:19-cv-00004-GHW, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)...............50

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
 902 F.2d 194 (2d Cir. 1990), *cert. denied*, 498 U.S. 854 (1990)......................12, 13

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
 No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ................45

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)...............................................................................................13

*Ben-Rafael v. Islamic Republic of Iran*,
 718 F. Supp. 2d 25 (D.D.C. 2010) .........................................................................7

*Bernhardt v. Islamic Republic of Iran*,
 47 F.4th 856 (D.C. Cir. 2022).......................................................................... *passim*

*Brodie v. Green Spot Foods, LLC*,
 503 F. Supp. 3d 1 (S.D.N.Y. 2020)....................................................................17, 26

*Buon v. Spindler*,
 65 F.4th 64 (2d Cir. 2023) ....................................................................................12

*Cabrera v. Islamic Republic of Iran*,
 No. 19-3835, D.E. 73 (D.D.C. July 19, 2022) ......................................................49

*Calcano v. Swarovski N. Am. Ltd.*,
  36 F.4th 68 (2d Cir. 2022) ................................................................25, 26

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
  230 F.3d 934 (7th Cir. 2000) ....................................................................21

*Chufen Chen v. Dunkin Brands, Inc.*,
  954 F.3d 492 (2d Cir. 2020)......................................................................16

*Convergen Energy LLC v. Brooks*, No. 20-CV-3746 (LJL), 2020 WL 4038353
  (S.D.N.Y. July 17, 2020) ..........................................................................14

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010).......................................................................5

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013).........................................................................12

*Estate of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) ...........................................................7

*Fischer v. Fed. Express Corp.*,
  42 F.4th 366 (3d Cir. 2022) ......................................................................18

*Force v. Qatar Charity*,
  No. 20-cv-2578 (BMC), 2025 WL 43163 (E.D.N.Y. Jan. 7, 2025) .......................24

*Freeman v. HSBC Holdings PLC*,
  465 F. Supp. 3d 220 (E.D.N.Y. 2020) ..............................................34, 35, 38, 45

*General Cigar Holdings, Inc. v. Altadis, S.A.*,
  205 F.Supp.2d 1335 (S.D. Fla. 2002) ........................................................20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011).......................................................................18, 19, 22

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .........................................................29, 37, 42, 46

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)........................................................................13

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ............................................................... *passim*

*In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455 (S.D.N.Y. 2022), *aff'd sub nom. Watson Lab'ys, Inc.*, 101 F.4th 223 (2d Cir. 2024).......................................26

*In re Terrorist Attacks on Sept. 11, 2001*,
  No. 02-CV-06977, 2023 WL 2711126 (S.D.N.Y. Mar. 30, 2023), *motion to
  certify appeal denied*, No. 02-CV-06977, 2023 WL 4281454 (S.D.N.Y. June
  29, 2023) .......................................................................................................................23, 50

*Jazini v. Nissan Motor Co.*,
  148 F.3d 181 (2d Cir. 1998)...................................................................................................13

*Kaplan v. Lebanese Canadian Bank*,
  999 F.3d 842 (2d Cir. 2021)...................................................................................30, 33, 45

*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) ...............................................................................................8, 35

*Keren Kayemeth LeIsrael - Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*,
  66 F.4th 1007 (D.C. Cir. 2023), *cert. denied sub nom. LeIsrael v. Educ. for a Just
  Peace in the Middle E.*, 144 S. Ct. 713 (2024) ..............................................................41, 47

*Khan v. Khan*,
  360 F. App'x 202 (2d Cir. 2010) ...........................................................................................12

*King v. Habib Bank Ltd.*,
  No. 20 Civ. 4322 (LGS), 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022).........................44, 45

*Koken v. Pension Benefit Guar. Corp.*,
  430 F. Supp. 2d 493 (E.D. Pa. 2006) ...................................................................................20

*L-7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011)...................................................................................................13

*Lau v. ZTE Corp.*,
  2023 WL 9066883 (E.D.N.Y. Sept. 28, 2023) ............................................................. *passim*

*Lau v. ZTE Corp.*,
  No. 22-cv-1855 (E.D.N.Y.) .......................................................................................... *passim*

*Lelchook v. Lebanese Canadian Bank*,
  No. 18-civ-12401 (GBD), 2024 WL 967078 (S.D.N.Y. Mar. 6, 2024)..................................50

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  673 F.3d 50 (2d Cir. 2012).................................................................................................15, 18

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013)...................................................................................................16

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)..............................................................................................29, 37

*Long v. MTN Group Ltd.*,
   No. 23-cv-5705 (E.D.N.Y.) ................................................................... *passim*

*Mastafa v. Chevron Corp.*,
   770 F.3d 170 (2d Cir. 2014)......................................................................13

*Mhina v. Bank of Am., N.A., Corp.*,
   No. 23-96-CV, 2023 WL 6873045 (2d Cir. Oct. 18, 2023)............................14, 21

*O'Sullivan v. Deutsche Bank AG*,
   No. 17 CV 8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .................35, 38

*Pado, Inc. v. SG Trademark Holding Co. LLC*,
   537 F. Supp. 3d 414 (E.D.N.Y. 2021) ................................................................26

*Peay v. BellSouth Medical Assistance Plan*,
   205 F.3d 1206 (10th Cir. 2000) ................................................................24

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*,
   712 F.3d 705 (2d Cir. 2013)......................................................................3, 13

*Republic of Panama v. BCCI Holdings (Luxembourg)*,
   119 F.3d 935 (11th Cir. 1997) ................................................................24

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)......................................................................8

*S.E.C. v. Softpoint, Inc.*,
   No. 95 CIV. 2951 GEL, 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001).....................24

*Salazar v. Islamic Republic of Iran*,
   370 F. Supp. 2d 105 (D.D.C. 2005) ................................................................7

*Santos v. State Farm*,
   902 F.2d 1092 (2d Cir. 1990)......................................................................21

*Schrier v. Qatar Islamic Bank*,
   632 F. Supp. 3d 1335 (S.D. Fla. 2022) ................................................................20

*Siegel v. HSBC North America Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019)................................................................ *passim*

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023)................................................................ *passim*

*United States ex rel. Foreman v. AECOM*,
   19 F.4th 85 (2d Cir. 2021) ................................................................5

*Walden v. Fiore*,
  571 U.S. 277 (2014)...........................................................................................19, 20

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)...................................................................14, 18, 19, 20

*Waters v. Day & Zimmermann NPS, Inc.*,
  23 F.4th 84 (1st Cir. 2022)..........................................................................................15

*Wildman v. Deutsche Bank Aktiengesellschaft*,
  No. 21-CV-04400 (HG), 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022)...................... *passim*

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980).....................................................................................................20, 24

*Zobay v. MTN Group Ltd.*,
  695 F. Supp. 3d 301 (E.D.N.Y. 2023) ........................................................................ *passim*

*Zobay v. MTN Group Ltd.*,
  No. 21-cv-3503 (E.D.N.Y.) ........................................................................................ *passim*

**Statutes**

18 U.S.C. § 2333 .................................................................................................................37

18 U.S.C. § 2333(d)(2) ..................................................................................................25, 47

18 U.S.C. § 2334(a) ...........................................................................................................20

18 U.S.C. § 2336(a) ...........................................................................................................49

N.Y. C.P.L.R. § 302(a)(1) ...................................................................................................16

N.Y. C.P.L.R. § 308 ...........................................................................................................15

N.Y. C.P.L.R. § 311 ...........................................................................................................15

**Other Authorities**

15 C.F.R. Pt. 774, Supp. 1 ..................................................................................................18

Fed. R. Civ. P. 4(k)(1)(A)....................................................................................15, 18, 21, 22

Fed. R. Civ. P. 4(k)(1)(C)....................................................................................20, 21, 22

Fed. R. Civ. P. 4(k)(2)..........................................................................................20, 21, 22

## INTRODUCTION

ZTE Corporation ("ZTEC") has the utmost respect for the U.S. service members and civilians and the sacrifices that they made on behalf of the U.S. and the people of Iraq, Afghanistan and Syria. But ZTEC strongly denies any alleged role in causing Plaintiffs' injuries, and this lawsuit is not the proper way to seek redress for those injuries. Plaintiffs' allegations against ZTEC stretch the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, too far and ignore the careful limitations placed on liability by Congress.

As an initial matter, Plaintiffs' suit against ZTEC should be dismissed because personal jurisdiction is lacking. Plaintiffs cannot meet the relevant statutory requirements for personal jurisdiction, and also fail to allege that ZTEC has sufficient minimum contacts with the forum to meet the necessary due process requirements for this Court to exercise personal jurisdiction over ZTEC in this case.

In addition, the operative complaints should be dismissed for failure to state a claim. Plaintiffs implausibly allege an attenuated and disjointed series of intervening acts and actors in a farfetched attempt to link ZTEC to terrorist attacks that occurred in Iraq, Afghanistan and Syria. Plaintiffs allege that ZTEC transacted with the largest telecommunications provider in Iran, Telecommunications Company of Iran ("TCI"). Plaintiffs concede that those commercial transactions were for the purpose of updating the country's telecommunications infrastructure for the people of Iran. Yet Plaintiffs contend that ZTEC is responsible for terrorist acts abroad because TCI was allegedly controlled by the Iranian government, including the Iranian Revolutionary Guard Corps ("IRGC"), which provided assistance, through its sub-department Qods Force and through Hezbollah, a Lebanese terrorist organization, to dozens of terrorist 'syndicates' and 'proxies' responsible for Plaintiffs' injuries in Iraq, Afghanistan and Syria. Indeed, Plaintiffs seek to hold ZTEC liable for terrorist attacks allegedly committed, planned and authorized by at least

nine different global terrorist groups across multiple countries and Plaintiffs' sweeping theory of liability would impart liability on ZTEC for many more.

Plaintiffs' aiding-and-abetting claim suffers from at least five defects. First, many key allegations against ZTEC are improperly group-pled, improperly pled on information and belief, and unsupported by sufficient factual allegations. Without plausible allegations distinct to ZTEC, Plaintiffs' claims fail.

Second, Plaintiffs do not plausibly allege that ZTEC was "generally aware" that it was playing a role in illegal activity from which the attacks that caused Plaintiffs' injuries were foreseeable.

Third, Plaintiffs do not plausibly allege that ZTEC "consciously or culpably" participated in the terrorist attacks at issue or that the improvement of telecommunications infrastructure in Iran had a sufficient nexus to those attacks in Iraq, Afghanistan and Syria.

Fourth, Plaintiffs fail to allege that a designated Foreign Terrorist Organization ("FTO") "committed, planned or authorized" each of the attacks at issue, as required by Section 2333(d) of the ATA.

Lastly, the operative complaints should be dismissed because Plaintiffs' claims are barred by the act of war defense.

## **FACTUAL BACKGROUND**

Plaintiffs assert claims against ZTEC under aiding-and-abetting and conspiracy theories of liability under the Anti-Terrorism Act, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA") in three related cases: *Zobay v. MTN Group Ltd.*, No. 21-cv-3503 (E.D.N.Y.)

("*Zobay*"); *Lau. v. ZTE Corp.*, No. 22-cv-1855 (E.D.N.Y.) ("*Lau*"); and *Long v. MTN Group Ltd.*, No. 23-cv-5705 (E.D.N.Y.) ("*Long*") (collectively, the "Actions").[1]

On September 28, 2023, the Court issued an Opinion and Order in the *Zobay* and *Lau* Actions and dismissed the claims in both actions against ZTEC's U.S.-based subsidiaries—ZTE (USA), Inc. ("ZTE USA") and ZTE (TX), Inc. ("ZTE TX") for lack of personal jurisdiction. *Zobay v. MTN Group Ltd.*, 695 F. Supp. 3d 301 (E.D.N.Y. 2023); *Lau v. ZTE Corp.*, No. 22-cv-1855, 2023 WL 9066883 (E.D.N.Y. Sept. 28, 2023) (collectively, the "MTD Opinions"). Following the MTD Opinions, the parties stipulated to the dismissal of Plaintiffs' conspiracy and RICO predicate claims against ZTEC in the Actions. *Zobay*, ECF 210; *Lau*, ECF 102; *Long*, ECF 79.

Thus, the only theory remaining in each of the three Actions is Aiding and Abetting Liability (Attack Predicate). In *Zobay*, Plaintiffs were permitted to amend their complaint to add an additional count of Aiding and Abetting Liability (Attack Predicate) relating to the Afghanistan attacks, which had not been incorporated into Count I.

For purposes of this Motion, ZTEC treats as true only the factual allegations that are well-pleaded, non-conclusory, and not contradicted by matters subject to judicial notice, and disregard other bare allegations, unsupported inferences and mere legal conclusions. *See, e.g.*, *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 717 (2d Cir. 2013).

---

[1] *See Zobay*, ECF 142, Plaintiffs' Second Amended Complaint (hereinafter "*Zobay* SAC"); *Lau*, ECF 41, Plaintiffs' Corrected First Amended Complaint (hereinafter "*Lau* AC"); *Long*, ECF 1, Plaintiffs' Complaint (hereinafter "*Long* Compl."). ZTEC refers to the *Zobay* SAC, *Lau* AC and *Long* Compl. together as the "Operative Complaints." The Operative Complaints repeat the same allegations against ZTEC. To avoid unnecessary repetition, ZTEC will generally cite to one Operative Complaint and will correlate the materially identical paragraphs among all Operative Complaints in Exhibit A to the Declaration of Serena S. Gopal in support of ZTEC's Motion to Dismiss the Operative Complaints ("Gopal Decl.").

