UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
STEPHANIE ZOBAY, et al.,

Plaintiffs,

-against-

MTN GROUP LIMITED, et al.,

Defendants.
---------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
21-cv-3503 (CBA) (VMS)

**AMON, United States District Judge:**

Before me is the motion of Defendant MTN Group Limited ("MTN" or "Defendant") for reconsideration of my partial denials of its motions to dismiss in Zobay I (ECF Docket Entry ("D.E.") # 129 ("Zobay I")) and Zobay II (D.E. # 178 ("Zobay II")) pursuant to Federal Rules of Civil Procedure 54(b).[1] For the reasons set forth below, Defendant's motion to reconsider is denied.

## BACKGROUND AND PROCEDURAL HISTORY

I assume the parties are familiar with the extensive facts set out in Zobay I and Zobay II (collectively, the "Orders") as well as the procedural history of this case, but I briefly summarize the background relevant to the instant motion.

### I. The Orders

In February 2022, Plaintiffs filed their first amended complaint, alleging, inter alia, that MTN, a South African telecommunications company, aided-and-abetted certain terrorist groups in the commission of terrorist attacks in Iraq and Afghanistan between 2011 and 2019. (See D.E. # 52 ("FAC").). In September 2023, based on Twitter v. Taamneh, 598 U.S. 471 (2023), and the

[1] Subsequent references to my order in Zobay I refer to its page numbers as published in the Federal Supplement, Third Series. See Zobay v. MTN Grp. Ltd., 695 F. Supp. 3d 301 (E.D.N.Y. 2023).

law in the Second Circuit as it then existed, in Zobay I, I allowed Plaintiffs' first count, aiding-and-abetting liability for the Iraq attacks, to proceed against MTN. I explained that "Plaintiffs must plead three statutory elements: '(1) an injury arising from an act of international terrorism; (2) that the act was committed, planned, or authorized by a designated Foreign Terrorist Organization; and (3) that defendants aided or abetted an act of international terrorism by knowingly providing substantial assistance.'" Zobay I at 335 (quoting Atchley v. AstraZeneca UK Ltd., 22 F.4th 204, 216 (D.C. Cir. 2022)). The first element was not disputed. Id. I found the second element was satisfied because Plaintiffs sufficiently attributed the attacks to coalitions of Hezbollah, the Qods Force of the Islamic Revolutionary Guard Corps (IRGC), al-Qaeda, the Haqqani Force of the Taliban, and other terrorist groups. Id. at 335-36. Lastly, I found the third element was met under the framework set by Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), and Twitter. I found that Plaintiffs sufficiently pled general awareness because there was sufficient publicly available data suggesting that, at the time of the Irancell joint venture, the IRGC was looking to acquire U.S.-sourced technologies, which could advance its terroristic activities. Zobay I at 337-43.

I also found Plaintiffs alleged sufficient facts to show that MTN knowingly provided substantial assistance because: (1) the active provision of U.S. technologies and dollars to Irancell constituted the active and knowing provision of routine services in an unusual way, and that those proceeds could directly assist in the terrorist attacks in question; and (2) the pervasive, substantial assistance MTN provided the IRGC "could plausibly assist each and every IRGC-led terrorist attack." Id. at 345-48. This conclusion was bolstered by consideration of the factors identified in Halberstam, under which I found that MTN provided a large amount of technologies and money to the IRGC over a long period of time, supporting secondary liability. Id. at 348-51.

After I issued Zobay I, MTN requested leave to seek interlocutory appeal. (D.E. # 132.) However, Plaintiffs explained they wanted to amend their complaint to add a claim for aiding-and-abetting liability for the Afghanistan attacks based on a theory parallel to the one I allowed to proceed in Count One. (D.E. # 136.) I directed Plaintiffs to file their second amended complaint and for the parties to brief the interlocutory appeal issue, and I stayed consideration of the interlocutory appeal certification until after deciding whether to dismiss Plaintiffs' additional claim. (See Minute Entry dated Oct. 31, 2023 and Text Order dated May 13, 2024.) In September 2024, I denied MTN's motion to dismiss the fourth count of Plaintiffs' second amended complaint. See Zobay II. I explained that Plaintiffs' allegations that MTN deliberately shut down its cell towers to benefit the Taliban's resistance of U.S.-led coalition forces sufficed to show knowing and substantial assistance of the Taliban's terrorist activities. Id. at 6-13.