A.      **ZTE Corporation**

ZTEC is a global telecommunications company with a principal place of business in China. *Zobay* SAC ¶ 65. ZTEC was founded in 1985 and serves customers in more than 160 countries around the world.[2] Plaintiffs' allegations are generally directed toward "ZTE"[3]—defined by Plaintiffs as "ZTE Corporation, together with its subsidiaries." *Zobay* SAC ¶ 65.[4]

B.      **ZTEC's Transactions in Iran**

Plaintiffs allege that "ZTE. . . contract[ed] with TCI [Telecommunications Company of Iran] to modernize the IRGC-controlled Iranian cellular and landline communications systems[.]" *See, e.g.*, *Zobay* SAC ¶ 1478. According to Plaintiffs, from 2010 to 2016, "ZTE" "bid on and secured contracts worth hundreds of millions of dollars to install cellular and landline network infrastructure in Iran." *Id.* ¶ 1006. "ZTE's" contracts were for the "purpose of enhancing Iran's telecommunications infrastructure[.]" *Id.* ¶ 1016(vii); *see also id.* ¶ 1095 ("The United States Commerce Department has said that ZTE sold prohibited American electronics to Iran to help Iran build its telecom networks.").

In or around March 2012, the United States Office of Foreign Assets Control ("OFAC") as well as other government agencies began investigating ZTEC's business with Iranian companies.

---

[2] *See* https://www.zte.com.cn/global/about/corporate_information.html#companyInfo.html.

[3] *See, e.g.*, *Zobay* SAC ¶¶ 56, 1009–15, 1017, 1019, 1022, 1024, 1026, 1027, 1031, 1033–37, 1042, 1044, 1049–55, 1057, 1059, 1060, 1062–67, 1070–77, 1081–86, 1089, 1093, 1095–98.

[4] While Plaintiffs' definition suggests that any reference to "ZTE" includes every subsidiary, confusingly, Plaintiffs also sometimes separate "ZTE" from ZTEC's U.S subsidiaries—ZTE USA and ZTE TX. *See, e.g.*, *Zobay* SAC ¶ 77 (describing "ZTE . . . working with and through, ZTE USA and ZTE TX").

4

*See id.* ¶ 1087; Gopal Decl. Ex. B, Factual Resume ¶¶ 43, 57.[5] This investigation concluded when ZTEC pleaded guilty to charges related to violations of trade sanctions on March 7, 2017. *See Zobay* SAC ¶ 1007; Gopal Decl. Ex. C, Guilty Plea Agreement. As part of the case, ZTEC executed a settlement agreement with OFAC. *See Zobay* SAC ¶ 1016; *see also* Gopal Decl. Ex. D, OFAC Settlement Agreement. Plaintiffs' allegations in the Actions are largely copied from the Factual Resume, Guilty Plea Agreement and OFAC Settlement Agreement. *See, e.g.*, *Zobay* SAC ¶ 1002, 1005, 1007–16, 1025, 1026, 1033–35. The investigation did not link ZTEC to any terrorist activity or entity. *See id*; *see also* Gopal Decl. Exs. B–D. Additionally, none of Plaintiffs' source materials cited in the Operative Complaints link ZTEC to any terrorist activity.

## C. TCI and Its Ownership

Plaintiffs allege that TCI has maintained a monopoly over the telecommunications industry in Iran, which includes a monopoly over internet access, mobile phone services, landline telephone services, wireless services and data services. *See Lau*, ECF 57-2, Ex. D[6] at 17; *Zobay* SAC ¶¶ 654, 691. While Plaintiffs allege that the U.S. Treasury Department has designated certain Iranian entities as providing support for terrorist organizations (*e.g. Zobay* SAC ¶¶ 221–24), Plaintiffs do not (and cannot) allege that the U.S. Treasury Department has ever so designated TCI.

---

[5] A copy of the March 7, 2017 Factual Resume, Guilty Plea Agreement and OFAC Settlement Agreement of ZTEC are attached as Exhibits B–D to the Gopal Decl. The Court may consider these Exhibits because "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

[6] In *Zobay* SAC ¶ 154 n.7, *Lau* AC ¶ 78 n.7 and *Long* Compl. ¶ 84 n.7, Plaintiffs cite to: Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Defence Strategic Communications: The Official Journal of the NATO Strategic Communications Centre of Excellence, at 97 (Autumn 2020). A copy of this source material was filed with the Court at *Lau*, ECF 57-2, Exhibit D.

According to the Iranian Ministry of Technology website, "[m]ore than 80% of needed equipment[] of the communication network in [Iran] [has] been manufactured by [TCI]."[7] As Plaintiffs' source materials recognize, TCI is publicly traded on the Tehran Stock Exchange and is the largest telecommunications company in Iran. *See Lau*, ECF 57-2, Ex. D at 103; *see also id.* ("Essentially, any mobile or fixed-line phone user in Iran was interacting with TCI infrastructure."). Through TCI's subsidiaries, it holds a "monopoly over internet connectivity, with all internet traffic being directed through . . . TCI infrastructure." *Id.*

Notwithstanding that TCI provides telecommunications services to the vast majority of Iranian citizens, Plaintiffs allege that TCI is a terroristic "front" company for Iran and its Iranian Revolutionary Guard Corps ("IRGC") because "TCI is owned by the Iranian government and a private consortium with reported ties to IRGC." *Zobay* SAC ¶ 1090. But Plaintiffs' cited news reports demonstrate that the news media reported inconsistently on any affiliation between TCI and the IRGC. For example, Plaintiffs cite to a 2009 report speculating that it was "possible" that the IRGC was involved in an acquisition of TCI, but described reports of a link between TCI and IRGC as "spurious," noting "[a]ny such connection is not immediately apparent from the information publicly available[.]"). *See* Economist Intelligence Unit, *Iran Telecoms: Dial I for IRGC?*, Telecoms and Technology Forecast (Oct. 12, 2009), 2009 WLNR 20135393 (cited at *Zobay* SAC ¶ 690). A different 2015 report described merely an IRGC affiliation with two companies that owned, in part, a 50% stakeholder in TCI. *See Zobay* SAC ¶ 691.

Plaintiffs' own sources acknowledge that "TCI was never sanctioned by the U.S. or E.U., either for its IRGC ownership or potential role in human rights violations [with respect to

---

[7] *See* https://www.ict.gov.ir/en/introduction/affileted/telecommunication.

monitoring citizens domestically]." *See Lau*, ECF 57-2, Ex. E, at 13.[8] This source also explains the significance of a lack of a designation: "the global business community looks to the U.S. Treasury for guidance" and "Treasury has acknowledged this role," stating that the designations "help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities." *Id*. at 20. Conversely, "the international business community will presume that Iranian companies not listed are legitimate business partners." *Id*. This logical conclusion is also the one plausibly supported by Plaintiffs' own factual allegations. *See, e.g.*, *Zobay* SAC ¶ 1016(vii) (ZTE's contract with TCI was for the purpose of enhancing "Iran's telecommunications facilities and infrastructure"); *see also id.* ¶ 1095 ("The United States Commerce Department has said that ZTE sold prohibited American electronics to Iran to help Iran build its telecom networks."); Gopal Decl. Ex. B ¶ 21 (stating that ZTE Corp. sold goods to Iranian companies "to expand the existing telecommunication networks in Iran").

### D.    Iran, including the IRGC, and the Telecommunications Industry

According to Plaintiffs' source materials, the IRGC is part of the Iranian government. *See, e.g.*, *Lau*, ECF 57-2, Ex. D at 88 ("The IRGC is an organ of the Iranian state"); *see also Zobay* SAC ¶ 153 (the Iranian Supreme Leader is the "effective leader of the IRGC").[9] Plaintiffs also

---

[8] In *Zobay* SAC ¶ 686 n.325, *Lau* AC ¶ 360 n.89 and *Long* Compl. ¶ 524 n.179, Plaintiffs cite to the report of the congressional testimony provided by Dr. Ottolenghi from the Foundation for Defense of Democracies Center on Sanctions and Illicit Finance, before the House Committee on Foreign Affairs, Middle East and North Africa Subcommittee on September 17, 2015. A copy of this source material was filed with the Court at *Lau*, ECF 57-2, Exhibit E.

[9] Indeed, courts have allowed plaintiffs to sue Iran and the IRGC under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act because the IRGC is a division of the government of Iran. *See Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 32 (D.D.C. 2010) (noting that "all of the cases that have actually discussed the issue have found the IRGC to be part of the Iranian government"); *see also, e.g.*, *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255 (D.D.C. 2006); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005).

allege that the Qods Force division of the IRGC is "Iran's primary mechanism for cultivating and supporting terrorists abroad." *Id.* ¶ 159.

Plaintiffs deem the "Regular" IRGC, Qods Force and Hezbollah as "constituent parts of the IRGC." *See Zobay* SAC ¶ 86. Contrary to Plaintiffs' label, Hezbollah is an organization entirely separate from the IRGC, as the U.S. Government has designated the IRGC, Qods Force and Hezbollah separately and at different times. *See id.* ¶ 180 (Hezbollah designated as an FTO in 1997); ¶ 186 (Qods Force designated as an SDGT in 2007); ¶ 895 (IRGC designated as FTO in 2019).

Contrary to Plaintiffs' assertions that the IRGC's motive in enhancing Iranian telecommunications infrastructure was to further international terrorism, Plaintiffs' own source material indicates that the communications infrastructure in Iran "remained the domain of the state" and was used by the government and the IRGC primarily for domestic political purposes. *See Lau*, ECF 57-2, Ex. D at 104, 106–112. Plaintiffs' own sources corroborate the IRGC's "profit-driven motive" to further Iran's economic activities. *Id.* at 111. For example, the IRGC was tasked with "rebuilding [Iran's] infrastructure that had been damaged during the war" and was specifically provided with "a cut of oil income as seed money to invest in various strategic sectors of the economy" to strengthen Iran's economy. *See Lau*, ECF 57-2, Ex. D at 102 (discussing Iran's activity in the oil and gas industry to "satisfy the domestic needs of the country" and the growth of Iran's communications economy increasing participation of the Iranian population as internet users and mobile phone users); *see also, e.g.*, *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) ("[T]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund."); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393 (7th Cir. 2018) (same).

### E.    "ZTE's" Transactions in Afghanistan

Plaintiffs allege that "ZTE" conducted business "in post-invasion Afghanistan by servicing a broad array of customers there," but carefully decline to specify which ZTE entity conducted such alleged business. *See Lau* AC ¶¶ 559, 561. Plaintiffs claim that "ZTE" "sold products to Afghan telecommunications operators" (*id.* ¶ 561), operated as a "contractor" in some unspecified ventures (*id.* ¶ 569), "operated infrastructure project sites, ***and/or*** sold communications technology products to customers" (*id.* ¶ 570 (emphasis added)), and also drove the trucks that transported those products throughout Afghanistan (*id.* ¶¶ 564, 570).[10] But these allegations about "ZTE['s]" business in Afghanistan are simply unsupported by any actual facts.

### F.    Plaintiffs' Claims & Theories of Liability

In the Actions, Plaintiffs assert claims arising from disparate terrorist attacks committed by various different terrorist groups across twenty-two provinces in Iraq, Afghanistan and Syria, varying temporally, by location and by mode of attack.

#### 1.    The *Zobay* Action

The *Zobay* Plaintiffs assert claims stemming from ten alleged attacks that occurred between June 2011 and 2017 across four provinces in Iraq. *See Zobay* SAC ¶¶ 1287–1470. Plaintiffs also assert claims arising from two alleged attacks that occurred in 2019 in two provinces in Afghanistan. *Id.* ¶¶ 1438–1452. The twelve attacks are alleged to have deployed seven different modes of attack. *Id.* ¶¶ 1287–1470, 1438–1452 (EFP, rocket, explosive, IED, suicide bombing, insider small arms fire, kidnapping).

---

[10] *See also Long* Compl. ¶¶ 750–754, 759, 761. These conclusory allegations are absent in the *Zobay* SAC.

In Iraq, Plaintiffs allege that Jaysh al-Madhi ("JAM"), neither an FTO nor SDGT, served as the "triggerman" or "kidnapper" for the first nine attacks,[11] while acting in a "Joint Cell" with Hezbollah and Qods Force. *Id.* ¶¶ 1287–1396. Plaintiffs fail to allege the identity of the perpetrator of the tenth attack with any factual support. Rather, Plaintiffs allege "upon information and belief" that the tenth attack was allegedly committed by either al-Qaeda and Ansar al-Islam, or ISIS. *See id.* ¶ 1428 n.542. As to the eleventh attack, Plaintiffs allege that Syndicate members Haqqani Network, al-Qaeda and Lashkar-e-Taiba collaborated to commit the suicide bomb attack injuring Plaintiffs. *See id.* ¶ 1439. Lastly, Plaintiffs allege that the twelfth attack was allegedly committed by the Taliban. *Id.* ¶¶ 1450–51.