## II. Ashley

On July 21, 2025, the Second Circuit issued its decision in Ashley v. Deutsche Bank Aktiengesellschaft, 144 F.4th 420 (2d Cir. 2025). It dismissed a complaint against three bank defendants for aiding and abetting attacks by "the Syndicate," a joint venture of terrorists in Afghanistan and Pakistan. Id. at 428. First, the plaintiffs in that case alleged that Standard Chartered Bank ("SCB"), one of the defendant banks, aided and abetted the Syndicate by providing banking services to fertilizer suppliers ("the Companies"). Id. Plaintiffs alleged that the Companies' fertilizer was used to manufacture Syndicate bombs responsible for 80% of all American bomb casualties in Afghanistan, despite the fertilizer itself being made illegal in the country. Even with direct knowledge from the U.S. military that the bank's services were essential to the fertilizer companies' ability to support the terrorists' bomb campaign, SCB continued to provide financial services to the Companies. However, despite SCB's knowledge of its role in the

Syndicate's terrorist activities, the Second Circuit found that they were not liable under JASTA because the complaint did not allege that SCB provided knowing and substantial assistance to the Syndicate's terrorist activities by way of its banking relationship with the Companies. Id. at 439.

Second, the Ashley plaintiffs alleged that SCB aided the terrorists' money laundering operations by providing services to two entities that served as fronts to an "internationally infamous" terrorist money launderer. Despite actual knowledge that they had aided these fronts and knowledge that there were terrorism risks of continuing to support these customers, SCB continued to provide financial services that would benefit terrorists. The Second Circuit held that this was not enough: the court ruled that a money fungibility theory cannot be used to support aiding and abetting, because JASTA requires a connection to the violent activities of the terrorist group, not just that money flowed to the group itself. Id. at 444. Third, the panel held that VAT fraud allegations failed to sufficiently plead general awareness. Last, the Second Circuit dismissed claims that the Ashley defendants aided and abetted the "Taliban-al-Qaeda Campaign" because JASTA only provides relief for aiding and abetting "act[s] of international terrorism" and an overall campaign of terror is not an "act." Id. at 448.

## III. Defendant's Motion for Reconsideration

On September 29, 2025, two years after my original decision in Zobay I and two months after the Second Circuit's decision in Ashley, MTN filed a letter motion requesting a pre-motion conference for leave to file a motion for reconsideration of my Orders. (D.E. # 248.) I granted MTN leave to file a motion without a pre-motion conference, and on December 1, 2025, over 100 days after the Second Circuit's decision in Ashley, Defendant filed the instant motion on the docket, asking for reconsideration of Zobay I and Zobay II. (D.E. # 252 ("Mot.").) In its motion, MTN argues that Ashley represents an intervening change in the law, specifically altering the

"knowing and substantial assistance" analysis. It contends that there are key differences between the reasoning in Ashley and Zobay I which warrant reconsideration of my earlier Orders.

Plaintiffs respond on procedural and substantive grounds. Procedurally, they contend that the motion for reconsideration is untimely. (D.E. # 255 ("Opp.") at 1.) Substantively, they argue that nothing in Ashley undermines my conclusions in the Orders because (a) Ashley does not change the law, and (b) MTN's conduct was more conscious and culpable and less attenuated than the support in Ashley, which justifies the different outcomes. (Id. at 2-10.)