### 2.    The *Lau* Action

The *Lau* Plaintiffs assert claims stemming from sixty-four attacks that occurred across seventeen provinces in Afghanistan between April 2012 and July 2017. *Lau* AC ¶¶ 1089–1473. The sixty-four attacks allegedly deployed eleven different modes of attack. *Id.* (IED, suicide bombing, insider, complex, indirect fire, RPG, rocket, helicopter, small arms fire, recoilless rifle and kidnapping). According to Plaintiffs, the following groups committed the sixty-four attacks: a joint cell of al-Qaeda + Taliban + Haqqani Network + Lashkar-e-Taiba,[12] the Taliban,[13] the

---

[11] ZTEC references each of the twelve attacks chronologically, which is also the order in which they appear in the *Zobay* SAC.

[12] *See Lau* AC ¶¶ 1099, 1104, 1112, 1121, 1126, 1191, 1196, 1201, 1211, 1220, 1242, 1251, 1264, 1269, 1279, 1294, 1329, 1344, 1347, 1371, 1380, 1394, 1412, 1422, 1427, 1460.

[13] *See id.* ¶¶ 1131, 1139, 1144, 1149, 1153, 1157, 1176, 1206, 1225, 1239, 1256, 1261, 1274, 1284, 1299, 1320, 1334, 1339, 1385, 1403, 1408, 1440, 1450, 1469.

Haqqani Network,[14] a joint cell of al-Qaeda + Taliban,[15] and a joint cell of al-Qaeda + Taliban + Haqqani Network.[16]

### 3.    The *Long* Action

In *Long*, Plaintiffs assert claims stemming from three small arms fire attacks that occurred in three provinces in Afghanistan between August 2013 and June 2014, and one kidnapping attack that occurred in Syria in December 2012. *Long* Compl. ¶¶ 1260, 1266, 1272, 1280. The four attacks were allegedly committed respectively by the Haqqani Network, the Taliban, a joint cell consisting of al-Qaeda and the Taliban, and the al-Nusra Front. *Id.* Plaintiffs allege that the Afghanistan attacks were planned and authorized by al-Qaeda, and the Syria attack was planned and authorized by al-Qaeda-in-Iraq ("AQI"). *Id.*

### 4.    Plaintiffs' Theories of Aiding-and-Abetting Liability

Plaintiffs' primary theory of aiding-and-abetting liability is that ZTEC is liable for the injuries of hundreds of Plaintiffs caused by terrorist groups in Iraq, Afghanistan and Syria because it contracted with TCI to improve Iranian infrastructure, which in turn provided a "vast network of logistical and operational support" to Iran, which includes the "Regular" IRGC, and thus through Iran's alleged foreign terror agents (the Qods Force and Hezbollah), this "vast network of logistical and operational support" in *Iran* "flowed through" to JAM, al-Qaeda, the Taliban, the Haqqani Network, Ansar al-Islam, ISIS, Lashkar-e-Taiba, AQI, and al-Nusra Front, who all allegedly committed, planned and/or authorized each attack in Iraq, Afghanistan and Syria that

---

[14] *See id.* ¶¶ 1162, 1171, 1181, 1186, 1234, 1289.

[15] *See id.* ¶¶ 1089, 1134.

[16] *See id.* ¶¶ 1352, 1361, 1366, 1417, 1445, 1455.

injured Plaintiffs. *See, e.g.*, *Lau* AC ¶¶ 1082–87; *Zobay* SAC ¶¶ 1232, 1233, 1275, 1427, 1435; *Long* Compl. ¶ 1087.

Plaintiffs also include conclusory allegations that "ZTE" or "Defendants" made protection payments to terrorists, and provided free goods, monetary funding and logistical aid to terrorists. *See e.g.*, *Lau* AC ¶¶ 559, 570, 574; *Zobay* SAC ¶¶ 16, 21, 1020 1519.

### G.    Alternative Service on ZTEC

Plaintiffs attempted to serve ZTEC through China's Central Authority in accordance with the Hague Service Convention in *Zobay* and *Lau* but were unsuccessful. On December 6, 2023, Plaintiffs in all three cases moved for alternative service seeking to serve ZTEC through their U.S. counsel. *Zobay*, ECF 156; *Lau*, ECF 76; *Long*, ECF 22. On September 30, 2024, Magistrate Judge Scanlon granted Plaintiffs' motions for alternative service. *Zobay*, ECF 180; *Lau*, ECF 87; *Long*, ECF 38. Upon challenge to that Order, on March 6, 2025, this Court affirmed the Magistrate Judge's ruling but on a different legal basis. *Zobay*, ECF 208; *Lau*, ECF 100; *Long*, ECF 77.

## LEGAL STANDARD

### A.    Standard of Review Under Rule 12(b)(5) for Lack of Proper Service of Process

On a Rule 12(b)(5) motion to dismiss, the plaintiff bears the burden of establishing that service of process was sufficient. See *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010). Service of process must be satisfied before a federal court may exercise personal jurisdiction over a defendant. *Buon v. Spindler*, 65 F.4th 64, 73 (2d Cir. 2023).

### B.    Standard of Review Under Rule 12(b)(2) for Lack of Personal Jurisdiction

Plaintiffs must assert non-conclusory allegations that are legally sufficient to establish a *prima facie* case of personal jurisdiction. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.

12

1990), *cert. denied*, 498 U.S. 854 (1990); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (pleadings that assert only "conclusory non-fact-specific jurisdictional allegations" or state a "legal conclusion couched as a factual allegation" do not meet plaintiffs' burden).

### C.    Standard of Review under Rule 12(b)(6) for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility"—*i.e.*, "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

A court may consider only well-pleaded factual allegations and must ignore "legal conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). A court must disregard "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement.'" *Pension Benefit Guar. Corp.*, 712 F.3d at 717 (citation omitted). Further, "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation omitted).

Determining whether inferences drawn from specifically alleged facts are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Mastafa*, 770 F.3d at 177 (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). Furthermore, when a document relied on in the complaint contradicts allegations in the complaint, the document controls, and the court need not accept the allegations in the complaint as true. *See Allah v. City of New York*, No. 15-CV-6852 (CBA), 2019 WL 6875410, at *5 (E.D.N.Y. Dec. 17, 2019).

13

## ARGUMENT

### I.    This Court Lacks Personal Jurisdiction over ZTEC

Plaintiffs cannot satisfy the requirements necessary for the Court to exercise personal jurisdiction over ZTEC. "To exercise personal jurisdiction lawfully, three requirements must be met. First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327–28 (2d Cir. 2016) (citation and quotations omitted).

As to the first requirement, ZTEC incorporates and fully preserves the arguments in its prior briefing on Plaintiffs' motions for alternative service and on ZTEC's objections to Magistrate Judge Scanlon's alternative service orders. *See Zobay*, ECF 161, 187, 201; *Lau*, ECF 81, 88, 95; *Long*, ECF 27, 48, 66. ZTEC maintains that service on U.S. counsel is not procedurally proper in this case, and therefore the Operative Complaints should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure for insufficient service of process, as well as lack of personal jurisdiction under Rule 12(b)(2). *See, e.g.*, *Mhina v. Bank of Am., N.A., Corp.,* No. 23-96-CV, 2023 WL 6873045, at *2 (2d Cir. Oct. 18, 2023) (affirming Rule 12(b)(5) dismissal because plaintiff did not serve defendants, "instead, he served an attorney who was not authorized to accept service on their behalf"); *Convergen Energy LLC v. Brooks*, No. 20-CV-3746 (LJL), 2020 WL 4038353, at *9 (S.D.N.Y. July 17, 2020) ("if service is to be made on an agent of a foreign company in the United States, that agent must be 'authorized by appointment or by law to receive service of process.' Thus, Plaintiffs cannot serve the Spanish Corporate Defendants through their U.S. counsel.").

But even if service was procedurally proper under New York law, Plaintiffs must still satisfy the second and third requirements for lawful exercise of personal jurisdiction: a statutory basis that renders the chosen method of service effective; and compliance with constitutional due process. This Court found service on U.S. counsel "proper under Fed. R. Civ. P. 4(e)(1) and (h)(1)(A) applying New York C.P.L.R. §§ 308 and 311." *Zobay*, ECF 208 at 2. Thus, as noted by the Court, Fed. R. Civ. P. 4(k)(1)(A) is the relevant provision of Rule 4(k) for which Plaintiffs must demonstrate a statutory basis for jurisdiction. *See id.* at 10 (stating that Rule 4(k)(1)(A) "provid[es] for jurisdiction based on service according to state law"). Thus, per Rule 4(k)(1)(A), Plaintiffs must show that jurisdiction is authorized by New York's long-arm statute and satisfy the due process requirements of the Fourteenth Amendment. *See Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, 94 (1st Cir. 2022) ("Rule 4(k)(1)(A) . . . make[s] the due process standard of the Fourteenth Amendment applicable to federal-question claims in federal court when a plaintiff relies on a state long-arm statute for service of the summons. Rule 4(k)(1)(A) requires looking to state law to determine whether service is effective to confer jurisdiction, and 'because state law is subject to Fourteenth Amendment limitations, the minimum contacts doctrine, while imposing no direct state-by-state constraint on a federal court in a federal question case, acts indirectly as a governing mechanism for the exercise of personal jurisdiction.'" (citations omitted)); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012) (applying Rule 4(k)(1)(A) and state long-arm statute invokes the "constitutional constraints . . . imposed by the Due Process Clause of the Fourteenth Amendment").

Here, Plaintiffs fail to sufficiently allege the facts necessary for personal jurisdiction to be authorized over ZTEC under New York's long-arm statute, and the Court's exercise of jurisdiction would not satisfy due process considerations under the Fourteenth Amendment.

15

A.      **Plaintiffs Have Not Demonstrated that Personal Jurisdiction Is Authorized by New York's Long-Arm Statute**

For the Court to exercise personal jurisdiction over ZTEC under New York's long-arm statute, Plaintiffs must adequately allege that (1) ZTEC "transacts any business" or "contracts anywhere to supply goods or services" in New York, and (2) that their claims arose "from that business activity." *See* N.Y. C.P.L.R. § 302(a)(1); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013). As to ZTEC's U.S. subsidiaries, the Court stated:

> Plaintiffs contend that ZTE transacts business in New York by: (1) selling cell phones and telecommunications equipment; (2) maintaining New York financial accounts that, on information and belief, ZTE utilized in furtherance of their scheme; and (3) entering into partnerships in New York to source materials for their cell phones, such as rugged glass fronts. None of these theories is availing.

*Lau*, 2023 WL 9066883, at *3 (citations omitted). This conclusion applies with equal force to ZTEC because as the Court noted, Plaintiffs' allegations about the ZTE Defendants' contacts with New York are "attributed to 'ZTE,'" generally, and do not set forth any ZTE-entity-specific contacts with New York. *Id.* Moreover, these "ZTE" New York contacts are not plausibly alleged, let alone "plausibly attributed" to ZTEC. *See id.* Nor are they sufficient to establish either general or specific personal jurisdiction.

First, Plaintiffs state that "ZTE does business in New York, including by selling cell phones and telecommunications equipment" but only points to the fact that "ZTE USA is registered to do business in the state of New York, and its Registered Agent is Incorp Services Inc. of Albany, NY." *Lau* AC ¶ 67. Plaintiffs do not allege (nor could they) that ZTEC is registered to do business in New York.[17] There are no other factual allegations related to the contention that ZTEC sells goods in New York. And even if there were allegations of ZTEC selling goods in New York, such

---

[17] In any event, registration to do business alone does not confer jurisdiction. *See Lau*, 2023 WL 9066883, at *3 (citing *Chufen Chen v. Dunkin Brands, Inc.*, 954 F.3d 492, 496 (2d Cir. 2020)).

allegations would not be sufficiently claim-related because Plaintiffs' theory of liability has nothing to do with ZTEC purportedly selling goods to New York consumers.

Second, Plaintiffs contend that "ZTE also maintains accounts with financial institutions, located in New York, which, on information and belief, ZTE utilized in furtherance of their scheme alleged herein." *Lau* AC ¶ 67. As this Court stated with respect to the U.S. subsidiaries, "Plaintiffs provide no specific factual support, asserting only that it is plausible that companies having business relationship with a New York company would maintain New York bank accounts." *Lau*, 2023 WL 9066883, at *3. The same is true for ZTEC, as Plaintiffs include no other factual allegations, specific to ZTEC or otherwise, to support the contention that ZTEC maintained financial accounts in New York. This is insufficient to allege a *prima facie* basis for personal jurisdiction. *See Brodie v. Green Spot Foods, LLC*, 503 F. Supp. 3d 1, 13 (S.D.N.Y. 2020) (plaintiffs must support 'on information and belief' allegations with "facts upon which that belief is founded"). Furthermore, even if Plaintiffs plausibly alleged that ZTEC maintained New York financial accounts, there are no factual allegations indicating that ZTEC utilized any such accounts in a claim-related way. The Factual Resume, Guilty Plea Agreement and OFAC Settlement, for instance, do not refer to any bank accounts used in furtherance of ZTEC's sanctions evasion, let alone accounts in New York. *See* Gopal Decl. Exs. B–D.