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 54(b), interlocutory decisions may be reconsidered "before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). "Reconsideration of a previous order by the Court is an extraordinary remedy to be employed sparingly." Ortega v. Mutt, No. 14-CV-9703 (JGK), 2017 WL 1968296, at *1 (S.D.N.Y. May 11, 2017) (quoting Anwar v. Fairfield Greenwich Ltd., 800 F. Supp. 2d 571, 572 (S.D.N.Y. 2011)). As such, reconsideration is limited to circumstances when there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotation marks and citation omitted). Whether to grant or deny a motion for reconsideration is "committed to the sound discretion of the district court." Abu Dhabi Com. Bank v. Morgan Stanley & Co., 888 F. Supp. 2d 478, 483 (S.D.N.Y. 2012) (citation omitted). In exercising this discretion, the court must be mindful that "a motion for reconsideration is not favored and is properly granted only upon a showing of exceptional circumstances." Nakshin v. Holder, 360 F. App'x 192, 193 (2d Cir. 2010) (internal quotation marks and citation omitted).

## DISCUSSION

### IV. Application of Ashley to the Orders

#### A. Reconsideration Standard

I do not find that the decision in Ashley merits the extraordinary remedy of reconsideration.[2] As discussed, reconsideration "is limited to circumstances when there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." Official Comm. of Unsecured Creditors of Color Tile, Inc., 322 F.3d at 167 (internal quotation marks and citation omitted). Defendant argues that Ashley represents an intervening change in controlling law. "[A] movant bears a substantial burden when urging the district court to depart from binding Second Circuit precedent on the basis of an asserted intervening change in controlling law." King v. Habib Bank Ltd., No. 20-CV-4322, 2023 WL 8355359, at *1 (S.D.N.Y. Dec. 1, 2023), motion to certify appeal denied, 2024 WL 3761821 (S.D.N.Y. Jan. 2, 2024) (citations omitted). "[T]he district court must follow Second Circuit precedent 'unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'" Id. (quoting United States v. Diaz, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015)). Although Ashley may have clarified Second Circuit case law and the

---

[2] Under Local Rule 6.3, notice of a motion for reconsideration must be filed and served within fourteen days after entry of the challenged order, "[u]nless otherwise provided by the Court." Local Civ. R. 6.3. A "strict application of Rule 6.3 would warrant denying [a motion filed after fourteen days] as grossly untimely" and as such, courts in this circuit routinely dismiss motions for being untimely if filed after this fourteen-day period. Palin v. New York Times Co., 482 F. Supp. 3d 208, 224 n.15 (S.D.N.Y. 2020), modified, 510 F. Supp. 3d 21 (S.D.N.Y. 2020); see also McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018) (collecting cases holding that "the untimeliness of a motion for reconsideration is reason enough to deny the motion"). As Plaintiffs note, the decisions for which MTN seeks reconsideration were both issued over a year (September 2023, September 2024) before MTN filed its motion, long after the fourteen-day deadline. (See Opp. at 1.) Under a strict interpretation of Local Rule 6.3, MTN's delay is therefore considered untimely. However, I will instead decide the instant motion on the merits.

application of Twitter in this circuit, it did not change the law nor does it cause me to alter any of my previous decisions.

**B. Specific Findings in Ashley**

The relevant part of the law that Ashley clarified relates to the "final requirement under the Halberstam framework . . . that the defendant provides knowing and substantial assistance." Ashley, 144 F.4th at 438. The "knowing and substantial" framework contains "twin requirements" that are "part of a single inquiry designed to capture conscious and culpable conduct." Id. (citing Twitter, 598 U.S. at 491, 504). A lesser showing of one part of the requirement demands a greater showing of the other. Id. "Knowing" assistance is "designed to capture the defendant['s] state of mind with respect to their actions and the tortious conduct." Id. (citing Twitter, 598 U.S. at 504). This means that the defendant "knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly." Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 864 (2d Cir. 2021). The "substantial" assistance part is based on the six-factor test in Halberstam. These factors "are a tool to identify participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." Ashley, 144 F.4th at 439 (internal quotation marks and citation omitted). This inquiry is "highly fact intensive" and "differs on a case-by-case basis," Id. at 438. Therefore, comparing the facts in Ashley to those I considered in Zobay I and Zobay II is illustrative.