Finally, Plaintiffs allege that "ZTE" supposedly entered into partnerships with unidentified counterparties in New York "to source rugged glass fronts" for their cell phones, and to "assist" "ZTE" with enhancing the security features on its smartphones. *Lau* AC ¶ 67. These allegations are conclusory with no basis in fact and should not be credited. For instance, Plaintiffs do not provide a factual basis for who "ZTE" allegedly sourced glass fronts from or when. And to the extent Plaintiffs assert that "glass fronts" were part of the embargoed goods sent to Iranian

customers in violation of trade sanctions, the Factual Resume identifies the types of goods shipped by ZTEC by export control classification number ("ECCN"), and glass fronts were not identified therein. *Compare* Gopal Decl. Ex. B, at 30, 33 *with* 15 C.F.R. Pt. 774, Supp. 1. So even if this conduct was plausibly alleged with any basis in fact, this conduct is not sufficiently claim-related either. Plaintiffs simply cannot rely on speculation as a basis for personal jurisdiction.

## B.    Personal Jurisdiction over ZTEC Does Not Satisfy Fourteenth Amendment Due Process Requirements

Even if Plaintiffs could satisfy Rule 4(k)(1)(A) and the requirements of New York's long-arm statute, their allegations fail the due process test. Here, Plaintiffs must satisfy the due process considerations of the Fourteenth Amendment. *See Licci ex rel. Licci*, 673 F.3d at 59–60 (where personal jurisdiction rests upon Rule 4(k)(1)(A) and a state long-arm statute, "the relevant constitutional constraints are those imposed by the Due Process Clause of the Fourteenth Amendment"); *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 370–71 (3d Cir. 2022) ("[W]here the basis of personal jurisdiction in [a federal question] action in a federal court is specific personal jurisdiction established by serving process according to Federal Rule of Civil Procedure 4(k)(1)(A), every plaintiff . . . must demonstrate his or her claim arises out of or relates to the defendant's minimum contacts with the forum state.").

Constitutional due process considerations foreclose the Court's exercise of personal jurisdiction over ZTEC. The constitutional due process analysis consists of two parts: the "minimum contacts" inquiry and the "reasonableness" inquiry. *See Waldman*, 835 F.3d at 331. To satisfy the "minimum contacts" requirement, Plaintiffs must establish either general or specific jurisdiction over each defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The reasonableness inquiry then requires that the assertion of personal jurisdiction

over the defendant comport with "'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman*, 835 F.3d at 331 (citations omitted).

>  ***Minimum contacts***: Here, the Court has already found that ZTEC is a foreign company that is neither incorporated in nor maintains its principal place of business in New York (*see Zobay*, 695 F. Supp. 3d at 323 n.6), thus there is no general jurisdiction over ZTEC. Accordingly, Plaintiffs must demonstrate specific jurisdiction over ZTEC. Specific jurisdiction, or "case-linked jurisdiction," allows the court to exercise personal jurisdiction only if the defendant's in-state contacts "gave rise to the episode-in-suit." *Goodyear*, 564 U.S. at 923. Plaintiffs must allege "suit-related conduct" that "create[s] a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

>  Plaintiffs have not plausibly alleged any case-specific contacts with New York sufficient to establish personal jurisdiction over ZTEC. Plaintiffs do not plausibly allege that ZTEC transacted business in New York in a way that sufficiently relates to the claims in this lawsuit. Plaintiffs' other alleged "ZTE" New York contacts are insufficiently pled and do not relate to this lawsuit. Plaintiffs allege in conclusory fashion that "ZTE" "entered into major partnership and business deals in New York," such as a "partnership with the New York Knicks," and "typically announces new product offerings at events physically in New York." *Lau* AC ¶ 67. None of these purported contacts are related to the facts of this case. Plaintiffs also allege that the Southern District of New York U.S. Attorney's Office is "investigating ZTE with regard to potential bribes paid by ZTE," *see id.*, but again do not allege any relation to this case, as they must. *See Walden*, 571 U.S. at 284. Any remaining allegations about ZTEC's purported New York contacts that are assertedly related to this case are impermissibly conclusory, as discussed *supra*.

*Reasonableness*: In addition to the lack of minimum contacts, the exercise of personal jurisdiction here would not satisfy "traditional notions of fair play and substantial justice," *i.e.*, the reasonableness and fairness prong of the due process analysis. *See Waldman*, 835 F.3d at 331. Fair play and substantial justice requires, at a minimum, that the defendant reasonably anticipate "being haled into court" in the district in which suit is brought—thus, the district should have some reasonable connection to the lawsuit and the defendant. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Here, there is no such connection. *See Walden*, 571 U.S. at 284–85; *World-Wide Volkswagen Corp.*, 444 U.S. at 297. Personal jurisdiction therefore does not comport with due process.

## C.    Plaintiffs Cannot Rely on Rule 4(k)(1)(C) or Rule 4(k)(2) as a Basis for Jurisdiction

Because the Court authorized service pursuant to *state law*, neither Fed. R. Civ. P. 4(k)(1)(C) nor 4(k)(2) may authorize statutory jurisdiction over ZTEC. Thus, there is no basis to apply a "nationwide" contacts test and Plaintiffs must allege sufficient claim-related contacts between ZTEC and the state of New York for the Court to exercise personal jurisdiction over ZTEC.

First, Plaintiffs cannot invoke Rule 4(k)(1)(C)—i.e., statutory jurisdiction under the ATA's "nationwide service" provision, 18 U.S.C. § 2334(a)—because ZTEC was not served pursuant to the nationwide service of process provision. *See e.g.*, *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1350 (S.D. Fla. 2022); *Koken v. Pension Benefit Guar. Corp.*, 430 F. Supp. 2d 493, 498 (E.D. Pa. 2006); *General Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F. Supp. 2d 1335, 1340 (S.D. Fla. 2002). The ATA's nationwide service of process provision states that "[p]rocess in such a civil action may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). ZTEC was not served where it resides, where it is found or where it has an

20

agent. As the Court acknowledged, "black-letter law in New York law does not consider a defendant's lawyer his agent for service of process." *See Zobay*, ECF 208 at 9. So too has the Second Circuit rejected such a contention. *See, e.g.*, *Santos v. State Farm*, 902 F.2d 1092, 1094 (2d Cir. 1990); *Mhina*, 2023 WL 6873045, at *2.  Accordingly, this Court found that while Rule 4(k)(1)(C) does not apply, "it does not displace Fed. R. Civ. P. 4(k)(1)(A) (providing for jurisdiction based on service according to state law)." *Zobay*, ECF 208 at 10. As discussed above, the relevant forum for a minimum contacts analysis in accordance with Rule 4(k)(1)(A) is New York.

Second, Plaintiffs cannot invoke Rule 4(k)(2) because it only applies in federal question cases involving international service of process, not domestic service pursuant to state law, as this Court authorized. *See e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 942 (7th Cir. 2000) (noting that Rule 4(k)(2) "is meant to permit international service of process where statutes are silent" and provide the corresponding statutory basis for personal jurisdiction).

Rule 4(k)(2) was enacted in response to the U.S. Supreme Court's decision in *Omni Capital*, 484 U.S. 97, 111 (1987). In *Omni Capital*, the Court explained that "[a] narrowly tailored service of process provision, authorizing service on an alien in a federal-question case **when the alien *is not amenable to service* under the applicable state long-arm statute**, might well serve the ends of the CEA and other federal statutes." *Id.* (emphasis added). As the history behind Rule 4(k)(2) explains, the Rule 4(k)(2) "revision responds to [this] suggestion of the Supreme Court made in *Omni Capital*[.]" *Amendments to Federal Rules of Civil Procedure*, April 22, 1993 Committee Notes, 146 F.R.D. 401, 571. Indeed, the corresponding amendments to Fed. R. Civ. P. 4(f), authorizing international service, were intended to facilitate Rule 4(k)(2)'s authorization of

jurisdiction—and both provisions, operating in tandem, were meant to apply when a defendant "**cannot be served under any state law**." *See id.* at 567 (noting that a "secondary effect" of Rule 4(f) "is to facilitate the use of federal long-arm law in actions brought to enforce the federal law against defendants who **cannot be served under any state law** but who can be constitutionally subjected to the jurisdiction of the federal court. Such a provision is set forth in paragraph (2) of subdivision (k) of this rule, applicable only to persons not subject to the territorial jurisdiction of any particular state." (emphasis added)).

In sum, there is no statutory basis for personal jurisdiction over ZTEC under Rule 4(k)(1)(C) or Rule 4(k)(2). The relevant statutory provision that renders service of process pursuant to New York state law effective is Rule 4(k)(1)(A), which requires sufficient contacts with the state of New York. Accordingly, ZTEC should be dismissed for lack of personal jurisdiction due to Plaintiffs' failure to allege adequate claim-specific, New York contacts.

### D.    Even if a Nationwide Contacts Test Could Be Invoked, Personal Jurisdiction over ZTEC Does Not Satisfy Fifth Amendment Due Process Requirements

Even if the Court were to apply a U.S.-contacts test under the Fifth Amendment, the allegations against ZTEC do not sufficiently give "rise to the episode-in-suit." *Goodyear*, 564 U.S. at 923.[18]

Beyond the purported contacts with New York, which are neither sufficiently pled nor claim related, Plaintiffs allege that ZTEC has minimum, suit-related contacts with the United States in two ways. First, Plaintiffs allege that ZTEC "expressly aimed" or "targeted" the United States by "entering into transactions with fronts, operatives, and agents for the IRGC . . . that were

---

[18] Because ZTEC is a Chinese corporation with a principal place of business in China, (*Zobay* SAC ¶ 65), there is no general jurisdiction over ZTEC in the United States. *See Zobay*, 695 F. Supp. 3d at 323 n.6.

intent on harming United States nationals." *See Zobay* SAC ¶ 77; *see also id.* ¶ 1058. Second, Plaintiffs allege that ZTEC "reach[ed] into the United States" or availed itself of the benefits of the United States by "obtaining U.S.-origin technology and equipment for export to Iran" in violation of trade sanctions. *See id.* ¶ 77; *see also id.* ¶¶ 1056, 1059, 1089.

As this Court has already found, Plaintiffs' first theory, that ZTEC "targeted" the United States to harm Americans, is "foreclosed by" *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 95 (2d Cir. 2008). *See Zobay*, 695 F. Supp. 3d at 332 n.13 (citing *In re Terrorist Attacks*, 538 F.3d at 95 (provision of "indirect funding to an organization that was openly hostile to the United States does not constitute [the] type of intentional conduct" sufficient to show that a defendant "expressly aimed" intentional tortious acts at the forum)). Additionally, this theory is insufficiently pled because it relies on Plaintiffs' conclusory and inflammatory allegations that ZTEC was acting at the behest "of the Chinese Communist agenda" (*see Zobay* SAC ¶¶ 1059–1063, 1069–81), allegations the Court has already found were "conclusory" and "contradicted by other, more specific allegations 'suggesting that money—and not extremism—was the motivation behind defendants' actions.'" *Lau*, 2023 WL 9066883, at *8 n.7.

Plaintiffs' second theory, that "ZTE reached into the United States to acquire U.S.-sourced embargoed technology that it then provided to [TCI]" are not sufficiently related to Plaintiffs' alleged injuries. *Zobay* SAC ¶ 1089. As this Court stated with respect to MTN, Plaintiffs' theory "hinges on the connection between the [] sanction-evasion scheme, the IRGC, and money tunneled through that scheme to Hezbollah and other terrorist proxies who perpetrated the Attacks." *Zobay*, 695 F. Supp. 3d at 333. While the Court found this connection sufficiently pled with respect to MTN and its joint venture with SDGTs to form Irancell, the same conclusion should not be drawn for ZTEC and its arm's-length transactions with TCI. *See infra* at pp. 30–35. Furthermore,

Plaintiffs fail to allege specific facts establishing how the U.S.-sourced technology that ZTEC sold to TCI gave rise, or relates to, Plaintiffs' alleged injuries. Absent a plausible link between ZTEC's transactions and the IRGC's provision of support to the terrorists that injured the Plaintiffs, ZTEC's alleged U.S. contacts are not sufficiently claim related. *See, e.g.*, *Force v. Qatar Charity*, No. 20-cv-2578, 2025 WL 43163, at *5 (E.D.N.Y. Jan. 7, 2025). Here, there are no sufficient allegations that ZTEC provided Iranian infrastructure to TCI "in order to support terrorist activity" or that its provision gave rise to Plaintiffs' claims. *Id.* (citation omitted).

Further, the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice." Fair play and substantial justice requires, at a minimum, that ZTEC reasonably anticipate "being haled into court" in the forum. *See World-Wide Volkswagen Corp.*, 444 U.S at 297. Even when federal courts apply a U.S. minimum contacts test, the "reasonableness" prong of the Fifth Amendment due process test ensures that the "national contacts test" be "supplemented by some assurances that the particular choice of forum will be one that is fair to the defendant." *S.E.C. v. Softpoint, Inc*., No. 95 CIV. 2951 GEL, 2001 WL 43611, at *5 n.8 (S.D.N.Y. Jan. 18, 2001); *see also Peay v. BellSouth Medical Assistance Plan,* 205 F.3d 1206, 1211 (10th Cir. 2000) ("[D]ue process requires something more" than permitting the exercise of jurisdiction "as long as [defendants] have minimum contacts with the United States as a whole."); *Republic of Panama v. BCCI Holdings (Luxembourg),* 119 F.3d 935, 947 (11th Cir. 1997) (same). ZTEC would be unduly burdened by the Court's exercise of personal jurisdiction, as ZTEC has no presence in the United States, let alone in the Eastern District of New York. Thus, Plaintiffs' allegations fail to satisfy the Fifth Amendment due process test.