In Ashley, the defendant became "generally aware" that its banking services would indirectly play a role in the use of bombs against Americans following a meeting with a representative from the U.S. military who informed them that they provided banking services for companies that were the source of the explosive material the terrorists used. Id. at 440. But "knowledge of one's role in terrorist activities by itself is insufficient to allege an aiding-and-

abetting claim." Id. The complaint in Ashley failed because it failed to allege that the defendant "consciously or culpably sought to make the [terrorists'] bombings succeed." Id. Furthermore, there was only a "tenuous connection between the banking services and the terrorist attacks [that was] not substantial." Id. In Ashley, the defendant merely provided routine banking services to the companies supplying terrorists, and unlike in Kaplan, there was no "special treatment" of the terrorists. Id. at 441 (citing Kaplan, 999 F.3d at 850, 866). Finding that the defendant only provided "peripheral assistance" to the companies that were providing the explosive material to the terrorists, the Ashley panel found that the plaintiff had a "higher burden to allege that [the defendant] was consciously trying to help or otherwise participate in the [terrorists'] wrongdoing." Id. at 441 (citing Twitter, 598 U.S. at 492). Because in Ashley, the "substantial" part of the "knowing and substantial" inquiry was so attenuated, it demanded that the "knowing" part require that the defendant "wanted to help the [terrorists'] bombmaking operation succeed by providing banking services to the [companies that supplied the explosive material]." Id.

**C. Reconsideration of Zobay I**

The sustained claims in Zobay I and Zobay II involved Defendant's activities with fronts for the IRGC and with the Taliban. As I explained in Zobay I, Defendant entered into a joint venture (Irancell) with the Iran Electronic Development Company ("IEDC") wherein Defendant had 49% ownership and the IEDC had 51% ownership. (D.E. # 142 ("SAC") ¶ 682.) The IEDC was made up of two shareholders: the Bonyad Mostazafan and Iran Electronic Industries; Plaintiffs allege that these were known fronts for the IRGC. (Id. ¶¶ 658-667, 675, 676.) When Defendant entered into the joint venture agreement, it stated that there would be "defensive, security, and political cooperation." (Id. ¶ 825.) Plaintiffs allege that "security" cooperation was understood

by Defendant to be a euphemism for terrorism, including against the United States. (Id. ¶¶ 47, 762-63, 769.) Leaked whistleblower documents revealed that the Defendant discussed circumventing U.S. sanctions to source American tech equipment for Irancell. (Id. ¶ 859.) Additionally, Irancell provided tens of millions of dollars annually in funding, weapons, and operational support to the IRGC and IRGC-backed groups like Hezbollah, which were used to attack Americans. (Id. ¶ 872.) In terms of the Afghanistan attacks, Plaintiffs allege that Defendant paid the Taliban protection payments to avoid attacks on its staff and network and that Defendant deactivated its cell towers at the Taliban's request. (Id. ¶¶ 926, 938.) Plaintiffs allege that the Irancell joint venture was involved in the Afghanistan attacks as well through the "indirect" financing of the Taliban's terrorist attacks. (Id. ¶ 1521.)

Defendant's activity in the Irancell venture, as alleged, amounted to affirmative misconduct – namely violating U.S. law to procure embargoed technologies that assisted terrorist campaigns as well as facilitating a steady flow of funds to the IRGC. Zobay I at 346-47. I previously found that Plaintiffs sufficiently pled that the Defendant's activities aided and abetted the ten Iraq Attacks, and in the alternative that the aid was so "pervasive and systemic" that it can be said that Defendant aided and abetted each IRGC-led attack during the period of assistance. Id. at 347-48 (citing Twitter, 598 U.S. at 502, 506). It is plausible that the materials Irancell provided were used in the Iraq attacks, providing a concrete nexus, and nothing in Ashley changed my determination that the aid was alternatively "pervasive and systemic." Id.