## II.    Pursuant to Rule 12(b)(6), the Operative Complaints Should Be Dismissed Because They Fail to State a JASTA Aiding-and-Abetting Claim Against ZTEC

Plaintiffs' aiding-and-abetting claims, premised on allegations derived from ZTEC's violation of sanctions, fail for at least five reasons. First, key allegations against ZTEC are pled improperly, without a sufficient basis in fact. Second, Plaintiffs do not plausibly allege that by transacting with TCI in Iran, ZTEC was generally aware that it was assuming a role in terrorist activities in Iraq, Afghanistan or Syria. Third, Plaintiffs do not plausibly allege that ZTEC provided knowing substantial assistance to the terrorist attacks. Fourth, Plaintiffs cannot establish that their injuries arose from an act of international terrorism "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization" at the time of the alleged attack, as required under 18 U.S.C. § 2333(d)(2). Fifth, Plaintiffs' claims are barred by the act of war defense.

Additionally, certain individual Plaintiffs fail to state a claim under the ATA because they are not U.S. nationals or direct family members of an individual killed or injured in an act of international terrorism.

### A.    Plaintiffs' Allegations Against ZTEC Are Improperly Group Pled, Alleged Upon Information and Belief, and Lack a Sufficient Factual Basis

Plaintiffs' conclusory allegations against ZTEC are improperly group pled, upon information and belief, with no plausible facts to support them. A plaintiff naming multiple defendants in a complaint must provide sufficient factual allegations to distinguish between each defendant's conduct. *See* Fed. R. Civ. P. 8; *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [plaintiff]'s complaint failed to satisfy [Rule 8's] minimum standard[.]"); *Zobay*, 695 F. Supp. 3d at 351(rejecting allegations against "Defendants" generally "without facts indicating that parallel conduct is properly attributed to the intra-corporate entity").

25

Imparting conduct from one defendant to another, absent sufficient factual allegations to do so, is improper. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 77 (2d Cir. 2022) (rejecting plaintiffs' use of "identical language to state the same conclusory allegations" against different defendants). And Plaintiffs may only "plead facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Pado, Inc. v. SG Trademark Holding Co. LLC*, 537 F. Supp. 3d 414, 423 (E.D.N.Y. 2021) (citing *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Generally, "[c]ourts in this Circuit look unfavorably upon conclusory pleadings made on information and belief[.]" *Brodie*, 503 F. Supp. 3d at 13. They are no better than mere "labels and conclusions" or "naked allegations[.]" *See In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 484 (S.D.N.Y. 2022), *aff'd sub nom. Watson Lab'ys, Inc.*, 101 F.4th 223 (2d Cir. 2024).

While certain allegations may have been plausibly alleged against certain Defendants, those allegations cannot simply be imparted onto ZTEC without a sufficient factual basis. Here, Plaintiffs fail to adequately plead that (1) ZTEC entered into a "security" agreement with the IRGC, (2) ZTEC was a "joint venturer" with the IRGC, (3) ZTEC made protection payments or provided free goods to terrorist groups, (4) ZTEC funded terrorist groups, and (5) ZTEC provided technical or logistical aid to terrorist groups.

First, Plaintiffs implausibly assert that ZTEC entered into an agreement with the IRGC to uphold its "security" (i.e., terroristic) objectives. *See Zobay* SAC ¶¶ 5, 10, 15, 21, 34, 40, 42, 47, 123, 202, 711, 718, 761, 770, 776, 824, 1004, 1059, 1061, 1064, 1081, 1492. But every one of these allegations are conclusory with no facts to support such a conclusion. *See id.* Rather, Plaintiffs contend "on information and belief" that ZTEC must have signed the agreement simply

26

because MTN signed such an agreement. *See id.* This is insufficient to plausibly establish that ZTEC signed a "security" agreement with the IRGC. *E.g.*, *Calcano*, 36 F.4th at 77; *Brodie*, 503 F. Supp. 3d at 13.

Second, Plaintiffs allege that all Defendants are "joint venturers" with the IRGC (*e.g. Zobay* SAC ¶¶ 11, 13, 21, 125, 918) but only factually allege that MTN Group was part of a joint venture with the IRGC, not ZTEC. Without factual allegations to support the conclusion that ZTEC was part of a joint venture with the IRGC, these allegations imparting conduct from another defendant are simply conclusory. Plaintiffs attempt to justify its improper group pleading by stating that MTN's alleged conduct "shows what the IRGC demanded of every corporate business partner in this space" and thus MTN's alleged conduct "offers a reasonable inference regarding the conduct of ZTE Corp. and Huawei Co., as well as that of their mutual business partner – the IRGC." *Id.* ¶ 44. But speculating that MTN is a representative of "every corporate business partner in this space" is simply a conclusion, not a plausible factual allegation.

Third, in conclusory fashion, Plaintiffs allege that ZTEC provided "protection payments" and "free goods" to terrorist groups. *See e.g.*, *Lau* AC ¶¶ 559, 570, 574; *Zobay* SAC ¶¶ 16, 21, 1519. But Plaintiffs fail to cite a *single* source supporting their speculation and several of their sources actually undermine their own allegations. Indeed, this Court has already found that "Plaintiffs do not plausibly allege that even ZTE Corp. provided free 'American-made cell phones' as protection payments to the Taliban. All allegations purporting to raise such an inference are either conclusory or speculative." *Lau*, 2023 WL 9066883, at *5. The same applies here to Plaintiffs' conclusory allegations that ZTEC provided "free goods" to other groups, also made "on information and belief." *Lau* AC ¶¶ 20, 789–91, 793. Like the Taliban-related allegations, these conclusory assertions are unsupported by any properly alleged facts. Plaintiffs' claims rely solely

27

on ZTEC's sanctions violation and nowhere in that investigation was ZTEC accused of providing free mobile phones or making protection payments to any group in Iran. *See* Gopal Decl. Exs. B– D.

Fourth, Plaintiffs do not plausibly allege that ZTEC funded any alleged group in Iran, Iraq, Afghanistan or Syria. Throughout the Operative Complaints, in group-pled fashion, Plaintiffs allege that Defendants paid "millions of dollars" to IRGC fronts. *See Zobay* SAC ¶ 1020; *see also id.* ¶¶ 11, 15, 16, 18, 21, 28, 43, 46, 48, 49, 52, 61, 125, 168, 710, 715, 1038, 1230, 1244, 1286, 1496, 1519. But there are no plausible allegations that ZTEC paid any Iranian entity. Rather, ZTEC *sold* telecommunications equipment to TCI. If anything, per Plaintiffs' theory, money would be paid to ZTEC, not to TCI or the IRGC. Plaintiffs do not provide any specific facts to support these threadbare allegations. *See Zobay*, 695 F. Supp. 3d at 352.

Fifth, Plaintiffs fail to plausibly allege that ZTEC provided "technical" or "logistical" aid to the IRGC or any terrorist group,[19] sourced "weapons" for any group, or provided technology to make weapons.[20] After a several-years-long investigation by the U.S. government, ZTEC was not even accused of providing technical or logistical (or any) aid or weapons to terrorists. Plaintiffs' allegations that "embargoed American technology" provided by ZTEC to TCI could be "reverse engineered" into making weapons are conclusory with not even an iota of factual support. *See e.g. id.* ¶ 1243. To be sure, Plaintiffs allege that the *IRGC* provided Hezbollah with "key components" and "bomb parts" for terrorist weapons, but Plaintiffs do not plausibly allege that such components or parts came from ZTEC or even from TCI. *See e.g.*, *id.* ¶ 1242. And, Plaintiffs' suggestion that the mere provision of cell phones to the largest telecommunications company servicing Iranian

---

[19] *See Zobay* SAC ¶¶ 10, 11, 18, 28, 48, 53, 123, 125, 710, 715, 1020, 1092, 1230, 1286.

[20] *See id.* ¶¶ 51–53, 61, 168, 646, 698, 715, 1018, 1022, 1061, 1092, 1232, 1242, 1243.

civilians (even if such allegations were factually supported) is akin to supplying the IRGC with means to create weapons, such a theory is insufficient to state a claim under the ATA. *See e.g., Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493, 499 (2023) ("cell phones" are used "for illegal—and sometimes terrible—ends," yet "we generally do not think that … cell service providers incur culpability merely for providing their services to the public writ large").

Stripping away Plaintiffs' improperly pled and conclusory allegations, the remaining allegations are taken directly from ZTEC's violation of trade sanctions, relating to ZTEC's transactions with TCI. *See Zobay* SAC ¶¶ 1002, 1005, 1007–16, 1025, 1026, 1033–35, 1082, 1087. Plaintiffs misrepresent even these allegations, too. Throughout the Operative Complaints, Plaintiffs allege that ZTEC pled guilty to violating trade sanctions for transacting with *the IRGC*. *See e.g.*, *id.* ¶¶ 1010–15, 1029, 1098. Not so. Nowhere in the Factual Resume, Guilty Plea Agreement or OFAC Settlement is the IRGC even mentioned. *See* Gopal Decl. Exs. B–D.

In sum, Plaintiffs cannot craft liability against ZTEC based on improperly pled, "on information and belief" conclusory allegations that are baseless.

### B.    Plaintiffs Do Not Plausibly Allege That ZTEC Was "Generally Aware" That It Was Assuming a Role in Terrorist Activities

Plaintiffs fail to satisfy the "general awareness" element of a JASTA aiding-and-abetting claim, which requires sufficient allegations that a defendant was "generally aware" it was playing a role in illegal activity from which the attacks that caused the plaintiffs' injuries were foreseeable. *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496, 499 (2d Cir. 2021). This means Plaintiffs must plausibly allege that ZTEC was "'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Given that ZTEC is not alleged to have interacted with any terrorist group directly, Plaintiffs must plausibly allege that "(1) [ZTEC] was

29

aware of [TCI]'s connection to the terrorist organization, and (2) [TCI] is 'so closely intertwined' with the terrorist organization's illegal activities that one can reasonably infer [ZTEC] was generally aware of its role in terrorist activities." *Zobay*, 695 F. Supp. 3d at 334, 337 (citing *Honickman*, 6 F.4th at 496–99).

Here, Plaintiffs fail to satisfy the "general awareness" element because Plaintiffs do not plausibly allege that TCI had a known connection to terrorism and was "so intertwined" with a terrorist group's violent activities so as to give rise to the inference that ZTEC was generally aware it was assuming a role in the terrorist activities that injured Plaintiffs by transacting with TCI. Plaintiffs' mere reliance on ZTEC's sanctions-evading transactions with TCI is not enough to establish general awareness.

      1.     <u>Plaintiffs Fail to Plausibly Allege that TCI Had a Known Connection to Terrorism or Was Publicly Deemed a Terrorist Front</u>

Plaintiffs fail to adequately plead that TCI was a known terrorist front or had a known connection to terrorists or terrorist activity.

The Second Circuit focuses the "general awareness" inquiry on whether a defendant's customer had a publicly-known affiliation or connection to the terrorist groups that planned, authorized or committed the attack that injured the plaintiffs. *See Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842, 862, 864 (2d Cir. 2021) (general awareness satisfied where defendant's customers were known "integral parts of Hizbollah" and "Hizbollah repeatedly publicized those relationships" on websites and in news media); *Honickman*, 6 F.4th at 499, 501 (plaintiffs' "limited public sources" failed to plausibly support an "inference that [defendant] was aware of the Three Customers' ties with Hamas"); *see also Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 867–69 (D.C. Cir. 2022) (allegations connecting the defendant's customer to Iran's support of terrorism

generally fail to support an inference that the defendant had general awareness it was playing a role in *al-Qaeda's* terrorist acts).

Here, Plaintiffs do not even attempt to allege that TCI had a known affiliation or connection to JAM, Hezbollah, the Taliban, the Haqqani Network, al-Qaeda, Lashkar-e-Taiba, Ansar al-Islam, ISIS, AQI or al-Nusra Front—who allegedly committed, planned or authorized the attacks in Iraq, Afghanistan and Syria that injured Plaintiffs. Rather, Plaintiffs only attempt to plead a known affiliation between TCI and the IRGC, which is insufficient. *E.g.*, *Honickman*, 6 F.4th at 499, 501. But even if it were sufficient, Plaintiffs also fail to plausibly allege that during the relevant period, TCI was a publicly-known IRGC front.

Unlike MTN and its relationship to Irancell, ZTEC's relationship to TCI was only as an arm's-length seller, not a business partner or joint venturer. *See Zobay*, 695 F. Supp. 3d at 341 (finding that the circumstances surrounding MTN's joint venture to form Irancell was "sufficient to put [MTN] on notice" of Irancell's IRGC connection). Accordingly, Plaintiffs must sufficiently allege that public news sources during the relevant period would have put ZTEC on notice of TCI's affiliation to the IRGC and its terrorist activities. Indeed, Plaintiffs have conceded that the general awareness analysis is markedly different for ZTEC than MTN. *Zobay*, ECF 121 at 28:18–29:3 ("I think the general awareness case actually differs a little bit by defendant. I think MTN is a very different case than the other two. Most of the briefing did focus on sort of publication-based awareness. . . But for our friends at MTN, the general awareness for them, the indicia, the circumstances of their engagement with the Iranian shareholders are themselves sufficient to put them on notice that . . . something untoward was afoot and that it had access to terrorism.").