Defendant asks me to consider Ashley's finding that "in deciding whether there is a 'close nexus between the assistance and the tort,' 'it is not enough to say that the defendant assisted the terrorist organization's activities in general." (Mot. at 5 (citing Ashley, 144 F.4th at 439, 444). But in addition to the fact that a concrete nexus is plausibly alleged, Ashley left open an alternative

aiding-and-abetting theory that may be pursued when a concrete nexus to the particular attack is lacking. Here, Plaintiff alleges that Defendant aided and abetted a broad category of misconduct with participation that was so pervasive, systemic, and culpable that it can be said that Defendant aided every wrongful act. Ashley, 144 F.4th at 445 (citations omitted). The bank in Ashley did not reach that level of culpable aiding and abetting because: (1) it did not associate itself with the terrorists' operations or form a near-common enterprise with the terrorists; (2) it was at least one step removed from dealing with the terrorists; and (3) it merely "opened its doors to criminals with ties to terrorists" and treated them like normal customers. Id.

The conduct alleged here is distinguishable from that alleged in Ashley. In this case, Defendant is alleged to have literally entered into a joint venture with the IRGC fronts that provided funding, technology, and operational support which enabled the wrongful acts. (SAC ¶ 872.) Plaintiffs allege that Defendant's President and CEO executed the Irancell agreement "in the presence of one or more notorious IRGC terrorists." (Id. ¶ 102 (emphasis added).) Nor did Defendant merely open its doors to the IRGC or fronts connected to the IRGC and treat them like ordinary customers: it allegedly helped the IRGC source embargoed American technology that was "illicitly acquired in the U.S." and then provided them to IRGC-front counterparties to then be given to the terrorists. (Id. ¶ 716.) Additionally, Defendant "openly discussed circumventing U.S. sanctions to source American tech equipment" for Irancell. (Id. ¶¶ 859, 865.) This is not a case of Defendant simply opening its doors and treating the alleged IRGC fronts like ordinary customers: the consummation of a business opportunity with an ordinary customer does not require procuring embargoed technology and evading sanctions. This is similar to the facts in the Kaplan decision which the Second Circuit endorsed in Ashley. There, the bank treated the terrorists unlike

ordinary customers by violating sanctions laws and providing exemptions to obscure the substance of deposits. Ashley, 144 F.4th at 445 (citing Kaplan, 999 F.3d at 858, 865).

Defendant argues that Ashley rejects any reliance on a "money's fungibility" nexus theory under JASTA. (Mot. at 3; Ashley, 144 F.4th at 444 ("A fungibility theory would evade [the foreseeability principle] entirely.").) When analyzing the "pervasive and systemic" theory in Zobay I, I noted that Defendant is alleged to have "known that a significant portion of Irancell's annual profits would flow to the IRGC and ultimately be used to fund terrorist operations." Zobay I at 348 (citation omitted). However, that was just a single part of why I found that the alleged aid was "pervasive and systemic" – nothing in Ashley changes my consideration of the millions of dollars' worth of "embargoed dual-use technologies" and "operational or technical support" that constituted "pervasive and systemic" aiding-and-abetting. Id. at 348-49. Therefore, I find that there was no intervening change in the law after Ashley that warrants reconsideration of Zobay I.

**D. Reconsideration of Zobay II**

Zobay II follows a slightly different path. The allegations in Zobay II relate to Defendant's alleged support of the Taliban through issuing protection payments and deactivating cell phone towers at the Taliban's request. (SAC ¶ 1521.) There is also an allegation that the Irancell joint venture "indirectly financed the Taliban's terrorist attacks." (Id.) Although there is no direct link of the protection payments to any specific Afghanistan attack, the alleged act of deactivating cell phone towers at the Taliban's request remains a viable JASTA aiding-and-abetting theory.

I find that this theory was adequately alleged for the purposes of a motion to dismiss. Plaintiffs state that Defendant's "tower shutdowns substantially contributed to the Taliban's ability to commit the attacks that killed and injured Plaintiffs" and that despite U.S. and Afghan government requests for Defendant to stop, Defendant failed to do so. (Id. ¶ 948.) Although the