Plaintiffs insist that a few news articles "alerted Defendants that TCI was a known IRGC front." *See supra* at pp. 5–7. Not so. Plaintiffs' sources are inconsistent and do not plausibly

establish a publicly-known link between TCI and the IRGC during the relevant time period. Indeed, public news during the relevant period described reports of a link between TCI and IRGC as "spurious," noting "[a]ny such connection is not immediately apparent from the information publicly available[.]"). *See supra* at p. 6. At most, a 2015 report alleged that the IRGC was affiliated with two companies that own, in part, a stakeholder that, in turn, owns 50% of TCI. *See id.* Thus, at best, Plaintiffs allege only that the IRGC was described to have been affiliated with the owners of a partial-owner of TCI. It is implausible for Plaintiffs to suggest that a couple of news articles describing the IRGC-affiliated consortium's ownership of one of TCI's shareholders should have alerted ZTEC that TCI, the largest telecommunications company in Iran, was really an IRGC front.

Contrary to the public sources discussing alleged IRGC "front" companies such as Bonyad Mostazafan, IEI and Irancell, Plaintiffs cite to no source linking TCI to terrorist activity. And Plaintiffs do not allege that TCI's owners were designated entities or publicly linked to terrorism activity either, unlike Irancell's owners. *See Zobay*, 695 F. Supp. 3d at 338–40 (noting that Irancell owner IEI was designated as an SDGT in 2008 and Irancell owner Bonyad Mostazafan was publicly linked to "arms" shipments to Iran and "supporting terrorism").

In fact, Plaintiffs' own sources explain that "TCI was never sanctioned by the U.S. or E.U." *See Lau*, ECF 57-2, Ex. E at 13. This lack of a designation is significant to the general awareness analysis as "the global business community looks to the U.S. Treasury for guidance" via its listed designations and thus "the international business community will presume that Iranian companies not listed are legitimate business partners." *Id*. at 20.

Contrary to Plaintiffs' conclusory allegations labeling TCI as a "sham" terrorist "front," Plaintiffs describe TCI as a publicly-traded company that has maintained a monopoly over the

telecommunications industry in Iran, which includes a monopoly over mobile phone services, landline telephone services, wireless services and data services in Iran. *See supra* at pp. 5–6. As Plaintiffs' source materials explain, "any mobile or fixed-line phone user in Iran" relies on TCI's infrastructure and "all internet traffic" is directed through TCI's infrastructure. *See id.* Thus, if anything, Plaintiffs' allegations more plausibly suggest that ZTEC had little reason to believe that it was transacting with a terrorist front or assuming a role in terrorist activities by engaging in transactions with TCI. *See e.g.*, *Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-CV-04400 (HG), 2022 WL 17993076, at *14 (E.D.N.Y. Dec. 29, 2022) ("Plaintiffs, however, provide no factual allegations supporting these bald conclusory statements that Defendants knew of the nexus between [alleged IRGC fronts] and the terrorist acts alleged in the Complaint. Again, 'mere conclusory statements[ ] do not suffice' to state a plausible claim that [defendant] was 'generally aware' of the alleged role [alleged IRGC fronts] played financing international terror." (citation omitted)); *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (finding defendant "had little reason to suspect that it was assuming a role in [] terrorist activities" by engaging in transactions with Saudi Arabia's largest bank).

The distinguishing factor is whether the defendant's customer is a legitimate entity with "connections" to terrorists or itself a "front" for a terrorist group. *See Zobay*, 695 F. Supp. 3d at 342 ("So, in <u>Bernhardt</u> and <u>Siegel</u>, the defendant bank had a customer, ARB, which had connections to integral persons within al Qaeda and fronts for al-Qaeda. But in <u>Atchley</u> and <u>Kaplan II</u>, defendant's customer (or business partner) was itself a front for a terrorist group"). This Court found that Plaintiffs alleged that the IRGC pursued stakes in the telecommunications sector for its own nefarious purposes but also cited "more specific sources that situate [MTN's customers] . . . within this context." *Zobay*, 695 F. Supp. 3d at 338. For example, news articles reported that the

33

Bonyad Mostazafan was a "safe haven for those who support terrorist groups," a longtime "front for the IRGC" and supporter of "terrorism and arms smuggling." *Id.* But here, Plaintiffs fail to sufficiently allege that TCI was a terrorist "front" company for the IRGC. At most, Plaintiffs plausibly allege that TCI was a legitimate company with an attenuated, non-terroristic affiliation to the IRGC.

> 2.    Plaintiffs Fail to Allege that TCI Was "So Intertwined" with Any Terrorist Group's Violent Activities

Even if Plaintiffs have adequately alleged that ZTEC was generally aware that TCI was connected to the IRGC, that alone would not be enough. Rather, Plaintiffs are required to plausibly allege both that TCI was a known terrorist front, *and* that TCI was so intertwined with the IRGC's violent terrorist activities. *See Zobay*, 695 F. Supp. 3d at 340 (requiring sufficient allegations that defendant's customer was a known IRGC front and customer was "so closely intertwined with IRGC's violent terrorist activities that one can reasonably infer that defendant was generally aware while it was" transacting with customer that it was playing a role in unlawful activities from which attacks were foreseeable) (alterations and citations omitted); *see also e.g.*, *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 230 (E.D.N.Y. 2020) (it is not enough that the defendant is alleged to have provided services to an organization that "supports terrorist organizations"; rather, the defendant "must be aware that through its own conduct, whether legal or illegal, it is assuming a role in actual terrorist activity"); *Siegel*, 933 F.3d at 225–26 (allegations that defendant serviced customer "despite knowing that [customer] supported terrorist organizations" is not sufficient to establish general awareness).

Here, there are simply no plausible allegations specifically linking TCI to the IRGC's (or any entity's) violent terrorist activities. And to the extent that the Court has deemed sufficient allegations tying a defendant's customer to "the military side of the IRGC," (*Zobay*, 695 F. Supp.

3d at 340), even those allegations are lacking with respect to TCI. Ultimately, Plaintiffs fail to plausibly link TCI to any terrorist activity, let alone sufficiently allege that TCI was so closely intertwined with the IRGC's violent terrorist activities such that one could infer ZTEC's general awareness of playing a role in unlawful activities from which the attacks were foreseeable.

> ### 3.    Plaintiffs Cannot Satisfy General Awareness by Alleging Sanctions-Evading Conduct with Iran

Given Plaintiffs' failure to link ZTEC's customer to any terrorist activity, Plaintiffs lean heavily on ZTEC's violation of trade sanctions to meet the general awareness requirement. But evading sanctions, without more, is insufficient to meet the general awareness prong.

It is well established that sanctions violations, even involving a state sponsor of terrorism, are not enough to establish general awareness under the ATA. *See e.g.*, *Wildman*, 2022 WL 17993076, at *7 (allegations that "a defendant to knowingly violate[d] laws which were designed to prevent terrorist activity" is not enough to establish general awareness (citations omitted)); *O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019*)* ("Allegations regarding Iran's status as a state sponsor of terrorism, as well as allegations regarding the purpose of U.S. sanctions are, on their own, insufficient to allege plausibly that Defendants were 'generally aware' that they had taken a 'role' in the attacks that killed or injured Plaintiffs."); *Freeman*, 465 F. Supp. 3d at 230 ("[I]t is not enough for a defendant-bank to be aware that its conduct violates the law—even one intended to prevent terrorism"); *see also Kemper*, 911 F.3d at 394 (transacting with Iran insufficient, rather facts "suggesting either an intent to support terrorism or a direct provision of services to terrorists," was required to create a sufficient link to establish liability under ATA). Because "sovereign nations invariably maintain legitimate government activities," alleging a defendant's awareness of Iran's support for terrorism is not enough to demonstrate a defendant's general awareness that its transactions with Iranian

entities would support other groups' terrorist acts without additional allegations closely connecting the defendant's customers to the "terrorist act or organization." *Bernhardt*, 47 F.4th at 868 (citation omitted).

ZTEC's violation of trade sanctions by conducting business with a legitimate Iranian company does not (and cannot) support the contention that ZTEC was generally aware that it assumed a role in every terrorist activity that was supported, in some way, by Iran and its IRGC. The Court should not be the first to accept this sweeping theory of liability.

\* \* \*

In sum, the Operative Complaints' failure to support a reasonable inference of general awareness by ZTEC "sounds the death knell of Plaintiffs' JASTA aiding-and-abetting liability action." *Honickman*, 6 F.4th at 503.

### C. Plaintiffs Do Not Plausibly Allege that ZTEC Provided Knowing Substantial Assistance to the Terrorist Attacks that Injured Plaintiffs

Under binding Supreme Court precedent, Plaintiffs must establish that ZTEC's transactions with TCI amount to knowing and substantial assistance to the terrorist attacks that injured Plaintiffs. *Twitter*, 598 U.S. at 484. JASTA aiding and abetting liability requires plaintiffs to prove that a defendant consciously and culpably associated itself with the underlying tort, participated in the underlying attacks as something that it wished to bring about, or sought to make the attacks succeed. *Twitter*, 598 U.S. at 493, 497–98. Further, "the focus must remain on the [attacks] for which plaintiffs seek to impose liability," requiring a sufficient nexus between a defendant's alleged assistance and each specific attack. *Id*. at 506. The intent and nexus standards are "twin requirements" that operate "in tandem, with a lesser showing of one demanding a greater showing of the other[.]" *Id.* at 491–92. These standards reflect the need and desire to "cabin aiding and abetting liability" and to prevent "boundless" and "overly broad liability," by requiring that

the secondary defendant have a sufficient relation to the harm with an intention to produce it. *Id.* at 488–91.

Additionally, to determine whether assistance is knowing and substantial, courts consider generally a six-factor test outlined in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See Linde*, 882 F.3d at 329 (citing 18 U.S.C. § 2333 Statutory Note). Those six factors are: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Id.* (citing *Halberstam*, 705 F.2d at 483–84). These factors are not to be taken as an "inflexible code[]" but rather should be analyzed flexibly to see whether a plaintiff's allegations "capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Twitter*, 598 U.S. at 497.

Here, Plaintiffs fail to plausibly allege that ZTEC provided knowing substantial assistance because (1) ZTEC is not plausibly alleged to have consciously and culpably participated in any terrorist attacks, (2) Plaintiffs fail to plead a sufficient nexus between ZTEC's transactions with TCI and the terrorist attacks that injured Plaintiffs, and (3) application of the *Halberstam* factors support dismissal.

           1.       <u>Plaintiffs Fail to Adequately Plead that ZTEC Consciously and Culpably Participated in Terrorist Attacks</u>

Plaintiffs fail to sufficiently allege that ZTEC consciously and culpably associated itself with, or participated in, any acts of international terrorism so as to help "make [them] succeed," as *Twitter* requires. *Twitter*, 598 U.S. at 493, 497.

Plaintiffs plead no specific conduct by ZTEC to infer an intent to make the terrorist attacks in Iraq, Afghanistan and Syria succeed. Nor do Plaintiffs allege conduct sufficient to infer that

ZTEC consciously and culpably associated itself with terrorist activity. While the Court found Plaintiffs' allegations against MTN sufficient, those facts are not plausibly alleged with respect to ZTEC. *See Zobay*, 695 F. Supp. 3d. at 346–47 (MTN allegedly entered into a joint venture with entities publicly linked to terrorism, signed a letter agreement with "militaristic-coded language" under circumstances suggesting a "sinister meaning," and MTN's Iran offices were allegedly "populated by military intelligence officials" (citations omitted)).

Plaintiffs rely primarily on the fact that ZTEC pled guilty to sanctions violations for its TCI transactions, but that is not enough to infer culpable and "conscious participation in the underlying [attacks]" that injured Plaintiffs. *See Twitter*, 598 U.S. at 492. This is especially true when Plaintiffs allege that ZTEC's intent was to profit by selling telecommunications infrastructure in Iran, not to further terrorist acts. *E.g.*, *Zobay* SAC ¶¶ 3, 12, 13, 47, 1062. Indeed, taking Plaintiffs' allegations as true, ZTEC's sanction-evasion "conduct was geared toward protecting itself from government interference," not furthering terrorism. *See Zobay*, 695 F. Supp. 3d at 353; *see also Wildman*, 2022 WL 17993076, at *7; *O'Sullivan*, 2019 WL 1409446, at *10; *Freeman*, 465 F. Supp. 3d at 230. Without more, Plaintiffs fall far short of adequately alleging that ZTEC culpably associated itself with the underlying terrorist attacks that injured the Plaintiffs or that ZTEC sought to make the attacks succeed.

Plaintiffs also fail to allege that ZTEC's provision of telecommunication infrastructure to the citizens of Iran is "culpable conduct" sufficient to infer terroristic intent. In *Twitter*, the Court held that the defendants' provision of social media platforms was not itself culpable conduct sufficient to suggest that defendants intended to associate themselves with the Reina attack. *Twitter*, 598 U.S. at 498–99 ("To be sure, it might be that bad actors like ISIS are able to use platforms like defendants' for illegal—and sometimes terrible—ends. But the same could be said

38

of cell phones, email, or the internet generally."). Here, too, Plaintiffs allege that ZTEC intended to "modernize telecommunications technology" by providing telecommunications equipment to Iran's largest telecommunications company, TCI, for use by millions of citizens across Iran. *See supra* at p. 4. Even if ZTEC's alleged assistance in providing telecommunications equipment to TCI ultimately made it easier for the IRGC to conduct its illegal activities, that alone cannot support liability. *Twitter*, 598 U.S. at 499 ("Nor do we think that such providers would normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones— even if the provider's conference-call or video-call features made the sale easier."); *Zobay*, 695 F. Supp. 3d at 353 (rejecting claims against Huawei U.S. where "the terrorist groups associated with Huawei Co.'s sanctions-evasion scheme incidentally benefitted as a result.").