allegation that these tower shutdowns "substantially contributed" to the Afghanistan attacks is something that will eventually need to be proven by a preponderance of the evidence at trial, I find that this was plausibly alleged for the purposes of a motion to dismiss. Unlike the Iraq attacks, this assistance was not "pervasive and systemic," but viewing the inferences in the Second Amended Complaint in the light most favorable to Plaintiffs, I find that shutting down the cell towers would plausibly create a sufficient nexus to the Afghanistan attacks because it was substantial assistance that prevented the U.S. forces from stopping the attacks. This was allegedly done at the Taliban's behest. (Id. ¶ 942.) Similar to the sanctions and embargo evasion in Irancell, shutting down cell phone towers at the request of a known terrorist group can hardly be seen as business as usual. See Ashley, 144 F.4th at 443 (finding a strong case for conscious and culpable assistance where "special treatment" is provided). For these reasons, I find that there was no intervening change in the law after Ashley that warrants reconsideration of Zobay II.

**E. Factual Comparison to Other Recent JASTA Cases**

As a final note, none of the cases Defendant cites where JASTA aiding-and-abetting claims were dismissed involved conduct as direct as the conduct alleged in this case. Those cases involved "tangential assistance." See Twitter, 598 U.S. at 488 (finding that aiding-and-abetting liability should not apply to "those who only gave tangential assistance."). To start, Twitter involved allegations that social media platforms, which were open to any user, were used by ISIS to recruit new terrorists. Id. at 478. Ashley involved allegations that banks provided banking services for companies that supplied explosive materials to the terrorists. 144 F.4th at 427. Lafarge involved providing wrongful financial assistance to ISIS which could not be directly traced to any attacks. Finan v. Lafarge S.A., 22-cv-7831 (NGG) (PK), 2025 WL 2504317, at *20 (E.D.N.Y. Aug. 29, 2025). Fraenkel involved claims that the defendant, a bank, violated sanctions

by "moving money" for IRGC fronts. Fraenkel v. Standard Chartered Bank, 24-cv-4484 (MMG), 2025 WL 2773251, at *10 (S.D.N.Y. Sept. 26, 2025). Unlike the instant case, these cases involved financial assistance or providing routine services that treated the terrorists – or terrorist fronts – like any other customer.

One post-Ashley case Defendant did not cite is Moses v. BNP Paribas, S.A., where the defendant bank evaded sanctions and provided "millions of dollars to Iranian entities in industries controlled by the Terrorist Sponsors." 802 F. Supp. 3d 567, 588 (S.D.N.Y. 2025). As the court in Moses noted, the plaintiffs "narrowly, but plausibly, stated a JASTA aiding-and-abetting claim." Id. at 581. The allegations in Zobay I and Zobay II much more easily clear the hurdle than the allegations in Moses. Here, Defendant is alleged to have done more than just providing or enabling the flow of money. Defendant is alleged to have: shut down cell phone towers to allow the Taliban to operate without detection (SAC ¶ 948), provided operational and technological support for the IRGC (id. ¶ 843), provided weapons to Hezbollah, Jaysh al-Mahdi, and the IRGC (id. ¶ 872), and imported embargoed U.S. technologies for the specific purpose of flowing the technology to Iran where it knew it would only go to the IRGC, including Hezbollah and the Qods force (id. ¶ 863).

Ultimately, the JASTA aiding-and-abetting liability framework is "highly fact intensive" and flexible, requiring judgments to be made "on a case-by-case basis." See Ashley, 144 F.4th at 443; accord Twitter, 598 U.S. at 507 (Jackson, J., concurring) ("[T]he Court's view of the facts . . . properly rests on the particular allegations in those complaints. Other cases presenting different allegations and different records may lead to different conclusions."). Because my analysis in Zobay I and Zobay II was based on a careful reading of the allegations in the complaint, the Supreme Court's decision in Twitter, and circuit precedent that was not overruled in Ashley, I find that there was no intervening change in case law or clear error in my reasoning that would

necessitate the "extraordinary remedy" of reconsideration. Ortega, 2017 WL 1968296, at *1 (citation omitted).

## CONCLUSION

For these reasons, Defendant's motion for reconsideration is **DENIED**.

SO ORDERED.

Dated: September 25, 2026

Brooklyn, New York

/s/ Carol Bagley Amon

Carol Bagley Amon
United States District Judge