There are ultimately no plausible allegations that ZTEC sold goods to TCI for the purpose of furthering terrorist activity or acted in any way sufficient to infer conscious and culpable participation in terrorist attacks. Accordingly, Plaintiffs try to fill the gap by lobbing hyperbolic, inflammatory and conclusory allegations about the "Chinese communist agenda." *E.g.*, *Zobay* SAC ¶¶ 47, 776, 1044, 1070–72, 1074, 1490; *see also id.* ¶ 18, 1059, 1062. It is implausible to assert that ZTEC, a global telecommunications provider, was furthering an alleged Chinese plot to kill U.S. military members and "inflict pain on Americans." *See id*; *see also id.* ¶ 1077. As the Court has already found, Plaintiffs' allegations about "the hostile security strategy of the Chinese Communist Party" are "conclusory" and "contradicted by other, more specific allegations 'suggesting that money—and not extremism—was the motivation behind defendants' actions.'" *Lau*, 2023 WL 9066883, at *8 n.7. Nowhere in the Operative Complaints are any facts found to support the inference that ZTEC had an intent to further terrorist activities or harm Americans abroad.

In sum, Plaintiffs fail to plausibly allege that ZTEC violated sanctions with the conscious and culpable intent of getting embargoed goods to terrorists, rather than improving Iranian infrastructure while motivated by profit.

2.     Plaintiffs Fail to Plead a Sufficient Nexus Between ZTEC's Assistance to TCI and the Terrorist Attacks in Iraq, Afghanistan and Syria

Plaintiffs fail to adequately plead a nexus between ZTEC's transactions with TCI and terrorist activity generally, let alone the specific terrorist attacks that injured Plaintiffs.

A JASTA claim requires sufficient allegations that a defendant aided another in the commission of the specific acts of international terrorism that injured the Plaintiffs. *Twitter*, 598 U.S. at 494–95. The Supreme Court explained that "the focus must remain on the tort itself" – on the act, not simply the "person" or entity receiving the assistance. *Id*; *see also id*. at 497 ("[B]ecause [plaintiffs] are trying to hold defendants liable for the Reina attack, plaintiffs must plausibly allege that defendants aided and abetted ISIS in carrying out *that attack*." (emphasis added)). Aid to the specific terrorist attack is required, and it is "not enough" to allege a defendant's "substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id.* at 495; *see also id.* at 503 ("plaintiffs' failure to allege any definable nexus between the defendants' assistance and that attack therefore—at minimum—drastically increases their burden to show that defendants somehow consciously and culpably assisted the attack.").

Plaintiffs have failed to plausibly allege a link between ZTEC's improvement of telecommunications infrastructure in Iran and the terroristic activities of more than a dozen terrorist groups in twenty-two provinces across Iraq, Afghanistan and Syria, deploying over a dozen different modes of attack that have no plausible relation to or reliance on telecommunications infrastructure in a different country. *See supra* at pp. 9–11. At best, Plaintiffs' sweeping theory is that ZTEC sold telecommunications infrastructure to TCI, which allowed TCI

40

to improve Iran's infrastructure, thereby enhancing the IRGC's technological abilities and generating profits that allegedly flowed to the IRGC—which the IRGC used to support terrorism in other countries in the world. But the fatal defect in Plaintiffs' theory is that any benefit purportedly received by the IRGC has no connection to the specific attacks at issue here, as opposed to the IRGC's general activities. Ultimately, the alleged relationship between ZTEC and the attacks is far too attenuated. *See Siegel*, 933 F.3d at 225; *Keren Kayemeth LeIsrael - Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1017 (D.C. Cir. 2023), *cert. denied sub nom. LeIsrael v. Educ. for a Just Peace in the Middle E.*, 144 S. Ct. 713 (2024) ("Appellants fail to allege that the funds that [defendant] provided to [its customer] were used to finance any terrorist attacks, much less that [defendant] was aware that it was happening."); *Wildman*, 2022 WL 17993076, at *15, *20, *22, *24, *26 (plaintiffs failed to allege that any defendant knowingly provided substantial assistance to the terrorist attacks as the allegations were "too attenuated" and "vague" to support a finding of substantial assistance).

Even accepting Plaintiffs' implausibly-pled allegations as true, Plaintiffs' theory is, at best, that ZTEC's conduct aided and abetted the IRGC's "transcendent enterprise" generally. *See, e.g.*, *Zobay* SAC ¶ 1478 (alleging that "ZTE" aided and abetted the attacks by modernizing Iranian telecommunications, providing U.S.-origin technology and generating revenue, which were used "*in furtherance of Hezbollah's terrorist enterprise*" (emphasis added)); ¶ 53 (alleging that Defendants provided "logistical and operational aid for the IRGC's, including its Hezbollah Division's and Qod Force's terrorist enterprise."); *see also id.* ¶¶ 46, 50, 127, 637, 647, 701, 705, 706, 721, 1019, 1024, 1059, 1092. However, the U.S. Supreme Court has rejected this theory. *See Twitter*, 598 U.S. at 494 ("'Enterprises' or 'conspiracies' alone are…not tortious" for purposes of JASTA).

41

Recognizing that the improvement of Iranian infrastructure in Iran has an insufficient nexus to the specific attacks, Plaintiffs desperately attempt to allege more direct forms of assistance. But the best that they can marshal are conclusory and speculative allegations that "ZTE" or "Defendants" made protection payments, provided free goods, provided monetary funding, and provided technical or logistical aid to the IRGC. As discussed *supra* at pp. 26–29, Plaintiffs fail to allege a sufficient factual basis to support these theories.

At bottom, Plaintiffs' aiding-and-abetting claims fail because, among other things, they do not plausibly allege a nexus between ZTEC's provision of telecommunications infrastructure to TCI and the terrorist attacks that injured Plaintiffs or their relatives.

### 3.    Application of the Halberstam Factors Also Support Dismissal

Applying the *Halberstam* factors as articulated in *Twitter*, Plaintiffs fail to allege that ZTEC provided knowing substantial assistance to the terrorist attacks that injured Plaintiffs.

**(1) *Nature of the Act Encouraged***:  This factor "requires assessing whether the alleged aid"—provision of telecommunications network infrastructure in Iran— "would be important to the nature of the injury-causing act"—terrorist attacks in Iraq, Afghanistan and Syria. *Honickman*, 6 F.4th at 500. As discussed, Plaintiffs do not sufficiently plead that the improvement of Iranian telecommunications *in Iran* would encourage, support or aid terrorist attacks in Iraq, Afghanistan or Syria. This factor weighs against finding that ZTEC's alleged assistance was substantial. *C.f. Zobay*, 695 F. Supp. 3d at 348–49.

**(2) *Amount of Assistance Given***:  To meet this factor, Plaintiffs must plead "[f]actual allegations that permit a reasonable inference that the defendant recognized the [goods and services it provided] to its customers would be received by the FTO." *Honickman*, 6 F.4th at 500; *Siegel*, 933 F.3d at 225 (finding factor not met where plaintiffs failed to plead nonconclusory allegations that perpetrator received any alleged assistance or that defendant knew or intended that perpetrator

would receive the assistance). In applying this factor, the Supreme Court explained that ISIS' ability to benefit from the defendants' platforms "was merely incidental to defendants' services and general business models; it was not attributable to any culpable conduct of defendants directed toward ISIS." *Twitter*, 598 U.S. at 504. The same is true here. Plaintiffs plead only that IRGC terrorists incidentally benefitted from ZTEC's assistance in "modernizing" Iran's telecommunications infrastructure. *See Zobay*, 695 F. Supp. 3d at 353 (noting that any terrorists "associated with Huawei Co.'s sanctions-evasion scheme incidentally benefitted"). They do not plead that ZTEC's conduct was "directed toward" the terrorists who injured the Plaintiffs.

As to amount, "plaintiffs failed "to allege how much (if any) of that money indirectly flowed" to the terrorist groups that perpetrated the attacks. *See Bernhardt*, 47 F.4th at 871. Plaintiffs explain the IRGC's sources of funding, yet TCI is not mentioned as a significant source of cash flow, like other alleged "fronts" are. *See e.g.*, *Zobay* SAC ¶ 38 ("Cash flow from the telecom company Irancell was either the largest or second largest source of cash flow from any IRGC front and caused hundreds of millions per year to flow to the IRGC"); *see also id.* ¶ 891. Thus, this factor does not lend support to ZTEC's assistance being substantial.

**(3)** ***Presence or Absence at the Time of the Tort***: Plaintiffs do not allege that ZTEC or any of its employees or representatives were "present" at any of the attacks. Nor do Plaintiffs allege any direct involvement with the perpetrators of the attacks at any time, let alone at the time of the attacks. *See Bernhardt*, 47 F.4th at 871–72. While the Court stated that it could potentially find MTN to be "'transactionally' present" because of its involvement with Irancell up to and through the time period of the attacks (*Zobay*, 695 F. Supp. 3d at 350), the same conclusion should not be drawn for ZTEC given the significant distinctions between the parties' respective relationships with distinct Iranian entities.

43

**(4)** ***No Direct Relationship to the Principal***: In applying this factor, the U.S. Supreme Court emphasized that Twitter had a mere "arm's-length relationship with ISIS." *Twitter*, 598 U.S. at 504. Here, there is far greater attenuation, because ZTEC's arm's-length relationship was with TCI, not any terrorist group. Indeed, Plaintiffs do not attempt to allege that ZTEC had an arm's-length relationship with any "principal"— i.e., JAM, the Taliban, the Haqqani Network, al-Qaeda, Lashkar-e-Taiba, Ansar al-Islam, ISIS, AQI and al-Nusra Front. Nor could they.

The Second Circuit has affirmed dismissal of secondary liability claims where, as here, the defendant's relation to the principal was "several steps removed." *Honickman*, 6 F.4th at 501 (discussing *Siegel*, 933 F.3d at 220-21). In *Siegel*, the defendant did business with a bank whose customers were allegedly tied to terrorism. 933 F.3d at 224. The Second Circuit reiterated in *Honickman* that "the relationship between the defendant and the FTO [committing the attack] should not be so attenuated as in *Siegel*." *Honickman*, 6 F.4th at 501. Here, as discussed *supra*, the allegations are more attenuated than in *Siegel*. *See also Bernhardt*, 47 F.4th at 872 (plaintiffs failed to allege a connection between defendants and al-Qaeda "sufficient to infer any relationship, much less a close one"); *c.f. King v. Habib Bank Ltd.*, No. 20 Civ. 4322 (LGS), 2022 WL 4537849, at *1 (S.D.N.Y. Sept. 28, 2022) (defendant provided banking services to "notorious terrorists" like Osama bin Laden and Jalaluddin Haqqani, as well as known al-Qaeda fronts).

| Case | Alleged Connection Between Defendant and Perpetrators of the Attacks | D's Customer's Connection to Terrorist Activity Publicly-Known? | Aiding & Abetting Adequately Pled? |
|------|------|------|------|
| *Kaplan* | Defendant → customers were "integral parts" of Hezbollah | Yes | **Yes** |
| *Bartlett* | Defendant → "alleged Customers include Hezbollah itself" | Yes | **Yes** |
| *King* | Defendant → customers were "notorious terrorists" | Yes | **Yes** |
| *Siegel* | Defendant → ARB → al-Qaeda & AQI | Yes | **No** |
| *Honickman* | Defendant → SDGTs → Hamas | No | **No** |
| *Bernhardt* | Defendants → Iranian companies → IRGC → QF & Hezbollah → al-Qaeda | No | **No** |
| *Freeman* | Defendants → Iranian entities → IRGC→ Hezbollah | No | **No** |
| *Wildman* | Defendants → Iranian "front" companies → IRGC → QF & Hezbollah → al-Qaeda, Taliban, Haqqani Network | No | **No** |
| *Zobay, Lau & Long* | ZTEC → TCI → IRGC → QF & Hezbollah → JAM, Taliban, Haqqani Network, al-Qaeda, LeT, Ansar al-Islam, ISIS, AQI, al-Nusra Front | No | **No** |

*See Kaplan*, 999 F.3d at 862; *Bartlett v. Societe Generale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *10 (E.D.N.Y. Nov. 25, 2020); *King v. Habib Bank Ltd.*, 2022 WL 4537849, at *1; *Honickman*, 6 F.4th at 491–92; *Siegel*, 933 F.3d at 224–25; *Bernhardt*, 2022 WL 4074415, at *3; *Freeman*, 465 F. Supp. 3d at 231; *Wildman*, 2022 WL 17993076, at *14.

**(5) *State of Mind***:  Plaintiffs must also plausibly allege that "ZTE" "knowingly assumed a role in [JAM, the Taliban, the Haqqani Network, al-Qaeda, Lashkar-e-Taiba, Ansar al-Islam, ISIS, AQI and al-Nusra Front's] terrorist activities or otherwise knowingly or intentionally supported [them]." *Siegel*, 933 F.3d at 225. In applying this factor, the *Twitter* Court determined that the Ninth Circuit erred by not giving greater weight to the defendants' "lack of intent to support ISIS." *Id*. at 504–05. Here, like in *Twitter*, no such intent was plausibly pled or can be reasonably inferred by ZTEC. Plaintiffs fail to allege that ZTEC "knowingly or intentionally" supported terrorists. To

the contrary, Plaintiffs' allegations are that "ZTE" was driven by commercial motives. *See, e.g.*, *Zobay* SAC ¶ 707 (Defendants had an "insatiable appetite for Iran's telecom market," because "Iran offers a unique opportunity for telecommunications investors'"); ¶ 1062 ("ZTE's primary motivation . . . was financial"). Plaintiffs attempt to overcome this deficiency with vague, implausible allegations that "ZTE's" intent or purpose was to harm Americans generally. *See, e.g.*, *id.*, ¶ 1062. But as discussed, there is no factual support for the offensive, conclusory assertion that ZTEC, one of the world's largest telecommunications companies, intended to harm Americans or intended for any terrorist attacks to occur in Iraq, Afghanistan and Syria against American service people.

(6) *Period of Assistance*: This final factor also weighs against the finding of knowing substantial assistance. Plaintiffs allege that ZTEC transacted with TCI from 2010 to 2016, but there are no factual allegations as to when, how, or in what quantity any telecommunications equipment shipped to TCI allegedly flowed to terrorist groups in Iraq, Afghanistan or Syria, or when the TCI network infrastructure was allegedly implemented and operational in Iran. And while Plaintiffs allege that the IRGC indirectly profited from ZTEC's transactions with TCI, they fail to allege when, if at all, of those alleged profits flowed from ZTEC's transactions. The 2010 to 2016 time period cannot be construed as the "period of assistance" relevant to the terrorist attacks absent those factual allegations. *See e.g.*, *Bernhardt*, 47 F.4th at 872 (finding that a "lengthy financial relationship" did not equate to "terrorism assistance" where defendants' "years-long relationship" was with institutions with "legitimate operations and uncertain ties to al-Qaeda").

In sum, none of the six *Halberstam* factors support the conclusion that ZTEC provided knowing substantial assistance to the terrorist attacks that injured Plaintiffs.

**D.    Plaintiffs Fail to Plead that Each Attack Was "Committed, Planned, or Authorized" by a Designated FTO**

A JASTA claim is available only where it arises from an act of international terrorism that was "committed, planned, or authorized" by an entity designated by the Secretary of State as a foreign terrorist organization ("FTO") at the time of the alleged act. 18 U.S.C. § 2333(d)(2). Many Plaintiffs' claims fail under this pleading requirement because the attacks that give rise to the claims are not specifically alleged to have been committed, planned or authorized by a designated FTO.

The Court found that Plaintiffs alleged that "Hezbollah, al-Qaeda or the Haqqani Network" planned or authorized the attacks that were committed by non-FTOs like JAM and the Taliban. *Zobay*, 695 F. Supp. 3d at 335. But for many attacks, Plaintiffs rely entirely on unsupported "information and belief" allegations, or Plaintiffs' attack-specific allegations contradict that finding. For example, for the April 29, 2017 IED attack, Plaintiffs allege "upon information and belief" that attack was "either committed by Ansar al-Islam and al-Qaeda, or alternatively, by ISIS," but assert no facts to support that belief. *See Zobay* SAC ¶ 1428 n.542; *Keren Kayemeth LeIsrael - Jewish Nat'l Fund*, 66 F.4th at 1016–17 ("Appellants' uncertainty about who perpetrated the incendiary attacks is fatal to their ability to plead that [defendant] aided and abetted those attacks.").

In *Lau*, while Plaintiffs blanketly allege that al-Qaeda (an FTO) planned and authorized every attack carried out by the Taliban (not an FTO), such conclusory allegations should be disregarded where Plaintiffs' attack-specific allegations omit any reference to al-Qaeda's or any other FTO's involvement.[21] *See Wildman*, 2022 WL 17993076, at *8; *Compare Lau* AC ¶ 1450

---

[21] These attacks took place in Afghanistan and were allegedly committed by the Taliban, or the Haqqani Network before it was designated as an FTO, and no other FTO involvement is mentioned at all (conclusory or otherwise) in the attack-specific allegations. *See Lau* AC ¶ 1131 (May 20,

("On January 5, 2016, the Taliban committed a complex attack against Americans in Helmand") *with* ¶ 1469 ("On July 3, 2017, the Taliban committed an indirect fire attack against Americans in Helmand, which was planned and authorized by al-Qaeda.").

The remaining attacks in *Zobay*, *Lau* and *Long* were allegedly (i) committed by a "joint cell" of various terrorist groups or (ii) committed by non-FTOs Jam, the Taliban or al-Nusra Front and Plaintiffs merely copy and paste the assertion that an FTO planned or authorized the attack. *See supra* at pp. 9–11. Plaintiffs' 'joint cell' or 'proxy' or 'Syndicate' theories are mere conclusory allegations that are meant to satisfy this FTO requirement and link Iran and the IRGC to virtually every single terrorist attack that occurred in Iraq, Afghanistan and Syria during the relevant period. Plaintiffs plead the FTO requirement using their own creative labeling and attempts at collapsing different terrorist groups together without sufficient basis in fact, but these allegations are often contradictory. *Compare Zobay* SAC, ¶ 1276 (the IRGC "includ[es]" Hezbollah and Qods Force) with ¶ 1275 (Hezbollah and Qods Force are part of the "IRGC Shiite Terrorist Proxies" that conspired with the IRGC); *compare id.* ¶ 362 (Taliban and Haqqani Network are "part of the same organization"), ¶ 374 ("the Haqqani Network and al-Qaeda are one") *with* ¶ 376 (Haqqani Network

---

2012 complex attack in Kandahar), ¶ 1139 (May 23, 2012 IED attack in Kandahar), ¶ 1144 (May 30, 2012 IED attack in Kandahar), ¶ 1149 (May 31, 2012 IED attack in Helmand), ¶ 1153 (June 12, 2012 IED attack in Helmand), ¶ 1157 (June 12, 2012 IED attack in Kandahar), ¶ 1162 (July 8, 2012 IED attack in Wardak), ¶ 1171 (July 13, 2012 IED attack in Zabul), ¶ 1176 (July 19, 2012 IED attack in Helmand), ¶ 1181 (July 22, 2012 IED attack in Logar), ¶ 1186 (July 22, 2012 insider attack in Logar), ¶ 1206 (August 16, 2012 helicopter attack in Kandahar), ¶ 1225 (September 15, 2012 complex attack in Helmand), ¶ 1234 (September 16, 2012 insider attack in Zabul), ¶ 1239 (September 17, 2012 IED attack in Kandahar), ¶ 1256 (October 13, 2012 small arms fire attack in Kunduz), ¶ 1261 (October 22, 2012 IED attack in Kandahar), ¶ 1274 (November 18, 2012 IED attack in Helmand), ¶ 1284 (February 22, 2013 IED attack in Helmand), ¶ 1299 (May 4, 2013 IED attack in Kandahar), ¶ 1320 (May 14, 2013 IED attack in Kandahar), ¶ 1334 (June 2, 2013 IED attack in Helmand), ¶ 1339 (June 18, 2013 rocket attack in Parwan), ¶ 1385 (October 6, 2013 IED attack in Kandahar), ¶ 1403 (February 15, 2014 IED attack in Helmand), ¶ 1408 (August 12, 2014 IED attack in Kandahar), ¶ 1440 (August 26, 2015 insider attack in Helmand), ¶ 1450 (January 5, 2016 complex attack in Helmand).

raised funds for Taliban and al-Qaeda). It is implausible for Plaintiffs to plead separate organizations "as one" or synonymous with each other, in hopes of circumventing the FTO requirement, while simultaneously explaining in detail how these organizations were designated separately and operated individually. *E.g.*, *Wildman*, 2022 WL 17993076, at *8 n.12 (rejecting plaintiffs' attempt to attribute attacks to "the Taliban (including its Haqqani Network)" or deem them "inseparable").

### E.   The Operative Complaints Should Be Dismissed Because Plaintiffs' Claims Are Barred by the Act of War Defense

The ATA provides a complete defense when the attacks result from an "act of war." *See* 18 U.S.C. § 2336(a). An "act of war" is defined as "any act occurring in the course of . . . armed conflict, whether or not war has been declared, between two or more nations[.]" § 2331(4) (emphasis added). Here, through their joint cell, proxy and syndicate theories, Plaintiffs' claims are premised on the theory that Iran aided every terrorist attack and Iran's fundamental "anti-American" objectives caused the attacks at issue, which brings the attacks into the scope of the act of war defense. *See, e.g.*, *Zobay* SAC ¶¶ 524, 544, 762, 763. If Plaintiffs' allegations are accepted as true, then Iran had a hand in every terrorist attack and the attacks were acts of war between the nations of Iran and the United States under the ATA. Thus, the claims are barred by Section 2331(4)(B).

Many *Lau* Plaintiffs were also plaintiffs in *Cabrera*, represented by the same counsel, and asserted that the country of Iran was responsible for each of these attacks at issue here.[22] Plaintiffs

---

[22] In fact, thirty-one Plaintiffs in *Lau* (representing six of the eleven bellwether attacks in *Cabrera*) prevailed in a default judgment against the country of Iran, successfully persuading the *Cabrera* court that Iran was responsible for the attacks at issue. *See Cabrera v. Islamic Republic of Iran*, No. 19-3835, D.E. 73 (D.D.C. July 19, 2022); *see also id.*, D.E. 48 (identifying the six overlapping bellwether attacks, seven families and thirty-one Plaintiffs: Ryan Gregory Timoney, Diane Timoney, Gregory Timoney (Ryan G. Timoney Family), Eric M. Hunter, Kenna Hunter, J.H., K.H., Betty Black, Joey Hunter Sr., Joey Hunter II, Nicholas Robinson IV (Eric M. Hunter

should be estopped from taking a contrary position and now arguing that Iran was not responsible for the attacks.

### F.    Individual Plaintiffs Fail to State a Claim Under the ATA

While Plaintiffs' claims should be dismissed for every Plaintiff, certain Plaintiffs cannot assert an ATA claim because they are not a U.S. national, or they are not a direct family member of an individual injured or killed in an act of international terrorism.

In *Lau*, Plaintiffs Tracey Prescott, Julia Steiner, L.S., and M.S are not U.S. nationals and thus cannot bring an ATA claim for their own alleged injuries. *See Lau* AC, Ex. B at 7, 11; *Lelchook v. Lebanese Canadian Bank*, No. 18-civ-12401 (GBD), 2024 WL 967078, at *9 (S.D.N.Y. Mar. 6, 2024); *Averbach v. Cairo Amman Bank*, No. 1:19-cv-00004-GHW, 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020).

In *Zobay*, Plaintiffs Cassandra Rzepa, Andrew Major, Ashley Major, Alyssa Major, and Alexis Grant cannot bring an ATA claim for their own alleged injuries because they fail to allege that they are direct family members or spouses of an individual killed or injured in an act of international terrorism, and there are no allegations that these Plaintiffs were the functional equivalent of direct family members either. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 02-CV-06977, 2023 WL 2711126, at *4 (S.D.N.Y. Mar. 30, 2023), *motion to certify appeal denied*, No. 02-CV-06977, 2023 WL 4281454 (S.D.N.Y. June 29, 2023) (only immediate family members and "functional equivalents" can bring an ATA claim). *Compare Zobay* SAC ¶¶ 1323, 1369–1371,

---

Family), Joelle R. Ellis, John F. Ellis, James Earl Ellis (Robert W. Ellis Family), Michelle Marie Fischbach, Chris Lee Zimmerman, Baily Zimmerman (Sonny C. Zimmerman Family), Kevin King, Stephanie Miller (Kevin King Family), Christopher Baldridge, E.B., L.B., S.B, Jessie Baldridge (Dillon C. Baldridge Family), April Angel Bays, Timothy Lee Bays, Brenda Griner, Lindsay Redoutey, Jasmin Bays (William M. Bays Family)).

1413 *with Lau* AC, Ex. B at 8–9 (including allegations that stepfamily members were functional equivalents of direct family members).

## CONCLUSION

For all these reasons, the Court should grant ZTEC's Motion to Dismiss the Operative Complaints.

Dated:  May 7, 2025                              Respectfully submitted,

                                                 **BLANK ROME LLP**

                                        By:  */s/ Frank A. Dante*
                                             Frank A. Dante (admitted *PHV*)
                                             Melissa F. Murphy (admitted *PHV*)
                                             Serena S. Gopal (admitted *PHV*)
                                             One Logan Square
                                             Philadelphia, Pennsylvania 19103
                                             (215) 569-5645
                                             frank.dante@blankrome.com
                                             melissa.murphy@blankrome.com
                                             serena.gopal@blankrome.com

                                             Martin S. Krezalek
                                             1271 Avenue of the Americas
                                             New York, NY 10020
                                             (212) 885-5130
                                             martin.krezalek@blankrome.com

                                             *Attorneys for ZTE Corporation*